# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| LEE E. MOORE, | ) | CASE NO.  C-1-00-023 |
| | ) | |
| Petitioner, | ) | JUDGE DLOTT |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE MERZ |
| | ) | |
| BETTY MITCHELL, Warden | ) | |
| | ) | *DEATH PENALTY CASE* |
| Respondent. | ) | |

---

## PETITIONER'S BRIEF ON THE MERITS
## IN SUPPORT OF HIS PETITION FOR WRIT OF HABEAS CORPUS

---

**LAURENCE E. KOMP - 0060142**
**Trial Counsel**
**Attorney at Law**
**423 Madrina**
**Ballwin, MO 63021**
**Phone (636) 207 – 7330**
**Fax (636) 207 – 7351**
**LEAD COUNSEL FOR PETITIONER**

**MICHAEL J. O'HARA – 0014966**
**O'Hara, Ruberg, Taylor, Sloan & Sergent**
**25 Crestview Hills Mall Rd, Ste 201**
**P.O. Box 17411**
**Covington, KY 41017**
**Phone: (859) 331-2000**
**Fax: (859) 578-3365**
**CO-COUNSEL FOR PETITIONER**

# TABLE OF CONTENTS

I.    INTRODUCTION - PROCEDURAL HISTORY  . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

II.   RELEVANT FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.  ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

    AEDPA DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

    **FIRST GROUND FOR RELIEF** – FORMER ATTORNEY CHUCK STIDHAM
        SUFFERED FROM AN UNDISCLOSED, ACTUAL CONFLICT BY
        SIMULTANEOUSLY REPRESENTING PETITIONER AND HIS CO-
        DEFENDANT, JASON HOLMES, WHILE PREPARING AND
        INVESTIGATING PETITIONER'S MITIGATION DEFENSE IN VIOLATION
        OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. **6**

        *Strickland v. Washington*, 466 U.S. 668, 692 (1984). . . . . . . . . . . . . . . . **6**

        Mickens v. Taylor, 535 U.S. 162, 175 (2002)  . . . . . . . . . . . . . . . . . . . . . **7**

        Cuyler, 466 U.S. at 348 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

        Frazier v. Huffman, 343 F. 3d 780, 791 (6th Cir. 2003) . . . . . . . . . . . . . **11**

    **SECOND GROUND FOR RELIEF** – PETITIONER MOORE'S TRIAL COUNSEL
        RENDERED INEFFECTIVE ASSISTANCE AT THE MITIGATION PHASE
        BY (A) EMPLOYING A MITIGATION SPECIALIST WHO NEVER
        DISCUSSED SUBSTANTIVE MITIGATION ISSUES WITH PETITIONER
        MOORE AND FAILED TO ADEQUATELY ASSIST IN THE
        PREPARATION OF THE MITIGATION PHASE; (B) FAILING TO
        ADEQUATELY PREPARE FOR THE MITIGATION PHASE, DURING
        WHICH DR. CHIAPPONE, THE EXPERT OFFERED BY TRIAL
        COUNSEL, IMPEACHED PETITIONER MOORE'S ENTIRE LIABILITY
        AND MITIGATION CASE; (C) PRESENTED A HOPELESSLY
        INEFFECTIVE MITIGATION ARGUMENT WHICH ACTUALLY
        DAMAGED PETITIONER MOORE'S MITIGATION CASE AND FAILED
        TO EMPHASIZE PETITIONER MOORE'S YOUTH, REMORSE, AND
        PSYCHO SOCIAL BACKGROUND; AND (D) FAILING TO SEEK OR
        OFFER AN EXPERT TO TESTIFY AS TO THE EFFECTS OF
        EXTENSIVE ALCOHOL AND DRUG ABUSE ON PETITIONER MOORE.
        THIS INEFFECTIVE ASSISTANCE VIOLATED PETITIONER MOORE'S
        RIGHTS, INCLUDING HIS RIGHTS TO COUNSEL, NOT TO

INCRIMINATE HIMSELF, DUE PROCESS, EQUAL PROTECTION, A
FAIR PROCEEDING, AND A RELIABLE SENTENCE. . . . . . . . . . . . .  12

Strickland v. Washington, 466 U.S. 668, 687 (1984) . . . . . . . . . . . . . .  12

*Williams v. Taylor,* 529 U.S. 362, 407, 120 S. Ct. 1495 (2000) . . . . . . .  13

A.    Trial Counsel Employed a Mitigation Specialist Who Failed to
      Adequately Assist in the Preparation of the Mitigation Phase.
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

      *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999) . . . . . . . . . .  18

      Wiggins v. Smith, 539 U.S. at 524. . . . . . . . . . . . . . . . . . . . . . . .  20

      Magana v. Hofbauer, 263 F.3d 542 (6th Cir. 2001) . . . . . . . . . .  20

B.    Trial Counsel Failed to Adequately Prepare for the Mitigation
      Phase, During Which Dr. Chiappone, the Expert Offered by Trial
      Counsel, Impeached Petitioner Moore's Entire Liability and
      Mitigation Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

      Combs v. Coyle 205 F.3d 269, 288 (6th Cir. 2000) . . . . . . . . . . .  30

      Williams, 529 U.S. at 406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

      Wiggins, 539 U.S. at 523-528 . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

      Miller v. Anderson, 255 F.3d 455, 458 (7th Cir. 2001). . . . . . . .  32

C.    Trial Counsel Presented a Hopelessly Ineffective Mitigation
      Argument Which Actually Damaged Petitioner Moore's Mitigation
      Case and Failed to Emphasize Petitioner Moore's Youth, Remorse,
      and Psycho social Background. . . . . . . . . . . . . . . . . . . . . . . . . . .  32
      *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997). . . .  36
      *U.S. v. Cronic,* 466 U.S. 648, 656 (1984). . . . . . . . . . . . . . . . . .  37
      Combs v. Coyle 205 F.3d 287 . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

D.    Trial Counsel Failed to Seek or Offer an Expert to Testify as to the
      Effects of Extensive Alcohol and Drug Abuse on Petitioner Moore.
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

      *Caro v. Calderon*, 165 F.3d at 1226 . . . . . . . . . . . . . . . . . . . . . .  39

      Skaggs v. Parker, 235 F.3d 261, 271-272 (6th Cir. 2000) . . . . . .  39

*Powell v. Collins,* 332 F.3d 376,392 *et seq.* (6th Cir. 2003). . . . . 39

Strickland v. Washington, 466 U.S. at 687. . . . . . . . . . . . . . . . 40

Wiggins v. Smith 539 U.S. at 512. . . . . . . . . . . . . . . . . . . . . . 42

**THIRD GROUND FOR RELIEF** – MOORE'S ATTORNEYS RENDERED THE INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO REQUEST AN INTOXICATION INSTRUCTION AND FAILING TO SECURE THE ASSISTANCE OF A FORENSIC EXPERT TO CHALLENGE THE STATE'S THEORY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Strickland, 466 U.S. at 687. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Williams v. Taylor, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . 43

*Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir.1984) . . . . . . . . . . . . . . 43

Scott v. Mitchell, 209 F.3d 854, 881 (6th Cir. 2000) . . . . . . . . . . . . . . 44

*Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) . . . . . . . . . . . 44

A.    Did not present intoxication evidence. . . . . . . . . . . . . . . . . . . 45

B.    No request for involuntary intoxication . . . . . . . . . . . . . . . . . . . 45
      Combs v. Coyle, 205 F.3d 269, 288 (6th Cir. 2000) . . . . . . . . . 45

C.    Counsel failed to obtain the assistance of a forensic expert.
      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Ake v. Oklahoma, 470 U.S. 68, 76-78 (1985). . . . . . . . . . . . . . 46

Miller v. Anderson,  255 F. 3d 455, 459 (7th Cir. 2001) . . . . . . . 47

Mason v. Mitchell, 320 F. 3d 604, 615 (6th Cir. 2003) . . . . . . . . 47

Terry v. Rees, 985 F.2d 283, 284 (6th Cir. 1993) . . . . . . . . . . . . 48

**FOURTH GROUND FOR RELIEF**– ONE OF PETITIONER MOORE'S TRIAL COUNSEL CONTINUED TO REPRESENT HIM ON HIS INTERMEDIATE DIRECT APPEAL AND RENDERED INEFFECTIVE ASSISTANCE AT THIS STAGE BECAUSE HE HAD AN ACTUAL CONFLICT OF INTEREST AND BECAUSE HE FAILED TO RAISE MERITORIOUS

ISSUES.  THIS VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO COUNSEL, DUE PROCESS, EQUAL PROTECTION, AND A FAIR PROCEEDING. . . . . . . . . . . . . . . . . . . . . 48

**FIFTH GROUND FOR RELIEF** – JUDGE RUEHLMAN, THE TRIAL JUDGE, WAS NOT AN IMPARTIAL JUDGE AT TRIAL OR ON POST-CONVICTION, AS EVIDENCED BY HIS DESIRE TO HAVE PETITIONER MOORE EXECUTED IMMEDIATELY AFTER SENTENCING HIM TO DEATH, THUS VIOLATING PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHT TO AN IMPARTIAL TRIBUNAL, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AND A RELIABLE SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

A.    The Assignment of Judge Ruehlman was not Random. . . . . . . . 48

B.    The Trial Judge's Desire to Have Petitioner Moore Executed Immediately Without Providing Him with His State and Federal Appeals Showed His Actual or Apparent Bias Against Petitioner Moore and His Hostility to Petitioner Moore's Federal Constitutional Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986). . . . . . . 49
See Bracy v. Gramley, 520 U.S. 899 (1997). . . . . . . . . . . . . . . 49

C.    Judge Ruehlman's Conduct Throughout Petitioner Moore's Trial Showed His Actual or Apparent Bias Against Petitioner Moore and the Defense as Well as His Hostility to Petitioner Moore's Federal Constitutional Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

1.    During the pre-trial phase, Judge Ruehlman refused to permit Petitioner Moore's counsel to present evidence regarding the racial imbalance of the petit jury venire. . . . 51

2.    During *voir dire*, Judge Ruehlman refused to permit Petitioner Moore's counsel to fully explore the potential biases of the prospective jurors and denied Petitioner Moore's challenge to the prosecution's removal of an African-American woman from the jury. . . . . . . . . . . . . . . 52

3.    During the liability phase, Judge Ruehlman failed to promptly excuse a sleeping juror, improperly denied objections by Petitioner Moore's counsel, assumed that Petitioner Moore would be convicted, and improperly permitted the jury to conduct an experiment. . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

4.      The Trial Judge had Improper *Ex Parte* Contacts With Defense Expert and improperly permitted the prosecutors to urge the jurors to identify with the victim. . . . . . . . . . . . . 57

5.      During the post-conviction proceedings, Judge Ruehlman ruled upon Petitioner Moore's petition despite his earlier comments in this case calling for the elimination of the post-conviction process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

G.      Judge Ruehlman recently barred a member of the Ohio bar from practicing in his courtroom because he stated that he could not be fair to the lawyer based on the fact that the lawyer, an African-American, had been convicted of being an accomplice to an aggravated murder twenty-five years ago when he was sixteen years old. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

H.      Judge Ruehlman had an apparent or actual bias against Petitioner Moore and should have been recused or disqualified at trial and on post-conviction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

        *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986) . . . . . . . 61

        Bracy v. Gramley, 520 U.S. 899 (1997). . . . . . . . . . . . . . . . . . . 62

**SIXTH GROUND FOR RELIEF AND SIXTEENTH GROUND FOR RELIEF** (PET. PARA. 264)- AT THE MITIGATION PHASE, THE TRIAL COURT ERRONEOUSLY INSTRUCTED THAT THE JURY'S VERDICT HAD TO BE UNANIMOUS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . 62

McCleskey v. Kemp, 481 U.S. 279, 304 (1987) . . . . . . . . . . . . . . . . . . 64

*Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) . . . . . . . . . . . . 65

Mapes v. Tate, 388 F. 3d 187 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . 66

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . . . . . . . . . . . 66

Smith v. Texas, 125 S. Ct. 400 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 67

*Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999) . . . . . . . . . . . . . . . 69

Coe v. Bell, 161 F.3d 320 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . 70

Henderson v. Collins, 262 F.3d 615, 622 (6th Cir. 2001) . . . . . . . . . . . 70

*Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . 71

*Boyde v. California*, 494 U.S. 370, 380 (1990) . . . . . . . . . . . . . . . . . . 74

**SEVENTH GROUND FOR RELIEF** – PROSECUTORIAL MISCONDUCT AT
THE MITIGATION PHASE CLOSING ARGUMENT WAS IN VIOLATION
OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . 75

Boyle v. Million, 201 F.3d 711, 715 (6th Cir. 2000) . . . . . . . . . . . . . . . 78

*Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000) . . . . . . . . . . . . . . . 78

Combs v. Coyle, 205 F.3d 269, 292-293 (6th Cir. 2000) . . . . . . . . . . . 79

United States v. Young, 470 U.S. 1, 18 (1985) . . . . . . . . . . . . . . . . . . 80

Stringer v. Black, 503 U.S. 222, 232 (1992); . . . . . . . . . . . . . . . . . . . . 81

DePew v.Anderson, 311 F.3d 742 (6th Cir. 2002) . . . . . . . . . . . . . . . 82

Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997) . . . . . . . . . . . . 83

Bates v. Bell, -- F.3d --, 2005 U.S. App. LEXIS 4711 *36 (6th Cir. 2005)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

**EIGHTH GROUND FOR RELIEF** – MOORE RECEIVED INEFFECTIVE
ASSISTANCE OF COUNSEL IN HIS DIRECT APPEAL OF RIGHT TO
THE OHIO SUPREME COURT IN VIOLATION OF THE SIXTH, EIGHTH
AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . 87

*Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) . . . . . . . . . . . . . . . 87

Pennsylvania v. Finley, 481 U.S. 551 (1987) . . . . . . . . . . . . . . . . . . . 87
*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 88

1.    Moore's appellate counsel failed to consult with him prior to filing
his appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

*United States v. Cronic*, 466 U.S. 648 (1984), . . . . . . . . . . . . . 89

Freels v. Hills**,** 843 F.2d 958 (6th Cir. 1988) . . . . . . . . . . . . . . 90

2.    Moore's appellate counsel failed to present significant claims of
constitutional error. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Evitts, 469 U.S. 387. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

Jones v. Barnes, 463 U.S. 745, 751 (1983) . . . . . . . . . . . . . . . . 90

Penson v. Ohio, 488 U.S. 75 (1989) . . . . . . . . . . . . . . . . . . . . . . 91

Strickland, 466 U.S. at 687-688. . . . . . . . . . . . . . . . . . . . . . . . . . 92

**NINTH GROUND FOR RELIEF** – THE SELECTION OF THE GRAND JURY
FOREPERSON AND THE UNDER REPRESENTATION OF MINORITIES
AND WOMEN AS GRAND JURY FOREPERSONS IN HAMILTON
COUNTY VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS
RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR CROSS-
SECTION, AND A FAIR PROCEEDING.  . . . . . . . . . . . . . . . . . . . . . . . 94

Mitchell v. Rose, 570 F.2d 129, 133 (6th Cir.1978) . . . . . . . . . . . . . . . . 94

Castaneda v. Partida,430 U.S. at 494-495  . . . . . . . . . . . . . . . . . . . . . . 94

Aldridge v. Marshall 765 F.2d 63, 68 -69 (6th Cir. 1985). . . . . . . . . . . . 94

Mosley v. Dretke 370 F.3d 467, 477 (5th Cir. 2004) . . . . . . . . . . . . . . . 94

*Senter v. General Motors Corp.*, 532 F.2d 511, 529 (6th Cir.)  . . . . . . . . 95

Campbell v. Louisiana, 523 U.S. 392, 398 (1998) . . . . . . . . . . . . . . . . . 96

Jefferson v. Morgan, 962 F.2d 1185, 1189 (6th Cir. 1992)  . . . . . . . . . . 96

Castaneda v. Partida, 430 U.S. 482, 496 n.17 (1977) . . . . . . . . . . . . . 96

Rideau v. Whitley,  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

Whitus v. Georgia, 385 U.S. 545, 550 (1967)  . . . . . . . . . . . . . . . . . . . . 97

**TENTH GROUND FOR RELIEF.**  THE UNDER REPRESENTATION OF
MINORITIES IN THE GRAND JURY AND PETIT JURY VENIRE IN
HAMILTON COUNTY – INCLUDING PETITIONER MOORE'S PETIT
JURY VENIRE  – VIOLATED PETITIONER MOORE'S RIGHTS,
INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A
JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY,
AND A FAIR PROCEEDING.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
*Witherspoon v. Illinois*, 391 U.S. 510, 543 (1968). . . . . . . . . . . . . . . . 97

Batson v. Kentucky 476 U.S. 79, 95-96 (1986).  . . . . . . . . . . . . . . . . .  98

Taylor v. Louisiana, 419 U.S 522, 528 (1975  . . . . . . . . . . . . . . . . . . .  98

Smith v. Texas, 311 U.S. 128, 130 (1940)  . . . . . . . . . . . . . . . . . . . . .  98

Duren v. Missouri, 439 U.S. 357, 364 (1979)  . . . . . . . . . . . . . . . . . .  100

**ELEVENTH GROUND FOR RELIEF** – HAMILTON COUNTY'S
OVERPROSECUTION OF PEOPLE CHARGED WITH HOMICIDE
VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS
TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING,
AND A RELIABLE SENTENCE.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

**TWELFTH GROUND FOR RELIEF** -  PETITIONER MOORE WAS DENIED HIS
RIGHTS TO COUNSEL, DUE PROCESS, EQUAL PROTECTION, A FAIR
PROCEEDING, AN IMPARTIAL TRIBUNAL, A RELIABLE SENTENCE,
AND AN ADEQUATE CORRECTIVE PROCESS DURING HIS POST-
CONVICTION PROCEEDINGS.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

A.    Petitioner Moore's Representation During State Post-conviction
Proceedings Was So Inadequate and Lacking in Investigation and
Preparation as to Violate Petitioner Moore's Due Process and
Equal Protection Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

B.    JUDGE RUEHLMAN SHOULD HAVE RECUSED OR
DISQUALIFIED HIMSELF FROM PARTICIPATING IN THOSE
PROCEEDINGS DUE TO HIS BIAS AGAINST PETITIONER
MOORE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  101

Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986  . . . . . .  103

Bracy v. Gramley, 520 U.S. 899 (1997)  . . . . . . . . . . . . . . . . .  103

C.    The post-conviction process in Ohio is not an adequate corrective
process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  103

Coley v. Alvis, 381 F.2d 870, 872 (6th Cir. 1967)  . . . . . . . . . .  104

Allen v. Perini, 424 F.2d 134, 139 (6th Cir. 1970) . . . . . . . . . .  104

Young v. Ragen, 337 U.S. 235 . . . . . . . . . . . . . . . . . . . . . . . . .  105

**THIRTEENTH GROUND FOR RELIEF** – ERRORS DURING <u>VOIR</u> <u>DIRE</u>, INCLUDING THE PROSECUTORS' RACIALLY BIASED PEREMPTORY CHALLENGE OF AN AFRICAN-AMERICAN WOMAN, RESULTED IN A BIASED JURY THAT WAS ORGANIZED TO RETURN A DEATH VERDICT IN VIOLATION OF PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHT TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AN IMPARTIAL JURY, AND A RELIABLE SENTENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

      Lockhart v. McCree, 476 U.S. 162, 179 (1986) . . . . . . . . . . . 106

      Witherspoon v. Illinois, 391 U.S., at 519 . . . . . . . . . . . . . . . . 107

      Adams v. Texas, 448 U.S. 38 (1980) . . . . . . . . . . . . . . . . . . . 107

A.    Judge Ruehlman Erroneously Denied Trial Counsel's Unopposed Request for Individual <u>Voir</u> <u>Dire</u> on Death Penalty Issues . . . . 108
    *Morgan v. Illinois,* 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . 108

B.    The Prosecutors Committed Misconduct in Organizing a Jury to Return a Death Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

      *Wolfe v. Brigano* 232 F.3d 499, 503 (6th Cir. 2000) . . . . . . . . . 111

      Miller v. Webb, 385 F.3d 666, 675 (6th Cir. 2004). . . . . . . . . . 111

      Morgan v. Illinois, 504 U.S. 719 (1992) . . . . . . . . . . . . . . . . . 111

D.    The Prosecutors Used – and Judge Ruehlman Condoned – a Peremptory Challenge Against Prospective Juror Freeman, an African-American Woman, on the Basis of Her Race . . . . . . . . 112
    Adams, 448 U.S. at 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

**FOURTEENTH GROUND FOR RELIEF** – THE SENTENCERS BASED THEIR DECISIONS TO SENTENCE MOORE TO DEATH ON IMPROPER AND NON-STATUTORY AGGRAVATING FACTORS IN VIOLATION OF MOORE'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

      Gregg v. Georgia, 428 U.S. 153 (1976) . . . . . . . . . . . . . . . . . . . 114

      *Proffitt v. Florida*, 428 U.S. 242 (1976) . . . . . . . . . . . . . . . . . . . 114

      Sochor v. Florida, 504 U.S. 527, 532 (1992) . . . . . . . . . . . . . . . . 114

Stringer v. Black, 503 U.S. 222, 232, 235-36 (1992) . . . . . . . . . . . . . 114

A.  Improper prosecutorial argument. . . . . . . . . . . . . . . . . . . . . . 114

B.  Readmission of all culpability phase evidence. . . . . . . . . . . . . 115

C.  A Reasonable Juror Would Understand Instruction to consider "any other factors relevant to the issue of whether Petitioner Moore should be sentenced to death" as a basis to consider non-statutory aggravating circumstances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

Espinosa, 505 U.S. at 1081 . . . . . . . . . . . . . . . . . . . . . . . . . 117

Clemons, 494 U.S. at 752 . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Zant, 462 U.S. at 885. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

**FIFTEENTH GROUND FOR RELIEF** – THE SENTENCER FAILED TO GIVE ANY WEIGHT TO THE UNCONTRADICTED MITIGATING EVIDENCE PRESENTED BY MOORE IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

*Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) . . . . . . . . . . . . . . . 119

Lockett v. Ohio, 438 U.S. 586, 604 (1978) . . . . . . . . . . . . . . . . . . . 119

Woodson v. North Carolina, 428 U.S. 280, 303-04 (1976) . . . . . . . . 119

Wright v. Walls, 288 F.3d 937 (7th Cir 2002) . . . . . . . . . . . . . . . . . 121

Hicks v. Oklahoma, 447 U.S. 343, 346 (1980) . . . . . . . . . . . . . . . . 122

Paxton v. Ward, 199 F.3d 1197, 1220 (10th Cir. 1999) . . . . . . . . . . 122

**SIXTEENTH GROUND FOR RELIEF** – IMPROPER INSTRUCTIONS DEPRIVED MOORE OF HIS CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 124

Schad v. Arizona, 501 U.S. 624 (1991) . . . . . . . . . . . . . . . . . . . . . . 125

Richardson v. United States, 526 U.S. 813 (1999) . . . . . . . . . . . . . . 125

**SEVENTEENTH GROUND FOR RELIEF** – JUDGE RUEHLMAN ORDERED THE COURTROOM DOORS TO BE LOCKED IN VIOLATION OF

MOORE'S RIGHTS TO A PUBLIC TRIAL IN VIOLATION OF THE SIXTH
AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . . 126

Duncan v. Louisiana, 391 U.S. 145, 148-49 (1968) . . . . . . . . . . . . . 126

Waller v. Georgia, 467 U.S. 39, 49 n.9 (1984) . . . . . . . . . . . . . . . . . 126

Johnson v. United States, 520 U.S. 461, 469 (1997) . . . . . . . . . . . . 126

Walton v. Briley, 361 F.3d 431 (7th Cir. 2004) . . . . . . . . . . . . . . . . . 127

**EIGHTEENTH GROUND FOR RELIEF –** THE PROSECUTORS COMMITTED
MISCONDUCT AT THE PRE-TRIAL, VOIR DIRE, AND LIABILITY
PHASES OF PETITIONER MOORE'S TRIAL IN VIOLATION OF HIS
RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL
PROTECTION, A FAIR TRIAL, AN IMPARTIAL JURY AND JUDGE, AND
EFFECTIVE ASSISTANCE OF COUNSEL. . . . . . . . . . . . . . . . . . . . . 127

A.    During the Pretrial, the Prosecutors Had ex Parte Discussions with
Judge Ruehlman and Met with the Defense Expert. . . . . . . . . . 128

Lambert v. Blackwell 962 F.Supp. 1521, 1546 (E.D.Pa.,1997),
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

B.    During *Voir Dire,* the Prosecutors Organized a Jury to Return a
Death Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

Adams  448 U.S. 47-48. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

C.    During the Liability Phase, the Prosecutors Presented Testimony
from the Victim's Father in Order to Elicit Sympathy from the Jury,
Denigrated Petitioner Moore's Counsel, Encouraged the Jury to
Perform its Own Experiment, and Commented on Trial Counsel's
Failure to Present Expert Witnesses. . . . . . . . . . . . . . . . . . . . . 131
In re Beverly Hills Fire Litigation, 695 F.2d 207 (6th Cir. 1982)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

Payne v. Tennessee, 501 U.S. 808, 825 (1991) . . . . . . . . . . . 132

D.    During the mitigation phase, the prosecutors urged the sentencers
to identify with the victim and made other improper arguments.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

United States v. Francis, 170 F.3d 546, 550-551, 553 (6th Cir. 1999)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

xi

*United States v. Carroll,* 26 F.3d 1380, 1388 (6th Cir. 1994) . . . 133

Sizemore v. Fletcher, 921 F.2d 667, 670 (6th Cir. 1990) . . . . . . 134

United States v. Krebs, 788 F.2d 1166, 1177 (6th Cir. 1986) . . 134

Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) . . . . . . . . . 134

**NINETEENTH HABEAS GROUND** – PETITIONER'S STATEMENT WAS TAKEN FROM PETITIONER IN VIOLATION OF HIS RIGHTS UNDER FIFTH AND FOURTEENTH AMENDMENT. . . . . . . . . . . . . . . . . . . . 134

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . 134

Dickerson v. United States, 530 U.S. 428, 440 (2000) . . . . . . . . . . . 135

Haynes v. Washington, 373 U.S. 503, 513 (1963) . . . . . . . . . . . . . 135

Miller v. Fenton, 474 U.S. 104, 109-10, (1985) . . . . . . . . . . . . . . . . 135

Schneckloth v. Bustamonte, 412 U.S. 218, 223 (1973) . . . . . . . . . . . 136

Stein v. New York, 346 U.S. 156, 185 (1953) . . . . . . . . . . . . . . . . . 136

Hart v. AG, 323 F.3d 884 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 139

**TWENTIETH HABEAS GROUND** – MOORE'S REASONABLE DOUBT INSTRUCTION FAILED TO COMPORT WITH THE REQUIREMENTS UNDER THE FOURTEENTH AMENDMENT. . . . . . . . . . . . . . . . . . . . 140

Jackson, 443 U.S. at 315 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

In re Winship, 397 U.S. 358, 364 (1970 . . . . . . . . . . . . . . . . . . . . . . 140

Cage v. Louisiana, 498 U.S. 39, 41 (1990) . . . . . . . . . . . . . . . . . . . 142

*Holland v. United States,* 348 U.S. 121, 140 (1954) . . . . . . . . . . . . . 142

*United States v. Pinkney,* 551 F.2d 1241 (D.C. Cir. 1976) . . . . . . . . 142

Victor v. Nebraska, 511 U.S. 1 (1994) . . . . . . . . . . . . . . . . . . . . . . . 143

**TWENTY-FIRST GROUND FOR RELIEF** – THE TRIAL COURT'S INSTRUCTIONS AT THE CULPABILITY PHASE VIOLATED MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL

PROTECTION, AND A FAIR PROCEEDING. . . . . . . . . . . . . . . . . . 145

A.    The "principal offender" and "prior calculation and design" elements
      of capital aggravated murder/felony murder are alternatives that are
      not to be charged and proven in the same case. . . . . . . . . . . . 145
      Ring v. Arizona, 536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . 145
      Richardson v. United States, 526 U.S. 813 (1999) . . . . . . . . . 146
      Schad v. Arizona, 501 U.S. 624 (1991) . . . . . . . . . . . . . . . . 146

B & C. The definition of "cause" and purpose diluted the "specific intent to
       kill" element that is required in a capital aggravated murder case.
       . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

       Yates v. Evatt, 500 U.S. 391, 401-02 (1991) . . . . . . . . . . . . . 147

       Francis v. Franklin, 471 U.S. 307, 317 (1985); . . . . . . . . . . . . 147

       Houston v. Dutton, 50 F.3d 381, 385 (6th Cir. 1995) . . . . . . . . 147

       Caldwell v. Bell, 288 F.3d 838 (6th Cir. 2002) . . . . . . . . . . . . 147

       Carella v. California, 491 U.S. 263 (1989) . . . . . . . . . . . . . . . 147

       Patterson v. New York, 432 U.S. 197, 210, 215 (1977) . . . . . . 147

       Mullaney v. Wilbur, 421 U.S. 684, 698-701 (1975) . . . . . . . . . 148

       State v. Jenkins, 473 N.E.2d 264, 305 n.41 (Ohio 1984); Ohio v.

       Scott, 400 N.E.2d 375 syl. 4 (1980) . . . . . . . . . . . . . . . . . . . 148

       Reagan v. Norris, 365 F.3d 616 (8th Cir. 2004) . . . . . . . . . . . 149

TWENTY-SECOND GROUND FOR RELIEF – THE USE OF DUPLICATIVE
      SPECIFICATIONS TO THE AGGRAVATED MURDER COUNTS AND
      THE USE OF THE SAME OPERATIVE FACTS TO ELEVATE MURDER
      TO AGGRAVATED MURDER AND TO CAPITAL AGGRAVATED
      MURDER AS WELL AS THE SUBMISSION TO THE JURY OF ALL OF
      THESE COUNTS VIOLATED PETITIONER MOORE'S RIGHTS,
      INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A
      FAIR PROCEEDING, A RELIABLE SENTENCE, AND TO BE FREE
      FROM CRUEL AND UNUSUAL PUNISHMENT. . . . . . . . . . . . . . . 150

       Tuilaepa v. California, 512 U.S. 967, 973 (1994). . . . . . . . . . . . 151

xiii

United States v. McCullah, 76 F.3d 1087, 1111 (1996) . . . . . . . . . . . 152

Stringer v. Black, 503 U.S. 222, 230-32, 1(1992) . . . . . . . . . . . . . . . 152

**TWENTY-THIRD GROUND FOR RELIEF** – THE OHIO COURTS THAT HEARD
MOORE'S DIRECT APPEAL AND POST-CONVICTION PROCEEDINGS
LACKED JURISDICTION OVER THOSE PROCEEDINGS, VIOLATING
MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS AND
EQUAL PROTECTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

**TWENTY-FOURTH GROUND FOR RELIEF** – MEANS AND METHOD OF
EXECUTION BY LETHAL INJECTION IS UNCONSTITUTIONAL. . . . 153
Nelson v. Campbell, 124 S. Ct. 2117 (2004) . . . . . . . . . . . . . . . . . . . 153

**TWENTY-FIFTH GROUND FOR RELIEF.** OHIO'S DEATH PENALTY SCHEME
IS UNCONSTITUTIONAL AND VIOLATED PETITIONER MOORE'S
RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

## I.    INTRODUCTION - PROCEDURAL HISTORY

Petitioner Lee Moore was indicted in Hamilton County, Ohio, on three counts of capital aggravated murder.  (T.d. 1).  Each count had three capital specifications and one firearm specification. Id.  Petitioner Moore was also charged with kidnaping and aggravated robbery.  Id. The events which were the subject of the indictment occurred in January of 1994.

On May 5, 1994, a suppression hearing was held on trial counsel's motions to suppress Petitioner Moore's statements to the police and evidence obtained from searches.  (Tr. 6-193).  These motions were denied.  (T.d. 27, 28).

The jury trial on liability began on November 9, 1994, and concluded on November 15, 1994.  On November 16, 1994, the jury found Petitioner Moore guilty on all counts and specifications.  (Tr. 1041-1049).

The mitigation phase began on November 21, 1994.  (Tr. 1076-1262).  It lasted for about four and one-half (4½) hours, including opening statements and closing arguments.  (Tr. 1074; 1257).  Three hours later, the jury recommended that Petitioner Moore be sentenced to death.  (Tr. 1258-1261).  On December 14, 1994, Judge Ruehlman accepted the recommendation and sentenced Petitioner Moore to death.  (Tr. 1263-1271; T.d. 167; 168).

Petitioner Moore appealed to the Hamilton County Court of Appeals, which denied relief.  State v. Moore, No. C-950009, 1996 WL 348193 (Ohio App. 1996).  His subsequent appeal to the Ohio Supreme Court, was likewise unsuccessful.  State v. Moore, (1998) 81 Ohio St. 3d 22.

Petitioner Moore then filed a timely post-conviction petition in the trial court, Judge Ruehlman denied relief. *State v. Moore,* No. B-9400481 (Hamilton C.P. Apr. 10, 1997). Mr. Moore appealed this denial to the Hamilton County Court of Appeals, which remanded the case to the trial court so that Judge Ruehlman could state which portions of the record he considered in denying relief. *State v. Moore,* No. C-970353 (Hamilton Ct. App. Aug. 29, 1997). Judge Ruehlman responded by stating that he did not recall which portions of the record he considered, *State v. Moore,* No. B-9400481 (Hamilton C.P. Mar. 18, 1998), and Petitioner Moore appealed this denial to the Hamilton County Court of Appeals, which affirmed the original denial of relief, *State v. Moore,* No. C-970353, 1998 WL 638353 (Hamilton Ct. App. Sept. 18, 1998). Petitioner next filed his memorandum in support of jurisdiction in the Ohio Supreme Court, which declined jurisdiction. *State v. Moore,* (1999) 84 Ohio St. 3d 1472.

Petitioner initiated this action by filing his Petition for Writ of Habeas Corpus on January 18, 2000. (Doc. 14) and Supplemental Petition on June 1, 2000 (Doc. 29). The Parties have previously briefed procedural default defenses asserted by the Respondent which are pending before this Court. Consistent with this Court's scheduling order, Petitioner now submits his brief on the merits of the grounds of relief asserted in his Petition for Writ of Habeas Corpus.

