## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **LEE E. MOORE,** | ) | **CASE NO.  C-1-00-023** |
| | ) | |
| **Petitioner,** | ) | **JUDGE DLOTT** |
| | ) | |
| **vs.** | ) | **MAGISTRATE JUDGE MERZ** |
| | ) | |
| **BETTY MITCHELL, Warden** | ) | |
| | ) | ***DEATH PENALTY CASE*** |
| **Respondent.** | ) | |

### PETITIONER'S REPLY TO RESPONDENT'S MERIT BRIEF

#### A.  INTRODUCTORY STATEMENT

Petitioner does not respond to a majority of the arguments raised by Respondent.

Petitioner is not acquiescing in Respondent's arguments, rather he simply rests on his opening

memorandum in that it adequately addressed the contentions made by Respondent.  Petitioner

suggests Respondent did not consider or address the factual development that has occurred in

discovery before this Court.[1]  Petitioner addresses those few claims where a significant

misstatement of fact or law.

Respondent relies greatly on the AEDPA standard of review to justify Petitioner's

conviction and sentence.  Respondent argued on many occasions that even if the Ohio court's did

not consider United States Supreme Court authority – this Court may surmise whether AEDPA

constrains this Court's review of Petitioner's allegations.  Setting aside the fact that nothing

could more offend comity than substituting this Court's judgment for what a state court intended,

---

[1] The Parties have agreed to expanding the record with the depositions and the relevant portions
of trial counsels' file and the complete court clinic file.  The Parties are working together to
expediently prepare and file with the Court the materials, and an agreed upon motion to expand
the record.

meant or reasonably intended to do based on a silent record, Petitioner objects in that such speculation should not be a basis to deny him his right to federal habeas review.  Otherwise, Petitioner's right to habeas review has been violated by the Suspension Clause of the federal constitution.  It is "emphatically the province and duty" of federal judges to "say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803), not state courts even if so endorsed by Congress.

While it may be possible to determine whether or not the underlying decision was "contrary to" law but it is simply impossible to determine whether the decision was an "unreasonable application" of law since there is no indication as to what law was applied. The only way a state court could unreasonably apply federal law is if it knows of that law and actually tries to apply that law to the case before it.

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams v. Taylor*, 529 U.S. 362, 407 (2000). As this quote demonstrates, the "unreasonable application" clause of AEDPA is applicable only when the state court actually "identifies the correct governing legal rule." *Id.*

In *Early v. Packer*, 537 U.S. 3 (2002), the Court demonstrated the difference between "contrary to" and "unreasonable application." The Court specifically addressed only the "contrary to" standards and determined that this standard did not require any citation to, or even awareness of, Supreme Court law. *Id.*, at 8. *See also Mitchell v. Esparza*, 540 U.S. 12, 16 (2003)(reviewing only "contrary to" standard); *Bell v. Cone*, 125 S.Ct. 847 (2005)(same). However, the Court did not discuss whether this standard applied to "unreasonable application" review. Given the impossibility of conducting proper review of an unexplained state court decision it is clear that an unexplained decision on the merits cannot be reviewed under the "unreasonable application" standard and therefore the constraints of the AEDPA are inapplicable.

As a matter of policy and statutory interpretation this makes perfect sense. A holding to the contrary would mean that a state court could insulate all decisions from federal review by simply denying relief without any explanation or even thought. The federal courts would then be left to blindly determine whether this decision was an unreasonable application of law without any guidance as to whether the state courts even knew that there was law to apply. As previously noted, this situation would result in a suspension of the writ and render AEDPA void and unconstitutional.

Finally, Respondent again touches upon the procedural default arguments previously raised and briefed.  Petitioner is not attempting to revisit such arguments but simply notes (and argues as cause) that this Court should consider the appellate ineffectiveness as cause for any claim found to be procedurally defaulted.  As this Court has previously held, the Ohio Supreme Court considered the merits of such allegations , and therefore, Petitioner's cause arguments are both exhausted and not procedurally defaulted.

