Moore was ~~nothing about~~ why he was being held. (T.p. 19-21, 66). While in the holding cell, officers ~~came into Moore's cell and~~ took his hat, shirt, ~~and~~ sweatshirt, and shoes, even though it was extremely cold outside. (T.p. 28, 131-132). Moore was not allowed to speak to anyone, call his parents, or even eat while he was in the holding cell. (T.p.    ).

Finally, at 12:10 a.m. on January 21, ~~1991~~ is six hours after Moore ~~was~~ arrested, Officer Tiernan entered the holding cell and read Moore his <u>Miranda</u> rights. As Tiernan was reading, Moore requested an attorney. (T.p. 133). The Officer ~~Tiernan simply~~ ignored Moore's request and kept reading. (T.p. 134). Of course, the Officer ~~Tiernan~~ testified that he did not hear Moore's request. (T.p. 71). Also No one informed ~~Moore would not be informed~~ of his rights again. Six hours later, Moore ~~he~~ alleged confessed to the crimes ~~alleged~~. (T.p.    ).

~~In~~ <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the United States Supreme Court held that, ~~as an absolute constitutional prerequisite to the admissibility of a confession or other incriminatory statement,~~ a suspect subjected to custodial police interrogation must, in the absence of a clear, intelligent waiver of the constitutional rights involved, be ADVISED OF ~~warned in regard to~~ his constitutional rights. The aim of the <u>Miranda</u> warnings is to INSURE ~~assure that~~ an individual's right to choose between silence and speech ~~remains unfettered throughout~~ DURING the custodial interrogation process. <u>Colorado v. Spring</u>, 479 U.S. 564 (1987). The <u>Miranda</u> rule requiring proof of the voluntary waiver of the right not to respond to police questioning exists independently of, and in addition to, the historic rule of evidence that an accused's statement may not be used against him in any way if the statement itself is proved to be involuntary or untrustworthy when tested by traditional legal standards. <u>State v. Kassow</u>, 28 Ohio St. 2d 141, 277 N.E.2d 435 (1971).

A waiver of an accused's <u>Miranda</u> rights must be voluntary, ~~in the sense that it was~~ the product of a free, ~~and~~ deliberate choice rather than intimidation, coercion, or deception, ~~and~~ A the waiver must have been made with a full awareness both of the nature of the right being

28

abandoned and of the consequences of the decision to abandon it. Spring, supra. If, after an individual held by the police has been given the required constitutional warnings, the interrogation continues without the presence of an attorney, and a statement is taken, a heavy burden rests on the government MUST CONCLUSIVELY demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to ~~retained or appointed~~ counsel. North Carolina v. Butler, 441 U.S. 369 (1979); State v. Kassow, 28 Ohio St. 2d 141, 277 N.E.2d 435 (1971).

HELD that a waiver can be inferred from actions and words of the person being interrogated, BUT ONLY IF HIS INTENT IS CLEAR:

> The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant did not waive his rights; the prosecution's burden is great. . . .

Thus, even though a court may find, even absent an express written or oral waiver (neither of which is claimed to have occurred here) that a particular defendant waived his rights, the court must make such a finding based upon the facts in evidence in order to satisfy North Carolina v. Butler.

Here, the record demonstrates that the trial court did not require the prosecution to bear the "heavy burden" that the post-Miranda law requires. In fact, the court completely disregarded the evidence surrounding the obtaining of Moore's statement, which was clearly the product of custodial interrogation. No HRT OR TP

Not only was there no factual basis for the trial court's denial of the motion to suppress, the legal standard and analysis the trial court employed, as demonstrated by the record, shows ALSO FAILED TO PLACE A HEAVY BURDEN OF PROOF ON THE STATE TO ESTABLISH A VALID WAIVER that the court misapplied the law by not making inquiry into the circumstances surrounding the statements allegedly made by the Appellant after a period of incarceration without being

29

008712

provided the assistance of an attorney. Such constitutes clear error and this Court should reverse the Appellant's conviction.

Furthermore, the state did not prove that Moore's waiver was the product of a free and deliberate choice. By any stretch of the imagination, Moore signed the rights form only after being deprived of food, water, being scantily clad in ~~and drink for eighteen hours, having had most of his clothes taken from him~~ in the middle of winter, and being kept ignorant of the ~~not knowing what he had been arrested for or what~~ charges ~~were being brought~~ against him. Also, the officers ignored all of Moore's requests for the advice and assistance of counsel. As a result, Moore's waiver of his Constitutional rights was involuntary, and his taped and transcribed confession should not have been suppressed. Therefore, ~~evidence. As a result,~~ this Court should reverse Moore's convictions ~~and death sentence~~ and remand the case for a new trial.

**PROPOSITION OF LAW # 7**

> ADMISSION IN EVIDENCE OF STATEMENTS WHICH WERE THE PRODUCT OF UNDUE COERCION BY POLICE OFFICERS, AND WHICH WERE, THEREFORE, INVOLUNTARY, VIOLATES THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND PARALLEL CONSTITUTIONAL AND STATUTORY PROVISIONS IN THE STATE OF OHIO.

In State v. Edwards, 489 Ohio St.2d 31, 358 N.E.2d 1051 (1976), ~~the Ohio Supreme~~ Court put forth the test for determining whether a confession is voluntary or involuntary in the syllabus:

> "In deciding whether a defendant's confession is voluntary or involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."

