Q.      YEAH.

A.      THEN I WENT IN THE HOUSE.

Q.      BUT YOU KNEW WHAT HE WAS GONNA DO THOUGH RIGHT.

A.      YEAH.

Q.      HOW COME... ONCE YOU KNEW HE WAS GONNA KILL HIM, YOU JUST SAY HEY LET ME OUT OF IT.

A.      I WAS OUT OF IT AFTER THAT POINT. AFTER I, AFTER HE DROP ME OFF.

Q.      OKAY, ANYTHIN' ELSE UH MIKE.

QQ.     YOU SAID UH, LEE TOLD THE GUY THAT IF HE COOPERATED HE WOULDN'T BE HURT.

A.      THAT'S WHAT LEE TOLD ME HE SAID. HE TOLD ME HE SAID THAT ...

QQ.     YOU DIDN'T HEAR LEE TELL THE GUY THAT?

A.      UN UN. THAT'S THE ONLY CONVERSATION WE HAD FOR ABOUT WHAT HE SAID TO THAT DUDE. AN' THE OTHER ONLY THING WE TALKED ABOUT WAS HOW HE UH, KILLED HIM.

Q.      LET ME GO BACK, YOU MENTIONED BEFORE -- -- IS THAT LATER ON THEY FOUND SOME MORE CREDIT CARDS UNDER A TIRE IN THE TRUNK.

A.      YEAH, WE WENT TO THE STORE, WE WENT TO THE STORE...

Q.      WHO IS WE?

A.      ME AN' LEE.

Q.      YEAH IN THE TAURAS.

A.      UH HUH.

Q.      OKAY. WHAT DAY WAS THIS?

A.      I THINK ON TUESDAY.

CC 0181

Page 20

Q.   ALRIGHT.

A.   WENT TO THE STORE. AN' LEE HAD UH, I DON'T KNOW WHAT HE WAS DOIN', HE SEEN A MICHIGAN THING ON THE BACK OF IT, I THINK IT SAID LAKE WATER, MICHIGAN.

Q.   ON THE BACK OF WHAT?

A.   THE CAR.

Q.   ON THE BUMPER OR SOMETHIN'.

A.   UN UN. RIGHT THERE NEAR THE SYMBOL.

Q.   NEAR THE WHAT?

A.   NEAR THE SYMBOL, THE FORD SYMBOL.

Q.   I DON'T KNOW WHAT YOU'RE SAYIN'?

QQ.  ON THE, ON THE TRUNK.

A.   NO, NOT UH, YEAH PROBABLY ON, THE PART OF THE TRUNK. IT, IT JUST SAID LAKE FORD, MICHIGAN...

QQ.  OKAY.

A.   OR LAKE WATER, MICHIGAN. BUT HE MOVED THAT TIRE AN' IT WAS, IT WAS A UH.....

Q.   CREDIT CARDS.

A.   HE HAD TWO MORE CREDIT CARDS....

Q.   WHAT KIND WERE THEY?

A.   THE EXPENSIVE KIND.

Q.   WHAT KIND WERE THEY?

A.   AN AMERICAN EXPRESS AN' I DON'T KNOW THE OTHER ONE.

Q.   ALRIGHT, WHAT HAPPENED TO THEM.

A.   NOTHIN'.

Q.   WHERE ARE THEY AT?

A.   HUH?

Q. WHERE ARE THEY AT?

A. WHAT THE CREDIT CARD.

Q. YEAH.

A. THREW THEM AWAY TOO CAUSE WE KNEW WE COULDN'T USE 'EM. IT WAS WAY TOO LATE THEN. HE WAS ROLLIN' THAT CAR, CAR HOT.

Q. WHERE, WHERE WERE THEY THROWN AT....

A. A DUMPSTER.

Q. HUH?

A. A DUMPSTER.

Q. BY YOUR HOUSE. WHO THREW THEM AWAY?

A. UH, LEE.

Q. DID YOU THROW ANY OF THEM AWAY.

A. I THREW THE UH, I THREW THE JC PENNY, THE JEANNIE AN' THAT UH, MARATHON ONE.

QQ. THESE CARDS WERE UNDER THE SPARE TIRE IS THAT WHAT YOU'RE SAYIN'...

A. YEAH THOSE LAST TWO.

QQ. IN THE TRUNK.

