## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

LEE E. MOORE,

          :

      Petitioner,              Case No. 1:00-cv-023

          :        District Judge Susan J. Dlott

    -vs-                Chief Magistrate Judge Michael R. Merz

BETTY MITCHELL, Warden,

          :

      Respondent.

---

### REPORT AND RECOMMENDATIONS ON THE MERITS

---

This capital habeas corpus case is before the Court for decision on the merits.

### Procedural History in the State Courts

Petitioner was indicted on January 27, 1994, by the Hamilton County Grand Jury on five counts, three for aggravated murder in violation of Ohio Revised Code § 2903.01, one for aggravated robbery in violation of Ohio Revised Code § 2911.01, and one for kidnaping in violation of Ohio Revised Code § 2905.01. The aggravated murder counts carried three death penalty specifications: one under Ohio Revised Code § 2929.04(A)(3) and two under Ohio Revised Code § 2929.04(A)(4).

The jury found Moore guilty of aggravated murder and all three capital specifications in Counts I, II, and III. The jury also returned guilty verdicts for aggravated robbery and kidnaping, as well as five firearm specifications. Upon completion of the mitigation phase of the trial, the jury

recommended that the death penalty be imposed, a recommendation the court adopted on December 14, 1994.

The Ohio Supreme Court summarized the underlying facts as follows:

> On the evening of January 14, 1994, defendant-appellant, Lee Edward Moore, Jr., and Jason Holmes abducted Melvin Olinger at gunpoint and forced him into the trunk of his blue Ford Taurus. Moore drove Olinger's car to Mt. Healthy, dropped Holmes off, and picked up Larry Kinley. The two drove Olinger's car to a factory area in Cincinnati, where Moore ordered Olinger out of the trunk, robbed him of his wallet, and shot him in the head, killing him. Moore later admitted committing the crimes but claimed that the shooting was accidental. Moore was subsequently convicted of aggravated murder, kidnapping [sic], and aggravated robbery, and sentenced to death.

> On January 14, at approximately 7:20 p.m., Melvin Olinger, a suburban Chicago businessman, visited his parents in Fairfield. Olinger then went to a funeral home during calling hours for a friend who had passed away. Later, he went to Gina's, a bar, around 9:00 to 9:30 p.m., where he talked with Charlotte James. He told her that he was going to visit his mother that evening before returning to Chicago the next day. Olinger stayed in the bar for about fifteen minutes.

> That same evening, Moore and Jason Holmes drove to Fairfield, intending to steal a car. Moore waited outside Gina's and saw Olinger get out of his blue Ford Taurus and enter the bar. When Olinger returned to his car, Moore confronted him with a gun and told Olinger to get in. Moore drove the Taurus to the rear of the bar and forced Olinger to climb into the trunk. Moore drove the Taurus to Larry Kinley's house in Mt. Healthy while Holmes followed in Moore's Ford Fairmont.

> Moore and Kinley drove to a store in the Taurus, leaving Holmes behind to babysit. Moore told Kinley how he had stolen the car and that he was going to get it painted and modified. Moore told Kinley that he was driving to the Cumminsville area of Cincinnati to show the car to a friend. Instead, Moore drove to a factory area at 3366 Llewellyn Street. On the way, Moore told Kinley that he was going to kill the man in the trunk. When Kinley asked Moore why he was going to kill the man, Moore responded, "This ain't nothing. * * * We're not going to get caught for it."

> Upon driving into the factory area, Moore headed toward a dumpster.

2

He stopped the car and let Olinger out of the trunk while Kinley remained in the car. Kinley testified that he didn't see what happened because the trunk lid was up, but that he heard Moore tell Olinger to empty his pockets. Kinley testified that Moore directed Olinger to the corner by the dumpster and that he heard Olinger beg and plead to Moore about Olinger's sick mother.

Kinley heard a gunshot, then Moore jumped into the car. According to Kinley, Moore laughed and asked him, "Did you see his dome get shot off?" After leaving the scene, Moore directed Kinley to take the credit cards out of Olinger's wallet. Kinley said that Moore sounded upset because he had forgotten to ask Olinger for the personal identification number to his Jeanie card.

In a taped statement to police, Moore claimed that he asked Olinger for his wallet after directing him to the dumpster. When Olinger dropped the wallet and stepped forward, Moore said that he panicked and "accidently pulled the trigger. But it was an accident. * * * I had a large amount of drinks an' * * * some marijuana. An' it truly truly was an accident."

Moore and Kinley returned to Kinley's house, where Moore told Holmes what had happened. Moore told Holmes that he planned to keep the Taurus and that Holmes could use his Fairmont any time he wanted. At Moore's request Kinley took the Michigan plates off Olinger's Taurus. Kinley then took one of the plates off Moore's Fairmont and put it on the Taurus.

The next day, Moore and Kinley went out to get "some stuff." Moore used Olinger's credit card to purchase over $1,000 worth of clothing and jewelry at two J.C. Penney stores in the Cincinnati area. A sales clerk became suspicious and contacted Penney's loss prevention officer. The officer observed two black males place their purchases in the trunk of a blue Ford Taurus with Ohio tags and drive away.

At approximately 5:30 p.m. on January 20, police apprehended Moore and Kinley as they waited for an order in the drive-through lane of a McDonald's restaurant. Moore was placed in a holding cell at the Mt. Healthy police station. Officers confiscated several items of clothing from Moore which were believed to have been purchased with Olinger's credit card. Shortly after midnight, Moore was advised of his *Miranda* rights and signed a waiver of rights form.

Moore was then taken to the downtown Cincinnati police station for questioning. Although the weather was cold and snowy, Moore was required to walk a short distance to and from the police car in his stocking feet, since his shoes had been confiscated as evidence. At

approximately 6:30 a.m., while "crying a little bit" and sniffling, Moore admitted to police that he had robbed and kidnapped [sic] Olinger and that he had shot and killed Olinger. He claimed that the shooting was accidental.

Based on information supplied by Kinley, police located Olinger's body. The chief deputy coroner determined that Olinger had died of a single gunshot wound to the head fired from a distance of between six and twenty-four inches away.

*State v. Moore*, 81 Ohio St. 3d 22, 22-24 (1998).

In his direct appeal to the Court of Appeals, First Appellate District, Hamilton County,

Moore raised the following twenty-six assignments of error:

**Assignment of Error I**
The trial court erred to the substantial prejudice of Appellant when it overruled Appellant's motion to suppress from evidence statements allegedly made by appellant after his involuntary waiver of his <u>Miranda</u> rights, which statements were used as evidence in chief against Appellant at his trial in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under Article I, Section 10 of the Constitution of Ohio.

**Assignment of Error II**
The trial court erred to the substantial prejudice of Appellant when it overruled Appellant's motion to suppress from evidence statements allegedly made by Appellant which were involuntary and the product of undue stress and coercion by law enforcement authorities. Appellant's statements were used as evidence in chief against him at his capital trial in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under Article I, Section 10 of the Constitution of Ohio.

**Assignment of Error III**
A trial court errs to the prejudice of the Appellant in overruling the motion to suppress from evidence statements allegedly made by Appellant after he was denied the advice, assistance, and representation of counsel, which statements were used as evidence in chief against the Appellant at his trial in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and under the Constitution of Ohio, Article I, Section 10.

4

**Assignment of Error IV**
The trial court violated Appellant's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution when it overruled Appellant's motion to reassign the trial judge pursuant to Local Rule 7 of the Rules of Practice of the Hamilton County Court of Common Pleas.

**Assignment of Error V**
Appellant's rights to an impartial jury under the Sixth Amendment to the United States Constitution and Article I, Section 5 of the Ohio Constitution and to Due Process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, were violated because the trial court abused its discretion when it refused to grant Appellant's motion for individual sequestered voir dire.

**Assignment of Error VI**
The trial court erred by permitting the prosecution to exceed proper bounds for voir dire in appellant's capital case when it obtained juror's personal commitments to a death verdict in the particular case before them, creating a presumption in favor of a death sentence and diminishing the jurors sense of responsibility for a death verdict.

**Assignment of Error VII**
The trial court erred by imposing the death sentence upon Appellant because the jury which convicted Appellant and recommended the death sentence was improperly constituted in violation of Appellant's right to a fair and impartial jury under the Sixth and Fourteenth Amendments to the Constitution of the United States, in addition to constituting a violation of Ohio Statutory law.

**Assignment of Error VIII**
The court erred to the prejudice of Appellant by refusing to allow Appellant to present evidence and by permitting the State to employ jury selection procedures which exclude African-Americans from the venire in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

**Assignment of Error IX**
The trial court erred in overruling the Appellant's motion to prohibit death qualification of the jury which resulted in a jury that did not represent a fair cross-section of the community.

**Assignment of Error X**
The prosecutor's systematic use of peremptory challenges to exclude all prospective jurors with some reservations about the death penalty

violated Appellant's right to equal protection and a fair and impartial jury in a capital case under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 10 and 16, Article I of the Ohio Constitution.

## Assignment of Error XI
The trial court erred to the prejudice of Appellant by permitting the prosecution to exercise its peremptory challenges to exclude jurors of his race in violation of the Appellant's right to a fair and impartial jury of his peers under the Sixth and Fourteenth Amendments to the United States Constitution.

## Assignment of Error XII
The Defendant's conviction and death sentence cannot stand when misconduct by the prosecutors results in a trial so unfair that the defendant is denied due process of law and a reliable capital sentencing proceeding.

## Assignment of Error XIII
The trial court abused its discretion by allowing the prosecution to play a tape recording of Appellant's confession and then allowing the State to provide the jury with transcripts of the exhibit during testimony. The two exihibits [sic] were unduly repetitive and unfairly emphasized the contents of the recordings, to the extreme prejudice of Appellant.

## Assignment of Error XIV
The trial court erred to the prejudice of Appellant by admitting gruesome, prejudicial and cumulative photographs, even though their prejudicial effect outweighs their probative value, in violation of his Sixth, Eighth, and Fourteenth Amendment rights to a fair trial, due process and a reliable determination of his guilt and sentence.

## Assignment of Error XV
The trial court commited [sic] prejudicial error by basing it decision to impose the death sentence upon the nonstatutory aggravating factor of the nature and circumstances of the offense, by giving insufficient consideration to valid mitigating factors, and by considering the nonexistence of some statutory mitigating factors as nonstatutory aggravating factors. These violated Appellant Michael Bies' [sic] constitutional right to reliability in the imposition of a death sentence upon him.

## Assignment of Error XVI
The trial court erred by issuing instructions to the jury on the definition of reasonable doubt which allowed the jurors to return convictions based on a degree of proof below that required by the due

process clause of the Fourteenth Amendment.

**Assignment of Error XVII**
The trial court erred by giving penalty phase jury instructions which relieved the State of its burden of proof and which effectively mandated a death verdict, in violation of Appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

**Assignment of Error XVIII**
The trial court erred by sentencing Appellant to death and to terms of imprisonment, to be served consecutively, in violation of R.C. 2929.41.

**Assignment of Error XIX**
The trial court erred to the prejudice of the Appellant when it failed to include Appellant's requested jury instructions on mitigation because of drug or alcohol impairment, the sufficiency of a single mitigating factor, the lack of requirement for unanimous agreement on mitigating factors, and residual doubt as a mitigating factor.

**Assignment of Error XX**
The trial court's instructions to the jury that its sentencing verdict was only a recommendation diminished the jury's responsibility for its verdict and rendered Appellant Moore's death sentence unreliable in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 5, 9, 10, and 16 of the Ohio Constitution.

**Assignment of Error XXI**
The trial court commits plain error by submitting to the jury a verdict form as the sentencing phase stating that the verdict of the jury was merely a "recommendation."

**Assignment of Error XXII**
The trial court erred to the substantial prejudice of Appellant and in violation of his rights to due process of law under the United States and Ohio Constitutions by denying Appellant's Rule 29 Motions, and by entering judgments of conviction on the counts of aggravated murder for the reason that there was insufficient evidence produced to support convictions for those offenses.

**Assignment of Error XXIII**
The judgments of conviction for aggravated murder are contrary to the manifest weight of the evidence.

**Assignment of Error XXIV**

The judgment of the trial court, as well as the jury, that the aggravating factors of which Appellant was convicted outweighed the mitigating factors presented by the defense is contrary to the manifest weight of the evidence and to the constitutional right to due process of law, and to be free from cruel and unusual punishment under the Eight [sic] Amendment and Article I, Section 9 of the Ohio Constitution.

### Assignment of Error XXV
The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code, Section 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied to Appellant.

### Assignment of Error XXVI
The Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Sections 10 and 16, Article I of the Ohio Constitution and Ohio Revised Code, Section 2929.05 guarantee a convicted capital defendant a fair and impartial review of his death sentence. The statutory mandated proportionality process being employed in Ohio does not comport with this constitutional requirement and thus is fatally flawed.

(Return of Writ, Doc. No. 31, Exhibit D.)  After reviewing the merits of Moore's assignment of errors, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the penalty of death, the court of appeals affirmed Moore's conviction and the sentence of death. *State v. Moore*, 1996 Ohio App. LEXIS 2617 (Ohio App. 1st Dist. 1996).

Moore then appealed to the Ohio Supreme Court, advancing the following twenty-six propositions of law:

### Proposition of Law #1
The trial court violated Appellant's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution when it overruled Appellant's motion to reassign the trial judge pursuant to Local Rule 7 of the Rules of Practice of the

Hamilton County Court of Common Pleas.

**Proposition of Law #2**
Appellant's right to an impartial jury under the Sixth Amendment to the United States Constitution and Article I, Section 5 of the Ohio Constitution and to due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution, were violated because the trial court abused its discretion when it refused to grant Appellant's motion for individual sequestered voir dire.

**Proposition of Law # 3**
The trial court erred by permitting the prosecution to exceed proper bounds for voir dire in Appellant's capital case when it obtained jurors' personal commitments to a death verdict in the particular case before them, creating a presumption in favor of a death sentence and diminishing the jurors' sense of responsibility for a death verdict.

**Proposition of Law # 4**
Systematic exclusion of prospective jurors opposed to the death penalty, or with some reservations about its imposition, violated Defendant's right to a fair and impartial jury which reflects the community from which it is drawn, as guaranteed by the State and Federal Constitutions.

**Proposition of Law # 5**
A Defendant is a capital case is entitled to a jury venire which does not unreasonably exclude members of any discrete racial group, including, particularly, Defendant's own race.

**Proposition of Law # 6**
Admission in evidence of statements elicited from Defendant while in custody, which are obtained without a knowing and voluntary waiver of <u>Miranda</u> rights, violates the Fifth and Sixth Amendments to the United States Constitution and parallel constitutional and statutory provisions in the State of Ohio.

**Proposition of Law # 7**
Admission in evidence of statements which were the product of undue coercion by police officers, and which were, therefore, involuntary, violates the Fifth and Sixth Amendments to the United States Constitution and parallel constitutional and statutory provisions in the State of Ohio.

**Proposition of Law # 8**
Admission in evidence of statements which were obtained after Defendant requested counsel, and before any counsel was provided,

violates the Fifth and Sixth Amendments to the United States Constitution and parallel constitutional and statutory provisions in the State of Ohio.

**Proposition of Law # 9**
Admission over defense objection of photographs of the deceased which were cumulative, repetitive, gruesome and unnecessary to exemplify any relevant fact to be proven by the State, violates Defendant's right to due process as guaranteed by the State and Federal Constitutions.

**Proposition of Law # 10**
Unduly repetitious presentations of evidence unfairly emphasize the contents, and prejudicially lend additional weight to such evidence.

**Proposition of Law # 11**
Trial tactics and arguments utilized by the prosecutor in the instant case, when considered collectively, deprived Defendant of a fair trial and a reliable determination of the appropriate penalty, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and parallel state provisions.

**Proposition of Law # 12**
Ohio's statutory definition of reasonable doubt allows a jury to return convictions based on a degree of proof which fails to meet the constitutional guarantee of due process of law embodied in the Fourteenth Amendment to the United States Constitution and corresponding language in the Ohio Constitution.

**Proposition of Law # 13**
Where trial counsel fails to request adequate time to prepare for the penalty phase after guilty verdicts are rendered, and to properly interview and prepare the testimony of mitigation witnesses, Defendant has been deprived of the effective assistance of counsel and a fundamentally fair trial in violation of the Sixth and Fourteenth Amendments to the United States Constitution and the corresponding provisions of the Ohio Constitution, statutes, and laws.

**Proposition of Law # 14**
Refusal to grant Defendant's request for an instruction on legitimate mitigating factors invites the jury to ignore or give less weight to such factors, in violation of Defendant's rights under the Eighth and Fourteenth Amendments to the United States Constitution and corresponding State Constitutional provisions.

**Proposition of Law # 15**
An instruction to the jury at the penalty phase of trial that its

sentencing verdict was only a recommendation, reinforced by a verdict form which referred to the verdict as a recommendation, diminished the jury's sense of responsibility for the verdict and rendered the subsequent death verdict unreliable, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 2, 5, 9 and 16 of the Ohio Constitution.

**Proposition of Law # 16**
The trial court erred by giving penalty phase jury instructions which relieved the state of its burden of proof and which effectively mandated a death verdict, in violation of Appellant's rights as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

**Proposition of Law # 17**
The trial court committed prejudicial error by basing its decision to impose the death sentence upon the nonstatutory aggravating factor of the nature and circumstances of the offense, and by giving insufficient consideration to valid mitigating factors, in violation of Defendant's constitutional right to reliability in the imposition of a death sentence upon him.

**Proposition of Law # 18**
A term of imprisonment can be made consecutive only to another term of imprisonment.   A death sentence is not a term of imprisonment.  Therefore, a trial court cannot legally impose a term of imprisonment to be served consecutively to a sentence of death.

**Proposition of Law # 19**
The convictions for aggravated murder, and subsequent finding that the aggravating circumstances outweighed the mitigation, are not supported by sufficient evidence and are contrary to the manifest weight of the evidence.

**Proposition of Law # 20**
The statutorily mandated proportionality review currently being employed in Ohio does not comport with the requirements of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution, Article One, Sections 10 and 16 of the Ohio Constitution, or the plan language of O.R.C. §2929.05.

**Proposition of Law # 21**
Use of the same operative fact to first elevate ordinary murder to aggravated murder and then to capital, death eligible, aggravated murder violates Defendant's protection against cruel and unusual punishment as secured to him by the Eighth Amendment, and the

right to due process and equal protection of law under the Fourteenth Amendment and corresponding provisions of the Ohio Constitution.

**Proposition of Law # 22**
Although multiple charges of aggravated murder may be submitted to the jury during the guilt phase of trial, where there is only one death charge there can be only one conviction, and presentation to the jury of multiple counts, with multiple specifications, followed by imposition of multiple death sentences, violates Defendant's right to be free from cruel and unusual punishment under the State and Federal Constitutions.

**Proposition of Law # 23**
Submission of irrelevant and duplicative specifications to the jury during the penalty phase of the trial violates Defendant's right to be free from cruel and unusual punishment as guaranteed by the Eighth Amendment to the United States Constitution and by parallel state constitutional provisions.

**Proposition of Law # 24**
Imposition of the sentence of death on Defendant violates his rights under the Eighth Amendment and the due process and equal protection clauses of the Fourteenth Amendment of the Federal Constitution, and his right to due course of law and punishment not cruel and unusual under the Ohio Constitution.

**Proposition of Law # 25**
Adequate proportionality review reveals that Defendant's sentence is disproportionately severe, and was, therefore unconstitutionally imposed.

**Proposition of Law # 26**
The combined effect of errors in evidentiary rulings, and rulings on pretrial motions denied Defendant a fair and impartial disposition of his case, and made imposition of the death penalty arbitrary, all in violation of Defendant's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitutions, and parallel state provisions.

(Return of Writ, Doc. No. 31, Exhibit I.)

After reviewing the merits of Moore's claims, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the death penalty, the Ohio Supreme Court affirmed Moore's conviction and sentence of death on February 4, 1998.

*State v. Moore*, 81 Ohio St. 3d 22 (1998).

On September 20, 1996, Moore filed his petition for Post-Conviction Relief under Ohio

Revised Code § 2953.21 in the Hamilton County Court of Common Pleas, pleading the following

causes of action:

> **First Cause of Action**
> Mr. Moore's conviction and death sentence are void or voidable because the State of Ohio presented the testimony of the victim's father, Noah Olinger, at Mr. Moore's trial. The introduction of this evidence denied Mr. Moore his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

> **Second Cause of Action**
> Mr. Moore's conviction and sentence are void or voidable because the trial court gave improper instructions and committed error during the sentence determination phase of the proceedings. The action of the trial court deprived Mr. Moore of his rights guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution, and Mr. Moore was prejudiced thereby.

> **Third Cause of Action**
> Prior to the sentence determination phase of the proceedings, trial counsel had a duty to investigate possible mitigating factors by making a through [sic] review of Mr. Moore's background. This failure by trial counsel violated Mr. Moore's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10 and 16, Article I of the Ohio Constitution.

> **Fourth Cause of Action**
> Prior to the sentence determination phase of the trial, counsel has a duty to investigate and familiarize himself with the law that applies to such proceedings to ensure that counsel presents credible, persuasive mitigating evidence in order to cause the jury to return a life verdict. Counsel's failure to present a coherent, cohesive theory of mitigation deprived Mr. Moore the effective assistance of counsel at the only stage of the trial where counsel could really be effective: at the sentence determination phase of the trial. This violated Mr. Moore's rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10, and 16, Article I of the Ohio Constitution.

**Fifth Cause of Action**
The United States Supreme Court has held that any systematic infliction of the death penalty is administered in an arbitrary and capricious manner violates the Eighth Amendment to the United States Constitution.

**Sixth Cause of Action**
The judgment and sentence against Mr. Moore are void or voidable because his rights were violated as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

**Seventh Cause of Action**
The judgments and sentence against Mr. Moore are void or voidable because Mr. Moore's rights were violated as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 9, 10, and 16, Article I of the Ohio Constitution.  Trial Counsel failed to request a voir dire of the jury be conducted after the close of the guilt phase determination phase and prior to the commencement of the sentence determination phase to ascertain whether any juror had been exposed to extrinsic matters which would influence that juror regarding the sentencing verdict.

**Eighth Cause of Action**
Mr. Moore's conviction and sentence are void or voidable because the Ohio death penalty scheme is unconstitutional on its face in violation of the United States Constitution and the Ohio Constitution.

**Ninth Cause of Action**
Mr. Moore's conviction and sentence are void or voidable because the guilt determination and sentence determination phases of the trial were replete with errors, making his sentence of death unreliable and inappropriate in violation of his rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution.  The errors and failures of counsel, the prosecutor, and the trial court were left uncorrected and were compounded by counsels' failure in the Court of Appeals and counsels' failure to perfect an appeal to the Ohio Supreme Court.  The judicial system failed to give Mr. Moore a fair trial, a reliable sentencing determination, and fair review to insure against the arbitrary and capricious imposition of the death sentence.  Any death sentence imposed as the result of these numerous failures throughout the judicial system can never be deemed appropriate.

**Tenth Claim for Relief**[1]

Mr. Moore's convictions and/or sentences are void or voidable because death by electrocution constitutes a blatant disregard for the value of human life, entails unnecessary and wanton infliction of pain and diminishes the dignity of man.

**Tenth Claim for Relief**[2]

Mr. Moore's convictions and/or sentences are void or voidable because the death penalty is disproportionately meted out to those defendants who are racial minorities and/or those defendants who are accused of killing white victims. This disparity exists in Hamilton County, the State of Ohio, and all of the thirty-seven (37) states in the United States that have provisions for capital punishment. Mr. Moore's same rights were violated as guaranteed by Article I, §§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Eleventh Claim for Relief**

Mr. Moore's conviction and/or sentences are void or voidable because death sentences in Ohio are racially biased against African-Americans. Mr. Moore is an African-American. In addition to Petitioner, eighty other inmates on Ohio's death row are African-Americans. Exhibit 10. Therefore eighty-one (81) out of the one hundred sixty-four (164) death row inmates, or 49.4%, are African-American. In contrast, African-Americans make up only 10.64% of the population of the State of Ohio. Exhibit 10. Furthermore, Hamilton County, where the instant offense occurred has a total racial minority population of only 198,454 persons, or twenty-two (22%) of the total population. *Id.* Mr. Moore's same rights were violated as guaranteed by Article I, §§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Twelfth Claim for Relief**

The failure of the Court of Appeals to grant Mr. Moore relief on these issues on direct appeal denied Mr. Moore due process of law and subjects him to cruel and unusual punishment in violation of the rights guaranteed him by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 1, 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

(Return of Writ, Doc. No. 31, Exhibit M.)

The Common Pleas Court found that Moore was not entitled to relief on any of his claims

---

[1] At this point in the Petition, Moore switches from "cause of action" to "claim for relief."

[2] Moore numbers two claims as "Tenth Claim for Relief."

and denied the petition for post-conviction relief. (Return, Doc. No. 31, Exhibit Q.) Moore appealed

to the court of appeals. *Id*. at Exhibit R.  He alleged his counsel did not receive notice of the trial

court's November 20, 1996, order. *Id*. at Exhibit S.  The court granted Rule 60(B) relief from the

judgment and a new order was entered dismissing the petition. *Id*.  Petitioner filed a timely appeal

from that second order. *Id*.  In the court of appeals Petitioner made the argument that throughout the

post-conviction relief proceedings, his entire record had been before the court of appeals or Ohio

Supreme Court on direct appeal. *Id*.  The Clerk of the Ohio Supreme Court refused to relinquish the

records to the lower courts for review while the case was pending argument in the Ohio Supreme

Court, thus denying the trial court the ability to review the entire record in evaluating the post-

conviction petition. *Id*.  Additionally his merit brief raised the following assignments of error:

**First Assignment of Error**
The court below erred in dismissing without an evidentiary hearing
a petition for post-conviction relief when the record was not available
for review by the trial court and, therefore, the trial court could not
have discharged its duty to review the entire record.

**Second Assignment of Error**
The court below denied Petitioner due process and erred in
dismissing without an evidentiary hearing a petition for post-
conviction relief which stated a prima-facie claim for relief, was
supported by evidence and documents uncontradicted by the State,
and when the transcripts, exhibits, and other documents in the record
of trial were not available to the trial court at the time the dismissal
was entered.

**Third Assignment of Error**
The trial court erred in issuing insufficient findings of fact and
conclusions of law in regard to Appellant's petition for post-
conviction relief.

**Fourth Assignment of Error**
Ohio's post-conviction process is not an adequate and corrective
process.

**Fifth Assignment of Error**
The trial court erred in denying the merits of Appellant's post-
conviction petition.

16

(Return of Writ, Doc. No. 31, Exhibit T.)

The court of appeals granted the motion for a remand to allow for the trial court to certify which portions of the record had been reviewed for the purpose of post-conviction relief. (Return, Doc. No. 31 at Exhibit V.)  On March 18, 1998, the Hamilton County Common Pleas Court issued an Entry on Remand stating that it had no present recollection as to what materials were reviewed. (Return, Doc. No. 31 at Exhibit X.)  The Court of Appeals then affirmed the judgment of the trial court on September 18, 1998. (Return, Doc. No. 31 at Exhibit Y.)  Moore then appealed to the Ohio Supreme Court which declined to review the judgment of the lower courts. *State v. Moore*, 84 Ohio St. 3d 1472 (1999).

On September 7, 2000, Moore filed an Application to Reopen his direct appeal under Ohio R. App. P. 26(B), alleging that his direct appeal counsel had been constitutionally ineffective for their failure to raise the following assignments of error:

1.   Mr. Stidham's undisclosed conflict of interest violated Appellants' federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to counsel, due process, equal protection, a fair proceeding, and a reliable sentence.

2.   The ineffectiveness at the mitigation phase of trial counsel and Mr. Stidham violated Appellants' federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to counsel, not to incriminate himself, due process, equal protection, a fair proceeding, and a reliable sentence.

3.   Trial counsel's ineffectiveness at the liability phase violated Appellants' federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to counsel, due process, equal protection, and a fair proceeding.

4.   The trial judge (1) was not impartial; and (2) made erroneous rulings throughout the proceedings, all violating Appellants' federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to an impartial tribunal, due process, equal protection, a fair proceeding, and a reliable sentence.

5.    The trial court's erroneous mitigation phase instructions ( and trial counsel's failure to object to such instructions) violated Appellants' federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.

6.    The selection of the grand jury foreperson and the underrepresentation of minorities and women as grand jury forepersons (and trial counsel's failure to investigate or raise this issue) violated Appellants' federal constitutional rights under the 5th, 6th, 8th,  and 14th amendments, including his rights to due process, equal protection, a fair cross-section, and a fair proceeding.

7.    Errors during *voir dire* violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his right [sic] to due process, equal protection, a fair proceeding, an impartial jury, and a reliable sentence.

8.    The sentencers' decisions were based on improper and non-statutory aggravating factors, violating Appellants' federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

9.    The sentencers failed to consider and give effect to uncontradicted mitigating evidence, violating Appellants' federal constitutional rights.  Under the 5th, 6th, 8th, and 14th amendments, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

10.   The trial judge (A) erroneously denied trial counsel's request for proper mitigation instructions and (B) gave erroneous mitigation instructions (some of which trial counsel failed to object to), all in violation of Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

11.   The trial judge ordered the courtroom doors to be locked, violating Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his right to a

public trial, due process, and equal protection.

12.    The State committed misconduct in violation of Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to due process, equal protection, a fair trial, an impartial jury and trial judge, and effective assistance of counsel.

