UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| LEE E. MOORE, | ) | CASE NO. C-1-00-0023 |
| | ) | |
| Petitioner, | ) | Judge Dlott |
| | ) | |
| vs. | ) | Chief Magistrate Judge Merz |
| | ) | |
| BETTY MITCHELL, Warden | ) | |
| | ) | *DEATH PENALTY CASE* |
| Respondent. | ) | |

**PETITIONER'S REPLY TO RESPONDENT'S OBJECTIONS**

On February 15, 2007, the Magistrate recommended that Petitioner's death sentence be vacated and a new penalty hearing occur due to the ineffective assistance of counsel at mitigation. Doc. 128. Respondent timely filed her objections. Doc. 130.[1] Petitioner now timely responds.

**I.     INTRODUCTION – GENERAL PRINCIPLES**

The Magistrate Judge's Report and Recommendation is dispositive of Petitioner's claims. The governing rule under which this Court is to consider Respondent's objections is Fed. Civ. R. P. 72(b).    The standard of review to be employed by this Court is *de novo*.  28 U.S.C. § 636(b)(1) (2000); Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts (2005). *See Gomez v. United States*, 490 U.S. 858, 864-69, 874 n.28 (1989); *Flournoy v. Marshall*, 842 F.2d 875, 875-76 (6th Cir. 1988).   This applies for legal, mixed or factual questions.  *Thomas v. Arn*, 474 U.S. 140, 150 & n.8 (1985) (plain language of statute recognizes no distinction between legal and factual matters)

Because the parties received notice in the Report and Recommendation (*see* Doc. 128 p.

---

[1] Petitioner has up to an including April 26, 2007 to file his objections to the remaining portions of the report and recommendation.

1

139), the failure to lodge a specific objection or make specific arguments in support of an objection acts as waiver of the argument. *United States v. Walters*, 638 F.3d 947 (6th Cir. 1981). The lack of specificity as to an objection constitutes a waiver of such an objection. *Kelly v. Withrow*, 25 F.3d 363, 365-66 (6th Cir.), *cert. denied*, 513 U.S. 1061 (1994) (failure to file objections to magistrate's report precludes appellate review. Only specific objections are sufficient to preserve appellate review.).

## II. ARGUMENT

    A.    **MAGISTRATE JUDGE CORRECTLY APPLIED THE AEDPA DEFERENCE STANDARD AND *STRICKLAND* PRINCIPLES IN RECOMMENDING GRANTING HABEAS RELIEF DUE TO TRIAL COUNSEL'S FAILURE TO PREPARE FOR THE TESTIMONY OF DR. CHIAPPONE**

The Magistrate Judge recommended granting relief regarding a portion of Petitioner's Second Ground for Relief. Specifically, the Magistrate Judge concluded that trial counsel's failure to properly prepare for the testimony of their expert witness at mitigation constituted ineffective assistance of counsel. He concluded that the expert's testimony effectively gutted counsel's own theory of mitigation that Petitioner had not intended to kill the victim. This resulted in unconstitutional prejudice to Petitioner's mitigation efforts. (Doc. 128, p. 47). The Magistrate Judge sets forth in detail the factual record upon which this conclusion is based:

> When put on the stand, Dr. Chiappone undercut the defense mitigation theory by testifying that Moore admitted lying to the police when giving his statements concerning the "accidental shooting" of Olinger. Dr. Chiappone further testified that Moore admitted to having shot the victim to avoid being identified. The exchange between Dr. Chiappone and the prosecutor during the
> mitigation phase was as follows:
>
> > Q: Dr. Chiappone, you reviewed all these tests, all these records. And again, you're still trying to find out why Lee Moore did what he did. Did you ever ask him why he killed Melvin Olinger?