## II.    RELEVANT FACTS

Petitioner sets forth the facts relevant to each claim for relief under the Argument for each Ground for Relief below.

## III.    ARGUMENT

### *AEDPA DISCUSSION*

Moore concedes his habeas petition is subject to AEDPA because his petition was filed after April 24, 1996.  *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000).

The restrictions contained in 28 U.S.C. §2254(d),however, are not necessarily applicable to each and every claim contained in a habeas petition filed after April 24, 1996. The restrictions do not apply unless the state court decision involved an adjudication of the constitutional claim on the merits.  A state court does not adjudicate the claim on the merits if it 1) found the constitutional claim procedurally defaulted, *Liegakes v. Cook*, 106 F.3d 1381, 1385 (7th Cir. 1997); 2) failed to rule on the issue, *Newton v. Million*, 349 F.3d 873, 877-878 (6th Cir. 2003); *Davis v. Litscher*, 290 F.3d 943, 951 (7th Cir. 2002); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); 3) addressed the issue but only in terms of state law, *Everett v. Beard*, 298 F.3d 500, 509 (3rd Cir. 2002), *Gruning v. DiPaulo*, 311 F.3d 69, 71 (1st Cir. 2002); 4) addressed the wrong issue on the merits, *McKenzie v. Smith,* 326 F.3d 721, 727 (6th Cir.2003); *Appel v. Horn*, 250 F.3d 203, 211 (3rd Cir. 2001); 5) applied the wrong standard in adjudicating the claim, *Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001); 6) failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000); 7) failed to cite any federal case law in its reasoning, *Romine v. Head*, 253 F.3d 1349, 1365 (11th Cir. 2001); 8) failed to address all of the pertinent parts of the constitutional analysis, *Frazier v. Huffman*, 343 F. 3d 780 (6th Cir. 2003);  *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002), or 9) failed to consider all relevant facts related to the claim. *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003).

If the 2254 standard of review does apply, 2254(d)(1) provides that a federal court may not grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court, unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court addressed the meaning of §2254(d)(1).  Section II of Justice O'Connor's concurring opinion sets forth the majority view of the Court as to the meaning of §2254(d)(1).

The Court explained that a state court decision is "contrary to" the Supreme Court's clearly established precedent "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases . . . [or] if the state court confronts a set of facts that are materially indistinguishable from a decision of the [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."  *Id.* at 406.

The Court further explained that a state-court decision would fail the "unreasonable application" prong of §2254(d)(1) if the state court's application of the Supreme Court's precedent was "objectively unreasonable."  *Id.* at 409-10.  The Court made clear that an "objectively unreasonable" application of federal law is something more that merely an "erroneous" or "incorrect" application of federal law, *id.* at 411, but something less than the "all reasonable jurists would agree that the application was unreasonable" standard.  *Id.* at 409-10.

Thus, a district court, in evaluating an application of a legal standard that the Supreme Court has "clearly established" to a factual context substantially different from any

the Supreme Court has yet to address, is "unreasonable" under §2254(d)(1) if the reviewing court can say with any degree of confidence that the state court decision is erroneous under established Supreme Court precedent.  When, on the other hand, the question is so close that the reviewing court can muster no confidence that the outcome it would reach de novo is more appropriate than the different outcome the state court reached, then the state court decision is not "an unreasonable application of clearly established" Supreme Court precedent, and relief "shall be denied."  As the Second Circuit explains:

> Some increment of incorrectness is required [to permit habeas relief under the 'unreasonable application' clause.] We caution, however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions "so far off the mark as to suggest judicial incompetence." *Matteo [v. Superintendent, SCI Albion*], 171 F.3d [877] at 889 [3d Cir. 1999].  We do not believe [the] AEDPA restricted federal habeas corpus to that extent.

*Francis v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

In *Wiggins v. Smith*, 539 U.S. 10 (2003), the Supreme Court considered an ineffective assistance of counsel claim pursuant to the AEDPA.  In *Wiggins*, the Court enunciated the applicable two pronged *Strickland* standard (deficiency and prejudice) and then assessed the state court's consideration of the claim.  *Id.* at 523-528.  The Court thoroughly explained why the state court's decision as to deficiency was not reasonable and did not have a basis in fact.  *Id.*  Thereafter, the Court turned to the prejudice prong.

The prejudice prong was reviewed de novo.  As noted by the Court, "[i]n this case, our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis."  *Id.* at 534.  In *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003), a majority of the Sixth Circuit panel

noted the Sixth Circuit's unusual insistence on applying §2254(d) even to claims that were not adjudicated on the merits in state court and found that this approach has been "abrogated by *Wiggins v. Smith*, 123 S.Ct. 2527 (2003)."  Indeed, as noted in *Lynn v. Farmon*, 347 F.3d 735, 741 (9th Cir. 2003), a federal court cannot "invent an alternative basis for denying the state prisoner relief when the state ground was unreasonable or contrary to established law."

This Court must apply a de novo review to any claim to which the AEDPA is not applicable.

## *HABEAS GROUNDS FOR RELIEF*

**FIRST GROUND FOR RELIEF** – **FORMER ATTORNEY CHUCK STIDHAM SUFFERED FROM AN UNDISCLOSED, ACTUAL CONFLICT BY SIMULTANEOUSLY REPRESENTING PETITIONER AND HIS CO-DEFENDANT, JASON HOLMES, WHILE PREPARING AND INVESTIGATING PETITIONER'S MITIGATION DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

The Sixth Amendment right to counsel includes the right to representation that is free from conflicts of interest.  *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Glasser v. United States*, 315 U.S. 60, 70 (1942).  The duty of unfettered loyalty to one's clients is among the most central of a criminal defense attorney's responsibilities.  *Strickland v. Washington*, 466 U.S. 668, 692 (1984).  The existence of an actual conflict of interest violates not only the Sixth Amendment, but also the due process guarantee of the Fifth and Fourteenth Amendments.  *Wood*, 450 U.S. 261; *see also, Smith v. Anderson*, 689 F.2d 59, 62-63 (6th Cir. 1982) (affirming grant of writ where conflict of interest).  The "assistance of counsel is among those 'constitutional rights' so basic to a fair trial that their infraction can never be treated as harmless error."  *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978).

6

In particular, the United States Supreme Court has repeatedly cautioned against the high probability of prejudice from multiple concurrent representation. *See e.g., Mickens v. Taylor*, 535 U.S. 162, 175 (2002). "In a case of joint representation of conflicting interests the evil, it bears repeating, is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." *Holloway*, 435 U.S. at 490.

To prevail on a conflict of interest claim, a defendant must demonstrate an actual conflict of interest that adversely affected counsel's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980); *accord*, *Mickens*, 535 U.S. at 168. Unlike a traditional ineffective assistance of counsel claim, a defendant raising a conflict of interest claim need not establish a reasonable probability that the outcome of the trial would have been different. *See Strickland*, 466 U.S. at 692. When an actual conflict of interest is established, prejudice is presumed. *Id.*; *Cuyler*, 466 U.S. at 348; *Holloway*, 435 U.S. at 487-91; *Olden v. United States*, 224 F.3d 561, 565 (6th Cir. 2000); *United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000).

An actual conflict is shown by pointing to specific instances in the record of inconsistent interests that indicate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987); *accord United States v. Hall*, 200 F.3d at 965-66; *United States v. Hopkins,* 43 F.3d 1116, 1119 (6th Cir. 1995). As noted by the Sixth Circuit, *Mickens* changed the terminology, but not the substance of the test to be applied, since the standard still requires a choice by

counsel, caused by the conflict of interest. *See Moss v. United States*, 323 F.3d 445, 466-67 & n.23, 469 (6th Cir. 2003).

In *Cuyler*, the Supreme Court found a conflict of interest where counsel's actions or omissions "resulted from counsel's desire to diminish the jury's perception of a co-defendant's guilt." *Cuyler*, 446 U.S. at 349. In *Glasser*, the Supreme Court found a conflict where counsel's efforts to protect one client resulted in his failure to cross-examine a state's witness and argue against the admission of evidence all to the prejudice of another client. The Supreme Court found this "struggle to serve two masters" to result in a violation of the Sixth Amendment right to counsel. *Glasser,* 315 U.S. at 75. *See also United States v. Boling*, 869 F.2d 965, 972 (6th Cir. 1985)(failure to take actions adverse to a co-defendant and former client may have been part of "common defense strategy" but resulted in reversible error).

In *United States v. Hall*, 200 F.3d 962 (6th Cir. 2000), two brothers, Rex and Stanley Hall, were represented by the same attorney with reference to the same narcotics trafficking charges. The district court informed the brothers that the joint representation could result in a conflict of interest, but they elected to continue with the same counsel. *Id.* at p. 964. After both were convicted at trial, the Sixth Circuit reversed the conviction of Stanley Hall because the attorney's loyalty was divided as to trial strategy. *Id.* at pp. 966-67. Because he pursued a particular defense for Rex Hall, he failed to pursue relevant lines of defense for Stanley Hall. *Id.* Accordingly, an actual conflict of interest existed that the district court erred in failing to correct. *Id.* at p. 967.

Here, it cannot be disputed that former attorney Chuck Stidham had an actual conflict of interest from his joint representation of Moore and Jason Holmes. The Hamilton

8

County Court of Appeals appointed Stidham to represent Jason Holmes on May 10, 1994. *See* Doc. 29 at Exhibit 6 to Habeas Petition. Subsequently on June 20, 1994, Moore hired Stidham to investigate and prepare the mitigation phase of Moore's trial. *See* Moore Supp. Apx. Vol. I at p. 344.

Moore establishes that this conflict imperiled his right to a fair trial. The mitigation presentation that was prepared and presented was absolutely devastating. Dr. Chiappone testified contrary to Moore's interests by stating that Moore confessed the shooting was not accidental, that he lied to police, and that the killing was necessary to escape detection for the crimes. (Tr. V. 7, pp. 1116-1117). Indeed, the testimony presented to the jury undercut Moore's entire defense to that point, that the killing was not purposeful or with specific intent, and that in any event, Moore was remorseful about the shooting. (Tr. pp. 552-553, 1080-1089). Instead, Dr. Chiappone's testimony endorses Stidham's arguments simultaneously being made to the Hamilton County Court of Appeals that his other client Jason Holmes was significantly less culpable and that the bad actor in this case was Moore. *See* Doc. 29 at Exhibit 7 to Habeas Petition at pp. 3, 4 and 9.

In his federal discovery, Attorney Deardorff noted that his practice would have been to discuss the conflict and obtain a waiver from the client, something he never did with Moore. Deardorff Depo p. 58. Attorney James indicated he did not know of the actual conflict and only became aware of it after the trial. James Depo p. 19-20. James agreed that Holmes' interests were not the same as Moore's and that anything Stidham learned in handling the Holmes' appeal, if not directly usable on a direct appeal, would potentially be usable for post-conviction relief. *Id.* at 21, 22, 23; *See Reynolds v. Chapman*, 253 F.3d 1337 (11th Cir. 2001) (*Cuyler* violated by simultaneous representation in post-trial matters).

9

Stidham contributed to Dr. Chiappone's testimony.  Chiappone noted in response to a state question that Stidham gathered information that assisted and contributed to Chiappone's assessment of Moore.  (Tr.  p. 1110).  Further, Stidham testified in his deposition that Chiappone was selected, "became involved," because another expert was deemed "not very helpful." Stidham Depo p. 68 lines 3-5.[1]  Stidham added that he had worked with Chiappone in the past and that he had "a very good rapport" with him. *Id.* at 86 lines  3-6, 6-8.  Stidham admitted that no other experts were recommended based on the record. *Id.* at 110 lines 21-23.  Stidham affirmed, however, that he requested Chiappone be brought in to address Moore's mental status or whether any mental disorder may have played a role.  *Id.* at 111 lines 11-13.

Having assisted and requested the mental health expert that would torpedo the entirety of the mitigation presentation, there can be no question that Moore satisfies *Cuyler* and *Mickens*.

AEDPA does not constrain this Court's review of Moore's claim.  While the claim was not presented in direct appeal, a subsequent *Murnahan* application, in which this allegation was raised, received merits review.  *State v. Moore*, 93 Ohio St.3d 649 (2001)(per curiam).  Indeed, this Court has noted the Ohio Supreme Court considered the merits of this Claim. Doc. 70 at p. 2. The merits review for this claim, as well as numerous others, consisted of the following statement: "Moore has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the application to reopen can be granted, as required under App.R. 26(B)(5)."  *Moore,* 93 Ohio St.3d at 651.

---

[1]Although Stidham later admitted that he never spoke with the other expert, Dr. Schwartz. Stidham Depo p. 78 lines 4-5.

Unquestionably, the Ohio Supreme Court forgave any default by addressing the merits of the claim. *Frazier v. Huffman*, 343 F. 3d 780, 791 (6th Cir. 2003); *see also Patterson v. Haskins*, 316 F.3d 596 (6th Cir. 2003) (state court reaching the issue in the App. R. 26(B) ruling preserved the merits of the issue for federal review).

This one sentence merits analysis does not identify or apply the appropriate United States Supreme Court standard for this claim, *Cuyler*, therefore AEDPA is not applicable. *Williams*, 529 U.S. at 406.  Because the Ohio Supreme Court did not apply the correct United States Supreme Court standard, this Court's review is not constrained by AEDPA. *Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001).  Further, the Ohio Supreme Court failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000).  Clearly, by not citing to or analyzing Moore's claim under *Cuyler*, the Ohio Supreme Court failed to address all of the pertinent parts of the constitutionally required *Cuyler* analysis.  Therefore, and again, AEDPA does not constrain this Court's review of Moore's claim.  *Frazier*, 343 F. 3d 780;  *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

To conclude, the simultaneous representation of Moore and Holmes created an actual conflict of interest.  Moore satisfies the *Cuyler* standard in that the conflicted attorney provided the background information to the expert that formed the basis of the expert's testimony that torpedoed the mitigation phase and requested this same expert, yet simultaneously provided support for the co-defendant's case.

**SECOND GROUND FOR RELIEF – PETITIONER MOORE'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE MITIGATION PHASE BY (A) EMPLOYING A MITIGATION SPECIALIST WHO NEVER DISCUSSED SUBSTANTIVE MITIGATION ISSUES WITH PETITIONER MOORE AND FAILED TO ADEQUATELY**

**ASSIST IN THE PREPARATION OF THE MITIGATION PHASE; (B) FAILING TO ADEQUATELY PREPARE FOR THE MITIGATION PHASE, DURING WHICH DR. CHIAPPONE, THE EXPERT OFFERED BY TRIAL COUNSEL, IMPEACHED PETITIONER MOORE'S ENTIRE LIABILITY AND MITIGATION CASE; (C) PRESENTED A HOPELESSLY INEFFECTIVE MITIGATION ARGUMENT WHICH ACTUALLY DAMAGED PETITIONER MOORE'S MITIGATION CASE AND FAILED TO EMPHASIZE PETITIONER MOORE'S YOUTH, REMORSE, AND PSYCHO SOCIAL BACKGROUND; AND (D) FAILING TO SEEK OR OFFER AN EXPERT TO TESTIFY AS TO THE EFFECTS OF EXTENSIVE ALCOHOL AND DRUG ABUSE ON PETITIONER MOORE. THIS INEFFECTIVE ASSISTANCE VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO COUNSEL, NOT TO INCRIMINATE HIMSELF, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AND A RELIABLE SENTENCE.**

Petitioner Moore was entitled to the effective assistance of counsel consistent with the mandate of the Sixth and Fourteenth Amendments to the United States Constitution. Petitioner's trial counsel in the case at bar made errors so serious that counsel was not functioning as the "counsel to which he was constitutionally entitled." Constitutionally ineffective assistance of counsel occurs where,

> (1) Counsel's performance was deficient, meaning that `counsel' made errors so serious that counsel was not functioning as the `counsel guaranteed the Defendant by the Sixth Amendment'; and (2) the deficient performance prejudiced the Defendant by depriving him `of a fair trial, a trial whose result is reliable.'

*Strickland v. Washington,* 466 U.S. 668, 687 (1984). This principle applies to both trial proceedings and capital sentencing proceedings alike. *Id.*, 466 U.S. at 686-87.

A conviction or sentence to death will be constitutionally fatal where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.,* 466 U.S. at 694, 104 S. Ct. at 2068. Governing legal standards at the guilt and sentencing phases has been defined by the Supreme Court as follows:

> When a defendant challenges a conviction, the question is
> whether there is a reasonable probability that, absent the
> errors, the fact finder would have had a reasonable doubt
> respecting guilt.   When a defendant challenges a death
> sentence . . . the question is whether there is a reasonable
> probability that, absent the errors, the sentencer–including an
> appellate court, to the extent it independently re-weighs the
> evidence–would have concluded that the balance of
> aggravating and mitigating circumstances did not warrant
> death.

*Id.,* 466 U.S. at 695.  This determination requires the Court to consider the totality of the

evidence before the judge or jury.  *Id.*  The ultimate focus continues to be on the

"fundamental fairness of the proceeding whose result is being challenged."  *Id.,* 466 U.S.

at 696.  Additionally, it must be remembered that, where a convicted petitioner asserts a

claim of ineffective assistance of counsel, such a claim "is an attack on the fundamental

fairness of the proceeding . . ."  *Id.*

As this Court is aware, it reviews the state court's determination regarding

ineffectiveness to determine whether the trial court made an unreasonable application of

the *Strickland* standard.  An unreasonable application occurs "if the state court identifies

the correct governing legal principle from [the Supreme] Court's decisions but unreasonably

applies that principle to the facts of the prisoner's case." *Williams v. Taylor,* 529 U.S. 362,

407, 120 S. Ct. 1495 (2000).  Thus, "a federal habeas court making the 'unreasonable

application' inquiry should ask whether the state court's application of clearly established

federal law was objectively unreasonable." *Id.* 529 U.S. at 409.

### A.    Trial Counsel Employed a Mitigation Specialist Who Failed to Adequately Assist in the Preparation of the Mitigation Phase.

Besides carrying out conflicting representation of Petitioner Moore's co-defendant,

trial counsel's mitigation efforts were half-hearted and utterly inadequate.  Their lack of any

13

effective preparation for mitigation is evidenced by the work of Chuck Stidham, the attorney retained by Mr. Deardorff and Mr. James for the sole purpose of preparing the mitigation portion of the defense.

Mr. James testified in deposition that he would certainly expect Mr. Stidham to be working with Dr. Chiappone (the Defendant's only "mitigation expert")[2] in developing whatever mitigation evidence Dr. Chiappone would be presenting at the penalty phase. (James Dep. V. 2 p. 9).   The record reflects, however, that Mr. Stidham had no communications nor any direct contact with Dr. Chiappone,[3] prepared no report for Dr. Chiappone or counsel,[4] and was very late in presenting any materials to the defense team.[5] On August 11, 1994, Mr. James requested Mr. Stidham to deliver his mitigation evidence and material "within the next few days."  James informed Stidham that he would need his information "so that we can get Chiappone started."  (James Letter to Stidham, August 11, 1994, Petitioner's Exhibit 11 to Stidham Deposition). Those materials were not forthcoming. The time sheets of Mr. Stidham and his assistant reveal that their interviews with "family and friends" were not completed until October 28, 1994.  (See Assistant's Time Sheet,

---

[2] As demonstated below at page ___, Dr. Chiappone did not appear to be acting as a defense mitigation expert in any respect.  Shortly before the mitigation hearing, he had ex parte contacts with both the judge and the prosecutor during which he discussed his mitigation evidence.  See, for example, Tr. Vol. 2, p. 322 where the judge states the day Chiappone and his partner called him to say they were going to do a presentence investigation report and the judge instructed them not to.  See also Tr. Vol. 7, p. 1119, where Dr. Chiappone concedes that he had discussions with Judge Ruehlman prior to mitigation regarding his position and duties in the case and further had ex parte meetings with the prosecutor reviewing his evaluation and findings.

[3] Stidham Dep. p. 94.  Neither Stidham nor his assistant had any direct contact or communication with Chiappone, as confirmed by their time sheets.  *Id.*

[4] Deardorff Dep.  pp. 50-51, where Deardorff states he does not recall receiving a report from Stidham and, in any event " didn't use a lot of Mr. Stidham's stuff."

[5] Stidham Dep. pp. 121-123; and see Petitioner's Exhibits 12 and 13 to Stidham deposition.

14

Petitioner's Exhibit 2 to Stidham Deposition).   While Mr. Stidham's time sheet reflects "preparation of documentation to be sent to Dr. Chiappone" on September 20, no entry reflects delivery and James letter confirms that the documentation had not been delivered as late as September 23.   (See Stidham Time Sheet, Petitioner's Exhibit 3 to Stidham Deposition, and see James Letter to Stidham September 23, 1994, Petitioner's Exhibit 12 to Stidham Deposition).   Dr. Chiaponne confirms Stidham's dilatory action:

> Forgive me now, I can't remember the specifics, but he [Stidham] was supposed to help with this case, and if I remember correctly he was dragging his feet, didn't get some stuff, and so I think that's what that's referring to.

(Chiappone Dep. p. 99).   When asked about inability to get information from Stidham, Dr. Chiaponne recollected, "but I remember in general. You look back at the case and say, oh, yeah, we had -- we couldn't get some stuff. . . . I didn't mean we didn't get it, but it wasn't coming the way we thought it would." (*Id.* p. 100).   In any event, no materials were received from Stidham by Chiappone until approximately 2 weeks before the trial was to start. Chiappone does not recall ever speaking with Stidham prior to the mitigation hearing. (*Id.* at 103).   It was the responsibility of all counsel to assure that mitigation information was prepared in a timely and usable fashion.   They clearly failed in this obligation rendering the representation at mitigation ineffective

As late as November 2, 1994, Mr. Stidham had not shared his "mitigation materials" with trial counsel.  (James Letter to Stidham, November 2, 1994, Petitioner's Exhibit 6 to Stidham deposition; and see James Letter to Deardorff, November 2, 1994, Petitioner's Exhibit 2 to Deardorff Deposition). Mr. James requested receipt of those materials by November 7, just 2 days before the beginning of trial.   It is inconceivable that trial counsel could have adequately absorbed the materials and prepared a competent mitigation case

15

at the same time they are beginning *voir dire* and the guilt phase trial. Indeed, Mr. Deardorff conceded that "during the mitigation phase, I didn't use a lot of Mr. Stidham's stuff . . . I kind of shied away from Mr. Stidham in the mitigation phase. . . . . I felt like Chiappone was going to be more effective than Stidham. I wanted not to use Stidham.." (Deardorff Dep. pp. 50-51). Although Stidham was assigned the responsibility of putting together a mitigation case, he was not requested by either James or Deardorff to attend or participate in any way in the mitigation hearing. (Stidham Dep. p. 121). During this time there is no question that Mr. Stidham was acting as an attorney for Mr. Moore. All of his correspondence requesting information on Mr. Moore's behalf was sent on his law firm's letter head, identifying Stidham as an attorney. (Stidham Dep. p. 137).

Mr. Stidham's lack of preparation for the mitigation phase is not surprising in light of his dual representation of Petitioner Moore and one of Petitioner Moore's co-defendants.[6] As demonstrated previously, at the time Mr. Stidham was supposed to be representing Mr. Moore's interests by preparing mitigation (which presumably would include some element of reduced culpability), Stidham was representing Moore's co-defendant on his appeal. In fact, Stidham was appointed to represent co-defendant Holmes on May 10, 1994 whose defense included diverting responsibility to Mr. Moore.[7] *See* Doc. 29, Supplemental Petition, at Exhibit 7 to Habeas Petition at pp. 3, 4 and 9.

---

[6]During his representation of Mr. Moore, Mr. Stidham was suffering from serious emotional impairments which played a part in his eventual suspension from the practice of law. (Stidham Depo., pp. 32-43).

[7] As Petitioner demonstrates in his First Ground for Relief, this constitutes a conflict of interest with respect to which prejudice is presumed under *Sullivan.*

16

Additionally, every member of the defense team, James, Deardorff and Stidham, were aware of Mr. Moore's history of drug and alcohol abuse. In fact, these issues are noted by Mr. Stidham's assistant in his mitigation notes. (Petitioner's Ex. 6, Bates p. 9014, attached to Stidham Deposition.). Mr. Stidham was or should have been aware that drugs and alcohol played a role in the shooting of the victim. (Stidham Depo., p. 80). Indeed, drug and alcohol abuse was specifically mentioned by trial counsel in their opening statement (Tr. Vol. 4, pp. 53-54), and Mr. Moore's $350.00 a week marijuana habit and his alcohol abuse were mentioned in the mitigation hearing. (Tr. Vol. 7, p. 1104).[8] In spite of counsel's knowledge of this history, no one on the defense team ever considered hiring an expert specifically to address the issues of drug or alcohol addiction and related mental disorders. (Stidham Depo., p. 111). Dr. Chiappone concedes that, at the time, he did not consider himself to have any speciality with respect to treatment of alcohol and drug abuse. He was not asked by trial counsel to perform any specific tests relating to those issues in Mr. Moore's case. (Chiappone Depo., pp. 26-28).

The Court in *Wiggins v. Smith,* 539 U.S. 510 (2003) reviewed the standards which must guide a federal court's decision with respect to state trial counsel's performance at mitigation.

> The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover ***all reasonably available*** mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). . . . Despite these well-defined norms, however,

---

[8]Nothing was done with this information. Dr. Chiappone simply repeated what he was told by Mr. Moore.

17

> counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

(Emphasis added by Supreme Court) *Id.* at 524.

The same deficiency exists with Mr. Moore 's counsel in this case. As demonstrated, trial counsel interviewed and presented evidence almost entirely focused on Moore being considered a good child by a few family members and friends. They almost completely ignore, however, the evidence relating to Petitioner's documented history of drug and alcohol addiction.

Thus, trial counsel proceeded to hearing on mitigation with no helpful information from the only attorney retained to assist trial counsel at the mitigation phase. It is not surprising, therefore, that the jury returned a recommendation of death. Counsel's failure to meet minimum standards of conducting "some investigation into available evidence, operates to deny Petitioner his constitutional right to effective assistance of counsel and undermines the fundamental fairness of the jury's imposition of the death penalty. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999) (trial counsel's failure to investigate and present records showing that the defendant was not the trigger man in a prior murder conviction, even though "slim evidence of mitigation" should have been presented to the jury).[9]

In *Caro v. Calderon*, 165 F.3d 1223, 1226-27 (9th Cir. 1999), *cert. denied*, 527 U.S. 1049 (1999) the Court noted that, although counsel consulted four experts, including a medical doctor, a psychologist, and a psychiatrist, counsel failed to consult neurologist or

---

[9]Although the Court found that trial counsel's ineffectiveness had been waived, that ineffectiveness played a part in the Court's decision to find Appellate counsel ineffective, in part for failing to investigate and present corroborating mitigation evidence. *Id.* at 427.

toxicologist who could have explained neurological effects of defendant's extensive exposure to pesticides.  The Court held,

> Counsel have an obligation to conduct an investigation which will allow a determination of what sort of experts to consult. Once that determination has been made, counsel must present those experts with information relevant to the conclusion of the expert. Counsel in this case was aware of Caro's extraordinary acute and chronic exposure to neurotoxicants, and yet he failed to consult either a neurologist or a toxicologist, experts on the effects of the chemical poisoning.  In addition, he failed to provide those experts who did examine Caro with the information necessary to make an accurate evaluation of Caro's neurological system.

*Id.* at 1226.  The Court concluded that such a failure could constitute ineffective assistance of counsel and renders the results of the mitigation phase unreliable.  *Id.* at 1228.  The same failure occurred in this case.

Although the Ohio Supreme Court considered this claim through its consideration of the Murnahan application, the AEDPA will not restrict this Court's review of this Ground. Moore's case is materially indistinguishable from *Wiggins* in that both involved the failure of counsel to properly investigate available mitigating evidence.  That is, counsel did not engage in adequate "efforts to discover ***all reasonably available*** mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." *Wiggins v. Smith,* 539 U.S. at 524.  Therefore, the AEDPA does not bar relief of Moore's claim. *Williams*, 529 U.S. at 406 ("A state court decision will…be contrary to…clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."); *Vincent*, 226 F.3d at 689 (State court decision unreasonable when

19

it reached a different result from the United States Supreme Court but considered materially indistinguishable facts).

As discussed in the First Ground for Relief, AEDPA does not constrain this Court's review of Moore's claim. While the claim was not presented in direct appeal, a subsequent *Murnahan* application, in which this allegation was raised, received merits review. *State v. Moore*, 93 Ohio St.3d 649 (2001)(per curiam). The Court's one sentence merits analysis does not identify or apply the appropriate United States Supreme Court standard for this claim (*Wiggins*). Consequently, the AEDPA is not applicable. *Williams*, 529 U.S. at 406. *See also, Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001). Further, the Ohio Supreme Court failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000). Clearly, by not citing to or analyzing Moore's claim under *Wiggins* the Ohio Supreme Court failed to address all of the pertinent parts of the constitutionally required by that analysis. Thus, the AEDPA does not constrain this Court's review of Moore's claim. *Frazier*, 343 F. 3d 780; *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

**B.    Trial Counsel Failed to Adequately Prepare for the Mitigation Phase, During Which Dr. Chiappone, the Expert Offered by Trial Counsel, Impeached Petitioner Moore's Entire Liability and Mitigation Case.**

Petitioner Moore's trial counsel offered the testimony of Dr. Chiappone, a psychologist, who provided devastating testimony against Petitioner Moore during the mitigation phase. (Tr. 1090 *et seq.*). As demonstrated above, Dr. Chiappone failed to receive mitigation information from Mr. Moore's "mitigation specialist" (Attorney Chuck Stidham) until shortly before trial. More important, it is apparent from the record that trial

counsel never resolved the confusion regarding Dr. Chiappone's role in the case. (See, for example, T.d. 95; 96; 103; 114; 117). The record reviewed below confirms that Chiappone conducted himself as a Court expert and never as an independent expert for Defendant. Thus, trial counsel was left without any independent mitigation expert.

After appointing Dr. Chiappone, the Court Clinic sent a letter to Judge Morrisey informing him that the clinic did not have the expertise to provide mitigation specialist services. Dr. Schmidtgoesling informs the judge that they are only suited to provide evaluation services. "A mitigation specialist has training and expertise that our clinic does not possess." (Court Clinic Record, bates p. CC 0358, attached as _____).

Dr. Chiappone did his entire work up in this case through the Central Psychiatric Clinic (Court Clinic). However, Dr. Chiappone testified that when he does work through the Court Clinic, it is done as an expert for the Court and not privately for a specific Defendant. (Chiappone Depo., p. 18). Dr. Chiappone's records indicate that the referral came from the Court to the Court Clinic. The face sheet indicates that the referral was done pursuant to OR 2929.03 and OR 2947.06. (Court Clinic Record, Bates p. CC0002). Dr. Chiappone conceded that referrals of this sort generally mean that the Court Clinic is being appointed as a court expert, not an expert specifically for the Defendant. (Chiappone Depo., p. 40). As the Court is aware, the Ohio Revised Code references on the referral sheet are references to pre-sentence investigation reports which are always conducted for the Court, but only when a specific request is made by the Defendant, a request that was never made in this case. In any event, Dr. Chiappone's chart confirms that all of the work done by Dr. Chiappone and his assistant in this case was done by the Court Clinic, and not as an independent expert for the Defendant which would normally be handled through Dr.

21

Chiappone's private office.  (Chiappone Depo., p. 40, and see Court Clinic Record, Bates pp. CC 0001-CC 0365, attached as _____).

Trial counsel's ineffectiveness regarding mitigation is further apparent from their casual approach to preparation.  Immediately after the verdicts at the guilt phase were announced, the trial court asked counsel when they could be ready to proceed with the mitigation hearing.  Although there is no evidence that either Mr. Deardorff[10] or Mr. James had done any substantive preparation for mitigation at that point, and despite the fact that they had not met with either Dr. Chiappone or Mr. Stidham, Mr. James informed the Judge, "[w]e're anticipating Monday morning," leaving just 4 days to prepare.  Counsel simply accommodated the Court's desire to end the case the following Wednesday.  No continuance was requested.  In short, no professional judgment was exercised in the decision to proceed with mitigation on such short notice.

When asked how long the mitigation presentation would take, Mr. James told Judge Reuhlman, "I would think about half a day, less than half a day."  (Tr. Vol. 7, pp. 1049-1050). Trial counsel then advises the court that they would call only four (4) witnesses, including Chiaponne. They give this arbitrary number while admitting to the judge that "[w]e're still waiting to discuss it with [Chiaponne]."  (Tr. Vol. 7, p. 1050).  Even the prosecutor was incredulous about this fact:

| | |
|---|---|
| Mr. Deters: | You've not been with Dr. Chiappone yet? |
| Mr. Deardorff: | No, I haven't. |
| Mr. James: | We met with him once **but haven't talked to him about his testimony.** |

---

[10] Mr. Deardorff and his wife were expecting a baby 2 days after the guilt phase concluded.

22

(Tr. Vol. 7, p. 1050-1051).[11]    In spite of these concessions they arbitrarily limit their witnesses and presentation.  As the decision to limit both the number of witnesses and the time of preparation occurred without conferring with either Mr. Stidham or Dr. Chiappone, the decision clearly lacks the exercise of professional judgment.

Additionally, Dr. Chiappone had *ex parte* contacts with both Judge Ruehlman and the prosecutor, Mr. Piepmeier.  First, during a break in the proceedings on November 9, 1994, the Judge informed counsel that he had a conversation with both Dr. Schmidtgoessling and Dr. Chiappone, a few days before trial:

> Nancy Schmidtgoessling called me the other day concerning - - she was going to **make a full report.**  And as you know, especially under the Cook case, there shouldn't be any reports unless they ask for one.
>
> They were going to make a whole pre-sentence investigation type report. Dave Chippone (*sic*) and Nancy Schmidtgoessling called me and I said no. They even asked for that.  They've been contacted as they are in every case, to do mitigation . . . to do mitigation for the Defendant, you know, and normally, because they don't want you to get the report, they don't make a report.  But I think Dave Chippone (*sic*) and/or Nancy Schmidtgoessling are going to be your witnesses.?