B.  *PETITIONER HAS ESTABLISHED IN HIS MERITS BRIEF THAT HE*
    *IS ENTITLED TO RELIEF.*

**First Habeas Ground –Simultaneous Representation By**
**A Conflicted Attorney**

Some facts are not in dispute.  Attorney Stidham had simultaneous representation of the interests of Petitioner and his co-counsel.  *See* Doc 29 at Exhibit 6 to Habeas Petition; Moore Supp. Apx. Vol. I at p. 344.  Indeed, the evidence presented via Dr. Chiappone supported the defense of Petitioner's co-defendant (*See* Doc 29 at Exhibit 7 to Habeas Petition at pp. 3, 4 and 9) while simultaneously undercutting any opportunity for a life sentence.  *See* Deardorff Dep. pp. 88-89 ("I believed at the time he was going to get the death penalty based on what Dr. Chiappone said. He was cooked.").

Respondent suggests, however, that Attorney Stidham did not act as counsel.  Resp. Memo p. 8.  The record does not support such an assertion.  Attorney Stidham's correspondence on firm letter head and signed as an attorney at law reflects that he was acting as an attorney. Moore Sup. Apx. Vol. I pp. 496-497.  Unquestionably, Stidham acted as an attorney – even though his responsibility as an attorney was to investigate and prepare a mitigation presentation. An attorney does not lose his obligations despite his "job description."

As noted more fully in his opening briefing, *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980), is violated because there is no question Stidham adversely affected Petitioner's representation.  Indeed, Dr. Chiappone noted he relied on information provided by Stidham to form his opinion. Tr. p. 1110.  Further, Stidham affirmed he requested Dr. Chiappone to be brought in to address Petitioner's mental status. Stidham Depo p. 110 lines 11-13.

In sum, Stidham's correspondence and responsibilities reflect his acting as an attorney on behalf of Petitioner.  The simultaneous representation of a co-defendant hampered his

4

obligations to Petitioner.  Indeed, the expert Stidham recommended devastated the mitigation phase while simultaneously assisting the co-defendant.

### Second Habeas Ground – Petitioner Deprived Of The Effective Assistance of Counsel

Respondent contends that Petitioner has failed to point to any evidence with respect to his Second Ground for Relief which would undermine the Supreme Court of Ohio's determination that Petitioner was not denied constitutionally adequate counsel at the penalty phase of this trial. Petitioner respectfully refers to the Court to Petitioner's Merit's Brief, pp. 20-43 for a thorough discussion with detailed references to the record, confirming trial counsel's hopelessly ineffective efforts to investigate and present mitigation during the penalty phase of Petitioner's trial.  Counsel will not repeat those specific points here, but will address the few issues raised in the Respondent's Brief.

As demonstrated in Petitioner's Merit's Brief, Dr. Chiappone, the only expert utilized for mitigation offered devastating testimony which his own counsel characterized as virtually assuring Petitioner's death sentence.  As Petitioner's state trial counsel put it so bluntly, "I believed at the time he was going to get the death penalty based on what Dr. Chiappone said.  He was cooked."  Deardorff Dep. pp. 88-89.

Respondent attempts to argue that trial counsel properly prepared Dr. Chiappone. Respondent states that "[Mr.] James was absolutely certain that Dr. Chiappone did not inform him of the `devastating' statements by Petitioner revealed on cross-examination."  Resp. Memo p. 9.  This is incorrect.  At his deposition, Mr. James made it clear that he has no recollection of discussing Petitioner's conversations with Dr. Chiappone.

> Q: . . . I want to go back again to your discussions with Dr.
> Chiappone prior to trial.  Now, as you recall today, is it–again, tell

me do you have a recollection as to discussing with him anything
that your client may have said to him during an interview by Dr.
Chiappone.

A:  I can't say that I recall specifically talking to Dr. Chiappone
about what Mr. Moore told him.

James Depo., Vol. II, pp. 83-84.  He testified that he did not recall Chiappone ever

communicating to him Petitioner's purported admissions, it is telling that he does not recall ever

discussing the conversations that Petitioner had with Dr. Chiappone or his assistant.  It is

inconceivable that Mr. James would not have learned of the potentially fatal testimony had he

simply reviewed everything that his client had discussed with Dr. Chiappone's office.[2]

Obviously, the prosecutor clearly had this information based on his *ex parte* contact with Dr.