Id. at 34. See also State v. Gray, 14 Ohio App. 3d 42, 469 N.E.2d 1340 (Hamilton Co., 1984); State v. Arrington, 14 Ohio App. 3d 111, 470 N.E.2d 211 (1984).

~~The record here demonstrates that Lee Moore's statement of confession to the police as documented by officers' notes and audio tapes was the evidence upon which~~ the

It heavily on Moore's statement the prosecution relied to obtain a conviction. Moore was arrested while in the process of buying dinner, but no one offered him food or water until nearly 5:00 a.m. the next morning. (T.p. 10, 33, 112, 129, 135, 139). His clothing was taken from him without any explanation. (T.p. 28-29, 41, 131-132). For six hours, the police held Moore in a cell, at the Mt. Healthy Police Department upon which no running water, and only a cot to sit on (T.p. 20, 131). On two occasions, Moore was forced to walk through snow and slush without shoes. (48-49, 52, 135). At the Cincinnati Criminal Investigation office, he was held in a cell for four hours while handcuffed. (T.p. 139). All of his requests for the assistance of an attorney were denied. (T.p. 133-134, 142, 146-147). While sobbing loudly, Moore finally gave the officers a taped statement, which led to his conviction. (T.p. 125, State's Ex. 18, 19).

The record clearly shows that Moore's confession was involuntary and the statement should have been suppressed as evidence. As a result of the trial court's error, this Court must now reverse Moore's convictions and remand for a new trial.

**PROPOSITION OF LAW # 8**

> **ADMISSION IN EVIDENCE OF STATEMENTS WHICH WERE OBTAINED AFTER DEFENDANT REQUESTED COUNSEL, AND BEFORE ANY COUNSEL WAS PROVIDED, VIOLATES THE FIFTH AND SIXTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND PARALLEL CONSTITUTIONAL AND STATUTORY PROVISIONS IN THE STATE OF OHIO.**

Six hours after Moore was arrested, Officer Tiernan entered the holding cell and read Moore his <u>Miranda</u> rights. As Tiernan was reading, Moore requested an attorney. (T.p. 133-134). Tiernan simply ignored Moore's request and kept reading. (T.p. 134). Of course, Tiernan testified that he did not hear Moore's request. (T.p. 71). After he was brought to the Cincinnati Police headquarters, Moore again requested the assistance of a lawyer. (T.p. 142). Again, the investigating officers also ignored the request, and told him to make a statement. (T.p. 142).

A criminal suspect undergoing custodial interrogation who has expressed a desire to deal

31

008714

with the police only through counsel is not subject to further interrogation by the authorities until counsel has been made available to the suspect, unless the suspect initiates further communication, exchanges, or conversations with the police. Edwards v. Arizona, 451 U.S. 477 (1981); State v. Williams, 6 Ohio St. 3d 281, 452 N.E.2d 1323 (1983). The Ohio Supreme Court's holding in Williams delineates a bright-line rule:

> (O)nce an accused who is undergoing custodial interrogation invokes his right to counsel, all further questioning must cease and may not be resumed in the absence of counsel unless the accused thereafter effects a valid--voluntary, intelligent and knowing--waiver of his right to counsel or himself renews communication with the police. The fact that the suspect may have responded to further police-initiated interrogation before the requested counsel was furnished does not legitimize such police behavior. Moreover, interrogation in the context of Miranda rights, "refers not only to express questioning, but also to any words or actions on the part of the police (other than in those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the subject. Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

Lee Moore requested the presence of an attorney two times before he confessed to the crimes alleged by the police. There is no question that the authorities should have ceased their questioning and assisted Moore in locating an attorney. However, the police desperately wanted to get Moore's statement as soon as possible, and after depriving him of food, water, clothing and sleep and making him trudge through cold slush in his bare feet, the officers finally coerced Moore into confessing.

Clearly Moore's statement should have been suppressed from evidence because it was obtained in derogation of his Constitutional right to counsel. As a result, this Court must now reverse his conviction and remand for a new trial.

**PROPOSITION OF LAW # 9**

ADMISSION OVER DEFENSE OBJECTION OF PHOTOGRAPHS OF THE DECEASED WHICH WERE CUMULATIVE, REPETITIVE, GRUESOME AND UNNECESSARY TO EXEMPLIFY ANY RELEVANT FACT TO BE PROVEN BY THE STATE, VIOLATES DEFENDANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS.

Over defense objection, the trial court admitted five photographs of the body of the

009715

32

deceased, including autopsy shots. (T.p. 866-867, 871-873). These photographs were gruesome and unnecessary to establish any fact required to be proved by the state in this case. The autopsy shots of the victim's body added nothing of evidentiary value and were calculated to inflame the jury. The decision to admit photographs of the deceased rests within the sound discretion of the court. However, in reaching that decision, the court must balance the probative value of the photographs sought to be admitted against the prejudicial effect upon Defendant. Such photographs must be excluded where they add nothing to the state's case, but will prejudice the jury against the accused. State v. Mauer (1984), 15 Ohio St. 3d 239, 473 N.E.2d 768.