A. UH HUH.

QQ. UNDER THE SPARE TIRE.

A. SOMEWHERE BACK THERE, I DON'T REALLY KNOW EXACTLY WHERE IT WAS AT. I KNOW THEY WAS HID GOOD, BECAUSE...

QQ. IT WAS INSIDE THE TRUNK.

A. YEAH. AN' LEE DIDN'T GET THAT MAN'S WALLET UNTIL HE GOT HIM OUT BEFORE HE WAS FINNA KILL HIM.

Q. OKAY SO NOW WHAT, WHAT WAS THE CARDS IN THE TRUNK THAT YOU... AMERICAN EXPRESS CARD AN' WHAT ELSE?

CC 0183

A.     I DON'T KNOW THE OTHER ONE.  I JUST KNOW IT MUST OF HAD A LOT OF MONEY ON IT BECAUSE HE HID IT, THINKIN' HE WAS GONNA LIVE.

Q.     OKAY AN' THEN YOU, YOU SAID YOU THREW AWAY THE JC, THE JEANNIE AN' WHAT ELSE?

A.     THE UH, MARATHON GAS STATION CARD.

Q.     WHERE DID YOU THROW THEM AWAY AT?

A.     THE DUMPSTER.

Q.     THE DUMPSTER.

A.     YEAH.

Q.     WHO FOUND THESE CARDS IN THE TRUNK, YOU OR LEE?

A.     LEE, I WENT TO THE STORE.  I CAME OUT, HE WAS LIKE MAN, MAN HE SWINDLED US AN' ALL THAT.  I'M LIKE FOR REAL.  AN' HE WAS LIKE LOOK AT THIS, HE SHOWED ME 'EM TWO SHINY CARDS.  AN' I WAS LIKE OH DAG.

Q.     DID YOU EVER DRIVE THAT TAURAS, HE EVER LET YOU DRIVE IT.

A.     NO.

Q.     HUH?

A.     NO, NOT AT ALL.

Q.     DID HE GIVE YOU ANYTHIN' OUT OF ALL OF THIS.

A.     NOPE, I DIDN'T GAIN NOTHIN'.  AFTER I GOTTA ROLL HIS CAR FROM FAIRFIELD TO MY HOUSE.

Q.     YOU GOTTA DRIVE LEE'S CAR RIGHT?

A.     FROM FAIRFIELD TO MY HOUSE, THAT'S ALL I GOT OUT OF IT.

Q.     OKAY.

A.     OH AN' HE HAD SIX DOLLARS IN HIS WALLET.

Q. WHERE'S HIS WALLET AT.

A. I AIN'T HIP, LEE AN' LARRY HAD IT.

Q. OKAY HE HAD SIX DOLLARS IN HIS WALLET?

A. YEAH THEY TOLD ME HE HAD SOME CHUMP CHANGE.

Q. WHAT WAS LEE SAYIN' TO YOU WAS HE, WAS HE, HOW WAS HE ACTIN' ABOUT WHEN HE WAS TELLIN' YOU HE SHOT HIM, WHAT WAS HE SAYIN'?

A. HE SAID, HE DIDN'T SOUND LIKE NOTHIN', HE JUST SOUNDED JUST REGULAR, JUST TALKIN'. HE, HE WASN'T HAPPY, HE WASN'T SAD, HE DIDN'T CARE, HE JUST DIDN'T CARE.

Q. JUST DIDN'T CARE.

A. NO.

Q. AN' WHY DID HE SHOOT HIM?

A. I AIN'T HIP, HE AIN'T HAVE TO. IF, IF, CAUSE WE THOUGHT HE WAS FROM MICHIGAN. HE DIDN'T HAVE TO SHOOT HIM, ESPECIALLY IF WE THOUGHT HE WAS FROM MICHIGAN, THAT'S WAY FAR UP THERE.

QQ. SO UH, YOU SAID THAT UH, YOU FOUND THIS STUFF TUESDAY SO YOU GUYS ROLLED IN IT ALL THE WAY UP TO TWO DAYS AGO, OR TWO DAYS BEFORE WE CAME OVER AN' SAW YOU?

A. YES.

QQ. DID, WHAT DAY DID HE GET RID OF THE CAR?