13.    The use of duplicative specifications to the aggravated murder counts, the use of the same operative facts to elevate murder to aggravated murder and then to capital aggravated murder, and the submission to the jury of all these counts violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

14.    The courts that heard Appellant's direct appeal lacked jurisdiction, violating Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th amendments, including his rights to due process and equal protection.

15.    Direct appeal counsel failed to adequately brief issues.

(Supplemental Appendix, Doc. No. 79 at 2-10.)

The Hamilton County Court of Appeals declined to hear the Application on the merits because it found Petitioner had not shown good cause for failing to file within the ninety days allowed for such motions by Ohio R. App. P. 26(B); the Application was filed more than four years after the Court of Appeals had journalized its decision that was sought to be reopened. (Entry Denying Application for Reopening, Ex. A to Doc. No. 60 at 1.) The Court of Appeals also held that all of the claims were barred by *res judicata* because they could have been raised on direct appeal to the Ohio Supreme Court and were not. *Id.* at 3.

On appeal, Moore presented six propositions of law to the Ohio Supreme Court. In his first three propositions of law, he presented the merits of all of the proposed assignments of error which he had raised in the Court of Appeals. (Supplemental Joint Appendix, Doc. No. 79, Merit Brief of Appellant at 20-85.) On Proposition 4, the Ohio Supreme Court decided that Mr. Moore had not

19

shown good cause for late reopening, but also that "Moore has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the application to reopen can be granted, as required under App.R. 26(B)(5)." *State v. Moore*, 93 Ohio St. 3d 649, 651 (2001). In her concurring opinion, then-Justice Cook[3] noted that it was illogical to find a failure to demonstrate good cause for late filing on the basis that there were not genuine issues because these are entirely separate questions. *Id.* She also noted that the majority had unnecessarily reached the merits because the Court of Appeals had correctly held the claims were barred by *res judicata*. *Id.* at 652.

### Proceedings in this Court

Moore filed his Notice of Intention to seek habeas relief in this Court on September 19, 1999, and followed with the Petition on January 18, 2000 (Doc. No. 14).[4] In his Petition for Writ of Habeas Corpus, Moore pleads twenty-five grounds for relief as follows:

#### First Ground for Relief

Petitioner Moore's mitigation specialist, Chuck Stidham, had an undisclosed, actual conflict of interest when he simultaneously represented Petitioner Moore and one of Petitioner Moore's co-defendant [sic] on his appeal of convictions and sentences for the same crime. This conflict violated Petitioner Moore's rights, including his right to counsel, due process, equal protection, a fair proceeding, and a reliable sentence.

#### Second Ground for Relief

---

[3] Justice Cook has since become a Judge of the United States Court of Appeals for the Sixth Circuit.

[4] In a Scheduling Order (Doc. No. 28) filed May 22, 2000, shortly after referral of the case, the Magistrate Judge ordered an amended petition be filed with the signature of Petitioner himself, rather than that of counsel, as was then required by Rule 2 of the Rules Governing § 2254 Cases. Petitioner complied with that Order by filing a Supplemental Petition (Doc. No. 29) which was properly signed.

Petitioner Moore's trial counsel rendered ineffective assistance at the mitigation phase by (A) employing a mitigation specialist who never discussed substantive mitigation issues with Petitioner Moore and failed to adequately assist in the preparation of the mitigation phase; (B) failing to adequately prepare for the mitigation phase, during which Dr. Chippone, the expert offered by trial counsel, impeached Petitioner Moore's entire liability and mitigation case; (C) presented a hopelessly ineffective mitigation argument which actually damaged Petitioner Moore's mitigation case and failed to emphasize Petitioner Moore's youth, remorse, and psychosocial background; and (D) failing to seek or offer an expert to testify as to the effects of extensive alcohol and drug abuse on Petitioner Moore. This ineffective assistance violated Petitioner Moore's rights, including his rights to counsel, not to incriminate himself, due process, equal protection, a fair proceeding, and a reliable sentence.

**Third Ground for Relief**

Petitioner Moore's trial counsel rendered ineffective assistance at the liability phase by (A) inadequately preparing the sole defense, lack of a purposeful state of mind; (B) failing to present or seek a jury instruction on the voluntary intoxication defense; and (C) failing to seek or offer a forensic expert, thus violating Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.

**Fourth Ground for Relief**

One of Petitioner Moore's trial counsel continued to represent him on his intermediate direct appeal and rendered ineffective assistance at this stage because he had an actual conflict of interest and because he failed to raise meritorious issues. This violated Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.

**Fifth Ground for Relief**

Judge Ruehlman, the trial judge, was not an impartial judge at trial or on post-conviction, as evidenced by his desire to have Petitioner Moore executed immediately after sentencing him to death, thus violating Petitioner Moore's rights, including his right to an impartial tribunal, due process, equal protection, a fair proceeding, and a reliable sentence.

**Sixth Ground for Relief**

At the mitigation phase, the trial court erroneously instructed that the

jury's verdict had to be unanimous; this instruction was contrary to Ohio law and violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.

**Seventh Ground for Relief**

The prosecutor's misconduct at the mitigation phase closing argument when, among other things, he urged the sentencers to identify with the victim, violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.

**Eighth Ground for Relief**

Petitioner Moore's appellate counsel on his appeal to the Ohio Supreme Court rendered ineffective assistance because they never met with Petitioner Moore to discuss this appeal, never showed him a copy of the appellate brief before it was filed, and failed to raise meritorious issues. This violated Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.

**Ninth Ground for Relief**

The selection of the grand jury foreperson and the underrepresentation of minorities and women as grand jury forepersons in Hamilton County violated Petitioner Moore's rights, including his rights to due process, equal protection. A fair cross-section, and a fair proceeding.

**Tenth Ground for Relief**

The underrepresentation of minorities in the grand jury and petit jury venires in Hamilton County-including Petitioner Moore's petit jury venire - violated Petitioner Moore's rights, including his rights to due process, equal protection, a jury drawn from a fair cross-section of the community, and a fair proceeding.

**Eleventh Ground for Relief**

Hamilton County's overprosecution of people charged with homicide violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, and a reliable sentence.

**Twelfth Ground for Relief**

Petitioner Moore was denied his rights to counsel, due process, equal protection, a fair proceeding, an impartial tribunal, a reliable sentence, and an adequate corrective process during his post-conviction proceedings.

**Thirteenth Ground for Relief**

Errors during <u>voir dire</u>, including the prosecutors' racially biased peremptory challenge of an African-American woman, resulted in a biased jury that was organized to return a death verdict in violation of Petitioner Moore's rights, including his right to due process, equal protection, a fair proceeding, an impartial jury, and a reliable sentence.

**Fourteenth Ground for Relief**

The sentencers based their decisions to sentence Petitioner Moore to death on improper and non-statutory aggravating factors - including the prosecutor's argument urging them to identify with the victim - in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

**Fifteenth Ground for Relief**

The sentencers failed to give any weight to the uncontradicted mitigating evidence presented by Petitioner Moore in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

**Sixteenth Ground for Relief**

Judge Ruehlman (a) erroneously denied trial counsel's requests for proper mitigation instructions and (b) gave erroneous mitigation instructions, in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

**Seventeenth Ground for Relief**

Judge Ruehlman ordered the courtroom doors to be locked in violation of Petitioner Moore's rights, including his right to a public trial, due process, and equal protection.

**Eighteenth Ground for Relief**

The prosecutors committed misconduct at the pre-trial, voir dire, and liability phases of Petitioner Moore's trial in violation of his rights, including his rights to due process, equal protection, a fair trial, an impartial jury and judge, and effective assistance of counsel.

**Nineteenth Ground for Relief**

Petitioner Moore's statements to the police were admitted in violation of his rights, including his *Miranda* rights and rights to counsel, due process, and equal protection.

**Twentieth Ground for Relief**

The reasonable doubt instruction given at the liability and mitigation phases is unconstitutional and violated Petitioner Moore's rights, including his rights to due process, equal protection, and fair proceedings.

**Twenty-First Ground for Relief**

The trial court's instructions at the liability phase violated Petitioner Moore's rights, including his rights to due process, equal protection, and a fair proceeding.

**Twenty-Second Ground for Relief**

The use of duplicative specifications to the aggravated murder counts and the use of the same operative facts to elevate murder to aggravated murder and to capital aggravated murder as well as the submission to the jury of all of these counts violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

**Twenty-Third Ground for Relief**

The Ohio courts that heard Petitioner Moore's direct appeal and post-conviction proceedings lacked jurisdiction over those proceedings, violating Petitioner Moore's rights, including his rights to due process and equal protection.

**Twenty-Fourth Ground for Relief**

Execution by electrocution or lethal injection is unconstitutional. Forcing Petitioner Moore to choose the method of his execution is

24

unconstitutional. Execution by either of these means, as well as forcing Petitioner Moore to choose the means, would violated Petitioner Moore's rights, including his rights to due process, equal protection, and to be free from cruel and unusual punishment.

**Twenty-Fifth Ground for Relief**

Ohio's death penalty scheme is unconstitutional and violated Petitioner Moore's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Supplemental Petition, Doc. No. 29.)

Respondent filed a Return of Writ on July 17, 2000 (Doc. No. 31). In response, Petitioner filed a Traverse on November 12, 2002 (Doc. No. 81). After a number of "false starts," the Magistrate Judge granted in part and denied in part Petitioner's request for discovery (Doc. No. 93). Judge Dlott overruled Petitioner's Objections to that Decision (Doc. No. 100). On September 3, 2004, the Magistrate Judge denied Petitioner's Motion for Evidentiary Hearing because he had not shown due diligence in presenting the intended evidence to the state courts as required by *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992), and he had listed intended witnesses without any suggestion of what they would testify to (Decision and Order, Doc. No. 105). Judge Dlott again overruled Petitioner's Objections (Doc. No. 111). The parties then briefed the merits. (Petitioner's Brief , Doc. No. 115, Respondent's Brief, Doc. No. 116, Petitioner's Reply Brief, Doc. No. 117.) After briefing, Petitioner filed the depositions of Timothy Deardorff, Fritz Meyer, Dr. David Chiappone, Elizabeth Agar, Julia Sears, James Daniel, and Charles Stidham (Notice, July 15, 2005) and, pursuant to agreement with Respondent's counsel, numerous documents to expand the record (Doc. Nos. 120, 121, 122, 123, and 124). The case thus became ripe for decision on the merits.

**Standard of Review and Generally Applicable Law**

The Antiterrorism and Effective Death Penalty Act ("AEDPA") was signed and took effect

on April 24, 1996. Moore filed his petition on January 18, 2000. (Doc. No. 14.) As Moore's

petition was submitted after the AEDPA was effective, this case is subject to its provisions. 28

U.S.C. § 2254(d), as amended by the AEDPA, provides:

> (d)     An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in state court proceedings unless the
> adjudication of the claim-
>
> > (1)     resulted in a decision that was contrary to, or
> > involved an unreasonable application of,
> > clearly established federal law, as determined
> > by the Supreme Court of the United States; or
> >
> > (2)     resulted in a decision that was based on an
> > unreasonable determination of the facts in
> > light of the evidence presented in the State
> > court proceeding.
>
> (e) (1) In a proceeding instituted by an application for a writ
> of habeas corpus by a person in custody pursuant to
> the judgment of a State court, a determination of a
> factual issue made by a State court shall be presumed
> to be correct. The applicant shall have the burden of
> rebutting the presumption of correctness by clear and
> convincing evidence.

Any factual finding made by the state court is presumed to be correct and a petitioner must

rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e). A state

court's decision is contrary to the Supreme Court's clearly-established precedent if (1) the state court

applies a rule that contradicts the governing law as set forth by the Supreme Court case law, or (2)

the state court confronts a set of facts that are materially indistinguishable from those in a decision

of the Supreme Court and nonetheless arrives at a result different from Supreme Court precedent.

*Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court's decision involves an

unreasonable application of clearly established federal law "if the state court identifies the correct

governing legal rule [from Supreme Court] but unreasonably applies it to the facts of the particular

state prisoner's case," "if the state court either unreasonably extends a legal principle from [Supreme

Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407-08.

In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that the petitioner is "actually innocent." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). To meet the "actual innocence" standard the petitioner must demonstrate that "it is more likely than not that no reasonable fact finder would have found petitioner guilty beyond a reasonable doubt" or "must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Schlup v. Delo*, 513 U.S. 298 (1995)(articulating the necessary standard to prove actual innocence of the crime in which the petitioner was convicted); *Sawyer v. Whitley*, 505 U.S. 333, 336, 350 (1992)(setting forth standard for which applies the *Schlup* "actual innocence" standard to the sentencing phase of the trial.)

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000). That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977);

*Engle v. Isaac*, 456 U.S. 107 (1982). Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F.3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107 (1982); *Wainright v. Sykes*, 433 U.S. 72, 87 (1977). *Wainright* replaced the "deliberate bypass" standard of *Fay v. Noia,* 372 U.S. 391 (1963).

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice standard of *Wainwright v. Sykes*, 433 U.S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985). Failure to present an issue to the state supreme court on discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

As is well-established (although sometimes muddled by courts), two types of procedural barriers might preclude federal review of claims in a habeas petition. The first type, procedural default, is a judicially created rule, grounded in fealty to comity values and requiring federal courts to respect state court judgments that are based on an "independent and adequate" state procedural ground. *Coleman v. Thompson*, 501 U.S. 722, 732, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (establishing a four-part test for determining whether a procedural rule is an independent and adequate state ground). In procedural default cases, the state court or courts reject a direct or post-conviction appeal because the defendant failed to comply with some state law or rule concerning timeliness, pleading requirements, sufficient evidence, or the like.

The second type of bar, exhaustion, is similarly grounded in respect for state court procedures, but it is federally mandated by AEDPA, see 28 U.S.C. § 2254(b)(1)(A),(c), and requires petitioners to give state courts a "fair opportunity" to assess petitioners' claims. *O'Sullivan*, 526 U.S. at 844. Often, federal courts will rule that a petitioner's claim is "defaulted" because the petitioner failed to exhaust his remedies and the time for refiling an appeal in the state court has passed. The unexhausted claim is then classified as "procedurally defaulted" and deemed forfeited absent a showing of cause and prejudice. *See In re Cook*, 215 F.3d 606, 607-08 (6th Cir.

2000). . . .

> But exhaustion and procedural default are distinguishable in an important sense.  A defendant could fail to exhaust a claim without procedurally defaulting if he could return to the state courts to exhaust.  Alternatively, as in this case, the defendant could fail to exhaust without defaulting if a clarification in procedural law indicates that he has already taken the necessary action to exhaust.  That is, forfeiture by failure to exhaust entails a legal fiction, of sorts.  The state court has not rejected an appeal based on a state rule violation; there is no declaration by the state court of an independent and adequate state ground to which the federal court must defer.  Instead, the federal court makes a presumption that the state court would reject the appeal on independent and adequate state grounds if the petitioner tried to file it.  But, by declaring the claim forfeited, the federal court saves the petitioner and the state court from respectively preparing and rejecting a futile filing.  The federal court then views the claim through the lens of procedural default to determine whether there is cause and prejudice to excuse the default.  In short, the crux of forfeiture by failure to exhaust is that the federal court's default decision rests upon a presumption about what the state court would do, rather than respect for what a state court actually did.

*Abdur'Rahman v. Bell (In re Abdur'Rahman)*, 392 F.3d 174, 186-187 (6th Cir. 2004).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a habeas claim is precluded by procedural default. *Reynolds v. Berry*, 146 F.3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>
> . . . .
>
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, *citing County Court of Ulster County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).
>
> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F.2d at 138.

The general governing standard for effective assistance of counsel is found in *Strickland v.*

*Washington*, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different.  A reasonable probability is a probability
sufficient to overcome confidence in the outcome.

466 U.S. at 694; *see also Darden v. Wainright*, 477 U.S. 168 (1986); *Wong v. Money,* 142 F.3d 313,

319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir. 1987); *see generally* Annotation, 26

ALR Fed 218.

# ANALYSIS

### First Ground for Relief

Petitioner Moore's mitigation specialist, Chuck Stidham, had an
undisclosed, actual conflict of interest when he simultaneously
represented Petitioner Moore and one of Petitioner Moore's co-
defendant [sic] on his appeal of convictions and sentences for the
same crime.  This conflict violated Petitioner Moore's rights,
including his right to counsel, due process, equal protection, a fair
proceeding, and a reliable sentence.

In his first ground for relief, Petitioner argues that his mitigation specialist, attorney Charles

Stidham,[5] operated under an actual conflict of interest because he was simultaneously Mr. Moore's

mitigation specialist and counsel on appeal for co-defendant Jason Holmes (Petition, Doc. No. 29

at 4).

Respondent argues that this ground for relief is procedurally defaulted as Petitioner failed

to present it to the state courts (Return, Doc. No. 31 at 36).  Petitioner counters that he presented it

as one of the omitted assignments of error in his Application for Delayed Reopening and the Ohio

Supreme Court decided it on the merits (Pet. Merit Brief, Doc. No. 115 at 10-11).

Petitioner is mistaken.  What the Ohio Supreme Court decided on the merits was his claim

that it constituted ineffective assistance of appellate counsel for his direct appeal counsel to fail to

_____

[5] Mr. Stidham has resigned his license to practice law. *In re Resignation of Stidham*, 91 Ohio St. 3d 1231
(2001).

present this claim. The sole purpose of an Ohio App. R. 26(B) or *Murnahan* application is to present claims of ineffective assistance of appellate counsel. It is not intended to allow a criminal defendant another bite at the appellate apple by raising claims on the merits which he failed to raise previously. The application for reopening is granted only "if there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal." Ohio App. R. 26(B)(5). "Neither *Murnahan* nor App. R. 26(B) was intended as an open invitation for persons sentenced to long periods of incarceration to concoct new theories of ineffective assistance of appellate counsel in order to have a new round of appeals." *State v. Reddick,* 72 Ohio St.3d 88, 90-91 (1995). "In light of the requirements of Rule 26(B), the [appellate] court's holding must be read as pertaining to the merits' of [petitioner's] ineffective assistance of appellate counsel claim, not his state procedural rule claim." *Roberts v. Carter,* 337 F.3d 609 (6th Cir. 2003).

The Ohio Court of Appeals refused to reach the substantive issue Petitioner presented – did he receive ineffective assistance of appellate counsel? – because it found he had not established good cause for filing four years late. However, the Ohio Supreme Court did not enforce that procedural default, but instead reached the merits of the 26(B) Application and concluded, albeit in summary fashion, that Petitioner had failed to raise a genuine issue of ineffective assistance of appellate counsel.

The effect of that ruling is to preserve the merits of Petitioner's ineffective assistance of appellate counsel claims for review in this Court, either insofar as such claims, if meritorious, might constitute excusing cause for a procedural default in presenting the underlying claims (e.g., the Stidham conflict of interest claim) or in themselves as justifying the writ conditioned on Petitioner's being granted a reopened appeal. *See Edwards v. Carpenter,* 529 U.S. 446 (2000); *Franklin v. Anderson,* 434 F 3d 412, 420-421(6th Cir. 2006); *Landrum v. Anderson,* 185 F. Supp. 2d 868 (S.D. Ohio, 2002).

Because the Ohio Supreme Court decided Petitioner's ineffective assistance of appellate counsel claim on the merits, this Court must consider if that decision was contrary to or an unreasonable application of law clearly established by the United States Supreme Court. 28 U.S.C. §2254(d); *Terry Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  However, in this case, the Ohio Supreme Court's conclusion is so summary that it is not possible to determine whether it is in any way an application of clearly established federal law.  Literally all the Ohio Supreme Court said in disposing of these claims was "Moore has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the application to reopen can be granted, as required under App.R. 26(B)(5)." *State v. Moore*, 93 Ohio St. 3d 649, 651 (2001).

A criminal defendant is entitled to effective assistance of counsel on appeal as well as at trial, counsel who acts as an advocate rather than merely as a friend of the court. *Evitts v. Lucey*, 469 U.S. 387 (1985); *Penson v. Ohio*, 488 U.S. 75 (1988).  The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987).  The attorney need not advance every argument, regardless of merit, urged by the appellant. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues"). Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *See Smith v. Murray*, 477 U.S. 527 (1986).  However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Joshua v. Dewitt,* 341 F.3d 430, 441 (6th Cir. 2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir. 1999); *Mapes v. Coyle,* 171 F.3d 408, 427-29 (6th Cir. 1999).

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions." *McMeans v. Brigano*, 228 F.3d 674

(6th Cir. 2000), *citing Strickland,* 466 U.S. 668; and *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994). Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004), *citing Greer v. Mitchell,* 264 F.3d 663, 676 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002). "Counsel's performance is strongly presumed to be effective." *McFarland,* 356 F.3d at 710, *quoting Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000)(*citing Strickland*).

It is certainly arguable that the omitted issue of Mr. Stidham's possible conflict of interest should have been raised on direct appeal. The facts are apparently undisputed. Mr Stidham was appointed as counsel on appeal for Jason Holmes, Mr. Moore's co-defendant. Obviously, it would have been in Holmes' interest to put as much of the blame as possible on Moore. After he was appointed to represent Holmes, Stidham accepted employment as the mitigation specialist from Moore's trial counsel and never revealed to them, at least until after the trial, that he was representing Holmes. Thus no one presented the facts to Moore and asked if he wished to waive any possible conflict, nor were the facts presented to the trial judge so as to allow him to make an inquiry as to the possible conflict.

Respondent asserts that the conflict is immaterial because Stidham was not serving as Moore's attorney (Respondent's Merit Brief, Doc. No. 116 at 15). The Court finds the distinction unpersuasive. Mr. Stidham was at the time a licensed attorney. Had he been an employed "associate" attorney of trial counsel, his conflict would have been imputed to all the lawyers in the firm. "Consistent with the approach of ethics codes, conflicts are vicariously imputed to all members of a law firm." LaFave, Israel & King, Criminal Procedure 2d, §11.9(a) at 656, *citing Austin v. State*, 327 Md. 375 (1992); *Ross v. Heyne*, 638 F.2d 979 (7th Cir. 1980); *United States v. Ross*, 33 F. 3d 1507, 1523 (11th Cir. 1994). Perhaps if Mr. Stidham, although an attorney, had been

34

employed as an office manager by defense counsel, his duty of loyalty to clients as an attorney would not be implicated, but here he was an important part of the defense team.

Counsel, including attorneys employed in a capacity such as mitigation specialist, owe the defendant a duty of loyalty, which includes the duty to avoid conflict of interest. *Strickland v. Washington*, 466 U.S. 688 (1984) *citing Cuyler v. Sullivan*, 446 U.S. 335 (1980). A claim of conflict of interest alone, however, is insufficient to justify reversal of a conviction. *See United States v. Hall*, 200 F.3d 962, 966 (6th Cir. 2000) *citing Thomas v. Foltz*, 818 F.2d 476, 480 (6th Cir. 1987). Petitioner must be able to demonstrate that counsel actively represented conflicting interests and that there was an actual conflict of interest which adversely affected the lawyer's performance. *Strickland*, 466 U.S. at 692 *citing Cuyler*, 446 U.S. at 348, 350. Petitioner "must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting evidence helpful to one client but harmful to the other." *Thomas*, 818 F.2d at 481. If defendant can do this, then prejudice is presumed. There is no violation, however, when the conflict results in irrelevant or hypothetical prejudice. *United States v. Hopkins*, 43 F.3d 1116, 1119 (6th Cir. 1995).

While Mr. Stidham's involvement with both clients was active at the same time, there is no proof that the conflict adversely affect Mr. Stidham's performance for Mr. Moore. To succeed in this claim Petitioner must demonstrate that the actual conflict of interest adversely affected counsel's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980).

> We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." . . . Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "make a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." . . .There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an

"actual significant conflict."

*United States v. Hall*, 200 F.3d 962 (6th Cir. 2000) *citing Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987) adopting standard set forth in *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983). Petitioner's argument that Stidham purposely asked trial counsel to use Dr. Chiappone as their expert, the expert who would completely undercut the defense theory in an effort to advance his claims on Holmes' appeal, is purely hypothetical. First of all, the record does not establish that the use of Dr. Chiappone was based solely on Stidham's decision. To the contrary, it appears that neither counsel, nor Stidham, nor Chiappone himself, can recall the exact circumstances under which he was retained as the defense expert.[6] (James Depo. 10/16/2003 at 33-34; James Depo. 12/3/2003 at 9; Deardorff Depo at 40; Stidham Depo at 86; Chiappone Depo. at 31.)

Secondly, despite the multiple representation, there is no evidence that Stidham made "a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." While representing Holmes on appeal, Stidham was confined to raising issues apparent from the record of the trial court, rather than presenting new evidence outside the record. The fact that Dr. Chiappone's testimony was damaging to Moore, even assuming Stidham fully anticipated what it would be, could hardly be helpful to Holmes since it could not be considered and was not heard by the factfinders in Holmes' case, nor could it have been, since that record was already "frozen" on appeal. Additionally, defense counsel in Moore's case made the choice not to present testimony by Stidham during mitigation, but rather to present testimony of others instead. This further reduced any chance of possible prejudice as Stidham was precluded from giving testimony which may have been harmful to one client, Moore, and helpful to another.

---

[6] There is a court order appointing the Court Psychiatric Clinic to perform a psychiatric examination. Later, due to confusion as to the role of Dr. Chiappone, another entry was made appointing Dr. Chiappone as the defense expert. Counsel is unsure if they specifically requested this expert or if the court appointed him to the case.

Because it is unlikely this claim of conflict of interest would have been successful if presented on appeal, it was not ineffective assistance to fail to present it. Thus the hypothetical ineffective assistance of appellate counsel posited by Petitioner cannot serve to excuse his procedural default in presenting this claim to the Ohio courts. The First Ground for Relief is procedurally defaulted or, in the alternative on the basis of the foregoing analysis, without merit.

### Second Ground for Relief

> Petitioner Moore's trial counsel rendered ineffective assistance at the mitigation phase by (A) employing a mitigation specialist who never discussed substantive mitigation issues with Petitioner Moore and failed to adequately assist in the preparation of the mitigation phase; (B) failing to adequately prepare for the mitigation phase, during which Dr. Chippone, the expert offered by trial counsel, impeached Petitioner Moore's entire liability and mitigation case; (C) presented a hopelessly ineffective mitigation argument which actually damaged Petitioner Moore's mitigation case and failed to emphasize Petitioner Moore's youth, remorse, and psychosocial background; and (D) failing to seek or offer an expert to testify as to the effects of extensive alcohol and drug abuse on Petitioner Moore. This ineffective assistance violated Petitioner Moore's rights, including his rights to counsel, not to incriminate himself, due process, equal protection, a fair proceeding, and a reliable sentence.

In his second ground for relief, Petitioner asserts ineffective assistance of trial counsel during the mitigation phase. (Petition, Doc. No. 29 at 7) Respondent argues the first, third and fourth sections of this claim are procedurally defaulted as Petitioner failed to raise these claims at the proper point in the state courts and is barred from raising them now. (Return, Doc. No. 31 at 38-39.) Alternatively, Respondent argues this claim lacks merit. *Id.* at 39.

A portion of this claim was raised by Petitioner in his post-conviction relief proceedings. The court held that it was barred by *res judicata*, was unsupported by evidentiary documents, and was factually incorrect. The court further stated that this claim could still be brought on direct

appeal to the Ohio Supreme Court. (Return, Doc. No. 31 at Exhibit O.)

Petitioner makes the argument that this claim is not procedurally defaulted as it could not have been raised on direct appeal and was properly brought in post-conviction relief, which ran concurrently with his direct appeal. (Traverse, Doc. No. 81 at 11-12.)  He supports this argument with the fact that his trial attorney continued to represent him in his intermediate appeal and his new counsel was precluded from bringing the claim on direct appeal to the Ohio Supreme Court as it was not raised in the court of appeals. *Id.*

The Ohio state courts have routinely held that:

> Where a defendant, represented by new counsel upon direct appeal, fails to raise therein the issue of competent counsel and said issue could fairly have been determined without resort to evidence *dehors* the record, *res judicata* is a proper basis for dismissing defendant's petition for post-conviction relief.

*State v. Cole*, 2 Ohio St. 3d 112 (1982).

The Ohio courts have also held, however, that an attorney cannot reasonably be expected to assert his or her own ineffective assistance on appeal. *State v. Cole*, 2 Ohio St. 3d 112 (1982). Therefore, the doctrine does not apply to bar claims in post-conviction where the defendant was represented by the same counsel at trial and on direct appeal. *Id.*  Furthermore, it does not apply when the claim of ineffective assistance cannot fairly be decided on the basis of what is in the appellate record.

"Generally, a federal habeas court sitting in review of a state-court judgment should not second guess a state court's decision concerning matters of state law." *Gall v. Parker*, 231 F.3d 265, 303 (6th Cir. 2000).  "Nevertheless, when the record reveals that the state court's reliance on its own rule of procedural default was misplaced, we are reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded." *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001).  In this particular instance Ohio did not follow its own exception to its *res judicata*

38

doctrine, so this Court may look at the merits.