> A: Yes, I did.
> Q: What did he tell you?
> A: Well what struck me is he had a difficult time explaining it, if you will. I asked him several times. It's almost like he didn't know what to do. He said he wasn't sure what to do. He said that he was afraid the man would identify him.
> Q: So he shot him so he would not be identified?
> A: That's the implication . . . .
> Q: Doctor, you are familiar with the previous statement that Lee Moore gave to the police, wherein he claimed this was all an accident?
> A: Yes, I am aware of that.
> Q: Did you specifically confront Lee Moore with that and ask him whether or not this was an accident when he shot Melvin Olinger?
> A: I am not sure if he used the word accident, but I did confront him about the information regarding his report to the police officers.
> Q: About the way he characterized it to the police?
> A: Correct.
> Q: What is your memory of how he characterized it at the time?
> A: Well, he told me that he made that up when he talked to the police, because he wanted to make it look like an accident.
> Q: So when he gave that statement to the police about dropping the wallet and the gun just went off and it was an accident, he told you that he made that up?
> A: That is correct.

(T.p. 1115-1117.)

Trial counsel's lack of preparation for the Chiappone testimony is not surprising in light of counsel's candid admission to the trial court (just 4 days before the start of the mitigation phase) that they had not yet spoken with their expert regarding his testimony. (T.p. 1050-1051).

The Magistrate Judge then analogizes Mr. Moore's case to established precedent from the Sixth Circuit:

> In *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000), the only expert witness put on by defense counsel undercut their entire defense theory that the defendant was too drunk and high on drugs to form intent. The court held that:

> Although Comb's counsel's decision may be considered a strategic one, it was a decision without undertaking a full investigation . . . . However, Stidham testified that defense counsel put Fisher on the stand in an effort "to establish that Combs could not act purposely and intentionally because of his diminished capacity," and Stidham admitted that he was "surprised" when Fisher testified to the opposite. Fisher's opinion regarding whether Combs lacked the requisite intent to commit the crimes was crucial to the defense theory; defense counsel's failure to have questioned Fisher in this regard prior to trial is inexcusable. Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly. Regardless of whether Comb's counsel should have known or instead actually knew Fisher's opinion regarding Comb's intent, however, counsel's decision to put him on the stand was objectively unreasonable.

*Combs*, 205 F.3d at 288.

> The Court finds that this case is similar to the *Combs* case. While the testimony in Combs occurred during the culpability phase and here it occurred in the penalty phase, it was no less detrimental. Counsel should have interviewed their expert witness before putting him on the stand where his testimony would contradict the defense mitigation theory. They should have been aware of the information he was going to testify to regarding Moore's statements to him about the shooting and confession. The State relied on this testimony in closing arguments in an attempt to show that Petitioner killed Olinger for the purpose of avoiding identification and to counter Petitioner's mitigation argument of remorse. The trial judge also relied on this testimony in sentencing as evidenced from his opinion, "[t]he defendant did not do this accidently, but, rather, as he told Dr. Chiappone, the victim was executed because the defendant was worried about being identified." (T.p. 1265.) Petitioner has shown prejudice: trial counsels' lack of preparation and Dr. Chiappone's testimony severely damaged the defense's mitigation case.

Doc. 128, pp. 45-47. The above discussion demonstrates that the Magistrate appropriately considered the state court record and applied the appropriate test under the Sixth Amendment.

Respondent incorrectly argues that the reference to *Combs* in the Report and Recommendation demonstrates a failure to give proper deference to the State Supreme Court's legal determinations as required by the AEDPA. Respondent contends that the Court cannot rely on Circuit decisions that involve, as *Combs* did, pre-AEDPA petitions. This contention is simply

incorrect.

Respondent suggests a Federal court cannot rely on pre-AEDPA circuit authority in determining whether to grant habeas relief. *See* Doc. 130 pp. 5-6. It is entirely appropriate for a Federal court to rely on Circuit authority under AEDPA when determining the reasonableness of a state court decision. In *Towns v. Smith,* 395 F.3d 251, 258-259 (6th Cir. 2005), a case governed by the AEDPA, the Sixth Circuit found ineffective assistance of counsel based on trial counsel's failure to investigate a potentially important alibi witness. The *Towns* Court cites *Combs*, among other cases, to support issuance of the writ. It did not matter to the Court in *Towns* that the decision in *Combs* involved a pre-AEDPA review. The import of both the *Combs* and *Towns* holdings is that *Strickland* is clearly violated by counsel's failure to properly investigate and prepare for mitigation. That is, the state court's application of the *Strickland* clearly contradicts *Strickland's* articulated standard for deficient performance of trial counsel. Both the Sixth Circuit in *Towns* and Magistrate Judge Merz properly cite *Combs* as support for the conclusion that Mr. Moore was deprived of his Sixth Amendment right to effective assistance of counsel and that he was prejudiced thereby. Ironically, to demonstrate the reasonableness of the Ohio Supreme Court's decision Respondent herself engages in the inquiry that she faults the Magistrate for conducting and offers pre-AEDPA Circuit authority to support the proposition the Ohio Supreme Court's decision is reasonable. *See* Doc. 130 pp. 6-7.