(Tr. V. 7, p. 322).   In fact, they had already prepared a full report which was dated November 2, 1994.  As shown below this was part of Mr. Moore's records developed by the clinic which the Judge directs Dr. Chiappone to share with the prosecutor.  In any event, that statement by the Court begs the following questions: Why were the experts, who were purportedly Defense experts, communicating directly with the trial judge?  Why were they preparing a  report under OR 2929.03 and OR 2947.06 before trial begins if, in fact, they were the independent experts for Mr. Moore?  It is clear from the record that, if trial counsel

---

[11] Apparently, Mr. Deardorff never spoke with him about his testimony since his time sheet indicates is last discussion with Chiappone took place on 10-25-94.  (Deardorff Dep. p. 63).

had engaged in even minimal communication with their "expert," no such misunderstanding would ever have occurred.

Even after this contact with the Court, the confusion as to Chiappone's role continues. After the verdict and the guilt phase and shortly before the beginning of the mitigation hearing, on November 17, 1994, Dr. Chiappone's records indicate that he met with the prosecuting attorney for one and a half hours to share his records and discuss his opinions. (Court Clinic Record, Service Ticket, 11/17/94, Bates CC 0063). On the same day he spoke for a second time with the trial judge and received Judge Reuhlman's permission to deliver his records regarding Mr. Moore to the prosecutor prior to the mitigation hearing. *Id.* This was a point conceded by Dr. Chiappone during his testimony at mitigation.

> Q:    Now throughout these proceedings, Doctor, have you–have you been in contact with Judge Ruehlman? Have you discussed your position, your duties with Judge Ruehlman in this case?
>
> A:    Yes.
>
> Q:    Have you also discussed your evaluations with the prosecutor?
>
> A:    I met with Mr. Piepmeier, yes.
>
> Q:    You met with him most recently within the last week. Is that correct?
>
> A:    Yes.
>
> Q:    And then, again, you did discuss with him your findings and the results of your examinations. Is that correct?
>
> A:    Yes.

(Mitigation Tr., p. 1119). Such conduct is unquestionably inconsistent with the interest of Mr. Moore. Dr. Chiappone concedes that he has never had such *ex parte* contacts with the Court and the prosecutor in any case where he has acted as an expert for the Defendant. (Chiappone Depo., p. 77). Likewise, Mr. Deardorff concedes that in his experience he would no permit such ex parte communications between his expert and the adverse party. (See Deardorff Depo., p.47).

Although proper preparation by trial counsel should have revealed this occurrence and the potential problems it would cause their mitigation efforts, neither Mr. James nor Mr. Deardorff recalled being aware of this at the time they were preparing Dr. Chiappone for the hearing. (Deardorff Depo., pp. 46-47; James Depo., p. 90-91).[12]

Mr. James' indifference to the interests of his client is evidenced by the fact that Mr. James' own file reflects a message from Dr. Chiappone indicating that he was about to have these ex parte contacts. Mr. James purported at his deposition to be utterly unaware of the contact or the message. (James Depo., pp. 90-91; Petitioner's Ex. 12 to James Depo.).

With such a chaotic approach to mitigation preparation, it is little wonder that to the ostensible surprise of both Mr. James and Mr. Deardorff, Dr. Chiappone completely undercut all mitigation theories during his testimony. During his cross-examination of Dr. Chiappone, it is clear that Mr. Piepmeier knows that Dr. Chiappone can utterly destroy the mitigation efforts of the Defendant, as demonstrated during the prosecutor's examination Chiappone at the mitigation hearing:

---

[12]Of course, Mr. James' memory in this regard is undercut by the fact that he specifically asked questions regarding the ex parte contacts in his redirect of Dr. Chiappone. (Mitigation Tr., Vol. 7, p. 1119).

Q:    Dr. Chiappone, you reviewed all these tests, all these records.  And, again, you're still trying to find out why Lee Moore did what he did.  Did you ever ask him why he killed Melvin Olinger?

A:    Yes, I did.

Q:    What did he tell you?

A:    Well what struck me is that he had a difficult time explaining it, if you will.  I asked him several times.  Its almost like he didn't know what to do.  He said he wasn't sure what to do.  He said that he was afraid the man would identify.

Q:    So he shot him so he would not be identified?

A:    Thats the implication. . . .[13]

Q:    Doctor, are you familiar with the previous statement that Lee Moore gave to the police, wherein he claimed this was all an accident?

A:    Yes, I am aware of that.

Q:    Did you specifically confront Lee Moore with that and ask him whether or not this was an accident when he shot Melvin Olinger?

A:    I am not sure if he used the word accident, but I did confront him about the information regarding the report to the police officers.

Q:    About the way he characterized it to the police?

A:    Correct.

Q:    What is your memory of how he characterized it at the time?

---

[13]An objection to this question was overruled.  (Mitigation Tr. Vol. 7, p. 1116).

A:    Well, he told me that he made that up when he talked to
the police, because he wanted to make it look like an
accident.

Q:    So when he gave that statement to the police about
dropping a wallet and the gun just went off and it was an
accident, he told you that he made that up?

A:    That is correct.

(Mitigation Tr. Vol. 7, pp. 1115-1117).  The utter lack of preparation by Mr. James and Mr.

Deardorff for the mitigation is demonstrated by that exchange.   Nothing can be more

devastating to Mr. Moore's efforts to avoid the death penalty than this testimony by his own

purported expert.   Indeed, Mr. Deardorff testified that after Chiappone's testimony, "I

believed at the time he was going to get the death penalty ***based on what Dr. Chiappone***

***said. He was cooked.***"   (Deardorff Dep. pp. 88-89).  Appellate counsel agrees with that

assessment: ". . .  the mitigation expert who turned out to be ***a prosecutor's witness . . .***"

(Agar Dep. p. 47).  Ms. Agar explained further they had "obviously not prepped this witness

well enough to know that he was going to absolutely slaughter them on the witness stand."

(Agar. Dep. p. 48).

There can be no doubt that Chiappone's testimony was the single most powerful

factor in producing a verdict of death.   The prosecutor, in his closing argument, relied heavily

on Dr. Chiappone's testimony:

. . . in the third aggravating factor you weigh which the
Defendant basically admitted–***he told Dr. Chiappone–you
know, he asked, 'Why did you do this?'***

My God, he said he was even trying to draw this out of him.
You know, `You got this car.  You got this wallet.  You got
everything you want.  Why on earth did you have to kill him?

27

> Lee Moore **told Dr. Chiappone, `I killed him because he might identify me.'**

Tr. V. 7, pp. 1196-97.  The prosecutor then uses Chiappone and his testimony to argue to the jury that Petitioner refused to take responsibility for what he did and showed no remorse.

Further evidence of the critical importance of Chiappone's testimony is found in the Judge's explanation of his decision to impose a death sentence.

> The Defendant did not do this accidentally, . . . rather, **as he told Dr. Chiappone,** the victim was executed because the Defendant was worried about being identified.

Tr. V. 7, p. 1265.  Thus, the "expert" who had *ex parte* contacts with both the prosecutor and the Court prior to his testimony, becomes the key witness for the prosecution.

Of course, Dr. Chiappone's testimony in this regard is highly suspect.  He improperly prepared a pre-sentence investigation report for the Court which makes no mention of such a critical piece of information.  (Petitioner Exhibit ____, Court Clinic Record, Bates pp. CC 0016-0021).  More important, not a single document in the Court Clinic file reflects any such admission by Mr. Moore.  Curiously, Dr. Chiappone could not find any of his notes of the his conversation with Mr. Moore.  (Chiappone Dep. pp. 67-68).  Nor was he able to locate any of his notes with trial counsel.  (Chiappone Dep. pp. 71-72).[14]  At his deposition, Dr. Chiappone conceded that he normally would record such important information by making notes of all interviews in his file as a standard practice. (Chiappone Dep. p. 54).  He states that no such notes exist.  While Dr. Chiappone's testimony may be consistent with the

---

[14] Dr. Chiapponne's first meeting with Trial Counsel, did not occur until approximately 2 weeks before trial. (Chiappone Dep. p. 71).  He has no notes of these meetings although the form used to record the meeting has ample room for notes of his meeting.  Indeed, his assistant, Ms. O'Donnell, recorded her notes directly on the form. (See e.g., Court Clinic Records, CC 0075, Chiappone entry, and compare to O'Donnell entry at CC 0078).)

defense asserted by co-Defendant Jason Holmes as recorded in Dr. Chiappone's file,[15] it is utterly inconsistent with every statement given by Mr. Moore to his counsel, to the police and to his family members. (Deardorff Depo., p. 68 - 69, 70). In any event, only a lack of any adequate preparation can explain trial counsel's failure to be aware of their purported expert's knowledge regarding Defendant's main theory of mitigation.

Trial counsel state that they were totally surprised by this testimony (Deardorff Dep. pp. 60-61), confirming both their failure to obtain an independent expert as well the complete absence of any effective preparation. There can be no legitimate exercise of professional judgment that would explain counsel's decision to use an expert who would do nothing more than reinforce the prosecution's theory of a purposeful killing to protect the identity of defendant and absence of remorse.

There is no substantive distinction between the facts of this case and those resulting in the issuance of the writ in *Combs v. Coyle* 205 F.3d 269, 288 (6th Cir. 2000). Notably the petitioner in that case was represented by Chuck Stidham who presented the testimony of Dr. Fisher to bolster the defense theory lack of purpose and intent. Like Chiappone in this case, Dr. Fisher was the only expert to testify for the defense. In his habeas petition, Mr. Combs alleged, as Petitioner does here, ineffectiveness of counsel with respect to their preparation and strategy in the use of the expert. Rather than assist the defendant regarding the intent issue, Fisher testified on cross that although intoxicated, Combs acted purposefully and intentionally. *Id.* at 287. Fisher was called at mitigation where he gave the same testimony regarding intent. *Id* at f.n. 2. The Sixth Circuit concluded,

---

[15]Dr. Chiappone, for some reason, had a copy of Jason Holmes' statement in his Court Clinic file. (Court Clinic file, Bates pp. CC 0162-CC 0193).

> Regardless of whether Combs's counsel should have known or instead actually knew Fisher's opinion regarding Combs's intent, however, counsel's decision to put him on the stand was **objectively unreasonable.**

(Emphasis added). *Id* . at 288. The Court noted that, much like this case, the expert testimony presented by counsel "directly contradicted the sole defense theory." *Id.* at 288. "Quite simply, this testimony was completely devastating to the defense, and counsel's decision to present it was objectively unreasonable." *Id.* The Court concluded that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687. He is therefore entitled to a conditional grant of habeas relief. *Id.* at 291. *Combs* must control the outcome here.

The Ohio Supreme Court's treatment of Moore's claim regarding trial counsel's ineffectiveness regarding Chiappone is unreasonably sparse and contains absolutely no analysis of the applicable United States Supreme Court authority. The basis for denying Moore's claim on direct appeal was that defense counsel undercut the damage by noting that Moore made up the part of Olinger dropping the wallet. *Moore*, 81 Ohio St. 3d at 36. Absolutely no other analysis is provided and Moore is unsure how presenting even more instances of Moore allegedly lying to the police cures the alleged lies regarding it being an accident and his motive for killing Olinger.

This is an unreasonable application of United States Supreme Court precedent on a number of levels. First, the Ohio Supreme Court, based upon the above language, never considered the two-part *Strickland* standard regarding Chiappone, instead focusing on curative measures.[1] The Ohio Supreme Court failed to review whether (1) the decision to

---

[1] Moore does not suggest that the Ohio Supreme Court did not cite or reference *Strickland*, but merely in the context of the Chiappone error – the Ohio Supreme Court failed to apply *Strickland's* two part test.

30

present Chiappone was tactical, let alone a reasonable tactical decision; or (2) what prejudice may have inured from Chiappone's devastating admissions at the penalty phase. Therefore, AEDPA does not constrain this Court's review of Moore's claim on either prong of *Strickland. Williams*, 529 U.S. at 406, *Wiggins,* 539 U.S. at 523-528, 534, (AEDPA does not constrain federal review when state court did not consider second prong of *Strickland* analysis);See also, *Maples v. Stegall*, 340 F.3d at 437; *Frazier*, 343 F. 3d 780;  *Miller v. Staub*, 299 F.3d at 581-582.

Second, as a practical matter, the Ohio Supreme Court's reliance on defense counsel's curative efforts after torpedoing their entire mitigation defense does not address why defense counsel had to engage in a curative course of action in the first place.  The Ohio Supreme Court's *Strickland* review should have focused on the conduct of counsel prior to Dr. Chiappone's devastating and suspect testimony.  Rather, if counsel had been prepared in a timely fashion, they would have retained a qualified expert to address the alcohol and drug abuse issues that were apparent form his history, and deal with the accident theory with the forensic evidence already in the record.  That evidence would show and entry and exit wound inconsistent with the prosecution's theory of an execution style shooting.

The Ohio Supreme Court simply failed to consider whether this was a tactical decision.  In very similar circumstances involving an expert destroying a culpability defense in a death penalty case, the Seventh Circuit found the Indiana Supreme Court unreasonably applied *Strickland* because "Nor did the Indiana courts give any reason for supposing it an even minimally intelligent tactic."  *Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001).

Moore's case echoes Judge Posner's sentiments from *Miller*. It is not a minimally intelligent tactic to present evidence, the effect of which prompted his trial counsel to conclude,"***He was cooked***" (Deardorff Dep. pp. 88-89), and appellate counsel to state, "they had "obviously not prepped this witness well enough to know that he was going to absolutely slaughter them on the witness stand." (Agar. Dep. p. 48).

    **C.    Trial Counsel Presented a Hopelessly Ineffective Mitigation Argument Which Actually Damaged Petitioner Moore's Mitigation Case and Failed to Emphasize Petitioner Moore's Youth, Remorse, and Psycho social Background.**

Not only were trial counsel ineffective for failing to adequately prepare for the mitigation phase, their opening and closing arguments at mitigation were utterly aimless, and presented in such a way as to support the prosecution's demand for the death penalty. During mitigation opening, Mr. Deardorff gives the jury the false impression that it was Defendant's heavy burden to overcome the overwhelming evidence already presented by the prosecution, despite the fact that no evidence regarding mitigation had yet been presented and although due process places the burden on the state.

> ***We have to convince you*** that right now all you've heard are aggravating circumstances, we're up here. You know, if you're playing basketball right now, ***its ninety-eight for the prosecutor, its zero for Mr. Deardorff. I have to do something in the second half to make it a hundred and one for Mr. Deardorff, ninety-nine for the prosecutors.*** We have to outweigh what the prosecutors have shown you.

(Tr. Vol. 7, p. 1083). Not only does the defense attorney shift the burden from the prosecutor to Mr. Moore, he begins mitigation by incorrectly conceding that they have an

enormous deficit to overcome.  One that, using the basketball analogy, would be impossible to overcome.[2]

Trial counsel exacerbates the damage done by this misstatement of Defendant's burden by further telling the jury, "[m]aybe . . . a very long term in prison would be fair.  ***Or, if not, if I can't convince you, and you feel he deserves the death penalty,*** then maybe, for his family, I can tell why this happened. . ."   (Tr., V. 7, p. 1082).  Trial counsel, thus, concedes in his opening that death may be the appropriate sentence then offers no cogent theory or argument regarding what evidence they intended to present in mitigation of sentence.  (Tr., V. 7, p. 1080 - 1087).

The closing was nearly incoherent as Deardorff was admittedly rattled by the irreparable damaged done by Chiappone. (See, Deardorff Dep. pp. 78-81).  Like the opening statement at mitigation where trial counsel presented no cogent theory or argument regarding what evidence they intended to present, much of their closing argument was dedicated to impugning Petitioner Moore's character; emphasizing a ***lack of mitigating*** factors, an absence of remorse; and the brutality of the shooting.   (Tr. V. 7 1200-1222).  The closing argument was contradictory, directionless and even incriminating.  Instead of effectively arguing the existence and weight of mitigating factors, Mr. Deardorff actually agreed with the prosecution and presented a closing that was indistinguishable in its effect from that of the prosecution.  The following excerpts of Mr. Deardorff's closing demonstrate this point.

---

[2]As the Court is aware, ORC Section 2929.03(D)(1) places the burden on prosecution of establishing "by proof beyond a reasonable doubt, that the aggravating circumstances the Defendant was found guilty of committing are sufficient to outweigh the factors in mitigation of the imposition of the sentence of death."

First, trial counsel eliminates any credibility his case has by informing the jury, in effect, that he has no faith in his client or his client's case and eliminates one of their main theories of mitigation, residual doubt as to whether the shooting was the consequence of an accident.[3]

> …as Mr. Deters says, is :  Did he accidentally shoot him? That's what he said he did.  ***I don't know if it's true, but it doesn't matter anymore***…"  (Emphasis added). (Emphasis added). (Tr. 1202).

> . . . but the bottom line - - ***cut out all the garbage - - he shot Mr. Olinger and stole his card and used his credit cards.*** That's the bottom line, that's what he did.  (Emphasis added). (Tr. 1202).

Trial counsel next emphasizes the guilt of his client and the gruesomeness of the offense.

> [Co-Defendant] Larry [Kinley] was not believable, but that doesn't matter because that's - - as Mr. Deter's said ***we showed you other things to find him guilty***… (Emphasis added).  (Tr. 1204)

> So maybe when he gave his statements, Lee didn't remember. ***I mean, if you shoot somebody in the head,*** and your in a little area ***and his brains fly out all over the wall, that is going to have an effect.*** (Emphasis added). (Tr. 1205).

> But the point is that, whatever statement he [Lee Moore] gave  - - ***I don't know if he was lying,*** if he wasn't lying . . .  (Emphasis added). (Tr. 1205).

> . . . Lee didn't say he put [the victim] on his knees. ***I don't know if he did or he didn't*** . . . But I don't think it's proven, if that's one of the factors beyond a reasonable doubt to you that he put him on his knees

---

[3]  Mr. Deardorff confirmed in his deposition that "accident" would be a focus at both the guilt phase and mitigation.  (Deardorff Dep. p. 23).  Indeed Mr. Deardorff remains convinced that the shooting itself was accidental. *Id.* There can be no logical justification, therefore, for telling the jury that he questioned the truthfulness of this contention, i.e., did not really believe his client and that, in any event, "it didn't matter."  (Tr. 1202).

> and shot him.  That's the bottom line.  He shot him.  So what do I say?
> (Emphasis added). (Tr. 1206).

Mr. Deardorff then concedes everything that the prosecutor has told the jury to counter

mitigation.

> Everything they tell you, everything they're going to tell you,
> **everything Mr. Peipmeier told you - - we didn't contest that**
> .
>
> **Mr. Piepmeier was right.**  I wish I could tell you I've got a---he
> was sexually abused when he was three, that he was left on
> streets when he was six.  I don't have that.  But what I do have
> is to show that he was raised in a good family.  (Tr. 1214).

Finally, after reviewing the relevant portions of his closing argument, Mr. Deardorff admits

that, at one point in his closing argument, he is clearly telling the jury that Mr. Moore does

not want to accept responsibility for his actions. (Deardorff Dep. p. 79).   This point is

reinforced by Mr. Deardorff's following closing comments:

> I don't know how many defendants I've seen as a prosecutor all
> of a sudden they fine God, **we all find . . . as soon as we're**
> **caught**, we all find God.   But you can look at their family
> backgrounds **and see it's a sham when they sit here and tell**
> **you they find God.**

(Tr. V. 7 p. 1214).

  Deardorff does further damage to his client in closing argument when addressing the

issue concerning Mr. Moore's ability to work well in the structured setting of a prison.

> His future in the jail--as I said, he would get along in a structured
> setting.  So what does that mean?  **Oh, thats great.  We're**
> **going to send Lee off to a place where he is going to get**
> **along great.  That doesn't sound fair to the Olinger family,**
> **that he is going to go to jail where he can do well.**

35

> I think what that means is, if Lee went to jail for the next fifty-three years, he could be beneficial to other people in our prison system. ***I don't know how. I don't know how.***

Mr. Deardorff practically invites the jury to return a death penalty when he says, "I know I wouldn't want to go to jail for seventy-three years, I'd rather you put me to death." (Tr. V. 7, p. 1221).

Where counsel creates a more damaging image of his client than the prosecution, constitutional ineffectiveness is present and prejudice should be presumed. *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997). As the Court explained:

> As we shall describe, Livingston combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions. ***The effect of all this was to provide Rickman not with a defense counsel, but with a second prosecutor.*** And while the State makes a claim that Livingston was pursuing a strategy of painting a picture of his client that would make the jury find him too pitiable to convict or sentence to death, this simply stretches imagination past the point of credulity. Livingston succeeded in creating a loathsome image for Rickman--one that would make a juror feel compelled to rid the world of him.

*Id.* at 1157. The Court continued, "in our view, Rickman would have been better off to have been merely denied counsel; as it was, he had to endure attacks from his own attorney that equaled or exceeded those of the prosecution." *Id.*

With a mitigation defense as inept and damaging to their client's interest as occurred here, prejudice is presumed. *Id.* at 1159. In dispensing with the need to make a separate showing of prejudice, the Sixth Circuit relied on the Supreme Court's analysis in *U.S. v. Cronic,* 466 U.S. 648, 656 (1984). "The fundamental question, the *Cronic* Court suggested, is whether the trial 'process [has lost] its character as a confrontation between adversaries';

if so, then 'the constitutional guarantee is violated.' And then, it is not necessary to demonstrate actual prejudice. " *Rickman* 131 F.3d at 1155, quoting *Cronic* 466 U.S. 656-657. Thus, the Sixth Circuit held in *Rickman*,

> While our research reveals no cases in which a defense attorney behaved with this degree of hostility toward his client, it is quite clear that [trial counsel's] performance dispenses with the necessity of a separate showing of prejudice; it is, in this case, patently inherent. Courts have consistently treated similar behavior as an abandonment of the duty of loyalty, or as a conflict of interest. *See United States v. Swanson,* 943 F.2d 1070, 1074-75 (9th Cir.1991). And courts have rightly viewed the equivalent of what Livingston did in this case to be worse than no representation at all

*Id.* 131 F.3d at 1159. On this basis, the Court affirmed the District Court's grant of the writ, finding prejudice to be presumed. *Id.; see also Combs v. Coyle* 205 F.3d 287- 288; and *Miller v. Anderson,* 255 F.3d at 458.

The same result must obtain here were the trial counsel's closing argument did nothing more than support the prosecution's contention that aggravating factors outweighed mitigating factors. Trial counsel's decision, in effect, to inform the jury that they had an insurmountable burden to meet, that the death penalty may be fair in this case was objectively unreasonable. Even if prejudice were not presumed, it is clearly demonstrated by the record reviewed above. Given the fatal damage done to the Mr. Moore's efforts to receive a sentence less than death, by the complete failure to prepare their expert, and what can only be fairly characterized as a closing argument hostile to the interests of his client, the ineffectiveness standard set by *Strickland* has been met. The actions outlined above depriving him "of a fair trial, a trial whose result is reliable." Thus, constitutional ineffectiveness has been established.

As discussed in the First Ground for Relief, AEDPA does not constrain this Court's review of this claim. While the claim was not presented in direct appeal, a subsequent *Murnahan* application, in which this allegation was raised, received merits review. *State v. Moore*, 93 Ohio St.3d 649 (2001)(per curiam). The Court's one sentence merits analysis does not identify or apply the appropriate United States Supreme Court standard for this claim *(Cronic)*. Consequently, the AEDPA is not applicable. *Williams*, 529 U.S. at 406. *See also, Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001). Further, the Ohio Supreme Court failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000). Clearly, by not citing to or analyzing Moore's claim under *Cronic*, 466 U.S. 656-657 the Ohio Supreme Court failed to address all of the pertinent parts of the constitutionally required by that analysis. Thus, the AEDPA does not constrain this Court's review of Moore's claim. *Frazier*, 343 F. 3d 780; *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

**D.    Trial Counsel Failed to Seek or Offer an Expert to Testify as to the Effects of Extensive Alcohol and Drug Abuse on Petitioner Moore.**

As demonstrated above, Mr. Moore's counsel failed to even seek an expert knowledgeable in the field of alcohol and drug abuse.  They failed otherwise to fully investigate these issues and properly present them to the jury for consideration at mitigation although all of the information above was available to them at the time of mitigation.  Indeed, some of it recorded in the mitigation notes of Stidham's assistant.  Given the fact that the effect of the drug abuse and alcohol abuse on Petitioner's culpability was the focus of the defense and mitigation at a relatively early stage of the proceedings, such a failure rises to the level of constitutionally ineffective assistance of counsel, undercutting the reliability of both the guilt phase and mitigation phase verdicts.  *Caro v. Calderon*, 165 F.3d at 1226; and see *Skaggs v. Parker,* 235 F.3d 261, 271-272 (6th Cir. 2000).  *And see, Powell v. Collins,* 332 F.3d 376,392 *et seq.* (6th Cir. 2003).

Trial counsel were ineffective for failing to seek or offer an expert witness on the subject of the effect of extensive drug and alcohol abuse and its relation to mental impairments as mitigation.  This is so despite the liability phase opening statement that alcohol and drug abuse affected Petitioner Moore's state of mind at the time of the shooting and should be considered as mitigating factors.  (Tr. V. 4, pp. 553-554).  Trial counsel was aware of this critical issue from the outset.  (Deardorff Dep. pp. 24, 35-36).  Mr. Deardorff was aware that a history of drug and alcohol abuse could be a sign of a related mental disorder. (Deardorff Dep. p. 37).

Despite realizing the relevance of extensive alcohol and drug abuse, trial counsel never sought nor offered any expert testimony on the effects of this abuse on Petitioner

Moore, opting instead for the cursory testimony of Dr. Chippone who testified generally that such abuse can have an unspecified effect depending upon each individual. (Tr. V. 7, 1104-1106). Deardorff does not recall giving Dr. Chiappone any direction or instruction to explore this issue.  Dr. Chiappone, in fact, had no expertise in testing specifically for those issues. No testimony was offered as to the effects of drug and alcohol abuse upon Petitioner Moore in particular.  (Tr. 1104-1105).  Accordingly, the jury and the trial court rejected this alcohol and drug abuse as mitigating factors and sentenced Petitioner Moore to death. (Tr. 1263-1271).

As demonstrated above the effects of the drug abuse and alcohol abuse on Petitioner's culpability was well known to defense counsel at a relatively early stage of the proceedings.  A failure to investigate and develop such mitigation evidence rises to the level of constitutionally ineffective assistance of counsel, undercutting the reliability of both the guilt phase and mitigation phase verdicts.   *Caro v. Calderon*, 165 F.3d at 1226; *Skaggs v. Parker,* 235 F.3d at 271-272.

Petitioner has thus established both prongs of the *Strickland* test.  That is, counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and this deficient performance prejudiced Defendant by depriving him of trial whose result is reliable.  *Strickland v. Washington*, 466 U.S. at 687.  The state court's ruling to the contrary constitutes an unreasonable application of *Strickland* and *Wiggins.*

As mentioned, the only evidence developed in mitigation regarding drug and alcohol abuse amounted to nothing more than Chiapppone repeating what was said to him by Mr. Moore.  In *Wiggins v. Smith,* 539 U.S. 510 (2003)  the Supreme Court addressed ineffective assistance of counsel claims at the mitigation phase.  Indeed, the Court decided claims quite

40

similar to the claims asserted by Petitioner here.  In *Wiggins*, the petitioner's state trial counsel did conduct some investigation for mitigation and offered some mitigating evidence to the jury at sentencing in an effort convince the jury to return a sentence of life.  The Court ultimately held that trial counsel was constitutionally deficient and that the Maryland Court of Appeals application of *Strickland* in holding otherwise was "objectively unreasonable." The Court also concluded that the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of his moral culpability." (Internal quotes and citations omitted). *Id* 539 U.S. at 534.  Thus, the Court reversed the Court of Appeals denial of the writ.

> Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records--evidence that would have led a reasonably competent attorney to investigate further. Counsel's pursuit of bifurcation until the eve of sentencing and their partial presentation of a mitigation case suggest that their incomplete investigation was the result of inattention, not reasoned strategic judgment. In deferring to counsel's decision not to pursue a mitigation case despite their unreasonable investigation, the Maryland Court of Appeals unreasonably applied *Strickland.*

*Id.* 539 U.S. at 534.

> Petitioner's trial counsel in *Wiggins* proffered some mitigation evidence:

> > [Trial counsel] explained that they would have introduced psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other

*Wiggins* at 516.  However, it was counsel's failure to proffer available evidence regarding petitioner's "bleak life history" that led to the finding that counsel's performance was constitutionally deficient.  *Id* .  Although the Supreme Court noted that trial counsel had

41

conducted some investigation into petitioner's personal history and had obtained some relevant records, their "tactical decision not to investigate further and present his "life history" to the jury or court at mitigation was constitutionally deficient. The Supreme Court reached this conclusion in spite of trial counsel's testimony that they investigated their client's life history, including a review of some relevant records, and made a tactical decision to focus mitigation on the contention that the client was not the principal offender.

> Counsel's decision not to expand their investigation beyond the PSI and the DSS records fell short of the professional standards that prevailed in Maryland in 1989. . . . Despite the fact that the Public Defender's office made funds available for the retention of a forensic social worker, counsel chose not to commission such a report. *Id.,* at 487. Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) -- standards to which we long have referred as guides to determining what is reasonable. (Internal quotations and citations omitted).

*Id.* at 524.

Like the state court's rejection of the ineffective assistance of counsel claims in *Wiggins*, the Court of Appeals similar holding in this case was objectively unreasonable. "The Maryland Court of Appeals' assumption that counsel's investigation was adequate reflected an unreasonable application of *Strickland.*" *Wiggins v. Smith* 539 U.S. at 512. *Wiggins* and *Strickland* compel the same holding here. The State's determination that the deficiency of counsel in Mr. Moore's case was acceptable is likewise an unreasonable application of *Strickland* and *Wiggins* and, thus, should be rejected.

42

**THIRD GROUND FOR RELIEF – MOORE'S ATTORNEYS RENDERED THE INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO REQUEST AN INTOXICATION INSTRUCTION AND FAILING TO SECURE THE ASSISTANCE OF A FORENSIC EXPERT TO CHALLENGE THE STATE'S THEORY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.[4]**

The United States Supreme Court enunciated the standard to be applied by this Court in *Strickland*, 466 U.S. at 687. The well-familiar *Strickland* standard need not be belabored. In order for Moore to prevail, he must: (1) establish that his counsel were deficient, and (2) demonstrate that the deficient performance of counsel prejudiced him by producing an unreliable result. *Id.* at 687.

Respondent incorrectly argues *Lockhart v. Fretwell*, 506 U.S. 364 (1993), modified the burden of prejudice imposed upon Petitioner to establish a *Strickland* violation. Return at 41. In reversing the Fourth Circuit, the Supreme Court unanimously rejected this precise argument in *Williams v. Taylor*, 529 U.S. 362 (2000).

Further, Respondent argues that the Sixth Circuit held in *Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir.1984), that "strategic decisions" are "virtually unchallengeable." Return at 41. *Meeks* does not stand for such a broad proposition. Such a statement excludes a significant portion of *Strickland*, recognized by the Sixth Circuit in *Meeks*, that a strategic decision must be "reasonable." In other words, a decision does not become unchallengeable simply because a choice was made, the decision only becomes constitutionally sufficient under *Strickland* after a reasonable investigation to discover available options and a reasonable choice is made from those options. *Meeks*, 749 F.2d at 328; *Strickland*, 466 U.S. at 691 ("strategic choices made after less than complete

---

[4]Moore hereby drops the allegations under subsection (a), par. 55-60 of the habeas petition.

43

investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation."); *Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir. 2000) ("Without effective research into the available mitigating testimony, of course, it would have been impossible for the lawyers to have made an informed decision either way."); *Workman v. Bell*, 178 F.3d 759, 769 (6th Cir. 1990). To the extent that Respondent expands *Meeks* to exclude a reasonableness component, Moore objects because it does not stand for that proposition.

It cannot be presumed that Moore's ineffectiveness arguments are probable strategy decisions – or can be described as reasonable strategy decisions. As similarly noted by the Supreme Court, such descriptions "resemble more a post-hoc rationalization of counsel's conduct than an accurate description of their deliberations…." *Wiggins*, 539 U.S. at 534. *Strickland*, 466 U.S. at 690, simply directs that "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." However, courts cannot "construct strategic defenses which ***counsel does not offer***." (Emphasis added). *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990); *Eddmonds v. Peters*. 93 F.3d 1307, 1325 (7th Cir. 1996); *Griffin v. Warden*, 970 F.2d 1355, 1358 (4th Cir. 1992) (court may not "conjure up" tactical rationalizations for the actions of trial counsel that counsel could have made, but did not make).

In the case at bar, trial counsel's tactic was to concede the fact that a shooting occurred and to argue that Petitioner Moore lacked the "purpose" to commit murder, based in part on his intoxication at the time of the shooting. (T.p. 554). 63)    Nonetheless,

44

they failed to present or request an instruction on the well-established affirmative defense that voluntary intoxication negates the element of "purpose" under Ohio law.

### A.    Did not present intoxication evidence.

Moore hereby drops this allegation of error.

### B.    No request for involuntary intoxication

Moore's trial counsel ineffectively presented their only culpability phase defense. As noted in their opening statement, trial counsel argued to the jury that Moore's influence under drugs and alcohol affected his state of mind. (Tr. p. 554). There is no question that trial counsel was aware from the outset of the case that the effect of drug and alcohol abuse would be a focus at both guilt and mitigation phases. In introducing Moore's statement, the state established the amount of alcohol and drugs Moore ingested the day and evening of the killing. Thus, defense counsel had a basis to request an intoxication instruction at the culpability phase.

Respondent answers this allegation by only arguing Moore's counsel requested an intoxication instruction during the mitigating phase. Return p. 58. However, Moore's allegation relates to the culpability phase, thus any mitigation instruction, refused and never heard by the jury, has no relevance to Moore's claim.

Under Ohio law and as noted by the Sixth Circuit, voluntary intoxication may be considered in determining whether an act was done intentionally. *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) ("In Ohio, evidence of voluntary intoxication 'may be considered in determining whether an act was done intentionally or with deliberation or premeditation.' *Ohio v. Fox*, 68 Ohio St. 2d 53, 428 N.E.2d 410, 412 (Ohio 1981)."). When such evidence is presented, an attorney must request the proper instruction to allow the jury

45

to give effect to the evidence. Moore's trial counsel unreasonably failed to make such a request. Moore was prejudiced in that the jury was unable to consider and give effect to evidence that lessened Moore's intent – further supporting trial counsel's closing argument to convict Moore of a lesser offense. *(See* Tr. pp. 933, 935 (involuntary manslaughter)).