Chiappone.

Respondent attempts to undercut the impact of the prosecutor's *ex parte* discussions with

Dr. Chiappone by simply stating that those discussions occurred after November 10, 1994, when

Dr. Chiappone was identified as a witness who would be called by Petitioner.[3]  Resp. Memo pp.

9-10.  Respondent fails to explain how this chronology renders a prosecutor's *ex parte* contact

with an expert who is suppose to be retained to assist the Defendant.  To the contrary, such *ex

parte* contacts are clearly improper and unethical.  As Petitioner demonstrated in his Merit's

Brief, this was a unique occurrence in the experience of both Mr. Deardorff and Dr. Chiappone.

Neither of them had any other case or such *ex parte* contacts occurred with the prosecutor.

Chiappone Dep., pp. 77; Deardorff Dep., p. 47.

---

[2]  This would have afforded trial counsel time to review Dr. Chiappone's records regarding these
purported admissions.  As Petitioner has previously pointed out and Respondent agrees, there is
no support in Dr. Chiappone's documents for these purported admissions.
[3]  This discussion applies with equal force to both Petitioner's Second and Eighteenth Grounds
for Relief and addresses issues raised by Respondent at pp. 9 and 19.

Regarding *ex parte* contacts by opposing counsel with a party's expert generally, the

Ninth Circuit observed the following:

> A leading legal ethics treatise discusses the ethical implications of communications with an adversary's expert witness. 2 Geoffry C. Hazard & W. William Hodes, *The Law of Lawyering, Section 3.4:402 (2ⁿᵈ Ed. Supp. 1994)*. The treatise advises that: `since existing rules of civil procedure carefully provide for limited and controlled discovery of an imposing party's expert witnesses, **ALL FORMS OF CONTACT ARE IMPLIEDLY PROHIBITED.**' Therefore, an attorney here engages in prohibited communications violates the attorney's ethical duty to obey the obligations of the tribunal. Moreover, since the procedure for discovery of experts is well established, an attorney may also be in violation of the rule prohibiting conduct prejudicial to the administration of justice.

*Erickson v. Newmar Corp.*, 87 F.3d 298, 301-302 (9th Cir. 1996). Although the Court was

talking about the civil rules, as applied in Nevada, the principals enunciated are necessarily

applicable in both the civil and criminal venues. As the District Court in Pennsylvania addressed

the same issue in the context of a criminal case similar to the case at bar. A defendant has

retained an expert to assist the Defendant in a case involving a charge of first degree murder.

The expert retained by the Defendant's counsel in that case, like Dr. Chiappone here, had an *ex*

*parte* meeting with the prosecutor prior to the presentation of the expert's testimony. Regarding

those *ex parte* communications, District Court found,

> [the expert's] understanding that this conduct is `just not done' is in perfect congruity with the rules that [the Assistant District Attorney] so wantonly broke. As Professor Charles Wolfram, Chief Reporter of the *Restatement of the Law Governing Lawyers* testified, ***it is a `no-brainer' that a prosecutor simply does not make an ex parte communication with a defense expert without the explicit consent of defense counsel***. . . . (Emphasis added).

*Lambert v. Blackwell*, 962 F.Supp. 1521, 1546 (E.D. Pa. 1997), vacated on other grounds 134

F.3d 506 (3d Cir. 1997).[4]  Like Dr. Chiappone here, the defense expert in that case who had *ex parte* contact with the prosecutor's office testified that he had never in his long experience ever heard of a prosecutor having such contacts with the expert of a defendant.  *Id*.  As the Court concluded,

> This is not surprising.  Rule 8.4(d) of the Rules of Professional Conduct for bid actions which are `prejudicial to the administration of justice.'