The mere fact that a photograph is gruesome or horrendous is not in itself sufficient to require its exclusion per se. Where the accused is materially prejudiced, however, exclusion is required. State v. Hymor (1967), 9 Ohio St. 2d 122. In capital cases, strict review of each photograph is required. The probative value of every exhibit must outweigh its potential for prejudice. The court must also exclude cumulative photographs. The fact that an additional photo shows a slightly different view or angle is not sufficient. State v. Durr (1991), 58 Ohio St. 3d 86, 92; State v. Thompson (1987), 33 Ohio St. 3d 1, 9; State v. Morales (1988), 32 Ohio St. 3d 252, 258.

In the instant case, neither the fact of the victim's death nor the method of that death was contested by defense. An autopsy was performed and the coroner testified in detail about the cause of death. No material issue of fact remained which would, in any way, be established, bolstered or made more likely by the admission of these exhibits. Since the exhibits did not tend to make the existence of any material fact more or less likely, they did not constitute relevant evidence under the Ohio Rules of Evidence.

008716

33

Furthermore, there can be no doubt of their prejudicial impact. ~~Since the evidence was not relevant to any disputed fact, and was highly prejudicial to Defendant's case,~~ of irrelevant, highly prejudicial evidence the Rules of Evidence require exclusion. ~~Furthermore, Defendant's right to~~ Due process entitles ~~him to~~ Defendant a fair and impartial verdict, not based on emotion or prejudice. These photographs were designed to appeal to the jury's emotions rather than its intellect.

For all these reasons, admission of these photographs constituted reversible error.

**PROPOSITION OF LAW # 10**

**UNDULY REPETITIOUS PRESENTATIONS OF EVIDENCE UNFAIRLY EMPHASIZES THE CONTENTS, AND PREJUDICIALLY LENDS ADDITIONAL WEIGHT TO SUCH EVIDENCE.**

Cincinnati Police Officer David Feldhaus, an investigator in the homicide unit, testified against ~~Appellant Moore~~ DEFENDANT at his capital trial. Through Feldhaus, the prosecution introduced Moore's taped statement, ~~State's Exhibit 18, a tape which contained incriminating statements made by Moore~~ (T.p. 684). ~~The prosecution also moved that the~~ Over defense objections, the police-prepared transcriptions of the audiotape ~~exhibit to be~~ were supplied to the jury while the tapes were played. ~~over defense counsel's timely objection~~ (T.p. 685). ~~The transcripts were given to the jury while the tapes were played at trial~~ (T.p. 685, 697-698).

There was absolutely no necessity for admitting both the audiotape and the TRANSCRIPT ~~interpretation of the tape~~ made by law enforcement officials. Under Evidence Rule 403(B), courts should exclude evidence which is needlessly cumulative. The tape was easy to understand, and playing it before the jury was certainly sufficient. ~~to get across to the jurors the point that Appellant had given accounts of the events surrounding the crime to the police.~~ There was no reason to ~~cumulate~~ DUPLICATE this evidence by providing jurors with transcripts of the tape.

Courts have disapproved repetitious and prejudicial presentations of evidence at trial. In Harleysville Mut. Ins. Co. v. Santora, 3 Ohio App. 3d 257 (1982), the court was faced with a case in which both a tape recording and a transcript of the tape recording were admitted into

008717

34

evidence. The <u>Harleysville</u> court was persuaded by the reasoning in an Oklahoma criminal decision, <u>Bonicelli v. State</u>, 339 P.2d 1063 (1959). In <u>Bonicelli</u> the trial court admitted a tape recorded conversation <u>and</u> admitted a transcript of that recording. The defendant's conviction was reversed because the duplicitous evidence had an unfair impact on the jury:

> As defense counsel urges the court might as well have said: 'Here is something good, we want you to have a double dose of it so you won't overlook it. We think it's (sic) importance deserves extra special treatment. Hence, we do not only present the recording but in transcript form so you won't possibly forget it and hence we place the judicial finger of approval on it by way of emphasis"

<u>Bonicelli</u>, <u>supra</u>, at 1065,

Just as in <u>Bonicelli</u>, the prosecution gave the jurors in Moore's case a "double dose" by admitting both the tapes and the transcripts. The effect of this created an unfair emphasis on the tape, that should not have been allowed. Lee Moore was denied fair treatment and a fair trial under the Due Process Clause of the Fourteenth Amendment by the erroneous admission of needlessly cumulative evidence against him. His convictions should now be reversed.

**PROPOSITION OF LAW # 11**

> TRIAL TACTICS AND ARGUMENTS UTILIZED BY THE PROSECUTOR IN THE INSTANT CASE, WHEN CONSIDERED COLLECTIVELY, DEPRIVED DEFENDANT OF A FAIR TRIAL AND A RELIABLE DETERMINATION OF THE APPROPRIATE PENALTY, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND PARALLEL STATE PROVISIONS.

The issue of prosecutorial misconduct was recently addressed by the First District Court of Appeals in <u>State v. Hart</u> (Hamilton Co., 1994), 94 Ohio App.3d 665, 641 N.E.2d 755. That Court noted that "in our adversarial system, prosecutors are not only permitted but also encouraged to argue fervently for conviction. <u>Id</u>. at 671, 758; <u>see</u> <u>also</u> <u>State v. Lott</u> (1990), 51 Ohio St. 3d 160, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591. However, the latitude granted to prosecutors is limited by the need for fairness of the defendants' trial. <u>State v. DePew</u> (1988), 38 Ohio St. 3d 275, 528 N.E.2d 542. The Court wrote that "while he may strike hard blows, the prosecutor is not at liberty to strike foul ones. <u>Id</u>. at 671,

008713

35

758.