A. WHAT DAY. THE TWO -- MISSED US -- BOTH OF YA'LL, THE CAR AT SOMEBODY HOUSE.

Q. HUH?

A. THE CAR IS OVER SOMEBODY HOUSE.

Q. THE CAR IS AT SOMEBODY'S HOUSE. WHOSE HOUSE IS THE CAR AT?

CC 0185

A.      IT'S OVER CAMERON'S.

Q.      WHO?

A.      CAMERON, CAMERON CALLERY.

Q.      WHO'S THAT?

A.      A FRIEND, THAT WENT TO THE MALL WITH US YESTERDAY. THE CAR DIDN'T GET GONE TILL YESTERDAY. WELL FIRST ON TUESDAY, ALRIGHT HE PARKED IT IN ANOTHER COURT TUESDAY NIGHT, HE PARKED IT IN ANOTHER COURT IN COMPTON GROVE. AN' ON WEDNESDAY WE WENT TO THE MALL. AN' THEN ON, ON WEDNESDAY WE WENT, I GOT MY HAIR CUT, LARRY GOT HIS HAIR CUT, AN' WE PICKED UP CAMERON AN' GARY. GARY IS THE ONE THAT CUT HAIR, BUT THEY LIVE TOGETHER. UH, GARY UH, WE WENT TO THE MALL IN THE FAIRMOUNT, CAME BACK TO MY HOUSE. AN' LEE DIDN'T FEEL LIKE DROPPIN' CAMERON OFF, SO WE TOLD HIM LIKE YOU CAN TAKE THE TAURAS BUT YOU KNOW IT GOT SOME DIRT ON IT. AN' CAMERON SAID YEAH, AN' THEN HE LEFT, TOOK THE CAR OVER HIS HOUSE.

QQ.     WHAT'S CAMERON'S LAST NAME?

A.      CALLERY, C-A-L-L-E-R-Y.

Q.      HOW OLD IS HE?

A.      SIXTEEN.

Q.      AN' YOU SAID HIS FIRST NAME IS WHAT?

A.      C-A-M-E-R....

Q.      C-A-M-E-R....

A.      O-N.

Q.      HUH?

CC 0186

Q.  CAMERON.

A.  CAMERON.

QQ. CAMERON.

A.  CAMERON, LIKE CAMERON.

Q.  OKAY, C-A-R, C-A-M-E-R-O-N. AN' WHERE'S UH, CAMERON LIVE AT?

A.  COLLEGE HILL.

Q.  WHAT STREET?

A.  I DON'T KNOW THE STREET, IT'S OFF OF UH, IT'S OFF OF ARGUS ...

Q.  A STREET OFF ARGUS.

A.  YES, I CAN SHOW YOU BETTER THAN I CAN TELL YOU CAUSE HIS STREET GOT A FUNNY NAME.

Q.  WHERE DOES HE GO TO SCHOOL AT?

A.  AIKEN.

Q.  DOES HE KNOW ANYTHIN' ABOUT THIS GUY GETTIN' KILLED OR JUST WHAT.

A.  NO HE AIN'T KNOW, HE DON'T KNOW, HE STILL DON'T KNOW RIGHT NOW. HE JUST, ALL HE KNOW IS THE CAR STOLEN.

Q.  IS IT PARKED AT HIS HOUSE, OR WHERE'S HE PARKIN', HE WOULDN'T PARK IN FRONT OF HIS HOUSE WOULD HE. WHERE DO YOU THINK HE PARKED IT AT.

A.  IN A GARAGE.

Q.  HUH?

A.  IN A GARAGE.

Q.  HIS GARAGE?

A. IT, IT'S LIKE, IT'S NOT LIKE A GARAGE WHERE THE DOORS COME DOWN, IT'S A FOUR PERSON GARAGE. AN' AIN'T NO DOOR, IS JUST, YOU CAN JUST DRIVE INTO IT.