To show ineffective assistance of trial counsel, Petitioner must be able to show that counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In evaluating whether or not the representation of counsel was ineffective, it must be evaluated for "reasonableness under prevailing professional norms." *Id*.  Next, Petitioner must be able to show that he was prejudiced by the ineffectiveness of counsel. *Strickland*, 466 U.S. at 680.  Prejudice results when a defendant is deprived of a fair trial. *Id*.  To demonstrate prejudice a petitioner must show that there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different. *Id*. at 698.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

The American Bar Association has adopted Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. (1989); (2003).  The Supreme Court has held that these Guidelines "provide the guiding rules and standards to be used in defining the "prevailing professional norms."" *Wiggins v. Smith*, 539 U.S. 510 (2003)(reinforcing rulings in *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995); *Austin v. Bell*, 126 F.3d 843, 847-48 (6th Cir. 1997); *and Coleman v. Mitchell*, 268 F.3d 417, 449-52 (6th Cir. 2001)).  The Sixth Circuit has held that the standards in the 1989 ABA Guidelines merely represented:

> a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.  The ABA standards are not aspirational in the sense that they represent norms newly discovered after *Strickland*.  They are the same type of longstanding norms referred to in *Strickland* in 1984 as "prevailing professional norms" as "guided" by "American Bar Association standards and the like."

*Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003).  The Guidelines provide that:  Investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1

(C), p 93 (1989) . . . .

> [T]hat among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences. ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.8.6, p 133

*Wiggins*, 539 U.S. 510 (emphasis in original). Petitioner's four sub-claims are considered here in light of these standards.

> A.    Trial counsel employed a mitigation specialist who failed to adequately assist in the preparation of the mitigation phase.

Petitioner argues that defense counsel were ineffective due to the performance of members of the defense team, specifically mitigation specialist Chuck Stidham. (Petition, Doc. No. 29 at 7);(Brief, Doc. No. 115 at14). Petitioner argues that Stidham's efforts were half-hearted and inadequate. (Brief, Doc. No. 115 at14.) He argues that this inadequate preparation carried over to an ineffective and incomplete presentation of mitigation evidence. *Id*.

In support of this claim he details the communication between Stidham and other members of the defense: Stidham met with Moore on only one occasion, for approximately twenty-five minutes, and did not discuss any substantive mitigation issues; it was difficult for defense counsel to obtain the materials prepared by Stidham, finally obtaining them approximately two weeks prior to the start of trial; Stidham had no communication or direct contact with Dr. Chiappone; and failed to recommend that defense counsel hire an expert in substance abuse. *Id* at 14-15.

There is, however, no constitutional right to an "effective mitigation specialist." Indeed, the Guidelines do not mandate employment of a separate "mitigation specialist." What is required instead is the effective assistance of counsel in presenting mitigation evidence. Defense counsel in this case were not ineffective in this regard: they presented a adequate mitigation case and made

a strategic decision to shy away from Mr. Stidham during the mitigation phase.(Depo. of Deardorff

at 50-51).  Strategic choices made after a thorough investigation of law and facts relevant to

plausible options are virtually unchallengeable; and strategic choices made after less than complete

investigation is reasonable precisely to the extent that reasonable professional judgements support

the limitations on the investigation. *Strickland v. Washington*, 466 U.S. 668, 690-691 (1984).  This

portion of the claim is without merit.

> B.   Trial counsel failed to adequately prepare for the mitigation
> phase, during which Dr. Chiappone, the expert offered by
> trial counsel, impeached Petitioner Moore's liability and
> mitigation case.

In the next sub-claim petitioner argues that trial counsel were ineffective in that they did not

did adequately prepare for the mitigation phase, specifically the portions dealing with defense expert

Dr. Chiappone. (Petition, Doc. No. 29 at 8.)  Respondent replies that this claim was raised on direct

appeal to the Ohio Supreme Court as the thirteenth proposition of law and that it lacks merit.

(Return, Doc. No. 31 at 40.)

For the ease of considering the sub-claims, the applicable portion of the Ohio Supreme

Court's opinion is reproduced below:

> On cross-examination, Moore's court-appointed psychologist, Dr.
> David Chippone [sic],[7] testified that Moore had admitted that he had
> murdered Olinger to escape detection.  Moore argues that counsel
> could not have spent enough time with Dr. Chippone because if they
> had, they would not have called him as a witness.  Moore contends
> that other facts support the conclusion that counsel were "unready to
> proceed" with the penalty phase: that the court pressed the parties to
> finish the mitigation phase by the following Wednesday (a week
> later) to accommodate a juror who had to leave town; that defense
> counsel had met with Dr. Chippone only once prior to the conclusion
> of the guilt phase of the trial, and had not, at that point, discussed his
> testimony with him; and that the wife of one of the defense counsel
> was expecting a child in a few days.

---

[7] The Ohio Supreme Court consistently misspells Dr. Chiappone's name in this way.

Moore's arguments under this proposition are purely speculative and do not compel a reversal of his death sentence. That defense counsel had not discussed Dr. Chippone's [sic] testimony with him at the time the guilty verdict was issued does not mean that the several days available prior to the penalty phase were inadequate. The fact that a juror had to leave town by the following Wednesday does not necessarily mean that the penalty phase was rushed improperly.

Moore's arguments appear to assume that defense counsel did not begin to prepare for the mitigation phase until the guilty verdict was announced. There is nothing in the record to support such an assumption.

With respect to Dr. Chippone's testimony, defense counsel attempted to rehabilitate this witness, or at least to have him explain the meaning of his comments made during cross-examination. It is clear that part of Dr. Chippone's testimony did not aid Moore's efforts to secure a life sentence. When the prosecutor asked Dr. Chippone on cross-examination whether he had ever questioned Moore as to why he killed Olinger, Dr. Chippone said that Moore "had a difficult time explaining it * * *. He said he was afraid the man would identify him" The prosecutor then asked, "So he [Moore] shot him so he would not be identified?" Dr. Chippone replied, "That's the implication." Defense counsel's objection was overruled. The prosecutor then asked, "When [Moore] gave that statement to the police about dropping the wallet and the gun just went off and it was an accident, [Moore] told you that he made that up?" Dr. Chippone replied, "That is correct."

On redirect, defense counsel undercut the damage of the prior exchange by asking Dr. Chippone, "That Moore indicated that the man dropped the wallet, but that's the part * * * that he made up to police, that the man [Olinger] actually did not drop the wallet that [Moore] claimed that [Olinger] did?" Dr. Chippone replied, "Yes." Moore has not established that his defense counsel's preparation for mitigation fell below an objective standard of reasonable representation. Given the paucity of mitigating evidence available on Moore's behalf, he called four witnesses and presented evidence for only half a day, the short period of time between the verdict and the beginning of the penalty phase (four days) may not be an inadequate time in which to prepare. Moreover, nothing indicates that counsel did not prepare for the penalty phase prior to the close of the guilt phase. In fact, the evidence produced during the penalty phase indicates the opposite.

We conclude that Moore has not demonstrated "a reasonable probability that, were it not for counsel's errors, the result of the trial

court would have been different." *State v. Bradley* (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373, paragraph three of the syllabus. Accordingly, we reject the thirteenth proposition of law.

*State v. Moore*, 81 Ohio St. 3d 22, 36-37 (1998).

Petitioner alleges there was confusion as to the role Dr. Chiappone had been hired to play by the court: either as a court expert, or as an independent expert for the defense. (Brief, Doc. No. 115 at 20-21.) Dr. Chiappone was appointed to work on this case through the Central Psychiatric Clinic Court Clinic, as opposed to coming through his private practice which would have been the typical practice at that time to retain his services as a private expert. Given this information, Petitioner makes the argument that this sort of referral would have lead Dr. Chiappone to believe he was being hired as a court expert, not an expert for the defense. This confusion is furthered by the fact that the referral was made by the trial court pursuant to Ohio Revised Code §§ 2929.03 and 2947.06. *Id.* The trial judge considered the situation as evidenced by the brief excerpt from the transcript:

> Now, what about the mitigation? One thing on mitigation. There was a kind of mistake. Judge Morrissey did put an order on which was really -- well, I straightened it out the other day. Nancy Schmidtgoessling called me the other day concerning -- she was going to make a full report. And, as you know, especially under that *Cook* case, there shouldn't be any reports unless they ask for one.
>
> They were going to make a whole pre-sentence investigation type report. Dave Chippone [sic] and Nancy Schmidtgoessling called me, and I said no. They even asked for that. They've been contacted, as they are in every case, to do mitigation . . . to do mitigation for the defendant, you know, and normally, because they don't want you to get the report, they don't make a report. So they're not going to make a report. But I think Dave Chippone [sic] and/or Nancy Schmidtgoessling are going to be your witnesses?

(T.p. 321-322.) It is apparent from the above exchange that there was confusion as to the role of Dr. Chiappone. Regardless, the situation was clarified as all parties were informed by the court that Dr. Chiappone was to be an expert for defense counsel. *Id.* As for the reports mentioned above, there

is no evidence that the trial judge or jury had access to the reports during deliberations, nor the court of appeals or supreme court in their independent re-weighing.

Additionally, Petitioner argues that the above constituted *ex parte* communication between the judge, prosecutor, and defense expert. (Brief, Doc. No. 115 at 23.)  *Ex parte* communications are strongly discouraged so as to ensure that defendants are afforded the right to be present at all critical stages of his trial and to guarantee an opportunity to be heard. *See Rogers v. United States*, 422 U.S. 35, 39 (1975); *United States v. Reynolds*, 489 F.2d 4, 7-8 (6th Cir. 1973).  "When an *ex parte* communication relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Rushen v. Spain*, 464 U.S. 114, 119 (1983).

In this case the trial judge disclosed the *ex parte* communications on the record and before counsel on November 9, 1994.  This allowed for any objections and the opportunity to correct any errors which may have resulted. *Id*. at 2414-5.  The communication appeared to have been focused around the role of the experts in this case. *Id*.  The court undertook such communications to clarify the situation and request that no reports be made unless upon the request of defense counsel. *Id*. There was no reasonable possibility that the *ex parte* communication prejudiced the Petitioner to the point it affected the verdict of the trial. *See Rushen*, 464 U.S. at 119-20.  To the contrary, the clarification of the role of the experts in this case benefitted the Petitioner.

Petitioner next argues ineffective assistance of counsel due to their permitting *ex parte* communications between defense expert, Dr. Chiappone, and the prosecutor.  He argues that the contact was "clearly improper and unethical" and refers to case law from the Ninth Circuit and the Eastern District of Pennsylvania. (Pet. Reply Brief, Doc. No. 117 at 6.)

It is undisputed in this case that the defense expert met with the prosecuting attorney for one and a half hours for the purpose of sharing his records and opinions. (Brief, Doc. No. 115 at 24.) Dr. Chiappone admitted to such communication when giving his testimony during mitigation. (T.p.

1119.)  Furthermore, records from defense counsel show that Attorney James received a phone message from Dr. Chiappone indicating he was going to meet with the state to discuss mitigation issues. (Depo. of Chiappone at 78.)

Counsel were not ineffective in their failure to prevent this meeting.  Dr. Chiappone was listed on the defense witness list, as counsel was obligated to do under the Ohio Criminal Rules, and the State had a right to contact him prior to trial.  The Sixth Circuit has stated "instructions to a witness not to cooperate with the other side or to talk to lawyers for the other side would not be proper, but a witness is free to talk or not unless compelled by order of the court." *Workman v. Bell*, 178 F.3d 759, 771-772 (6th Cir. 1998) *citing United States v. Matlock*, 491 F.2d 504, 506 (6th Cir. 1974).  Petitioner's assertion that somehow it was improper for this witness to discuss the case with the prosecutor is not supported in law.

In this next portion of this claim, Petitioner argues that his counsel did not have enough time to prepare for Dr. Chiappone, as evidenced by their decision to put him on the stand. (Petition, Doc. No. 29 at 9.)  He claims that had counsel been properly prepared, they would have been well aware that this witness' testimony would undercut their entire defense and mitigation theory. *Id.*

Respondent argues that Chiappone's testimony, while damaging, was not prejudicial.  The jury had already determined that Moore had purposefully murdered Olinger, having so concluded in the previous stage of the trial independent of the cross-examination of Chiappone. (Return, Doc. No. 31 at 43.)

While there is no absolute rule regarding the minimum amount of time necessary to prepare for an adequate mitigation phase, once the court has considered the case specific facts and circumstances, it must then "look for a showing from the defendant of prejudice, i.e., a showing that the continuance would have made relevant witnesses available, or would have added something to the defense." *United States v. Faulkner*, 538 F.2d 724, 729-30 (6th Cir. 1976); *United States v.*

45

*Moore*, 419 F.2d 810 (6th Cir 1969). Petitioner's trial counsel did not request a continuance between the guilt and penalty phase and aside from hypothesizing that counsel would have used this time to prepare Dr. Chiappone, Petitioner does not offer any evidence that the time permitted was insufficient for counsel to prepare. Petitioner offers the following exchange to show a continuance was necessary:

> Mr Deters:    You've not been with Dr. Chippone[sic] yet?
> Mr. Deardoff: No, I haven't.
> Mr. James:    We met with him once but haven't talked to him about his testimony.

(T.p. 1050-1051.) Petitioner further argues that ". . . .there is no evidence that either Mr. Deardorff or Mr. James had done any substantive preparation for mitigation at that point. . . ." (Brief, Doc. No. 115 at 22.) Yet, this Court notes, there is nothing in the record to suggest that counsel needed more time to prepare for mitigation. To the extent Petitioner is arguing counsel were ineffective in failing to request a continuance, this portion of the sub-claim is without merit.

When put on the stand, Dr. Chiappone undercut the defense mitigation theory by testifying that Moore admitted lying to the police when giving his statements concerning the "accidental shooting" of Olinger. Dr. Chiappone further testified that Moore admitted to having shot the victim to avoid being identified. The exchange between Dr. Chiappone and the prosecutor during the mitigation phase was as follows:

> Q:    Dr. Chiappone, you reviewed all these tests, all these records. And again, you're still trying to find out why Lee Moore did what he did. Did you ever ask him why he killed Melvin Olinger?
> A:    Yes, I did.
> Q:    What did he tell you?
> A:    Well what struck me is he had a difficult time explaining it, if you will. I asked him several times. It's almost like he didn't know what to do. He said he wasn't sure what to do. He said that he was afraid the man would identify him.
> Q:    So he shot him so he would not be identified?
> A:    That's the implication . . . .

46

Q:      Doctor, you are familiar with the previous statement that Lee Moore gave to the police, wherein he claimed this was all an accident?

A:      Yes, I am aware of that.

Q:      Did you specifically confront Lee Moore with that and ask him whether or not this was an accident when he shot Melvin Olinger?

A:      I am not sure if he used the word accident, but I did confront him about the information regarding his report to the police officers.

Q:      About the way he characterized it to the police?

A:      Correct.

Q:      What is your memory of how he characterized it at the time?

A:      Well, he told me that he made that up when he talked to the police, because he wanted to make it look like an accident.

Q:      So when he gave that statement to the police about dropping the wallet and the gun just went off and it was an accident, he told you that he made that up?

A:      That is correct.

(T.p. 1115-1117.)  In *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), the only expert witness put on by defense counsel undercut their entire defense theory that the defendant was too drunk and high on drugs to form intent.  The court held that:

> Although Comb's counsel's decision may be considered a strategic one, it was a decision without undertaking a full investigation . . . .  However, Stidham testified that defense counsel put Fisher on the stand in an effort "to establish that Combs could not act purposely and intentionally because of his diminished capacity," and Stidham admitted that he was "surprised" when Fisher testified to the opposite.  Fisher's opinion regarding whether Combs lacked the requisite intent to commit the crimes was crucial to the defense theory; defense counsel's failure to have questioned Fisher in this regard prior to trial is inexcusable.  Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly.  Regardless of whether Comb's counsel should have known or instead actually knew Fisher's opinion regarding Comb's intent, however, counsel's decision to put him on the stand was objectively unreasonable.

*Combs*, 205 F.3d at 288.

The Court finds that this case is similar to the *Combs* case.  While the testimony in Combs occurred during the culpability phase and here it occurred in the penalty phase, it was no less

47

detrimental. Counsel should have interviewed their expert witness before putting him on the stand where his testimony would contradict the defense mitigation theory. They should have been aware of the information he was going to testify to regarding Moore's statements to him about the shooting and confession. The State relied on this testimony in closing arguments in an attempt to show that Petitioner killed Olinger for the purpose of avoiding identification and to counter Petitioner's mitigation argument of remorse. The trial judge also relied on this testimony in sentencing as evidenced from his opinion, "[t]he defendant did not do this accidently, but, rather, as he told Dr. Chiappone, the victim was executed because the defendant was worried about being identified." (T.p. 1265.) Petitioner has shown prejudice: trial counsels' lack of preparation and Dr. Chiappone's testimony severely damaged the defense's mitigation case.

Next, Petitioner argues that, had counsel had adequate time to prepare, an expert psychologist could have testified that Petitioner Moore suffered from depression, abused drugs and alcohol, and was impacted by systematic brutality and parental strife. (Petition, Doc. No. 29 at 10); (Brief, Doc. No. 115 at 18.). During mitigation counsel did in fact present evidence relating to: the effect of his parent's divorce (T.p. 1095,1096, 1154, 1157, 1170, 1175); his use of drugs and alcohol (T.p. 1101, 1103-1106, 1119-1120, 1162, 1184, 1189); the brutality he encountered as a child from his peers (T.p. 1098, 1099, 1127, 1128, 1129, 1130-1143, 1145-1146, 1148-1149, 1156, 1159, 1176-1181); his depressed state of mind (T.p. 1113, 1187); and his adjustment to jail and ability to be rehabilitated (T.p. 1107, 1108, 1145, 1185, 1188). Petitioner does not offer any additional evidence to show that the outcome would have been different had counsel presented additional testimony from an expert on these matters. As Petitioner does not attempt to show prejudice, this claim is without merit.

      C.    Trial counsel presented a hopelessly ineffective mitigation argument which actually damaged Petitioner Moore's mitigation case and failed to emphasize Petitioner Moore's

youth, remorse, and psycho social background.

Next Petitioner argues that trial counsel were ineffective in that they failed to present a cogent, well-reasoned mitigation case. Specifically, it is argued that their opening and closing arguments were utterly aimless and actually supported the prosecutor's demand for the death penalty. (Petition, Doc. No. 29 at 10-11) Petitioner states that defense counsel actually shifted the burden of proof to the defendant and began mitigation by admitting that they had a big deficit to overcome. *Id.* He further argues that in closing arguments counsel emphasized their lack of mitigating factors and supported the state's contention that the aggravating factors outweighed mitigating factors.

First Petitioner argues that counsel were ineffective in opening statements in that they shifted the burden to themselves and admitted they were beginning this phase with a deficit over the Prosecution. (Brief, Doc. No. 115 at 32.) As support, Petitioner offers incomplete references to the record. *Id.* The omitted portions of the argument are in italics.

> *There's no book I can pick up that I can say, well, as long as I follow these, I know Tim Deardorff did his job.* All I can do today is show you basically two things: I can show you Lee's background. *I can show you the factors that I think will convince you that maybe the death penalty is not sufficient in this matter.*
>
> *Maybe a long term imprisonment,* a very long term in prison would be fair. Or if not, if I can't convince you, and you feel he deserves the death penalty, then maybe, for his family, I can tell you why this happened. *At least, I think I know what the dynamics were that led up to Mr. Olinger's death.*
>
> * * *
>
> *Mr. Deters is correct. They've proved to you that the aggravating circumstances exist. They're there. And we have to show now on a scale - - and that's a great symbol, the scales of justice, because they really, really tell you what it is all about.*
>
> We have to convince you that right now all you've heard are aggravating circumstances, and we're up here. You know, if we're

> playing basketball right now, it's ninety-eight for the prosecutor, zero for Mr. Deardorff. I have to do something in the second half to make it a hundred and one for Mr. Deardorff, ninety-nine for the prosecutors. We have to outweigh what the prosecutors have shown you.
>
> *Our mitigating factors - - again, although they don't justify what has happened, they don't excuse  - - they're not an excuse. We're not putting them forward as an excuse to justify what has occurred. But we're simply asking you to consider those in fairness and mercy, whether Lee should live or die in the electric chair.*
>
> *Today, I expect the evidence to show that the history and his character and his background and his family will outweigh the aggravating circumstances that you have found him guilty of.*

(T.p. 1081-1084.)

It is apparent that counsel's opening statement was made in an effort to advance mitigation. Additionally, this Court notes that while the Ohio statutes clearly place the burden on the State to prove that the aggravating circumstances outweigh mitigating factors by proof beyond a reasonable doubt before a death sentence can be imposed, evidence proving the existence of any mitigating factors is on the defendant. Ohio Rev. Code § 2929.03(D)(1). A requirement that the defendant do so by a preponderance of the evidence does not offend the federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) *overruled in part* by *Ring v. Arizona*, 536 U.S. 584 (2002).

Turning to the closing argument, Petitioner again erroneously quotes the record to show that closing arguments were damaging to his case. The quotations were taken out of context. By reading the quotations with their surrounding text, as actually spoken by defense counsel in closing, it is apparent to this Court that counsel was in fact attempting to explain their mitigation case to the jury. The Court has reproduced the closing statement below with the portions omitted from Petitioner's claim in italics:

> . . . But the bottom line in the first issue, or in the first phase, as Mr. Deters says, is: Did he accidently shoot him?

That's what he said he did.  I don't know if it's true, but it doesn't matter anymore.  *You say he didn't.  All right.  So I'm not going to argue with you whether that's true or not.  But just like in that contract, all the things we have to show you in that book, it goes on and on and on,* but the bottom line - - cut out all the garbage - -he shot Mr. Olinger and stole his car and used his credit cards.  That's the bottom line.  That's what he did.

* * * *

*If he was going to lie and not be cooperative - - and he's not blaming anybody else.  If I were - -if I were some Californian lawyer in some big criminal case, I would say: Okay.  Let's see.  I got Larry Kinley.  I've got Lee Moore.  I've got a gun with no fingerprints.  I've got no witnesses.  I've got no bullet.  Let's blame it on Larry.  Let's say Larry did it.  How are they going to know?*

*You saw Larry on the stand.  It would be pretty easy for us to make Larry out, who says, when I said, "Are you telling the jury what you want so you can save your ass?"*

*Remember, I asked him that?  He said, "Yeah, yeah, that's what I'm doing."*

Larry was not believable, but that doesn't matter, because that's - -as Mr. Deters said, we showed you other things to find him guilty.  *But the point is Lee didn't blame it on anybody else.  When he said, "I'm going to be accountable" - -he says, "I'm going to be accountable."*

*Maybe when he gave that statement, I don't know what it's like to be eighteen years old, to be under arrest for a murder, investigating a murder, smoking three hundred fifty dollars' worth of pot a week, drinking gin and drinking beer and that's my life style.  I don't know what it's like to be scared.*

*And you didn't hear from all the family.  What we're trying to tell you: He doesn't know how to communicate his problems.  He never tells anybody his problems.  Even trying to get him to say something to you is hard to do.  He keeps it all inside.*  So maybe when he gave his statements, Lee didn't remember.  I mean, if you shoot somebody in the head, and you're in a little area and his brains fly out all over the wall, that is going to have an effect.

*He's not an animal.  His family has described him.  He has emotions.  And he can perceive that, "God, look what I did," and be stunned.*

*We can drive our cars in the snow and lose control of the car.  Did*

*you ever do that before? Just lose control of your car and almost have an accident? And how you feel for maybe two or three minutes?*

*Magnify that by a thousand or two thousand times and see how you're going to feel if you just shot somebody in the head. I don't know. Does that go on for days? Does that go on for just a few minutes?*

But the point is that, whatever statement he gave - - I don't know if he was lying, if he wasn't lying, *but I do know this: I do know that he didn't say Larry did it. And that's unusual for me as a defense lawyer. He didn't say Jason did it. That's unusual. He admitted to it all the time that I just explained to you that he would do.*

*Larry says he didn't put him on his knees. We know what the photograph looks like. So I - -I went down Saturday to look at the dumpster. I went down - - and Officer Murray said right here that he had to turn to get in between the dumpster. Remember he said that he had to turn. And all I know is, as Mr. Deters portrayed to you - - and Mr. Deters doesn't know and I don't know, but I know if there is a dumpster here and there's a wall here and there's a wall here and I get hit with a .357 Magnum and I hit that wall, there's only one way I can go, and that's down (indicating).*

*That's the only way I can drop if I fall back. And if you looked at that picture, that's as plausible a theory as to how he ended up on his knees. I don't know that.* Lee didn't say he put him on his knees. I don't know if he did or he didn't. But I don't think it's proven, if that's one of the factors beyond a reasonable doubt to you that he put him on his knees and shot him. But he shot him. That's the bottom line. He shot him. So what do I say?

*As I said earlier, what do I do as a defense lawyer to say he should not have the death penalty? Again, you have alternatives, and that's what you have to - - I think you also have alternatives in sentencing.* Everything they tell you, everything they're going to tell you, everything Mr. Piepmeier told you - - we didn't contest that.

*We as defense lawyers have to make them put on their case. I have to do that. If I didn't have to do that, I wouldn't have done it. I would have just said, "This is what he did. Let's just go to the second phase."*

*But the Court of Appeals says if you do that, you waive all your rights, and that's a dumb thing to do, and you can't do that. So if we had to go through this, we're the ones to blame, because we have to make you go through this. Lee didn't make you go through this. Lee*

*got up here and said, "I shot him," although in his mind he thinks it's accidental.*

*We don't know. And you say it's not accidental. But my point being is that Lee believes it was accidental. If it wasn't, then maybe somewhere along the line - -because of the trauma or somewhere along the line, he's convinced himself that it was.* And I think the bottom line is Lee just doesn't want to believe that he did this. He doesn't want to accept that he did this. In his own mind, he can't believe he did it. *And I think that's what he's trying to say to you today.*

*Larry Kinley was on the stand. He's an accomplice. Jason Holmes was an accomplice. Mr. Piepmeier says, well, he's only nineteen. That's right. He was nineteen when he committed this act. Is that enough to justify them taking Mr. Olinger behind and shooting him behind there in such a desolate place?*

* * * *

His future in the jail- as I said, he would get along in a structured setting. So what does that mean? Oh, that's great. We're going to send Lee off to a place where he's going to get along great. That doesn't sound fair to the Olinger family, that he is going to go to jail where he can do well.

I think what that means is, if Lee went to jail for the next fifty-three years, he could be beneficial to other people in our prison system. I don't know how. I don't know how.

I don't know how many defendants I've seen as a prosecutor, all of a sudden, they all find God. We all find - - as soon as we're caught, we all find God. But you can look at their family backgrounds and see it's a sham when they sit here and tell you they find God.

Mr. Piepmeier was right. I wish I could tell you I've got a - - he was abused, my God, sexually abused when he was three, that he was left on streets when he was six. I don't have that. But what I do have is to show you that he was raised in a good family. *So when Doctor Chippone [sic] says he could do well and he is remorseful, at least there's some background, some basis to make that believable. He went to a very Christian school as a young boy. You can see from his pictures that he came from a nice family.*

* * * *

*And what is amazing to me is that he - - all he wanted you to know is,*

*"I didn't put him on his knees. Don't think I'm that bad. I shot him, but I didn't put him on his knees."*

*I think that says a lot for Lee. I think it says a lot when his family says he's remorseful. I mean, if either one of you or I got on the stand and couldn't cry, I would think there's something seriously wrong with you. I was almost crying listening to it. He can't even cry.*

*That shows as he grew up - - as he grew up, is there something where he can't say, "Feel sorry for me," or "Mom, this is my problem."*

*They all said that, all through his life, Lee couldn't even do that. Did he get beat up so many times that he became desensitized to emotion? Did he become desensitized to pain? I don't know. I find that amazing that he couldn't cry. But the bottom line is I think his remorse is here. That's all I have to tell you.*

*I've got a nineteen-year-old kid that says, "I think I accidentally shot him. That's what I really believed happened, but I guess it really doesn't make any difference. But I did shoot him, and I'm sorry I did it. I'm sorry to Mr. Olinger."*

\* \* \* \*

*. . . . Can you say you're sorry and let me go to jail for seventy-three years? Is that enough? Is that enough punishment? I know I wouldn't want to go to jail for seventy-three years.*

*I'd rather you put me to death. If I knew I couldn't have a wife, if I knew I couldn't have children, if I knew I couldn't see my mother, if I knew I couldn't do all the things we take for granted every day, for the next fifty-three years, if I knew I didn't get to go to college, all these things, no Christmases, no Thanksgivings, is that enough? How much punishment do we have to give someone?*

*And I will say one thing more. I know, when we all watched the movie Moses, when he came down with the ten commandments and said, "Thou shall not kill," he didn't make an exception for the Ohio State Legislature. There is no exception.*

\* \* \* \*

(T.p. 1202-1221.)

Rather than damaging his case, as Petitioner asserts, it is clear that counsel was arguing his case. Additionally the Court notes that during closing arguments, counsel did in fact make

arguments as to age, rehabilitation, and drugs and alcohol. (T.p. 1200, 1208-1209, 1211, 1214, 1217-1218, 1220.) Petitioner has not demonstrated ineffective assistance of counsel in making opening and closing arguments.

> D.    Trial counsel failed to seek or offer an expert to testify as to the effects of extensive alcohol and drug abuse on Petitioner Moore.

In his last sub-claim, Petitioner argues that his counsel were ineffective in their failure to hire and present an expert in substance abuse. (Petition, Doc. No. 29 at 12-13.) Petitioner argues that counsels' failure to investigate this issue was prejudicial as the effect of drug and alcohol abuse on Petitioner's culpability was the focus of both the defense and mitigation phase. (Brief, Doc. No. 115 at 18.) Additionally he asserts that Attorney Deardorff was aware that a history of drug and alcohol abuse could be a sign of a possible related mental disorder. Yet, despite realizing the relevance of this abuse, defense counsel never sought expert testimony.