Respondent's suggestion that Magistrate Judge failed to apply appropriate AEDPA deference to the Ohio Supreme Court's analysis is contradicted by the Report and Recommendation. The Magistrate Judge quotes the AEDPA deference standard as set out at 28 U.S.C. §2254(d)(1) and (2). (Doc. 128, p. 26). Magistrate Judge Merz further explains the appropriate application of the AEDPA standard:

5

> The state court's decision is contrary to the Supreme Court's clearly-established precedent if (1) the state court applies a rule that contradicts the governing law as set forth by the Supreme Court case law, or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and none the less arrives at a result different from the Supreme Court precedent.

(Doc. 128, p. 26). The Magistrate Judge then notes that,

> The state court's decision involves an unreasonable application of clearly established federal law `if the state court identifies the correct governing legal rule [from the Supreme Court] but unreasonably applies it to the facts of the particular state prisoner's case,' if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply [,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply.

(Doc. 128, pp. 26-27). Thus, it is quite clear that the Magistrate Judge properly applies AEDPA deference principles to the analysis of the Ohio Supreme Court's resolution of Mr. Moore's IAC claim.

Indeed, when discussing the ineffective assistance of counsel claims, the Magistrate Judge accurately describes the *Strickland* standard and the Supreme Court's adoption of ABA Guidelines as applicable to the determination of whether counsel breeched the constitutional duty they owed to Mr. Moore to properly prepare for mitigation. (Doc. 128, pp. 39-40, citing *Wiggins v. Smith,* 539 U.S. 510 (2003). The Magistrate Judge states unequivocally, "Petitioner's four [IAC] sub-claims will be ***considered here in light of these standards.***" (Emphasis added). (Doc. 128, p. 40). Unquestionably, the Magistrate Judge applies the appropriate deference principles under §2254(d) and the appropriate, clearly established Supreme Court precedent to the IAC claim regarding which he recommends the granting of relief.[2]

Respondent's final basis is that the Ohio Supreme Court's decision is reasonable. *Id.*

---

[2] Although §2254(d) was properly followed by Magistrate Judge Merz, Petitioner demonstrates below that the Ohio Supreme Court failed to conduct an analysis of Petitioner's IAC claims under Supreme Court precedent thus

Given the record in this case and the controlling principle of law, the Magistrate Judge properly recommends granting relief. As will be explained below, both as a factual and legal matter, the Magistrate Judge is correct.

### 1. The Factual Record Supports the Recommendation of the Magistrate Judge.

At the time of Petitioner's trial (after conviction but before the mitigation phase), Petitioner's trial counsel informed the judge that "[w]e're still waiting to discuss [the expert's testimony] with [Chiaponne]." (Tr. Vol. 7, p. 1050). Even the prosecutor responded incredulously:

| | |
|---|---|
| Mr. Deters: | You've not been with Dr. Chiappone yet? |
| Mr. Deardorff: | No, I haven't. |
| Mr. James: | We met with him once **but haven't talked to him about his testimony.** |

(Tr. Vol. 7, p. 1050-1051). As previously mentioned, in light of this concession, it is no surprise that the devastating testimony from Dr. Chiappone (quoted above) occurred. The record in this case confirms that trial counsel utterly failed in their duty under *Strickland* to properly prepare for Dr. Chiappone's testimony.

At his deposition, Mr. James (Petitioner's state co-counsel) made it clear that he had no recollection of discussing Mr. Moore's conversations with Dr. Chiappone.

> Q: . . . I want to go back again to your discussions with Dr. Chiappone prior to trial. Now, as you recall today, is it–again, tell me do you have a recollection as to discussing with him anything that your client may have said to him during an interview by Dr. Chiappone.
>
> A: I can't say that I recall specifically talking to Dr.

---

obviating the need to give any deference to the Ohio Supreme Court's legal conclusions.