As noted above, the AEDPA does not constrain this Court's review of Moore's claim. While the claim was not presented in direct appeal, a subsequent *Murnahan* application received merits review. Because of the analysis (not) employed, this Court's review of Moore's claim is not constrained by AEDPA. *Williams*, 529 U.S. at 406; *Magana*, 263 F.3d 542; *Hameen*, 212 F.3d at 248; *Frazier*, 343 F. 3d 780; *Miller*, 299 F.3d at 581-582.

## C.    Counsel failed to obtain the assistance of a forensic expert.

The culpability defense in its entirety was that the gun Moore held accidentally discharged. Defense counsel argued such in the opening statement. (Tr. pp. 553-554). However, defense counsel did not present any expert testimony to support Moore's statement the gun fired accidentally. Further in this vacuum, the state ably painted Moore as a cold-blooded executioner and specifically argued to the jury that Moore could have presented expert testimony but did not. (Tr. p. 9560). The failure of Moore's counsel constitutes the ineffective assistance of counsel.

The right to expert assistance is imbedded in the Fourteenth Amendment's due process guarantee. *See Ake v. Oklahoma*, 470 U.S. 68, 76-78 (1985). The "opportunity to participate meaningfully in a judicial proceeding in which one's liberty is at stake" is a core principle rooted in the Fourteenth Amendment's due process guarantee of fundamental fairness. *Id.* at 76. Under *Ake*, constitutional due process requires that the defendant have "a fair opportunity to present his defense," "the opportunity to meaningfully participate" in his

46

defense, and "access to the raw materials integral to the building of an effective defense" without regard to poverty. *Id.* at 76, 77.

Trial counsel deprived Petitioner of the "raw materials integral to building an effective defense" in their failure to request the assistance of a forensic expert. By obtaining the assistance of a forensic expert, defense counsel could have presented evidence challenging the state's cold blooded execution theory. Indeed, the state argued this point repeatedly to Moore's jury. *(See* Tr. pp. 826, 856-857, 1191-1200, 1223-12340). However, defense counsel never challenged this argument – nor did they adequately present their defense via expert testimony. *See Soffar v. Dretke*, 368 F.3d 441, *amended*, 391 F.3d 703 (5th Cir. 2004) (IAC found when attorneys failed to present expert testimony that could have supported defense); *Miller v. Anderson*, 255 F. 3d 455, 459 (7th Cir. 2001) (counsel ineffective for failing to obtain a hair analysis expert, and for failing to consult with DNA, tread mark and foot print experts). Even the prosecutor argued to the jury that Moore could have presented expert testimony but did not. (Tr. p. 956).

The Sixth Circuit in *Mason v. Mitchell*, 320 F. 3d 604, 615 (6th Cir. 2003)[5] endorsed as reasonable the Ohio Supreme Court's determination that providing the tools of a defense under *Ake* applies to non-psychiatric experts. While ultimately denying Mason's claim, it endorses the Sixth Circuit's longstanding policy that attorney's can be ineffective in failing to secure and present expert testimony that may support a defense. *See Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993) (*Ake* denied when defendant denied right to pathologist); *Sims*

---

[5] The Sixth Circuit also noted that trial counsel's failure to retain a competent expert would be relevant in determining the issue of ineffective assistance of counsel. *Id.* at 616.

*v.Livesay*, 970 F.2d 1575, 1580-1581 (6th Cir. 1992) (counsel ineffective for not acquiring ballistics expert that could have contradicted the state's case); *see also Richey v. Mitchell*, --F.3d --, 2005 U.S. App. LEXIS 1218 (6th Cir. 2005) (counsel was ineffective for the retention and handling of the arson expert). Moore's case is similar to *Sims* in that his counsel failed to investigate and present expert testimony that could have refuted the state's incendiary version or manner of the actual killing.

For the reasons previously stated above and under sub-section (b) of this ground, AEDPA does not constrain this Court's review of Moore's claim.

**FOURTH GROUND FOR RELIEF– ONE OF PETITIONER MOORE'S TRIAL COUNSEL CONTINUED TO REPRESENT HIM ON HIS INTERMEDIATE DIRECT APPEAL AND RENDERED INEFFECTIVE ASSISTANCE AT THIS STAGE BECAUSE HE HAD AN ACTUAL CONFLICT OF INTEREST AND BECAUSE HE FAILED TO RAISE MERITORIOUS ISSUES. THIS VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO COUNSEL, DUE PROCESS, EQUAL PROTECTION, AND A FAIR PROCEEDING.**

Petitioner respectfully preserves this claim by relying on the allegations in his petition.

**FIFTH GROUND FOR RELIEF – JUDGE RUEHLMAN, THE TRIAL JUDGE, WAS NOT AN IMPARTIAL JUDGE AT TRIAL OR ON POST-CONVICTION, AS EVIDENCED BY HIS DESIRE TO HAVE PETITIONER MOORE EXECUTED IMMEDIATELY AFTER SENTENCING HIM TO DEATH, THUS VIOLATING PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHT TO AN IMPARTIAL TRIBUNAL, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AND A RELIABLE SENTENCE.**

**A.    The Assignment of Judge Ruehlman was not Random.**

Petitioner withdraws this as a separate ground for relief

48

**B.    The Trial Judge's Desire to Have Petitioner Moore Executed Immediately Without Providing Him with His State and Federal Appeals Showed His Actual or Apparent Bias Against Petitioner Moore and His Hostility to Petitioner Moore's Federal Constitutional Rights.**

In reviewing the record set out below regarding the bias and predisposition of the trial judge and ultimate sentencer in this case, there is one overriding principle by which to measure the actions of the judge who ultimately sentenced Petitioner to death.  The mere appearance of a state judge's bias violates the due process rights of litigants, regardless of whether the judge is actually biased.  *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986).  If the mere appearance of a judge's bias exists, then his decisions are subject to reversal. *Id.* at 828.  *See Bracy v. Gramley*, 520 U.S. 899 (1997).

During sentencing the trial judge made no effort to conceal his disdain for the legally mandated post-conviction and federal habeas corpus processes. When Judge Ruehlman[6] sentenced Petitioner Moore to death, he made it clear that he wanted Petitioner Moore to be executed immediately – regardless of his statutory and constitutional rights to appeal and post-conviction remedies:

> One last comment, Mr. Moore.  You know, I'm required by law to set this execution date of – I put down May 16th, 1995, but you won't be executed then.  ***In fact, I'll probably be retired – seriously – by the time you're ever executed, and you'll be a middle-aged person, because you're going to the safest place in the United States.  And the safest place in the United States right now is Ohio's Death Row.***

---

[6] Judge Reuhlman was selected by Common Pleas Presiding Judge Cartalano when the original judge disqualified himself due to a heavy case load.  Thus, the ultimate trial judge was not randomly selected as local Rule 7(H) appeared to require in death penalty cases. (T.d. 113, 115, 116, Tr. 205-206). That argument was not accepted by the Ohio Supreme Court. *State v. Moore*, (1998) 81 Ohio St.3d 22, 25.  Curiously, the Prosecutor Joseph  Deters apparently had an *ex parte* communication with Judge Reuhlman regarding his reassignment to the case. "from discussions with this Court ... judges were petitioned by Judge Cartolano, and this Court [Judge Ruehlman] was available for this trial, and that is why we're here today."  (Tr. V. 2, p. 210).

You'll be completely protected. If there's a riot, you'll be protected. You won't be killed by other prisoners, because they protect you there. If there is a fire, you're the first one they're going to get out.

The only person I know if that – when I was a prosecutor, we prosecuted Mr. Mize, John Mize. He's the only person I know to have died on Death Row in the last over thirty years, and he died from natural causes. And the only irony in that case is that, if he hadn't have died of cancer, he'd still be alive today on Death Row.

***The delays brought on by the Ohio Post-conviction Relief statute and the Federal Habeas Corpus procedure that we now have caused the citizens to really distrust our justice system, and hopefully, our newly elected federal legislators will pass laws that restrict the Federal Habeas Corpus procedure as a methods to unjustly delay these convictions.***

If we're going to volunteer the death penalty, we should use it. I believe in it. ***I believe it should be used and not delayed. And yours shouldn't be delayed. But now it probably will.***

We took a big step in November when we passed the law that gets rid of intermediate appeals, but, still, ***we need to get rid of Ohio's Post-conviction Relief Statute and the federal habeas corpus delays*** which are part of that statute. It's wrong. It's causes people to really think this system is not a fair just system, when sentences are not carried out.

Okay. You can take him away. That's the sentence of the Court.

(Tr. V. 7, pp. 1269-1271 emphasis added).

These comments are consistent with other public comments made by Judge Ruehlman in other death penalty cases.[7] While the Judge Reuhlman has certainly been open and straightforward about his personal biases against a defendant's constitutional and legal right to pursue post-conviction relief, they are ***biases*** nonetheless.

---

[7] Judge Reuhlman has also been frank in his public pronouncements critical of post-conviction legal options available to defendants sentenced to death. In sentencing Cook, Judge Ruehlman said that he was worried about the possibility of executive intervention because a state legislator had told him that Governor Celeste planned to commute death sentences before he left office in January, 1991. He said that he hoped that this was not true: "That would be a spineless, gutless act." Article, "Cook sentenced to die for killing shopkeeper; *Cincinnati Enquirer* 9/6/92.

**C.    Judge Ruehlman's Conduct Throughout Petitioner Moore's Trial Showed His Actual or Apparent Bias Against Petitioner Moore and the Defense as Well as His Hostility to Petitioner Moore's Federal Constitutional Rights.**

Judge Ruehlman displayed bias against the defense during the pretrial, liability and mitigation phases, as demonstrated by the following examples and erroneous rulings.

**1.    During the pre-trial phase, Judge Ruehlman refused to permit Petitioner Moore's counsel to present evidence regarding the racial imbalance of the petit jury venire.**

Trial counsel asked Judge Ruehlman to have a new jury venire picked because the venire of 50 prospective jurors had only 5 African-American jurors. (Tr. V. 2, pp. 212; 220-227). Of these 5 African-Americans, only one was male. (Tr. 212-213; 215-216). Trial counsel argued that this petit jury venire failed to reflect a representative cross-section of the community, including a cross-section of Petitioner Moore's race (African-American), gender (male), and age (19). (Tr. V. 2, pp. 212-215; 217). *See* Tenth Ground for Relief (regarding petit jury venire issue).[8]

Judge Ruehlman asked trial counsel if they had any evidence that the venire selection process was improper or evidence that someone on the jury commission "intentionally just picked out white jurors?" (Tr. 214; <u>see</u> Tr. 217). This question was irrelevant in part because a defendant may prevail on a cross-section claim without demonstrating that the selection of white jurors was intentional.[9]

---

[8] The selection of a petit jury from a representative cross section of the community is an essential component of a defendant's Sixth Amendment right to a jury trial. *Taylor v. Louisiana,* 419 U.S 522, 528 (1975); *Smith v. Texas*, 311 U.S. 128, 130 (1940).

[9] "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri,* 439 U.S. 357, 364 (1979) .

Judge Ruehlman asked trial counsel whether they were going to present evidence but then denied counsel's requests for time to prepare and present an expert witness despite the judge's admissions that he did not know (a) whether another method of selecting jurors would produce a fair cross-section of the community; or (b) the percentage of the African-American population of Hamilton County.  (Tr. V. 2, pp. 216-218; 227).  Judge Ruehlman ignored trial counsel's proffer that the African-American population in Hamilton County was between 17% and 20%.  (Tr. V. 2p. 216).

While Judge Ruehlman erroneously denied trial counsel's request for time to prepare and present evidence on this issue, he nonetheless permitted the prosecutor to present the testimony of the county jury commissioner.  (Tr. V. 2, pp. 218-227).  At the conclusion of this testimony, he denied trial counsel's motion for a new venire without giving any specific reasons.  (Tr. V. 2, .p. 227).

2.      **During *voir dire*, Judge Ruehlman refused to permit Petitioner Moore's counsel to fully explore the potential biases of the prospective jurors and denied Petitioner Moore's challenge to the prosecution's removal of an African-American woman from the jury.**

During *voir dire,* Judge Ruehlman told counsel that "you can object all you want on this voir dire stuff when it comes up for cause on – when somebody says they can't follow the law, there's a point where, if they answer my question a certain way I'm going to excuse them." (Tr. V. 2, p. 320).  This indicated that the judge was not going to permit trial counsel to conduct a comprehensive *voir dire* despite an order by Judge Morrisey granting trial counsel's motion for comprehensive *voir dire*.  (Tr. V. 1, p. 199).

_____

In fact, the Judge interrupted trial counsel and prevented him from fully exploring whether a prospective juror would consider sorrow or remorse as a mitigating factor. (Tr. V. 2, pp. 347-349). Judge Ruehlman stated that he did not think that a defendant's remorse was a mitigating factor that could be considered and sustained the prosecutor's objections to those questions. (Tr. V. 2, pp. 349-350). As a matter of law such remorse must be considered as a mitigating factor where evidence of remorse is presented.[10] The natural consequence of this ruling is eliminating counsel's ability to discover whether any of the jury members would refuse to properly consider remorse as a mitigating factor.

Judge Ruehlmann said that as long as the prospective jurors agree to follow the law and the instructions then that is all that is required. (Tr. 347-348; 350). He even ruled that the questions being asked by trial counsel were improper because they had nothing to do with the prospective jurors' ability to be fair and impartial. (Tr. 350). This ignored the proper legal standard in a capital case – jurors in a capital case must be asked if they would impose the death penalty automatically without regard to mitigating factors.[11]

Additionally, in ruling upon trial counsel's *Batson* objection to the State's peremptory challenge to Prospective Juror Freeman, an African-American woman, Judge Ruehlman upheld the peremptory challenge in part based upon his own subjective observation of Ms. Freeman's body language. His own observation of Ms. Freeman was that she was

---

[10]Under R.C. 2929.04(B)(7)'s "other factors," we consider, as mitigating factors, Williams's psychological problems and the remorse he expressed in his unsworn statement.*State v. Williams* (2003) 99 Ohio St.3d 439, 462,.

[11] See *Morgan v. Illinois,* 504 U.S. 719 (1992) (reversed death sentence because inadequacy of voir dire made Court doubt that petitioner was sentenced to death by fair and impartial jury). General questions about whether a prospective juror can be fair and follow the law are not sufficient. Id., at 734-736.

"defensive with the prosecution and I sensed a little hostility." (Tr V. 2 p. 413-414).  *(See* Thirteenth Ground for Relief regarding errors during *voir dire, Batson* claim).

One reason for the challenge, according to the prosecutor, was that an uncle of Ms. Freeman's was a lawyer in Columbus and had once been a public defender.  (Tr V. 2 p. 414).  Judge Ruehlman stated that when he was a prosecutor every defense attorney struck his relatives.  *Id.*  He also stated that from reading a Columbus magazine, that in Columbus "they" (it is unclear whether he meant defense attorneys or African-Americans or African-American defense attorneys) are "very hostile" towards prosecutors and police," a point not raised by the prosecutor and a point for which there is no support in the record.  *Id.* Permitting the striking of a black juror without a proper basis, when the venire already failed to reflect a fair racial cross-section of the community, exacerbated the prejudice caused to Petitioner.

> **3.    During the liability phase, Judge Ruehlman failed to promptly excuse a sleeping juror, improperly denied objections by Petitioner Moore's counsel, assumed that Petitioner Moore would be convicted, and improperly permitted the jury to conduct an experiment.**

Judge Ruehlman refused to excuse Juror No. 2 despite being informed twice by trial counsel that the juror was falling asleep during the proceedings.  (Tr. p.  V.  526-527).  In refusing to excuse the juror, the judge – who admitted that he had not been watching the jury – stated that he had not seen the juror fall asleep.  (Tr. p.  V.  527).  It was only after the judge's bailiff informed him that this juror was indeed falling asleep that the juror was excused.  (Tr. p.  V.4, p. 685-689).

Additionally, when trial counsel objected to the victim's father testifying about what

the victim did on the day he was killed, the judge denied the objection.  The Judge's hostility

to the defense is demonstrated in the following exchange:

> Q:    And, sir, will you tell the jury the nature of that contact?
>        What happened when he [victim] came home?
>
> A:    Well, he came home and brought his clothes and
>        shaving kit inside - -
>
> MR. JAMES: There will be an objection again, Judge.
>
> THE COURT: It is overruled.
>
> MR. JAMES: We're willing to acknowledge this man's son - -
>
> THE COURT: It is overruled.  Have a seat.  I said it was
> overruled and I know the reason.  Have a seat.
>
> MR. JAMES: Judge, if the prosecutor doesn't know the
> objection - -
>
> THE COURT: Overruled.
>
> MR. JAMES:  - - I don't know how you can.
>
> THE COURT: Have a seat.
>
> MR. DEARDORFF:   Can we request a side bar for the record?
>
> THE COURT: No, you can't.  Have a seat.
>
> MR. DEARDORFF: Your Honor, we are entitled to make a
> record for the Appellate  - -
>
> THE COURT: You made a record.
>
> MR. DEARDORFF: You don't even know what the objection is.
>
> THE COURT: Have a seat. . . .

(Tr. V. 4, p. 559-560).  At the first break, trial counsel stated that his objection was based

on relevance and the argument that what the victim did that day was not relevant.  (Tr.  V.

4, p. 629). He argued that the State was trying to present the picture that the victim was a dutiful son and that this was not relevant to whether Petitioner Moore was guilty of the charges. (Tr. V. 4, p. 629). In response, the trial judge ruled it relevant, despite clear law to the contrary. (Tr. V. 4, p. 629). As the Court is aware, Ohio's death penalty scheme does not provide for the consideration of any victim impact testimony. Nor has the Supreme Court ever permitted it in the culpability phase. *Payne v. Tennessee,* 501 U.S. 808, 825 (1991).

In contrast, rather than sustaining the proper objections made by the defense to hearsay and questions that lacked proper foundation, the trial judge assists the prosecution in laying appropriate foundations. (Tr. V. 4, pp. 611-612).

Before the liability phase testimony concluded, Judge Ruehlman assumed that Petitioner Moore was going to be convicted. This was evidenced by his request for the prosecutors to indicate which photos they chose not to introduce in this case so that "the Court of Appeals knows you used the weighing process." (Tr. V. p. 805) When the photos are later formally admitted, the judge again helps the prosecution preserve a record to secure what the court appears to believe will be a conviction. (Tr. V. 6, p. 871-872). Again, he assists the prosecution in protecting a record on appeal, an advantage not shared with the defense counsel.

During closing argument Judge Ruehlman failed to intervene when Prosecutor Deters encouraged the jury to perform its own experiment regarding the victim's position when he was shot. (Tr. V. 956-957). The coroner had testified that the victim's position (he was found lying on his back with his legs bent underneath him) was the result of either the position he was in when he was shot or the position he was placed in after he had been

shot, and over trial counsel's objection, that this position would not be highly unusual if the victim had been kneeling when he was shot. (Tr. V. 856; 879). During closing argument at the liability phase, Prosecutor Deters told the jury to

> go back in the jury room – nothing prevents you from doing this. Go back and see how did he get in that position, what you have to do. You're like this (indicating). He's like this on his knees. .... After you're down like this, have somebody take that State's Exhibit 16 [the gun] and see what your reaction is. Do you think you might maybe turn away from that gun and tilt your head back a little bit?

(Tr. V. 6, p. 957). Judge Ruehlman's failure to intervene and instruct the jury not to perform its own experiment permitted the jury to base its verdict on additional evidence not admitted at trial.[12] The effect of this argument is to ask the jury to re-enact the prosecutor's version of the shooting by putting the jury members in the position of the victim. The prosecutor's comments constituted impermissible victim-impact evidence that is "so unduly prejudicial that it renders the trial fundamentally unfair" and, thus deprives a capital defendant of due process. *Payne v. Tennessee,* 501 U.S. 808, 825 (1991).

### 4.   The Trial Judge had Improper *Ex Parte* Contacts With Defense Expert and improperly permitted the prosecutors to urge the jurors to identify with the victim.

Judge Ruehlman had an *ex parte* conversation with Dr. Chippone, the psychologist presented by trial counsel at the mitigation hearing, to discuss the doctor's position and duties. (Tr. V. 7, p. 1119). This meeting with the court-appointed defense expert constituted both actual and apparent impropriety. (T.d. 83; 95; 115; 117).

_____

[12] See In re Beverly Hills Fire Litigation, 695 F.2d 207 (6th Cir. 1982).

During the mitigation closing arguments Judge Ruehlman denied trial counsel's objections to the prosecutor's arguments that (a) repeatedly asked the jury to put themselves in the victim's place and speculate on what the victim was feeling and thinking in the moments leading up to the shooting and improperly consider those matters as aggravating factors. (Tr. V. 1196; 1231-1232; 1251-1254). Such matters were argued by the prosecutor although there was, and could be no evidence introduced at mitigation regarding what was going through the mind of the victim. (Tr. V. 1196; 1231-1232; 1250-1254). Moreover the trial judge permitted the prosecutor to comment on the fact that Petitioner Moore was not subject to cross-examination when he made his unsworn statement and argued that the jury could consider this when it considered Petitioner Moore's credibility. (Tr. V. 1227-1228; 1254).

These objections should have been sustained because the prosecutors' arguments were improper under Ohio's death penalty scheme and the federal Constitution.[13] (*See* Seventh Ground for Relief regarding prosecutorial misconduct). Thus, Judge Ruehlman permitted these improper arguments to infect the sentencing decisions rendered by both the jury and, ultimately, the trial court itself. (*See* Fourteenth and Fifteenth Grounds for Relief.)

**5. During the post-conviction proceedings, Judge Ruehlman ruled upon Petitioner Moore's petition despite his earlier comments in this case calling for the elimination of the post-conviction process.**

As demonstrated above Judge Ruehlman expressed in unequivocal terms his bias against affording Petitioner any post conviction rights. He expresses his personal regret that a defendant he had prosecuted when he was an assistant prosecuting attorney had not yet

---

[13] See O.R.C. §§ 2929.03, 2929.04

been executed and, as part of the sentencing proceeding, informs Mr. Moore that the post conviction relief statute should be repealed. (Tr. V. 7, p. 1270) Having so publicly criticized the existence of Ohio's post conviction relief statute and inveighed against the delays in executions in Ohio, it is inconceivable that the judge could serve as an impartial jurist in Petitioner's post conviction relief proceeding.

Indeed, Judge Reuhlman had been disqualified by the Ohio Supreme Court in a previous case where he served as trial judge and made injudicious remarks similar in import to those made in this case. During a sentencing hearing, Judge Reuhlman offered his opinion that the defendant should not enjoy parole. The Ohio Supreme Court disqualified the Judge from sitting at the hearing of a post-sentencing motion. The Court held, "[t]his remark suggests 'the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind' such that a reasonable person could question whether the decision on the pending motion 'will be governed by the law and the facts.' *In re Disqualification of Ruehlman* (1991) 74 Ohio St.3d 1229, 1229-1230. "Adjudication before a biased trial judge falls within the "very limited class of cases" that represents a "structural" error subject to automatic reversal.",*Bigby v. Dretke* 2005 WL 540048, *4 (5th Cir. 2005), quoting, *Neder v. United States,* 527 U.S. 1, 7-8 (1999)

G.  **Judge Ruehlman recently barred a member of the Ohio bar from practicing in his courtroom because he stated that he could not be fair to the lawyer based on the fact that the lawyer, an African-American, had been convicted of being an accomplice to an aggravated murder twenty-five years ago when he was sixteen years old.**

Last year Judge Ruehlman barred Derek Farmer, a newly-admitted member of the Ohio bar, from practicing law in his courtroom because he had been convicted in 1974 of

59

being an accomplice to the aggravated murder of a police officer and a civil rights activist.[14] Judge Ruehlman was "outraged" that Mr. Farmer was able to practice law and said that he should not even be out of prison: "You can't redeem yourself for killing two people. He's just not allowed to practice in my courtroom because I don't think I could be fair."[15]

Mr. Farmer, an African-American man who was 16 at the time of his offense, was convicted of being an accomplice to aggravated murder; he was sentenced to life imprisonment despite the trial judge's conclusion that he had not been the triggerman.[16] The shootings occurred as Mr. Farmer and a then-18 year old nephew fled after robbing a jewelry store in Dayton.[17]   Not only is this offense is similar to the offense at issue in Petitioner Moore's case – a killing in the course of a robbery – but Mr. Farmer and Petitioner Moore are both African-American men.

During his 18-year incarceration, Mr. Farmer studied law and corresponded with several judges. He worked to improve race relations, medical care and access to the law library.  He spoke to troubled teenagers about the dangers of crime.  "In one letter presented to the [parole] review board, a teen-aged boy said Mr. Farmer had 'changed my life.' 'No more drugs and robberies,' the teen wrote, 'It is time to start again.'"

After his parole in 1992, Mr. Farmer attended college and the University of Akron law school.  He clerked for U.S. District Judge Rice, who wrote a letter of support for him when

---

[14] "Judge bars cop-killer lawyer," The Cincinnati Enquirer 11/16/99.
[15] Id.
[16]  "Cop killer resigns as lawyer; Future uncertain after protests over admission to bar," The Cincinnati Enquirer 11/17/99; "Cops decry killer becoming lawyer; But judge said he's paid for death of police officer," The Cincinnati Enquirer 11/14/99.
[17] Id.

he sought permission to become a lawyer; this letter noted Mr. Farmer's "determination to pay back our community for what had transpired. By making a contribution to his community, he could in some way do penance for and right the horrible wrong he had done his community."[18]

In contrast, Judge Ruehlman's admitted bias against Mr. Farmer showed he could not be fair to a defendant convicted of aggravated murder despite uncontroverted evidence of that individual's positive conduct in prison. Similarly, Judge Ruehlman failed to consider and give effect to Petitioner Moore's uncontroverted evidence of his potential for positive conduct in prison. (Tr. V. 1107-1108; 1188; 1269-1271; T.d. 168 at 8-9).This deprived Petitioner of a fair trial and mitigation hearing.[19]

### H.  Judge Ruehlman had an apparent or actual bias against Petitioner Moore and should have been recused or disqualified at trial and on post-conviction.

All of the above evidence demonstrates that Judge Ruehlman had an apparent or actual bias against Petitioner Moore and the defense. This bias affected the pre-trial, trial, mitigation, and sentencing phases as well as the post-conviction proceedings.

As stated above, the mere appearance of a state judge's bias violates the due process rights of litigants, regardless of whether the judge is actually biased. *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986). If the mere appearance of a judge's bias exists, then his decisions are subject to reversal. *Id.* at 828. *See Bracy v. Gramley*, 520 U.S. 899 (1997). See also, *In Re Disqualification of Sheward*, (1996) 77 Ohio St. 3d 1258, (where the Ohio Supreme Court has disqualified the trial judge in order to guard against even the appearance

---

[18] "Judge bars cop-killer lawyer," The Cincinnati Enquirer 11/16/99.
[19] See Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978).

of impropriety). Even where there is no evidence or allegation of actual bias or prejudice, a judge should disqualify himself when his impartiality "<u>might</u> reasonably be questioned ... ." These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Prejudice must be presumed from these errors. In the alternative, these errors prejudiced Petitioner Moore since his sentenced was determined by a sentencer who had an expressed predisposition to imposition of the death penalty.

The AEDPA does not restrict review of this ground for relief. To the extent the state court considered the above grounds, it failed to address all of the pertinent parts of the constitutional analysis, *Frazier v. Huffman*, 343 F. 3d 780 (6th Cir. 2003); *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002), or failed to consider all relevant facts related to the claim. *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003). Moreover, Petitoner has demonstrated above that the decision of the state court is an unreasonable application of *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. at 825. And see *Bracy v. Gramley,* 520 U.S. 899 (1997).

**SIXTH GROUND FOR RELIEF AND SIXTEENTH GROUND FOR RELIEF (PET. PARA. 264)- AT THE MITIGATION PHASE, THE TRIAL COURT ERRONEOUSLY INSTRUCTED THAT THE JURY'S VERDICT HAD TO BE UNANIMOUS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Judge Ruehlman erroneously denied trial counsel's motion to instruct the jury that it need not unanimously agree on the existence of a mitigating factor. (T.d. 161, Tr. V. 7.p. 1063-1064). Had this instruction been given, it would have lessened the prejudicial effect of the Court's unanimity and acquittal first instructions.

The trial court improperly instructed Petitioner's jurors that they could not give effect to the mitigation -- consider a life sentence -- until they had **first** acquitted, unanimously,

Petitioner of the potential death sentence.  Until the unanimous acquittal on death, the jury could not **give effect to** any mitigating evidence.

The trial court unequivocally stated that "you," the jury had previously found Moore guilty of the specifications. (Tr., p. 1234).  The trial court then stated "you" are to weigh the previously found specifications against the mitigation presented. (Tr., p. 1235).  The trial court then stated "you must make a recommendation" as to sentence. *Id.*  "It is now my duty to instruct you on the law which applies in this proceeding…Now, again, the Court and jury have separate functions. You decide the disputed facts and the Court provides instructions of the law." (Tr., p. 1235).  This makes it absolutely clear that "you" or "your"[20] is the equivalent of "jury" or "the trial jury" not only as to this instruction, but as to all the penalty phase instructions as well.

In other words, a decision is made by all twelve jurors, not just one.  This is corroborated by the court's recognition of a single verdict – describing it as "your verdict." (Tr., p. 1236; *see also* Tr., p. 1250) ("Until your verdict is announced in open court, you are not to disclose to anybody else that status of your deliberations or the nature of your verdict.")  Consequently, the trial jury -- not individual jurors -- makes the two decisions (existence of mitigation and sentencing decision) at the penalty phase.

The trial court improperly instructed Moore's jurors that they could not give effect to the mitigation -- consider a life sentence -- until they had **first** acquitted, unanimously, Moore of the potential death sentence. (Tr., p. 1243-1244).  Until the unanimous acquittal on death, the jury could not **give effect to** any mitigating evidence.  Specifically, the trial court

---

[20] "You" or "your" is frequently referred to during the mitigation instructions.

instructed the jury:

> All twelve jurors must agree on a verdict. If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then you must recommend to the Court a sentence of death as to that particular count.
>
> On the other hand, if, after considering all of the relevant evidence admitted at the two trials and the arguments of counsel, you find that the State of Ohio failed to prove by proof beyond a reasonable doubt that the aggravating circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then you will not recommend to the Court a sentence of death as to that particular count of aggravated murder.
>
> In this event you will then proceed to determine which of the two possible life imprisonment sentences to recommend to the Court.

(Tr., p. 1243-1244).  (Emphasis added).  The trial court used mandatory language, "must," when instructing the jury.  A reasonable juror would understand that they **must** first acquit of death, and then and only then, would they be able to consider the life sentences. Thus, Moore's jury could not give effect to its reasoned moral response to mitigating evidence.

"In contrast to the carefully defined standards that must narrow a sentencer's discretion to **impose** the death sentence, the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to **decline to** impose the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, 304 (1987) (emphasis in original). Indeed, the Supreme Court's requirement that a jury both **consider and give effect** to mitigating evidence is as inflexible as it is longstanding.

In *Gregg v. Georgia*, 428 U.S. 153, 188 (1976), a plurality reasoned that a state sentencing procedure is constitutional when it does not create "a substantial risk that the

[death penalty will] be inflicted in an arbitrary and capricious manner." As noted in *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), the sentencing process must permit consideration of mitigating evidence "as a constitutionally indispensable part of the process of inflicting the penalty of death." This ensures compliance with the Eighth Amendment standard that "death is the appropriate punishment in a specific case." *Id.* at 305.

Consequently, the North Carolina statute considered in *Woodson* was struck as constitutionally deficient because it permitted **no** consideration of "relevant facets of the character and record of the individual offender or the circumstances of the particular offense." *Id.* at 304. Subsequent to *Gregg* and *Woodson*, the Supreme Court decided *Lockett v. Ohio*, 438 U.S. 586 (1978).

In *Lockett*, the Court considered an Ohio death penalty statute that limited the mitigating factors the sentencer could consider to three specific circumstances. 438 U.S. at 607-608. The Court concluded "the limited range of mitigating circumstances which may be considered by the sentencer under Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute **must not preclude consideration of relevant mitigating factors**." *Id.* at 608. (emphasis added). As *Lockett* noted, in a statute preventing consideration of mitigating evidence "[w]hen the choice is between life and death, the risk is unacceptable and incompatible with the commandments of the Eighth and Fourteenth Amendments." *Id.* at 605.

The *Lockett* rule was subsequently reaffirmed in *Eddings v. Oklahoma*, 455 U.S. 104 (1982). In *Eddings*, at 113, the Court considered a circumstance where the defendant presented mitigating evidence but the state court refused to consider the evidence because

it held as a matter of law it was not relevant.  The Court held that this violated the rule announced in *Lockett*.  "Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, **as a matter of law**, any relevant mitigating evidence."  *Eddings,* at 113-114 (emphasis in original).

*Eddings* made clear that it is not enough simply to allow a defendant to present mitigation.  The sentencer must **also** be able to consider and give effect to the mitigation.  In this regard, the Court compared the state court's error in *Eddings* to inappropriately instructing a jury as to mitigation. *Id.* at 114 ("In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf"); *Mapes v. Tate*, 388 F. 3d 187 (6th Cir. 2004) (appellate counsel ineffective for not raising an *Eddings* claim based upon improper jury instructions).

After *Lockett* and *Eddings*, it was clear that a State could not, consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to mitigating evidence. *Penry v. Lynaugh*, 492 U.S. 302 (1989)("*Penry I*"), simply reaffirmed this doctrine.

In *Penry I*, the Court considered whether a jury was properly instructed to allow it to consider and give effect to mitigating evidence.  The Court noted that a jury "must be able to consider and give effect to any [mitigating evidence.]"  *Penry I*, at 328.  In *Penry I*, the Court concluded "the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision."  *Id.*

In *Penry v. Johnson*, 532 U.S. 782 (2001)("*Penry II*"), the Court again required that jury instructions allow a jury to **give effect** to mitigating evidence.  Otherwise, the instructions

66

are unconstitutional. Penry argued his jury instructions did not provide the jury "with a vehicle for expressing its reasoned moral response to the mitigating evidence." *Penry II*, 532 U.S. at 796. The Court concluded:

> [T]he key under *Penry* I is that the jury be able to "consider **and give effect to** [a defendant's mitigating] evidence in imposing sentence." 492 U.S. at 319 (emphasis added). *See also Johnson v. Texas*, 509 U.S. 350, 381, 125 L. Ed. 2d 290, 113 S. Ct. 2658 (1993) (O'CONNOR, J., dissenting) ("[A]sentencer [must] be allowed to give full consideration and full effect to mitigating circumstances" (emphasis in original)). For it is only when the jury is given a "vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision," *Penry* I, 492 U.S. at 328, that we can be sure that the jury "has treated the defendant as a 'uniquely individual human being' and has made a reliable determination that death is the appropriate sentence," id. at 319 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 305, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976)).