*Id*.[5]

The District Court in *Lambert*, included that "there is no question that Professor Wolfram was right in violation of these rules creates circumstances which are `rife with the possibility for corruption of the testimony.'" *Id*.  It should be emphasized that the expert in *Lambert* gave testimony that undercut the Defendant's case, much the way Dr. Chiappone's testimony in this case effectively guaranteed imposition of the death penalty.  Thus, Respondent was clearly incorrect in stating that there is no professional standard which prohibits such *ex parte* communication.  Resp. Memo p. 9.

Respondent also argues that Mr. Moore failed to present evidence outside of the record regarding unspecified claims and allegations relating to ineffective assistance of counsel.  Resp. Memo p. 10.  As to the allegation challenging the *ex parte* communications between Defendant's purported independent expert and the prosecutor and trial judge, that evidence was before the Court at the mitigation hearing.  At mitigation, on redirect examination, Mr. James had Dr.

---

[4] The 3d Circuit found that the District Court lacked authority to consider the merits of the petitioner's claim in light of her failure to exhaust state remedies and that exhaustion would not clearly be futile.

[5] The Court also cited a Pennsylvania rule of Criminal Procedure which is substantially similar to Rule 16(C), Ohio Rules of Criminal Procedure which limits the obligation of the Defendant to disclose information to the prosecution.

Chiappone concede that he had *ex parte* contacts with both Mr. Piepmeier, the assistant prosecutor, and Judge Ruehlman.  Dr. Chiappone testified that he discussed his evaluations with the prosecutor prior to his testimony in the case.  Tr. Vol. 7, p. 1119.

Moreover, Petitioner has previously demonstrated in his memoranda in support of his Motion for an Evidentiary hearing in this action that he was given no effective opportunity to develop any record in his state post-conviction proceedings.  Petitioner respectfully refers the Court to that discussion.  In summary, Petitioner filed his Petition in state court detailing his IAC factual issues and making reference in the Petition to the facts that were outside of the record relating to those claims.  *See for example*, ROW APX. M, pp. 737 *et seq*.  Petitioner requested discovery in a hearing on those claims.  *Id.* at 771.  Although Respondent received an extension of 45 days to respond to Petitioner's post-conviction pleading, the trial court, without any notice or warning to Petitioner ruled on the merits just 14 days after the state filed its Motion for Summary Judgment on all claims raised in the post-conviction relief proceedings.  ROW APX O, pp. 876 *et seq*.  Thus, Petitioner has demonstrated that he was given no adequate opportunity to develop any evidence outside of the record in his state post conviction relief proceedings.

### Fifth and Twelfth Habeas Ground – Biased Judge

Respondent next contends that the record does not support Petitioner's Fifth and Twelfth Grounds for Relief relating to the bias of the trial judge.  Respondent does not specifically address the factual record developed and recounted in detail in Petitioner's Merit Brief.  Respondent simply argues that the "trial judge's views concerning delay in capital cases are not evidence of bias."  Resp. Memo p. 12.  Respondent cites no controlling law on this point.  Rather, she relies on Justice Scalia's decent in *Collins v. Byrd*, 510 U.S. 1185 (1994).  Nothing in Justice Scalia's decent addresses the highly prejudicial statements made by the trial judge in this

case which are recounted at pages 48-62, 100-105 of Petitioner's Merit Brief.  Moreover, a rule enunciated in a decent can have no controlling effect.

The biased remarks of the trial judge as set out at pages 49 and 50 of Petitioner's Merit Brief were made during the sentencing proceeding at which the Court imposed a death sentence and expressed, in no uncertain terms, that the Court would prefer to have that sentence carried out without affording Petitioner the benefit of any post-conviction review through the state court post-conviction process and without any review by the Federal Courts.  Tr. Vol. 7, pp. 1269-71. During his remarks, the trial judge appears to have relied on his frustration as a prosecutor in failing to obtain the execution of a defendant he personally prosecuted.  The judge appears to express his dismay that the defendant died of natural causes rather than as a result of execution. These remarks together with the other evidence, including the public comments the judge has set out at pages 50-51 of Petitioner's Merit Brief clearly demonstrate bias by the sentencing trial judge at the time the sentence was imposed.  The mere appearance of a state judge's bias violates the due process rights of litigants, regardless of whether the judge is actually biased.  *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986).  When you look at the entire record, including the rulings as set forth in detail in Petitioner's Merit Brief, is evident that Petitioner has met his burden establishing judicial bias significant enough to deprive him of due process when a sentence of death was imposed in this case.[6]