The test for whether prosecutorial misconduct may serve as the basis for reversing a conviction was held to be "first, whether the prosecutor's remarks were improper, and, if so, whether they prejudicially affected substantial rights of the accused." Id.; see also State v. Lott (1990), 51 Ohio St. 3d 150, 555 N.E.2d 293, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591, State v. Hudson (Hamilton Co., 1993), 86 Ohio App. 3d 113, 619 N.E.2d 1190.

Even if individual remarks by the prosecutor's do not rise to the level of reversible error, taken together, "they reflect the tenor of the prosecutors' conduct during the whole of the trial." Hart at 673, 760; see also State v. Keenan (1993), 66 Ohio St.3d 402, 613 N.E.2d 203. Taken as a whole, the prosecutor's comments may be found to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Hart at 674, 761; Donnelly v. DeChristoforo (1994), 416 U.S. 637, 94 S.Ct. 1868; State v. Apanovitch (1987), 33 Ohio St.3d 19, 514 N.E.2d 394. The prosecutors' improper conduct should be assessed within the context of the entire case, and more particularly the entire closing argument, to determine whether it was prejudicial. State v. Keenan, supra at 410, see also State v. Single (1992), 65 Ohio St.3d 597, 607, 605 N.E.2d 916, 926.

> A) A trial court may not allow the prosecutor to use facts not in evidence to appeal to the passions and prejudices of the jury at the penalty phase of the trial. This violates the accused's rights under the Sixth and Fourteenth Amendments to the United States Constitution and his concomitant rights under Article I Section 10 of the Ohio Constitution.

The essential arguments in this area were stated by Justice Wright, dissenting in State v. Bedford 39 Ohio St.3d 122, 529 N.E.2d 913 (1988). the prosecutor's function" . . . is not

36

008719

to tack as many skins of victims as possible to the wall. His function is . . . to give those accused of a crime a fair trial." Donnelly v. DeChristoforo, 416 U.S. 637, 648-649 (1974) (Douglas, J. dissenting); see also EC 7.13 of the Code of Professional Responsibility. Furthermore,

> The concern of improper prosecutorial influence upon a jury is particularly acute in the penalty phase of a capital case, especially where it tends to rebut a substantial amount of argument of mitigation, as was the case here. "(I)t is most important that the sentencing phase of the "capital) trial not be influenced by passion, prejudice, or any other arbitrary factor. . . . With a man's life at stake, a prosecutor should not play on the passions of the jury."

Bedford, supra, at 135-136. No HRT on it.

The Supreme Court of the United States has affirmed that the Eighth Amendment will not tolerate sentences imposed as the result of whim, passion, prejudice, mistake, or other improper influences. Eddings v. Oaklahoma, 455 U.S. 104 (1982).

The prosecutor in the instant case appealed improperly to the jurors' passions when he alluded to the victim's state of mind during the penalty phase of the trial: "he (the victim) saw where he was .. he knew what was coming." (T.p. 1196). The prosecutor implored the jury to "think a minute about what Melvin Olinger (the victim) went through during that kidnapping." (T.p. 1194). He attempted to draw them inside of the victim's mind by suggesting that "maybe there was a moment of hope for Mr. Olinger. You know, 'they're going to let me out." (T.p. 1195). None of these were facts in evidence. These continual references to the victim's state of mind unfairly influenced the jury. Clearly, the cumulative effect of these improper remarks was prejudicial to Defendant.

In State v. Thompson, 33 Ohio St. 3d 1, 514 N.E.2d 407 (1987), the Supreme Court of Ohio reversed a death sentence where the prosecutor used prejudicial arguments in arguing in the penalty phase. The Court stated that any egregious prosecutorial misconduct, including but not limited to prejudicial arguments at the penalty phase, would be cause for reversal of the death sentence. In later decisions, the Court has reluctantly affirmed the general principle,

going so far as to threaten prosecutors with disciplinary action should such practices continue. State v. DePew, 38 Ohio St. 3d 275, 528 N.E.2d 542 (1988). However Justice Wright noted in dissent, such a disciplinary proceeding offers "cold comfort to the appellant who faces death by electrocution." DePew, supra at 299, 528 N.E.2d at 5266. Also, it is important to consider the improper arguments of the prosecutor for their cumulative effect, not just individually. State v. Williams, 38 Ohio St. 3d 346, 528 N.E.2d 910 (1988) (Sweeney, J., dissenting).

The improper statements made by the prosecutor may have contributed to the jury's verdict. Accordingly, Defendant is entitled to a reversal of his conviction.

B) A prosecutor may not comment on a defendant's unsworn statement during mitigation, phase, other than to state that it was not given under oath or affirm. Pursuant to R.C. 2929.03(D)(1), a defendant is only subject to cross examination if a statement is given under oath or affirmation. This section grants the defendant in a capital proceeding the right to make an unsworn statement at the penalty stage. State v. DePew (1988), 38 Ohio St. 3d 275, 285, 528 N.E.2d 542, 554. The DePew court acknowledged that while in the interests of fairness, the prosecution could comment upon this, but warned that unlimited comment affects Fifth Amendment rights and negates the defendant's statutory prerogative. Id. Accordingly, the Court held that "where the defendant chooses to make an unsworn statement in the penalty stage of a capital trial, the prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." Id. at syllabus ¶ 2. see also State v. Mapes (1985), 19 Ohio St. 3d 108, 484 N.E.2d 140 (modified in part).