Q. SO HIS PARENTS WOULDN'T KNOW ANYTHIN' ABOUT IT.

A. UH, NO.

Q. WHERE'S THE GARAGE AT?

A. IN THE BACK OF HIS HOUSE.

Q. AN' THE STREET IS OFF ARGUS.

A. UH HUH.

Q. HUH?

A. YES.

Q. IF YOU HEARD THE STREET WOULD YOU KNOW IT?

A. UN UN. I COULDN'T. I, I KNOW IT'S THE FIRST STREET OFF OF ARGUS COMIN' FROM NORTH BEND.

Q. SO YOU GO THEN, YOU GO OUT NORTH BEND TO WHERE?

A. TO ARGUS.

Q. AN' THEN TURN RIGHT OR LEFT.

A. COMIN', COMIN' DOWN NORTH BEND, COMIN' DOWN NORTH BEND YOU TURN UH, RIGHT GOIN' UP NORTH BEND YOU TURN LEFT.

Q. COMIN' FROM UH, YOU KNOW WHERE THRIFTWAY IS ON NORTH BEND.

A. UN UN.

Q. OKAY. YOU KNOW WHERE KROGER'S IS?

A. YEAH, KROGER'S.

Q. GOIN' TOWARD UH, GOIN' UH, AWAY FROM THE CITY.

A. HUH?

Q. GOIN' TOWARD UH, THE WHITE CASTLE.

CC 0188

| | |
|---|---|
| A. | YEAH, GOIN' TOWARDS WINTON TERRACE... |
| Q. | RIGHT. |
| A. | GOIN' TOWARD WINTON... |
| Q. | YOU TURN RIGHT OR LEFT ON ARGUS. |
| A. | TURN, YOU TURN RIGHT. |
| Q. | AN' THEN IT'S A STREET OFF ARGUS. |
| A. | UH HUH, THE FIRST STREET OFF ARGUS. |
| Q. | AN' WHAT'S HE LIVE ON THE LEFT OR RIGHT SIDE. |
| A. | HE LIVE ON THE LEFT SIDE, THE DEAD END. |
| Q. | HOW FAR DOWN. |
| A. | UH AT THE END. |
| Q. | ALL THE WAY TO THE END OF THE STREET.  SO ARGUS THE FIRST STREET ON THE LEFT AN' ALL THE WAY TO THE DEAD END. |
| A. | YEAH. |
| Q. | OKAY.  WHAT COLOR IS HIS HOUSE? |
| A. | BRICK, IT'S, IT'S LIKE A, IT'S A HOUSE, BUILT LIKE AN APARTMENT BUILDING. |
| Q. | OKAY.  AN' THERE'S FOUR APARTMENTS IN THERE. |
| A. | UH HUH. |
| Q. | WHAT'S HE LIVE ON, THE FIRST OR SECOND FLOOR. |
| A. | FIRST FLOOR.  YOU GOTTA KNOCK TO GET IN. |
| Q. | OKAY. |
| A. | YOU GOTTA HAVE A KEY. |
| Q. | OKAY. |
| A. | HE, ALL CAMERON KNOW ABOUT THE CAR IS THAT, IS IT'S HOT. |

CC 0189

Q.    OKAY.

QQ.   WHAT'S GARY'S NAME?

A.    GARY BOX.  BOX.

QQ.   B-O-X.

A.    UH HUH.

Q.    OKAY I'M GONNA STOP THE UH, TAPE HERE WE'RE GONNA SWITCH SIDES, IT'S ABOUT RUNNIN' RIGHT OFF OF THE FIRST SIDE.  OKAY UH, THIS IS THE INTERVIEW WITH UH, JASON HOLMES.  THIS WILL BE UH, SIDE TWO.

QQ.   YOU SAID GARY LIVES WITH CAMERON?

A.    YEAH.

QQ.   IN THE SAME APARTMENT OR THE SAME BUILDIN'.

A.    THE SAME APARTMENT.

QQ.   HOW ARE THEY RELATED.

A.    UH, THEY NOT REALLY RELATED, THEY JUST REAL CLOSE FRIENDS, KNOWIN' EACH OTHER SINCE THEY WAS LITTLE.  GARY TURNED EIGHTEEN EARLIER IN JANUARY.  CAMERON IS THREE DAYS, HOLD ON, CAMERON IS FIVE DAYS YOUNGER THAN ME, BORN DECEMBER 8TH, 1977.

QQ.   UH, WELL WHOSE APARTMENT IS IT?

A.    HIS MOTHER'S, PAT CALLERY.

Q.    WHAT'S HIS MOTHER'S NAME?

A.    PAT CALLERY.

Q.    PAT.

A.    UH HUH.  SHE DON'T KNOW NOTHIN' ABOUT IT.  SHE PROBABLY DON'T EVEN KNOW THE CAR BACK THERE BECAUSE HER CAR BROKE DOWN.