Counsel did however present some testimony as to Petitioner's drug and alcohol history. (T.p. 1103-1105, 1162, 1189). Testimony was given that Petitioner abused both alcohol and marijuana and had since the age of 15 or 16. *Id.* Petitioner spent an average of $350 per week on marijuana and the day of the murder he smoked two "dime" bags of marijuana and consumed two forty-ounce beers and some gin. (T.p. 1189.)

Petitioner fails to demonstrate that he was prejudiced as a result of counsels' failure to present additional information or an expert in the alcohol/substance abuse area. He does not support this claim with any evidence to show that had an expert been obtained or more evidence on this matter presented in mitigation that it may have influenced the jury to decide differently.

The second ground for relief is without merit except for that portion which asserts that counsel were ineffective in preparing for Dr. Chiappone's testimony which was very damaging to Petitioner's case.

**Third Ground for Relief**

> Petitioner Moore's trial counsel rendered ineffective assistance at the liability phase by (A) inadequately preparing the sole defense, lack of a purposeful state of mind; (B) failing to present or seek a jury instruction on the voluntary intoxication defense; and C) failing to seek or offer a forensic expert, thus violating Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.

In his third ground for relief, Petitioner argues ineffective assistance of trial counsel during the guilt phase of trial. (Petition, Doc. No. 29 at 14.) Respondent argues that these claims are procedurally defaulted as Moore failed to raise the claims in the Ohio state courts and is therefore barred from raising them now unless he can demonstrate both a cause for his failure to raise the claim and actual prejudice resulting from such failure. (Return, Doc. No. 31 at 54-56.) Specifically Respondent notes that Moore failed to raise these claims in his direct appeal. *Id*. Alternatively, if not defaulted, Respondent argues these claims are without merit. *Id*.

      A.      Did not present intoxication evidence.

In his first sub-claim Petitioner makes the argument that his counsel were ineffective in their failure to present intoxication evidence. (Brief, Doc. No. 115 at 45.)

Petitioner has withdrawn this claim. *Id*.

      B.      No request for voluntary intoxication instruction.

Next Petitioner argues that his counsel was ineffective in their failure to present or to request an instruction on voluntary intoxication during the guilt phase of trial. (Petition, Doc. No. 29 at 15.) Petitioner argues that counsel told the jury in opening statement that Petitioner was under the influence of alcohol and drugs on the day of the murder, the State then established the amount of alcohol and drugs that Moore had ingested, yet counsel failed to request an instruction on voluntary intoxication. He argues that this failure prejudiced him as the jury was not able to consider and give effect to evidence that lessened his intent.

At the time of the crime the law in Ohio stated that "evidence of voluntary intoxication 'may be considered in determining whether an act was done intentionally or with deliberation and premeditation.'" *Hicks v. Collins*, 384 F.3d 204, 214 (6th Cir. 2004), *quoting Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), *quoting State v. Fox,* 68 Ohio St. 2d 53, 55 (1981); *see also State v. Wolons,* 44 Ohio St. 3d 64, 68 (1989). Voluntary intoxication is a defense to a crime where specific intent is a necessary element of the crime and "the intoxication was such as to preclude the formation of such intent . . . ." *Fox*, 68 Ohio St. 2d at 55.

Respondent notes that defense counsel filed a motion on November 18, 1994, which included the request to charge the jury with the following:

> Intoxication by alcohol and/or drugs is not an excuse for an offense. However, such a condition must be consolidated as a mitigating factor for the purpose of determining whether such intoxication adversely affected Mr. Moore's mental processes, conduct and actions and whether such intoxication deprived him of the clearness of intellect and control of himself that he would otherwise have possessed.

(Return, Doc. No. 31 at 58-59.)

Petitioner correctly notes that the above request for jury instructions occurred for the mitigation phase, not the guilt phase. (Brief, Doc. No. 115 at 45.) However, the claim that it was ineffective assistance of counsel to fail to request this instruction at the guilt phase is without merit. Impairment does not equal incapacity and as the Ohio courts have stated, "intoxication is not raised as a defense to the element of purpose in a criminal prosecution merely because the evidence suggests reduced inhibitions, impaired judgment, or blurred appreciation by the defendant of the consequences of his conduct." *State v. Hill*, 73 Ohio St. 3d 433, 443 (1995) *citing State v. Hicks*, 43 Ohio St. 3d 72 (1989). Even had counsel requested this instruction during the guilt phase, Petitioner's actions appear to have been intentional. He drove to another county with the intentions of stealing a car with out of state plates. He kidnaped Olinger at gunpoint, put him in the trunk, and

57

drove to multiple locations before going to the desolate area in which Olinger was shot. Once there Moore had Olinger empty his pockets and then walk over to the dumpster. Following the murder, Moore used Olinger's credit cards at local JC Penny department stores. Thus the evidence did not support a voluntary intoxication defense and Petitioner was not entitled to the instruction. It was therefore not ineffective assistance to fail to request it. Since this sub-claim is without merit, the Court need not decide whether it is also procedurally defaulted.

C.    Counsel failed to obtain the assistance of a forensic expert.

Finally, Petitioner argues that his counsel were ineffective in their failure to obtain the assistance of a forensic expert to support their theory that the gun accidently discharged as Moore bent down. (Petition, Doc. No. 29 at 15.) Petitioner argues that the failure to present this evidence, despite saying they would do so in opening statement, permitted the State to argue without rebuttal that it was unlikely the gun accidently discharged in this execution-style killing. *Id.* at 15-16.

Respondent argues that Petitioner has failed to satisfy the prejudice prong of the *Strickland* inquiry. (Return, Doc. No. 31 at 59.)

The Ohio Supreme Court has extended *Ake v. Oklahoma,* 470 U.S. 68 (1985), to apply to nonpsychiatric expert assistance when the trial court finds, in the exercise of sound discretion, that the defendant has made a showing 1) of a reasonable probability that the requested expert would aid in his defense, and 2) that denial of the requested expert assistance would result in an unfair trial.[22] *State v. Mason*, 82 Ohio St. 3d 144, 149 (1998) *citing State v. Broom*, 40 Ohio St. 3d 277 (1988), and *Little v. Armentrout,* 835 F.2d 1210, 1244 (8th Cir. 1987). The Sixth Circuit has found this interpretation of *Ake* is not objectively unreasonable:

> We are not persuaded that the Ohio Supreme Court applied *Ake* in an objectively unreasonable manner. In *Ake*, the Supreme Court weighed three factors in determining whether access to competent psychiatric assistance was required: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest

that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Ake*, 470 U.S. at 77. In this case, the Ohio Supreme Court simply stated that trial courts have discretion in evaluating the third factor. We do not believe that this application of *Ake* was objectively unreasonable. Therefore, bound as we are by the dictates of AEDPA, we hold that Mason is not entitled to habeas relief on this claim.

*Mason v. Mitchell*, 320 F.3d 604, 615-16 (6th Cir. 2003).

Moore argues that a firearm expert would have supported his claim that the shooting was accidental. (Brief, Doc. No. 115 at 47.) He fails, however, to offer any evidence of what an expert would have found and testified to concerning the gun and that the failure to obtain such expert denied him of a fundamentally fair trial. His support for this sub-claim is merely speculative and hypothetical. Because this sub-claim is without merit, the Court need not decide whether it is also procedurally defaulted.

### Fourth Ground for Relief

One of Petitioner Moore's trial counsel continued to represent him on his intermediate direct appeal and rendered ineffective assistance at this stage because he had an actual conflict of interest and because he failed to raise meritorious issues. This violated Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.

In his fourth ground for relief, Petitioner makes the argument that his rights were violated as a result of Attorney Deardorff's continued representation on direct appeal to the Hamilton County Court of Appeals. (Petition, Doc. No. 29 at 17-18.)

Respondent argues that this claim is procedurally defaulted. (Return, Doc. No. 31 at 61.) Specifically, in that Petitioner failed to bring this claim on direct appeal in the Ohio Supreme Court.

*Id.* Petitioner retorts that counsel was precluded from raising this claim as it was not brought on direct appeal to the court of appeals, the Ohio Supreme Court did not impose an adequate and independent state ground but rather addressed the claim on the merits, and that he can show cause for his failure to bring this claim. (Traverse, Doc. No. 81 at 24) *citing* (Decision and Order, Doc. No. 70 at 2.)

Moore argues that the continued representation by Deardorff amounted to ineffectiveness as he had an actual conflict of interest and failed to raise meritorious issues. (Petition, Doc. No. 29 at 17.)  Specifically, Petitioner argues that Deardorff failed to inform the Moore family that as a result of his continued representation any issues regarding ineffectiveness of trial counsel would not be raised and that ineffectiveness of trial counsel is a possible grounds for appeal. *Id.*

This Court notes that counsel cannot be held to have been ineffective for his failure to raise a claim of ineffectiveness of trial counsel on direct appeal as counsel is not required to present his own issues of ineffectiveness. *State v. Cole*, 2 Ohio St. 3d 112, 114 (1982).  As such, Deardorff was not ineffective as a result of his continued representation on direct appeal.

Next Petitioner argues that counsel was ineffective on appeal for his failure to raise claims pertaining to: errors in the jury instruction; bias of the trial judge; the jury's consideration of non-statutory aggravating factors; a lack of consideration of and failure to give effect to mitigation evidence; prosecutorial misconduct; the locking of the courtroom doors; and duplicative specifications and counts. (Petition, Doc. No. 29 at 17.)  These claims were raised in Petitioner's 26(B) Motion and are addressed throughout this Report.

**Fifth Ground for Relief**

Judge Ruehlman, the trial judge, was not an impartial judge at trial or on post-conviction, as evidenced by his desire to have Petitioner Moore executed immediately after sentencing him to death, thus violating Petitioner Moore's rights, including his right to an impartial

tribunal, due process, equal protection, a fair proceeding, and a reliable sentence.

In his fifth ground for relief, Petitioner argues that the trial judge was not impartial and as a result his rights were violated. (Petition, Doc. No. 29 at 19.)  Respondent argues that this claim is procedurally defaulted due to Petitioner's failure to raise the claim in the state courts and alternatively that it lacks merit (Return, Doc. No. 31 at 64-65).  The portions of this claim pertaining to judicial bias at trial should have been raised on direct appeal as they are based on the trial court record.  This claim however, was raised as an underlying claim in Petitioner's 26(B) motion.  As noted above in the analysis of the First Ground for Relief, the Ohio Supreme Court decided the 26(B) motion on the merits.  Therefore, this Court must also considers the merits of Petitioner's claim of ineffective assistance of appellate counsel and the merits of this Fifth Ground for Relief to the extent relied upon by the claim of ineffective assistance of appellate counsel.

A.      The assignment of Judge Ruehlman was not random.

In his first sub-claim Petitioner makes the argument that the assignment of his trial judge, Judge Ruehlman, was not random. (Petition, Doc. No. 29 at 19);(Brief, Doc. No. 115 at 48.)

Petitioner has withdrawn this portion of his Fifth Ground for Relief. *Id*.

B.      The trial judge's desire to have Petitioner Moore executed immediately without providing him with his state and federal appeals showed his actual or apparent bias against Petitioner Moore and his hostility to Petitioner Moore's federal constitutional rights.

In his next sub-claim Petitioner argues that the trial judge was biased as demonstrated by comments made at trial. (Petition, Doc. No. 29 at 20);(Brief, Doc. No. 115 at 49.)

During the sentencing phase after pronouncing sentence, Judge Ruehlman made the following comments:

One last comment, Mr. Moore.  You know, I'm required by law to set this execution date of-- I put down May 16th, 1995, but you won't be

executed then.  In fact, I'll probably be retired -- seriously-- by the time you're ever executed, and you'll be a middle-aged person, because you're going to the safest place in the United States.  And the safest place in the United States right now is Ohio's Death Row.

You'll be completely protected.  If there's a riot, you'll be protected.  You won't be killed by the other prisoners, because they protect you there.  If there is a fire, you're the first one they're going to get out.

The only person I know of that-- when I was a prosecutor, we prosecuted Mr. Mize, John Mize.  He's the only person I know to have died on Death Row in the last over thirty years, and he died from natural causes.  And the only irony in that case is that, if he hadn't have died of cancer, he'd still be alive today on Death Row.

The delays brought on by the Ohio Post-conviction Relief Statute and the Federal Habeas Corpus procedure that we now have caused the citizens of the State of Ohio to really distrust our justice system, and, hopefully, our newly elected state legislators will repeal the Ohio Post-conviction Relief Statute and our newly elected federal legislators will pass laws that restrict the Federal Habeas Corpus procedure as a method to unjustly delay these convictions.

If we're going to volunteer the death penalty, we should use it.  I believe in it.  I believe it should be used and not delayed.  And yours shouldn't be delayed.  But now it probably will.

We took a big step in November when we passed the law that gets rid of intermediate appeals, but, still, we need to get rid of Ohio's Post-conviction Relief Statute and the federal habeas corpus delays which are part of that statute.  It's wrong.  It's causes people to really think this system is not a fair just system, when sentences are not carried out.

Okay.  You can take him away.  That's the sentence of the Court.

(T.p. 1269-1271.)

It is of course unconstitutional to try a defendant before a judge whose impartiality might reasonably be questioned because of direct, personal, substantial, pecuniary interest in the case. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 824 (1986), *quoting Tumey v. Ohio*, 273 U.S. 510, 523 (1927).  The quoted remarks, however, do not establish a disqualifying bias.  They are gratuitous in that the law requires no finding by a trial judge that a sentence needs to be carried out speedily.

However, at most, they reflect Judge Ruehlman's firm conviction that Petitioner was deserving of the death penalty, a conclusion he was required to reach in any event before imposing that penalty. There is no proof that Judge Ruehlman's view of Petitioner was based on anything beyond what he learned during the trial.

A disqualifying prejudice or bias must ordinarily be personal or extrajudicial. *United States v. Sammons,* 918 F.2d 592 (6ᵗʰ Cir. 1990); *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1250 (6ᵗʰ Cir. 1989). That is, it "must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966); *see also Youn v. Track, Inc.,* 324 F.3d 409 (6ᵗʰ Cir. 2003)*;Bradley v. Milliken,* 620 F.2d 1143 (6ᵗʰ Cir. 1980). The Supreme Court has written:

> The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for 'bias and prejudice' recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a *sufficient* condition for 'bias and prejudice' recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice. . . . [J]udicial rulings alone almost never constitute valid basis for a bias or partiality motion. See *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966). . . . Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."

*Liteky v. United States,* 510 U.S. 540 (1994). The Court went on to hold:

> *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration — even a stern and short-tempered judge's ordinary efforts at courtroom administration — remain immune.

*Id.*

Judge Ruehlman's views about delays in carrying out executions were widely shared at the time and are known to have influenced adoption of the Antiterrorism and Effective Death Penalty Act of 1996 (Pub. L. No 104-132, 110 Stat. 1214)(the "AEDPA").[8]  Whether a capital sentencing hearing is the best place to state such views is open to debate, but they do not prove a disqualifying bias.

    C.    Judge Ruehlman's conduct throughout Petitioner Moore's trial showed his actual or apparent bias against Petitioner Moore and the defense as well as his hostility to Petitioner Moore's federal constitutional rights.

    1.    During the pre-trial phase, Judge Ruehlman refused to permit Petitioner Moore's counsel to present evidence regarding the racial imbalance of the petit jury venire.

In this first sub-sub-claim, Petitioner argues that the trial judge showed bias when he refused to permit trial counsel's request to have a new jury venire selected due to racial imbalance in the existing venire. (Petition, Doc. No. 29 at 21);(Brief, Doc. No. 115 at 51.)  Specifically, out of the fifty people selected only five were African Americans, and only one of which was a male. *Id.*  Moore argues that this venire failed to reflect a representative cross-section of the community. *Id.*

Defendants have a constitutional right to a jury selected from a fairly representative cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975).  The various methods of selection; jury wheels, pools of names, panels, or venires, from which juries are drawn must not systematically exclude distinctive groups in the community. *Id.*  Although petit juries must be drawn from this cross-sectioned source, there is no requirement that the petit jury actually selected must mirror the community and reflect the various distinctive groups in the population as defendants do

---

[8] Of course, one unintended but undoubted effect of that reform was now more than ten years of satellite litigation to construe the Act, much of which has undercut its purpose of hastening executions.

not have a constitutional entitlement to a jury of any particular composition. *Id. citing Fay v. New York*, 332 U.S. 261, 284 (1947).

In this case defense counsel brought the court's attention to what they felt was an unfair result in the selection of the venire. (T.p. 211-213.)  In response, the trial judge reminded counsel that potential jurors were selected at random from voter registration lists and asked if counsel had any evidence that the selection process was improper, wasn't drawn at random, or that someone on the jury commission "intentionally just picked out white jurors?" (T.p. 214, 217.)  Counsel stated that they did not have any evidence that the jury venire had been improperly selected, but again voiced their disapproval at the result of only five African Americans in a venire of fifty. *Id.* at 214.

Defense counsel then began to attempt to establish a prima facie violation under the *Duren v. Missouri* standard.[9]  The judge asked if defense counsel could put on any evidence to further demonstrate the systematic exclusion prong. *Id.* at 218.  Defense counsel stated that they did not have enough time to prepare but could gather evidence if the judge wanted to have a hearing on the matter at a future date. *Id.* at 218.  The State, however, offered the testimony of jury commissioner Fritz Meyer. *Id.* at 220.  Meyer testified as to the selection of the jury pool in Hamilton County.[10] *Id.* at 220-227.  He further stated that he did not systematically exclude potential jurors of African-American descent nor males. *Id.* at 222.  After an opportunity for cross-examination defense counsel asked the court to consider a motion in progress to allow them the opportunity to present additional

---

[9] "Defendant must show 1) that the group alleged to be excluded is a 'distinctive' group in the community; 2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this under representation is due to systematic exclusion of the group in the jury selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

[10] Meyer articulated the process in which potential jurors come in and fill out questionnaires and are assigned a notecard.  As judges need jurors a select number from the jury pool is selected by randomly selecting the notecards.  At the time of this particular case there were approximately 78 people, 7 or 8 of which were excused for personal or business hardships.  An additional 20 were selected for voir dire on another trial, leaving approximately the remaining potential members to serve as the 50 in this case.

information. *Id*. at 227.  This motion was denied as was the motion for a new venire. *Id*.

This Court finds that this action by the trial judge does not show bias as Petitioner alleges. The judge allowed both sides to argue this case and listened to testimony from the jury commissioner to the effect that there was no systematic exclusion.  As there was not a purposeful exclusion of a portion of the community, there was not a constitutional violation or a need for a new venire.  Furthermore, it should be noted that the use of the voter rolls as opposed to driver's license lists does not create a representative cross-section claim. *State v. Moore*, *citing State v. Fulton,* 57 Ohio St. 3d 120 (1991), *following Duren v. Missouri*, 439 U.S. 357, 364 (1979).  Finally, there is no proof that Judge Ruehlman singled out Petitioner for the rulings he made, as compared with other similarly-situated criminal defendants.  In other words, there is no proof that granting additional relief under similar circumstances was Judge Ruehlman's common practice, set aside in this case because of some personal or racial bias.  This portion of the sub-claim is without merit.

> 2.    During voir dire, Judge Ruehlman refused to permit Petitioner Moore's counsel to fully explore the potential biases of the prospective jurors and denied Petitioner Moore's challenge to the prosecution's removal of an African-American woman from the jury.

Petitioner argues that the trial judge improperly upheld the peremptory challenge of Prospective Juror Freeman based on his own observations of her demeanor. (Petition, Doc. No. 29 at 23-24.)  Upon defense counsels' objection to the State's use of a peremptory challenge against an African-American woman, the judge requested that the State justify their reason for the challenge. (T.p. 407-409.)  At that point the State articulated various reasons which included answers to her questionnaire, that her uncle is an attorney and at one point was a public defender, and that her body language seemed hostile. (T.p. 409-412.)  Once the State had concluded offering their reasons for the challenge, defense counsel began to rebut the State's arguments. *Id*. at 413.  Judge Ruehlman

responded that he too had noticed her demeanor and that the State had met their burden of demonstrating that the challenge was not based on race. *Id*. at 414-415.

Additionally, at this point Petitioner argues that he is unsure if during the exchange between the State and the trial judge, "they" refers to defense attorneys or African-Americans or African-American defense attorneys. *Id*. at 24. Upon reading the quotation, it seems apparent that the use of "they" refers to defense attorneys. While it is true that the statement occurred during a discussion as to defense counsels' *Batson* challenge to the State's peremptory challenge, the portion of the discussion regarding relatives in the legal field is entirely race neutral:

> It's a common thing. That would be - - people have talked to their uncle. He's a defense attorney. It's something you think about when you're a lawyer: Do I want somebody that might be a little bit predisposed to the defense? Because they talked to their uncle, their uncle is a defense attorney, and they'd be more predisposed to the defense case and maybe a little more anti-prosecutor, because I know, in Ohio, especially in Columbus, from reading that vindicating magazine that they send down here all the time - -that's a Columbus magazine. I mean, they're very hostile towards prosecutors and police.
>
> But, you know, she could be a little anti-prosecutor. I think that's just being a good lawyer. I don't think it was race-based at all, this challenge. I don't have a problem at all with them knocking her off for those reasons. So I'll note your objections.

(T.p. 414-415.) This is an apparently appropriate disposition of a *Batson* challenge based on the grounds for exercising a peremptory excuse raised by the prosecutor. The judge is concluding that expecting a person to have been influenced in their views by an uncle who was or is a public defender is a race-neutral explanation. Petitioner has tendered no evidence to the contrary and this sub-claim is therefore without merit.

> 3.    During the liability phase, Judge Ruehlman failed to

> promptly excuse a sleeping juror, improperly denied objections by Petitioner Moore's counsel, assumed that Petitioner Moore would be convicted, and improperly permitted the jury to conduct an experiment.

In the first portion of his next sub-claim, Petitioner argues that the judge failed to promptly excuse a sleeping juror. (Petition, Doc. No. 29 at 24.)  Judge Ruehlman did not personally observe the sleeping juror and therefore decided the best option would be to voir dire the juror individually to assess the situation.  Once the judge witnessed the juror sleeping, however, the juror was promptly replaced with an alternative.  While this Court agrees that the juror was not replaced as quickly as possible, he was replaced as soon as the judge himself noticed the juror's lapse in attention.  The alternate juror, who replaced the original juror, had been present throughout the entire trial and there is no evidence that the alternate had not been attentive.  Therefore, no prejudice arose out of the slight delay in replacing the "sleeping" juror, nor does it show judicial bias.

Next Petitioner argues the trial judge improperly denied defense counsels' objections without permitting them to argue them, specifically on the objection concerning the use of victim impact statements. (Petition, Doc. No. 29 at 24); (Brief, Doc. No. 115 at 54.)  *Payne v. Tennessee* permitted the use of victim impact statements in the sentencing phase and the Sixth Circuit extended the *Payne* holding to the guilt phase of trial in *Cooey v. Coyle*. *Payne v. Tennessee*, 501 U.S. 808, 827 (1991); *Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004) *citing Cooey v. Coyle,* 289 F.3d 882 (6th Cir. 2004) and appendix at 2000 U.S. App. Lexis 38700 (6th Cir. 2000); *Cooey v. Anderson,* 988 F. Supp. 1066, 1089-1090 (N.D. Ohio 1997).  Additionally, this Court notes that counsel was permitted, during a break, to fully state their objection on the record to preserve it for review on appeal. (T.p. 628-629.)

Next Petitioner argues that Judge Ruehlman assumed he was going to be convicted as

evidenced by the fact he asked the State to indicate which photos they used for purposes of the appeals court. (Petition, Doc. No. 29 at 25);(Brief, Doc. No. 115 at 56.)  Petitioner argues that the trial judge was going out of his way to help the State preserve the record for what he assumed would be a conviction and later an appeal, but did not share this advantage with defense counsel. (Brief, Doc. No. 115 at 56.)  The Court rejects this interpretation.   The trial judge was trying to preserve the record in the event there would be an appeal, not necessarily because he believed there would be an appeal.  Furthermore, Petitioner cannot show prejudice as a result of the trial judge ensuring the trial record was preserved.  This sub-claim is without merit.

Next Petitioner argues that the trial judge failed to intervene when the prosecutor encouraged the jurors to conduct an experiment during their deliberations. (Petition, Doc. No. 29 at 25.)  The comments made in closing were specifically:

> Mr. Olinger, who is in this position - - and go back in the jury room - - nothing prevents you from doing this.  Go back and see how did he get in that position, what you have to do.   You're like this (indicating).  He's like this on his knees.

> We know from expert testimony that this shot was fired from between six inches and thirty inches.  After you're down like this, have somebody take that State's Exhibit 16 and see what your reaction is.  Do you think you might maybe turn away from that gun and tilt your head back a little bit?  That's exactly what happened in this case.

(T.p. 957.)   Defense counsel did not object to the statement when it was made.   Ohio's contemporaneous objection rule states that parties must preserve errors for appeal by calling them to the attention of the trial court at a time when the error could have been avoided or corrected, set forth in *State v. Williams,* 51 Ohio St. 2d 112 (1977); *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998). This rule is an adequate and independent state ground, thus this claim is procedurally defaulted. *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003) *citing Hinkle v. Randle*, 271 F.3d 239, 244

(6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000) *citing Engle v. Isaac,* 456 U.S. 107,

124-29 (1982). *See also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000). It is hardly sufficient

evidence of judicial bias that a trial judge did not intervene when counsel made no objection.

Furthermore, "jurors must be given enough latitude in their deliberations to permit them to

use common experiences and illustrations in reaching their verdict." *United States v. Sivils*, 960 F.2d

587, 592-593 (6th Cir. 1992) *quoting United States v. Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983)

Here the State was asking jurors to draw on their common every day experiences. It must also be

noted that there is no evidence that the jurors did in fact perform such experiment to determine how

and where Mr. Olinger was positioned as he was shot. Even assuming that the jurors had considered

this, Petitioner is not alleging that the jurors were exposed to extraneous materials during their

deliberation. *United States* v. *Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983). This sub-claim is without

merit.

> 4.    The trial judge had improper *ex parte* contacts with defense expert and improperly permitted the prosecutors to urge the jurors to identify with the victim.

For the reasons set forth above with respect to the Second Ground for Relief, the *ex parte*

communication with the defense experts does not merit relief.

> 5.    During the post-conviction proceedings, Judge Ruehlman ruled upon Petitioner Moore's petition despite his earlier comments in this case calling for the elimination of the post-conviction process.

Next Petitioner Moore makes the argument that Judge Ruehlman improperly ruled on his

post-conviction relief petition despite Ruehlman's earlier comments during the sentencing portion

of Moore's trial, in which he stated his opinion that post-conviction rights should not be offered.

(Petition, Doc. No. 29 at 27);(Brief, Doc. No. 115 at 58.) The comments in question were

reproduced above. This claim is procedurally defaulted as it was not brought at the proper time –

Petitioner filed no motion for disqualification with the Ohio Chief Justice as permitted for removing

a Common Pleas judge for bias – and Moore does not attempt to show cause for or prejudice arising

from such failure.

Alternatively, this Court notes that bias sufficient to justify recusal must be personal, arising

out of the judge's background rather than based on the judge's interpretation of the law. *Ullmo v.*

*Gilmour Academy*, 273 F.3d 671, 681 (6th Cir. 2001). "'Personal' bias is prejudice that emanates

from some source other than participation in the proceedings or prior contact with related cases.

Personal bias arises out of the judge's background and associations. The critical test is whether the

alleged bias 'stems from an extrajudicial source and results in an opinion on the merits on some

basis other than what the judge learned from his participation in the case.'" *Wheeler v. Southland*

*Corp.*, 875 F.2d 1246,1251-1252 (6th Cir. 1989). It is not sufficient to prove bias or prejudice if the

action arose out of the judge's view of the law, which may have been expressed by him in prior

cases or if upholding the law with vehemence. *Knapp v. Kinsey*, 232 F.2d 458 (6th Cir. 1956).

This portion of the claim is without merit.

> D.    Judge Ruehlman's conduct in other death penalty cases shows his actual or apparent bias against capital defendants and his hostility to their federal constitutional rights.
>
> E.    Judge Ruehlman's actual or apparent bias against criminal defendants and his hostility to their federal constitutional rights extends beyond capital cases.
>
> F.    Judge Ruehlman has said that he sees nothing wrong with his comments from the bench and that he makes these comments in order to "voice outrage on behalf of the victims."
>
> G.    Judge Ruehlman recently barred a member of the Ohio bar from practicing in his courtroom because he stated that he could not be fair to the lawyer based on the fact that the lawyer, an African-American, had been convicted of being an accomplice to an aggravated murder twenty-five years ago when he was sixteen years old.

(Petition, Doc. No. 29 at 27, 32, 33.)  The above claims have not been previously raised in any court.

Failure to raise a constitutional issue at all on direct appeal is subject to the cause and prejudice

standard of *Wainwright v. Sykes*, 433 U. S. 72 (1977). *Murray v. Carrier*, 477 U.S. 478, 485 (1986);

*Mapes v. Coyle,* 171 F.3d 408, 413 (6th Cir. 1999); *Rust v. Zent,* 17 F.3d 155 (6th Cir. 1994); *Leroy*

*v. Marshall*, 757 F.2d 94 (6th Cir. 1985).  Failure to present an issue to the state supreme court on

discretionary review constitutes procedural default. *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999).