Chiappone about what Mr. Moore told him.

(James Depo., Vol. II, pp. 83-84). It is telling that he does not recall ever discussing the conversations that Mr. Moore had with Dr. Chiappone or his assistant. It is inconceivable that Mr. James would not have learned of the potentially fatal testimony had he simply reviewed everything that his client had discussed with Dr. Chiappone's office.

Trial counsel state that they were totally surprised by the Chiaponne testimony, confirming both their failure to obtain an independent expert as well the complete absence of any effective preparation. (Deardorff Dep. pp. 60-61). There can be no legitimate exercise of professional judgment that would explain counsel's decision to use an expert who would do nothing more than reinforce the prosecution's theory of a purposeful killing to protect the identity of defendant, and provide evidence of the absence of remorse.

As the Magistrate Judge accurately concludes, there can be no doubt that Dr. Chiappone's testimony was the single most powerful factor in producing a verdict of death. The prosecutor, in his closing argument, relied heavily on Dr. Chiappone's testimony:

> . . . in the third aggravating factor you weigh which the Defendant basically admitted–*he told Dr. Chiappone–you know, he asked, 'Why did you do this?'*
>
> My God, he said he was even trying to draw this out of him. You know, `You got this car. You got this wallet. You got everything you want. Why on earth did you have to kill him?
>
> Lee Moore *told Dr. Chiappone, `I killed him because he might identify me.'*

Tr. V. 7, pp. 1196-97. The prosecutor then uses Chiappone and his testimony to argue to the jury that Petitioner refused to take responsibility for what he did and showed no remorse. Further evidence of the critical importance of Chiappone's testimony is found in the Judge's explanation of his decision to impose a death sentence.

> The Defendant did not do this accidentally, . . . rather, *as he told Dr. Chiappone,* the victim was executed because the Defendant was worried about being identified.

Tr. V. 7, p. 1265.

Nothing can be more devastating to Mr. Moore's efforts to avoid the death penalty than this testimony by his own purported expert. Indeed, Mr. Deardorff confirms that Chiappone's testimony was fatal to Moore's mitigation case, "I believed at the time he was going to get the death penalty *based on what Dr. Chiappone said. He was cooked."* (Deardorff Dep. pp. 88-89). Appellate counsel agrees with that assessment noting that ". . . the mitigation expert [] turned out to be *a prosecutor's witness .* . ." (Agar Dep. p. 47). Ms. Agar explained further they had "obviously not prepped this witness well enough to know that he was going to absolutely slaughter them on the witness stand." (Agar. Dep. p. 48).

### 2. The Law Supports the Recommendation of the Magistrate Judge.

The Ohio Supreme Court's treatment of Moore's claim regarding trial counsel's ineffectiveness in the failure to prepare for their own expert's testimony is unreasonably sparse and contains absolutely no analysis of the applicable United States Supreme Court authority. The state court's basis for denying Moore's claim on direct appeal was that defense counsel undercut the damage of Chiaponne's testimony by noting that Moore fabricated the story of Olinger (the victim) dropping the wallet. *Moore,* 81 Ohio St. 3d at 36. Absolutely no other analysis is provided. The Ohio Supreme Court fails to explain how Mr. Deardorf's redirect, which reinforced Chiaponne's testimony that Moore allegedly lied to police about the accidental circumstances of the shooting, would somehow dilute the devastation of Chiappone's

accusations. One need only look to the closing argument of the prosecution and the statement of the sentencing judge, as quoted above, to know that there was nothing effective about trial counsel's presentation of Chiaponne's testimony, direct or redirect. Rather than meet their obligation under *Wiggins* to properly investigate their client's background to present mitigation and ***rebut*** the aggravating evidence, trial counsel's use of Chiaponne served only to add to the body of the state's aggravating evidence. This contravenes well-established, constitutionally mandated professional standards. *Wiggins*, 539 U.S. at 524; *see also Rompilla v. Beard*, 545 U.S. 374 (2005).

In any event, the Ohio Supreme Court fails to take the facts developed in the record and apply any *Strickland* analysis. That state's high court simply mischaracterizes trial counsel's redirect examination as somehow having "undercut the damage [done by Chiaponne's testimony]," and leaves it at that. *Moore*, 81 Ohio St. 3d at 36. The Court focuses on the supposed "curative" efforts of counsel but never addresses whether any professional judgment was exercised in the decision to present Chiaponne. *Id*.