*Id.* at 797 (emphasis in original). Ultimately, the Court concluded that the instructions did not allow the jury to give effect to the mitigation presented. *Id.* at 804; *Bigby v. Cockrell*, --- F.3d ---, 2005 U.S. App. LEXIS 3815 (5th Cir. 2005)(habeas granted when trial court gave instructions that did not permit the jury to give full effect to the defendant's mitigation); *Blue v. Cockrell*, 298 F.3d 318 (5th Cir. 2002) (same).

Recently, in *Smith v. Texas*, 125 S. Ct. 400 (2004), the Supreme Court again confronted substantially similar jury instructions as those present in *Penry II*, and the Court *again* held that the jury instructions were unconstitutional. Although the supplemental instruction in *Smith* was not identical to the one given in *Penry II*, the Smith Court stated that the distinctions were constitutionally insignificant. *Smith*, 125 S. Ct. at 406. As in *Penry II*, the Court found that the jury was faced with the ethical dilemma of either answering the special issue questions in a manner prescribed on the verdict form and ignoring the

67

supplemental instruction, or answering the questions as prescribed by the supplemental instruction which necessarily meant ignoring the verdict form instructions. *Id.* As in *Penry II*, the problem presented itself because Smith's mitigation evidence of organic learning disabilities and speech handicaps at an early age, a low IQ, and a drug addicted criminal father apparently did not fit within the scope of the special issues. *Id.* at 407 ("And just as in *Penry II*, the burden of proof on the State was tied by law to findings of deliberateness and future dangerousness that had little, if anything, to do with the mitigation evidence petitioner presented.")

In conclusion, the Supreme Court has universally condemned any procedure that restricts a jury's consideration of mitigating evidence. Indeed, this has become a benchmark of the Supreme Court's post-*Furman* death penalty jurisprudence and was recently reaffirmed in *Smith*. That is because mitigation can lessen the degree of punishment to be imposed by a jury. If a jury cannot lessen the degree of punishment, impose a life sentence, until acquitting first of the death penalty, then the jury cannot given effect to the mitigation.

Similarly, Ohio prohibits instructing jurors that mitigation cannot be given effect to until an acquittal of the death sentence option. In *Ohio v. Brooks*, 661 N.E.2d 1030, 1041 (Ohio 1996), the Ohio Supreme Court ruled that an acquittal-first instruction of the death penalty created a constitutionally impermissible risk of the erroneous imposition of the death penalty.

As noted by the Ohio Supreme Court:

> R.C. 2929.03(D)(2) contains no limiting language as to when a jury may contemplate a life sentence. The jury instruction given by the trial court would require unanimity that the death penalty was inappropriate before the jury could even **consider** a life sentence. Instead of requiring the unanimity of a death

68

> sentence, this instruction required the jury to issue a death
> sentence unless each juror was convinced that the death penalty
> was inappropriate.

*Brooks*, 661 N.E.2d at 1041.  The Ohio Supreme Court held that the jury "did not have to rule out the death penalty unanimously before considering a life sentence." *Id.*

The Sixth Circuit recognized the vitality of *Brooks* in *dicta* in *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).  *Mapes* noted likely constitutional error when an Ohio capital jury was instructed that they must be unanimous on the weighing calculus in favor of life (or, stated another way, unanimous on the weighing calculus against death) before the jury is permitted to return one of the life sentences allowed under Ohio law.

The Sixth Circuit relied on *Brooks*, which "ruled that an acquittal-first instruction, such as the one given by the trial court here, violates the Eighth and Fourteenth Amendments by creating a risk of an erroneous imposition of the death penalty."  *Mapes*, 171 F.3d at 416. The Court adopted the following rationale contained in *Brooks*:

> The record reflects that the jury in this case was instructed in a
> manner completely contrary to law, making it less likely for
> [petitioner] to benefit from the opinion from one juror that the
> death penalty was inappropriate. . . . [I]f a juror believed his one
> vote could not effect the ultimate result, you might acquiesce in
> the death sentence.  In this case, the jury instruction undermined
> the reliability of the jury verdict and risked an erroneous
> imposition of the death sentence, thereby materially prejudicing
> [petitioner's] right to a fair trial.

*Mapes*, 171 F.3d at 416, quoting *Brooks*, 661 N.E.2d at 1042.  The Court noted that *Brooks* "clearly establishes that the trial court misapplied O.R.C. §2929.03(D)(2) by requiring the jury to unanimously reject the death penalty before considering a life sentence."  *Id.* at 416-417.

The purpose of mitigation is to lessen the degree of punishment to be imposed by a jury considering death as an option.  If a jury cannot lessen the degree of punishment, and

69

impose a life sentence, until acquitting first of the death penalty, then the jury has not given

effect to the mitigation. A jury must be able to impose life without first acquitting of death in

order to give effect to mitigation.

Respondent argued *Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998) controls Moore's

situation. (Return pp. 68-70). However, in *Coe* the Sixth Circuit considered allegations of

whether *Mills v. Maryland*, 486 U.S. 367 (1988), had been violated by requiring a jury to

unanimously agree on the ultimate sentence. *See Coe*, 161 F.3d at 338 (requiring unanimity

as to results much different matter than requiring unanimity as to presence of mitigating

circumstances). The Sixth Circuit merely declined to extend *Mills*, instead finding that the

jury was not prevented from considering and giving effect to the mitigation, but was simply

required to unanimously agree on a sentence. *Coe*, 161 F.3d at 338. However, the Sixth

Circuit noted in *Henderson v. Collins*, 262 F.3d 615, 622 (6th Cir. 2001), that if there is a true

acquittal first instruction "…reversal of a capital sentence is warranted." In *Henderson*, the

Sixth Circuit discerned the difference between "acquittal first" instructions (as considered by

the Ohio Supreme Court in *Brooks*) and "consider first" instructions (as considered by this

Court in *Coe*). *Henderson*, at 622. This Court concluded "we find nothing constitutionally

impermissible with allowing jurors to consider whether death is appropriate ***so long as*** they

are aware that they may consider possible life sentences ***before*** reaching a final decision

with respect to death.**"** *Id.* (emphasis added); *see also Buell v. Mitchell*, 274 F.3d 337, 255-

56 n. 8 (6th Cir. 2001).

The Sixth Circuit confirmed this in granting habeas relief in *Davis v. Mitchell*, 318 F.3d

682 (6th Cir. 2003). In *Davis*, as in Moore's case, the jury had just been instructed as to the

two decisions they were required to make at the mitigation phases: the preliminary question as to existence of mitigation and the ultimate decision as to the weighing of aggravation versus mitigation.  Thereafter, the jury was instructed regarding the verdict forms which required twelve signatures signifying acquittal of death before a life verdict could even be considered. *Davis*, at 689-90.  In these circumstances, the court concluded "the inescapable likelihood in this case is that the jury understood the instructions to require unanimity in both its ultimate and interim conclusions violates *Mills*." *Id.* at 690.  The court thus granted relief on the ground that Davis was denied his rights at the penalty phase of the trial, as guaranteed by *Mills*, 486 U.S. 367 and *McCoy v. North Carolina*, 494 U.S. 433 (1990).

The trial court initially read the death penalty verdict form, again instructing the jury that they would have to be unanimous as to death, "and there's twelve blank lines there at the bottom." (Tr., p. 1246).  Thereafter, the trial court read the verdict form as to the first life option:

> "We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving thirty full years of imprisonment," and there's twelve full blank lines on the bottom of the form.

(Tr., pp. 1246-1247).  The verdict form and the trial court's instruction on the verdict form required the jury to make a unanimous finding acquitting of death before considering the life options.  *Id.*  This instruction and verdict form requiring a unanimous finding before considering a life sentence was repeated for the 20-life option under count 1 (Tr., p. 1247), and the two life options under Count 2. (Tr., pp. 1248, 1249).

Just as in *Davis*, Petitioner has a true acquittal first instruction. *Id.* at 1243-1244 ("you

71

**must** find that the state has failed to prove beyond a reasonable doubt ... **In this event you will then** proceed to determine which of the two possible life imprisonment sentences.") (Emphasis added). The verdict forms reflect that language to the same effect. (Tr., pp. 1246-1248). Instead of being instructed that sentencing options were "either A or B or C," the trial court instructed Moore's jury "A, but if not A, only then can you consider B or C."[21] Because this is a true acquittal first instruction, reversal of Petitioner's death sentence is warranted.

Moore's jury was told that it could give effect to mitigation -- consider a life sentence -- **only if the jurors first unanimously rejected death as a possible sentence**. It is presumed that the jurors followed this erroneous instruction. *Richardson v. Marsh*, 481 U.S. 200, 211 (1987). Indeed, the trial court instructed Moore's jury that they had no choice but to follow the mitigation instructions. (Tr., pp. 1235-1236) ("It is your sworn duty to accept these instructions, and to apply the law as it is given to you. You are not permitted to change the law nor to apply your own conception of what you think the law should be, nor are you to disregard the law in order to avoid an unpleasant decision.")

Respondent asserts in her Return that Moore's arguments run afoul of the United States Supreme Court authority that a jury need not be instructed as to what occurs if they are deadlocked. Return p. 70; *see Jones v. United States*, 527 U.S. 373 (1999). Moore is making no such argument and directs this Court's attention to the *Davis* opinion.

Moore presents the identical arguments presented and accepted by the Sixth Circuit

---

[21]Stated another way, just as a child understands a parent's proclamation "no dessert until the vegetables are eaten," a reasonable juror would understand no life sentences until an acquittal of death.

in *Davis*.  *Davis* did not find constitutional error due to a failure to instruct as to the

consequences for a potential failure to agree.  The Court applied *Boyde* and found error

because the instructions and verdict forms violated *Mills* by requiring juror unanimity as to

the existence of mitigation and requiring an "acquittal first" of death before the jury could give

effect to mitigating evidence and consider a life sentence. *Davis*, 318 F.3d at 689-71. Indeed,

the opinion states:

> Given the requirement of unanimity as to the jury's ultimate
> recommendation of either death or life under Ohio law, it is not
> surprising that the unarticulated but constitutionally required non-
> unanimous mechanism that will prevent a recommendation of
> death is obscured to such an extent that it cannot even be said
> to be implied by the instructions in this case. Instead of
> instructing the jury that it need not be unanimous in rejecting the
> death penalty, the trial judge in this case told the jury that in
> order to return a verdict for life imprisonment, "you must find that
> the State has failed to prove beyond a reasonable doubt that the
> aggravating circumstances which the defendant was found guilty
> of committing outweigh the mitigating factors." Immediately
> thereafter, the Court instructed that "since this is a criminal case
> the law requires that in order for you to reach a decision all 12 of
> you must be in agreement." The verdict form likewise reflected
> a unanimity requirement in finding that the aggravating
> circumstances do not out weigh the mitigating circumstances….

*Davis,* at 689.  The court did not fault the trial court for failing to instruct on what occurs upon

jury deadlock, but faulted the state court for "obscuring" the juror's ability to consider and give

effect to mitigation without the unanimous approval of all jurors. *Id.* Thus, the court concluded

acquittal first instructions present "an entirely different instruction from one that clearly

informs the jurors that a life verdict can be rendered by a jury that has not first unanimously

rejected the death penalty." *Id.*

    This "acquittal of death" instruction and accompanying verdict forms prevented

Moore's jury from giving effect to mitigating evidence as required by *Lockett*, *Eddings*, *Penry I*, *Penry II* and *Smith*. This instruction prevented a juror in Moore's case, inclined to grant mercy, to fail to give effect to his or her weighing calculus in favor of life based on the mistaken belief that he or she was required to gather the unanimous support of the entire jury room before a life sentence could be considered. There is, at the very least, "a reasonable likelihood that the jury. . .applied the challenged instruction in a way that prevent[ed]" it from giving effect to the mitigation. *Boyde v. California*, 494 U.S. 370, 380 (1990). Therefore, the acquittal first instruction unconstitutionally restricted Petitioner's jury from making a reasoned moral response to his mitigation.

As noted above, AEDPA does not constrain this Court's review of Moore's claim. While the claim was not presented in direct appeal, a subsequent *Murnahan* application received merits review. Because of the analysis not employed, (the correct United States Supreme Court analysis is contained *Boyde and* Miils), this Court's review of Moore's claim is not constrained by AEDPA. *Williams*, 529 U.S. at 406; *Magana*, 263 F.3d 542; *Hameen*, 212 F.3d at 248; *Frazier*, 343 F. 3d 780; *Miller*, 299 F.3d at 581-582.

**SEVENTH GROUND FOR RELIEF – PROSECUTORIAL MISCONDUCT AT THE MITIGATION PHASE CLOSING ARGUMENT WAS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

The prosecutor functions as the government's representative "whose obligation to govern impartially is as compelling as its obligation to govern at all. . . ." *Berger v. United States*, 295 U.S. 78, 88 (1935). The duty of the prosecutor is to seek justice, not merely to convict. ABA Standards for Criminal Justice §3-1.1(a). The misconduct of the prosecutor can "render the trial fundamentally unfair." *United States v. Chambers*, 944 F.2d 1253, 1272 (6th Cir. 1991). In Moore's case, the prosecutor's improper closing argument at the penalty

phase denied Moore his right to a fundamentally fair penalty hearing.

In Moore's case, the prosecutor failed to comport himself within constitutional bounds when he argued 1) personal feelings of the victim and speculated as to what the victim was feeling; 2) jury had a duty to impose death; 3) referenced non-statutory aggravating factors as a basis to return a death sentence; and 4) improperly commented on Moore's unsworn statement. The Ohio Supreme Court addressed the merits of each of the above finding them to be improper arguments.

The prosecutor repeatedly asked the jury to place themselves in the victim's shoes and improperly speculated as to what the victim was thinking and feeling. This court should consider this argument in the context of the earlier improper argument and request that the jury experiment with the murder weapon in the jury room. (Tr., p. 944 ("I ask each of you take this gun and try it."); p. 957 (asks jury to put the gun to their head and see if they turn away); *see also* Tr., p. 912 (defense argument noting "You saw Piepmeier pull the trigger of the gun.") Thus, the jurors would have a tangible reaction of fear, as would everyone who had a gun pointed at them and the trigger pulled.

Consistently, the prosecutor argued at length concerning the feelings, fears and hopes of Mr. Olinger.

> And think a minute what Melvin Olinger went through during that kidnapping. That's really what you have to do in order to decide how much weight do I attach to that [i.e., the kidnapping]?
>
> You know, when he is first scooted over in his car, that's when the kidnapping began, and when they took him behind that building and said 'Get out of the car,' I'm sure he was thinking, 'Thank God, I'm going to be let out here, I'm alive, take my car, take everything I have,' and then he's put into that trunk.
>
> If you look at the weather report for that day, it started out, I

75

think, at twenty-nine degrees at midnight the night before. By 10 o'clock that night, it was down in single digits, somewhere around four or two or six degrees. Just setting aside a moment the physical discomfort of not having a heavy coat on and being placed in that trunk, what went through his mind as he was driven from Fairfield back to Mount Healthy?

And when they made that initial stop in Mount Healthy, I'm sure at that point – because it's in this little complex where there's a lot of apartments and cars and activity – Mr. Olinger maybe there felt a little bit of relief that, you know, 'I'm not anywhere out in the sticks, out in the boondocks. I'm not going to be abandoned. Maybe they're going to let me out here. Maybe they're going to put me someplace.'

And I'm not sure exactly how much time he spent at that location, but a short time later the car started up again, and, again he's in the trunk, and, again, he's on a journey. But when the car stopped that last time, I'm sure the sounds were a little bit different.

And you can tell from the photograph of that old Gilbert Machine Company, I believe it is, down in Cumminsville. It's a very, very desolate area. It's basically the perfect place to take someone if you want to get rid of them. And when the trunk lid opened, maybe there was a moment of hope for Mr. Olinger. You know, 'They're going to let me out.'

And after all that time in the trunk, I'm sure he's freezing, he's cramped, he's been bounced around. Just for one moment maybe there was a little bit of hope for Mr. Olinger. But I'm sure when he got out and saw the .357 was still in the hands of Lee Moore, and he saw where he was, he knew – [Defense objection overruled]

He knew what was coming. And when he's marched back into that little cubbyhole behind the dumpster, that's the kidnapping. How much weight do you put on that? That's the aggravating factor. That's the second aggravating factor.

(Tr., pp. 1194-1196).

He's got a .357 on his lap. Mr. Olinger comes out of the car and is confronted by Lee Moore. As Mr. Piepmeier said, there's your kidnapping. Can you imagine the terror he's going through at

76

this point?

These are the aggravating circumstances that you're balancing against mitigation. What did Mr. Olinger do to deserve this?

They pull around the building. He's ordered out, thrown in the trunk, six degrees maybe, in the trunk of a car; confined in an incredibly small place in freezing temperatures and driven quite some distance down to where Kinley stayed. Those are factors – those are facts to weight in considering the aggravating circumstance against this mitigation.

He drives him down, the car stops for a while, Kinley gets in, Holmes gets out, and then there is a conversation. While he's in the trunk, he, Lee Moore, is saying he's got a guy in the trunk he's going to kill. Can you imagine the abject terror Melvin Olinger has at this point? [Defense objection overruled].

They drove him to the factory. Again, he's ordered out at gunpoint. Is the trunk open or shut? It doesn't matter. Does it really matter? He gets him out of the car. Was he begging for his life? You bet he was. [Defense objection overruled].

(Tr., pp. 1231-1232).

These arguments are highly improper (*see* Return p. 106 (recognizing asking jury to identify with victim were improper)) and ask the jury to speculate on matters not in evidence. They paint a vivid and emotional portrait of an individual who was feeling "hope" only to have that replaced with "abject terror." Asking the jurors to identify themselves with this hope and then terror is highly improper. *Boyle v. Million*, 201 F.3d 711, 715 (6th Cir. 2000).

Indeed, the improper arguments prompted Moore to move for a curative instruction.

"Judge, at this point I'm going to ask the court to instruct the jury to disregard the comments of the prosecutor, both Mr. Piepmeier and Mr. Deters, as to the suffering of the victim at the time of the offense…Mr. Deters talked about the defendant [sic] laying in the trunk shivering, with what array of hope he must have had when the trunk was opened. Mr. Deters talked about the abject terror of Melvin Olinger begging for his life. In *State v. Combs*, 1991, 62 Ohio St.3d 278, the Court, the Supreme Court specifically

found that this is error to speculate at length about what the victims thought as they were confronted by the defendant. I'm reading from that particular case. The prosecutor did err. The prosecutor did improperly suggest that how the victims were killed and the suffering and the mental anguish the victims endured was an aggravating circumstance. Improperly injecting nonstatutory aggravating circumstances is error. By continually referring to what the victims were thinking, the prosecutor engaged in gross misconduct.

(Tr., pp. 1251-1252).   In response to this objection the trial court noted "when I was a prosecutor, I always criticized Justice Wright." (Tr., p. 1252.)[22]  Despite Moore's additional objection that the comments were nothing more than pure speculation, the trial court denied Moore's request for a curative instruction. (Tr., pp. 1253-1254).

The prosecutor's repeated argument violates "the cardinal rule that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000) (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)); *see also Stumbo v. Seabold*, 704 F.2d 910, 912 (6th Cir. 1983) (denouncing statements which "tend[] to prejudice and inflame the jury."). Eliciting the feeling of hope dashed by abject terror unequivocally calls on jurors' emotions rather than "the evidence and law of the case." *United States v. Gainey*, 111 F.3d 834, 836 (11th Cir. 1997). Rather, in Moore's case the prosecutor asked the jury to base its decision on passion and matters not in evidence.

Indeed, the Sixth Circuit noted that prosecutorial arguments asking the jury to speculate as to the terror or anguish of a victim has no place in a death penalty sentencing

---

[22]This is an odd criticism given the fact that the entire Ohio Supreme Court found the comments to be misconduct in *Combs*.  Judge Wright dissented indicating that reversal was necessary in *Combs.*

hearing. *See Combs v. Coyle*, 205 F.3d 269, 292-293 (6th Cir. 2000). This is significant in that the misconduct described in *Combs* formed the actual basis of Moore's objection and request for a curative instruction. This Court can take notice of the fact that *Combs* is a Hamilton County case predating Moore's trial by five years – thus Hamilton County knowingly ignored the *Combs* admonition from the Ohio Supreme Court. Further, the law concerning what is a proper penalty consideration was longstanding.

Respondent characterizes Moore's complaint as complaining that Mr. Olinger felt cold. Return p. 77. Moore does not complain of the prosecutor's statement that Mr Olinger was cold – his complaint surrounds the emotions and thought processes; the emotional ups and downs; or in the prosecutor's words the "hope" and "abject fear." Those prosecutorial arguments violate *Combs*; so much so, the Ohio Supreme Court ruled the arguments were improper.

The prosecutor also improperly argued that it was the jury's responsibility or duty to impose death. (Tr., p. 1191). Statements that exhort the jury to "do its job" are improper. *United States v. Young*, 470 U.S. 1, 18 (1985). The above-quoted argument unambiguously pressures the jury to assist Ohio in executing Moore. This kind of pressure "has no place in the administration of criminal justice." *Id.*

The prosecutor misled the jury as to the appropriate considerations at the penalty phase by arguing non-statutory aggravating circumstances. Specifically, the prosecutor argued that the aggravating factors to give weight were:

> But if you really want to look at it and you really want to assign some weight to that, the real strength of that factor from the State's point of view is that Lee Moore put that type of value on someone's life; that to get a hat and to get a sweatshirt and to drive around in a nice car and to get some chains to wear and a

79

> gold nugget ring, he robbed for all those; that means more to him
> than someone's life; and back on January 14th, the ability to get
> those items meant more to him than Melvin Olinger. And that's
> what you consider when you weigh that aggravating factor.

(Tr., pp. 1193-1194).  Thereafter the prosecutor argued the previously excerpted portions of

the closing argument as the weight to be assigned the kidnapping aggravator.  *(See* Tr., pp.

1194-1196 (fear and dashed hope of Mr. Olinger); Tr., pp. 1231-1232 ("imagine the terror").

But that was not all – the prosecutor also argued that to place on the death side "the

coldness and premeditation in which Melvin Olinger was stalked." Tr., p. 1230; Tr., p. 1231

("coldly and premeditatedly went to a county and sought a victim who wouldn't be missed for

a while."))

Under Ohio law, although prosecutors in the penalty phase of a capital case may

properly refer to the nature and circumstances of the offense, it is improper to characterize

that evidence as a nonstatutory aggravating circumstance. *See e.g. State v. Gumm*, 653

N.E.2d 253, 262-63 (Ohio 1995). Thus, in so arguing, the prosecutor misled the jury and

injected an improper sentencing consideration. *See Combs*, 205 F.3d at 292-293 (Error for

prosecutor to argue that the facts and circumstances, including the manner in which the

victim died, are aggravating factors).  As noted in the Ohio Supreme Court's very first death

penalty case considering Ohio's current death penalty statute, *State v. Steffen*, 31 Ohio St.3d

111,  116-117, 509 N.E.2d 383, 590 (1987), the court limited the proper weighing process

to the statutory aggravating circumstances.

In a weighing state like Ohio, i.e., a state where the sentencer weighs aggravating and

mitigating circumstances, "the weighing of an invalid aggravating circumstance violates the

Eighth Amendment."  *Espinosa v. Florida*, 505 U.S. 1079, 1081 (1992) (*per curiam*)(citing

80

*Sochor v. Florida*, 504 U.S. 527, 532 (1992); *Stringer v. Black*, 503 U.S. 222, 232 (1992); *Parker v. Dugger*, 498 U.S. 308, 319-321 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 752 (1990)). Further, in a weighing state that allocates sentencing authority to the jury and/or the trial court, **both** the jury and/or the trial court must weigh aggravating and mitigating circumstances properly. *See Espinosa*, 505 U.S. at 1082. In addition, a death sentence must be struck when a sentencer considers as an aggravating circumstance "that [which] actually should militate in favor of a lesser penalty." *Zant v. Stephens*, 462 U.S. 862, 885 (1983).

Finally, the prosecutor made numerous inappropriate comments on Moore's use of the statutory permitted unsworn statement. Specifically, the prosecutor's argued over objection: "But what's their last piece of mitigation? Their last piece of mitigation is the defendant's statement, unsworn statement, so he does not have to face any cross-examination or face any tough questions from the prosecutors." (Tr., p. 1227). Seizing upon the avoidance of tough questions, the prosecutor later comments on the unsworn statement and its content – and challenges "If there is some big mystery why he went to Butler County besides that, why didn't he tell you that today in his unsworn statement?" (Tr., p. 1231). Moore again moved for a curative instruction in this regard which was overruled. (Tr., p. 1254).

To her credit, Respondent recognizes that there is a Fifth Amendment violation when a prosecutor comments on the failure of a defendant to testify. Return p. 76. However, Respondent suggests no error in Moore's case because "the prosecutor did not implicitly or explicitly mention the failure of Moore to testify." *Id.* The record refutes this claim and documents the prosecutor making two such statements: one, "he does not have to… face

81

any tough questions from the prosecutors." (Tr., p. 1227); two, "If there is some big mystery why he went to Butler County besides that, why didn't he tell you that today in his unsworn statement?" (Tr., p. 1231).

In *DePew v.Anderson,* 311 F.3d 742 (6th Cir. 2002), the Sixth Circuit affirmed this Court and held such arguments to be constitutionally improper.

> As a general matter, a comment by the prosecution on a defendant's failure to testify violates the Fifth Amendment. *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965). Under Ohio's unique statutory scheme, a defendant may present an unsworn statement at sentencing without subjecting himself to cross-examination. Ohio Rev. Code §2929.03(D)(1). We agree with the Ohio Supreme Court that "to permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights." [*State v. DePew*,] 38 Ohio St. 3d at 285, 528 N.E.2d at 554. It was a direct comment on the refusal of the defendant to testify under oath and subject himself to cross-examination -- a clear, though perhaps unpopular, right of a defendant in a criminal case under the Fifth Amendment. The prosecutor asked the jury to draw an adverse inference from the defendant's failure to testify.

*Depew*, 311 F.3d at 750.

In habeas, "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416, U.S. 637, 643 (1974)). "Even if the prosecutor's conduct was improper or even universally condemned, we can provide relief only if the statements were so flagrant as to render the trial fundamentally unfair." *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003). Yet reversal is required if the prosecutor's misconduct is "so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Pritchett v.*

*Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997); *see also Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000).

In order to obtain relief, Moore must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal. *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). If this Court finds improper conduct, four factors are considered in determining whether the challenged conduct is flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant. *See Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004); *Bowling*, 344 F.3d at 512-13; *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc) (citing *United States v. Leon*, 534 F.2d 667, 677 (6th Cir. 1976)).

The question of whether the arguments were improper was answered by the Ohio Supreme Court. In each of the above instances, the Ohio Supreme Court found that the arguments were improper. *Moore*, 81 Ohio St.3d at 33-34 (speculating what victim was feeling improper but did not impact any substantial right); *id.* at 35 (comments on unsworn statement did not impact a substantial right); *id.* (arguments regarding non-statutory aggravators improper but not prejudicial). Therefore, the sole question for this Court is the four-part flagrancy test, which Moore also satisfies.

First, there is a high likelihood each of the above remarks misled the jury. The speculation of Mr. Olinger's "abject fear" and dashed hopes requested a death recommendation on emotion rather than evidence. This was seized upon and specifically argued (improperly) that this fear and dashed hope was to be weighed against mitigation.

83

Thus, while not only asking the jury to base their verdict on the emotion – they were specifically requested to weigh this emotion as aggravation in spite of longstanding state court authority prohibiting such reliance. The comment on the unsworn statement improperly asked the jury to draw an adverse inference from Moore's failure to offer sworn testimony. Indeed, the prosecutor harped upon this inference in arguing "If there is some big mystery why he went to Butler County besides that, why didn't he tell you that today in his unsworn statement?" (Tr., p. 1231).

A factor to weigh in this regard, the state, despite the improper arguments, successfully opposed any curative instruction. (Tr., pp. 1252-1254). Any prejudice, however, could have been cured, or at least minimized, by curative instructions to the jury. This aspect of the first factor leans greatly in Moore's favor. *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994) ("The first factor [whether the remarks tended to mislead the jury or to prejudice the defendant] includes consideration of whether the trial judge gave an appropriate cautionary instruction to the jury.").

Second, the remarks are quite extensive. The closing argument in this case is relatively short – constituting approximately 21 pages of transcript. The above cited quotes from the closing argument are lengthy excerpts. The prosecutor invested a large portion of the closing argument to hitting the improper emotional argument as to what the victim may have been feeling and weighing that as an aggravating circumstance.

Third, the prosecutor organized his arguments very well, in that the argument builds the emotions from hope to abject fear. The consistent progression of the improper argument suggests it is the product of strategy, not the product of emotion momentarily overcoming a frazzled prosecutor. Further, the fact that the Ohio Supreme Court admonished Hamilton

84

County for virtually identical arguments five years before Moore's trial notes the deliberateness of the argument. *See State v. Combs*, 62 Ohio St. 3d. 278, 283 (1991). Finally, deliberateness is particularly apparent given defense counsel orally renewed his earlier written motion to limit argument to the statutory aggravating circumstances (Tr., p. 1067) and requested limits on comments regarding the unsworn statement. (Tr., pp. 1070-1071). In this regard, the prosecutor must have been fully aware of the propriety of such arguments – and assured their impact by opposing any curative instruction.

Fourth, the case for death is not overwhelming. Moore presented mitigation, especially his age at the time of the offense, and drug and alcohol dependence, which clearly support a compelling case for life. However, the jury was prevented from considering such evidence by the improper arguments. *See Bates v. Bell*, -- F.3d --, 2005 U.S. App. LEXIS 4711 *36 (6th Cir. 2005)("Overwhelming evidence of guilt can oftentimes be sufficient to sustain a conviction despite some prosecutorial misconduct, but overwhelming evidence of guilt does not immunize the sentencing phase evaluation of aggravating and mitigating factors."); *DePew*, 311 F.3d at 748 (prosecutorial misconduct in the sentencing hearing can operate to preclude the jury's proper consideration of mitigation.)

Under AEDPA, this Court must determine whether the Ohio Supreme Court's determination of Moore's prosecutorial misconduct claims are unreasonable or contrary to United States Supreme Court authority. In considering the merits of the claims, the Ohio Supreme Court did not cite to or rely upon any United States Supreme Court authority. *See Moore*, 81 Ohio St.3d at 33-35. Instead, the Ohio Supreme Court relied on previous state court authority regarding whether Moore was deprived of a substantial right. This is neither similar to nor the same as the United States Supreme Court's *Donnelley* test. Because the

85

Ohio Supreme Court did not consider, rely on or even analyze Moore's claim under *Donnelley,* AEDPA does not constrain this Court's review of the claim. *Williams*, 529 U.S. at 406; *Magana*, 263 F.3d 542; *Hameen*, 212 F.3d at 248; *Frazier*, 343 F. 3d 780; *Miller*, 299 F.3d at 581-582.

Because AEDPA does not constrain this Court's review of Moore's claim, this Court must determine whether the misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). The Sixth Circuit described the complexity of this inquiry: "In the context of a death penalty sentencing hearing, however, the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death." *Bates*, -- F.3d --, 2005 U.S. App. LEXIS 4711 *14-*15.

Moore demonstrates a substantial injurious effect. The improper arguments undermined the jury's ability to make a fair determination as to whether the Moore's proffered mitigation was outweighed by the aggravating factors proved against him. The improper arguments, particularly when taken together, were designed to keep, and successfully kept, the jury from properly considering and weighing the mitigating evidence offered by Moore. Thus, there is a substantial injurious effect inured at the penalty phase. As a consequence, this Court should reverse Moore's death sentence and remand for a new sentencing hearing.

**EIGHTH GROUND FOR RELIEF – MOORE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN HIS DIRECT APPEAL OF RIGHT TO THE OHIO SUPREME COURT IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Like all capital appellants, Moore had an appeal of right to the Ohio Supreme Court. Ohio Const. Art. IV, §2; O.R.C. §2929.05(A). Under *Evitts v. Lucey*, 469 U.S. 387 (1985), an appeal of right "trigger[s] the right to counsel" and the concomitant right to the effective assistance of appellate counsel. *Id.* at 402, 401 (citations omitted). It is an "obvious truth" that lawyers are "necessities, not luxuries" in our adversarial criminal justice system. *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).

In *Pennsylvania v. Finley*, 481 U.S. 551 (1987), the Court recognized that "the substantive holding of *Evitts* - that the State may not cut off a right to appeal because of a lawyer's ineffectiveness - **depends on a constitutional right to appointed counsel** that does not exist in state habeas proceedings." *Id.* at 558 (citations omitted) (emphasis added). Furthermore, in *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996), the Court stated that "[a] State's obligation to provide appellate counsel to poor defendants faced with incarceration applies to appeals of right." *Id.* at 113 (citing *Douglas v. California*, 372 U.S. 353, 357 (1963)). A State may not "bolt the door of equal justice." *Id.* at 102 (citing *Griffin v. Illinois*, 351 U.S. 12 (1956)).

The actions of Moore's appellate attorneys violated his right to the effective assistance of appellate counsel. First, no appellate counsel ever consulted with Moore prior to the filing of an appellate brief. Second, the attorneys failed to raise significant constitutional errors.

### 1.    Moore's appellate counsel failed to consult with him prior to filing his appeal.

Elizabeth Agar ("Agar") and Julia Sears ("Sears") represented Moore in his appeal of right to the Ohio Supreme Court. The testimony of both Agar and Sears demonstrates that they failed to consult with Moore before filing his brief, regarding whether to file a reply brief

87

or file for rehearing.