### Ninth and Tenth Habeas Ground – Discrimination In Selection Of Grand Jury Forepeople And In Petite Venire

---

[6] Although not determinative, Respondent is incorrect that there is no record indicating that the trial judge had any *ex parte* communications regarding the substance of Dr. Chiappone's testimony.  Dr. Chiappone specifically testified that he spoke with Judge Ruehlman prior to the mitigation hearing regarding his "position" in the case.  More important, as demonstrated in his Merit Brief, Petitioner has developed a strong record regarding the issue of judicial bias.

Respondent argues, again in a very cursory fashion, that Petitioner has failed to meet his burden to show discriminatory selection regarding the grand jury foreperson and the jury veneer. As is true with the other arguments raised by Respondent, Respondent fails to address any of the specific factual record developed by Petitioner and the applicable case law.   Notably, Respondent fails to address appropriate legal standard enunciated in *Castaneda v. Partida*, 430 U.S. 482, 494 (1977) or *Rose v. Mitchell*, 443 U.S. 545, 565 (1979).  Petitioner's burden is to demonstrate essentially that the procedure employed produces an under-representation of the defendant's race.  *Rose v. Mitchell*, 443 U.S. at 565.  In fact, at pages 95 through 100 of Petitioner's Merit Brief, he demonstrates that there is statistically significant under-representation of African-Americans with respect to both the grand jury foreperson selection and the African-American representation on the jury.  Respondent addresses none of the facts demonstrating the racial disparity nor does Respondent address the applicable law.  Petitioner respectfully refers the Court to that discussion.

## Thirteenth Habeas Ground – Errors Occurring In Voir Dire

Regarding Petitioner's Thirteenth Ground for Relief, Respondent addresses only one isolated issue relating to the prosecutions challenge of an African-American woman because of her race.  Respondent fails to address the substantial factual record developed by Petitioner in support of his Thirteenth Ground for Relief.  See Petitioner's Merit Brief, pp. 105-113.  The record set out in Petitioner's Merit Brief confirms that the state, contrary to constitutional prohibitions, did in fact organize the sentencing tribunal to return a verdict of death.  *Lockhart v. McCree*, 476 U.S. 162, 179 (1986).  Respondent's failure to address the record developed by Petitioner supports Petitioner's claim that the Ohio Supreme Court unreasonably applied the

11

applicable constitutional rules because Respondent fails to address the specific record and

arguments proffered by Petitioner in support of this Ground for Relief, Petitioner will not repeat

them here.  Petitioner respectfully refers the Court to his discussion of the appropriate record and

law as set forth at pages 105 through 112 of Petitioner's Merit Brief.[7]

                                          Respectfully Submitted,

                                          /s/ Laurence E. Komp
                                          LAURENCE E. KOMP - 0060142
                                          Attorney at Law
                                          423 Madrina
                                          Ballwin, MO 63021
                                          Phone (636) 207 – 7330
                                          Fax (636) 207 – 7351

                                          -and-

                                          MICHAEL J. O'HARA – 0014966
                                          O'Hara, Ruberg, Taylor, Sloan &
                                               Sergent
                                          25 Crestview Hills Mall Rd, Ste 201
                                          P.O. Box 17411
                                          Covington, KY 41017
                                          Phone: (859) 331-2000
                                          Fax: (859) 578-3365

                                          COUNSEL FOR PETITIONER

---

[7]  Regarding the only factual issue addressed by Respondent, the improper exclusion of an African-American woman, Petitioner demonstrates that the prosecutor offered no adequate justification, that did not apply to white members of the jury veneer, which would justify her exclusion on grounds other than race.  Thus, the exclusion of that juror was a clear violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).  Respondent does not specifically address that factual record.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed with and will be made available to Respondent via this Court's electronic filing system and pursuant to Loc. R. 5.2 this constitutes service.

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142

13