In 1993, the Supreme Court of Ohio reaffirmed the holding of Depew in State v. Loraine (1993), 66 Ohio St. 3d 414, 613 N.E. 2d 212. The Court further held that as in the case

38                                                    008721

# The Supreme Court of Ohio

FILED
FEB 04 1998

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

1998 TERM

State of Ohio,
    Appellee,

v.

Lee Edward Moore, Jr.,
    Appellant.

Case No. 96-2204

JUDGMENT ENTRY

APPEAL FROM THE
COURT OF APPEALS

    This cause, here on appeal from the Court of Appeals for Hamilton County, was considered in the manner prescribed by law. On consideration thereof, the judgment of the Court of Appeals is affirmed consistent with the opinion rendered herein.

    Furthermore, it appearing to the Court that the date heretofore fixed for the execution of judgment and sentence of the Court of Common Pleas has passed,

    IT IS HEREBY ORDERED by this Court that said sentence be carried into execution by the Warden of the Southern Ohio Correctional Facility or, in his absence, by the Deputy Warden on Tuesday, the 5th day of May, 1998, in accordance with the statutes so provided.

    IT IS FURTHER ORDERED that a certified copy of this entry and a warrant under the seal of this Court be duly certified to the Warden of the Southern Ohio Correctional Facility and that said Warden shall make due return thereof to the Clerk of the Court of Common Pleas for Hamilton County.

    IT IS FURTHER ORDERED by the Court that the appellee recover from the appellant its costs herein expended; and that a mandate be sent to the Court of Common Pleas for Hamilton County to carry this judgment into execution; and that a copy of this entry be certified to the Clerk of the Court of Appeals for Hamilton County for entry.

COSTS:

    Docket Fee, Affidavit of Indigency filed.

    (Hamilton County Court of Appeals; No. C950009)

THOMAS J. MOYER
Chief Justice

0015r020498

008722

00 Ohio St.3d]             STATE v. MOORE                          1
                            Statement of the Case

THE STATE OF OHIO, APPELLEE, v. MOORE, APPELLANT.

[Cite as *State v. Moore* (1998), —— Ohio St.3d ——.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

2204       (No. 96-____—Submitted October 21, 1997—Decided ——, 1998.)       February 4

APPEAL from the Court of Appeals for Hamilton County, No. C-950009.

On the evening of January 14, 1994, defendant-appellant, Lee Edward Moore, Jr., and Jason Holmes abducted Melvin Olinger at gunpoint and forced him into the trunk of his blue Ford Taurus. Moore drove Olinger's car to Mt. Healthy, dropped Holmes off, and picked up Larry Kinley. The two drove Olinger's car to a factory area in Cincinnati, where Moore ordered Olinger out of the trunk, robbed him of his wallet, and shot him in the head, killing him. Moore later admitted committing the crimes but claimed that the shooting was accidental. Moore was subsequently convicted of aggravated murder, kidnapping, and aggravated robbery, and sentenced to death.

On January 14, at approximately 7:20 p.m., Melvin Olinger, a suburban Chicago businessman, visited his parents in Fairfield. Olinger then went to a funeral home during calling hours for a friend who had passed away. Later, he went to Gina's, a bar, around 9:00 to 9:30 p.m., where he talked with Charlotte James. He told her that he was going to visit his mother that evening before returning to Chicago the next day. Olinger stayed in the bar for about fifteen minutes.

That same evening, Moore and Jason Holmes drove to Fairfield, intending to steal a car. Moore waited outside Gina's and saw Olinger get out of his blue Ford Taurus and enter the bar. When Olinger returned to his car, Moore confronted him with a gun and told Olinger to get in. Moore drove the Taurus to the rear of the bar and forced Olinger to climb into the trunk. Moore drove the Taurus to Larry Kinley's house in Mt. Healthy while Holmes followed in Moore's Ford Fairmont.

Moore and Kinley drove to a store in the Taurus, leaving Holmes behind to babysit. Moore told Kinley how he had stolen the car and that he was going to get it painted and modified. Moore told Kinley that he was driving to the Cumminsville area of Cincinnati to show the car to a friend. Instead, Moore drove to a factory area at 3366 Llewellyn Street. On the way, Moore told Kinley that he was going to kill the man in the trunk. When Kinley asked Moore why he was going to kill the man, Moore responded, "This ain't nothing. * * * We're not going to get caught for it."

Upon driving into the factory area, Moore headed toward a dumpster. He stopped the car and let Olinger out of the trunk while Kinley remained in the car.

2    SUPREME COURT, JANUARY TERM, 1998 [00 Ohio St.3d
Statement of the Case

Kinley testified that he didn't see what happened because the trunk lid was up, but that he heard Moore tell Olinger to empty his pockets. Kinley testified that Moore directed Olinger to the corner by the dumpster and that he heard Olinger beg and plead to Moore about Olinger's sick mother.