CC 0190

Page 29

Q.  YOU KNOW HIS PHONE NUMBER?

A.  HE DON'T HAVE A PHONE.

Q.  OKAY. WHOSE UH, IN-LAWS, WHO IS THIS GARY BOX NOW, YOU'RE SAYIN' GARY BOX.

A.  THAT'S, THAT'S JUST A FRIEND, A FRIEND OF THE FAMILY.

Q.  OKAY. SO WHO GAVE HIM THE CAR.

A.  WHO GAVE, CAMERON THE CAR.

Q.  YEAH.

A.  LEE.

Q.  LEE DID. HE JUST TOLD HIM HE AIN'T FEEL LIKE DRIVIN' HIM HOME YESTERDAY SO, HE, I MEAN ON WEDNESDAY, SO HE SAID GO AHEAD, USE IT. TAKE THAT CAR BUT YOU KNOW IT GOT DIRT ON IT SO, BE CAREFUL

QQ.  THAT WAS WEDNESDAY.

A.  HUH?

QQ.  THAT WAS WEDNESDAY.

A.  YES.

Q.  ANYTHIN' ELSE, ANYTHIN' ELSE YOU CAN UH, REMEMBER ABOUT THIS JASON?

A.  YEAH. I AIN'T, ...

Q.  WHAT, WHAT ELSE DO YOU REMEMBER.

A.  ...TELL YOU EVERYTHIN'.

Q.  WELL THAT'S WHAT YOU, WE WANT THE TRUTH.

A.  UH LEE BOUGHT HIS GIRLFRIEND SOME STUFF. SHE GOT ALL THAT, HER NAME SHATAYNDA NEAL.

Q.  ALRIGHT. LEE BOUGHT SOME UH, JEWELRY FOR HER.

A.  YEAH. I DON'T KNOW EXACTLY WHAT IT IS. LARRY JUST, LARRY WAS A LITTLE BIT UPSET BECAUSE LEE, HE WENT WITH

CC 0191

Page 30

|   |   |
|---|---|
| | LEE AN' LEE DIDN'T GET HIM NOTHIN'. HE WAS LIKE MAN, HE BOUGHT THAT, THIS AN' THAT, ALL THIS STUFF. |
| Q. | WHAT'S HER NAME? |
| A. | SHATAYNDA NEAL. |
| Q. | SHATAYNDA, SPELL IT. |
| A. | SHATAYNDA, I DON'T KNOW HOW TO SPELL IT. I JUST KNOW HER NAME SHATAYNDA NEAL. |
| Q. | WHERE SHE LIVE AT? |
| A. | SEVEN HILLS, YA'LL, YA'LL WAS OVER HER HOUSE. |
| Q. | OKAY. YOU KNOW WHERE SHE LIVE AT, OKAY. ANYTHIN' ELSE MIKE. |
| QQ. | UH NO. |
| Q. | OKAY IS THAT IT JASON, ANYTHIN' ELSE YOU WANNA ADD? |
| A. | NO, I TOLD YOU THE WHOLE TRUTH, NOTHIN' BUT THE TRUTH. |
| Q. | ANYBODY ELSE KNOW ABOUT THIS GUY BEIN' KILLED BESIDES YOU, LARRY... |
| A. | NO, JUST HAPPEN ON THE HUSH, HUSH. |
| Q. | AN' LEE. YOU NEVER TOLD ANYBODY ELSE, JUST THAT THEY KNEW YOU HAD A STOLEN CAR. |
| A. | YEAH, YEAH, ONLY THING EVERYBODY KNEW WAS THAT WE HAD A STOLE CAR, A STOLE TAURAS. AN' THAT'S ABOUT IT. PEOPLE WAS ASKIN' FOR RIDES, THEY ACT LIKE THEY DIDN'T CARE. |
| Q. | KNOWIN' IT WAS STOLEN? |
| A. | YEAH. THEY SEEN IT WAS ALL PRETTY, PRETTY BLUE AN' ALL THAT. SO THEY JUST WAS LIKE DAG, GIVE ME A RIDE. EVERYBODY WANTED TO RIDE IN IT. PEOPLE KNEW, HE AIN'T |