In the case at bar Moore has pursued both his direct appeal and his post-conviction claims

to the Ohio Supreme Court.  Therefore, it is clear that Moore no longer has a remedy available to

him in the courts of the state pursuant to 28 U.S.C. § 2254(b)(1)(A) and the claims are procedurally

defaulted.  Petitioner makes no attempt to show cause for or prejudice arising from the failure to

bring the claims to overcome the default.

> H.    Judge Ruehlman had an apparent or actual bias against
>        Petitioner Moore and should have been recused or
>        disqualified at trial and on post-conviction.

This sub-claim appears to be merely a summary of the other portions of this claim and does

not require independent analysis.

Petitioner has not shown that any of these claims would have had merit if raised on direct

appeal.  Therefore the failure to raise them cannot have constituted ineffective assistance of appellate

counsel and the Fifth Ground for Relief should be denied.

### Sixth Ground for Relief

> At the mitigation phase, the trial court erroneously instructed that the
> jury's verdict had to be unanimous; this instruction was contrary to
> Ohio law and violated Petitioner Moore's rights, including his rights
> to due process, equal protection, a fair hearing, and a reliable
> sentence.

In his sixth ground for relief, Petitioner argues that the trial judge erred when he gave

improper jury instructions concerning unanimity and acquittal first. (Petition, Doc. No. 29 at 37); (Brief, Doc. No. 115 at 62.)  Respondent argues that this claim is procedurally defaulted as Petitioner failed to present this claim to the state courts, specifically to the Ohio Supreme Court on direct appeal. (Return, Doc. No. 31 at 67.)  Alternatively, Respondent asserts that this claim lacks merit. *Id*. at 68.

This claim is procedurally defaulted as it was based on the record and could have been brought on direct appeal.  It was, however, asserted as a basis for relief in the 26(B) Motion and this Court therefore considers the merits in determining whether it was ineffective assistance of counsel to fail to raise it on direct appeal.

In charging the jurors during the mitigation phase, the trial judge instructed:

> All twelve jurors must agree on a verdict.  If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then you must recommend to the Court a sentence of death as to that particular count.

> On the other hand, if, after considering all the relevant evidence admitted at the two trials and the arguments of counsel, you find that the State of Ohio failed to prove by proof beyond a reasonable doubt that the aggravating circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then you will not recommend to the Court a sentence of death as to that particular count of aggravated murder.

> In that event, you will determine which of two possible life imprisonment sentences to recommend to the Court as to that particular count of aggravated murder.

> Your recommendation to the Court shall be one of the following: (1) that Lee Moore be sentenced to life imprisonment with parole eligibility after twenty full years of imprisonment; or, (2) that Lee Moore be sentenced to life imprisonment with parole eligibility after

thirty full years imprisonment.

You must understand that you make one of these recommendations - -if you make one of these recommendations, it will be binding upon the Court and the Court must impose the specific life sentence you recommend. So if you make one of these recommendations of either twenty years to life or thirty years to life, it will be binding upon me, and I must impose the specific life sentence that you recommend.

In making your recommendation as to each count of aggravated murder, keep in mind that the fact there are some mitigating factors present does not preclude or prevent the death penalty if you find beyond a reasonable doubt that the aggravating circumstances still do outweigh the mitigating factors.

Now, the three possible sentencing recommendations as to each count will be in verdict forms which I'm about to read to you. You should not draw any inferences from the order in which these verdict forms are read to you. These are how my secretary gave them to me this morning.

(T.p. 1243-1245.)

Petitioner argues that this instruction is similar to the one given in *Mapes v. Coyle,* 171 F.3d

408, 413 (6th Cir. 1999). The instruction as given in that case was as follows:

On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, the other evidence, the unsworn statement of David Mapes, the evidence of the State of Ohio, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, David Mapes, was found guilty of committing outweigh the mitigating factors, then you will return your verdict reflecting your decision. That is, you must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors. In this event you will *then proceed* to determine which of two possible imprisonment sentences to recommend to the Court.

*Mapes v. Coyle,* 171 F.3d 408, 416 (6th Cir. 1999). Petitioner is erroneous in his assumption that the

language in the two cases is the same. Judge Ruehlman did not use the charging language which

74

insinuated the deliberations must be done in a certain order.  The instructions did not prohibit the jurors from considering mitigating factors until after they had unanimously rejected a death sentence, as Petitioner contends, but rather outlined for the jurors the sentencing options they would consider once they had considered all evidence from both phases of trial and weighed to determine if the State had or had not met its burden.  Therefore, unlike *Mapes*, there was not an acquittal-first instruction.

Next Petitioner challenges the unanimity portion of the instructions. (Petition, Doc. No. 29 at 37);(Brief, Doc. No. 115 at 71.)  He argues that the verdict forms, as verbally instructed and the written form, require a unanimous finding before considering a life sentence. *Id*.  The verdict forms in part stated:

> Now, the three possible sentencing recommendations as to each count will be in verdict forms which I'm about to read to you.  You should not draw any inferences from the order in which these verdict forms are read to you.  These are how my secretary gave them to me this morning.

> "We, the jury, unanimously find by proof beyond a reasonable doubt that the aggravating circumstance the defendant was found guilty of committing in Count 1 outweighs the mitigating factors, and, therefore, we do further hereby recommend to the Court that the sentence of death be imposed on the defendant . . . ."

> * * *

> "We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving thirty full years of imprisonment . . . ."

> * * *

> "We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors, and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment . . . ."

75

(T.p. 1246-1247.)  Twelve blank lines were provided at the bottom of each verdict form to be signed by the members of the jury.

This Court finds that the unanimity instruction goes to the *result* of the weighing, in that the jury had to be unanimous in their recommendation of sentence.  A reasonable juror would not take this language to impede his or her ability to consider and give effect to such mitigation factors nor that it required unanimity of all jurors as to the presence of a mitigating factor. *See Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998); *Eddings v. Oklahoma*, 455 U.S. 104 (1982).  The instructions as given comported with Moore's constitutional rights and the Sixth Ground for Relief is therefore without merit.

### Seventh Ground for Relief

> The prosecutor's misconduct at the mitigation phase closing argument when, among other things, he urged the sentencers to identify with the victim, violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.

In this ground for relief, Petitioner argues prosecutorial misconduct in closing argument in the mitigation phase as the prosecutor argued 1) personal feelings of the victim and speculated as to what the victim was feeling; 2) that the jury had a duty to impose death; 3) referenced non-statutory aggravating factors as a basis to return a death sentence; and 4) improperly commented on Moore's unsworn statement. (Petition, Doc. No. 29 at 39); (Brief, Doc. No. 115 at 74.)  Respondent argues that the majority of this claim is procedurally defaulted as it was not raised on direct appeal, specifically to the Ohio Supreme Court. (Return, Doc. No. 31 at 73.)  Alternatively, if not defaulted, Respondent argues that this claim is without merit and the Ohio Supreme Court's rejection of the claim was not contrary to nor an unreasonable application of United States Supreme Court

precedent. *Id.*

The portions of this claim alleging improper comments as to what the victim was thinking; commenting on the defendant's unsworn statement; and arguing that the nature and circumstances of the offense were aggravating circumstances, were all raised on direct appeal to the Ohio Supreme Court as the eleventh proposition of law. (Traverse, Doc. No. 81 at 28-32.) The remaining portions of this claim were raised in Petitioner's 26(B) Motion which the Ohio Supreme Court decided on the merits; this Court must therefore address the underlying merits to the extent they support an ineffectiveness of appellate counsel claim.

On habeas corpus review, the standard to be applied to claims of prosecutorial misconduct is whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process, *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Darden v. Wainright,* 477 U.S. 168 (1986); *Kincade v. Sparkman*, 175 F.3d 444 (6th Cir. 1999) or whether it was "so egregious as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117 (6th Cir. 1979); *accord Summitt v. Bordenkircher*, 608 F.2d 247 (6th Cir. 1979), *aff'd sub nom*, *Watkins v. Sowders*, 449 U.S. 341 (1981); *Stumbo v. Seabold*, 704 F.2d 910 (6th Cir. 1983). The court must decide whether the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt. *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982). The court must examine the fairness of the trial, not the culpability of the prosecutor. *Serra v. Michigan Department of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993) *quoting Smith v. Phillips*, 455 U.S. 209, 219 (1982). In *Serra*, the Sixth Circuit identified factors to be weighed in considering prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Id.,* at 1355-56 (*quoting Angel*, 682 F.2d at 608).  The misconduct must be so gross that there was

probable prejudice the defendant. *Prichett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997); *United*

*States v. Ashworth,* 836 F.2d 260, 267 (6th Cir. 1988).

      In his first sub-claim Petitioner argues that the prosecution improperly asked jurors to

identify with the victim and what he was feeling. (Petition, Doc. No. 29 at 39.)  Moore argues that

this was improper because it was based on facts not in evidence and Ohio's death penalty scheme

does not permit any consideration of victim impact type evidence or argument at the mitigation

phase. *Id*. at 40-41.

      For purposes of addressing this claim, portions of the closing argument are reproduced below:

> . . . . And think a minute what Melvin Olinger went through during that kidnapping.  That's really what you have to do in order to decide how much weight do I attach to that?
>
> You know, when he is first scooted over in his car, that's when the kidnapping began, and when they took him behind that building and said "Get out of the car," I'm sure he was thinking, "Thank God, I'm going to be let out here, I'm alive, take my car, take everything I have," and then he's put into that trunk.
>
> If you look at the weather report for that day, it started out, I think, at twenty-nine degrees at midnight the night before.  By 10 o'clock that night, it was down in single digits, somewhere around four or two or six degrees.  Just setting aside a moment the physical discomfort of not having a heavy coat on and being placed in that trunk, what went through his mind as he was driven from Fairfield back to Mount Healthy?
>
> And when they made that initial stop in Mount Healthy, I'm sure at that point--because it's in this little complex where there's a lot of apartments and cars and activity-- Mr. Olinger maybe there felt a little bit of relief that, you know, "I'm not anywhere out in the sticks, out in the boondocks.  I'm not going to be abandoned.  Maybe they're going to let me out here.  Maybe they're going to put me someplace."
>
> And I'm not sure exactly how much time he spent at that location, but a short time later the car started up again, and, again he's in the trunk, and, again, he's on a journey.  But when the car stopped that last time, I'm sure the sounds were a little bit different.

And you can tell from the photograph of that old Gilbert Machine Company, I believe it is, down in Cumminsville. It's a very, very desolate area. It's basically the perfect place to take someone if you want to get rid of them. And when the trunk lid opened, maybe there was a moment of hope for Mr. Olinger. You know, "They're going to let me out."

After all that time in the trunk, I'm sure he's freezing, he's cramped, he's been bounced around. Just for one moment maybe there was a little bit of hope for Mr. Olinger. But I'm sure when he got out and saw the .357 was still in the hands of Lee Moore, and he saw where he was, he knew- [Defense objection overruled]

He knew what was coming. And when he's marched back into that little cubbyhole behind the dumpster, that's the kidnapping. How much weight do you put in that? That's the aggravating factor. That's the second aggravating factor.

(T.p. 1194-1196.)

He's got a .357 on his lap. Mr. Olinger comes out of the bar and is confronted by Lee Moore. As Mr. Piepmeier said, there's your kidnapping. Can you imagine the terror he's going through at this point?

These are aggravating circumstances that you're balancing against mitigating. What did Mr. Olinger do to deserve this?

They pull around the building. He's ordered out, thrown in the trunk, six degrees maybe, in the trunk of a car; confined in an incredibly small place in freezing temperatures and driven quite some distance down to where Kinley stayed. Those are factors- -those are facts to weight[sic] in considering the aggravating circumstance against this mitigation.

He drives him down, the car stops for a while, Kinley gets in, Holmes gets out, and then there is a conversation. While he's in the trunk, he, Lee Moore, is saying he's got a guy in the trunk he's going to kill. Can you imagine the abject terror Melvin Olinger has at this point? [Defense objection overruled].

They drove to the factory. Again, he's ordered out at gunpoint. Is the trunk open or shut? It doesn't matter. Does it really matter? He gets him out of the car. Was he begging for his life? You bet he was. [Defense objection overruled].

(T.p. 1231-1232.) During the State's closing argument, defense counsel objected and asked the

court for a curative instruction:

> Judge, at this point I'm going to ask the Court to instruct the jury to disregard the comments of the prosecutor, both Mr. Piepmeier and Mr. Deters, as to the suffering of the victim at the time this offense. . . . Mr. Deters talked about the defendant laying [sic] in the trunk shivering, with what array [sic] of hope he must have had when the trunk was opened. Mr. Deters talked about the abject terror of Melvin Olinger begging for his life. In *State v. Combs*, (1991) 62 Ohio St.3d 278, the Court, the Supreme Court specifically found that this is error to speculate at length about what the victims thought as they were confronted by the defendant. I'm reading from that particular case. The prosecutor did err. The prosecutor did improperly suggest that how the victims were killed and the suffering and the mental anguish the victims endured was an aggravating circumstance. Improperly injecting nonstatutory aggravating circumstances is error. By continually referring to what the victims were thinking, the prosecutor engaged in gross misconduct.

(T.p. 1251-1252.)  No curative instruction was given.  Instead the trial judge stated that

> They sure can. They can draw an inference, if you're stuck in a trunk in six degrees outside, or single digits outside, and you're stuck in a trunk with no coat on, you're going to be shivering and be scared after having somebody point a gun at you. I think they're just drawing inferences from the facts that were presented. So I have no problem with that. I don't think it's speculation at all, just fact.

(T.p. 1253-1254.)

In addressing these sub-claims, the Ohio Supreme Court held that:

> During closing argument at the penalty phase, the prosecutor made the following statements: "[W]hen he [Olinger] got out [of the trunk] and saw [the gun] * * *, and he saw where he was, * * * he knew what was coming"; "[T]hink a minute what Melvin Olinger went through during that kidnapping"; and "[M]aybe there was a moment of hope for Mr. Olinger. You know. 'They're going to let me out.'" Moore objected to the first comment but not the other two, which are waived absent plain error. *Slagle, supra*, 65 Ohio St.3d at 604, 605 N.E.2d at 924-925. Moore contends that the statements impermissibly used facts not in evidence to appeal to the passions and prejudice of the jury.

> Prosecutorial comments continually referring to what the victim was thinking are improper because they ask the jury to speculate on facts not in evidence. *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077. While the prosecution is entitled to a certain

80

degree of latitude in summation, *see State v. Liberatore* (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566, comments such as those complained of here are speculative and therefore improper. *Combs, supra.* Even so, these comments did not deprive Moore of a fair sentencing determination or prejudicially affect any other substantial right. *See State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

The prosecutor stated, "Their last piece [of mitigation] is the defendant's statement, unsworn statement, so he does not have to face any cross-examination or face any tough questions from the prosecutors. And you can consider that when you consider his credibility as a witness." Moore contends that this statement was impermissible. *See DePew, supra*, 38 Ohio St. 3d at 285, 528 N.E.2d at 554.

In *DePew*, we held that "the prosecution may comment that the defendant's statement has not been made under oath * * *, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." *Id.* at paragraph two of the syllabus.

In *Lorraine, supra* 66 Ohio St.3d at 419, 613 N.E.2d at 218, we stated that the prosecutions comments concerning the lack of cross-examination when a defendant makes an unsworn statement during the mitigation phase exceeded the limits of *DePew*. More recently, in *State v. Davis* (1996), 76 Ohio St.3d 107, 120, 666 N.E.2d 1099, 1110, this court found that prosecutorial comment on the lack of cross-examination was "consistent with *DePew*." We conclude that the prosecutor's comments did not prejudicially affect a substantial right.

*State v. Moore*, 81 Ohio St. 3d 22, 33-34 (1998).

In evaluating for prosecutorial misconduct this Court must consider whether the remarks had a tendency to mislead the jury and to prejudice the defense. Petitioner stated that the closing argument in his case was relatively short, comprising only twenty-one pages of transcript. (Brief, Doc. No. 115 at 84.) However, he alleges that prosecutors' remarks were extensive throughout the closing arguments. *Id.* He further argues that the extensiveness of the improper comments throughout the closing demonstrates that the comments were done purposely as a product of strategy, as opposed to a momentary emotional outburst. *Id.* Finally, he makes the argument that

the evidence against him was not overwhelming as he presented evidence in mitigation. (Brief, Doc. No. 115 at 85.)

This Court agrees that the comments were improper. It is particularly disturbing that, instructed by the Ohio Supreme Court in *Combs, supra*, to avoid such remarks, the Hamilton County Prosecutor's office which tried the Combs case, and indeed Mr. Deters himself, saw fit to repeat the same sort of remarks.

It is not, however, enough that the "prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) *citing Darden v. Wainwright*, 699 F.2d 947, 1036 (MD. Fla. 1981). In order to succeed on this claim, the remarks must have been so egregious as to infect the entire trial with unfairness. *Id*. The prosecutors' comments, as a whole, did not deny Petitioner his right to a fundamentally fair trial. Therefore the Ohio Supreme Court's decision is not an unreasonable application of clearly established United States Supreme Court precedent.

Petitioner argues that in addition, the prosecutor improperly argued that it was the jury's responsibility to seek or impose the death penalty. (Petition, Doc. No. 29 at 41.) Petitioner fails to supply the actual text to which he is objecting, so in an abundance of caution this Court has considered the State's entire closing argument. The State did remind jurors that they had a duty, but that this duty was to "decide this case on the law." (T.p. 1192.) This comment was not improper nor did it prejudice the Petitioner. This sub-claim is without merit.

Next Moore alleges that there was prosecutorial misconduct as a result of the state's arguing non-statutory aggravating circumstances. (Petition, Doc. No. 29 at 41);(Brief, Doc. No. 115 at 79.). Respondent argues that this claim is procedurally defaulted as Petitioner failed to object at trial. (Return, Doc. No. 31 at 77.) This Court agrees. Ohio's contemporaneous objection rule states that parties must preserve errors for appeal by calling them to the attention of the trial court at a time

when the error could have been avoided or corrected, set forth in *State v. Williams,* 51 Ohio St. 2d

112 (1977); *see also State v. Mason*, 82 Ohio St. 3d 144, 162 (1998). This rule is an adequate and

independent state ground, thus this claim is procedurally defaulted. *Mason v. Mitchell*, 320 F.3d 604

(6th Cir. 2003) *citing Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Scott v. Mitchell*, 209 F.3d

854 (6th Cir. 2000) *citing Engle v. Isaac,* 456 U.S. 107, 124-29 (1982). *See also Seymour v. Walker*,

224 F.3d 542, 557 (6th Cir. 2000).

However, Petitioner did raise this claim in his 26(B) Motion and the Court must address the

merits to the extent it acts as an underlying ground for ineffective assistance of appellate counsel.

In support of this claim, Petitioner specifically points to the portion of the State's closing

in which they argued:

> But if you really look at it and you really want to assign some weight
> to that, the real strength of that factor from the State's point of view
> is that Lee Moore put that type of value on someone's life; that to get
> a hat and to get a sweatshirt and to drive around in a nice car and to
> get some chains to wear and a gold nugget ring, he robbed for all
> those; that that means more to him than someone's life; and back on
> January 14th, the ability to get those items meant more to him than
> Melvin Olinger. And that's what you consider when you weigh the
> aggravating factor.

(T.p. 1193-1194.)

In addressing this claim for plain error on direct appeal, Ohio Supreme Court held:

> The prosecutor stated, "These are all the facts that are aggravating
> circumstances to be weighed against the total void of mitigation
> presented to you today." Under our decision in *State v. Wogenstahl*
> (1996), 75 Ohio St. 3d 344, 662 N.E. 2d 311, paragraph two of the
> syllabus, this comment was clearly improper because it elevates the
> nature and circumstances of the crime to the level of aggravating
> circumstances. However, no objection was raised to this statement,
> and we find it was not prejudicial.
>
> As noted above, none of the prosecutor's comments taken separately
> prejudiced any substantial rights. While some of the comments were
> improper, even when viewed collectively, we conclude that they did
> not prejudice any substantial rights of Moore. The eleventh
> proposition of law is rejected.

*State v. Moore*, 81 Ohio St. 3d 22, 35 (1998).

The Ohio Supreme Court's decision is neither contrary to nor an unreasonable application of federal constitutional law. In charging the jury at the end of the mitigation phase, the judge gave clear instructions as to what aggravating circumstances should be considered and weighed by the jurors. In addition, the judge reminded the jurors that neither the opening statements of the attorneys nor the closing arguments were in evidence. (T.p. 1237.)

Furthermore, "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990); *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003); *State v. Slagle* , 65 Ohio St. 3d 597 (1992). The Ohio Court of Appeals and Supreme Court both complied with Ohio Revised Code §§ 2929.03 (D)(3) and 2929.05 (A) by independently reviewing and weighing all of the facts and evidence disclosed in the record in the case, considering the offense and the offender, determining whether the aggravating circumstances that Moore was found guilty of committing outweighed the mitigating factors in the case, and whether the sentence of death was appropriate. Therefore any error would be devoid of constitutional import and does not support any claim of ineffective assistance of appellate counsel..

Finally Petitioner argues that the prosecutor improperly commented on the fact that Moore was not subject to cross-examination when he made his unsworn statement and argued that the jury could consider this in making their determination. (Petition, Doc. No. 29 at 41.) Moore makes the argument that this infringed upon his constitutional rights to make a statement. *Id*. Specifically, Petitioner cites to the portion of the record in which the State argued "But what's their last piece of mitigation? Their last piece is the defendant's statement, unsworn statement, so he does not have to face any cross-examination or face any tough questions from the prosecutors." (T.p. 1227. ) The

State later argues, "[i]f there is some pig [sic] mystery why he went to Butler County besides that, why didn't he tell you that today in his unsworn statement?" (T.p. 1231.)  It is not improper for a prosecutor to argue that an unsworn statement by an accused was not made under oath and therefore was not subject to cross-examination. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000); *Mason v. Mitchell*, 95 F. Supp. 2d 744, 785 (N.D. Ohio 2000); *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 827 (N.D. Ohio 2001); *see also Franklin v. Anderson*, 2002 U.S. Dist. LEXIS 26814.

This claim is without merit.  Therefore, there was no ineffectiveness of appellate counsel in their failure to raise this claim on appeal and any such alleged ineffectiveness cannot serve as cause to excuse the procedural default in failing to make a contemporaneous objection.


### Eighth Ground for Relief

Petitioner Moore's appellate counsel on his appeal to the Ohio Supreme Court rendered ineffective assistance because they never met with Petitioner Moore to discuss this appeal, never showed him a copy of the appellate brief before it was filed, and failed to raise meritorious issues. This violated Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.


In this ground for relief Petitioner argues ineffective assistance of appellate counsel. (Petition, Doc. No. 29 at 43.);(Brief, Doc. No. 115 at 87.)  Respondent argues that this ground for relief is procedurally defaulted as he failed to raise this claim in the Ohio courts. (Return, Doc. No. 31 at 78.)

      1.    Moore's appellate counsel failed to consult with him prior to filing his appeals.

Petitioner argues that his representation on direct appeal to the Ohio Supreme Court by Elizabeth Agar and Julia Sears was ineffective in that they failed to consult with him before filing his brief. (Petition, Doc. No. 29 at 43.).  Respondent is correct in that the portion of the claim

arguing appellate counsels' ineffectiveness in their failure to meet with Moore to discuss the appeal and that they did not allow him to review the brief prior to filing it with the Supreme Court is procedurally defaulted. Petitioner did not raise this claim in the Ohio courts at any stage and is now precluded from doing so absent a showing of cause and prejudice. Petitioner fails to establish either.

> 2.     Moore's appellate counsel failed to present significant claims
>         of constitutional error.

Next, Petitioner argues that his appellate counsel were ineffective in their failure to raise several substantial claims on appeal. He states that this failure fell below the range of competence as counsel did not exercise reasonable professional judgment in presenting the claims to the state appellate courts.

Petitioner filed and pursued an Application for Delayed Reopening of Direct Appeal in both the Ohio First District Court of Appeals and the Ohio Supreme Court. The court of appeals held that Petitioner failed to show good cause for the delay and the claims were barred under the Ohio criminal *res judicata* rule of *State v. Perry*, 10 Ohio St. 2d 175 (1967). *State v. Moore*, Appeal No. C-950009 (Ohio App. 1st Dist. 2001)(unreported).

The Ohio Supreme Court affirmed the denial of reopening, but did so on the merits, rather than on the procedural grounds found by the Court of Appeals, writing:

> We have reviewed Moore's assertions of deficient performance by
> appellate counsel and find that Moore has failed to raise a "genuine
> issue as to whether [he] was deprived of effective assistance of
> counsel on appeal" before the application can be granted, as required
> under App. R. 26(B)(5).

*State v. Moore*, 93 Ohio St. 3d 649 (2001). Because the motion was addressed on the merits, this Court must consider the underlying claims to the extent they support the ineffective assistance of appellate counsel claim.[11]

---

[11] In 2000 the Ohio Supreme Court began ignoring the lower courts dismissals of Rule 26(B) applications as untimely and affirming the dismissal of the applications on the merits. *See State v. Mack*, 101 Ohio St. 3d 397

In his 26(B) Motion, Petitioner included the following as alleged errors that appellate counsel failed to raise:

1.    Mr. Stidham's undisclosed conflict of interest violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to counsel, due process, equal protection, a fair proceeding, and a reliable sentence.

2.    The ineffectiveness at the mitigation phase of trial counsel and Mr. Stidham violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to counsel, not to incriminate himself, due process, equal protection, a fair proceeding, and a reliable sentence.

3.    Trial counsel's ineffectiveness at the liability phase violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to counsel, due process, equal protection, and a fair hearing.

4.    The trial judge (1) was not impartial; and (2) made erroneous rulings throughout the proceedings, all violating Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to an impartial tribunal, due process, equal protection, a fair proceeding, and a reliable sentence.

5.    The trial court's erroneous mitigation phase instructions (and trial counsel's failure to object to such instructions) violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.

6.    The selection of the grand jury foreperson and the

(Ohio 2004); *State v. Goff*, 98 Ohio St. 3d 327(Ohio 2003); *State v. Mitts*, 98 Ohio St. 3d 325 (Ohio 2003); *State v. Bryant-Bey*, 97 Ohio St. 3d 87 (Ohio 2002); *State v. Sneed*, 96 Ohio St. 3d 348 (Ohio 2002); *State v. Davie*, 96 Ohio St. 3d 133(Ohio 2002); *State v. Smith*, 95 Ohio St. 3d 127 (Ohio 2002); *State v. Sanders*, 94 Ohio St. 3d 150 (Ohio 2002). *See State v. Moore*, 93 Ohio St. 3d 649 (Ohio 2001); *State v. Carter*, 93 Ohio St. 3d 581 (Ohio 2001); *State v. Biros*, 93 Ohio St. 3d 250 (Ohio 2001); *State v. Brooks*, 92 Ohio St. 3d 537 (Ohio 2001); *State v. Jalowiec*, 92 Ohio St. 3d 421 (2001); *State v. Palmer*, 92 Ohio St. 3d 241 (Ohio 2001); *State v. Hooks*, 92 Ohio St. 3d 83 (Ohio 2001); *State v. Bradley*, 91 Ohio St. 3d 570 (Ohio 2001); *State v. Sheppard*, 91 Ohio St. 3d 329 (Ohio 2001); *State v. Hill*, 90 Ohio St. 3d 571 (Ohio 2001); *State v. Jells*, 90 Ohio St. 3d 454 (Ohio 2000). Recently, in yet another reversal of practice, the Ohio Supreme Court has renewed affirming the dismissal of Rule 26(B) applications in capital cases as untimely. *See State v. Gumm*, 103 Ohio St. 3d 162 (Ohio 2004); *State v. LaMar*, 102 Ohio St. 3d 467 (Ohio 2004); *see also State v. Myers*, 102 Ohio St. 3d 318 (Ohio 2004) (court affirms dismissal as the application was both untimely and meritless).

underrepresentation of minorities and women as grand jury
forepersons (and trial counsel's failure to investigate or raise
this issue) violated Appellant's federal constitutional rights
under the 5th, 6th, 8th, and 14th Amendments, including his
rights to due process, equal protection, a fair cross-section,
and a fair proceeding.

7.    Errors during voir dire violated Appellant's federal
constitutional rights under the 5th, 6th, 8th, and 14th
Amendments, including his right to due process, equal
protection, a fair proceeding, an impartial jury, and a reliable
sentence.

8.    The sentencers' decisions were based on improper and non-
statutory aggravating factors, violating Appellant's federal
constitutional rights under the 5th, 6th, 8th, and 14th
Amendments, including his rights to due process, equal
protection, a fair proceeding, a reliable sentence, and to be
free from cruel and unusual punishment.

9.    The sentencers failed to consider and give effect to
uncontradicted mitigating evidence, violating Appellant's
federal constitutional rights under the 5th, 6th, 8th and 14th
Amendments, including his rights to due process, equal
protection, a fair proceeding, a reliable sentence, and to be
free from cruel and unusual punishment.

10.   The trial judge (A) erroneously denied trial counsel's requests
for proper mitigation instructions; and (B) gave erroneous
mitigation instructions (some of which trial counsel failed to
object to), all in violation of Appellant's federal constitutional
rights under the 5th, 6th, 8th, and 14th Amendments, including
his rights to due process, equal protection, a fair proceeding,
a reliable sentence, and to be free from cruel and unusual
punishment.