Where the state courts fail to apply any appropriate federal analysis to the factual record, no AEDPA deference is accorded the state court conclusions and the federal courts will then conduct a *de novo* review. *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reasoning that because no state court had addressed Strickland prejudice prong its "review [of that issue was] not circumscribed by a state court conclusion . . . ."); *see also Clinkscale v. Carter*, 375 F.3d 430, 436 (6th Cir. 2004); *Newton v. Million*, 349 F.3d 873, 878 (6th Cir. 2003); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001). Magistrate Judge Merz' consideration of the law and record regarding the claim in question comports with these review standards.

Whatever degree of AEDPA deference that is applied to this issue, the Ohio Supreme

10

Courts' resolution is indefensible and clearly constitutes an unreasonable application of United States Supreme Court precedent on a number of levels. First, the Ohio Supreme Court never considered the two-part *Strickland* standard regarding the Chiappone testimony, instead focusing on curative measures. The Ohio Supreme Court failed to review whether (1) the decision to present Chiappone was tactical, let alone an objectively reasonable exercise of professional judgment; or (2) what prejudice may have inured from Chiappone's devastating admissions at the penalty phase.

Second, as a practical matter, the Ohio Supreme Court's reliance on defense counsel's "curative" efforts after torpedoing their entire mitigation defense does not address why defense counsel had to engage in a curative course of action in the first place. The Ohio Supreme Court's *Strickland* review should have focused on the conduct of counsel prior to Dr. Chiappone's pro-prosecution testimony. Rather, if counsel had been prepared, and had made a reasoned decision regarding Chiappone, they would not have called him as a witness at all. Alternatively, they would have lessened the blow of his testimony by bringing it out in direct and never would have argued the accident theory in their opening statement. The Ohio Supreme Court simply failed to consider whether this was a tactical decision.

In very similar circumstances involving an expert damaging a culpability defense in a death penalty case, the Seventh Circuit found the Indiana Supreme Court unreasonably applied *Strickland* explaining, "Nor did the Indiana courts give any reason for supposing it an even minimally intelligent tactic." *Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001); *see also United States v. Villalpando*, 259 F.3d 934, 939 (8th Cir. 2001)(Counsel ineffective in drug conspiracy and felon in possession of firearms case for eliciting testimony from a government's witness on cross-examination that the defendant made threats to her and told her that he had

ordered a murder. Although the court normally would not address an issue of ineffective assistance of counsel on direct appeal, the Eighth Circuit found that this error could not be explained by any possible strategy.).

The Sixth Circuit has followed *Combs* in other death penalty cases. In *Powell v. Collins*, 332 F.3d 376 (6th Cir. 2003), the Sixth Circuit in a similar circumstance noted counsel's ineffectiveness by presenting damaging evidence **at the mitigation phase:**

> Moreover, Dr. Schmidtgoessling presented damaging information to the jury. As we recently held in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000), presenting such damaging information, especially when first having failed to conduct a proper investigation, constitutes sufficient grounds to believe that the jury would have decided differently on the mitigation factors:
>
> The defense theory was that Combs's intoxication rendered him unable to act with purpose or prior calculation and design, and yet defense counsel made two crucial errors that substantially undercut this theory. We conclude that each of these errors is sufficiently prejudicial to satisfy the Strickland standard. . . . Presentation of Dr. Fisher's testimony is perhaps the most devastating error. *The testimony of the sole defense expert that Combs, although intoxicated, nevertheless acted with purpose and intent was obviously damaging to the defense. Furthermore, Dr. Fisher's testimony provided the State with its most powerful evidence of purpose.*

(emphasis in original). *Powell*, 332 F.3d at 401, *citing to Combs*, 205 F.3d at 290. Rather than look to Sixth Circuit authority, Respondent resorts to inapplicable authority from other circuits.