Sears testified that Agar handled all client contact. Sears Depo p. 44 lines 15-16. As noted by Sears, Agar "would do all the communication back and forth, what communication there was, I don't know." *Id.* p. 45 lines 8-11. Sears provided that only Agar could provide insight as to any consultations with Moore regarding whether to file a reply brief or motion for rehearing. *Id.* p. 46 lines 16-19; *Id.* p. 54 lines 9-14. Sears indicated that she had absolutely no contact or correspondence with Moore. *Id.* p. 44 lines 17-21.

Agar indicated that she never visited Moore. Agar Depo p. 62 lines 22-23. Further, Agar's time sheets do not record any phone calls with Moore. Agar Depo Ex. 1. Agar's file only contained two letters to Moore. The first letter indicated the brief had been filed. Agar Depo Ex. 4. The second indicated that the Ohio Supreme Court denied Moore's appeal. *See* Agar Depo p. 76 lines 20-24 through p. 77 lines 1-6. Through questioning, Agar agreed that all correspondence in her file had a corresponding entry in her time voucher. *See Id.* pp. 76-77.

Agar indicated that she made the decision not to file a reply brief. *Id.* p. 41 lines 19-21. She further indicated that she doubted Moore would have been consulted in that regard. *Id.* p. 42 lines 15-21. Agar indicated her standard practice is not to file a motion for rehearing. *Id.* p. 45 lines 5-7. Agar could not recall if Moore was advised or consulted in this regard. *Id.* p. 45 lines 14-17. However, the only correspondence noted on her time sheets and in her file is the single letter saying here is the opinion. *Id.* p. 76 lines 20-24 through p. 77 lines 1-6.

The Supreme Court recognized that an attorney has a constitutionally-imposed duty to consult with a defendant regarding an appeal. *See Roe v. Flores-Ortega*, 528 U.S. 470 (2000). Moore's Ohio Supreme Court attorneys violated this duty to consult.

In *Strickland*, the Supreme Court noted that in some circumstances a court must simply presume prejudice for deficient representation.  For instance, "when counsel is burdened by an actual conflict of interest . . . counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692. In *United States v. Cronic*, 466 U.S. 648 (1984), the Supreme Court elaborated on the *Strickland* presumed-prejudice exception and recognized that "[t]here are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. These circumstances arise when there is an actual or constructive denial of counsel. *Id.* at 659.  A constructive denial occurs when, although counsel is present, "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided." *Id.* at 654 n.11.

It cannot be disputed that a defendant can be actually or constructively denied his right to counsel during a direct appeal.  As noted in *Roe*, the *Cronic* principles apply when considering direct appeals. *Roe*, 528 U.S. at 481 (citing *Penson v. Ohio*, 488 U.S. 75, 88 (1989)).  In *Freels v. Hills*, 843 F.2d 958 (6th Cir. 1988), the Sixth Circuit presumed prejudice and remanded the case for a new appeal when appellate counsel did not substantially comply with *Anders* procedures.  The court noted in *Freels* that it was unclear from the record whether counsel "consulted with or sought the advice of Freels himself or even whether he gave any notice of his intention to file such a brief." *Id.* at 962.  In Moore's case, it is known that Agar and Sears did not consult with or seek the advice of Moore. Therefore, this Court should presume prejudice, and remand for a proper appeal. *See Freels*, 843 F.2d 958.

### 2.    Moore's appellate counsel failed to present significant

89

**claims of constitutional error.**

Appellate counsel failed to raise several substantial errors. As previously described, due process guarantees the effective assistance of counsel on a criminal appeal as of right. *See Evitts*, 469 U.S. 387. Counsel must exercise reasonable professional judgment in presenting the appeal. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). Concurring in *Jones*, Justice Blackmun wrote that appellate counsel may choose which issues to appeal as long as his performance is "'within the range of competence demanded of attorneys in criminal cases' and 'assure[s] the indigent defendant an adequate opportunity to present his claims fairly in the context of the state's appellate process.'" *Id.* at 755 (Blackmun, J., concurring) (internal citations omitted).

Appellate counsel must act as an advocate and support the cause of his client to the best of his ability. *See e.g., Penson v. Ohio*, 488 U.S. 75 (1989)*; Anders v. California*, 386 U.S. 738 (1967). Failure to present a meritorious issue for review also constitutes the ineffective assistance of appellate counsel. *See e.g., Mapes v. Tate*, 388 F. 3d 187 (6th Cir. 2004) (appellate counsel ineffective for not raising an *Eddings* claim based upon improper jury instructions); *Caver v. Straub*, 349 F. 3d 340, 345 (6th Cir. 2003) (appellate counsel was ineffective for failing to raise the absence of counsel during the jury re-instruction).

The errors missed by appellate counsel are apparent from even a cursory review of the record. This failure falls below the range of competence demanded in capital cases and denied Moore his rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. Moore's attorneys did not exercise reasonable professional judgment in presenting Moore's appeal to the state appellate courts. *See Jones*, 463 U.S. at 751, 755.

Moore's direct appeal counsel failed to raise several meritorious issues on Moore's

behalf:

1.     The trial counsel ineffectiveness at closing argument, lack of adequate preparation at the mitigation phase, and failure to obtain an expert [23]; (See Ground for Relief Two and Three above).

2.     Deardorff's conflict and ineffectiveness while pursuing the direct appeal to the court of appeals, and trial counsel's failure to seek an instruction of voluntary intoxication and secure a forensic pathologist expert to support Moore's defense (See Grounds for Relief Two and Three above).

3.     Improper acquittal first instruction impacting the jury's ability to consider and give effect to mitigation (See Grounds for Relief Two, Three and Sixteen above);

4.     Bias of the trial court judge (See Grounds for Relief Five and Twelve above);

5.     Improper selection and racism in the selection of the grand jury foreperson (See Grounds for Relief Two, Three and Nine above);

6.     Improper consideration of non-statutory aggravators by the jury and the sentencers (See Ground for Relief Two, Three and Fourteen above);

7.     The failure of the sentencer to consider mitigation as required by *Eddings* (See Ground for Relief Fifteen above);

8.     Improper jury instructions impacting the weighing process by the jury (See Ground for Relief Fifteen above);

9.     Prosecutorial misconduct (See Ground for Relief Sixteen above);

10.    Locking court house doors (See Ground for Relief Seventeen above);

11.    Instructional issues in violation of *Richardson* and *Sandstrom* (See Ground for Relief Fourteen, Fifteen and Sixteen above)

---

[23]Moore hereby incorporates by reference such arguments when he cites the pertinent pages of his Memo.

Appellate counsel also failed to present the above claims to the Ohio Supreme Court. As discussed *infra*, these constitutional deprivations, either taken separately or together, mandate that Moore's conviction and death sentence be overturned. One cannot presume that an attorney has raised all meritorious issues on behalf of his client. By not raising all meritorious issues, Moore's counsel on direct appeal performed deficiently to Moore's prejudice. *See Strickland*, 466 U.S. at 687-688. As the Supreme Court has recently observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2002). In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id*.

Applying the *Strickland* reasonableness test, Moore received the ineffective assistance of appellate counsel. Moore's direct appeal appellate attorneys unreasonably excluded meritorious grounds. His attorneys never consulted with Moore prior to the filing of his brief. As noted by the discussion of the issues not raised by appellate counsel in this Memo, significantly stronger grounds for appeal were excluded than were presented to the Ohio Supreme Court. Indeed, the issues raised by appellate counsel did not garner a single vote. Agar and Sears rendered ineffective assistance by not raising them.

The one denial on the merits of the above claims did not identify or apply the appropriate United States Supreme Court standard for this claim, therefore AEDPA is not applicable. *Williams*, 529 U.S. at 406. Further, the Ohio Supreme Court failed to provide any reasoning for its decision. *Hameen*, 212 F.3d at 248, or engage in any analysis of Supreme Court authority. *Romine*, 253 F.3d 1365. As a consequence, this Court's review of Moore's claim is not constrained by AEDPA.

92

**NINTH GROUND FOR RELIEF** – **THE SELECTION OF THE GRAND JURY FOREPERSON AND THE UNDER REPRESENTATION OF MINORITIES AND WOMEN AS GRAND JURY FOREPERSONS IN HAMILTON COUNTY VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR CROSS-SECTION, AND A FAIR PROCEEDING.**

Petitioner understands that there is no right to be indicted by a state grand jury However, "if a state chooses to use grand juries, the jurors must be selected without discrimination because of race or color." *Mitchell v. Rose,* 570 F.2d 129, 133 (6th Cir.1978), *rev'd on other grounds,* 443 U.S. 545 (1979). In *Castaneda v. Partida,* 430 U.S. at 494-495 the Supreme Court stated the test as:

> [i]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant *must show* that the procedure employed resulted in substantial under representation of his race or the identifiable group *to which he belongs.* The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied.... Next, the degree of under representation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time.... Finally, ... a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.... Once the defendant has shown substantial under representation of *his group,* he has made a prima facie case of discriminatory purpose and the *69 burden then shifts to the state to rebut the case. 430 U.S. at 494-95.

Aldridge v. Marshall 765 F.2d 63, 68 -69 (6th Cir. 1985).

"The Supreme Court in *Rose* unequivocally stated that in order to show that an *equal protection violation* has occurred in the context of grand jury foreman selection, the defendant must show that the procedure employed resulted in substantial under representation of his race or of the identifiable group to which he belongs." *Mosley v. Dretke* 370 F.3d 467, 477 (5th Cir. 2004), quoting *Rose v. Mitchell,* 443 U.S. 545, 565 (1979). The state court's failure in this case to apply the appropriate standard contradicts *Rose.*

93

The concern regarding discriminatory effects of a selection practice is particularly acute where, as here, the process is totally is subjective. Subjective decision making through these criteria provides a ready mechanism for discrimination. *Senter v. General Motors Corp.*, 532 F.2d 511, 529 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976); *Police Officers for Equal Rights v. City of Columbus*, 644 F. Supp. 393, 436 (S.D. Ohio 1985).

On January 27, 1994, a Hamilton County grand jury indicted Petitioner Moore on capital aggravated murder charges. (T.d. 1). These charges included three charges of capital aggravated murder (despite the fact that there was only one victim). Id. The grand jury is a central component of the criminal justice process. It acts as a vital check against the wrongful exercise of power by the state. It controls the initial decision to indict, and the subsequent decisions regarding how many counts to charge, whether to charge a greater or lesser offense, and whether to charge an offense as a capital offense.

The grand jury foreperson has the same full voting powers as other grand jury members. In Ohio, the Common Pleas court judge may select anyone to be the grand jury foreperson if that person satisfies the qualifications of a juror. See R.C. § 2939.02. This person's name need not be included in the grand jury venire. This statutory selection process is unconstitutional because it violates due process, fair cross-section, and equal protection guarantees.

Further, in Hamilton County, according to former Prosecutor (now common pleas Judge) Melba Marsh, the presiding criminal judge selects the grand jury foreperson and forwards that person's name to the Hamilton County prosecutor's office for approval. This practice is unconstitutional because it violates due process, fair cross-section, and equal protection guarantees. Not surprisingly, there is a gross disparity of between the

94

percentages of minorities in the Hamilton County population and the percentage of these minorities who have served as grand jury forepersons in Hamilton County. For example, the percentage of African-Americans who have served as grand jury forepersons in Hamilton County has never approached the percentage of African-Americans who live in Hamilton County. In fact, there was less than 25% as many African American forepersons than than would be expected based on their representation in Haamilton County. Similarly, the percentage of women who have served as grand jury forepersons has never approached the percentage of women who live in Hamilton County. (Affidavit of President of National Jury Project, Midwest, Exhibit E to Moore Supp. Apx., p. 431).

The Supreme Court's has recognized that "discrimination on the basis of race in the selection of members of a grand jury . . . strikes at the fundamental values of our judicial system" because the grand jury is a central component of the criminal justice process. *Campbell v. Louisiana*, 523 U.S. 392, 398 (1998)(citing *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)). As stated in *Powers v. Ohio*, 499 U.S. 400, 411 (1991), the grand jury "acts as a vital check against the wrongful exercise of power by the State and its prosecutors."

A finding of a disparity of six standard deviations, shifts the burden to the state to explain the disparity. *Jefferson v. Morgan*, 962 F.2d 1185, 1189 (6th Cir. 1992) (holding that six standard deviations establishes a prima facie case of discrimination in the selection of grand jury members). Indeed, even two or three standard deviations "would be suspect to a social scientist." *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977).

Further, in *Rideau v. Whitley*, 237 F.3d 472, 486 (5th Cir. 2000), the court held an absolute disparity of 13.5% created a presumption to discrimination. Smith has demonstrated an absolute disparity of 13.9% with regard to race and 31% with regard to

95

gender.  *See also Castenada*, 430 U.S. at 495-96, 97 (31% absolute disparity); *Whitus v. Georgia*, 385 U.S. 545, 550 (1967)(18% absolute disparity); *Sims v. Georgia*, 389 U.S. 404 (1967)(20% absolute disparity); *Jones v. Georgia*, 389 U.S. 24 (1967)(14.7% absolute disparity).

This disparities violates due process, fair cross-section, and equal protection guarantees.  *Rose v. Mitchell,* 443 U.S. at 565.  These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Prejudice must be presumed from these errors.  In the alternative, these errors prejudiced Petitioner Moore.  The state court's conclusion to the contrary is an unreasonable application of federal law.

**TENTH GROUND FOR RELIEF.  THE UNDER REPRESENTATION OF MINORITIES IN THE GRAND JURY AND PETIT JURY VENIRE IN HAMILTON COUNTY – INCLUDING PETITIONER MOORE'S PETIT JURY VENIRE  – VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY, AND A FAIR PROCEEDING.**

A state may not entrust the determination of whether a man should live or die to a tribunal that is organized to return a death verdict. *Witherspoon v. Illinois*, 391 U.S. 510, 543 (1968). Such can occur where the jury venire is discriminatorily constituted.  A defendant may make out a showing of unlawful discrimination by relying on the facts of his case to show the relevant racial disparity.  Petitioner is not obligated to show a long standing pattern and practice.

> Thus, since the decision in *Swain,* this Court has recognized that a defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection *in his case.* These decisions are in accordance with the proposition, articulated in *Arlington Heights v. Metropolitan Housing Department Corp.,* that **"a consistent pattern**

> ***of official racial discrimination" is not "a necessary predicate to a
> violation of the Equal Protection Clause.*** A single invidiously discriminatory
> governmental act" is not "immunized by the absence of such discrimination in
> the making of other comparable decisions." 429 U.S., at 266, n. 14. For
> evidentiary requirements to dictate that "several must suffer discrimination"
> before one could object, *McCray v. New York,* 461 U.S., at 965 (MARSHALL,
> J., dissenting from denial of certiorari), would be inconsistent with the promise
> of equal protection to all.

*Batson v. Kentucky* 476 U.S. 79, 95-96 (1986).

As mentioned on January 27, 1994, a Hamilton County grand jury indicted Petitioner Moore on capital aggravated murder charges.  (T.d. 1).  These charges included three charges of capital aggravated murder (despite the fact that there was only one victim).  *Id.* In October or November, 1994, the petit jury venire was picked by the jury commissioner. (Tr. V. 2 pp. 221-227).  On November 21, 1994, the jury recommended that Petitioner Moore be sentenced to death.  (Tr. V. 7, pp. 1258-1259).  On December 14, 1994, Judge Ruehlman accepted this recommendation and sentenced Petitioner Moore to death.  (Tr. V. 7, pp. 1263-1271).  See Fourth Ground for Relief (regarding lack of an impartial tribunal).

The grand jury and petit juries are central components of the criminal justice process. The grand jury acts as a vital check against the wrongful exercise of power by the state by controlling the initial decision to indict, and the subsequent decisions regarding how many counts to charge, whether to charge a greater or lesser offense, and whether to charge an offense as a capital offense.  The petit jury is an equally vital part of the criminal justice system.  The selection of a petit jury from a representative cross section of the community is an essential component of a defendant's Sixth Amendment right to a jury trial. *Taylor v. Louisiana,* 419 U.S 522, 528 (1975); *Smith v. Texas*, 311 U.S. 128, 130 (1940).

There is a gross disparity between the percentages of minorities and women in the Hamilton County population and the percentage of these minorities and women who have served on the grand and petit juries in Hamilton County.  For example, the percentage of African-Americans who have served on the grand and petit juries in Hamilton County has never approached the percentage of African-Americans who live in Hamilton County. (Affidavit of President of National Jury Project, Midwest, Exhibit E to Moore Supp. Apx., p. 431, and supporting documentation, pp. 431-466).

Specifically, in Petitioner Moore's case, the petit jury venire failed to represent a fair cross section of the community.  Of the petit jury venire of fifty (50) prospective jurors, only five (5) were  African-American.  (Tr. V.  pp. 212; 220-227).  Of these five (5) African-Americans, only one was male.  (*Id. at* 212-213; 215-216).

This petit jury venire failed to reflect a representative cross-section of the community, including a cross-section of Petitioner Moore's race (African-American), gender (male), and age (19).  (Tr. 212-215; 217).  According to the 1990 United States Census, in Hamilton County 20% of Hamilton County residents were African American during the relevant time period. A similar percentage of African Americans (19%) were 18 years of age and older.[24] Yet only 10% of Mr. Moore's of the venire was black

Judge Ruehlman asked trial counsel if they had any evidence that the venire selection process was improper or evidence that someone on the jury commission "intentionally just picked out white jurors?"  (Tr. 214; see Tr. 217).  This question was improper in part because a defendant may prevail on a cross-section claim without demonstrating that the selection

---

[24] The relevant excerpt of the 1990 U.S. Census Data, Hamilton County Data, a public record is attached for the Court's convenience as Attachment1.

98

of white jurors was intentional.  See *Duren v. Missouri,* 439 U.S. 357, 364 (1979) ("In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under representation is due to systematic exclusion of the group in the jury-selection process.").

When trial counsel requested time to prepare and present an expert witness, Judge Ruehlman denied this request despite his admissions that he did not know (a) whether another method of selecting jurors would produce a fair cross-section of the community; or (b) the percentage of the African-American population of Hamilton County. (Tr V. 2, pp. 216-218).  He ignored trial counsel's proffer that the African-American population in Hamilton County was between seventeen (17%) percent and twenty (20%) percent.  (Tr. 216; 227). (In fact it was 20%.) This denial was erroneous.

While Judge Ruehlman denied trial counsel's request for time to prepare and present an expert witness, he nonetheless permitted the prosecutor to present the testimony of the county jury commissioner. (Tr V. pp. 218-227).  Judge Ruehlman then erroneously denied trial counsel's motion for a new venire.  (*Id.* at 227).

In this case, Petitioner, an African American, has demonstrated that the venire in his case began with a gross under representation of his race.  As previously demonstrated, that disparity was exacerbated by the prosecutor's improper exercise of a peremptory challenge to a black female juror.  These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

99

Prejudice must be presumed from these errors.  In the alternative, these errors prejudiced Petitioner Moore. *Batson.*

Petitioner demonstrates above that the state court's decision rejecting this claim did not include a proper analysis under the federal standard enunciated in *Duren v. Missouri*, 439 U.S. 357, 364 (1979), and in any event constitutes and unreasonable application of *Duren.*

**ELEVENTH GROUND FOR RELIEF** – **HAMILTON COUNTY'S OVERPROSECUTION OF PEOPLE CHARGED WITH HOMICIDE VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AND A RELIABLE SENTENCE.**

Petitioner hereby withdraws this Ground for Relief.

**TWELFTH GROUND FOR RELIEF -  PETITIONER MOORE WAS DENIED HIS RIGHTS TO COUNSEL, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AN IMPARTIAL TRIBUNAL, A RELIABLE SENTENCE, AND AN ADEQUATE CORRECTIVE PROCESS DURING HIS POST-CONVICTION PROCEEDINGS.**

**A.    Petitioner Moore's Representation During State Post-conviction Proceedings Was So Inadequate and Lacking in Investigation and Preparation as to Violate Petitioner Moore's Due Process and Equal Protection Rights.**

Petitioner withdraws this as a separate claim.

**B.    JUDGE RUEHLMAN SHOULD HAVE RECUSED OR DISQUALIFIED HIMSELF FROM PARTICIPATING IN THOSE PROCEEDINGS DUE TO HIS BIAS AGAINST PETITIONER MOORE.**

Petitioner has demonstrated above in his Fifth Ground for Relief that the trial judge expressed and acted upon a bias against Petitioner and that the judge's predisposition to imposition of the death penalty denied Petitioner a fair and impartial tribunal.  Judge Reuhlman called for the elimination of state post conviction relief during his sentencing of Petitioner, and then decides whether such relief will be granted to Petitioner.

Moreover, the summary manner in which the trial judge disposed of Mr. Moore's petition for post-conviction relief confirms the presence of bias in the decision process, denying Petitioner any effective corrective state court process.    In this case the only response filed by the State was a "Motion for Judgment Pursuant to R.C. 2953.21(C)" which asked the state court to dismiss the petition largely on grounds of *res judicata.* (ROW APX. N, p. 860 *et se*q.). Petitioner's counsel was uncertain as to how this motion would be treated and rightfully expected notice from the trial court, pursuant to Rule 56, if and when the Common Pleas Judge decided to treat it as a motion for summary judgment. Post-conviction counsel reasonably believed that such notice was required by Rule 56, and would afford him the opportunity to submit the necessary affidavits. (ROW APX. T, p. 935). Counsel's expectation in this regard was entirely reasonable in light of the command in *Milanovich* which requires the courts to carefully follow the provisions of Rule 56 when that rule is being used as a means to resolve a post-conviction relief petition. *Milanovich* 42 Ohio St. 2d at 52 ("only careful adherence to the provisions of Civ.R. 56 can assure that the rights and obligations of both parties are fairly treated and respected..") Instead, no notice was given and the trial court entered judgment dismissing the post-conviction proceedings without the benefit of any response from Petitioner. (ROW APX. O, p. 876).

The record before this Court confirms that Petitioner was simply denied sufficient opportunity to develop facts in state court. He filed his petition in state court detailing IAC factual issues, making reference in the petition to facts that were outside of the record relating to those claims. *(See for example,* ROW APX M, pp. 737 *et seq*.). He requested discovery and a hearing on those claims. *(Id.* at 771*).* The Respondent obtained an extension of time and did not file any response for approximately 45 days.

101

In just 14 days, before any briefing or additional materials were filed by Petitioner, the Common Pleas Court entered a judgement dismissing Petitioner's post conviction proceedings and adopting the proposed Findings of Fact and Conclusions of Law filed by the State, verbatim. ( ROW APX O, pp. 876 *et seq.*).  This conduct by the trial judge was entirely consistent with his expressed bias against Petitioner's access to post conviction relief.

Rather than repeat the discussion set out in detail in the Fifth Ground for Relief, Petitioner respectfully refers the Court to the discussion and argument contained in the Fifth Ground for Relief above.  Petitioner has demonstrated in that ground that he was denied his constitutional right to an impartial tribunal at sentencing.   The mere appearance of a state judge's bias violates the due process rights of litigants, regardless of whether the judge is actually biased.  *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986).  If the mere appearance of a judge's bias exists, then his decisions are subject to reversal. *Id.* at 828. *See Bracy v. Gramley*, 520 U.S. 899 (1997).   The state court conclusion on this issue is contrary to applicable Supreme Court standards regarding the to an impartial tribunal as set forth in *Aetna* and *Bracy,* and therefore not entitled to deference.

**C.     The post-conviction process in Ohio is not an adequate corrective process.**

O.R.C. § 2953.21 does not provide an adequate corrective process due to the limitations placed on the remedy by the Ohio Supreme Court.   In *State v. Perry,* 10 Ohio St. 2d 175, 226 N.E.2d 104 (Ohio 1967), that court held at paragraph nine of its syllabus that:

> Under the doctrine of *res judicata*, a final judgment of conviction
> bars a convicted defendant who was represented by counsel
> from raising and litigating in any proceeding except an appeal

> from that judgment, any defense or any claimed lack of due
> process that was raised or could have been raised by the
> defendant at the trial, which resulted in that judgment or
> conviction, or on an appeal from that judgment.

The Sixth Circuit has criticized the *Perry* interpretation of state post-conviction review several times.[25]

Of the two hundred five (205) post-conviction petitions filed by death sentenced individuals since Ohio's death penalty statute was re-enacted in 1981, in only <u>one</u> (1) instance has relief been granted by the trial court.[26]  One hundred seventy-one (171) post-conviction petitions have been denied by the trial court;[27] thirty-four (34) are pending before the trial courts.

There is little opportunity for factual development in the post-conviction process in the State of Ohio.  An individual seeking post-conviction relief is not entitled to an evidentiary hearing until he produces sufficient evidence outside of the record to demonstrate that he is entitled to relief.  However, a post-conviction petitioner is not entitled to conduct discovery to obtain such evidence to warrant a hearing until he demonstrates that a hearing is necessary.  The post-conviction petitioner is caught in the classic "Catch 22" situation.  He cannot obtain a hearing until he demonstrates adequate proof of a constitutional violation, but he cannot utilize the means to gather the proof until he submits to the court sufficient proof of the constitutional violation.

---

[25] <u>See</u> *Coley v. Alvis*, 381 F.2d 870, 872 (6th Cir. 1967) ("The <u>Perry</u> decision has rendered such process ineffective ..."); *Allen v. Perini*, 424 F.2d 134, 139 (6th Cir. 1970) ("We are convinced that an appeal would be futile under the decision of the Supreme Court of Ohio in *State v. Perry*. . . ."); *Keener v. Ridenour*, 594 F.2d 581, 590 (6th Cir. 1979) ("This court consistently has recognized that because of the narrow interpretation placed on § 2953.21 by the Ohio Supreme Court, collateral relief is often unavailable or ineffective as a State remedy.").

[26] <u>State v. Barnes</u>, No. CR83-5911 (Lucas C.P. May 17, 1991).

[27] <u>See</u> Exhibit 10 attached To Petition

The record of the Ohio intermediate appellate courts with respect to capital post-conviction review is as cursory as the Ohio trial court's record.  Of those cases which have been decided by the Ohio intermediate appellate courts, the denial of post conviction relief has been affirmed in one hundred thirty two (132) cases.[28]  In only twenty-one (21) cases have these courts vacated the trial court judgment and remanded the case to the trial court for further review.[29]  Of these twenty-one (21) cases, seventeen (17) were again denied relief by the trial courts.[30]  Four (4) cases are currently pending before the trial courts.

Of the seventeen (17) cases that were again denied by the trial courts, fourteen (14) have been denied by the Ohio intermediate appellate courts.[31]  Three (3) cases are currently pending before the Ohio intermediate appellate courts.

The Ohio Supreme Court has discretionary review as to capital post-conviction cases.  It has <u>never</u> accepted jurisdiction to hear a capital post-conviction case.  It has rejected one hundred twenty-eight (128) memoranda in support of jurisdiction.[32]

As early as 1949 the Supreme Court *in Young v. Ragen,* 337 U.S. 235, 69 S.Ct. 1073, 93 L.Ed. 1333, articulated the principle that the States must afford prisoners some 'clearly defined method by which they may raise claims of denial of federal rights.' Id., at 239, 69 S.Ct., at 1074, 93 L.Ed. 1333. Case v. State of Neb. 381 U.S. 336, 337(1965), (Clark, J., concurring). That principle was clearly violated here.

These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth,

---

[28] <u>See</u> Exhibit 11 attached to Petition.
[29] <u>See</u> Exhibit 12 attached to Petition.
[30] <u>See</u> Exhibit 13 attached to Petition.
[31] <u>See</u> Exhibit 14 attached to Petition
[32] <u>See</u> Exhibit 15 attached to Petition

Eighth, and Fourteenth Amendments to the United States Constitution. Prejudice must be presumed from these errors. Alternatively, these errors prejudiced Petitioner Moore.

**THIRTEENTH GROUND FOR RELIEF – ERRORS DURING VOIR DIRE, INCLUDING THE PROSECUTORS' RACIALLY BIASED PEREMPTORY CHALLENGE OF AN AFRICAN-AMERICAN WOMAN, RESULTED IN A BIASED JURY THAT WAS ORGANIZED TO RETURN A DEATH VERDICT IN VIOLATION OF PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHT TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AN IMPARTIAL JURY, AND A RELIABLE SENTENCE.**

As previously mentioned a state may not, consistent with constitutional constraints, entrust the determination of whether a man should live or die to a tribunal that is organized to return a death verdict. *Witherspoon v. Illinois*, 391 U.S. 510, 543 (1968).

> "It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' *Fay v. New York,* 332 U.S. 261, 2941947]. See *Tumey v. Ohio,* 273 U.S. 510 [1927]. It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." 391 U.S., at 520-521 (footnotes omitted).

*Lockhart v. McCree,* 476 U.S. 162, 179 (1986).

In this context of *voir dire*, the Supreme Court has held that a State may not constitutionally execute a death sentence imposed by a jury culled of all those who revealed during *voir dire* examination that they had conscientious scruples against or were otherwise opposed to capital punishment. *Id.* 179-180. The State has "no valid interest in such a broad-based rule of exclusion, since '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him ... and can thus obey the oath he takes as a juror.' *Id., quoting, Witherspoon v. Illinois,* 391 U.S., at 519."

*Adams v. Texas,* 448 U.S. 38 (1980), involved what the Court has described as a

fairly straightforward application of the *Witherspoon* rule to the Texas capital punishment scheme. The Court held that the Texas exclusion statute "focuses the inquiry directly on the prospective juror's beliefs about the death penalty, and hence clearly falls within the scope of the *Witherspoon* doctrine"). *Adams* 448 U.S. *at 48*. The *Adams* Court explained,

> As an initial matter, it is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. [citation omitted]

*Adams* 448 U.S. 47-48. The actions of the prosecutor and jury in this case accomplished precisely that which is proscribed by *Adams* and *Lockhart*.

The erroneous denial of trial counsel's request for a change of venue resulted in Petitioner Moore's trial being held in Hamilton County, where the media's coverage of the crime and his co-defendants' court proceedings was pervasive.  In fact, during closing argument at co-defendant Jason Holmes' trial – which was held before Petitioner Moore's trial – Mr. Holmes' lawyer argued that <u>Petitioner Moore should be "smoked," i.e., electrocuted without having his appeals.  At that time, Petitioner Moore had not even been found guilty.</u>[33] Given the publicity and the trial of a co-defendant shortly before Mr. Moore's, the state court's should be keenly aware of the risk of picking a jury organized to return a death verdict.

---

[33] <u>State v. Holmes</u>, No. B-940661 (Hamilton C.P.), Tr. 367 (attached to Petition as Exhibit 16).

106

A.    **Judge Ruehlman Erroneously Denied Trial Counsel's Unopposed Request for Individual <u>Voir</u> <u>Dire</u> on Death Penalty Issues**

Judge Ruehlman denied trial counsel's <u>unopposed</u> request for individual <u>voir</u> <u>dire</u> on death penalty issues. (Tr. V. p. 34, 77; Tr. 199). This denial was unreasonable and forced trial counsel to question the jurors as a group regarding death penalty issues. This group questioning method did not constitute adequate <u>voir</u> <u>dire</u>. Lack of adequate <u>voir</u> <u>dire</u> impairs trial counsel's effective use of cause and peremptory challenges, and, thus, a defendant's right to exercise such challenges.

During <u>voir</u> <u>dire</u>, Judge Ruehlmann told trial counsel that as long as the prospective jurors agree to follow the law and the instructions then that is all that is required. (Tr. V. 2 p. 347-348; 350). He even ruled that the questions being asked by trial counsel were improper because they had nothing to do with the prospective jurors' ability to be fair and impartial. (Tr. V. 3, p. 350). At one point, he denied trial counsel the opportunity to discuss mitigating factors. (Tr. V. p. 273-274).

This ignored the proper legal standard in a capital case – jurors in a capital case must be asked if they would impose the death penalty automatically without regard to mitigating factors. See *Morgan v. Illinois,* 504 U.S. 719 (1992) (reversed death sentence because inadequacy of voir dire made Court doubt that petitioner was sentenced to death by fair and impartial jury). General questions about whether a prospective juror can be fair and follow the law are not sufficient.

Later during *voir dire*, Judge Ruehlman told counsel that "you can object all you want on this voir dire stuff when it comes up for cause on – when somebody says they can't follow the law, there's a point where, if they answer my question a certain way I'm going to excuse

107

them." (Tr. V. 3, p. 320). Thus, the judge was not going to permit trial counsel to conduct a comprehensive voir dire despite a previous order granting trial counsel's motion for comprehensive voir dire. (Tr. V. 2, p. 199).

### B.    The Prosecutors Committed Misconduct in Organizing a Jury to Return a Death Verdict.

Not only did the death qualification process in Mr. Moore's case unfairly tilt a jury towards sentencing the defendant to death, but the following errors at *voir dire* tilted Petitioner Moore's jury even closer toward the ultimate penalty.

During *voir dire*, the prosecutors asked the prospective jurors how they would rate their beliefs about the death penalty on a scale of one (1) to ten (10), with one being a belief of adamant opposition to the death penalty, and ten being a belief that everyone who commits murder should be sentenced to death. The prosecutors used this misleading scale in order to empanel a tribunal organized to return a death verdict.

The tribunal was, in fact, biased and organized to return a death verdict. Juror Wellington rated himself a 6-7. Juror Mason rated herself a 6 (saying that she was for the death penalty). Juror Miller rated himself a 7 (and later said that he favored the death penalty). ***Juror England rated herself a 10 – thus indicating that she thought that everyone who committed murder should get the death penalty.*** Juror Borgerding rated herself a 6. Juror Games rated herself a 5-6. Juror Phillips rated herself a 6-7 (saying that she was for the death penalty). Juror Hopkins rated himself a 7 and Alternate Juror Jackson (who was ultimately on the jury) rated herself a 5-6. (Tr V. pp. 282; 285; 295-296; 344-347; 373; 400-401; 429; 439; 452, 482).

Also, obtaining personal commitments from the prospective jurors that they could sign

108

a death verdict against a specific capital defendant is entrusting the determination of whether a man should live or die to a tribunal that is organized to return a death verdict.  In this case, the prosecutors sought to obtain personal commitments from the prospective jurors that they could sign a death verdict specifically against Petitioner Moore.  (Tr. V. 3 pp. 261, 264, 373, 383, 436, 463).