Kinley heard a gunshot, then Moore jumped into the car. According to Kinley, Moore laughed and asked him, "Did you see his dome get shot off?" After leaving the scene, Moore directed Kinley to take the credit cards out of Olinger's wallet. Kinley said that Moore sounded upset because he had forgotten to ask Olinger for the personal identification number to his Jeanie card.

In a taped statement to police, Moore claimed that he asked Olinger for his wallet after directing him to the dumpster. When Olinger dropped the wallet and stepped forward, Moore said that he panicked and "accidentally pulled the trigger. But it was an accident. * * * I had a large amount of drinks an' * * * some marijuana. An' it truly truly was an accident."

Moore and Kinley returned to Kinley's house, where Moore told Holmes what had happened. Moore told Holmes that he planned to keep the Taurus and that Holmes could use his Fairmont any time he wanted. At Moore's request Kinley took the Michigan plates off Olinger's Taurus. Kinley then took one of the plates off Moore's Fairmont and put it on the Taurus.

The next day, Moore and Kinley went out to get "some stuff." Moore used Olinger's credit card to purchase over $1,000 worth of clothing and jewelry at two J.C. Penney stores in the Cincinnati area. A sales clerk became suspicious and contacted Penney's loss prevention officer. The officer observed two black males place their purchases in the trunk of a blue Ford Taurus with Ohio tags and drive away.

At approximately 5:30 p.m. on January 20, police apprehended Moore and Kinley as they waited for an order in the drive-through lane of a McDonald's restaurant. Moore was placed in a holding cell at the Mt. Healthy police station. Officers confiscated several items of clothing from Moore which were believed to have been purchased with Olinger's credit card. Shortly after midnight, Moore was advised of his *Miranda* rights and signed a waiver of rights form.

Moore was then taken to the downtown Cincinnati police station for questioning. Although the weather was cold and snowy, Moore was required to walk a short distance to and from the police car in his stocking feet, since his shoes had been confiscated as evidence. At approximately 6:30 a.m., while "crying a little bit" and sniffling, Moore admitted to police that he had robbed and kidnapped Olinger and that he had shot and killed Olinger. He claimed that the shooting was accidental.

008724

Based on information supplied by Kinley, police located Olinger's body. The chief deputy coroner determined that Olinger had died of a single gunshot wound to the head fired from a distance of between six and twenty-four inches away.

The grand jury indicted Moore on three counts of aggravated murder, one count of aggravated robbery, and one count of kidnapping. All counts carried a firearm specification. All three aggravated murder counts carried three death-penalty specifications: (1) aggravated murder to escape detection for kidnapping and/or aggravated robbery [R.C. 2929.04(A)(3)]; (2) aggravated murder committed in connection with kidnapping where Moore either was the principal offender or committed the aggravated murder with prior calculation and design [R.C. 2929.04(A)(7)]; and (3) aggravated murder committed in connection with aggravated robbery where Moore either was the principal offender or committed the aggravated murder with prior calculation and design [R.C. 2929.04(A)(7)].

The defense essentially admitted Moore's involvement in the crimes. It argued that Moore had not formed the specific intent to kill Olinger. After deliberation, the jury found Moore guilty as charged.

Prior to the mitigation hearing, the trial court merged the three death specifications of Count I (aggravated murder committed with prior calculation and design) into one specification: murder to escape detection for kidnapping and/or aggravated robbery. The court also merged the two felony murder counts into one count and merged the three specifications attached to these counts into two: murder during kidnapping and murder during aggravated robbery.

During the mitigation hearing, several witnesses testified on Moore's behalf, and Moore gave a remorseful unsworn statement admitting the wrongfulness of his actions.

The jury recommended death, and the court imposed the death penalty. The court also imposed consecutive prison sentences for Moore's other convictions. Upon appeal, the court of appeals affirmed the convictions and sentence of death.

The cause is now before this court upon an appeal as of right.

---

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *William E. Breyer*, Assistant Prosecuting Attorney, for appellee.

*Elizabeth E. Agar* and *Julia A. Sears*, for appellant.

---

PFEIFER, J. Moore presents twenty-six propositions of law for our consideration. We have considered all of the propositions of law raised by Moore and have independently reviewed Moore's death sentence for appropriateness and

008725

proportionality. For the reasons that follow, we affirm the judgment of the court of appeals and uphold the death sentence.

### Pretrial Issues

In his first proposition of law, Moore argues that he was denied due process when the trial court denied his motion to reassign the trial judge. Judge William J. Morrissey was assigned by lot to Moore's capital case pursuant to Loc.R. 7(H) of the Court of Common Pleas of Hamilton County. He ruled on several pretrial motions and presided at the suppression hearing. On October 31, 1994, Judge Morrissey filed an entry disqualifying himself because he was "[h]eavily involved in other cases." That same day, the common pleas administrative judge reassigned the case to Judge Robert P. Ruehlman.

Defense counsel filed a motion to reassign the trial judge pursuant to Loc.R. 7 of the Court of Common Pleas of Hamilton County ("Local Rule 7"). Defense counsel asserted that the reassignment by the administrative judge was inappropriate, since Local Rule 7(H) contemplates a separate assignment by lot in death penalty cases.