CC 0192

Page 31

|||
|---|---|
| | REALLY WANT NOBODY TO GET IN IT THOUGH. HE AIN'T LET TOO MANY PEOPLE IN IT. |
| Q. | WHO IS THAT, LEE. WHY DID HE LET UH, CAMERON HAVE IT. |
| A. | SHOOO, HE KNEW HE HAD TO GET RID OF THAT CAR, IT WAS TOO HOT. BUT HEY, I'M TELLIN' THE TRUTH SO I CAN GET AS FAR AWAY FROM THIS AS I CAN, YOU KNOW WHAT I'M SAYIN'. |
| Q. | OKAY. OKAY UH, THIS WILL CONCLUDE THE INTERVIEW WITH UH, JASON HOLMES, END. |

Transcribed by:
Natasha V. Ruff
February 8, 1994
Cincinnati Police Division

CC 0193

**SUPPLEMENTARY REPORT**
**FAIRFIELD POLICE DEPARTMENT**

PAGE 1 OF 2 PAGES

| Event Number | Correct Offense Type | Victim's Name |
|---|---|---|
| 94-02765 | Missing Person | Olinger, Melvin |

| Date of Report | Time | Form Used For |
|---|---|---|
| 1-24-94 | 1140 | ☐ Additional Public Information   XX Investigative Supplement |

On 1-20-94 at 2100 hrs., I interviewed Jason T. Holmes at the Mt. Healthy Police Department. Holmes provided me with the following information.

On 1-14-94 at around 1900 hrs., Holmes and Lee Moore, Jr. left 7853 Clovernook Dr. in Mt. Healthy and drove to 627 Chestnut St. in Hamilton where Holmes' aunt lives. His aunt is Venetta Gillium.

They had gone to Butler County to do a "car-jacking" and to abduct the owner/operator. When they left the Chestnut St. address, they drove to Fairfield and stopped in the parking lot at Fair Plaza Shopping Center at the corner of Pleasant Ave. (U.S. 127) and Patterson Blvd. This position gave them the vantage point to observe cars entering the parking lots at Gina's Lounge in Fair Plaza and O'Casey's Pub in Riegert's Square Shopping Center.

They watched cars until they saw Melvin Olinger's Ford Taurus pull onto Patterson Blvd. and into the Fair Plaza parking lot. Olinger parked the car at Gina's Lounge and went inside. They parked near Olinger's car and waited for him to return.

When Olinger returned to his car, Moore approached him and, at gun-point, forced him into his car through the driver's door, and across the seat to the passenger side. Moore then got in behind the wheel of the Taurus. Holmes drove off in Moore's car and went to 7853 Clovernook Dr. where he met up with Moore.

**CC 0194**

When Moore arrived at Clovernook, he said he had place Olinger in the trunk of the Taurus.

| Code | Name/Clothing Description | Sex | Race | Age/D.O.B. | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|
| S-Suspect W-Witness | Holmes, Jason T. | M | B | 12-3-77 | | | Blk | Brn |
| | 7853 Clovernook Dr., Mt. Healthy, OH | | | | | | | |

Case Status: ☒ Cleared  ☐ Not Cleared  ☐ Unfounded  ☐ Cleared Except.
If Case Cleared, How Cleared: ☒ Arrest  ☐ Directed To Prosecutor  ☐ Refused To Prosecute  ☐ Station Adjustment  ☐ Other Excep.

Event Number: 94-002765

Unit No. 43   Unit No. 25

**SUPPLEMENTARY REPORT**
**[FAI]RFIELD POLICE DEPARTMENT**

PAGE 2 OF 2 PAGES

| Event Number | Correct Offense Type | Victim's Name |
|---|---|---|
| 94-00[?]55 | Missing Person | Olinger, Melvin |

| Date of Report | Time | Form Used For Additional Public Information | Form Used For Investigative Supplement |
|---|---|---|---|
| 1-24-94 | 1140 | ☐ | ☒ |

Holmes went to 7857 Clovernook Dr. where his cousin, Larry Kinley, was. [H]e told Kinley to come outside to see what Lee had. They showed Kinley the [c]ar and told him they had Olinger in the trunk of the Taurus.

They were going to get rid of Olinger. Kinley said he wanted to go with [M]oore, so Holmes stayed at Clovernook Dr.

Holmes said that they went to Fairfield to do a car-jacking for several [r]easons. They view Fairfield as a "white" community, so it would be safer [t]o accost someone there. The police in Butler County aren't as good as those [i]n Hamilton County, so they would be less likely to be caught. Olinger's car [w]as p[ar]ticularly attractive because it had Michigan registration on it. They [b]elieved no one would be looking for him in Hamilton Co[.] They discussed [t]heir plan while waiting for Olinger to come out of Gina's.