11.   The trial judge ordered the courtroom doors to be locked,
violating Appellant's federal constitutional rights under the
5th, 6th, 8th, and 14th Amendments, including his right to a
public trial, due process, and equal protection.

12.   The State committed misconduct in violation of Appellant's
federal constitutional rights under the 5th, 6th, 8th, and 14th
Amendments, including his rights to due process, equal
protection, a fair trial, an impartial jury and trial judge, and
effective assistance of counsel.

13.   The use of duplicative specifications to the aggravated

murder counts, the use of the same operative facts to elevate murder and then to capital aggravated murder, and the submission to the jury of all these counts violated Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

14.   The courts that heard Appellant's direct appeal lacked jurisdiction, violating Appellant's federal constitutional rights under the 5th, 6th, 8th, and 14th Amendments, including his rights to due process and equal protection.

(Return, Doc. No. 31, 26 B, Vol. I);(Brief, Doc. No. 115 at 91.)

Additionally he argues that counsel failed to adequately brief the following assignments of error:

1.   The trial court's sentencing decision being based upon the nature and circumstances of the offense, including this decision being a due process violation

2.   The trial court's denial of proposed mitigation instructions regarding the sufficiency of a single mitigating factor;

2.[sic]   Appellant's substance use at the time of the offense as a mitigating factor for a specific mitigation instruction for the jury to consider Appellant's impairment at the time of the offense (due to his ingestion of substances) as a mitigating factor;

3.[sic]   lack of unanimity of agreement on the existence of a mitigation factor; to instruct the jury that it need not unanimously agree on the existence of a mitigating factor;

5.   To instruct the jury regarding the sufficiency of a single mitigating factor to support a non-death verdict.

*Id.*

"It is not required that an attorney argue every conceivable issue on appeal, especially when some may be without merit. Indeed, it is his professional duty to choose among potential issues, according to his judgment as to their merit and his tactical approach." *Strickland v. Washington, supra;Jones v. Barnes*, 463 U.S. 745 (1983). It is the job of appellate counsel to provide effective

advocacy and in the process "winnow out" the weaker claims on appeal. *Smith v. Murray*, 477 U.S. 527, 536 (1986); *Jones v. Barnes*, *supra*.

Most, if not all, of the claims underlying Moore's ineffective assistance appellate counsel ground for relief are asserted as separate grounds for relief in his Petition. Thus, to the extent that they have been preserved, this Court has considered whether Moore's claims of defense counsel's ineffectiveness, trial court error, and prosecutorial error are meritorious in their own right and as claims that underlie his ineffective assistance of appellate counsel claims. Because grounds for relief number one, five, seven, nine, ten, thirteen, fifteen, seventeen, eighteen, and twenty-one have been found to be without merit, appellate counsels' failure to raise those issues as error on appeal cannot reasonably be characterized as deficient. A portion of Petitioner's Second Ground for Relief was found to have merit. However, because Petitioner was represented by trial counsel on his first appeal, and new counsel was precluded from bringing the claim on direct appeal to the Ohio Supreme Court, appellate counsel can not be held to have been ineffective. The ineffective assistance of trial counsel claim was brought properly during post-conviction relief, the only time Petitioner, in this situation, could do so.

Therefore Petitioner has not established that he suffered ineffective assistance of appellate counsel, except insofar as this Court has found the Second Ground for Relief to have merit in part. Because of the Magistrate Judge's recommendation below as to that Ground for Relief, insofar as it underlies this Eighth Ground for Relief and the Magistrate Judge's recommendation is adopted, this Eighth Ground for Relief will be moot. If, however, the District Court rejects the Magistrate Judge's recommendation on the Second Ground for Relief, it should conclude that Petitioner suffered ineffective assistance of counsel insofar as the claim made in the Second Ground was not raised on appeal.

**Ninth Ground for Relief**

> The selection of the grand jury foreperson and the underrepresentation of minorities and women as grand jury forepersons in Hamilton County violated Petitioner Moore's rights, including his rights to due process, equal protection. A fair cross-section, and a fair proceeding.

In his next ground for relief, Petitioner argues that his rights were violated because the selection process of the grand jury foreperson and grand jury members in Hamilton County results in an underrepresentation of minorities and women. (Petition, Doc. No. 29 at 45);(Brief, Doc. No. 115 at 93.)  Respondent argues that this claim is procedurally defaulted as Petitioner failed to raise this claim in the state courts and cannot demonstrate cause for this failure or prejudice resulting from the failure to raise the claim. (Return, Doc. No. 31 at 80-81.)  Alternatively, Respondent argues that this claim is without merit. *Id.*

Petitioner asserts that he can demonstrate cause in failing to raise this claim at the proper time because of ineffective assistance of appellate counsel.  It plainly could not have been ineffective assistance of appellate counsel to fail to raise this claim on direct appeal because it relies on substantial material outside of the record which could not have been added to the record on direct appeal.  Instead, it would have had to be added as part of a post-conviction relief petition under Ohio Revised Code § 2953.21.  Because it was not ineffective assistance of appellate counsel to attempt to do something Ohio law does not allow, Petitioner has not shown excusing cause for his failure to present this claim in the Ohio courts.

Alternatively, the claim is without merit.  The Supreme Court has set out the following as necessary in making a prima facie case of discrimination in selection of grand jury members:

> In order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial under representation of his race or the identifiable group to which he belongs.  The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or

91

applied . . . . Next the degree of under representation must be proved by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time . . . . Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing . . . . Once the defendant has shown substantial under representation of his group, he has made a prima facie case of discriminatory purpose and the burden then shifts to the state to rebut the case.

*Castaneda v. Partida*, 430 U.S. 482, 494-495 (1977).

Petitioner fails to argue how the procedure to select of grand jury members results in the under representation of minorities, rather he goes directly into arguing improper selection of the foreperson. Because he has not even attempted to establish the required prongs, Petitioner has failed to make a prima facie case as to discrimination of grand jury members. This Court now turns to that portion of his sub-claim dealing specifically with the foreperson.

The position of the grand jury foreperson is not derived from the Constitution but rather from statutory law for the administrative convenience of the court. In *Hobby* the Supreme Court held that any discrimination in the selection of the grand jury foreperson, as distinguished from discrimination in the selection of the grand jury itself, does not threaten the interests of the defendant. *Hobby v. United States*, 468 U.S. 339, 344 (1984). The Court based this on the fact that "the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment." *Id*. at 345. It concluded that reversal of a criminal defendant's conviction would be an inappropriate remedy as the impact from the violation would play a minor part in federal prosecutions. *Id*. at 350. The role of the foreperson in Ohio is similar to the role of the federal foreperson as discussed in *Hobby v. United States*. Portions of Ohio Rules of Criminal Procedure Rule 6 state:

A) Summoning grand juries. The judge of the court of common pleas for each county, or the administrative judge of the general division in

a multi-judge court of common pleas or a judge designated by him, shall order one of more grand juries to be summoned at such times as the public interest requires. The grand jury shall consist of nine members, including the foreman, plus not more than five alternates.

* * * *

C) Foreman and deputy foreman. The court may appoint any qualified elector or one of the jurors to be foreman and one of the jurors to be deputy foreman. The foreman shall have power to administer oaths and affirmations and shall sign all indictments. He or another juror designated by him shall keep a record of the number of jurors concurring in the finding of every indictment and shall upon the return of the indictment file the record with the clerk of court, but the record shall not be made public except on order of the court. During the absence or disqualification of the foreman, the deputy foreman shall act as foreman.

Petitioner is not able to establish prejudice. This claim is without merit.


### Tenth Ground for Relief

The underrepresentation of minorities in the grand jury and petit jury venires in Hamilton County-including Petitioner Moore's petit jury venire - violated Petitioner Moore's rights, including his rights to due process, equal protection, a jury drawn from a fair cross-section of the community, and a fair proceeding.

In his tenth ground for relief, Petitioner claims that his rights were violated due to the underrepresentation of minorities in the grand jury and petit jury venires in Hamilton County. (Petition, Doc. No. 29 at 47.) Respondent argues that this claim is procedurally defaulted as a result of Petitioner's failure to present the claim on his direct appeal to the Ohio Supreme Court. (Return, Doc. No. 31 at 82.)

Petitioner counters by arguing that the portion of this claim relating to the petit jury venire was raised on both intermediate direct appeal as the eighth assignment of error and on direct appeal to the Ohio Supreme Court as the fifth proposition of law. (Traverse, Doc. No. 81 at 36.) Additionally, the portion addressing the grand jury was raised in Petitioner's 26(B) Motion as the

6th claim, and as such, this Court may address it to the extent it affects the ineffective assistance of appellate counsel claim.

For reasons set forth in the Ninth Ground for Relief, the portion of this claim pertaining to grand juries is procedurally defaulted.

In addressing the portion of this claim concerning petit juries, the Ohio Supreme Court held:

> In his fifth proposition of law, Moore raises two arguments concerning the composition of the venire. First, Moore contends that the trial court erred in refusing a continuance to allow him to present evidence supporting his motion for a reconstituted venire. Moore alleges that the venire was composed unfairly because a large percentage of African-Americans are not registered to vote and therefore only five of the fifty members composing the jury pool were African-Americans. Moore asserted at the beginning of voir dire that such a venire did not represent a fair cross-section of the community, and that use of licensed drivers lists or Social Security numbers would attain a fairer representation from the black community. The court denied Moore's motion for a continuance and overruled his motion for a new venire.
>
> The decision to grant a continuance is within a trial court's discretion. *State v. Claytor* (1991), 61 Ohio St. 3d 234, 241, 574 N.E.2d 472, 478. "In order to establish a violation of the fair representative cross-section of the community requirement for a petit jury array * * *, a defendant must prove: (1) that the group alleged to be excluded is a 'distinct' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton* (1991), 57 Ohio St. 3d 120, 5666 N.E.2d 1195, paragraph two of the syllabus, following *Duren v. Missouri* (1979), 439 U.S. 357, 364, 99 S. Ct. 664, 668, 58 L. Ed. 2d 579, 586-587.
>
> Assuming that Moore can prove the first prong of the *Fulton* test, we move to the second prong. He has not adequately proven that African-Americans in Hamilton County are unfairly represented in venires in relation to their number in the community. He merely alleges that in this particular venire, the percentage of blacks in the jury pool did not equal the percentage of blacks in Hamilton County.
>
> Further, Moore cannot satisfy the third prong of *Fulton*. The use of voter registration rolls as exclusive sources for jury selection is constitutional and "does not systematically, [or] intentionally,

exclude any [economic, social, religious, racial, political and geographical group of the community]." *State v. Johnson* (1972), 31 Ohio St. 2d 106, 114, 60 Ohio Op. 2d 85, 90, 285 N.E.2d 751, 757; *State v. Spirko* (1991), 59 Ohio St. 3d 1, 35-36, 570 N.E.2d 229, 265. Thus, the trial court did not err in failing to grant Moore's motion for a new venire or abuse its discretion in failing to grant him a continuance to gather evidence in support of his motion. *Maurer, supra*, 15 Ohio St. 3d at 250, 15 Ohio B. Rep. At 389, 473 N.E.2d at 780.

*State v. Moore*, 81 Ohio St. 3d 22, 27-28 (1998).

For the reasons set forth in the Fifth Ground for Relief, subclaim A, portion one, this Court finds Petitioner's argument that his petit jury venire failed to represent a fair-cross-section of the community is without merit. (Petition, Doc. No. 29 at 48-49);(Brief, Doc. No. 115 at 98.)  The analysis used shows that there was not a systematic exclusion of African-Americans, nor any other group of the community, in selecting the jury pool.  Potential jurors are selected from voter registration lists and the use of voter rolls as opposed to driver's license lists does not create a representative cross-section claim. *State v. Moore*, *citing State v. Fulton,* 57 Ohio St. 3d 120 (1991), *following Duren v. Missouri*, 439 U.S. 357, 364 (1979).  This claim is without merit and appellate counsel were not ineffective in failing to raise he grand jury portion of this claim on direct appeal.

### Eleventh Ground for Relief

Hamilton County's overprosecution of people charged with homicide violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, and a reliable sentence.

In his eleventh ground for relief, Petitioner makes the argument that his rights were violated as a result of Hamilton County's overprosecution of people charged with homicide. (Petition, Doc. No. 29 at 50);(Brief, Doc. No. 115 at 100.)

Petitioner has withdrawn this Ground for Relief. (Brief, Doc. No. 115 at 100.)

**Twelfth Ground for Relief**

> Petitioner Moore was denied his rights to counsel, due process, equal protection, a fair proceeding, an impartial tribunal, a reliable sentence, and an adequate corrective process during his post-conviction proceedings.

Next Petitioner alleges that his rights to counsel, due process, equal protection, a fair proceeding, an impartial tribunal, a reliable sentence, and an adequate corrective process in post-conviction proceedings were violated. (Petition, Doc. No. 29 at 52.) Respondent counters that the claim is procedurally defaulted as Petitioner failed to present this claim in the state courts. (Return, Doc. No. 31 at 90.) Additionally, Respondent contends that collateral review is not constitutionally mandated. *Id*. at 91. Therefore, the Ohio courts' rejection of Petitioner's claim was neither contrary not an unreasonable application of U.S. Supreme Court law. *Id*. at 94.

Petitioner counters this procedural default argument by asserting that this claim could not have been raised on direct appeal because errors had not yet occurred. (Traverse, Doc. No. 81 at 39.) Additionally, even if procedurally defaulted, a biased judge is a structural error and the judge should have been required to recuse himself even absent counsel raising the issue. *Id*.

Petitioner has withdrawn one portion of this claim, the Court has previously dealt with sub-section B in a prior ground for relief, and the last sub-claim is not cognizable under federal law.

> A. Petitioner Moore's representation during state post-conviction proceedings was so inadequate and lacking in investigation and preparation as to violate Petitioner Moore's due process and equal protection rights.

Petitioner has withdrawn this portion of the Ground for Relief. (Brief, Doc. No. 115 at 100.)

> B. Judge Ruehlman should have recused or disqualified himself from participating in those proceedings due to his bias against Petitioner Moore.

This claim was address in the Fifth Ground for Relief, sub-claims B, C(5) and H. For the reasons stated above, this claim is without merit.

C.    The post-conviction process in Ohio is not an adequate corrective process.

Next Petitioner argues that Ohio Revised Code § 2953.21 does not provide an adequate corrective process due to limitations placed on the remedy by the Ohio Supreme Court. (Petition, Doc. No. 29 at 53);(Brief, Doc. No. 115 at 102.)

Federal habeas corpus is not the proper place to bring forth challenges to a state's scheme of post-conviction relief. *Kirby v. Dutton*, 794 F.2d 245, 247 (6th Cir. 1986). When a prisoner challenges errors or deficiencies in state post-conviction proceedings such claims address collateral matters rather than the underlying state conviction giving rise to the prisoner's incarceration. *Id.* at 247. Any challenges or amendments to the interpretation of Ohio's appellate and post-conviction remedies belongs with the highest judicial tribunal of Ohio, not with this Court. *Keener v. Ridenour*, 594 F.2d 581, 590 (6th Cir. 1979). Furthermore, the Supreme Court of the United States has held that there is no obligation on the part of the states to provide post-conviction relief remedies. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987); *United States v. MacCollom*, 426 U.S. 317, 323 (1976). This claim is not cognizable under 28 U.S.C. § 2254 as there is not a federal constitutional violation.


**Thirteenth Ground for Relief**

Errors during voir dire, including the prosecutors' racially biased peremptory challenge of an African-American woman, resulted in a biased jury that was organized to return a death verdict in violation of Petitioner Moore's rights, including his right to due process, equal protection, a fair proceeding, and impartial jury, and a reliable sentence.

In his thirteenth ground for relief, Petitioner argues that his rights were violated during voir dire, due to multiple factors, such as pre-trial publicity and a voir dire procedure which resulted in organizing a jury to return a death verdict. (Petition, Doc. No. 29 at 56);(Brief, Doc. No. 115 at 105.)

Respondent argues that the portion of this claim pertaining to trial counsels' failure to explore juror bias and permitting Juror England to sit on the jury is procedurally defaulted because Petitioner failed to properly present it during direct appeal to the Ohio Supreme Court. (Return, Doc. No. 31 at 97-104.)  Additionally, Respondent argues that the remaining portions of this claim are without merit. *Id*. at 94-105.

For reasons set forth in the Second Ground for Relief, the portions of this claim asserting ineffectiveness of trial counsel could not have been brought on direct appeal and may be addressed by this Court.

Furthermore, numerous portions of this claim served as underlying claims to the claim of ineffectiveness of appellate counsel claims in Petitioner's 26(B) Motion.  These include denial of his motion for a change of venue, instructions on how to follow the law, improper questions, denying counsel the opportunity to discuss mitigating factors, prosecutorial misconduct in asking jurors to rate their beliefs on a scale of one to ten, preventing counsel from fully exploring potential juror biases, and ineffectiveness of counsel in their failure to excuse Juror England.  (Traverse, Doc. No. 81 at 40.)  Therefore  this Court must consider the merits to the extent that they support the claim of ineffective assistance of appellate counsel.

First Petitioner argues that his rights were violated because his motion for a change of venue was denied and as a result his trial was held in Hamilton County. (Petition, Doc. No. 29 at 56);(Brief, Doc. No. 115 at 106.)  He argues that this resulted in the case being tried in a community where the media coverage of the crime and the trials of his co-defendants was pervasive, thus exposing potential jurors to substantial adverse pre-trial publicity. *Id*.  As a result, there was a risk that a jury picked from this county would be more likely to return a death verdict. *Id*.

The United States Supreme Court has held:

> It is not required, however, that the jurors be totally ignorant of the
> facts and issues involved.  In these days of swift, widespread and

> diverse methods of communication, an important case can be
> expected to arouse the interest of the public in the vicinity, and
> scarcely any of those best qualified to serve as jurors will not have
> formed some impression or opinion as to the merits of the case.

*Irvin v. Dowd*, 366 U.S. 717, 722 (1961)(holding that potential jurors, 90% of whom admitted to

having an opinion of defendant's guilt prior to the trial, could not escape pre-trial publicity and

opinions due to numerous newspaper headlines, articles, cartoons, and pictures dating back

approximately six to seven months before trial in conjunction with extensive coverage on local

television and news radio consisting of defendant's background information, alleged prior juvenile

and adult convictions, accusations of parole violations, identification results of the police line up,

comments on defendant's failure to take a lie detector test, an alleged confession, and commentary

that defendant had offered a pleas bargain to avoid the death penalty); *see also Sheppard v. Warden*,

384 U.S. 333 (1966)(describing a "carnival atmosphere" of pre-trial publicity including a three day

public inquest televised live from a high school gymnasium seating hundreds of people).  In this case

the trial judge instructed the jurors to inform the court if they had any knowledge and/or

predisposition to the case:

> Number 1, we want to find out if you know anything about this case
> and whether that will affect your ability to be fair and impartial,
> because this case was covered quite extensively in the news media as
> well as in the -- well, the paper and the television and radio.
>
> Okay.  So you might know something about this case.  And we want
> to know if that is going to affect your ability to be fair and impartial.

(T.p. 230-231.)

In the present case no venire members expressed difficulty in their ability to be fair based

upon exposure to pre-trial publicity.  Furthermore, the jurors were properly admonished to avoid

listening to or reading any accounts of the trial until after they were done deliberating.  Appellate

counsel was not ineffective in their failure to present this claim on appeal because the claim has no

merit.

      A.     Judge Ruehlman erroneously denied trial counsel's unopposed request for individual voir dire on death penalty issues.

Petitioner begins this argument by asserting that his rights were violated as a result of the trial judge's decision to deny the request for individual voir dire. (Petition, Doc. No. 29 at 56);(Brief, Doc. No. 115 at 107.)  The record reflects an exchange between counsel and the trial judge on June 27, 1994, in which counsel states in reviewing the pretrial motions,

> the motion for the individual sequestered voir dire was denied.  And, again, for the record Judge, the individual sequestered voir dire that is discussing here is bringing the jurors individually into the chambers one by one and questioning them.  That particular aspect is denied.  But we did discuss the possible voir dire of the jury, that it may include the whole panel, or 12 outside of the whole panel, and we indicated that we would discuss that at the time of trial in August and the Court would have worked out a reasonable solution.

(T.p. 199-200.)  From the transcript it appears that all potential jurors remained in the courtroom for the duration of the voir dire. (T.p. 228.)  Questions were posed to the group as to their knowledge of the case, possible acquaintances with witnesses, scheduling conflicts, etc., but questions as to their views and beliefs on the death penalty were posed to specific individuals, though they were not sequestered from the remaining venire during this time.  Defense counsel did not renew their objection prior at the start of voir dire and therefore have waived this claim.  The trial court did not abuse its discretion in how the voir dire was handled.  Neither Ohio nor federal law requires individual voir dire.  The discretion rests with the trial court. *Ritchie v. Rogers*, 313 F.3d 948 (6th Cir. 2002).

Additionally, Petitioner argues that the trial judge erred when he told prospective jurors that if they could agree to follow the law and instructions as given, that is all that is required. (Brief, Doc. No. 115 at 107. )  He further argues that his right to comprehensive voir dire was infringed upon by the trial judge. *Id*.  As an example he specifically cites the judge telling counsel "you can object all

you want on this voir dire stuff when it comes up for cause on- when somebody says they can't follow the law, there's a point where, if they answer my question a certain way, I'm going to excuse them." (T.p. 320.) The constitutional guarantee to a fair trial "requires that a defendant have a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Murphy v. Florida*, 421 U.S. 794 (1975). The Supreme Court further said in the *Irvin* case that to be fair and impartial, it is sufficient if the juror can "lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin*, 366 U.S. at 723. If the juror states that he or she is able to do so and follow the law, then it is not error to fail to dismiss the juror for cause. *United States v. Mitchell*, 556 F.2d 371 (6th Cir. 1977); *United States v. Giacalone*, 588 F.2d 1158,1164 (1978). This claim is without merit.

<blockquote>B.    The prosecutors committed misconduct in organizing a jury<br>to return a death verdict.</blockquote>

In the next sub-claim Petitioner argues that the death qualification process in this case tilted the jury to return a verdict of death. (Petition, Doc. No. 29 at 57);(Brief, Doc. No. 115 at 108.) Specifically, in that the State asked prospective jurors on a scale of one to ten, with one being the lowest, how they felt about the death penalty. *Id*. Petitioner argues that many of his jurors rated themselves at a six or above, thus creating a biased jury organized to return a death verdict. *Id*. Respondent does not argue procedural default on this particular sub-claim.

As the United States Supreme Court held in *Witherspoon v. Illinois*, the proper inquiry on *voir dire* is not whether the prospective juror is opposed to the death penalty, but rather whether their religious, moral, or conscientious objections would preclude him or her from following the instructions of the court. 391 U.S. 510, 521-522 (1968). Thus, it is proper to exclude for cause a prospective juror who indicates that either they could not vote for capital punishment under any circumstances or that they would be hesitant to do so. *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Here the prosecution asked on a scale of one to ten, how the individual prospective juror

would rate their beliefs about the death penalty. (Brief, Doc. No. 115 at 108.) Juror Wellington rated himself a 6-7, Juror Mason rated herself a 6, Juror Miller rated himself a 7, Juror England rated herself a 10, Juror Borgerding rated herself a 6, Juror Games rated herself a 5-6, Juror Phillips rated herself a 6-7, Juror Hopkins rated himself a 7 and Alternate Juror Jackson (later seated on the jury) rated herself a 5-6. *Id.*; *see also* T.p. 285, 295, 296, 401, 429, 439, 454, 482. The jurors were asked if they could follow the law and apply it as given to which they answered affirmatively. (T.p. 314-315, 346-347, 400, 429, 452,482-483, 491.) When questioned if they could give consideration to the life imprisonment options, the jurors being questioned stated they could do so. (T.p. 294, 333, 339-340.) Additionally, after a thorough reading of the voir dire transcript by this Court, it seems Petitioner has over simplified the jurors' positions based solely on their response to the "scale." For example, Juror England, who rated herself a 10, also stated that she didn't understand the number system being used on this scale and that she would "definitely go by the law." (T.p. 296.) Juror Hopkins, who rated himself a seven, also stated "I guess my response would be, sir, if I gave you a ten in any case, I would say, yes, that's reasonable, that should be done, and a five, six or seven, it depends on what the incident is, what the mitigating circumstances are, and what the evidence proved." *Id.* at 454.

Petitioner next argues that the Prosecutor told the jury that he was Catholic yet was not opposed to the death penalty. (T.p. 261.) Petitioner argues that this was improper as it inserted the Prosecutor's personal opinion into voir dire. "It is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of the defendant," or for them to express their opinion as to the existence of aggravating circumstances or mitigating factors or the appropriateness of the death penalty. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000). This, however, does not appear to be the case before us. Mr. Piepmeier was questioning a potential juror as to her opinion on the death penalty and if she had any moral opposition to its use.

102

(T.p. 264.)  The prospective juror had already answered in the negative to the question, "Do you belong to any type of organization, or have you been - - does your religion take a stance teaching that the death penalty is wrong or immoral or anything like that?" when Mr. Piepmeier made a comment about his own beliefs. (T.p. 260-261.)  The statement was not made in view of Moore's actual case, but rather in regard to a question posed during voir dire.  Furthermore, the Court notes that there was no objection from defense counsel to this statement.  This portion of the claim is without merit.

> C.      Trial counsel was ineffective at voir dire because they failed to fully explore the potential biases of the prospective jurors and because they permitted Prospective Juror England to sit on the jury.

Next Petitioner argues ineffective assistance of counsel for their failure to object to the above acts of errors. (Petition, Doc. No. 29 at 59);(Brief, Doc. No. 115 at 109).  He also makes the argument that counsel was ineffective in their failure to explore possible biases of the prospective jurors. *Id*.  Specifically, in their failure to challenge or use a peremptory challenge against Juror England. *Id*.

Juror England described her beliefs in the death penalty as a ten on the prosecutors' scale of one to ten.  She added, however, that she did not understand the numbering system and that she would definitely apply the law. (T.p. 296.)  When given the opportunity to voir dire Ms. England, defense counsel repeatedly asked her if she would be able to follow the law, to which she responded affirmatively each time. (T.p. 314-315.)  Counsel were not ineffective in their failure to raise this claim on appeal as it is without merit.

> D.      The prosecutors used- and Judge Ruehlman condoned- a peremptory challenge against Prospective Juror Freeman, an African-American woman, on the basis of her race.

Next Petitioner argues that the prosecutors improperly used, and the trial judge condoned,

a peremptory challenge against a prospective juror on the basis of her race. (Petition, Doc. No. 29 at 59);(Brief, Doc. No. 115 at 111.)  He argues this was a violation of his rights under *Batson v. Kentucky*, 476 U.S. 79 (1986). *Id*.  Respondent does not argue procedural default on this particular sub-claim.  It is argued, however, that the decision by the Ohio Supreme Court was neither contrary nor unreasonable in applying U.S. Supreme Court precedent to this ground for relief. (Brief in Response, Doc. No. 116 at 18.)

The Ohio Supreme Court held that:

> During voir dire, the prosecution exercised one of its peremptory challenges against prospective juror Freeman, an African-American woman.  The defense objected, and the trial judge requested the state to justify its peremptory challenge.  The judge, following his own rule of practice, requested the prosecution to explain why it had peremptorily challenged Freeman.
>
> The prosecution tried to explain that it did not engage in a pattern of discrimination, since it had exercised "for cause" challenges against three white prospective jurors but not against any black jurors.  When pressed for a justification by the trial court, the prosecutor stated that there were a couple of "things that bothered [him] about her [Freeman's] questionnaire."
>
> First, the prosecutor noted that Freeman stated on her questionnaire that she felt that alcoholism or drugs negatively affect a child's development.  The prosecutor explained that based on defense questions during voir dire, it was apparent that the defense was going to rely upon alcohol and drug use as a mitigating factor.  Second, the prosecutor stated that Freeman indicated on her questionnaire that her uncle was an attorney who had once served as a public defender.  Third, the prosecutor noted that Freeman had her arms folded when he had questioned her and that such body language "struck him" as being not receptive to the questions asked by the state.
>
> In ruling that the peremptory challenge of Freeman was not based on race, the court noted that a good attorney looks at body language.  The court further explained that it too had sensed a "little hostility" coming from Freeman toward the prosecution.  The court also accepted the prosecutor's reasoning that Freeman might be predisposed to the defense and perhaps a little "anti-prosecutor" because her uncle is a defense attorney.  We conclude that the trial court's finding of no discriminatory intent was not "clearly erroneous" under *Hernandez*, 63 Ohio St. 3d at 583, 589 N.E. 2d at

1314.  Therefore, we overrule the fifth proposition of law.

*State v. Moore*, 81 Ohio St. 3d 22, 29-30 (1998).

It is clearly established United States Supreme Court law that the State may not exercise its [peremptory] challenges in violation of the Equal Protection Clause.  It is impermissible to use the challenges to exclude from the jury minorities "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny "the same right and opportunity to participate in the administration of justice enjoyed by the white population." *Batson v. Kentucky*, 476 U.S. 79, 91 (1986) *quoting Swain v. Alabama*, 380 U.S. 202, 224 (1965).  As with any equal protection claim, the defendant who alleges the discrimination has the burden of establishing "the existence of purposeful discrimination." *Id.; Whitus v. Georgia*, 385 U.S. 545, 550 (1967) *citing Tarrance v. Florida*, 188 U.S. 519 (1903).