The authority relied upon by Respondent simply does not apply to Petitioner's or the *Combs*' circumstances. In *Messer v. Kemp*, 760 F.2d 1080, 1092 (11th Cir. 1985), the court considered an entirely different circumstance:

> Sawhill stated that he discussed her testimony with her on several occasions, and that he decided that the best approach would be to allow her to testify in a narrative fashion. Sawhill further stated that **he specifically instructed her not to mention that her son was anticipating the death sentence.** We refuse to fault an attorney for the spontaneous exclamation of an emotional witness where the attorney has specifically instructed the witness to avoid that topic.

(emphasis added). In Petitioner's case, defense counsel had not discussed Petitioner's alleged

damaging statement with their expert and were not aware of it prior to presenting Dr. Chiappone, Counsel's ignorance in this case, unlike *Messer,* was clearly the product of simply failing to prepare for the expert's testimony and not the product of the exercise of professional judgment *after* they became aware of his extremely damaging testimony.    In *Beaver v. Thompson*, 93 F.3d 1186, 1196 (4th Cir. 1996), the court also considered an equally inapposite factual circumstance.  The trial counsel made a calculated judgment to call the state's expert in their case in an effort to dilute his impact when called by the state.

> We think this testimony is, as his attorneys had hoped, ***more helpful to Beaver than harmful***. We conclude that the decision to call Dr. Dimitris was a reasonable tactical decision by counsel to control the presentation of evidence to diminish the force and effect of Dr. Dimitris' testimony and that this decision was within the standard of reasonably effective assistance of counsel.

The *Beaver* attorneys made a tactical decision to call a state's expert (who was going to testify anyway) and, according to the court, not only lessened the impact of the testimony, but presented helpful evidence.  In Petitioner's case, defense counsel made no such tactical decision because they were unaware of Dr. Chiappone's testimony.  If anything, *Beaver* supports the Magistrate Judge's recommendation because *Beaver* requires defense counsel to make an informed tactical decision and not fly by the seat of their pants and hope everything turns out okay.

Finally, in *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997), the court considered a circumstance where fully informed counsel made a tactical decision to present a witness:

> When Hoxsie's defense counsel decided to call Waters as a witness, Waters had not affirmatively named Hoxsie as the shooter. In fact, Waters told the police in his pretrial statement that, due to his level of intoxication, he could not remember what occurred the morning of the murder. Hoxsie's defense counsel clearly thought, based on Waters pretrial statements, that he would do poorly on the stand, perhaps even admitting to the shooting, and that the jury might conclude that Hoxsie was innocent.

In *Hoxie,* the Tenth Circuit concluded that there was evidence that the defendant actually changed his testimony after hearing the state's case. *Id.*   Unlike *Hoxsie*, Petitioner's trial counsel

13

here simply were not informed. They failed even to inquire of Chiappone as to the content of the conversations he had with their client regarding the core theory of mitigation – reduced culpability and remorse.

## CONCLUSION

In sum, there was no effort by the Ohio Supreme Court to apply the rules enunciated in *Strickland* and *Wiggins* to the record in Mr. Moore's case. Its complete failure to conduct any federal law analysis deprives the Ohio Supreme Court's decision of entitlement to any deference under AEDPA. But even applying AEDPA deference, the Magistrate Judge's review of the record here confirms that the Ohio Supreme Court's decision as to this claim was unquestionably "contrary to, [and] involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." (28 U.S.C. §2254(d)(1)) Moreover, the Ohio Supreme Court's decision regarding the presentation of Chiappone "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." (28 U.S.C. §2254(d)(2)).

Chiappone's testimony unquestionably gutted counsel's theory of mitigation (accident and remorse) and, in contravention of counsel's professional obligation under *Wiggins*, actually added to the evidence of aggravators that was expressly used by the trial judge to justify the sentence of death. In recommending the granting of the writ on this ground, the Magistrate Judge did what the Ohio Supreme Court failed to do. He properly applied the constitutional commands regarding counsel's performance enunciated on *Strickland* and *Wiggins* to the facts of this case. The Recommendation regarding this claim should be accordingly affirmed.

Respectfully Submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
Phone (636) 207 – 7330
Fax (636) 207 – 7351

-and-

MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan &
    Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
Fax: (859) 578-3365

COUNSEL FOR PETITIONER

CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the foregoing was filed with and will be made available to Respondent via this Court's electronic filing system and pursuant to Loc. R. 5.2 this constitutes service.

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142