One of the prosecutors first told the jury that although he was Catholic, he was not opposed to the death penalty and did not believe that it was a sin to believe in the death penalty, improperly interjecting his personal beliefs into this case.  (Tr. V. 3 p. 261).  He then stated that:

> So it may come down to the point, though, where everyone on this panel will sign that death penalty recommendation and they slide it across to you, and **even though you're one of twelve, at that point, even though you're the only thing standing between Mr. Moore and possibly the electric chair, do you feel at that point – again, following the law – you could do it**?

(Tr. V. 3 pp. 264 emphasis added; *and see Id.* at  253; 258-259; 381-383).

## C.    Trial Counsel Was Ineffective at *Voir Dire* Because They Failed to Fully Explore the Potential Biases of the Prospective Jurors and Because They Permitted Prospective Juror England to Sit on the Jury.

All of the above errors caused trial counsel to be ineffective at the <u>voir</u> <u>dire</u> phase by preventing counsel from fully exploring the biases of the prospective jurors.

Further, trial counsel was ineffective for failing to use a cause or peremptory challenge against Juror England, who had specifically stated she favors the death penalty that she rated herself a "10" on the prosecutor's scale of 1 to 10.  (Tr. V. 3 , p. 296). The prosecutor defined "10" as automatic.  (Tr. V. 3, p.)

"In the absence of an affirmative and believable statement that these jurors could set

109

aside their opinions and decide the case on the evidence and in accordance with the law, the failure to dismiss them was unreasonable. *Wolfe v. Brigano* 232 F.3d 499, 503 (6th Cir. 2000). Although the prosecutor elicited from her that she would be fair, [a] court's refusal to excuse a juror will not be upheld "simply because the court ultimately elicits from the prospective juror a promise that he will be fair and impartial...." *Id.* at 502.

The prosecutor recognized Ms. England's bias in favor of the death penalty by remarking "you feel very strongly, obviously , about the death penalty . . ." (Tr. V. 3, p. 296). Yet defense counsel does nothing to pursue this issue. This constituted constitutionally deficient performance.

> Because the trial court failed to respond to Juror Bell's statement of bias on *voir dire,* we find that, as in *Hughes,* counsel's failure to respond in turn was objectively unreasonable pursuant to *Strickland.* "When a venireperson expressly admits bias on *voir dire,* without a court response or follow-up, for counsel not to respond [to the statement of partiality] in turn is simply a failure 'to exercise the customary skill and diligence that a reasonably competent attorney would provide.' " *Hughes,* 258 F.3d at 462 (quoting *Johnson v. Armontrout,* 961 F.2d 748, 754 (8th Cir.1992)).

*Miller v. Webb,* 385 F.3d 666, 675 (6th Cir. 2004). See *Morgan v. Illinois,* 504 U.S. 719 (1992) (reversed death sentence because inadequacy of voir dire made Court doubt that petitioner was sentenced to death by fair and impartial jury).   There can be "no sound trial strategy that could support what is essentially a waiver of a defendant's basic Sixth Amendment right to trial by an impartial jury." *Id.* at 676.

Counsel failure to pursue England's bias during *voir dire* is constitutionally ineffective. Moreover,

> The " 'presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice.' " *Hughes,* 258 F.3d at 453 (quoting *United States v. Gonzalez,* 214 F.3d 1109, 1111 (9th Cir.2000) (citations omitted)). Therefore, because Miller's trial counsel impaneled a biased juror,

"prejudice under *Strickland* is presumed, and a new trial is required." *Id.*

*Id.* at 676. The Court of Appeals held, therefore, that the state court's finding to the contrary

is an unreasonable application of Strickland and granted the writ. *Id.* at 678.

### D.    The Prosecutors Used – and Judge Ruehlman Condoned – a Peremptory Challenge Against Prospective Juror Freeman, an African-American Woman, on the Basis of Her Race.

The prosecutors exercised a peremptory challenge against Prospective Juror

Freeman, an African American woman who had stated that she could follow the law and sign

a death verdict in this case and that sometimes the death penalty is warranted. (Tr. V. 3 pp.

258-260; 405). When trial counsel objected on the basis of *Batson v. Kentucky*, 476 U.S. 79

(1986), the prosecutor responded that things about Ms. Freeman's answer to a question on

the questionnaire bothered him (Tr. V. 3 pp. 405; 408-410). She had answered that

inconsistent parenting, alcoholism or drugs, and lack of a religious background were the

factors she thought were most likely to have a negative influence on a child's development.

The prosecutor said that he did not like this answer because he thought that trial

counsel would argue that alcohol or drugs use were relevant to mitigating factors and specific

intent. (Tr. V.3 p. 408-410). This answer of hers was the main reason that the prosecutors

removed Ms. Freeman. They had two other reasons for the removal: (a) an uncle of Ms.

Freeman's was a lawyer in Columbus and had once been a public defender; and (b) Ms.

Freeman's arms had been crossed. (Tr. V. 3 pp. 410-414). This last reason was the least

important of the three. (Tr. V. 3 pp. 412).

Judge Ruehlman upheld the removal of Ms. Freeman because (a) he had observed

that Ms. Freeman was defensive with the prosecution and a little hostile; and (b) from his

reading of a Columbus magazine, that in Columbus "they" (it is unclear whether he meant

111

defense attorneys or African-Americans or African-American defense attorneys) are "very hostile" towards prosecutors and police.  (Tr. V. 3 p. 414).

This ruling was erroneous because the prosecutor had failed to sufficiently rebut the prima facie case of discrimination.  (*See* Tr. V. 3 p. 413).  As trial counsel pointed out, there were white prospective jurors who had answered the question on the questionnaire the same way and were not removed by the prosecutors.  (Tr. V. 3 p. 413).  Also, as far as her uncle being a former defense lawyer, Ms. Freeman's questionnaire showed that her uncle had once been a prosecutor as well.

These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by permitting the state to focus largely on the personal beliefs of the venire regarding the death penalty and ultimately organizing the jury to return a sentence of death.  Such a record renders the sentence of death constitutionally infirm.  *Adams,* 448 U.S. at 51.

The state court's determination to the contrary constitutes an unreasonable application of the controlling federal standard. *Adams,* 448 U.S. at 51; and see *Wolfe v. Brigano* 232 F.3d at 503.

**FOURTEENTH GROUND FOR RELIEF – THE SENTENCERS BASED THEIR DECISIONS TO SENTENCE MOORE TO DEATH ON IMPROPER AND NON-STATUTORY AGGRAVATING FACTORS IN VIOLATION OF MOORE'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.**

The trial court permitted improper and irrelevant evidence in the form of non-statutory aggravating factors to be considered by Moore's jury.  This violated Moore's rights under the Eighth and Fourteenth Amendments.  Moore may only be sentenced to death where the sentencing authority's direction has been guided so as to avoid arbitrary and capricious

imposition of the death penalty.  *Gregg v. Georgia*, 428 U.S. 153 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972).

O.R.C.  §2929.04(A)  guides  and  limits  the  sentencing  discretion  in  Ohio. Consideration of irrelevant evidence and non-statutory aggravating factors destroys Ohio's statutory guidance and impermissibly risks imposition of an arbitrary death sentence.  *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *see Espinosa*, 505 U.S. at 1082.   Therefore, the Supreme Court has held that it is a violation of the Eighth Amendment for a sentencer to weigh invalid aggravating factors when deciding to impose the death sentence.  *Sochor*, 504 U.S. at 532. *See*, *Espinosa*, 505 U.S. at 1082; *Clemons v. Mississippi*, 494 U.S. 738, 752 (1990).   "Employing  an  invalid  aggravating  factor  in  the  weighing  process  creates  the possibility of randomness, by placing a thumb on death's side of the scale, thus creating the risk of treating the defendant as more deserving of the death penalty."  *Sochor*, 504 U.S. at 532 (citing  *Stringer v. Black*, 503 U.S. 222, 232, 235-36 (1992)).   Therefore,  the jury's consideration of improper non-statutory aggravating circumstances when recommending Moore's death sentence violated Moore's right to have his sentence individually determined as guaranteed by the Eighth and Fourteenth Amendments.

### A.    Improper prosecutorial argument.

Moore previously argued in detail the substance of the improper and prejudicial prosecutorial comments.  Moore will not repeat or belabor those arguments now.  Rather, Moore incorporates them by reference.  Moore notes, however, the four part prosecutorial flagrancy test is not applicable to this claim.  Instead, this Court must simply determine if the arguments had a substantial injurious effect.

The improper arguments undermined the jury's ability to make a fair determination as to whether the Moore's proffered mitigation was outweighed by the aggravating factors proved against him.  The improper arguments, particularly when taken together, were designed to keep, and successfully kept, the jury from properly considering and weighing the mitigating evidence offered by Moore.  Thus, there is a substantial injurious effect that inured at the penalty phase.

Consequently, this Court should reverse Petitioner's death sentence and remand to the State court's for imposition of a remedy envisioned by *Clemons*, 494 U.S. 738.

**B.      Readmission of all culpability phase evidence.**

Petitioner hereby withdraws this subsection of his habeas ground for relief.

**C.      A Reasonable Juror Would Understand Instruction to consider "any other factors relevant to the issue of whether Petitioner Moore should be sentenced to death" as a basis to consider non-statutory aggravating circumstances.**

The Supreme Court has held that the Eighth Amendment requires that the class of death eligible offenders must be narrowly and rationally guided by state law. *McCleskey*, 481 U.S. at 305.  In Ohio, the only factors that make a defendant death-eligible are detailed in O.R.C. §2929.04(A).   The language in O.R.C. §2929.04(B)(7), however, creates a reasonable likelihood that the average juror will apply the defendant's (B)(7) mitigation in an unconstitutional manner.  *See Stringer*, 503 U.S. at 231-235; *Boyde*, 494 U.S. at 380-81.

The statutory definition permits the capital sentencer to consider "[**a]ny other factors** relevant to the issue of whether the offender **should be sentenced to death**."  O.R.C. §2929.04(B)(7) (emphasis added).  This definition eviscerates the narrowing achieved by O.R.C. §2929.04 (A) because it requires the sentencer to consider **any** factor relevant to

114

imposing the **death sentence**.  Accordingly, there is a substantial risk that the sentencer will view the defendant's proffered (B)(7) mitigation as a nonstatutory aggravator, rather than evidence that weighs against a death sentence.

Moreover, the O.R.C. §2929.04(B)(7) definition precludes the jury from giving the defendant's "catch-all" mitigating evidence its full consideration and effect.  The intent of the legislature in drafting O.R.C. §2929.04(B)(7) was to allow the jury to consider **all** relevant evidence that supported a **life** sentence.  *See Lockett*, 438 U.S. 586.  The legislature's intent is frustrated by the ill-worded provision in O.R.C. §2929.04(B)(7).  That statutory definition shifts the focus of the defendant's (B)(7) or "catch-all" mitigating evidence from reasons to impose a **life** sentences to reasons to impose a **death** sentence.

Because Moore's (B)(7) mitigating evidence can be construed as an aggravating factor, it is stripped of its full mitigating effect.  To satisfy the Eighth Amendment, each actor in the capital sentencing scheme must be able to give consideration and full mitigating effect to all relevant mitigating evidence offered by the defendant.  *Penry*, 492 U.S. 302; *Eddings*, 455 U.S. 104; *Lockett*, 438 U.S. 586; *Smith*, 125 S. Ct. 400.  Moore's jury was instructed to consider, as per the statute: "any other factors that are relevant to the issue of whether the Defendant should be sentenced to death." (Tr., p. 1243).

Moore's jury would reasonably understand the plain language of this instruction: that Moore's (B)(7) mitigating evidence could be used as a reason to impose the death penalty, not as a reason to impose a life sentence.  The court's charge and the statutory definition of (B)(7) mitigation eviscerated the constitutional principle of guided discretion in capital sentencing and prevented the jury from giving full mitigating effect to Moore's (B)(7) or

"catch-all" mitigating evidence.[34]  If indeed these are to be factors in mitigation, then the factors should be framed accordingly – those that are relevant to the issue of whether the offender should receive a sentence **less than** death.

The trial court should have instructed the jury to consider:

(G)    any other factors that weigh in favor of a sentence <u>other than death</u>.  This means you are not limited to the specific mitigating factors that have been described to you.  You should consider any other mitigating factors that weigh in favor of a sentence other than death. (Emphasis added.)

4 OJI 503.011 §10(G).   Moore suffered substantial and injurious prejudice as to this instruction.  It permitted the jury to consider non-statutory aggravating circumstances.    In a weighing state (i.e., a state where the sentencer weighs aggravating and mitigating circumstances) like Ohio, "the weighing of an invalid aggravating circumstance violates the Eighth Amendment."  *Espinosa*, 505 U.S. at 1081, *citing Sochor*, 504 U.S. at 532; *Parker*, 498 U.S. at 319-321; *Clemons*, 494 U.S. at 752.   When a sentencer considers as an aggravating circumstance "[which] actually should mitigate in favor of a lesser penalty" the death sentence must be struck.  *Zant*, 462 U.S. at 885.  Further, in a weighing state that allocates sentencing authority to the jury and the trial court, <u>both</u> the jury and the trial court must weigh aggravating and mitigating circumstances properly.  *Espinosa*, 505 U.S. at 1082.

Instructing the jury that it could consider "any other factors that are relevant to the issue of whether the defendant should be sentenced to <u>death</u>" constituted a violation of

---

[34]The Ohio Supreme Court has repeatedly held that the facts of the case are not aggravating circumstances.  <u>State v. Wogenstahl</u>, 75 Ohio St. 3d 349, 356 (1996); <u>State v. Combs</u>, 62 Ohio St. 3d 278, 283 (1991).  Likewise, the aggravated murder itself is not an aggravating circumstance. *See also* <u>Combs v. Coyle</u>, 205 F.3d 269, 292 (6th Cir. 2000).

Moore's federal due process rights in the death penalty statutes established by Ohio.  These statutes specifically provide for statutory aggravating circumstances. O.R.C. §2929.04(A). This provision of a limited number of proper aggravating circumstances guides the capital sentencer's discretion in accordance with *Gregg*, 428 U.S. at 192-195 (when sentencer's discretion is guided "the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary" will be reduced). However, permitting the jury to consider other non-statutory factors as aggravating fails to guide the sentencer's discretion and increases the likelihood that it will impose a capricious and arbitrary sentence. *Id.*; *Gregg*, 428 U.S. at 192-195; *see Espinosa*, 505 U.S. at 1081, *citing Sochor*, 504 U.S. at 532; *Stringer*, 503 U.S. at 232; *Parker*, 498 U.S. at 319-321; *Clemons*, 494 U.S. at 752 (all holding that "the weighing of an invalid aggravating circumstance violates the Eighth Amendment.").

The Ohio Supreme Court did not provide any analysis for denying the claim.  Rather, the Ohio Supreme Court summarily disposed of this allegation of constitutional error along with other allegations in a single sentence.

Therefore, this Court's review is not constrained by the decision of the Ohio Supreme Court because it did not adjudicate the claims on the merits. 28 U.S.C. 2254(d); Wiggins, 503 U.S. at 534; Davis, 290 F.3d at 951 (AEDPA does not apply where the state court has failed to address an issue); Brown, 267 F.3d at 40; Romine, 253 F.3d at 1363-65; Hernandez, 108 F.3d at 558; Liegakos, 106 F.3d at 1385.  Further, to the extent a string cite to state authority is an adjudication, this is not an identification and application of the correct United States Supreme Court test to be applied in considering this error. Boyde, 494 U.S. 370.  Thus, even if an adjudication, this Court still is not constrained by the decision of the Ohio Supreme

117

Court. <u>Williams</u>, 529 U.S. at 405, 409; <u>Magana</u>, 263 F.3d 542 (state court's use of incorrect standard erects no AEDPA barrier to the federal court's review of claim).

## FIFTEENTH GROUND FOR RELIEF – THE SENTENCER FAILED TO GIVE ANY WEIGHT TO THE UNCONTRADICTED MITIGATING EVIDENCE PRESENTED BY MOORE IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

The trial court failed to consider relevant mitigation presented by Moore, denying Moore the individualized sentencing guaranteed by the Eighth and Fourteenth Amendments. *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). Furthermore, the independent sentencing review of the Ohio Supreme Court did not correct this error as alleged by Respondent, due to Moore's liberty interest, established by Ohio law, in having the trial court independently determine that the aggravating circumstance outweighs any mitigating factor once the jury has recommended a death sentence.

Both the Eighth and the Fourteenth Amendments require that the defendant's character and record, as well as the circumstances of the offense, be considered as mitigating factors when inflicting a penalty of death. *Eddings*, 455 U.S. at 110, *Lockett*, 438 U.S. at 604; *Woodson*, 428 U.S. at 304. Furthermore, Ohio's statute mandates that the sentencer consider the defendant's history, character, and background as mitigating evidence. O.R.C. §2929.04(B). Despite this clear direction, the sentencing order specifically held that other than age and a good family upbringing, nothing else was mitigating. (Return Ex. A at p. 12 ("the Court cannot find any [other mitigating factors]"); *see also* Tr., p. 1266).

However, the trial court should have considered (a) the effect of his parents' divorce on him; (b) the bullying, teasing and beating of him by his peers throughout his childhood and adolescence; (c) his feelings that he did not fit in with his peers; (d) his substance abuse and

118

dependency beginning at age fifteen (15); (d) how he was very capable of being productive in a structured environment, i.e., prison; and (e) his unrealized potential as mitigating aspects of Petitioner's history, character, and background.  Both Supreme Court precedent and Ohio's statute obligated the trial court to consider this evidence, but there is no evidence in the sentencing order that the court did so.  This failure is a violation of the Eighth and Fourteenth Amendments.

In *Eddings*, the Court reversed the defendant's death sentence and remanded the matter for a new sentencing hearing where it appeared that the Oklahoma trial and appellate courts refused to consider the defendant's mitigating evidence of his abused and traumatic youth.  *Id.* at 113-17.  In dissent, Chief Burger pointed out that the record was "at best ambiguous" as to whether the Oklahoma trial and appellate courts refused to consider that evidence.  *Id.* at 124-25 (Burger, CJ, dissenting).  Nevertheless, the majority reversed the defendant's death sentence because, as Justice O'Connor explained,

> [W]e may not speculate as to whether [the state courts] actually considered all of the mitigating factors and found them insufficient to offset the aggravating circumstances. … *Woodson* and *Lockett* require us to remove any legitimate basis for finding ambiguity concerning the factors usually considered by the trial court.

*Eddings*, 455 U.S. at 119 (O'Connor, J., concurring).  Moore's case is stronger in that the trial court specifically indicated it could find no other mitigation to weigh.

The Seventh Circuit recognized the continued validity of *Eddings* in another habeas proceeding, *Wright v. Walls*, 288 F.3d 937 (7th Cir 2002).  There, the Seventh Circuit affirmed the district court's grant of the writ with respect to Wright's death sentence, holding that "the trial judge's failure to consider as mitigation Wright's traumatic childhood…violated

*Eddings v. Oklahoma*." *Id.* at 941. The parallels between Wright's and Moore's case are unavoidable.

Respondent suggests that the Ohio Supreme Court's independent sentencing review cured any error committed by the trial court. Return p. 110. Contrary to Respondent's assertion, the errors in the sentencing order were not corrected by the independent sentencing review of the Ohio Supreme Court and were, in fact, a violation of Petitioner's liberty interest in having a trial court independently determine that the aggravating circumstance outweighs any mitigating factor.

Ohio's trial courts have an essential role in the imposition of sentences on capital defendants. After a jury recommends death, the trial court is mandated to reweigh all the evidence presented before imposing a sentence of death. O.R.C. §2929.03(D)(3). Furthermore, O.R.C. §2929.03 places very specific obligations upon the trial court sentencing a capital defendant to death. In its sentencing opinion, the trial court must state its "specific findings as to the existence of any of the mitigating factors set forth in O.R.C. 2929.04(B), the existence of any other mitigating factors, the aggravating circumstances of which the offender was found guilty of committing, and the reasons why the aggravating circumstances of the offender was found guilty of committing were sufficient to outweigh the mitigating factors." O.R.C. §2929.03(F). Thus, "state law creates for a defendant a liberty interest" in having the trial court make that determination. *See*, *Clemens*, 494 U.S. at 746; *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Therefore, Moore had a liberty interest in the trial court's sentencing determination.

Thus, it was improper for the Ohio Supreme Court to cure the trial court's error through reweighing. In Ohio, a defendant cannot be sentenced to death without the trial

120

court finding that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. O.R.C. §2929.03(D)(3). The trial court's finding was essential. Its failure to appropriately perform its statutory duty, failing to consider statutorily and Constitutionally mandated mitigating factors, infringed upon Moore's liberty interest and thus violated his rights. The error could not be cured by appellate speculation due to Moore's liberty interest and, thus, reweighing without the trial court's determination violated Moore's rights under the Fifth and Fourteenth Amendments. *See Clemons*, 494 U.S. at 746, 754; *See e.g. Paxton v. Ward*, 199 F.3d 1197, 1220 (10th Cir. 1999) (appellate court cannot reweigh when mitigation not considered).

In every capital case, an "individualized decision" must be made regarding imposition of the death penalty. *Lockett*, 438 U.S. at 605. In sentencing Moore to death, the trial court did not treat Moore as a unique individual. The trial court failed to consider mitigation. As a result, the trial court violated Moore's right to individualized sentencing as guaranteed by the Eighth and Fourteenth Amendments, and his due process rights guaranteed by the Fifth and Fourteenth Amendments.

Moore's case is materially indistinguishable from *Eddings*, in that both involved the failure of state courts to consider mitigation. Therefore, the AEDPA does not bar relief of Moore's claim. *Williams*, 529 U.S. at 406 ("A state court decision will…be contrary to…clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."); *Vincent*, 226 F.3d at 689 (state court decision unreasonable when it reached a different result from the United States Supreme Court but considered materially indistinguishable facts).

121

Neither the Ohio Supreme Court nor Respondent can cite to a United States Supreme Court case that allowed reweighing when mitigating evidence was not considered by the original sentencer. That is because all cases out of the United States Supreme Court regarding the failure to consider mitigation require an immediate vacation of the death sentence. Therefore, the Ohio Supreme Court's weighing of mitigation (for the first time by any sentencer) when it reweighed is contrary to and an unreasonable application of *Gregg*, *Woodson*, *Lockett*, *Eddings*, and *Penry I. See also Paxton*, 199 F.3d at 1220 (cannot reweigh when mitigation not considered); *Wright*, 288 F.3d 937 (remanded for resentencing for *Eddings* error).

Respondent relies on the Ohio Supreme Court's independent review to cure any error. This is contrary to and an unreasonable application of United States Supreme Court authority. The Court has never countenanced a reweighing of mitigation by an appellate court, when the mitigation had never been considered by the sentencer. Indeed, the remedy under *Eddings* and *Lockett* is an immediate reversal of the sentence.[35] Thus, the Ohio Supreme Court's treatment of Moore's *Eddings* error is contrary to Supreme Court precedent. *Williams*, 529 U.S. at 406 ("A state court decision will…be contrary to…clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."); *Vincent*, 226 F.3d at 689 (same).

_____

[35]It is a matter of common sense that one cannot reweigh something that was never weighed in the first place. However, removing something previously weighed from the scales, i.e. an improper aggravator, does logically permit a reweighing.

To conclude, the trial court failed to consider mitigating evidence presented by Moore. Therefore, pursuant to *Eddings* and *Lockett* this Court should remand to the Hamilton County Common Pleas for a resentencing.

**SIXTEENTH GROUND FOR RELIEF – IMPROPER INSTRUCTIONS DEPRIVED MOORE OF HIS CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.[36]**

Error occurred at Moore's mitigation hearing when the trial court refused to provide the jury guidance via certain instructions and affirmatively provided erroneous instructions. Individually and collectively, there instructions or the failed instructions prejudiced the weighing process and led to a death sentence.

In paragraphs 262 and 263, Moore alleges that the trial court erroneously denied Moore's request to restrict certain irrelevant and improper considerations he presumed the state would argue at the mitigation phase: non-statutory aggravating factors and excessive comments on Moore's unsworn statement. The trial court denied such requests giving the prosecutor the green light to argue such matters. Seizing upon this, close to the prosecutor's entire closing argument focused upon improper non-statutory aggravators. The prosecutor also improperly commented on Moore's unsworn statement. Setting aside the fact that this helps establish the knowing and flagrant nature of the prosecutorial argument, the Ohio Supreme Court found the arguments to be improper. *Moore*, 81 Ohio St.3d at 33-34 (speculating what victim was feeling improper but did not impact any substantial right); *id.* at 35 (comments on unsworn statement did not impact a substantial right); *id.* (arguments regarding non-statutory aggravators improper but not prejudicial). Thus, the failure of the trial

---

[36]Moore hereby withdraws the allegations contained in paragraphs 261, 265, 266, 267, 268, 272 and 273 of this habeas claim.

court to rule in Moore's favor allowed the prosecutor to knowingly inject improper penalty considerations for the jury. (See Ground for Relief Eighteen).

The trial court failed to instruct the jury that they need not be unanimous as to the existence of a mitigating factor. (Tr., pp. 1063-1064).  As explained more fully in his Sixth Ground and incorporated herein, the instructions as given would lead a reasonable juror to believe that he or she could not consider a mitigating factor unless and until every juror member agreed as to its existence.  (See Ground for Relief Six above) Therefore, the failure of the trial court to affirmatively instruct on non-unanimity, in the context of the erroneous instructions provided the jury, violated Moore's rights under *Mills* and *Eddings.*

As pled at paragraphs 269-271, the trial court improperly instructed Moore's jury on various non-unanimous bases upon which to base a death sentence.  Instructing the jury with the alternative elements risked the possibility of a non-unanimous finding as to the basis for the death penalty.   It is possible that some jurors found the death sentence applicable because Moore had prior calculation and design while other jurors based it upon Moore as the principal offender. Thus, the death sentence in this case did not comport with the dictates of *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson v. United States*, 526 U.S. 813 (1999).

**SEVENTEENTH GROUND FOR RELIEF – JUDGE RUEHLMAN ORDERED THE COURTROOM DOORS TO BE LOCKED IN VIOLATION OF MOORE'S RIGHTS TO A PUBLIC TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.**

The Sixth Amendment guarantees that, "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." This right is applicable to the states through the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 148-49 (1968). The benefits of a public trial, although "frequently intangible, difficult to prove, or a matter of chance," *Waller*

*v. Georgia*, 467 U.S. 39, 49 n.9 (1984), are a central tenant of our judicial structure.  Public trials help to prevent perjury, unjust condemnation, and keep the accused's "triers keenly alive to a sense of their responsibility and to the importance of their functions." *Id.* at 46 (*quoting In re Oliver*, 333 U.S. 257, 270 n.25 (1948)).

As noted, under the Sixth Amendment, a defendant is entitled to a trial which can be openly attended by the public. *Waller*, 467 U.S. 39.  A trial cannot be closed to the public unless (a) the party seeking closure advances an overriding interest that he is likely to be prejudiced; (b) the closure is no broader than necessary to protect that interest; (c) the trial court considers reasonable alternatives to closure, and (d) the court makes findings adequate to support the closure.  *Id.* at 47.  If these elements are not satisfied, the Sixth Amendment is violated and "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." *Id.* at 49; *see also Johnson v. United States*, 520 U.S. 461, 469 (1997)(recognizing denial of right to public trial a structural defect requiring no showing of prejudice).

In Moore's case, the trial court failed to comply with *Waller*.  Rather, the court closed the doors to the courthouse not at the request of a party who had demonstrated an overriding interest, identified no interest being protected, never considered alternatives and never made findings supporting closure.  In sum, the trial court failed to comply or follow the United States Supreme Court directives. *See Walton v. Briley*, 361 F.3d 431 (7th Cir. 2004)(granting habeas relief on the basis of the denial of public trial when "the record of this case fails to show that the court even considered the [Waller] four-part test.")

125

As noted by Respondent, the trial court specifically noted he was letting people leave the courtroom before it was locked. (Return p. 121-122; *see also* Tr. pp. 958, 1234). Certainly, once the doors were locked the public was denied access. Instead of refuting Moore's claim, this demonstrates that the doors were locked, thus, the trial court denied access without first complying with *Waller*.

As noted above, AEDPA does not constrain this Court's review of Moore's claim. While the claim was not presented in direct appeal, a subsequent *Murnahan* application received merits review. Because the Ohio Supreme Court failed to analyze this claim pursuant to *Waller*, this Court's review of Moore's claim is not constrained by AEDPA. *Williams*, 529 U.S. at 406; *Magana*, 263 F.3d 542; *Hameen*, 212 F.3d at 248; *Frazier*, 343 F. 3d 780; *Miller*, 299 F.3d at 581-582.

**EIGHTEENTH GROUND FOR RELIEF** – THE PROSECUTORS COMMITTED MISCONDUCT AT THE PRE-TRIAL, VOIR DIRE, AND LIABILITY PHASES OF PETITIONER MOORE'S TRIAL IN VIOLATION OF HIS RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR TRIAL, AN IMPARTIAL JURY AND JUDGE, AND EFFECTIVE ASSISTANCE OF COUNSEL.

There are four factors that a relevant in analyzing a claim of forensic prosecutorial misconduct: (1) what is the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks are isolated or extensive; (3) whether they were accidentally or deliberately placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *Hill v. Brigano*, 199 F.3d 833, 847 (CA6 1999). To constitute a due process violation, the prosecutorial misconduct must be " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' " *United States v. Bagley,* 473 U.S. 667, 676(1985) (quoting *United States v.*

126

*Agurs,* 427 U.S. 97, 108(1976)); and see *Greer v. Miller* 483 U.S. 756, *765 (U.S. Ill.,1987).

The scope and recurring nature of the misconduct in this case meets that standard.

> **A.    During the Pretrial, the Prosecutors Had ex Parte Discussions with Judge Ruehlman and Met with the Defense Expert.**

When trial counsel's motion to reassign the trial judge was argued, former Prosecutor

Joe Deters admitted that he had *ex parte* discussions with Judge Ruehlman: "from

discussions with this Court ... judges were petitioned by Judge Cartolano, and this Court

[Judge Ruehlman] was available for this trial, and that is why we're here today."  Tr. 210.

These *ex parte* discussions between Prosecutor Deters and Judge Ruehlman were improper.

Likewise, the prosecutors' meetings with the defense expert psychologist, Dr. Chippone, to

discuss his findings were improper.   The prosecutor's *ex parte* contacts with the Defendant's

expert *clearly go beyond ethical boundaries .*   (Tr. 1119).

> [The expert's]  understanding that this conduct is "just not done" is in perfect congruity with the rules that [the prosecutor so wantonly broke. As Professor Charles Wolfram, Chief Reporter of the *Restatement of the Law Governing Lawyers* testified, it is a "no-brainer" that a prosecutor simply does not make an *ex parte* communication with a defense expert without the explicit consent of defense counsel.

*Lambert v. Blackwell* 962 F.Supp. 1521, 1546 (E.D.Pa.,1997), rev'd on other grounds, 134

F.3d 506 (3rd Cir.1997).

As discussed in the First Ground for Relief, AEDPA does not constrain this Court's

review of Moore's claim.  While the claim was not presented in direct appeal, a subsequent

*Murnahan* application, in which this allegation was raised, received merits review.  *State v.*

*Moore*, 93 Ohio St.3d 649 (2001)(per curiam).  The Court's one sentence merits analysis

does not identify or apply the appropriate standard for this claim .  Consequently, the AEDPA

is not applicable. *Williams*, 529 U.S. at 406.  *See also, Magana v. Hofbauer*, 263 F.3d 542

(6th Cir. 2001).  Further, the Ohio Supreme Court  failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000).  Clearly, by not citing to or analyzing Moore's claim under the applicable standard,  the Ohio Supreme Court failed to address all of the pertinent parts of the constitutionally required by that analysis.  Thus, the AEDPA does not constrain this Court's review of Moore's claim.  *Frazier*, 343 F. 3d 780; *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

**B.     During *Voir Dire,* the Prosecutors Organized a Jury to Return a Death Verdict.**

As noted above, a state may not entrust the determination of whether a man should live or die to a tribunal that is organized to return a death verdict.[37]    The prosecutors committed misconduct in Petitioner Moore's case by organizing a jury to return a death verdict; by asking the jurors how they would rate on a death penalty scale that set forth false standards; obtaining personal commitments from the prospective jurors that they could sign a death verdict against Petitioner Moore; and by removing a juror on the basis of her race.

The effect of the prosecutor's conduct here is to focus the inquiry on the personal beliefs of the jurors regarding the death penalty, rather than on whether the venire member would be able to fairly apply the law as given by the court. Constitutional principles of due process forbid this conduct.  As previously discussed the Supreme Court has held that a *voir dire* process that "focuses the inquiry directly on the prospective juror's beliefs about the death penalty, . . . clearly falls within the

---

[37] *Witherspoon v. Illinois*, 391 U.S. 510, 543 (1968).

scope of the *Witherspoon* doctrine". *Adams* 448 U.S. at 48.   The *Adams* Court explained,

> As an initial matter, it is clear beyond peradventure that *Witherspoon* is not a ground for challenging any prospective  juror. It is rather a limitation on the State's power to exclude: if prospective jurors are barred from jury service because of their views about capital punishment on "any broader basis" than inability to follow the law or abide by their oaths, the death sentence cannot be carried out. [citation omitted]

*Adams*  448 U.S. 47-48. <u>See</u> Thirteenth Ground for Relief.

As discussed in the First Ground for Relief, AEDPA does not constrain this Court's review of Moore's claim.  While the claim was not presented in direct appeal, a subsequent *Murnahan* application, in which this allegation was raised, received merits review.  *State v. Moore*, 93 Ohio St.3d 649 (2001)(per curiam).  The Court's one sentence merits analysis does not identify or apply the appropriate United States Supreme Court standard for this claim *(Adams* and *Witherspoon*).  Consequently, the AEDPA is not applicable. *Williams*, 529 U.S. at 406.  *See also, Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001).  Further, the Ohio Supreme Court  failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000).  Clearly, by not citing to or analyzing Moore's claim under *Adams*  the Ohio Supreme Court failed to address all of the pertinent parts of the constitutionally required by that analysis.  Thus, the AEDPA does not constrain this Court's review of Moore's claim. *Frazier*, 343 F. 3d 780;  *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

> **C.    During the Liability Phase, the Prosecutors Presented Testimony from the Victim's Father in Order to Elicit Sympathy from the Jury, Denigrated Petitioner Moore's Counsel, Encouraged the Jury to**

**Perform its Own Experiment, and Commented on Trial Counsel's Failure to Present Expert Witnesses.**

The prosecutors presented testimony of the victim's father only for the purpose of being able to elicit sympathy from the jury and identify for the jury that Mr. Olinger would be sitting in the courtroom audience.  Mr. Olinger testified that (a) the victim had a sister; (b) he worked out of town; (c) he hugged and kissed his mother before he left the house the night that he was killed; and (d) a friend of his had died; and (e) his family did not know what to do when they discovered that he was missing.  (Tr. 556-565).  This testimony showed that the victim had been a dutiful son.  None of his testimony was relevant to any of the elements of the offenses at issue.  (*See* Tr. V. p. 629).  Judge Ruehlman, however, stated that it was relevant.  Id.