Local Rule 7(E) provides that when a judge properly disqualifies himself from a case, the case will be reassigned pursuant to Sections (B) and (C) of Local Rule 7. Section (C) of Local Rule 7 provides that when a date has been set for trial and counsel for the parties acknowledge their readiness to proceed to trial, the administrative judge may assign the case "to any judge of that division who is not engaged in the trial of a cause at that time * * *."

Moore contends that Section (H) of Local Rule 7 should apply, since it specifically directs that assignments of capital cases be undertaken by lot. However, Section (H) does not provide for reassignment by lot when a judge becomes disqualified from a capital case.

Moore contends that even assuming that Section (C) applies to this case, that provision was not followed because counsel never acknowledged their readiness to proceed to trial. Nothing in the record indicates that the parties did not acknowledge their readiness to proceed to trial. Defense counsel never raised this issue in their motion for reassignment or during the court session when Judge Ruehlman considered the matter prior to trial. Moreover, nothing in the record suggests that Moore's counsel were unprepared to proceed on the date set for trial. The first proposition of law is rejected.

In his second proposition of law, Moore argues that the trial court abused its discretion by denying his motion for individual sequestered voir dire. Moore alleges that remarks made by two prospective jurors supporting capital punishment "contaminated" the entire venire. The comments Moore complains of were isolated and their effect on the venire is purely speculative. More important,

008726

Moore fails to persuasively demonstrate that he was prejudiced by these remarks.

The manner of conducting voir dire is within the sound discretion of the trial court. *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 723; *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, paragraph two of the syllabus. Since no abuse of discretion is apparent, *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 389, 473 N.E.2d 768, 780, Moore's second proposition of law is rejected.

In his third proposition of law, Moore complains that the trial court erred in permitting the prosecution to obtain promises from prospective jurors that they could sign a death verdict specifically against Moore. Moore failed to object to these questions and, therefore, has waived all but plain error. *State v. Campbell* (1994), 69 Ohio St.3d 38, 40-41, 630 N.E.2d 339, 344; *State v. Slagle* (1992), 65 Ohio St.3d 597, 604, 605 N.E.2d 916, 924-925. Plain error is absent here. Moreover, this court has upheld voir dire questioning where prospective jurors were asked whether they could impose death "upon the defendant" or on "this particular defendant." See *State v. Evans* (1992), 63 Ohio St.3d 231, 249-250, 586 N.E.2d 1042, 1057-1058; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 424-425, 613 N.E.2d 212, 221. Accordingly, the third proposition of law is rejected.

In his fourth proposition of law, Moore claims that he was denied a fair trial due to errors during voir dire. He propounds four arguments which we will address in turn.

First, Moore argues that the death qualification of prospective jurors produced a jury that did not represent a fair cross-section of the community. Apparently, Moore assumes that a jury representing a fair cross-section of the community would include persons "opposed to the death penalty." However, the United States Supreme Court has stated that petit juries are not required to reflect the composition of the community at large and that persons opposed to the death penalty do not constitute a "distinctive group" for purposes of a cross-section claim. *Lockhart v. McCree* (1986), 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137. Thus, we have repeatedly upheld the type of death-qualification questioning criticized by Moore. See, *e.g., State v. Steffen* (1987), 31 Ohio St.3d 111, 120-121, 31 OBR 273, 281, 509 N.E.2d 383, 392-393; *Landrum, supra,* 53 Ohio St.3d at 118, 559 N.E.2d at 723; *State v. Grant* (1993), 67 Ohio St.3d 465, 476, 620 N.E.2d 50, 64.

Second, Moore asserts that exclusion of persons opposed to the death penalty results in a jury biased in favor of guilt and in favor of imposing the death penalty. We reject this argument on the authority of *Lockhart v. McCree, supra.*

Third, Moore contends that prospective jurors Warren and Savage were improperly excused for cause because they expressed reservations about the

death penalty. Prospective juror Warren was extensively questioned by both parties and the trial judge about whether she could vote to impose a death sentence. She said repeatedly that she would not sign a verdict imposing the death penalty, stating that her views were "religiously based." Prospective juror Savage stated that she could not vote for the death penalty, and indicated that her views against the death penalty would substantially impair her ability to follow her oath and the judge's instructions.

Where the trial court has the definite impression that a prospective juror will be unable to faithfully and impartially apply the law, deference must be given to the trial judge who sees and hears the prospective juror. *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284–285, citing *Wainwright v. Witt* (1985), 469 U.S. 412, 425–426, 105 S.Ct. 844, 853, 83 L.Ed.2d 841, 852–853. Here, both excused jurors expressed views that would prevent them from fulfilling their duties as jurors. We conclude that the trial court did not abuse its discretion in excusing the jurors for cause. See *State v. Tyler* (1990), 50 Ohio St.3d 24, 30, 553 N.E.2d 576, 587; *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 414, 280 N.E.2d 915, 920.

Lastly, Moore asserts that the use of peremptory challenges to excuse prospective jurors who expressed reservations about imposing the death sentence violates *Witherspoon v. Illinois* (1968), 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. Moore's argument is misplaced because the *Witherspoon* holding was substantially altered in *Wainwright v. Witt, supra*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841. See *State v. Rogers* (1985), 17 Ohio St.3d 174, 177–178, 17 OBR 414, 417, 478 N.E.2d 984, 989. Moreover, prosecutors can exercise peremptory challenges for any reason except to exclude jurors based on gender or race. See, e.g., *State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 419. The fourth proposition of law is rejected.