Moore had the revolver in his possession at the time to the abduction. [K]inley had told Holmes a few days before the murder that he would like to kill [s]omeone.

I was present on 1-21-94 when Moore and Holmes were interviewed at [C]incinnati P.D. The interviews were taped by Officer David Feldhaus of C.I.S.

All evidence was turned over to Cincinnati P.D.

CC 0195

Event Number: 94-002765
Case Status: ☒ Cleared
If Case Cleared, How Cleared: ☒ Arrest
Unit No. 43
Unit No. 25

# Death Record

COPY-NUMBER 2

**HAMILTON COUNTY CORONER'S OFFICE**
Cincinnati, Ohio

Number __121191__                          Reported by __Sergeant John Jay__

Time reported __2:04 A.M.__              Agency __Cincinnati Police, Homicide Squad__

Date reported __01/21/94__               Reported to __Edwin A. Deters - FPC__

Name __MELVIN NOAH OLINGER__     Age __53__     Birth Date __08 / 05 / 40__

Address __302 West 34th Street, Steger, Illinois 60475__

Occupation __Account Manager - Finance Company__     SS number __269  34  5223__

- ___ Single       ___ Widowed       _X_ Male       _X_ Caucasian
- ___ Married      _X_ Divorced      ___ Female     ___ Black
- ___ Separated    ___ Unknown                      ___ Other

Medical care:
- ___ 0-3 months          ___ None
- ___ 3-6 months          _X_ Unknown
- ___ 6 months or longer  At or by _____

_X_ Found dead at __3366 Llewellyn Avenue, Cincinnati, Ohio 45223__

Injured at __same as above location__

Time __at approx. 8:50 P.M.__                                Date __01 / 20 / 94__

Investigated by __Cincinnati Police, Homicide Squad__

Next of kin notified by __Cincinnati Police, Homicide Squad__   Date __01 / 21 / 94__

Pronounced dead by __Dr. George Carpenter__                     Date __01 / 21 / 94__

At __D.O.A. at University of Cincinnati Hospital__              Time __2:05 A.M.__

Postmortem examination  _X_ Yes   ___ No   _X_ Coroner's Office   ___ Hospital

Postmortem examination by __Dr. Elliot M. Gross__   H- __28-94__

Body viewed by _____                                            Date __/ /__

Disposition of body  _X_ Buried   ___ Cremated   ___ Other _____

Location __Rose Hill Burial Park, Hamilton, Ohio__               Date __01 / 26 / 94__

Funeral Director __Brown-Dawson Funeral Home, 330 Pershing Avenue, Hamilton, Ohio 45011__

|  | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|
| IMMEDIATE CAUSE OF DEATH (A) __Gunshot wound of head__ | minutes |
| Due to (B) __Homicide__ |  |
| Due to (C) _____ |  |
| Due to (D) _____ |  |

Part II. Other significant conditions contributing to death but not related to the terminal disease condition given in Part (A).

_____

CC 0196

E - 965 . 0

F.H. 01/26/94 jm

_Coroner of Hamilton County, Ohio_

REV 1-89

COPY-NUMBER 2

DEATH RECORD NO. 121191

H-28-94

PATHOLOGIC DIAGNOSES

OF THE BODY OF

MELVIN OLINGER

1. Gunshot wound, close range, of head.
2. Thawed, frigid body.

OPINION:

It is my opinion that the cause of death of Melvin Olinger is gunshot wound of head.

_____

Elliot M. Gross, M.D., Chief Deputy Coroner, Pathologist

Hamilton County, Ohio

CC 0197

POSTMORTEM EXAMINATION

OF THE BODY OF

MELVIN OLINGER

COPY-NUMBER 2

A postmortem examination of the body of a white male identified as Melvin Olinger is performed at the Hamilton County Morgue on January 22, 1994. The examination is conducted by Elliot M. Gross, M.D. and is begun at 1:00 p.m.