A state criminal defendant can establish a *prima facie* case of purposeful racial discrimination in the selection of jurors solely by proof of peremptory challenges to exclude members of the defendant's race. *Batson v. Kentucky*, 476 U.S. 79 (1986).  A trial court must use a three-step process to evaluate a *Batson* claim.  First, the opponent must make a *prima facie* showing that the proponent of the strike has exercised a peremptory challenge on the basis of race.  The burden then shifts to the proponent to articulate a race-neutral reason for the challenge.  Finally, the trial court must determine if the opponent has carried his burden of proving purposeful discrimination. *Purkett v. Elem,* 514 U.S. 765, 768 (1995); *Hernandez v. New York*, 500 U.S. 352 (1991).

To make a *prima facie* showing, a defendant must show that he is a member of a cognizable racial group, that a challenge has been exercised to remove a venireperson of the same race, and any additional facts and circumstances from which an inference could be drawn that the prosecutor had used the peremptory challenge in a race-based manner. *Batson,* 476 U.S. at 79.  The defendant is

105

entitled to rely on the fact that the peremptory challenge process is one in which those who are of a mind to discriminate on the basis of race are able to do so. *Id.* A trial judge's conclusion that the challenge was race-neutral must be upheld unless it is clearly erroneous. *Hernandez*; *supra*; *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990). The fact that the evidence would have supported a challenge for cause is sufficient to demonstrate that it is race-neutral. *Batson*, 479 U.S. at 97. A *Batson* error is never harmless, but rather is a structural error. *United States v. McFerron,* 163 F.3d 952 (6th Cir. 1998), relying on *Arizona v. Fulminante,* 499 U.S. 279 (1991). A State may not require a prosecutor to meet a more likely than not burden at the *prima facie* stage. *Johnson v. California,* 545 U.S. 162 (2005).

In the present case the State exercised a peremptory challenge against Prospective Juror Freeman, an African American woman. (T.p. 405.) Petitioner objected immediately based on *Batson v. Kentucky*. *Id*. at 406-407. The Judge then asked the State to justify their challenge. *Id*. at 407-408.

The State initially pointed to its pattern of challenges in this particular case. They had excused for cause two white males and one white female from the prospective jury. (T.p. 408.) Additionally, they reminded the court that their first two peremptory challenge were used against white males. *Id*. at 409. The State then offered the following explanation in discussing their use of the peremptory challenge against Prospective Juror Freeman:

> [S]pecifically, there were a couple things that bothered me about her questionnaire . . . .
>
> * * *
>
> One is Question No. 28. It talked about, "What factors do you feel most likely have a negative influence on a criminal's development?"
>
> From the questions asked by the defense, she points out that alcoholism or drugs, she feels, negatively impact a child's development.
>
> In fact, you know, we didn't really challenge her earlier. But as the defense started asking their questions on voir dire, it became obvious

to us that apparently that's going to be a factor in their defense. They're going to be raising that. If nothing else, in fact, it was questioned at one time, "How do you feel that would affect your decision as a mitigating factor?"

It was also brought out on, "How do you feel that will affect the specific intent that the State must prove?"

And since she on her own, without even knowing that, pointed out this is a factor that concerns her - - and that really bothers us, the fact she is predisposed, apparently, to consider those types of things.

The second thing, Judge: She indicated on her questionnaire, I believe, that her uncle is an attorney, and she checked that at least at some point in time he served as a public defender. And, again I'm going to her questionnaire. . . . .

*  **

Right. In No. 73, she says an uncle is a lawyer in Columbus. And when you get to Question No. 74, she checks a number of things, but one of those is, "Served as a public defender."

So I don't know what type of leanings that would give her, but, again, that's something that concerned us.

The final thing, Judge, is just she's a juror that, during a lot of her questions, had her arms folded when I was questioning her, which it just struck me as just not being receptive to the questions coming from the State.

*  *  *

I've seen it before in people. It's almost a sign that they're not -- they're not with you, they're not accepting your question, they're not following your theory of the case, whatever. And it's --again, that's the mind -- the least of the objections, but the main one, Judge, would be the alcoholism, and her predisposition to that before it was even brought out by the defense concerns us.

(T.p. 409-412.)

Judge Ruehlman agreed, stating:

That's body language. That's important, though. A good attorney looks at body language. I found her to be a nice lady, but I did think she was a little defensive with the prosecution, and I sensed a little hostility.

107

And on the thing about her relative, her uncle being a public defender, I mean -- hey, I remember, when I was a prosecutor, every defense attorney in the world knocked every one of my relatives off because they said they were related to me.

It's a common thing. That would be -- people have talked to their uncle. He's a defense attorney. It's something you think about when you're a lawyer: Do I want somebody that might be a little bit predisposed to the defense? Because they talked to their uncle, their uncle is a defense attorney, and they'd be more predisposed to the defense case and maybe a little more anti-prosecutor, because I know, in Ohio, especially in Columbus, from reading that vindicating magazine that they send down here all the time --that's a Columbus magazine. I mean, they're very hostile towards prosecutors and police.

But, you know, she could be a little anti-prosecutor. I think that's just being a good lawyer. I don't think it was race-based at all, this challenge. I don't have a problem at all with them knocking her off for those reasons. So I'll note your objections.

(T.p. 413-415.)

The State offered evidence sufficient to show that the challenge was not based on race and Judge Ruehlman concluded that the challenge was race-neutral. *Hernandez*; *supra*; *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996); *United States v. Peete*, 919 F.2d 1168, 1179 (6th Cir. 1990). This Court does not find the decision to have been clearly erroneous. Therefore it was not an unreasonable application of U.S. Supreme Court law for the Ohio Supreme Court to uphold Judge Ruehlman's decision. This sub-claim is without merit.

### Fourteenth Ground for Relief

The sentencers based their decisions to sentence Petitioner Moore to death on improper and non-statutory aggravating factors - including the prosecutor's argument urging them to identify with the victim - in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

Next Moore argues that the trial court permitted the jury to consider non-statutory

aggravating factors in their deliberations. (Petition, Doc. No. 29 at 61);(Brief, Doc. No. 115 at 112.) Respondent argues that the claim is without merit. (Return, Doc. No. 31 at 105.)  Additionally, she argues that the second sub-claim is procedurally defaulted as a result of Petitioner's failure to properly present the claim in state courts. *Id.* at 106.  This sub-claim has since been withdrawn. (Brief, Doc. No. 115 at 114.)

A. Improper prosecutorial argument.

In his first sub-claim Petitioner argues that the State improperly urged the jurors to put themselves in the victim's place. (Petition, Doc. No. 29 at 61);(Brief, Doc. No. 115 at 113).  This claim was addressed and rejected in the Seventh Ground for Relief.

Furthermore, as previously stated, "the Federal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990); *Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003).

B.    Readmission of all culpability phase evidence.

Petitioner has withdrawn this portion of the Ground for Relief. (Petition, Doc. No. 29 at 62);(Brief, Doc. No. 115 at 114.)

C.    A reasonable juror would understand instruction to consider "any other factors relevant to the issue of whether Petitioner Moore should be sentenced to death" as a basis to consider non-statutory aggravating circumstances.

Next Petitioner argues that the language of Ohio Revised Code § 2929.04 (B)(7), "any other factors relevant to the issue of whether the defendant should be sentenced to death,"eviscerates the narrowing of death eligible offenders and creates a reasonable likelihood that the average juror would apply the (B)(7) in an unconstitutional manner. (Petition, Doc. No. 29 at 63);(Brief, Doc. No. 115 at 114.)  Specifically, he argues that the instruction allows the sentencer to consider **any** factor

relevant to imposing the death penalty and there is a risk that the sentencer would consider nonstatutory aggravators rather than mitigating factors. *Id.* at 115.

The instruction as given by the trial judge was as follows:

> In deciding what penalty to recommend for Counts 1 and 2, you must consider each count and specification to each count separately.

> The mitigating factors -- what are mitigating factors? Well, the statutory law has established certain mitigating factors. These mitigating factors include the history, character, and background of the offender. That's No. 1. Number 2, the youth of the offender. Number 3, any other factors that are relevant to the issue of whether the offender should be sentenced to death.

> In reaching a verdict in this proceeding, you must consider all the evidence admitted at both trials and the arguments of counsel. You must then determine whether the State of Ohio has proven beyond a reasonable doubt that the aggravating circumstances in each count of aggravated murder which Lee Moore was found guilty of committing are sufficient to outweigh the mitigating factors present.

(T.p. 1243.) This Court finds that it was clear from Judge Ruehlman's statement that these factors were to be considered as mitigating evidence, rather than, as Petitioner would have this Court believe, permission to base a verdict of death on absolutely anything that it felt justified such punishment. It is recommended that this sub-claim be denied.

### Fifteenth Ground for Relief

> The sentencers failed to give any weight to the uncontradicted mitigating evidence presented by Petitioner Moore in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

In his fifteenth ground for relief, Petitioner argues that the trial court failed to consider relevant mitigation evidence presented by Moore during the punishment phase of his trial in determining his sentence. (Petition, Doc. No. 29 at 65); (Brief, Doc. No. 115 at 118. ) Respondent contends that this claim is procedurally defaulted as a result of Petitioner's failure to present the

claim in state court. (Return, Doc. No. 31 at 108.)  Alternatively, it is argued that the claim lacks

merit. *Id*. at 109.  This claim was presented in its entirety however, as an underlying claim in

Moore's 26(B) Motion.

The Court turns to the merits to the extent they support Petitioner's ineffective assistance of

appellate counsel claim.  Petitioner argues specifically that the trial court failed to take the following

factors into consideration: the effect of his parents' divorce on him; the bullying, teasing and beating

of him by his peers throughout his childhood and adolescence; his feelings that he did not fit in with

his peers; his substance abuse and dependency beginning at age 15; that he was capable of being

productive in a structured environment; and his unrealized potential. (Brief, Doc. No. 115 at 118-

119.)  In the sentencing opinion of the trial court, Judge Ruehlman summarized the findings as

follows:

> On November 21, 1994, the Court reconvened for the sentencing
> hearing.  The defendant presented four witnesses who testified under
> oath and then the defendant himself made an unsworn statement.
>
> The mitigating factors that the defendant tried to establish were the
> history, character and background of the defendant, the youth of the
> defendant and any other factors that are relevant to the issue of
> whether the defendant should be sentenced to death.
>
> The testimony as to the history, character and background of the
> offender consisted of evidence that the defendant's parents were
> divorced but that he was raised by a very loving mother.  The
> defendant's witnesses testified that the defendant was basically given
> anything he wanted during his childhood.  His mother had a good job
> and so could afford to provide him with nice clothing.  However,
> according to these witnesses, because the defendant was provided
> with such nice clothing, his peers became jealous and often would
> steal these clothes from the defendant.  As a consequence, the
> defendant became a target for abuse by his peers.
>
> As to evidence of the youth of the defendant, the defendant was born
> on October 19, 1974 and so therefore, he was nineteen (19) years old
> at the time of the Aggravated Murder.
>
> The evidence concerning any other factors that are relevant to the
> issue of whether the defendant should be sentenced to death,

consisted of testimony that the defendant was remorseful and that the shooting was an accident. However, one of the defendant's own witnesses during the mitigation hearing, Dr. David Chiappone, a clinical psychologist from the Community Diagnostic and Treatment Center, testified that the defendant admitted to him that he had killed the victim, Melvin Olinger, because the defendant did not want to be identified. Furthermore, the defendant told Dr. Chiappone that he lied to the police when he told them that the shooting was accidental. Moreover, he told Dr. Chiappone that he even tried to make the shooting look like an accident.

At the close [of] the evidence in the mitigation hearing, the Court instructed the jury that the mitigating factors were the history, character and background of the offender; the youth of the offender; and any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(Return, Doc. No. 31, Exhibit A at 89-91.)

The trial judge then articulated factors that were considered and the amount of weight afforded the mitigating factors:

The evidence is overwhelming that the aggravating circumstance in Count I and the aggravating circumstances in Count II outweigh the mitigating factors in each count. The defendant was nineteen at the time of these offenses but his history, character and background indicate that he was raised in a loving middle class home where he was not deprived of any material or emotional needs. Basically, the defendant was given every opportunity to lead a productive law abiding life.

As to any other factors that are relevant to the issue of whether the defendant should be sentenced to death, the Court cannot find any.

*Id*. at 93. *See also* T.p. 1266.

Petitioner claims that this situation is the same as that in *Eddings v. Oklahoma*, 455 U.S. 104 (1982). (Brief, Doc. No. 115 at 118.) In *Eddings*, while evaluating the mitigation evidence, the trial judge stated, "[n]or can the Court in following the law, in my opinion, consider the fact of this young man's violent background." *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982). The Supreme Court concluded that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record

and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Id. citing Lockett v. Ohio,* 438 U.S. 586, 604 (1978). The court held that the trial court erred as the trial judge did not evaluate the evidence because he thought he was not permitted to consider it as a matter of law. *Id.*

In contrast to *Eddings,* Moore offers no evidence that his right to present such mitigation was in fact limited in the trial court nor does he provide evidence that the trial court did not permit the consideration and weighing all mitigation evidence. As evidenced by the above excerpts, the trial court did in fact consider mitigating factors as prescribed in Ohio Revised Code § 2929.04 (B). The opinion specifically stated that the defendant presented evidence of his history, character, and background, including his parents' divorce, his youth, the bullying he experienced while growing up, and other factors relevant to the issue of whether the offender should be sentenced to death. (Return, Doc. No. 31, Exhibits A at 89-91.)

Additionally, one of the factors considered by the court was Ohio Revised Code § 2929.04 (B)(7) which provides a "catch-all" in that "any other factors that are relevant to the issue of whether the offender should be sentenced to death" should be considered. It appears that the judge did in fact consider mitigating factors and find that they did not outweigh the aggravating circumstances, as opposed to the judge in *Eddings*, who thought that, *as a matter of law*, he was *not permitted* to even consider such evidence. As long as the factors presented are considered the sentencer may determine the amount of weight to be given to mitigating factors. *Eddings*, 455 U.S. at 115. Furthermore, errors by the sentencing court in weighing aggravating and mitigating factors can be cured by reweighing in the state appellate court. *Clemons v. Mississippi*, 494 U.S. 738 (1990). Reweighing by the Ohio Supreme Court satisfies the requirements of *Clemons. Cooey v. Coyle,* 289 F.3d 882, 888-90 (6th Cir. 2002). *See also Baston v. Bagley*, 420 F.3d 632 (6th Cir. 2005). Appellate counsel was not ineffective in their failure to raise this claim as it is without merit.

**Sixteenth Ground for Relief**

> Judge Ruehlman (a) erroneously denied trial counsel's requests for
> proper mitigation instructions and (b) gave erroneous mitigation
> instructions, in violation of Petitioner Moore's rights, including his
> rights to due process, equal protection, a fair proceeding, a reliable
> sentence, and to be free from cruel and unusual punishment.

In his sixteenth ground for relief Petitioner Moore alleges that his rights were violated during

the mitigation phase when the trial court refused to provide the jury guidance in its instructions.

(Petition, Doc. No. 29 at 67.)  Respondent argues that the portions of the first sub-claim including

failure to limit the argument to the aggravating circumstances proven, to prohibit comments on the

unsworn testimony, and to instruct the jury it need not unanimously agree on a mitigating factor, are

all procedurally defaulted. (Return, Doc. No. 31 at 111-112.)

Petitioner has withdrawn the allegations set forth in paragraphs 261, 265, 266, 267, 268, 272

and 273.[12] (Brief, Doc. No. 115 at 123.)  All other portions were raised in the 26(B) Motion; thus

their merits are considered here for what support they may give to the claim of ineffective assistance

of appellate counsel.

Petitioner asserts that the trial judge improperly denied counsels' motion to limit the

prosecutors' argument to the aggravating circumstances proven. (Petition, Doc. No. 29 at 67.)  In

response to the motion *in limine* to limit the prosecutor's argument, the judge responded, "I'm sure

they're not going to raise something that was not proven.  But, again, if they tried to do that, under

*Brown*, I'd urge you to make your objection, because you have to do that to preserve the record."

(T.p. 1067.)  This was not improper.  While the motion was denied at the time, the court did not

---

[12] The withdrawn portions of the claim alleged that the trial court erroneously denied trial counsel's motion
for a specific instruction on substance abuse; denied a motion to instruct the jury regarding the sufficiency of a single
mitigating factor; denied a motion to prohibit references to the jury's verdict at mitigation as a recommendation;
grouped all aggravating circumstances together and told the jury to consider if these outweighed the mitigation; told
the jury he merged specifications but did not explain what it meant; failed to merge the factually duplicative
specifications; and failed to tell jury they should recommend life if the balance is equal.

preclude defense counsel from raising an objection in the future should the event actually occur, but rather encouraged the defense counsel to do so to properly preserve the record. This portion of the claim is without merit. Appellate counsel was not ineffective in their failure to raise this claim on direct appeal.

Next Petitioner argues that the court erred in denying defense counsels' motion to prohibit the State from commenting on his unsworn statement. (Petition, Doc. No. 29 at 67);(Brief, Doc. No. 115 at 123.) As held in the Seventh Ground for Relief, it is not improper for a prosecutor to argue that an unsworn statement by an accused was not made under oath and therefore was not subject to cross-examination. *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000); *Mason v. Mitchell*, 95 F. Supp. 2d 744, 785 (N.D. Ohio 2000); *Frazier v. Mitchell*, 188 F. Supp. 2d 798, 827 (N.D. Ohio 2001); *see also Franklin v. Anderson*, 2002 U.S. Dist. LEXIS 26814. The trial court did not error in denying this motion and permitting the State to comment on the fact that Petitioner's statement was unsworn. *See supra* Seventh Ground for Relief.

Next Moore alleges that the trial court erred in denying the motion to instruct the jurors that they did not need to unanimously agree on the existence of a mitigating factor. (Petition, Doc. No. 29 at 67);(Brief, Doc. No. 115 at 124). Petitioner cross-references this claim with the Sixth Ground for Relief. In addressing that claim, the Court held that the instructions were constitutional as a reasonable juror would not take the language of the charge to impede his or her ability to consider and give effect to mitigation factors nor that it required unanimity of all jurors as to the presence of a mitigating factor. *See Coe v. Bell*, 161 F.3d 320 (6th Cir. 1998); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). This portion of the claim is without merit.

In paragraph 269 Petitioner asserts that the trial judge improperly instructed the jury that the specification for Count I was that Petitioner Moore had committed the aggravated murder for the purpose of escaping detection for an aggravated robbery or kidnaping. (Petition, Doc. No. 29 at 68.)

He asserts that this permitted a non-unanimous verdict. The trial court properly merged the duplicate specifications to Count I at the beginning of the penalty phase. This portion of this claim is without merit.

In paragraphs 269, 270, and 271 of his Petition, Petitioner argues that the jurors were given erroneous instructions as they were given various alternative elements of the crime which created a risk of a non-unanimous finding. (Petition, Doc. No. 29 at 68-69); (Brief, Doc. No. 115 at 124.) Petitioner argues that Ohio's death penalty scheme provides that "principal offender" and "prior calculation and design" are not to be charged and proven in the same case and that the jurors in his case failed to specify which sub-section, the principal offender or aggravated murder with prior calculation and design, they found him guilty of violating, thus, they were not unanimous in either alternative when rendering their verdict. (Petition, Doc. No. 29 at 69);(Brief, Doc. No. 115 at 144.)

The United States Supreme Court recognized in *Schad v. Arizona* that there were instances when the single charge would be duplicitous and not appropriate. *Schad v. Arizona*, 501 U.S. 624 (1991). The case likewise stands for the proposition that jurors are not always required to agree upon a single means of commission, such as principal offender or with prior deliberation and design. The Court stated that "it may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means." *Id.* at 631. The *Schad* Court further stated that it is often immaterial whether death was caused from defendant acting as the principal offender or as a result of defendant's prior calculation and design and that state statutes frequently enumerate alternatives that are means of satisfying a single element of the offense. *Id. citing Borum v. United States*, 284 U.S. 596 (1932). Thus, the Court viewed these factors as alternatives to a common end and not as separate elements of the crime. State law determines whether the statutory alternatives are means to a common end or independent elements of the crime. *Id.* at 636.

116

Under Ohio law, a court may instruct a jury on both principal offender and prior calculation and design if the alternatives are given to the jury disjunctively in the same specification. *State v. Penix*, 32 Ohio St. 3d 369 (1987); *State v. Cook*, 65 Ohio St. 3d 527 (1992); *State v. Burke*, 73 Ohio St. 3d 399 (1995); *State v. Moore*, 81 Ohio St. 3d 22, 40 (1998).  A court errs, however, if it fails to instruct the jury they must be unanimous in agreeing on which of the alternatives the defendant is guilty of committing. *Burke*, 73 Ohio St. 2d at 405.  Such error is harmless error if the jury indicates a unanimous verdict elsewhere on either the aspect of "principal offender" or "prior calculation and design." *Id*.; *Hawkins v. Coyle*, 2005 U.S. Dist. LEXIS 35538 (S.D. Ohio 2005)

After reviewing the record, this Court finds that the trial court erred in that it did not require a unanimous finding as to which alternative specifications the jury found Petitioner guilty.  This error, however, was harmless because the jury concluded unanimously on Count I that Moore committed the murder with prior calculation and design.  Counsel were not ineffective in their failure to raise this claim on appeal, as the claim, is in its entirety, without merit.

### Seventeenth Ground for Relief

Judge Ruehlman ordered the courtroom to be locked in violation of Petitioner Moore's rights, including his right to a public trial, due process, and equal protection.

In his seventeenth ground for relief, Petitioner argues that his constitutional rights were violated when Judge Ruehlman ordered the courtroom doors to be locked. (Petition, Doc. No. 29 at 71); (Brief, Doc. No. 115 at 124-126.)  He asserts that this denied him the "right to a speedy and public trial." (Brief, Doc. No. 115 at 124.)  Respondent argues procedural default as a result of Petitioner's failure to present this claim to the state courts, specifically his direct appeal to the Ohio Supreme Court. (Return, Doc. No. 31 at 120.)  Alternatively, Respondent argues that Petitioner's claim is without merit and the decisions by the Ohio courts' were neither contrary to nor an unreasonable application of U.S. Supreme Court precedent. *Id*. at 122.  Petitioner argues cause for

his failure to properly bring this claim as it was not raised on direct appeal to the court of appeals so counsel was precluded from bringing it in the Ohio Supreme Court. (Traverse, Doc. No. 81 at 56.) Additionally, he argues that this ground for relief was brought in his 26(B) Motion as his eleventh assignment of error. *Id*.

To the extent this claim serves as an underlying claim for ineffective assistance of appellate counsel, this Court turns to the merits.  Petitioner supports this ground for relief by citing to *Waller v. Georgia*, 467 U.S. 39 (1984) and *In Re Oliver*, 333 U.S. 257, 270 (1948).  These cases hold that "[t]he central aim of a criminal proceedings must be to try the accused fairly, and "[our] cases have uniformly recognized the public-trial guarantee as one created for the benefit of the defendant." *Waller*, 467 U.S. at 46 *quoting Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979).  "The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ." *Waller*, 467 U.S. at 46 *quoting In Re Oliver*, 333 U.S. at 270.

In Moore's case however, the courtroom doors were locked only for the duration of the jury charge.  The judge permitted any spectator to stay for the charge, stating that "[o]nce the charge starts, you can't leave.  So if you want to leave before the charge, you'd better leave now." (T.p. 958.)  His second reference was similar, "[o]kay. I want to instruct the jury now, and once I start, of course, we lock the door.  So I'll give the news media or anybody else a chance to take off." (T.p. 1234.)  Thus Petitioner was given a public trial in that any interested spectators were permitted to witness the trial and Petitioner himself was given the benefit of allowing the public, including the news media, to see that he was fairly dealt with and not unjustly condemned.  The doors were locked only for a few moments of the actual trial and only while the jury was being charged.  Furthermore, the trial judge permitted the spectators to remain while he was giving instructions, thus he did not

bar the public from witnessing this portion of the trial. Rather, the doors were locked to keep people from coming and going and potentially interrupting important instructions to the jury. As the record is void of any other reference to a locked door, there was no constitutional violation and this claim is without merit. As such, appellate counsel were not ineffective in their failure to raise this claim at the proper time.

### Eighteenth Ground for Relief

> The prosecutors committed misconduct at the pre-trial, voir dire, and liability phases of Petitioner Moore's trial in violation of his rights, including his rights to due process, equal protection, a fair trial, an impartial jury and judge, and effective assistance of counsel.

Next Moore alleges that his rights were violated as a result of multiple instances of prosecutorial misconduct during the pre-trial, voir dire, and liability phases of trial. (Petition, Doc. No. 29 at 72.) Respondent argues that this claim is procedurally defaulted in its entirety. (Return, Doc. No. 31 at 122.) In the alternative Respondent argues that the claim is without merit. (*Id*. at 124-128.)

Petitioner argues that he can establish cause for failing to raise this claim based on ineffective assistance of appellate counsel. Portions of this claim, attempting to obtain a commitment from the jurors, comments directed at defense counsel, and urging jurors to identify with the victim, were all presented in direct appeal to the Ohio Supreme Court. (Traverse, Doc. No. 81 at 57-58.) This claim was presented in its entirety in the 26(B) Motion.

> A.    During the pre-trial, the prosecutors had *ex parte* discussions with Judge Ruehlman and met with the defense expert.

For the reasons set forth in deciding the Second Ground for Relief, this prosecutorial misconduct claim is without merit.

> B.    During *voir dire*, the prosecutors organized a jury to return a death verdict.

Petitioner alleges prosecutorial misconduct in regards to the State's conduct in voir dire. (Petition, Doc. No. 29 at 72);(Brief, Doc. No. 115 at 128.)  He specifically alleges that the State organized a jury to return a death verdict, asked potential jurors how they would rate their feelings on the death penalty, obtained personal commitments from the prospective jurors that they could sign a death verdict, and removed a juror on the basis of her race. *Id.*  Many of these issues have been discussed earlier in the Thirteenth Ground for Relief in terms of alleged errors during voir dire.

The ~~has~~ Court has previously discussed the scale used by the State in their voir dire of potential jurors.  In addition to being asked their feelings on the death penalty, the jurors were asked if they could follow the law and apply it as given, and additionally, if they could consider the life imprisonment options. (T.p. 294, 314-315, 333, 339-340, 346-347, 400, 429, 452,482-483, 491.) Jurors did not give their personal commitment that they could sign a death verdict against Moore, but rather they gave their commitment that they could consider all options and follow the law as given to them.  There was no prosecutorial misconduct.  This portion of the claim is without merit.

Next Petitioner alleges misconduct due to a *Batson* violation in challenging Prospective Juror Freeman. (Petition, Doc. No. 29 at 72);(Brief, Doc. No. 115 at 128.)  This claim was fully addressed in the Thirteenth Ground for Relief.  The decision of the Ohio courts that the challenge of this juror was not based on race, but rather on the fact her uncle was an attorney and on her body language, is not an unreasonable application of *Batson* and its progeny.  This portion of the claim is without merit.

> C.    During the liability phase, the prosecutors presented testimony from the victim's father in order to elicit sympathy from the jury, denigrated Petitioner Moore's counsel, encouraged the jury to perform its own experiment, and commented on trial counsel's failure to present expert witnesses.

> D.    During the mitigation phase, the prosecutors urged the sentencers to identify with the victim and made other

improper arguments.

These sub-claims are without merit. *Payne v. Tennessee* held that the 8th amendment is not a *per se* bar to the submission of victim impact statements. 501 U.S. 808, 827 (1991);*Hicks v. Collins*, 384 F.3d 204, 222 (6th Cir. 2004) *citing Cooey v. Coyle,* 289 F.3d 882 (6th Cir. 2004) and appendix at 2000 U.S. App. Lexis 38700 (6th Cir. 2000); *Cooey v. Anderson,* 988 F. Supp. 1066, 1089-1090 (N.D. Ohio 1997). The Sixth Circuit has extended the *Payne* holding to the liability phase of trial.

### Nineteenth Ground for Relief

> Petitioner Moore's statements to the police were admitted in violation of his rights, including his Miranda rights and rights to counsel, due process, and equal protection.

In his nineteenth ground for relief, Petitioner argues that his rights were violated as a result of the methods used to obtain his confession and its admission into evidence. (Petition, Doc. No. 29 at 76.) Respondent does not assert procedural default, but rather argues that the claim is without merit. (Return, Doc. No. 31 at 128-130.)

In addressing this claim on direct appeal the Ohio Supreme Court stated that:

> The issues of whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct. However, both standards are determined by the totality of the circumstances. *State v. Clark* (1988), 38 Ohio St. 3d 252, 261, 527 N.E.2d 844, 854.

> The evidence supports the trial court's findings that Moore was properly advised of his *Miranda* rights and that he understood those rights when he signed the waiver. An accused's signed waiver form is strong proof that the waiver was valid. *Id*. at 261, 527 N.E.2d at 854; *North Carolina v. Butler* (1979), 441 U.S. 369, 374-375, 99 S. Ct. 1755, 1758-1759, 60 L. Ed.2d 286, 293.