At the liability phase closing argument, the prosecutor improperly encouraged the jury to perform its own experiment regarding the victim's position when he was shot.  (Tr. 956-957).  The coroner had testified that the victim's position (he was found lying on his back with his legs bent underneath him) was the result of either the position he was in when he was shot or the position he was placed in after he had been shot, and over trial counsel's objection, that this position would not be highly unusual if the victim had been kneeling when he was shot.  (Tr. V. 6 p. 856; 879).

During closing argument at the liability phase, Prosecutor Deters told the jury to

> go back in the jury room – nothing prevents you from doing this.  Go back and see how did he get in that position, what you have to do. You're like this (indicating).  He's like this on his knees. .... After you're down like this, have somebody take that State's Exhibit 16 [the gun] and see what your reaction is.  Do you think you might maybe turn away from that gun and tilt your head back a little bit?

130

(Tr. V. p. 957).    This experiment permitted the jury to improperly base its verdict on additional evidence supplementing the evidence admitted at the mitigation phase.  *See In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982).

At the liability phase closing argument, when he was arguing about whether the victim was on his knees when he was shot, the prosecutor improperly commented on trial counsel's failure to present an expert witness: "The defense has every ability to subpoena in any expert they want to prove otherwise.  Where were they? Where were they?"  (Tr. V. 6 p. 956).  This improperly shifted the burden of proof to Petitioner Moore.

The state court decision to the contrary constitutes an unreasonable application of *Payne v. Tennessee,* 501 U.S. 808, 825 (1991), as the Court has never permitted such testimony in the culpability stage or to otherwise bias a jury and undercut the fairness of the proceedings.

131

**D.    During the mitigation phase, the prosecutors urged the sentencers to identify with the victim and made other improper arguments.**

The most egregious example of prosecutorial misconduct occurred at the mitigation phase closing arguments, when, among other things, the prosecutor repeatedly urged the sentencers to put themselves in the victim's place and speculate on what the victim was feeling. (Tr. V. 7 pp. 1194-1196; and *see Id.* 1231-1232; 1250-1254).  See Seventh Ground for Relief (regarding prosecutorial misconduct at mitigation phase closing argument).

In addition to these arguments, the prosecutors also improperly argued that it was the jury's responsibility to seek or impose the death penalty, (Tr. V. 7,  pp. 1191); that the sentencers should consider the nature and circumstances of the offense and of the aggravating circumstances as non-statutory (and thus improper) aggravating factors; that the strength of the aggravating circumstance of the killing being in the course of an aggravated robbery was that Petitioner Moore placed a certain value on someone's life, (Tr. 1193-1194); and commented on the fact that Petitioner Moore was not subject to cross-examination when he made his unsworn statement and argued that the jury could consider this when it considered Petitioner Moore's credibility, (Tr. 1070-1071; 1227-1228; 1231; 1254).  See Seventh Ground for Relief.

In combination, all of these arguments were improper, and warrant reversal because they mislead the jury, prejudiced Petitioner Moore, and were deliberately placed before the jury. *See United States v. Francis,* 170 F.3d 546, 550-551, 553 (6th Cir. 1999) (cumulative prosecutorial misconduct found despite overwhelming evidence of guilt); *United States v. Carroll,* 26 F.3d 1380, 1388 (6th Cir. 1994); *Sizemore v. Fletcher,* 921 F.2d 667, 670 (6th Cir.

132

1990); *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986); *United States v. Leon,* 534 F.2d 667 (6th Cir. 1976).

These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Prejudice may be presumed from these errors and omissions. In the alternative, these errors and omissions prejudiced Petitioner Moore.

Because AEDPA does not constrain this Court's review of Moore's claim, this Court must determine whether the misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). The Sixth Circuit described the complexity of this inquiry: "In the context of a death penalty sentencing hearing, however, the question of error or effect is more complex than in traditional trials. Rather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death." *Bates*, -- F.3d --, 2005 U.S. App. LEXIS 4711 *14-*15.

## NINETEENTH HABEAS GROUND – PETITIONER'S STATEMENT WAS TAKEN FROM PETITIONER IN VIOLATION OF HIS RIGHTS UNDER FIFTH AND FOURTEENTH AMENDMENT.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings[38] must be given before a suspect's statements made during custodial interrogation

---

[38] "These warnings (which have come to be known colloquially as 'Miranda rights') are: a suspect 'has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *Dickerson v. United States,* 530 U.S. 428, 435 (2000) (quoting *Miranda*, 384 U.S. at 479).

133

may be admitted in evidence. *Miranda* established a baseline rule as to warnings which must be given before a suspect's custodial statements may be admitted into evidence. As Chief Justice Rehnquist noted for the Court in *Dickerson v. United States*, 530 U.S. 428, 440 (2000): "After discussing the 'compelling pressures' inherent in custodial police interrogation, the Miranda court concluded that, 'in order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively appraised of his rights and the exercise of those rights must be fully honored.'" "*Miranda* announced a constitutional rule." *Dickerson*, 530 U.S. at 444.

Determining the validity of a Miranda waiver usually entails two separate inquiries. The waiver must be both voluntary, and knowing and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* A waiver is knowing and intelligent when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Both inquiries are judged based on the "totality of the circumstances surrounding the interrogation." *Id.* (internal quotation omitted).

As noted above, the requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry. *See Haynes v. Washington*, 373 U.S. 503, 513 (1963)(authorities would have "little, if any, trouble" obtaining a written "concession of voluntariness" and waiver of any rights); *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). In *Miller v. Fenton*, 474 U.S. 104, 109-10, (1985), the Court noted "…that tactics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." The Court's voluntariness

134

examination considers "whether a defendant's will was overborne" by the circumstances surrounding the giving of a confession, *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973); and by indicating that the due process test takes into consideration "the totality of the surrounding circumstances - both the characteristics of the accused and the details of the interrogation," *id.*; and by specifying that the due process test is determined by "a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, 346 U.S. 156, 185 (1953). The Supreme Court in *Dickerson*, 530 U.S. at 434, affirmed the continued viability of this involuntariness test.

Thus, even with a validly given Miranda waiver, a confession may be subject to suppression for a number of reasons. For example, after a Miranda waiver, the police cannot beat a confession out of a suspect or induce intoxication or a drugged state, and hope to have the confession admitted into evidence. *See Mincey v. Arizona*, 437 U.S. 385, 401 (1978). *Miranda* prohibits such acts and the use of such tactics invalidates a suspect's waiver. *See* 384 U.S. at 476 ("Any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege."). Such improper methods can deprive a defendant "of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran*, 475 U.S. at 424; *see Smith v. Illinois*, 469 U.S. 91, 98 (1984) (police statement not constitutional because it was "seriously misleading" because it "imparted" to the suspect that "he had to talk to the interrogator.")

The police must not only dispel, at the outset, the coercive atmosphere that is inherent in the surroundings of custodial interrogation; they must also ensure that it does not return. *Miranda*, 384 U.S. at 445-58. As stated by the Court: "Our aim is to assure that the

135

individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda*, 384 U.S. at 469. The Court pointed out that a one-time warning, delivered at the outset "by those who will conduct the interrogation, cannot itself suffice to that end...." *Id.* To emphasize this point, the Court added, "there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information on his own prior to invoking" his rights. *Id.* at 475-76. Of direct relevance here, the Court stated that "any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive" constitutional rights. *Id.* at 476.

The starting point for this Court's analysis should be the finding of the Ohio Supreme Court that "[s]everal aspects of the events leading to Moore's confession [were] troubling." *State v. Moore*, 81 Ohio St.3d 22, 32 (Ohio 1998). Specifically, the court found the following facts troubling.

> The police officer did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in subfreezing temperatures in his stocking feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room.

*Id.* Even though it found several aspects of these events troubling, the Ohio Supreme Court failed to consider <u>all</u> of the circumstances, specifically omitting the following:

- On January 20, 1994 @ 9:00 a.m., Moore eats for the last time on that day;
- On January 20, 1994 @ 2:00 p.m., Moore smokes a six inch cigar of marijuana;
- On January 20, 1994 @ 5:30 p.m., Moore is arrested while waiting for food at a fast-food restaurant;
- On January 20, 1994 immediately after his arrest, Moore is placed in a Mt. Healthy holding cell cuffed and the detective

136

responsible for removing cuffs does not recall removing Moore's cuffs;

- On January 20, 1994 @ 8:00 p.m., a detective takes Moore's hat, shirt and sweatshirt. Further, at some point in the evening Moore's shoes are also taken;

- On January 21, 1994 @ 12:10 a.m., Moore signs a *Miranda* form in the Mt. Healthy holding cell, however, he is not questioned;

These facts establish state coercion to obtain a statement.

The state court's treatment of this claim was contrary to and/or an unreasonable application of federal law as determined by the Supreme Court. A state court's decision is "contrary to" established Supreme Court precedent when it applies a rule that contradicts the governing law set forth in Supreme Court cases, or when it confronts a set of facts that is materially indistinguishable from those of a decision of the Supreme Court and still arrives at a different decision than Supreme Court precedent. *Williams*, 529 U.S. 362, 405 (2000). Although "unreasonable" has been harder to define, the Supreme Court has maintained that it means more than simply incorrect. *Id.* 410.

The Ohio Supreme Court's decision was contrary to U.S. Supreme Court authority under 2254 (d)(1). The Ohio Supreme Court's error occurred when it found the conduct troubling; yet also held Moore's *Miranda* violation was cured by an earlier valid waiver. *Miranda* and its progeny refute this illogic. *Miranda* specifically recognized that a one time waiver is not the end of the inquiry – that subsequent (mis)conduct can invalidate the waiver. It stands to reason that if a one-time warning given at the beginning of an interrogation may not satisfy the continuing obligation under *Miranda*, then a previous *Miranda* waiver given in a preceding interrogation would not satisfy *Miranda*. The Ohio Supreme Court ignored this basic principle of *Miranda*. It is impossible under *Miranda* to recognize that a harmful *Miranda* violation took place at a subsequent point in the case, but have it cured by earlier

137

conduct. *Miranda*, 384 U.S. at 469 ("Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process."). The *Miranda* decision imposes more than a mere requirement that warnings be provided at the beginning of an interrogation. Further, as in *Jackson v. Giurbino*, 364 F.3d 1002 (9th Cir. 2004)(finding AEDPA not applicable to a *Miranda* claim), the police officers did not improperly readvise Moore of his Miranda rights prior to the final interrogation session after the troubling aspects occurred. Because the Ohio Supreme Court did not identify and apply the correct Supreme Court case law, Moore satisfies the contrary to clause. *Williams*, 529 U.S. at 406.

Moore's case is similar to *Hart v. AG*, 323 F.3d 884 (11th Cir. 2003), in which the habeas court found that a confession offered after police told the defendant that "honesty wouldn't hurt him" was involuntary. *Id.* 894. Even though the defendant had received *Miranda* warnings earlier that day, the court found that the subsequent comment by an interrogating officer contradicted the *Miranda* warning, thus rendering his confession a product of the officer's deception.

Further, the Ohio Supreme Court unreasonably failed to discuss or consider the additional, relevant circumstances that: (a) Moore was cuffed in the holding cell even before being cuffed for several hours in the interview room; (b) Moore had smoked marijuana just hours before his arrest; (c) Moore's *Miranda* waiver was stale and preceded by several hours of physical deprivation; (d) Moore was not advised as to the charges against him; (e) Moore was not fully Mirandized just before his interview; and (f) Moore was uneducated and inexperienced in interrogation situations. The Ohio Supreme Court failed to consider these additional facts. As noted by the Supreme Court in *Wiggins*, 539 U.S. at 527, a state court unreasonably applied United States Supreme Court authority when it failed to consider

138

relevant facts. Therefore, AEDPA does not constrain this Court's review of Moore's claim that his *Miranda* rights were violated.

**<u>TWENTIETH HABEAS GROUND</u> – MOORE'S REASONABLE DOUBT INSTRUCTION FAILED TO COMPORT WITH THE REQUIREMENTS UNDER THE FOURTEENTH AMENDMENT.**

The "Due Process Clause of the Fourteenth Amendment protects the defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Jackson*, 443 U.S. at 315 (1979) (*quoting In re Winship*, 397 U.S. 358, 364 (1970)). In *Winship,* the Supreme Court spoke to the fundamental nature of the concept of reasonable doubt. The Court noted that "[t]here is always in litigation a margin of error" and stressed that "[i]t is critical that the moral force of the criminal law not be diluted by standard of proof that leaves people in doubt whether innocent men are being condemned." *Id.* at 364. In order for the public to maintain confidence in our system of laws, the Court continued, proof beyond a reasonable doubt must be held to be proof of guilt "with utmost certainty." *Id.* The beyond a reasonable doubt standard "plays a vital role in the American scheme of criminal procedure," because it operates to give "concrete substance" to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding. *Id.* at 363.

The trial court improperly defined reasonable doubt. The trial court at the culpability phase gave the following definition of reasonable doubt:

> Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt that's based on reason and common sense.

> Reasonable doubt is not mere possible doubt because everything relating to human affairs depending on moral evidence is open to some possible or imaginary doubt. So proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs

(Tr., pp. 962-63). At the penalty phase, the trial court gave the identical constitutionally infirm instruction. (Tr., p. 1237).

In its definition of reasonable doubt, the trial court instructed the jury on "firmly convinced of the truth of the charge," a "willingness to act," and "moral evidence." The trial court's charge, taken as a whole, did not adequately convey to jurors the stringent "beyond a reasonable doubt" standard. The "willing to rely and act" language provided the jury with no guidance because it is too lenient. Further, the "firmly convinced" language is not reasonable doubt language; rather, it represents a clear and convincing standard. Finally, references to "moral evidence" are almost universally rejected. As a result, the jurors convicted and sentenced Moore on a standard below that required by the Fourteenth Amendment. This fundamental, structural error requires reversal of convictions and sentences.

The Supreme Court has always been vigilant in enforcing the beyond a reasonable doubt standard. In *Cage v. Louisiana,* 498 U.S. 39, 41 (1990), the Court overturned a Louisiana defendant's capital conviction and death sentence because the instruction on reasonable doubt could have led jurors to find guilt "based on a degree of proof below that required by the Due Process Clause." The Supreme Court held that a jury instruction providing a constitutionally inadequate definition of reasonable doubt can never be subjected

140

to harmless error review under the test of *Chapman. Sullivan v. Louisiana,* 508 U.S. 275 (1993).

The Supreme Court and the majority of federal circuit courts have condemned the "willing to act" language with which the trial court defines reasonable doubt.  In *Holland v. United States,* 348 U.S. 121, 140 (1954), the Court indicated its strong disapproval of the "willing to act" language when defining proof beyond a reasonable doubt.

"There is a substantial difference between a juror's verdict of guilt beyond a reasonable doubt and a person making a judgment in a matter of personal importance to him."  *Scurry v. United States,* 347 F.2d 468, 470 (D.C. Cir. 1965).  Indeed, the majority of the federal circuit courts have disapproved of the "willing to act" phrase and adopted a preference in favor of defining proof beyond a reasonable doubt in terms of a prudent person who would hesitate to act when confronted with such evidence.  *United States v. Pinkney,* 551 F.2d 1241 (D.C. Cir. 1976); *United States v. Noone,* 913 F.2d 20 (1st Cir. 1990); *United States v. Colon,* 835 F.2d 27 (2nd Cir. 1987); *United States v. Conley,* 523 F.2d 650 (8th Cir. 1975); *Monk v. Zelez,* 901 F.2d 885 (10th Cir. 1990).

The definition of reasonable doubt given to Moore's jury was further flawed because it informed the jury that "[r]easonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt."  (Tr., pp. 963, 1237).  The phrase "moral evidence" improperly shifted the focus of this jury to the subjective morality of Moore rather than the required legal quantum of proof. *Victor v. Nebraska*, 511 U.S. 1 (1994). This is substantially the same as directing them to find guilt by some undefined quantum of moral conviction.  There is little difference

between this instruction and the constitutionally defective instruction in *Cage* that allowed the jury to be guided by a "moral certainty."

It is important to remember that the Supreme Court has been critical of a state's inclusion of the term "moral certainty" in a reasonable doubt instruction:

> The charge did at one point instruct that to convict, guilt must be found beyond a reasonable doubt; but it then equated a reasonable doubt with a "grave uncertainty" and an "actual substantial doubt," and stated that what was required was a "moral certainty" that the defendant was guilty. It is plain to us that the words "substantial" and "grave," as they are commonly understood, suggest a higher degree of doubt than is required for acquittal under the reasonable-doubt standard. When those statements are then considered with the reference to ***"moral certainty,"*** rather than **evidentiary certainty,** it becomes clear that a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.

*Cage,* 498 U.S. at 41.

In *Victor*, the Court rejected a due process challenge to a jury instruction that included the phrase "moral evidence." *Id.* at 13. *But see Id.* at 21 (Kennedy J., concurring). The Court found no error because the phrase "moral evidence" was proper when placed in the context of the jury instruction on reasonable doubt that was given:

> [T]he instruction itself gives a definition of the phrase. The jury was told that "everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt" - in other words, that absolute certainty is unattainable in matters relating to human affairs. Moral evidence, in this sentence, can only mean empirical evidence offered to prove such matters - the proof introduced at trial.

*Id.* at 13 (emphasis added).

Unlike *Victor*, the instruction in this case did not guide the jury by placing the phrase "moral evidence" within any proper context. In *Victor*, the jury was properly guided on the phrase "moral evidence" because it was conjunctively paired with the phrase "matters relating to human affairs." *Id.* Here, "moral evidence" appears to be a reference to the type of evidence offered in this action and is associated with the degree of doubt that the Court instructs the jury is "reasonable," and is undefined. Accordingly, Moore's jury was allowed to convict him based on considerations of subjective morality, rather than evidentiary proof required by the Due Process Clause. *Victor*, 511 U.S. at 21 (Kennedy J., concurring) ("[the] use of 'moral evidence' ... seems quite indefensible ... the words will do nothing but baffle").

The trial court also improperly equated reasonable doubt with whether the jurors were firmly convinced. (Tr., pp. 963, 1237.) The "firmly convinced" language is not reasonable doubt language; rather, it represents a clear and convincing standard as illustrated by *Cross v. Ledford*, 161 Ohio St. 469 (1954), syllabus. In <u>Cross</u>, clear and convincing evidence was defined as that "which will provide in the mind of the trier of facts a <u>firm belief or conviction</u> to the facts sought to be established." *Id.* at 477 (emphasis added). The similarity of this definition to O.R.C. §2901.05(D) is quite notable, where reasonable doubt is present if jurors "cannot say they <u>firmly convinced</u> of the truth of the charge." O.R.C. §2901.05(D) (emphasis added). As a result, the jurors convicted and sentenced Petitioner on a standard below that required by the Due Process Clause. *See Cage,* 498 U.S. 39; *In re Winship,* 397 U.S. at 364.

Moore recognizes that, as described by Respondent, the Ohio Supreme Court and the Sixth Circuit have accepted this definition of reasonable doubt. However, Moore respectfully argues that, applying United States Supreme Court authority – a Court that has never passed

143

on the Ohio definition of reasonable doubt, those decisions are unreasonable and contrary to *Cage*, 498 U.S. at 41, because the instructions in Moore's trial allowed his jury to find him guilty "based on a degree of proof below that required by the Due Process Clause."

**TWENTY-FIRST GROUND FOR RELIEF** – **THE TRIAL COURT'S INSTRUCTIONS AT THE CULPABILITY PHASE VIOLATED MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND A FAIR PROCEEDING.**

> **A.** **The "principal offender" and "prior calculation and design" elements of capital aggravated murder/felony murder are alternatives that are not to be charged and proven in the same case.**

The reason that aggravating factors must be found unanimously is that they are the elements of the murder offense that make the defendant death eligible. *See Ring v. Arizona*, 536 U.S. 584 (2002) (holding that because Arizona's enumerated aggravating factors operate as the functional equivalent of elements of the offense, the Sixth Amendment requires that they be found by a jury). All of the elements of a criminal offense must be found by a jury unanimously as a matter of constitutional criminal procedure, *see Richardson v. United States*, 526 U.S. 813 (1999), particularly all elements that make a defendant death eligible, *see Ring*, 122 S. Ct. at 2431.

The language of Ohio's death penalty scheme provides that the "principal offender" and "prior calculation and design" are not to be charged and proven in the same cause. These two elements were intended to be alternatives. In spite of this, the trial court in Moore's case instructed the jury on three separate occasions on both alternatives. *(See* Tr., pp. 971-982 (Count 1), pp. 984-993 (Count 2), pp. 994-1002 (Count 3)).

Instructing the jury with the alternative elements risked the possibility of a non-unanimous finding on this aggravating specification. It is possible that some jurors found that

144

Moore had prior calculation and design while other jurors found that Moore was the principal

offender, resulting in the verdict in this case to not comport with the dictates of *Schad v.*

*Arizona*, 501 U.S. 624 (1991), and *Richardson*, 526 U.S. 813.  In fact, on Moore's direct

appeal, the Ohio Supreme Court held that this instruction was improper.[39]

Respondent alleges that the Ohio Supreme Court remedied this error by finding it

harmless by relying on a finding of principal offender on the aggravated murder count.

Return p. 136.  However, it is contrary to and/or unreasonable pursuant to United States

Supreme Court authority to substitute an appellate court's finding as to an eligibility and

narrowing function to be made under the statute by the jury. *Richardson*, 526 U.S. 813.

### B & C.    The definition of "cause" and purpose diluted the "specific intent to kill" element that is required in a capital aggravated murder case.

It is an elementary principle of due process that the prosecution must prove every

element of the crime beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510, 520

(1979).  An instruction that tells a jury to presume any element of a crime without evidence

is unconstitutional, for "the Fourteenth Amendment's guarantees prohibit a State from shifting

to the defendant the burden of disproving an element of the crime charged." *Id.* at 527

(Rehnquist, J., concurring). The Supreme Court has made clear that an instruction that a jury

should presume malice from use of a deadly weapon falls under this constitutional

prohibition. *Yates v. Evatt*, 500 U.S. 391, 401-02 (1991); *Francis v. Franklin*, 471 U.S. 307,

317 (1985); *see also Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995);  *Caldwell v. Bell*,

288 F.3d 838 (6th Cir. 2002).

---

[39]*State v. Moore,* 81 Ohio St. 3d 22, 40, 689 N.E.2d 1, 17 (Ohio 1998).

*Carella v. California*, 491 U.S. 263 (1989), summarizes Moore's underlying contention: "The Due Process Clause . . . denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. Jury instructions relieving States of this burden violate a defendant's due process rights." Id. at 265 (citations omitted).  The Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364. This "bedrock, 'axiomatic and elementary' [constitutional] principle," *id.* at 363, prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. *Sandstrom*, at 520-524; *Patterson v. New York*, 432 U.S. 197, 210, 215 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 698-701 (1975); *see also Morissette v. United States*, 342 U.S. 246, 274-275 (1952).

In Ohio, "'the existence of an accused's purpose to kill must be found by the jury under proper instructions from the trial court and can never be determined by the court as a matter of law.'" *State v. Jenkins*, 473 N.E.2d 264, 305 n.41 (Ohio 1984); *Ohio v. Scott*, 400 N.E.2d 375 syl. 4 (1980) (same).  Further, 2929.03(D)(1) requires a specific intent to kill.  The trial court violated these principles by instructing the jury that it could infer the purpose or a specific intent to kill via a much lesser standard.

The trial court violated the Sandstrom and Winship principles in giving the following instructions.  First, the trial court instructed "cause" is when the death is the natural and foreseeable result of the act; that a death is the result of the act when it is produced directly by the act and would not have occurred without it; and that a result occurs when the death

146

is naturally and foreseeably caused by an act.  (Tr. pp. 968-969).   Second, the trial court

also instructed that a person acts purposely when it is his specific intention to cause a certain

result; that purpose is a decision to do an act with the conscious objective of producing a

specific result or engaging in specific conduct; that to do something purposely is to do it

intentionally and not accidentally; and that purpose is determined from the manner in which

the act is done, the means or the weapon used and all other facts and circumstances in

evidence, "the purpose to cause the death may be inferred from the use of the weapon."

(Tr., pp. 967-968).

The totality of the instructions would cause a reasonable juror to equate specific intent

with purpose and general intent.  Since the trial court instructed the jurors that specific intent

is present so long as there was no accident or from the use of a weapon, the jury had no

choice but to return a guilty verdict to all charges — especially when Mr. Ollinger was killed

by a handgun.  Thus, the trial court's instructions lessened the *mens rea* to a nullity, thereby

prejudicing Moore. *See Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (prejudice because

"jury could have believed every aspect of the defense's case and still convicted Reagan of

first-degree murder because the jury was instructed that simply 'causing' Sarah's death

would constitute cruel and malicious indifference.")

The trial court's instruction was to create a conclusive presumption that since a deadly

weapon was involved, or that it was reasonably foreseeable, or that it was not an accident,

Moore's purpose and specific intent had been established.  By also failing to instruct that this

inference was not conclusive, the trial court left the jury with a conclusive presumption on the

element of purpose and specific intent.  This relieved the State of its burden to prove the

elements in violation of the Fourteenth Amendment. *Cabana v. Bullock*, 474 U.S. 376, 384

(1986) ("A defendant charged with a serious crime has the right to a jury to determine his guilt or innocence.")

Respondent argues that the instructions did not create such presumptions or lessen the standards of proof. Return pp. 137-140. This misstates the test enumerated by the United States Supreme Court. In considering jury instruction issues, it is not simply as easy as determining what a court or party interprets the instruction to mean. This Court is required to examine what a reasonable juror could have understood the totality of the instructions to mean. *See Francis v. Franklin*, 471 U.S. 307, 315-316 (1985) ("The question…is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning."). The Ohio Supreme Court's decision failed to correctly identify and articulate the legal principle governing Petitioner's allegation of error. Instead of assessing how a jury may have reasonably interpreted the instruction, the Ohio Supreme Court rejected the claim in a single sentence, along with numerous other claims of error. At no point did the Ohio Supreme Court indicate that no reasonable jury would interpret this instruction to create a conclusive presumption. *See Francis*, 471 U.S. at 315-316; *Mills v. Maryland*, 486 U.S. 367, 370 (1988) (relief granted even though state appellate court's interpretation of the instructions was described as plausible). Because the Ohio Supreme Court did not identify and apply the applicable standard of the United States Supreme Court, the AEDPA does not erect a bar to this Court's review of Petitioner's claim. *See Williams*, 529 U.S. at 405 (AEDPA not applicable "if the state court applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases."); *McCambridge v. Hall*, 266 F.3d 12 (1st Cir. 2001) (AEDPA not applicable when state court did not identify Supreme Court standard); *Magana*, 263 F.3d at

148

549-550 (AEDPA not applicable when state court applies wrong standard); *Wade v. Terhune*,

202 F.3d 1190, 1197 (9th Cir. 2000)(same).

When this Court applies the court legal test *de novo*, this Court should find

constitutional error under *Sandstrom*, 442 U.S. 510, and grant habeas relief.

**TWENTY-SECOND GROUND FOR RELIEF – THE USE OF DUPLICATIVE SPECIFICATIONS TO THE AGGRAVATED MURDER COUNTS AND THE USE OF THE SAME OPERATIVE FACTS TO ELEVATE MURDER TO AGGRAVATED MURDER AND TO CAPITAL AGGRAVATED MURDER AS WELL AS THE SUBMISSION TO THE JURY OF ALL OF THESE COUNTS VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, A RELIABLE SENTENCE, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.**

Ensuring that a sentence of death is not so infected with bias or caprice is the

"controlling objective when we examine eligibility and selection factors for vagueness."

*Tuilaepa v. California,* 512 U.S. 967, 973 (1994).

Petitioner Moore was charged with three counts of capital aggravated murder  (T.d.

1) growing out of a single shooting incident and a single victim.  A single death can form the

basis for only one homicide conviction.

The first count charged him with purposely causing the death of the victim with prior

calculation and design.  Id.  It contained the following capital specifications:

> (a) committing the killing to escape detection for a kidnaping and/or an aggravated robbery; (b) committing the killing in the course of a kidnaping and either being the principal offender in the killing or committing the killing with prior calculation and design; and (c) committing the killing in the course of an aggravated robbery and either being the principal offender in the killing or committing the killing with prior calculation and design.  *Id.*

The second count charged him with purposely causing the death of the victim in the

course of a kidnaping.  *Id.*  It contained the following capital specifications:

(a) committing the killing to escape detection for a kidnaping; (b) committing the killing in the course of a kidnaping and with being either the principal offender in the killing or committing the killing with prior calculation and design; and (c) committing the killing in the course of an aggravated robbery and with being either the principal offender in the killing or committing the killing with prior calculation and design. *Id.*

The third count charged him with purposely causing the death of the victim in the course of an aggravated robbery. *Id.* It contained the following capital specifications:

(a) committing the killing to escape detection for an aggravated robbery; (b) committing the killing in the course of an aggravated robbery and either being the principal offender in the killing or committing the killing with prior calculation and design; and (c) committing the killing in the course of a kidnaping and either being the principal offender in the killing or committing the killing with prior calculation and design. *Id.*

Each of these three counts also contained a firearm specification, which is a non-capital specification. *Id.*

Charging Petitioner Moore with the same specifications for each count of aggravated murder constituted duplicative specifications. Moreover, the same operative facts served to elevate a murder charge to an aggravated murder charge and then to a capital aggravated murder charge.

The use of duplicative specifications and the use of the same operative facts to elevate the murder charge to a capital aggravated murder charge fail to (a) narrow the class of offenders eligible for the death penalty; and (b) properly guide the sentencer's discretion in imposing the death penalty. It skews the mitigation weighing process heavily in favor of death. "Double counting" has a tendency to skew the process so as to give rise to the risk of an arbitrary, and thus unconstitutional, death sentence. *United States v. McCullah,* 76 F.3d 1087, 1111 (1996).

150

Such double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally. *Cf. Stringer v. Black,* 503 U.S. 222, 230-32, 1(1992). As the Supreme Court of Utah pointed out, when the same aggravating factor is counted twice, the "defendant is essentially condemned 'twice for the same culpable act,' " which is inherently unfair. *Parsons v. Barnes,* 871 P.2d 516, 529 (Utah) (quoting *Cook v. State,* 369 So.2d 1251, 1256 (Ala.1979)), *cert. denied,* *1112 --- U.S. ----, 115 S.Ct. 431, 130 L.Ed.2d 344 (1994).

*Id.* at 1111-1112.  The Tenth Circuit explained its concern that the weighing process is tainted where the state is permitted to stack duplicative factors to obtain a sentence of death.

While the federal statute at issue is a weighing statute which allows the jury to accord as much or as little weight to any particular aggravating factor, the mere finding of an aggravating factor cannot but imply a qualitative value to that factor. *Cf. Engberg v. Meyer,* 820 P.2d 70, 89 (Wyo.1991). When the sentencing body is asked to weigh a factor twice in its decision, a reviewing court cannot "assume it would have made no difference if the thumb had been removed from death's side of the scale." *Stringer,* 503 U.S. at 232.

*Id.* at 1112.

Relying on *Stringer,* the Tenth Circuit held "that the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process which necessitates a reweighing of the aggravating and mitigating factors.  *Id.* at 1112.   The same result is constitutionally mandated here.

The state court determination to the contrary constitutes an unreasonable application of the standard enunciated in *Stringer* .

**TWENTY-THIRD GROUND FOR RELIEF – THE OHIO COURTS THAT HEARD MOORE'S DIRECT APPEAL AND POST-CONVICTION PROCEEDINGS LACKED JURISDICTION OVER THOSE PROCEEDINGS, VIOLATING MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS AND EQUAL PROTECTION.**

Petitioner Moore hereby withdraws his Twenty-third Ground for Relief as a basis for habeas relief.

151

**TWENTY-FOURTH GROUND FOR RELIEF – MEANS AND METHOD OF EXECUTION BY LETHAL INJECTION IS UNCONSTITUTIONAL.**

Moore hereby withdraws his Twenty-fourth Ground for Relief as a habeas claim, but he reserves the right to raise the issue in a cause of action under 42 USC §1983.  *See Nelson v. Campbell*, 124 S. Ct. 2117 (2004) (holding that §1983 is an appropriate vehicle for a death row inmate's Eighth Amendment claim challenging the constitutionality of a cut-down procedure).

152

**TWENTY-FIFTH GROUND FOR RELIEF. OHIO'S DEATH PENALTY SCHEME IS UNCONSTITUTIONAL AND VIOLATED PETITIONER MOORE'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Moore stands on the legal arguments and authority submitted with the habeas petition.

## CONCLUSION

Petitioner has demonstrated that the above acts and omissions of trial and Appellate counsel constituted ineffective assistance of counsel within the definition of *Strickland*. The errors of counsel, as well as the errors, acts and omissions of the prosecutor and trail court as detailed above, considered individually and collectively, had the effect of depriving Petitioner Moore of a fundamentally fair trial in violation of his rights as secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. These deficiencies as demonstrated above render the results of both the trial and appellate proceedings unreliable. Accordingly, we respectfully request the Court to issue the writ as requested in the Petition.

Respectfully Submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Trial Counsel
Attorney at Law
423 Madrina
Ballwin, MO 63021
Phone (636) 207 – 7330
Fax (636) 207 – 7351
LEAD COUNSEL FOR PETITIONER

153

-and-

/s/Michael J. O'Hara
MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan & Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
Fax: (859) 578-3365
CO-COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed electronically on this 15 th day
of November and this constitutes service upon counsel for Respondent pursuant to Loc. R.
5.2.

/s/Michael J. O'Hara
MICHAEL J. O'HARA – 0014966