In his fifth proposition of law, Moore raises two arguments concerning the composition of the venire. First, Moore contends that the trial court erred in refusing a continuance to allow him to present evidence supporting his motion for a reconstituted venire. Moore alleges that the venire was composed unfairly because a large percentage of African-Americans are not registered to vote and therefore only five of the fifty members composing the jury pool were African-Americans. Moore asserted at the beginning of voir dire that such a venire did not represent a fair cross-section of the community, and that use of licensed drivers lists or Social Security numbers would attain a fairer representation from the black community. The court denied Moore's motion for a continuance and overruled his motion for a new venire.

The decision to grant a continuance is within a trial court's discretion. *State v. Claytor* (1991), 61 Ohio St.3d 234, 241, 574 N.E.2d 472, 478. "In order to

00 Ohio St.3d]    STATE v. MOORE    7
Opinion, per Pfeifer, J.

establish a violation of the fair representative cross-section of the community requirement for a petit jury array * * *, a defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton* (1991), 57 Ohio St.3d 120, 566 N.E.2d 1195, paragraph two of the syllabus, following *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586-587.

Assuming that Moore can prove the first prong of the *Fulton* test, we move to the second prong. He has not adequately proven that African-Americans in Hamilton County are unfairly represented in venires in relation to their number in the community. He merely alleges that in this particular venire, the percentage of blacks in the jury pool did not equal the percentage of blacks in Hamilton County.

Further, Moore cannot satisfy the third prong of *Fulton*. The use of voter registration rolls as exclusive sources for jury selection is constitutional and "does not systematically, ███████ intentionally, exclude any [economic, social, religious, racial, political and geographical group of the community]." *State v. Johnson* (1972), 31 Ohio St.2d 106, 114, 60 O.O.2d 85, 90, 285 N.E.2d 751, 757; *State v. Spirko* (1991), 59 Ohio St.3d 1, 35-36, 570 N.E.2d 229, 265. Thus, the trial court did not err in failing to grant Moore's motion for a new venire or abuse its discretion in failing to grant him a continuance to gather evidence in support of his motion. *Maurer, supra*, 15 Ohio St.3d at 250, 15 OBR at 389, 473 N.E.2d at 780. [or]

Moore also contends in his fifth proposition of law that the trial court erred in permitting the prosecution to exercise a peremptory challenge against an African-American juror in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69. In order to state a prima facie case of purposeful discrimination under *Batson*, an accused must demonstrate (1) that members of a recognized racial group were peremptorily challenged and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors on account of their race. *State v. Hernandez* (1992), 63 Ohio St.3d 577, 582, 589 N.E.2d 1310, 1313; *State v. Hill* (1995), 73 Ohio St.3d 433, 444-445, 653 N.E.2d 271, 282. If the accused makes a prima facie case of discrimination, the state must then come forward with a neutral explanation. *Id.* at 445, 653 N.E.2d at 282. A trial court's finding of no discriminatory intent "will not be reversed on appeal absent a determination that it was clearly erroneous." *Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d at 1314.

During voir dire, the prosecution exercised one of its peremptory challenges against prospective juror Freeman, an African-American woman. The defense objected, and the trial judge requested the state to justify its peremptory challenge. The judge, following his own rule of practice, requested the prosecution to explain why it had peremptorily challenged Freeman.

The prosecution tried to explain that it did not engage in a pattern of discrimination, since it had exercised "for cause" challenges against three white prospective jurors, but not against any black jurors. When pressed for a justification by the trial court, the prosecutor stated that there were a couple of "things that bothered [him] about her [Freeman's] questionnaire."

First, the prosecutor noted that Freeman stated on her questionnaire that she felt that alcoholism or drugs negatively affect a child's development. The prosecutor explained that based on defense questions during voir dire, it was apparent that the defense was going to rely upon alcohol and drug use as a mitigating factor. Second, the prosecutor stated that Freeman indicated on her questionnaire that her uncle was an attorney who had once served as a public defender. Third, the prosecutor noted that Freeman had her arms folded when he had questioned her and that such body language "struck him" as being not receptive to the questions asked by the state.

In ruling that the peremptory challenge of Freeman was not based on race, the court noted that a good attorney looks at body language. The court further explained that it too had sensed a "little hostility" coming from Freeman toward the prosecution. The court also accepted the prosecutor's reasoning that Freeman might be predisposed to the defense and perhaps a little "anti-prosecutor" because her uncle is a defense attorney. We conclude that the trial court's finding of no discriminatory intent was not "clearly erroneous" under *Hernandez*, 63 Ohio St.3d at 583, 589 N.E.2d at 1314. Therefore, we overrule the fifth proposition of law.

## Statement to Police

In his sixth proposition of law, Moore argues that the trial court should have granted his motion to suppress because both his statement and his waiver of *Miranda* rights were involuntary. In his seventh proposition of law, Moore contends that his confession was the product of police coercion, in that he was deprived of food and water, forced to walk in the snow and slush without shoes, and handcuffed in his cell for three hours. In his eighth proposition of law, Moore asserts that his statement should have been suppressed because police officers ignored him when he requested counsel. We will address these related propositions of law together.

008730