EXAMINATION OF CLOTHING:

This is the examination of the clothing previously removed from the body prior to thawing and prior to the autopsy. The clothing consists of a down and feather-lined hooded outer jacket with the hood present in a zippered pouch about the neck and with the label "Outdoor Exchange"; a black short zippered outer jacket; a white shirt; a white long-sleeved shirt with the label "Arrow Bradstreet"; a white undershirt with the label "Hanes Bill Blass Collection"; a pair of blue wool trousers with a thin blue pinstripe with the label "Palm Beach"; a pair of white jockey briefs with the label "Jockey"; a pair of blue ankle length socks; a black leather belt with no label but size "42"; a purple tie with a rose-turquoise geometric design; a pair of brown gloves with the label "Christian Dior"; and a pair of black rubber-heeled laced leather shoes with the label "Allen Edmonds".

No perforations relating to wounds in the head are evident in the hood or the collar of the jacket.

EXTERIOR OF THE BODY:

The undressed body is that of a well developed, well nourished white male with a measured height of 70 inches and a scale weight of 245 pounds. The scalp hair is black with extensive graying. The irides are hazel. The teeth are in good condition. There are no masses in the neck. There is sparse hair on the chest and on the abdomen. The abdomen is

Olinger  -2-

COPY--NUMBER 2

protuberant. The external genitalia are those of a normal adult male. The penis is uncircumcised. Both testes are in the scrotum. The extremities are muscular. The fingernails are clean-edged, short and even, with the exception of the left 5th fingernail which is slightly irregular with an overlapping edge in the mid portion. The lower extremities are unremarkable. There is no rigor mortis.

The body was frozen when first received in the morgue and has been thawed. It shows changes secondary to exposure to the cold characterized by a generally purplish appearance to the body lividity with hemolysis of the superficial veins of the thighs and without any decompositional changes. Hemolysis of the superficial veins is also evident in the left forearm and left hand. There is clouding of the corneae. Lividity is present on the left side of the body, the left upper extremity and the left leg. The back is unremarkable. There is violaceous lividity on the back.

IDENTIFYING MARKS AND SCARS:

There is a faint transverse scar present in the left upper quadrant of the abdomen extending from the midline and midway between the xiphoid and the umbilicus and measuring 7.5 centimeters transverse.

EVIDENCE OF MEDICAL THERAPY:

None.

EXTERNAL EVIDENCE OF INJURY:

There is a dried brown abrasion measuring 3/4 inch vertical by 1/4 inch transverse directly above the left eyebrow. The left upper eyelid and the inner aspect of the right upper eyelid have a purplish appearance and are without appreciable hematoma. There is visible subconjunctival hemorrhage present over the left globe and in the palpebrae on the left with decompositional

CC 0199

Olinger    -3-

COPY NUMBER 2

change secondary to exposure to the cold. Numerous abrasions are present on the tip of the nose and over the chin slightly to the left of the midline. The abrasions on the tip of the nose and just distal to the junction of the bony and cartilaginous septa measure 1 1/4 inches vertical by 7/8 inch transverse. Over the left cheek is an abrasion measuring 1 1/2 inches transverse by 1/2 inch vertical. An abrasion is also present that has a brownish parchmentlike appearance at the inferior aspect of the left earlobe extending onto the skin of the face and overall measuring 3/4 inch by 1/4 inch on the inferior aspect of the ear and 5/8 inch vertical by 1/4 inch transverse on the skin of the cheek. Just below the concha of the left ear at the lateral aspect is a parchmentlike abrasion 5/8 by 3/8 inch. There appears to be a slight purplish discoloration of the left ear.

There are multiple abrasions present over the left leg extending from the inferior border of the patella to the junction of the upper and middle thirds. This overall measures 7 1/2 inches vertical by 3 inches transverse.

There is a bullet entry wound located in the right parietal scalp with the center of the perforation located 3 1/2 inches directly above and 1 inch posterior to the right external auditory meatus. The wound consists of an ovoid perforation 5/8 inch by 1/2 inch. An abraded zone 1/8 inch in width extends circumferentially about the margins of the perforation. The face on the right side and the right ear, as well as the postauricular area over the mastoid show a pattern of stippling that occupies an area which extends to the outer canthus of the right eye, to the hairline superiorly, and to the lower border of the mastoid inferiorly. The area overall measures 6 inches in the sagittal dimension by 4 inches in the vertical dimension. It is most concentrated about the right ear and the right temporo-zygomatic area. The stippling extends from the center of the perforation anteriorly a distance of 2 1/2 inches, inferiorly a distance of

CC 0200