> Several aspects of the events leading to Moore's confession are troubling. The police officers did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in subfreezing temperatures in his stocking

121

feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room. Nevertheless, based on the totality of the circumstances, these troubling aspects do not lead us to conclude that Moore's "will was overborne" or that "his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Otte* (1996), 74 Ohio St.3d 555, 562, 660 N.E.2d 711, 719; *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S. Ct. 515, 522, 93 L. Ed.2d 473, 484. *See also, State v. Edwards* (1976), 49 Ohio St. 2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Accordingly, we conclude that Moore made a knowing, voluntary, and intelligent waiver of his constitutional rights. The sixth and seventh propositions of law are rejected.

The credible evidence submitted at the suppression hearing indicates that Moore was properly advised of his constitutional right to counsel and that he validly waived that right. In deference to the trial court's ruling, we find that there is no credible evidence that Moore ever requested an attorney either before or during his custodial interrogation. *See Minnick v. Mississippi* (1990), 498 U.S. 146, 147, 111 S. Ct. 486, 488, 112 L. Ed. 2d 489, 494; *Edwards v. Arizona* (1981), 451 U.S. 477, 484-485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386; and *State v. Knuckles* (1992), 65 Ohio St. 3d 494, 605 N.E. 2d 54, paragraph one of the syllabus. We reject the eighth proposition of law.

*State v. Moore*, 81 Ohio St. 3d 22, 31-32 (1998).

The Court turns to the merits of whether the statement was unknowing or unintelligent and applies a totality of the circumstances test. *Colorado v. Spring*, 479 U.S. 564, 574 (1987). In considering the "totality of the circumstances" the Court must evaluate both the characteristics of the accused and the details surrounding the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Under the guidelines of *Spring*, to waive constitutional privilege within the meaning of the Fifth Amendment:

First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda*

rights have been waived.

*Spring*, 479 U.S. at 573 *quoting Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *see also Faretta v. California*, 422 U.S. 806, 835 (1975); *North Carolina v. Butler*, 441 U.S. 369, 374-375 (1979); *Brewer v. Williams*, 430 U.S. 387, 404 (1977).

Petitioner is arguing that his confession was not voluntary, but rather a result of coercion from the following circumstances: he was not provided with food or drink, and he was forced to walk in the snow and slush in sub-freezing temperatures in his socks. Additionally he argues that the state court failed to take other relevant circumstances into account when deciding the admissibility of his confession, including: he was cuffed in the holding cell prior to being cuffed in the interview room for several hours; he had smoked marijuana just hours before his arrest;[13] his *Miranda* waiver was stale and preceded by several hours of physical deprivation; he was not advised as to the charges against him; he was not fully *Mirandized* just before his interview; and he was uneducated and inexperienced in interrogation situations. (Brief, Doc. No. 115 at 138.)

Moore argues coercion because he was physically deprived of food. Moore states that the last meal he ate prior to his arrest was at 9 a.m.. He was arrested around 5:30 p.m. while waiting in line for food at a McDonald's drive-thru. (T.p. at 129.) Moore was not offered anything to eat or drink while being held at the Mount Healthy Police Station, but had water from the drinking fountain prior to his transport to Cincinnati. (T.p. 33, 49, 135-136.) Once he arrived at the Cincinnati station officers testified that he was offered snack foods and pop or coffee, but that he requested only water which was then provided to him. (T.p.112, 115-117, 140.) Petitioner testified, however, that he was not offered food nor did he see snacks in the police department, but that he was given water. (T.p. 141, 147.) The trial court's resolution of this conflicting testimony has not been shown to be incorrect by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

---

[13] At approximately 2:00 p.m. on January 20, 1994, Moore smoked a six inch cigar of marijuana.

Next Petitioner argues that his rights were violated and his confession was coerced as a result of being forced to walk through slush in his stocking feet. Testimony at the motion to suppress hearing, from both officers and Petitioner, established that while at Mount Healthy Police Station, Petitioner had his hat, t-shirt, sweatshirt, jewelry, and shoes confiscated as possible evidence. (T.p. 21, 132.) During the transport to Cincinnati Petitioner had to walk about 30 feet from the station to the squad car, through slush, in his stocking feet. *Id*. at 48-49, 135. Once in Cincinnati Petitioner again had to walk through the slush to get from the car to the building. *Id*. at 52, 137. Petitioner further testified that once inside, no one offered him a towel to dry off, or gave him an opportunity to take off his wet socks. *Id*. at 138.

He also asserts that the courts should have taken into consideration the fact that immediately after his arrest he was placed in a Mount Healthy holding cell while still in handcuffs. (Brief, Doc. No. 115 at 136.) The evidence simply does not support this proposition. During the motion to suppress hearing officers testified that the handcuffs were in fact removed. (T.p. 19, 28, 40, 64.) Petitioner himself testified to this fact. *Id*. at 131. However, the evidence does show that once transported to Cincinnati, Petitioner placed in an interview room and was then left for hours with his hands cuffed behind his back. The cuffs were removed at the time of the interview. While this Court is troubled as was the Ohio Supreme Court by the fact Petitioner was forced to walk through snow in stocking feet and then sit with his hands cuffed behind his back for hours, in considering the totality of the circumstances, we cannot hold that these circumstances overcame Moore's will and coerced a confession.

Next Petitioner argues physical deprivation in the form of sleep. Petitioner argues that at the time of his interrogation he had been awake from approximately 20 hours and was tired. (T.p. 143.) The record does not reflect police coercion in this area. A cot was provided in the holding cell and multiple officers observed him lying down. (T.p. 34, 99.) Whether or not Petitioner slept was not

a result of police action; there is no evidence he was intentionally deprived of sleep.

Furthermore, officers testified as to the mental and emotional state of Moore at the time of the interrogation. Officers testified that Moore was emotional during the interview, but that he was not overly emotional and appeared to be clearheaded. (T.p.102, 125-126.) Additionally, while Moore argues that he was under the influence as a result of having smoked marijuana at approximately 2 p.m. on the day of his arrest, there was no indication that he was under the influence of alcohol or drugs at the time of the arrest or interrogation. There was no odor of alcohol or marijuana coming from the car, from Moore himself, nor did he appear to act under the influence. (T.p. 12-15, 61, 123, 128.)

The record shows that Moore was given his rights at the Mount Healthy police department by an officer from Fairfield. (T.p. 44.) He was later given a waiver of rights form which he was given the opportunity to read for himself, was then read outloud, and was questioned on whether or not he understood these rights. *Id*. at 100-101, 103-104, 133, 152, 155. Petitioner stated that he did understand his rights and signed the form. *Id*. at 152, 155. This occurred at approximately 12:10 a.m. and was given by one of the officers who later participated in the interrogation. *Id*. at 66. Prior to the interview at 4:45 a.m. Petitioner was again presented with his waiver of rights form and questioned as to whether he had been read his rights, whether he understood those rights, and if that was his signature on the form waiving those rights. (T.p. 75, 101, 113.) Based on the above it is apparent that Petitioner was in fact given and advised of his *Miranda* rights on several occasions.

Petitioner also makes the argument that he was not informed as to the charges in which he was being held until the interview at 4:45 in the morning. The Supreme Court held in *Colorado v. Spring* that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment Privilege." 479 U.S. 564, 573 (1987).

Next Petitioner argues that he was inexperienced with the law and this should have been a circumstance considered by the courts. He testified that he had dropped out of school halfway through his junior year and had never before been interrogated in regards to any type of crime. (T.p. 145-146.) He also, however, testified to the fact that he had been read his *Miranda* warnings on three separate prior occasions and was familiar with and understood these rights. *Id*. at 152. This Court believes that based on the above admission, Petitioner was capable of and did understand his rights.

After reviewing the record and considering the totality of the circumstances, this Court finds that the relinquishment of Petitioner's rights was voluntary and not the product of coercion, intimidation, or deception. Petitioner was informed of the nature of these rights and waived them with full awareness of his decision. The Ohio courts' determinations to that effect are not unreasonable applications of clearly established United states Supreme Court precedent. This claim is without merit.

### Twentieth Ground for Relief

The reasonable doubt instruction given at the liability and mitigation phases is unconstitutional and violated Petitioner Moore's rights, including his rights to due process, equal protection, and fair proceedings.

Next Petitioner alleges that his rights were violated because the reasonable doubt instruction, as given, is unconstitutional (Petition, Doc. No. 29 at 80). Respondent asserts procedural default because Petitioner failed to object to the instructions at trial. (Return, Doc. No. 31 at 130.) Additionally, it is argued that even if not procedurally defaulted, the claim lacks merit. *Id*. The Court finds that even though this instruction was not objected to at trial, it was raised on direct appeal. The state court, however, addressed the claim under plain error review. A state appellate court's review for plain error is enforcement, not waiver, of a procedural default. *Hinkle v. Randle,*

271 F.3d 239 (6th Cir. 2001) *citing Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000)(plain error

review does not constitute a waiver of procedural default); *accord, Mason v. Mitchell,* 320 F.3d 604

(6th Cir. 2003).  Therefore, this claim is procedurally defaulted.

      Alternatively, the claim is without merit.  Petitioner contends that Ohio's statutory definition

of reasonable doubt sets an unconstitutionally low standard in deciding whether a person is

sentenced to death. (Petition, Doc. No. 29 at 80.)  Ohio Rev. Code § 2901.05 (D) states:

> "Reasonable doubt" is present when the jurors, after they have
> carefully considered and compared all the evidence, cannot say they
> are firmly convinced of the truth of the charge.  It is a doubt based on
> reason and common sense.  Reasonable doubt is not mere possible
> doubt, because everything relating to human affairs or depending on
> moral evidence is open to some possible or imaginary doubt.  "Proof
> beyond a reasonable doubt" is proof of such character that an
> ordinary person would be willing to rely and act upon it in the most
> important of his own affairs.

The trial court gave a virtually identical instruction in both the culpability and penalty phases of

trial. (T.p. 962-963; 1237.)  This particular instruction has been held by the Sixth Circuit Court of

Appeals to be constitutional. *Scott v. Mitchell*, 209 F.3d 854, 883-883 (6th Cir. 2000); *Byrd v.

Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Thomas v. Arn*, 704 F.2d 865 (6th Cir. 1983).


### Twenty-First Ground for Relief

The trial court's instructions at the liability phase violated Petitioner
Moore's rights, including his rights to due process, equal protection,
and a fair proceeding.


      In his twenty-first ground for relief, Petitioner argues that improper jury instructions violated

his rights. (Petition, Doc. No. 29 at 81.)  Respondent asserts procedural default as Petitioner failed

to raise all aspects of this claim on direct appeal in the Ohio Supreme Court. (Return, Doc. No. 31

at 131.)  Additionally, if not defaulted, Respondent argues that the claim lacks merit. *Id*. at 133.

      Petitioner raised the first sub-claim on direct appeal to the Ohio Supreme Court as his

twenty-third proposition of law. (Traverse, Doc. No. 81 at 66);(Return, Doc. No. 31 at Exhibit I.)

The second portion of this claim is procedurally defaulted as Petitioner failed to properly present

it to the state courts.

> A.    The "principal offender" and "prior calculation and design"
> elements of capital aggravated murder/felony murder are
> alternatives that are not to be charged and proven in the same
> case.

Petitioner argues that Ohio's death penalty scheme provides that "principal offender" and

"prior calculation and design" are not to be charged and proven in the same cause. (Petition, Doc.

No. 29 at 81);(Brief, Doc. No. 115 at 144.)  The jurors in Moore's case failed to specify which sub-

section, the principal offender or aggravated murder with prior calculation and design, they found

the defendant guilty of violating, thus, they were not unanimous in either alternative when rendering

their verdict. *Id.*  Petitioner argues that the alternatives resulted in a non-unanimous verdict by the

jury and is in opposition to *Ring v. Arizona*, 536 U.S. 584 (2002). *Id.*

In addressing this claim, the Ohio Supreme Court held:

> In his twenty-third proposition of law, Moore asserts that the court
> erred in submitting to the jury both alternatives to the aggravating
> circumstances set forth in R.C. 2929.04 (A)(7). *See State v. Penix*
> (1987), 32 Ohio St.3d 369, 513 N.E.2d 744.  At the beginning of the
> penalty phase, the trial court merged all three specifications to Count
> I (murder with prior calculation and design) into one specification:
> murder to escape detection for another offense.  The two felony-
> murder counts were merged into one and the three specifications to
> each of the felony murder counts were merged into two
> specifications: murder during kidnapping and murder during
> aggravated robbery.  Thus, the trial court properly merged the
> duplicate specifications. *See Jenkins*, *supra*, 15 Ohio St. 3d 164, 15
> Ohio B. Rep. 311, 473 N.E.2d 264, paragraph five of the syllabus.
>
> With regard to the court's instructing the jury on both principal
> offender and prior calculation and design, such an instruction is
> proper if the alternatives are given to the jury disjunctively in the
> same specification. *Cook , supra*, 65 Ohio St.3d at 527, 605 N.E.2d
> at 82-83.  The court erred in not instructing the jury to be unanimous
> in agreeing on which alternative Moore was guilty of.  Such error is

> harmless, since the guilty verdict on Count I indicated unanimous
> agreement that Moore committed the murder with prior calculation
> and design. *See State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653
> N.E.2d 242, 248.  The twenty-third proposition of law is rejected.

*State v. Moore*, 81 Ohio St. 3d 22, 40 (1998).  This Court does not find Petitioner's argument

persuasive for the reasons set forth in the Sixteenth Ground for Relief.

> B & C.      The definition of "cause" and purpose diluted the
>             "specific intent to kill" element that is required in a
>             capital aggravated murder case.

Though this claim is procedurally defaulted, the Court alternatively turn to the merits out of

an abundance of caution.  Moore argues that the court improperly defined "cause" in a manner that

negated the definition of "purpose" and "specific intent." (Petition, Doc. No. 29 at 83);(Brief, Doc.

No. 115 at 145.)   It is alleged that these instructions negated the *mens rea* requirement for

aggravated murder. *Id.*  Therefore, Petitioner argues, he was convicted without a finding beyond a

reasonable doubt that he acted with the purpose and specific intent to cause the death of another. *Id.*

To the contrary, the intent instruction informed the jurors that the State had a responsibility

to show intent to kill beyond a reasonable doubt.

The instructions were as follows:

> Before you can find the defendant guilty, you must find beyond a
> reasonable doubt that on or about the fourteenth day of January 1994
> -- and the State doesn't have to prove the exact date or minute or
> hour; they just have to prove that it happened on or about a certain
> date.  They have to prove it happened on or about January 14th, 1994.
> They also must prove that this happened in Hamilton County, Ohio,
> and that the defendant purposely caused the death of Melvin Olinger
> with prior calculation and design.
>
> Now let's go over the different elements.
>
> Purposely – purpose to cause death is an essential element of the
> crime of aggravated murder.  A person acts purposely when it is his
> or her specific intention to cause a certain result.
>
> Now, it must be established in this case that at the time in question
> there was present in the mind of the defendant a specific intention to

cause the death of Melvin Olinger.

Now, purpose is a decision of the mind to do an act with a conscious objective of producing a specific result or engaging in specific conduct. To do an act purposely is to do it intentionally, and not accidentally.

Purpose and intent mean the same thing. The purpose with which a person does an act, of course, is known only to himself, unless he expresses it to others or indicates it by his conduct.

The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence.

Now, no person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon.

Proof of motive is not required. The presence or absence of motive is one of the circumstances bearing upon purpose. And where an act is a crime, a good motive or purpose is not a defense.

Cause -- what does that mean? That's another element they have to prove. And cause is an essential element of this offense. The State charges that the act by the defendant caused the death of Melvin Olinger. Cause is an act which, in the natural and continuous sequence, directly produces the death and without which it would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act.

A death is the result of an act when it is produced directly by the act, in a natural and continuous sequence, and would not have occurred without the act. Result occurs when the death is naturally and foreseeably caused by the act.

(T.p. 966-969.)

Because of this instruction there is no way that a reasonable juror would have viewed the presumption as mandatory or even permissible or that such finding of intent was negated by the causation definition. It is clear in the instruction that the State had to prove the element of intent. In applying the *Estelle v. McGuire* standard, jury instructions infringe on a defendant's due process

rights when "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." 502 U.S. 62, 67-68 (1991). Here there is no such violation.

Furthermore, similar arguments have been rejected by this Court as well as the Sixth Circuit Court of Appeals. *Franklin v. Anderson*, 2002 U.S. Dist. LEXIS 26814 at * 238-239 (2002), aff'd., 434 F 3d 412 (6th Cir. 2006); *Campbell v. Coyle*, 260 F.3d 531, 557 (6th Cir. 2001); *Byrd v. Collins*, 209 F.3d 486, 527 (6th Cir. 2000); *Webb v. Mitchell*, 2006 U.S. Dist. LEXIS 82900 (S.D. Ohio 2006). To the extent that Moore argues this ground for relief on the basis of the trial court's instructions on causation the claim should be denied. Counsel were not ineffective for their failure to raise this claim on appeal.

### Twenty-Second Ground for Relief

> The use of duplicative specifications to the aggravated murder counts and the use of the same operative facts to elevate murder to aggravated murder and to capital aggravated murder as well as the submission to the jury of all of these counts violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.

In his twenty-second ground for relief, Petitioner argues that his rights were violated because he was charged with duplicative specifications and that the same operative facts served to elevate a murder charge to an aggravated murder charge, and then to a capital aggravated murder charge. (Petition, Doc. No. 29 at 85);(Brief, Doc. No. 115 at 149-151.) He argues specifically that as a result, his murder charge failed to 1) narrow the class of offenders eligible for the death penalty, and 2) properly guide the sentencer's discretion in imposing the death penalty. (Brief, Doc. No. 115 at 150.) Respondent does not assert procedural default, but rather argues that this claim is without merit.(Return, Doc. No. 31 at 140-142.) As such, this Court may proceed to address this ground for relief on the merits.

131

Petitioner is mistaken in his belief that the specifications were not merged for the purpose of mitigation. During the jury instructions the trial judge merged the specifications under each count and merged the felony-murder counts. (T.p. 1242-1243); *State v. Moore*, 81 Ohio St. 3d at 23.

Regardless, the Sixth Circuit has held this claim to be without merit in *Scott v. Mitchell*, 209 F.3d at 854, 884 (2000). An aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. *Williams v. Taylor*, 529 U.S. 362 (2000) *citing Lowenfield v. Phelps*, 484 U.S. 231 (1988). This claim is without merit.

### Twenty-Third Ground for Relief

The Ohio courts that heard Petitioner Moore's direct appeal and post-conviction proceedings lacked jurisdiction over those proceedings, violating Petitioner Moore's rights, including his rights to due process and equal protection.

In his twenty-third ground for relief Petitioner Moore argues that the courts that heard his direct appeal and post-conviction proceeding lacked jurisdiction to do so. (Brief, Doc. No. 115 at 151.)

Petitioner has withdrawn this Ground for Relief. *Id.*

### Twenty-Fourth Ground for Relief

Execution by electrocution or lethal injection is unconstitutional. Forcing Petitioner Moore to choose the method of his execution is unconstitutional. Execution by either of these means, as well as forcing Petitioner Moore to choose the means, would violated Petitioner Moore's rights, including his rights to due process, equal protection, and to be free from cruel and unusual punishment.

In this ground for relief Moore makes the argument that forcing him to choose between two methods of execution, electrocution or lethal injection, where at least one means is unconstitutional

violates his rights. (Petition, Doc. No. 29 at 88-89);(Brief, Doc. No. 115 at 152.)

Petitioner has withdrawn this Ground for Relief but purports to reserve the right to raise the issue in a cause of action under 42 U.S.C § 1983 and accordance with *Nelson v. Campbell*, 541 U.S. 637(2004). (Brief, Doc. No. 115 at 152.)  The Court offers no opinion on whether such a reservation is effective.

### Twenty-Fifth Ground for Relief

> Ohio's death penalty scheme is unconstitutional and violated Petitioner Moore's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Specifically he cites; Arbitrary and unequal punishment, unreliable sentencing procedures, lack of individualized sentencing, Defendant's right to a jury is burdened, Mandatory submission of reports and evaluations, The definition of mitigating factors in O.R.C. § 2929.04 (B)(7) violated the reliability component of the Eighth Amendment, O.R.C. § 2929.04 (A)(7) is constitutionally invalid when used to aggravate O.R.C. § 2903.01 (B) aggravated murder, O.R.C. §§ 2929.03 (D)(1) and 2929.04 are unconstitutionally vague, Proportionality and appropriateness review, electrocution is a cruel and unusual punishment, Ohio's statutory death penalty scheme violated international law.

Next Petitioner alleges that Ohio's death penalty scheme is unconstitutional for a variety of reasons. (Petition, Doc. No. 29 at 90-111.)  Respondent asserts that portions of this claim have been properly preserved by being presented in the state courts, though other portions are procedurally defaulted. (Return, Doc. No. 31 at 148-175.)  Respondent asserts the procedurally defaulted portions include: the lack of individualized sentencing, that the right to a jury trial is burdened, mandatory submission of reports and evaluations, the definition of mitigating factors in Ohio Revised Code § 2929.04 (B)(7) violates the reliability component of the Eighth Amendment, Ohio Revised Code § 2929.04(A)(7) is constitutionally invalid when used to aggravate Ohio Revised Code § 2903.01 (B) aggravated murder, Ohio Revised Code §§ 2929.03 (D)(1) and 2929.04 are unconstitutionally vague, that electrocution is cruel and unusual punishment, and that Ohio's death penalty scheme violates

international law. *Id*.

The above claims are both procedurally defaulted as a result of Petitioner's failure to properly present them in the state courts and without merit.

In his first sub-claim, Moore makes the argument that the death penalty is unconstitutional because it constitutes cruel and unusual punishment. (Petition, Doc. No. 29 at 90.)  That claim has been rejected by the Sixth Circuit Court of Appeals in a previous case. *Buell v. Mitchell*, 274 F.3d 337, 367 (6th Cir. 2001).

Next Moore argues that Ohio's capital sentencing scheme results in unreliable sentencing procedures. (Petition, Doc. No. 29 at 92.)  Specifically he argues that Ohio does not meet Due Process and Equal Protection Clauses in that it does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty.  Additionally, he argues that Ohio's death penalty statute fails to provide sufficient guidance on how to determine the existence of mitigating factors and fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances. *Id*.  The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).  The Court notes, too, that the Ohio statutes clearly place the burden of proving the existence of any mitigating factors on the defendant in a capital case, Ohio Rev. Code § 2929.03(D)(1), and a requirement that the defendant do so by a preponderance of the evidence does not offend the federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) *overruled in part by Ring v. Arizona*, 536 U.S. 584 (2002).

Next Moore asserts that Ohio's capital sentencing scheme is unconstitutional because of a lack of individualized sentencing. (Petition, Doc. No. 29 at 93.)  He makes the argument that it is unconstitutional because it requires proof of aggravating circumstances in the trial phase of the bifurcated proceeding. *Id*. at 97.  That argument has been rejected by this Court in *Zuern v. Tate*, 101

134

F. Supp. 2d 948, 1003-04 (S.D. Ohio 2000), *on the authority of Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994).

Moore argues that his right to a jury is burdened in that Ohio's death penalty statutory scheme unconstitutionally encourages capital defendants to plead guilty. (Petition, Doc. No. 29 at 94.) He argues that the scheme as it exists, imposes an impermissible risk of death on capital defendants who choose to exercise their rights to a trial as opposed to those who plead. *Id.* The same claim was rejected in *Zuern*, 101 F. Supp. 2d 948, 1004-05, *on the authority of Corbitt v. New Jersey*, 439 U.S. 212 (1978); *accord. Scott v. Anderson*, 58 F. Supp. 2d 767, 796 (N.D. Ohio 1998), *rev'd in part on other grounds*, *Scott v. Mitchell*, 209 F.3d 854 (6th Cir. 2000).

Next Moore argues that Ohio's statute is unconstitutional due to the requirement that if a capital defendant requests investigation reports and mental evaluations they must be submitted to the jury or judge once requested. (Petition, Doc. No. 29 at 95); *see* Ohio Revised Code § 2929.03 (D)(1) (Anderson 2003). This claim has been previously rejected. *Williams v. Bagley*, 380 F.3d 932 (6th Cir. 2004); *Cooey v. Coyle*, 289 F.3d 882, 925-26 (6th Cir. 2002); *Byrd v. Collins*, 209 F.3d 486, 539 (6th Cir. 2000); *Dennis v. Mitchell*, 68 F. Supp. 2d 863, 904 (N.D. Ohio 1999).

In his subsequent claim Moore argues that the definition of mitigating factors in Ohio Rev. Code § 2929.04 (B)(7) violates the reliability component of the Eighth Amendment. (Petition, Doc. No. 29 at 95.) His argument concerns the fact that the State does not have the burden of proving an absence of mitigating factors in the sentencing phase, nor is the State required to make a showing that death is the only appropriate sentence. The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." *Buchanan v. Angelone*, 522 U.S. 269, 276 (1998). The Court notes as well that the Ohio statutes clearly place the burden of proving the existence of any mitigating factors on the defendant in a capital case, Ohio Rev. Code § 2929.03(D)(1), and a requirement that the

defendant do so by a preponderance of the evidence does not offend the federal constitution. *See Walton v. Arizona*, 497 U.S. 639, 649-51 (1990) *overruled in part by Ring v. Arizona*, 536 U.S. 584 (2002).

In his next claim Moore argues that Ohio Rev. Code § 2929.04 (A)(7) is constitutionally invalid when used to aggravate Ohio Rev. Code § 2903.01 (B) aggravated murder. (Petition, Doc. No. 29 at 96.)  Specifically he states that this fails under constitutional standards because it fails to genuinely narrow a class of individuals eligible for the death penalty and because it allows an element of aggravated murder to be considered as an aggravating circumstance in the mitigation phase of trial. *Id.*  To be constitutional, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps*, 484 U.S. 231 (1988) *quoting Zant v. Stevens*, 462 U.S. 862, 877 (1983).   Under the Ohio capital sentencing scheme, the jury is required to find at least one aggravating circumstance before imposing a death sentence, creating a narrowing of the class of persons that may be eligible for the sentence.  Furthermore, an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself. *Williams v. Taylor*, 529 U.S. 362 (2000) *citing Lowenfield v. Phelps*, 484 U.S. 231 (1988) (concluding the Ohio statutory scheme is not constitutionally infirm on the ground stated here.)

Moore challenges the constitutionality of Ohio Rev. Code §§ 2929.03(D)(1) and 2929.04 as being vague. (Petition, Doc. No. 29 at 98.)  In his first portion of this claim he asserts that the reference to "the nature and circumstances of the aggravating circumstance" incorporates these factors to be weighed in favor of death. *Id.* at 102.  This claim has been previously rejected. *Cooey v. Coyle*, 2000 U.S. App. LEXIS 38700 (6th Cir. 2000).   Moore additionally argues that the

136

sentencers are not provided proper guidance in weighing the aggravating circumstances and mitigating factors, thus giving them unfettered discretion. (Petition, Doc. No. 29 at 98.) This portion of the claim has already been discussed and found to be without merit in an above sub-claim.

Next he asserts that Ohio law provides inadequate appellate review of the proportionality of death sentences. (Petition, Doc. No. 29 at 100.) This contention fails, however, as no proportionality review is constitutionally "required in every case in which the death penalty is imposed and the defendant requests it." *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984); *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001). As this is not a constitutional right states are afforded great latitude in the review it does provide as it is an additional safeguard against arbitrarily imposed death sentences . . . ." *Pulley*, 465 U.S. at 50.

Next Moore argues that the electric chair is cruel and unusual. (Petition, Doc. No. 29 at 101.) This sub-claim is moot as the state of Ohio no longer uses the electric chair as a means of execution. House Bill 362, signed by Governor Bob Taft on November 15, 2001, eliminated the choice of execution by the electric chair. *See* Ohio Revised Code § 2949.22

In his final sub-claim, Moore argues that sentencing an individual to death in violation of treaties to which the United States of America is a signatory violated the Supremacy Clause of the United States Constitution. (Petition, Doc. No. 29 at 102.) Moore advances this sub-claim by stating that pursuant to the Supremacy Clause of Article VI of the United States Constitution, the judges of every State are bound by the terms of international treaties to which the United States is a party. Ohio's statutory death penalty scheme violates international law. *Id.* This claim has been rejected by the Sixth Circuit in *Buell v. Mitchell*, 274 F.3d 337 (6th Cir. 2001) and *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001). The agreements entered upon by the United States do not prohibit the death penalty and furthermore, each agreement has been approved with reservations that preserve the power of the States, within constitutional limits, on the use of the death penalty. *Buell*, 274 F.3d at

371 *citing* Charter of the Organization of American States, 1951, 2 U.S.T. 2394, 2484.

## CONCLUSION

Upon the foregoing analysis, the Court should grant the writ of habeas corpus as to a portion of Petitioner's Second Ground for Relief and deny it as to all other grounds for relief.

The Second Ground for Relief posits constitutional error only at the mitigation phase of the case. In prior cases in which the sentence but not the underlying conviction have been found constitutionally infirm, the Sixth Circuit has required entry of a conditional writ, requiring the State to reduce the sentence to life imprisonment or retry the penalty phase of the case within a specified period of time. *DePew v. Anderson*, 311 F.3d 742, 754 (6th Cir. 2002). In *DePew*, the Circuit Court recognized that the issue of whether a defendant can be re-sentenced to death after a sentence is vacated is a matter to be decided in the first instance by the state courts. *Id.* Accordingly, it is respectfully recommended that the Court grant the writ of habeas corpus conditionally as to Ground Two and otherwise deny it.

February 15, 2007.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Moore v. Mitchell\Moore R&RDraft2.wpd