## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **LEE E. MOORE,** | ) | **CASE NO.  C-1-00-0023** |
| | ) | |
| **Petitioner,** | ) | **Judge Dlott** |
| | ) | |
| **vs.** | ) | **Chief Magistrate Judge Merz** |
| | ) | |
| **BETTY MITCHELL, Warden** | ) | ***Oral Argument Requested*** |
| | ) | |
| **Respondent.** | ) | ***DEATH PENALTY CASE*** |

### PETITIONER'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

Now comes, Petitioner, by and through counsel and objects to portions of the

Chief Magistrate Judge's Report and Recommendation (Doc. 128) that denied in part the

majority of Petitioner's claims for habeas relief.  Petitioner's objections are more fully

explained in the attached Memorandum in Support.

Respectfully Submitted,


/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
Phone (636) 207 – 7330
Fax (636) 207 – 7351

-and-

/s/ Michael J. O'Hara
MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan &
     Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
Fax: (859) 578-3365

COUNSEL FOR PETITIONER

## MEMORANDUM IN SUPPORT

1.    Introductory Statement

The Chief Magistrate recommended granting in part and denying in part

Petitioner's Writ of Habeas Corpus.  Doc. 128.  The Chief Magistrate granted Petitioner

relief on an error similar to that in which the Sixth Circuit granted relief in *Combs v.*

*Coyle*, 205 F.3d 269 (6th Cir. 2000) and *Powell v. Collins*, 328 F.3d 268 (6th Cir. 2003).

In Petitioner's case, defense counsel were constitutionally ineffective in presenting the

very damaging testimony of Dr. Chiappone at the mitigation phase.  Respondent timely

filed his objections.  Doc. 130.  Petitioner timely filed his response.  Doc. 131.  Those

objections are currently pending.

As to the other Habeas Grounds, the Chief Magistrate recommended denying

habeas relief.  *See* Doc. 128.  Petitioner now timely files his objections.[1]

2.    Applicable Standard

The Chief Magistrate's Report and Recommendation is dispositive of Petitioner's

claims.  The governing rule under which this Court is to consider Respondent's

objections is Fed. Civ. R. P. 72(b).  The standard of review to be employed by this Court

is *de novo*.  28 U.S.C. § 636(b)(1) (2000); Rule 8(b) of the Rules Governing Section 2254

Cases in the United States District Courts (2005). *See Gomez v. United States*, 490 U.S.

858, 864-69, 874 n.28 (1989); *Flournoy v. Marshall*, 842 F.2d 875, 875-76 (6th Cir.

1988).  This applies for legal, mixed or factual questions.  *Thomas v. Arn*, 474 U.S. 140,

150 & n.8 (1985) (plain language of statute recognizes no distinction between legal and

factual matters)

---

[1]  Petitioner previously requested up to and including April 26, 2007 to file his objections upon
agreement by Respondent.  ECF 129.  The Court granted that request in a margin order.

3.    General Objections[2]

The Recommendation is a lengthy 139 pages.  As a result, Petitioner presents general objections that relate to the treatment of numerous claims.  Thereafter, Petitioner presents specific objections under the applicable habeas ground for relief.

Petitioner does not interpose an objection as to those sections of the Recommendation dedicated to the procedural history of Petitioner's case.  *See* Doc. 129 pp. 1-12.  Nor does Petitioner object to the description of the applicable standards.  *See id.* pp. 25-31.

Petitioner objects to the Recommendation's failure to consider the merits of claims presented in a *Murnahan* that received merits review.  *See e.g.* 128 pp. 31-32 (First Habeas Ground), 61 (Fifth Habeas Ground), 73 (Sixth Habeas Ground), 77 (Portion of Seventh Habeas Ground), 99 (Portions of Thirteenth Habeas Ground), 111 (Fifteenth Habeas Ground), 118 (Seventeenth Habeas Ground), 119 (Eighteenth Habeas Ground), 128 (Portions of the Twenty-first Habeas Ground).  Rather than assess the claims under cause and prejudice, the Recommendation should have addressed the merits of the claim.  Once the Ohio Supreme Court reached the merits of the *Murnahan* claim, the merits of the claims not presented were considered on the merits.  Further, because the merits of the underlying claim could not be independent of the assessment of the merits of the appellate claim, there can be no independent basis for a default and the merits had to have been considered.

Petitioner objects to the prejudice component described by the Recommendation

---

[2] In an abundance of caution and because the discussion of merits can in some instances be part or parcel to the merits, Petitioner incorporates by reference his previous objections regarding the limits placed by the Court on discovery and the failure to conduct an evidentiary hearing. *See* Doc. 94 (Objections to Denial in part of discovery); Doc. 106 (Objections to denial of evidentiary hearing); Doc. 110 (Objections to denial of supplemental recommendation regarding evidentiary hearing requests).

regarding appellate ineffectiveness "reasonable probability that inclusion would have

changed the result of the appeal." Doc. 128 p. 34 (citations omitted). To the extent this

created an outcome determinative test, Petitioner objects.

The United States Supreme Court has stressed that "the adjective ["reasonable"]

is important." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). In *Kyles*, the Court observed

as follows:

> The question is not whether the defendant would more
> likely than not have received a different verdict with the
> evidence, but whether in its absence he received a fair trial,
> understood as a trial resulting in a verdict worthy of
> confidence.

*Id*.; *Strickland v. Washington*, 466 U.S. 668, 693 (1984) ("a defendant need not show that

counsel's deficient conduct more likely than not altered the outcome in the case"); *Nix v.*

*Whiteside*, 475 U.S. 157, 175 (1986) ("a defendant need not establish that the attorney's

deficient performance more likely than not altered the outcome in order to establish

prejudice").

As explained in *Strickland* itself:

> "[R]easonable probability of a different result" is thus less than a
> preponderance of the evidence. It is present when an evaluation of all of
> the evidence that should have been before the jury is "sufficient to
> undermine confidence in the outcome."

*Strickland*, 466 U.S. at 693 (emphasis added). As noted in *Miller v. Anderson*, 255 F.3d

455, 459 (7th Cir. 2001),[3] where the court found ineffectiveness in a death penalty rape

murder when "we think the chance of an acquittal would still have been significantly less

than 50 percent; but it would not have been a negligible chance, and that is enough to

require us to conclude that the lawyer's errors of representation were, in the aggregate,

---

[3] The order to issue the writ was vacated following settlement by the parties. *Miller v. Anderson*,
268 F.3d 485 (7th Cir. 2001).

prejudicial."

      **<u>FIRST GROUND FOR RELIEF</u> – FORMER ATTORNEY CHUCK STIDHAM SUFFERED FROM AN UNDISCLOSED, ACTUAL CONFLICT BY SIMULTANEOUSLY REPRESENTING PETITIONER AND HIS CO-DEFENDANT, JASON HOLMES, WHILE PREPARING AND INVESTIGATING PETITIONER'S MITIGATION DEFENSE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Petitioner alleged that attorney Chuck Stidham,[4] who acted in the role of a mitigation specialist, possessed an actual conflict of interest from his joint representation of Lee Moore and his co-defendant Jason Holmes. The Hamilton County Court of Appeals appointed Stidham to represent Jason Holmes on May 10, 1994. *See* Doc. 29 at Exhibit 6 to Habeas Petition. Subsequently on June 20, 1994, Moore hired Stidham to investigate and prepare the mitigation phase of Moore's trial. *See* Moore Supp. Apx. Vol. I at p. 344. As noted by the Chief Magistrate, "no one presented the facts to Moore and asked if he wished to waive any possible conflict, nor were the facts presented to the trial judge so as to allow him to make an inquiry…." Doc. 128 p. 34. Petitioner alleged that the above concurrent and dual representations demonstrate an actual conflict of interest that adversely affected counsel's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 348-49 (1980); *accord*, *Mickens v. Taylor*, 535 U.S. 162 (2002).

      The Sixth Amendment right to counsel includes the right to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981); *Glasser v. United States*, 315 U.S. 60, 70 (1942). The duty of unfettered loyalty to one's clients is among the most central of a criminal defense attorney's responsibilities. *Strickland v.*

---

[4] Mr. Stidham no longer possesses an active law license. *Cincinnati Bar Association v. Stidham*, 721 N.E.2d 977 (Ohio 2000) (two –year suspension); *see* (Cook, J., Dissenting) (penalty to light, should be indefinite suspension). **During** his representation of Petitioner, Mr. Stidham was suffering from serious emotional impairments which played a part in his eventual suspension from the practice of law. (Stidham Depo., pp. 32-43).

*Washington*, 466 U.S. 668, 692 (1984). The existence of an actual conflict of interest

violates not only the Sixth Amendment, but also the due process guarantee of the Fifth

and Fourteenth Amendments. *Wood*, 450 U.S. 261.

The Recommendation correctly recognized that Stidham's conduct must be

assessed as attorney conduct regardless of the moniker that attached to Stidham's role as

a mitigation specialist. However, Petitioner objects to the Recommendation's conclusion

that Stidham's undisclosed, dual representation did not adversely affect Petitioner. Doc.

128 pp. 35-36.

The Chief Magistrate relied on the basis that Stidham may not have provided the

"sole" basis for retaining the very damaging witness Dr. Chiappone as a basis to deny

relief. *Id.* at p. 36. As background, the testimony of Dr. Chiappone was so damaging, the

Chief Magistrate recommended granting habeas relief on the basis of trial counsel's

presentation of such damaging testimony. *See* Doc. 128 pp. 45-48.

Dr. Chiappone testified contrary to Moore's interests by stating that Moore

confessed the shooting was not accidental, that he lied to police, and that the killing was

necessary to escape detection for the crimes. (Tr. V. 7, pp. 1116-1117). Indeed, the

testimony presented to the jury undercut Moore's entire defense to that point, that the

killing was not purposeful or with specific intent, and that in any event, Moore was

remorseful about the shooting. (Tr. pp. 552-553, 1080-1089). Instead, Dr. Chiappone's

testimony endorses Stidham's arguments simultaneously being made to the Hamilton

County Court of Appeals that Stidham's other client Jason Holmes was significantly less

culpable and that the bad actor in this case was Moore. *See* Doc. 29 at Exhibit 7 to

Habeas Petition at pp. 3, 4 and 9. While Stidham may not have been the "sole" basis

retaining Dr. Chiappone (*see* Doc 128 p. 36), Stidham testified he requested Chiappone

be brought into Petitioner's case. Stidham Depo p. at 111 lines 11-13. Stidham admitted

that no other experts were recommended based on the record. *Id.* at 110 lines 21-23.

Further, Petitioner objects to the Chief Magistrate's reliance on a "frozen" direct

appeal record as a basis to deny Petitioner's claim. Doc. 128 p. 36. Any such favorable

testimony as to Holmes (damaging as to Moore) could be used in subsequent challenges

to Holmes' conviction. James Depo pp. 21, 22, 23; *See Reynolds v. Chapman*, 253 F.3d

1337 (11th Cir. 2001) (*Cuyler* violated by simultaneous representation in post-trial

matters). Thus, Petitioner objects.

Finally Petitioner objects to the Chief Magistrate's denial of the claim in part on

the basis that any potential harm was averted by trial counsel's failure to call Mr.

Stidham. Doc. 128 p. 36. The record reflects that – due to Mr. Stidham's inattention –

trial counsel did not feel comfortable calling him as a witness, and as a consequence

presented the horribly damaging testimony of Dr. Chiappone which was helpful to Mr.

Holmes (Mr. Stidham's other client).[5]

To conclude, the simultaneous representation of Moore and Holmes created an

actual conflict of interest. Petitioner satisfies the *Cuyler* standard in that the conflicted

attorney Stidham contributed to the selection of the expert and provided the background

information to the expert, which formed the basis of the expert's testimony. Such expert

testimony torpedoed the mitigation phase and simultaneously provided support for the

co-defendant's case, also represented by the conflicted attorney Stidham. Because the

---

[5]Dr. Chiappone, for some reason, had a copy of Jason Holmes' statement in his Court Clinic file. (Court Clinic file, Bates pp. CC 0162-CC 0193). Mr. Stidham provided records to Dr. Chiappone. *See* Tr. p. 1110 (Dr. Chiappone noted in response to a state question that Stidham gathered information that assisted and contributed to Chiappone's assessment of Moore.)

above claim has substantial merit and satisfies the applicable constitutional standard,

Petitioner objects to the denial of this constitutional violation as not satisfying cause and

the Chief Magistrate's alternative denial of the merits.

> **SECOND GROUND FOR RELIEF – PETITIONER MOORE'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE MITIGATION PHASE BY (A) EMPLOYING A MITIGATION SPECIALIST WHO NEVER DISCUSSED SUBSTANTIVE MITIGATION ISSUES WITH PETITIONER MOORE AND FAILED TO ADEQUATELY ASSIST IN THE PREPARATION OF THE MITIGATION PHASE; (B) FAILING TO ADEQUATELY PREPARE FOR THE MITIGATION PHASE, DURING WHICH DR. CHIAPPONE, THE EXPERT OFFERED BY TRIAL COUNSEL, IMPEACHED PETITIONER MOORE'S ENTIRE LIABILITY AND MITIGATION CASE; (C) PRESENTED A HOPELESSLY INEFFECTIVE MITIGATION ARGUMENT WHICH ACTUALLY DAMAGED PETITIONER MOORE'S MITIGATION CASE AND FAILED TO EMPHASIZE PETITIONER MOORE'S YOUTH, REMORSE, AND PSYCHO SOCIAL BACKGROUND; AND (D) FAILING TO SEEK OR OFFER AN EXPERT TO TESTIFY AS TO THE EFFECTS OF EXTENSIVE ALCOHOL AND DRUG ABUSE ON PETITIONER MOORE.  THIS INEFFECTIVE ASSISTANCE VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO COUNSEL, NOT TO INCRIMINATE HIMSELF, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AND A RELIABLE SENTENCE.**

*IAC regarding mitigation preparation –*

Petitioner alleges an ineffective preparation for the mitigation phase.  Stidham,

retained by Mr. Deardorff and Mr. James for the sole purpose of preparing the mitigation

portion of the defense, did not effectively perform that function.

Mr. James testified in deposition that he would certainly expect Mr. Stidham to be

working with Dr. Chiappone in developing whatever mitigation evidence Dr. Chiappone

would be presenting at the penalty phase.  (James Dep. V. 2 p. 9).  The record reflects,

however, that Mr. Stidham had no communications nor any direct contact with Dr.

Chiappone,[6] prepared no report for Dr. Chiappone or counsel,[7] and was very late in

---

[6] Stidham Dep. p. 94.  Neither Stidham nor his assistant had any direct contact or communication

presenting any materials to the defense team.[8]  On August 11, 1994, Mr. James requested

Mr. Stidham to deliver his mitigation evidence and material "within the next few days."

James informed Stidham that he would need his information "so that we can get

Chiappone started."  (James Letter to Stidham, August 11, 1994, Petitioner's Exhibit 11

to Stidham Deposition). Those materials were not forthcoming.

   The time sheets of Mr. Stidham and his assistant reveal that their interviews with

"family and friends" were not completed until October 28, 1994 (less then two weeks

prior to the beginning of trial).  (See Assistant's Time Sheet, Petitioner's Exhibit 2 to

Stidham Deposition).  While Mr. Stidham's time sheet reflects "preparation of

documentation to be sent to Dr. Chiappone" on September 20, no entry reflects delivery

and James letter confirms that the documentation had not been delivered as late as

September 23.  (See Stidham Time Sheet, Petitioner's Exhibit 3 to Stidham Deposition,

and see James Letter to Stidham September 23, 1994, Petitioner's Exhibit 12 to Stidham

Deposition).  Dr. Chiappone confirms Stidham's dilatory action:

> Forgive me now, I can't remember the specifics, but he [Stidham] was
> supposed to help with this case, and if I remember correctly he was
> dragging his feet, didn't get some stuff, and so I think that's what that's
> referring to.

(Chiappone Dep. p. 99).  When asked about inability to get information from Stidham,

Dr. Chiappone recollected, "but I remember in general. You look back at the case and

say, oh, yeah, we had -- we couldn't get some stuff. . . . I didn't mean we didn't get it, but

it wasn't coming the way we thought it would." (*Id.* p. 100).  In any event, no materials

---

with Chiappone, as confirmed by their time sheets.  *Id.*

  [7]  Deardorff Dep.  pp. 50-51, where Deardorff states he does not recall receiving a report from
Stidham and, in any event " didn't use a lot of Mr. Stidham's stuff."

  [8]  Stidham Dep. pp. 121-123; and see Petitioner's Exhibits 12 and 13 to Stidham deposition.

were received from Stidham by Chiappone until approximately 2 weeks before the trial was to start.  Chiappone does not recall ever speaking with Stidham prior to the mitigation hearing. (*Id.* at 103).

As late as November 2, 1994 (a week before Petitioner's trial), Mr. Stidham had not shared his "mitigation materials" with trial counsel.  (James Letter to Stidham, November 2, 1994, Petitioner's Exhibit 6 to Stidham deposition; and see James Letter to Deardorff, November 2, 1994, Petitioner's Exhibit 2 to Deardorff Deposition). Mr. James requested receipt of those materials by November 7, just 2 days before the beginning of trial.  It is inconceivable that trial counsel could have adequately absorbed the materials and prepared a competent mitigation case on the eve of jury selection and a capital trial. Mr. Deardorff recognized that "during the mitigation phase, I didn't use a lot of Mr. Stidham's stuff . . . I kind of shied away from Mr. Stidham in the mitigation phase. . . . . I felt like Chiappone was going to be more effective than Stidham.  I wanted not to use Stidham.." (Deardorff Dep.  pp. 50-51).  Although Stidham was assigned the responsibility of putting together a mitigation case, he was not requested by either James or Deardorff to attend or participate in any way in the mitigation hearing. (Stidham Dep. p. 121).  During this time there is no question that Mr. Stidham was acting as an attorney for Petitioner.   All of his correspondence requesting information on Petitioner's behalf was sent on his law firm's letter head, identifying Stidham as an attorney.  (Stidham Dep. p. 137).  For this and other reasons, the Chief Magistrate rightly found Stidham acted as an attorney under the Sixth Amendment.  Doc. 128 pp. 34-35.

Additionally, every member of the defense team, James, Deardorff and Stidham, were aware of Petitioner's history of drug and alcohol abuse.  In fact, these issues are

noted by Mr. Stidham's assistant in his mitigation notes.  (Petitioner's Ex. 6, Bates p.

9014, attached to Stidham Deposition.).  Mr. Stidham was or should have been aware that

drugs and alcohol played a role in the shooting of the victim.  (Stidham Depo., p. 80).

Indeed, drug and alcohol abuse was specifically mentioned by trial counsel in their

opening statement (Tr. Vol. 4, pp. 53-54), and Petitioner's $350.00 a week marijuana

habit and his alcohol abuse were mentioned in the mitigation hearing.  (Tr. Vol. 7, p.

1104).  In spite of counsel's knowledge of this history, no one on the defense team ever

considered hiring an expert specifically to address the issues of drug or alcohol addiction

and related mental disorders.  (Stidham Depo., p. 111).  Dr. Chiappone concedes that, at

the time, he did not consider himself to have any specialty with respect to treatment of

alcohol and drug abuse.  He was not asked by trial counsel to perform any specific tests

relating to those issues in Petitioner's case.  (Chiappone Depo., pp. 26-28).  Thus,

Petitioner objects to the recommendations statement that no additional mitigation could

have been presented, especially regarding the impact of drug and alcohol abuse.  Doc.

128 pp. 48, 55.

        Petitioner objects to the recommendation's characterization that Petitioner is

raising an ineffective assistance of a mitigation specialist claim.  Rather, Petitioner asserts

trial counsel deferred their responsibility to another attorney who acted as a mitigation

specialist, but who did not effectively perform their responsibility.  Because of this trial

counsel, could not make a reasoned judgment.  Rather they were extremely limited by the

initial inept investigation.  Petitioner's arguments closely resemble those upon which

Judge Graham granted relief in *Johnson v. Bagley*, Case No. 1:02-cv-220 (S.D. Ohio Apr.

24, 2006) (Doc. 74).

Petitioner objects to the Chief Magistrate's statement that the ABA Guidelines do not mandate a "mitigation specialist." Doc. 128 p. 40. ABA Death Penalty Guideline 4.1(A)(1) ("The Defense team and Supporting Services") requires that a defense team consist of "no fewer than two attorneys qualified in accordance with Guideline 5.1, and investigator, and a mitigation specialist." *See also* ABA Death Penalty Guideline 10.4 (C)(2)(a). The Commentary to the Guideline 4.1 notes "A mitigation specialist is also an indispensable member of the defense team throughout all capital proceedings."

Petitioner objects to the Chief Magistrate's reliance on trial counsel's testimony that they shied away from Mr. Stidham as a witness. Doc. 128 p. 41. It is because Mr. Stidham was inattentive and not working with trial counsel that such a decision was thrust upon them. Rather than being a reasoned tactical decision, the decision was based upon an ineffective investigation that did not satisfy the Sixth Amendment. *See e.g.* *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006); *Poindexter v. Mitchell,* 454 F.3d 564 (6th Cir. 2006); *Dickerson v. Bagley,* 453 F.3d 690 (6th Cir. 2006); *Powell v. Collins*, 328 F.3d 268 (6th Cir. 2003); *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000).

### IAC regarding the presentation of damaging evidence via Dr. Chiappone –

Petitioner does not object to the Chief Magistrates treatment of sub-section (B) of this Ground. Doc. 128 pp. 45-48. Respondent has lodged objections (Doc. 130), to which Petitioner has replied. (Doc. 131). Those objections are currently pending before the Court.[9]

### IAC in presenting a woefully ineffective opening and closing at the mitigation phase –

---

[9] The Chief Magistrate discussed *ex parte* contacts between the trial court and the prosecutor. Doc. 128 p. 44. Petitioner references and incorporates his objections as to the Eighteenth Ground.

Petitioner alleges that the opening and closing arguments of trial counsel at the mitigation phase did not satisfy the Sixth Amendment.

Specifically during his opening, Mr. Deardorff gives the jury the false impression that it was Defendant's heavy burden to overcome the overwhelming evidence already presented by the prosecution, despite the fact that no evidence regarding mitigation had yet been presented and although due process places the burden on the state.

> ***We have to convince you*** that right now all you've heard are aggravating circumstances, we're up here. You know, if you're playing basketball right now, ***its ninety-eight for the prosecutor, its zero for Mr. Deardorff. I have to do something in the second half to make it a hundred and one for Mr. Deardorff, ninety-nine for the prosecutors.*** We have to outweigh what the prosecutors have shown you.

(Tr. Vol. 7, p. 1083). Not only does the defense attorney shift the burden from the prosecutor to Petitioner, he begins mitigation by incorrectly conceding that they have an enormous deficit to overcome.

Trial counsel exacerbates the damage done by this misstatement of Defendant's burden by further telling the jury, "[m]aybe . . . a very long term in prison would be fair. ***Or, if not, if I can't convince you, and you feel he deserves the death penalty,*** then maybe, for his family, I can tell why this happened. . ."  (Tr., V. 7, p. 1082).  Trial counsel, thus, concedes in his opening that death may be the appropriate sentence then offers no cogent theory or argument regarding what evidence they intended to present in mitigation of sentence.  (Tr., V. 7, p. 1080 - 1087).  In light of the above arguments, Petitioner objects to the recommendation's conclusion that trial counsel presented a cogent opening argument to further the mitigation defense.  Doc. 128 pp. 49-50.

The closing was nearly incoherent as Deardorff was admittedly rattled by the irreparable damaged done by Dr. Chiappone. (See, Deardorff Dep. pp. 78-81). The closing was dedicated to impugning Petitioner Moore's character; emphasizing a *lack of mitigating* factors, an absence of remorse; and the brutality of the shooting. (Tr. V. 7 1200-1222). The closing argument was contradictory, directionless, incriminating and never effectively argued the existence and weight of mitigating factors.

First, trial counsel eliminates any credibility his case has by informing the jury, in effect, that he has no faith in his client or his client's case and eliminates one of their main theories of mitigation, residual doubt as to whether the shooting was the consequence of an accident.[10]

> …as Mr. Deters says, is : Did he accidentally shoot him? That's what he said he did. *I don't know if it's true, but it doesn't matter anymore*…" (Emphasis added). (Emphasis added). (Tr. 1202).

> . . . but the bottom line - - *cut out all the garbage - - he shot Mr. Olinger and stole his card and used his credit cards.* That's the bottom line, that's what he did. (Emphasis added). (Tr. 1202).

Trial counsel next emphasizes the guilt of his client and the gruesomeness of the offense.

> [Co-Defendant] Larry [Kinley] was not believable, but that doesn't matter because that's - - as Mr. Deter's said *we showed you other things to find him guilty*… (Emphasis added). (Tr. 1204)

> So maybe when he gave his statements, Lee didn't remember. *I mean, if you shoot somebody in the head,* and your in a little area *and his brains fly out all over the wall, that is going to have an effect.* (Emphasis added). (Tr. 1205).

---

[10] Mr. Deardorff confirmed in his deposition that "accident" would be a focus at both the guilt phase and mitigation. (Deardorff Dep. p. 23). Indeed Mr. Deardorff remains convinced that the shooting itself was accidental. *Id.* There can be no logical justification, therefore, for telling the jury that he questioned the truthfulness of this contention, i.e., did not really believe his client and that, in any event, "it didn't matter." (Tr. 1202).

> But the point is that, whatever statement he [Lee Moore] gave  - - *I don't know if he was lying,* if he wasn't lying . . .  (Emphasis added). (Tr. 1205).

> . . . Lee didn't say he put [the victim] on his knees. *I don't know if he did or he didn't* . . . But I don't think it's proven, if that's one of the factors beyond a reasonable doubt to you that he put him on his knees and shot him.  That's the bottom line.  He shot him.  So what do I say? (Emphasis added). (Tr. 1206).

Mr. Deardorff then concedes everything that the prosecutor has told the jury to counter mitigation.

> Everything they tell you, everything they're going to tell you, *everything Mr. Peipmeier told you - - we didn't contest that* .

> *Mr. Piepmeier was right.*  I wish I could tell you I've got a---he was sexually abused when he was three, that he was left on streets when he was six.  I don't have that.  But what I do have is to show that he was raised in a good family.  (Tr. 1214).

Finally, after reviewing the relevant portions of his closing argument, Mr. Deardorff admits that, at one point in his closing argument, he is clearly telling the jury that Petitioner does not want to accept responsibility for his actions. (Deardorff Dep. p. 79).

This point is reinforced by Mr. Deardorff's following closing comments:

> I don't know how many defendants I've seen as a prosecutor all of a sudden they fine God, *we all find . . . as soon as we're caught,* we all find God.  But you can look at their family backgrounds *and see it's a sham when they sit here and tell you they find God.*

(Tr. V. 7 p. 1214).

Deardorff does further damage to his client in closing argument when addressing the issue concerning Petitioner's ability to work well in the structured setting of a prison.

His future in the jail–as I said, he would get along in a structured setting.  So what does that mean?  ***Oh, thats great.  We're going to send Lee off to a place where he is going to get along great.  That doesn't sound fair to the Olinger family, that he is going to go to jail where he can do well.***

I think what that means is, if Lee went to jail for the next fifty-three years, he could be beneficial to other people in our prison system.  ***I don't know how.  I don't know how.***

Mr. Deardorff practically invites the jury to return a death penalty when he says, "I know I wouldn't want to go to jail for seventy-three years, I'd rather you put me to death."  (Tr. V. 7, p. 1221).

Where counsel creates a more damaging image of his client than the prosecution, constitutional ineffectiveness is present and prejudice should be presumed.  *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997).

Petitioner objects to the recommendation's conclusion that trial counsel presented a closing argument that satisfied the Sixth Amendment.  Doc. 128 pp. 50-55.[11]  Rather, and as established by the above, where counsel creates a more damaging image of his client than the prosecution, those attorneys are ineffective under the Sixth Amendment. *Spisak v. Mitchell*, 465 F.3d 684 (6th Cir. 2006); *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997).

> **THIRD GROUND FOR RELIEF – MOORE'S ATTORNEYS RENDERED THE INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO REQUEST AN INTOXICATION INSTRUCTION AND FAILING TO SECURE THE ASSISTANCE OF A FORENSIC EXPERT TO CHALLENGE THE STATE'S THEORY IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

---

[11] To the extent needed, Petitioner objects to any insinuation he "erroneously quote[d] the record" in support of his claim.  While Petitioner did not provide the entire argument in his claims, he verbatim provided the problematic arguments, and, where appropriate, provided ellipses so the Court would be aware of any non-included portions of the closing.

Petitioner objects to the Recommendation's conclusion that the evidence did not support the issuance of a voluntary intoxication instruction at the culpability phase, and therefore counsel were not ineffective. Doc. 128 pp. 57-58. There is no dispute as to Petitioner's drug and alcohol use the night of the offense. Also, there is no dispute trial counsel argued in opening that this intoxication affected Petitioner. Tr. 554. Further, there is no dispute that Petitioner received an instruction on a lesser offense. *(See* Tr. pp. 933, 935 (involuntary manslaughter)). Finally, Under Ohio law and as noted by the Sixth Circuit, voluntary intoxication may be considered in determining whether an act was done intentionally. *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) ("In Ohio, evidence of voluntary intoxication 'may be considered in determining whether an act was done intentionally or with deliberation or premeditation.' *Ohio v. Fox*, 68 Ohio St. 2d 53, 428 N.E.2d 410, 412 (Ohio 1981)."). Therefore, it was constitutionally ineffective not to follow up on their promise in opening and as supported by the evidence to request an intoxication instruction, and thus, Petitioner objects.

Petitioner also objects to the Chief Magistrate's recommendation that Petitioner's actions precluded such an instruction. Doc. 128 pp. 57-58. The state presented evidence what Petitioner drank (gin and beer) and as to other drug use (two blunts of marijuana). It was a jury function to determine whether Petitioner's actions while voluntarily drunk could provide a defense – but trial counsel did not request such an instruction even though enough evidence was present to allow instruction on a lesser included offense. Because the state presented the evidence and the evidence presented enough value to merit an instruction on a lesser included offense, the request for an instruction would have been granted.

Petitioner objects to the Recommendation's conclusion that trial counsel can argue a gun accidentally discharged in opening statement and then not present evidence of the same. Doc. 128 p. 59. Defense counsel argued such in the opening statement. Tr. 553-554. Indeed, the physical and forensic evidence supports a defense theory of accident, the bullet path was upwards – inconsistent with the state's theory of having the victim kneel and then being shot in such a circumstance the bullet path would have been downward. However, defense counsel did not present any expert testimony, or otherwise, to support Petitioner's statement the gun fired accidentally. *See Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002)(Counsel ineffective, under AEDPA, in third trial of drug trafficking case for promising the jury four times in the opening to call the defendant as a witness, but then failing to keep those promises.); *Harris v. Reed*, 894 F.2d 871, 878-79 (7th Cir. 1990); *Anderson v. Butler*, 858 F.2d 16, 18 (1st Cir. 1988). "The rationale for holding such a failure to produce promised evidence ineffective is that when counsel primes the jury to hear a different version of the events from what he ultimately presents, one may infer that reasonable jurors would think the witnesses to which counsel referred in his opening statement were unwilling or unable to deliver the testimony he promised." *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166-67 (3rd Cir. 1993).

**FOURTH GROUND FOR RELIEF– ONE OF PETITIONER MOORE'S TRIAL COUNSEL CONTINUED TO REPRESENT HIM ON HIS INTERMEDIATE DIRECT APPEAL AND RENDERED INEFFECTIVE ASSISTANCE AT THIS STAGE BECAUSE HE HAD AN ACTUAL CONFLICT OF INTEREST AND BECAUSE HE FAILED TO RAISE MERITORIOUS ISSUES. THIS VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO COUNSEL, DUE PROCESS, EQUAL PROTECTION, AND A FAIR PROCEEDING.**

Petitioner does not object to the Recommendation's treatment of this Habeas Ground regarding Mr. Deardorff's alleged conflict. However, Petitioner does object

under each claim where appropriate as to the recommendation's treatment of appellate counsel ineffectiveness claims on the merits or as cause and prejudice regarding procedural default.

> **FIFTH GROUND FOR RELIEF** –THE TRIAL JUDGE WAS NOT AN IMPARTIAL JUDGE AT TRIAL OR ON POST-CONVICTION, AS EVIDENCED BY HIS DESIRE TO HAVE PETITIONER MOORE EXECUTED IMMEDIATELY AFTER SENTENCING HIM TO DEATH, THUS VIOLATING PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHT TO AN IMPARTIAL TRIBUNAL, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AND A RELIABLE SENTENCE.

Petitioner raised many facets individually and cumulatively challenging the partiality of the trial court judge.

> **B.    The Trial Judge's Desire to Have Petitioner Executed Immediately Without Providing Him with His State and Federal Appeals Showed His Actual or Apparent Bias Against Petitioner and His Hostility to Petitioner's Rights.**

During sentencing the trial judge made no effort to conceal his disdain for the legally mandated post-conviction and federal habeas corpus processes. When sentencing Petitioner to death, the trial court made it clear that he wanted Petitioner to be executed immediately – regardless of his statutory and constitutional rights to appeal and post-conviction remedies:

> One last comment, Mr. Moore.  You know, I'm required by law to set this execution date of – I put down May 16th, 1995, but you won't be executed then.  ***In fact, I'll probably be retired – seriously – by the time you're ever executed, and you'll be a middle-aged person, because you're going to the safest place in the United States.  And the safest place in the United States right now is Ohio's Death Row.*** You'll be completely protected.  If there's a riot, you'll be protected.  You won't be killed by other prisoners, because they protect you there.  If there is a fire, you're the first one they're going to get out.
>
> The only person I know if that – when I was a prosecutor, we prosecuted Mr. Mize, John Mize.  He's the only person I know to have died on Death Row in the last over thirty years, and he died from natural causes.  And the

only irony in that case is that, if he hadn't have died of cancer, he'd still be alive today on Death Row.

> ***The delays brought on by the Ohio Post-conviction Relief statute and the Federal Habeas Corpus procedure that we now have caused the citizens to really distrust our justice system, and hopefully, our newly elected federal legislators will pass laws that restrict the Federal Habeas Corpus procedure as a methods to unjustly delay these convictions.***

> If we're going to volunteer the death penalty, we should use it. I believe in it. ***I believe it should be used and not delayed. And yours shouldn't be delayed. But now it probably will.***

> We took a big step in November when we passed the law that gets rid of intermediate appeals, but, still, ***we need to get rid of Ohio's Post-conviction Relief Statute and the federal habeas corpus delays*** which are part of that statute. It's wrong. It's causes people to really think this system is not a fair just system, when sentences are not carried out.

> Okay. You can take him away. That's the sentence of the Court.

(Tr. V. 7, pp. 1269-1271 emphasis added).

These comments are consistent with other public comments made by the trial court. *See* Doc. 115 p. 50 n. 7. While the trial judge has certainly been open and straightforward about his personal biases against a defendant's constitutional and legal right to pursue post-conviction relief, they are ***biases*** nonetheless. Petitioner objects to the Chief Magistrates recommendation that the above bias does not constitute a disqualifying bias. Doc. 128 pp. 63-64; *see Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986); *Bracy v. Gramley*, 520 U.S. 899 (1997).

**C.    Trial Court's Conduct Throughout Petitioner Moore's Trial Showed His Actual or Apparent Bias Against Petitioner and the Defense as Well as His Hostility to Petitioner's Rights.**

      **1.    During the pre-trial phase, the trial court refused to permit Petitioner to present evidence regarding the racial imbalance of the petit jury venire.**

Petitioner requested a new jury venire picked because the venire of 50 prospective jurors had only 5 African-American jurors.  (Tr. V. 2, pp. 212; 220-227).  Of these 5 African-Americans, only one was male.  (Tr. 212-213; 215-216).  Trial counsel argued that this petit jury venire failed to reflect a representative cross-section of the community, including a cross-section of Petitioner's race (African-American), gender (male), and age (19).  (Tr. V. 2, pp.  212-215; 217).

While the trial erroneously denied trial counsel's request for time to prepare and present evidence on this issue, he nonetheless permitted the prosecutor to present the testimony of the county jury commissioner.  (Tr. V. 2, pp. 218-227).  At the conclusion of this testimony, he denied trial counsel's motion for a new venire without giving any specific reasons.  (Tr. V. 2, .p. 227).

Petitioner objects to the basis of the Chief Magistrate's recommendation that the trial court allowed both sides to argue their case.  Doc. 128 p. 66.  As noted above, in spite of a marked disparity and because a request for a continuance was denied, the trial court deprived Petitioner of the real opportunity to argue his challenge to the petite venire.

> **2.      During *voir dire*, the trial court refused to permit Petitioner to fully explore the potential biases of the prospective jurors and denied Petitioner's challenge to the prosecution's removal of an African-American woman from the jury.**

During *voir dire,* the trial court told counsel that "you can object all you want on this voir dire stuff when it comes up for cause on – when somebody says they can't follow the law, there's a point where, if they answer my question a certain way I'm going to excuse them."  (Tr. V. 2, p. 320).  In fact, the trial court interrupted trial counsel and prevented him from fully exploring whether a prospective juror would consider sorrow or

remorse as a mitigating factor.  (Tr. V. 2, pp. 347-349).  The trial court stated that he did not think that a defendant's remorse was a mitigating factor that could be considered and sustained the prosecutor's objections to those questions.  (Tr. V. 2, pp. 349-350).  As a matter of law such remorse must be considered as a mitigating factor where evidence of remorse is presented.  The natural consequence of this ruling is eliminating counsel's ability to discover whether any of the jury members would refuse to properly consider remorse as a mitigating factor.

The trial court said that as long as the prospective jurors agree to follow the law and the instructions then that is all that is required.  (Tr. 347-348; 350).  He even ruled that the questions being asked by trial counsel were improper because they had nothing to do with the prospective jurors' ability to be fair and impartial.  (Tr. 350).  This ignored the proper legal standard in a capital case – jurors in a capital case must be asked if they would impose the death penalty automatically without regard to mitigating factors. See *Morgan v. Illinois,* 504 U.S. 719 (1992).  Petitioner objects in that the recommendation does not address this argument.

Additionally, in ruling upon trial counsel's *Batson* objection to the State's peremptory challenge to Prospective Juror Freeman, an African-American woman, the trial court upheld the peremptory challenge in part based upon his own subjective observation of Ms. Freeman's body language.  His own observation of Ms. Freeman was that she was "defensive with the prosecution and I sensed a little hostility." (Tr V. 2 p. 413-414).

One reason for the challenge, according to the prosecutor, was that an uncle of Ms. Freeman's was a lawyer in Columbus and had once been a public defender.  (Tr V. 2

p. 414). The trial court stated that when he was a prosecutor every defense attorney struck his relatives. *Id.* He also stated that from reading a Columbus magazine, that in Columbus "they" are "very hostile" towards prosecutors and police," a point not raised by the prosecutor and a point for which there is no support in the record. *Id.* Permitting the striking of a black juror without a proper basis, when the venire already failed to reflect a fair racial cross-section of the community, exacerbated the prejudice caused to Petitioner. Petitioner objects to the recommendation in that it relies on the basis provided by the trial court (*see* Doc. 128 pp. 66-67), which establishes the bias of the trial court.

### 3. During the liability phase, the trial court failed to promptly excuse a sleeping juror, improperly denied Petitioner's objections, assumed Petitioner would be convicted, and improperly permitted the jury to conduct an experiment.

The trial court refused to excuse Juror No. 2 despite being informed twice by trial counsel that the juror was falling asleep during the proceedings. (Tr. p. V. 526-527). In refusing to excuse the juror, the judge – who admitted that he had not been watching the jury – stated that he had not seen the juror fall asleep. (Tr. p. V. 527). It was only after the judge's bailiff informed him that this juror was indeed falling asleep that the juror was excused. (Tr. p. V.4, p. 685-689). Petitioner objects to the Chief Magistrate's treatment of this argument. Doc. 128 p. 68. It is not that the sleeping juror remaining caused prejudicial harm – its that the trial court's actions demonstrate a bias against valid objections made by Petitioner at the time of trial.

Additionally, when trial counsel objected to the victim's father testifying about what the victim did on the day he was killed, the judge denied the objection. The judge's hostility to the defense is demonstrated in the following exchange:

    Q:    And, sir, will you tell the jury the nature of that

contact?  What happened when he [victim] came home?

A:      Well, he came home and brought his clothes and shaving kit inside - -

MR. JAMES:  There will be an objection again, Judge.

THE COURT: It is overruled.

MR. JAMES:  We're willing to acknowledge this man's son - -

THE COURT: It is overruled.  Have a seat.  I said it was overruled and I know the reason.  Have a seat.

MR. JAMES: Judge, if the prosecutor doesn't know the objection -

THE COURT: Overruled.

MR. JAMES:  - - I don't know how you can.

THE COURT: Have a seat.

MR. DEARDORFF:   Can we request a side bar for the record?

THE COURT: No, you can't.  Have a seat.

MR. DEARDORFF: Your Honor, we are entitled to make a record for the Appellate  - -

THE COURT: You made a record.

MR. DEARDORFF: You don't even know what the objection is.

THE COURT: Have a seat. . . .

(Tr. V. 4, p. 559-560).  At the first break, trial counsel stated that his objection was based

on relevance and the argument that what the victim did that day was not relevant.  (Tr.

V. 4, p.  629).  He argued that the State was trying to present the picture that the victim

was a dutiful son and that this was not relevant to whether Petitioner Moore was guilty of the charges. (Tr. V. 4, p. 629). In response, the trial judge ruled it relevant, despite clear law to the contrary. (Tr. V. 4, p. 629). Ohio's death penalty scheme does not provide for the consideration of any victim impact testimony. Nor has the Supreme Court ever permitted it in the **culpability phase**. *Payne v. Tennessee,* 501 U.S. 808, 825 (1991). Thus, Petitioner objects to the Chief Magistrate's treatment of this claim. Doc. 128 p. 68.

During closing argument the trial court failed to intervene when Prosecutor Deters encouraged the jury to perform its own experiment regarding the victim's position when he was shot. (Tr. 956-957). The coroner had testified that the victim's position (he was found lying on his back with his legs bent underneath him) was the result of either the position he was in when he was shot or the position he was placed in after he had been shot, and over trial counsel's objection, that this position would not be highly unusual if the victim had been kneeling when he was shot. (Tr. 856; 879). During closing argument at the liability phase, Prosecutor Deters told the jury to

> go back in the jury room – nothing prevents you from doing this.
> Go back and see how did he get in that position, what you have to
> do. You're like this (indicating). He's like this on his knees. ....
> After you're down like this, have somebody take that State's
> Exhibit 16 [the gun] and see what your reaction is. Do you think
> you might maybe turn away from that gun and tilt your head back
> a little bit?

(Tr. 957). Judge Ruehlman's failure to intervene and instruct the jury not to perform its own experiment permitted the jury to base its verdict on additional evidence not admitted at trial. *See Turner v. Louisiana,* 379 U.S. 466, 472-473 (1965)(evidence must first be presented at trial); *In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982). The

effect of this argument is to ask the jury to re-enact the prosecutor's version of the shooting by putting the jury members in the position of the victim.

Petitioner objects to the recommendation's conclusion this claim is without merit. Doc. 128 pp. 69-70. Petitioner is unaware of any case that allows the request of a jury to conduct an experiment in the jury room by putting the murder weapon to the head of another juror. The extreme nature of the argument demonstrates the trial court's bias for failing to intercede.

### 4. The trial judge had improper *ex parte* contacts with defense expert and improperly permitted the prosecutors to urge the jurors to identify with the victim.

The trial court had an *ex parte* conversation with Dr. Chiappone, the psychologist presented by trial counsel at the mitigation hearing, to discuss the doctor's position and duties. (Tr. V. 7, p. 1119). This meeting with the court-appointed defense expert constituted both actual and apparent impropriety. (T.d. 83; 95; 115; 117). Petitioner incorporates his discussion as to objections to the Eighteenth Ground for Relief.

### 5. During the post-conviction proceedings, trial court ruled upon Petitioner's petition despite his earlier comments in this case calling for the elimination of the post-conviction process.

As demonstrated above the trial court expressed in unequivocal terms his bias against affording Petitioner any post conviction rights. He expresses his personal regret that a defendant he had prosecuted when he was an assistant prosecuting attorney had not yet been executed and, as part of the sentencing proceeding, informs Petitioner that the post conviction relief statute should be repealed. (Tr. V. 7, p. 1270) Having so publicly criticized the existence of Ohio's post conviction relief statute and inveighed against the delays in executions in Ohio, it is inconceivable that the judge could serve as an impartial

jurist in Petitioner's post conviction relief proceeding.  *See In re Disqualification of Ruehlman* (1991) 74 Ohio St.3d 1229, 1229-1230.

Petitioner objects to the recommendation's conclusion that this aspect is procedurally defaulted.  Further, as to the alternative merits ruling, Petitioner objects because the trial court's remark "suggests 'the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind' such that a reasonable person could question whether the decision on the pending motion 'will be governed by the law and the facts.'" *In re Disqualification of Ruehlman* (1991) 74 Ohio St.3d at 1229-1230.

**D-G.**

Petitioner does not object to the Recommendation's treatment of these subsections of his Fifth Habeas Ground.

**H.    The trial court had an apparent or actual bias against Petitioner and should have been recused or disqualified at trial and on post-conviction.**

Based on the above arguments, Petitioner objects to the recommendation's conclusion that the cumulative nature of the arguments do not establish bias.  Doc. 128 p. 72.  All of the above evidence demonstrates that the trial court  had an apparent or actual bias against Petitioner Moore and the defense. The mere appearance of a state judge's bias violates the due process rights of litigants, regardless of whether the judge is actually biased.  *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 825 (1986).  If the mere appearance of a judge's bias exists, then his decisions are subject to reversal. *Id*. at 828.  *See Bracy v. Gramley*, 520 U.S. 899 (1997).

**SIXTH GROUND FOR RELIEF AND SIXTEENTH GROUND FOR RELIEF - AT THE MITIGATION PHASE, THE TRIAL COURT**

**ERRONEOUSLY INSTRUCTED THAT THE JURY'S VERDICT HAD TO BE UNANIMOUS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Petitioner alleges error when the trial court improperly instructed his jurors that they could not give effect to the mitigation -- consider a life sentence -- until they had, unanimously acquitted Petitioner of the potential death sentence.  Until the unanimous acquittal on death, the jury could not **give effect to** any mitigating evidence.

The trial court unequivocally stated that "you," the jury had previously found Moore guilty of the specifications. (Tr. p. 1234).  The trial court then stated "you" are to weigh the previously found specifications against the mitigation presented. (Tr. p. 1235).  The trial court then stated "you must make a recommendation" as to sentence. *Id.*   "It is now my duty to instruct you on the law which applies in this proceeding…Now, again, the Court and jury have separate functions. You decide the disputed facts and the Court provides instructions of the law." (Tr., p. 1235).  This makes it absolutely clear that "you" or "your"[20] is the equivalent of "jury" or "the trial jury" not only as to this instruction, but as to all the penalty phase instructions as well.

In other words, a decision is made by all twelve jurors, not just one.  This is corroborated by the court's recognition of a single verdict – describing it as "your verdict."  (Tr., p. 1236; *see also* Tr., p. 1250) ("Until your verdict is announced in open court, you are not to disclose to anybody else that status of your deliberations or the nature of your verdict.")  Consequently, the trial jury -- not individual jurors -- makes the two decisions (existence of mitigation and sentencing decision) at the penalty phase.

The trial court improperly instructed Moore's jurors that they could not give

---

[20] "You" or "your" is frequently referred to during the mitigation instructions.

effect to the mitigation -- consider a life sentence -- until they had **first** acquitted,

unanimously, Moore of the potential death sentence. (Tr., p. 1243-1244). Until the

unanimous acquittal on death, the jury could not **give effect to** any mitigating evidence.

Specifically, the trial court instructed the jury:

> All twelve jurors must agree on a verdict. If all twelve
> members of the jury find by proof beyond a reasonable
> doubt that the aggravating circumstances in a particular
> count of aggravated murder which the defendant was found
> guilty of committing outweigh the mitigating factors, then
> you must recommend to the Court a sentence of death as to
> that particular count.
>
> On the other hand, if, after considering all of the relevant
> evidence admitted at the two trials and the arguments of
> counsel, you find that the State of Ohio failed to prove by
> proof beyond a reasonable doubt that the aggravating
> circumstances in a particular count of aggravated murder
> which the defendant was found guilty of committing
> outweigh the mitigating factors, then you will not
> recommend to the Court a sentence of death as to that
> particular count of aggravated murder.
>
> In this event you will then proceed to determine which of
> the two possible life imprisonment sentences to recommend
> to the Court.

(Tr., p. 1243-1244). (Emphasis added). The trial court used mandatory language,

"must," when instructing the jury. A reasonable juror would understand that they **must**

first acquit of death, and then and only then, would they be able to consider the life

sentences. In effect, the jury had to be unanimous as to the existence of a mitigating

factor. *Mapes v. Tate*, 388 F. 3d 187 (6th Cir. 2004). Thus, Moore's jury could not give

effect to its reasoned moral response to mitigating evidence.

Petitioner objects to the Recommendation's conclusion that the trial court did not

utilize the improper acquittal first language. Doc. 128 pp. 74-75. Contrary to the

recommendation, the instructions direct the consideration of death first, and "in the event" of an acquittal of death the consideration of a life sentence. This does violate *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999), as well as numerous other Sixth Circuit cases. *Spisak v. Mitchell*, 465 F.3d 684 (6th Cir. 2006); *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006); *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003). Indeed, the United States Supreme Court recently reaffirmed that jury instructions in a death penalty case must allow the jury to consider constitutionally relevant mitigating factors. *See Brewer v. Quarterman*, 2007 U.S. LEXIS 4538 (Apr. 25, 2007); *Abdul-Kabir v. Quarterman*, 2007 U.S. LEXIS 4536 (Apr. 25, 2007).

Petitioner objects to the Recommendation's severance of the verdict forms from the entirety of Petitioner's argument. Doc. 128 pp. 75-76. While the verdict forms alone may not have had the effect Petitioner contends, Petitioner's argument was that the totality of the instructions, as reinforced by the verdict forms, prevented a juror in Petitioner's case, inclined to grant mercy, to fail to give effect to his or her weighing calculus in favor of life based on the mistaken belief that he or she was required to gather the unanimous support of the entire jury room before a life sentence could be considered. *Davis*, 318 F.3d 682. Contrary to the standard imposed by the recommendation, there is, at the very least, "a reasonable likelihood that the jury. . .applied the challenged instruction in a way that prevent[ed]" it from giving effect to the mitigation. *Boyde v. California*, 494 U.S. 370, 380 (1990).

### SEVENTH GROUND FOR RELIEF – PROSECUTORIAL MISCONDUCT AT THE MITIGATION PHASE CLOSING ARGUMENT WAS IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

Petitioner objects to the Recommendation's conclusion that the improper

argument personalizing with the jury the victim's fears, emotions and thoughts, did not

deny Petitioner a fair trial. Doc. 128 p. 82. They paint a vivid and emotional portrait of

an individual who was feeling "hope" only to have that replaced with "abject terror."

      The prosecutor repeatedly asked the jury to place themselves in the victim's shoes

and improperly speculated as to what the victim was thinking and feeling. This court

should consider this argument in the context of the earlier improper argument and request

that the jury experiment with the murder weapon in the jury room. (Tr., p. 944 ("I ask

each of you take this gun and try it."); p. 957 (asks jury to put the gun to their head and

see if they turn away); *see also* Tr., p. 912 (defense argument noting "You saw Piepmeier

pull the trigger of the gun.") Thus, the jurors would have a tangible reaction of fear, as

would everyone who had a gun pointed at them and the trigger pulled.

      Consistently, the prosecutor argued at length concerning the feelings, fears and

hopes of Mr. Olinger.

> And think a minute what Melvin Olinger went through
> during that kidnapping. That's really what you have to do
> in order to decide how much weight do I attach to that [i.e.,
> the kidnapping]?
>
> You know, when he is first scooted over in his car, that's
> when the kidnapping began, and when they took him
> behind that building and said 'Get out of the car,' I'm sure
> he was thinking, 'Thank God, I'm going to be let out here,
> I'm alive, take my car, take everything I have,' and then
> he's put into that trunk.
>
> If you look at the weather report for that day, it started out,
> I think, at twenty-nine degrees at midnight the night before.
> By 10 o'clock that night, it was down in single digits,
> somewhere around four or two or six degrees. Just setting
> aside a moment the physical discomfort of not having a
> heavy coat on and being placed in that trunk, what went
> through his mind as he was driven from Fairfield back to
> Mount Healthy?

And when they made that initial stop in Mount Healthy, I'm sure at that point – because it's in this little complex where there's a lot of apartments and cars and activity – Mr. Olinger maybe there felt a little bit of relief that, you know, 'I'm not anywhere out in the sticks, out in the boondocks. I'm not going to be abandoned. Maybe they're going to let me out here. Maybe they're going to put me someplace.'

And I'm not sure exactly how much time he spent at that location, but a short time later the car started up again, and, again he's in the trunk, and, again, he's on a journey. But when the car stopped that last time, I'm sure the sounds were a little bit different.

And you can tell from the photograph of that old Gilbert Machine Company, I believe it is, down in Cumminsville. It's a very, very desolate area. It's basically the perfect place to take someone if you want to get rid of them. And when the trunk lid opened, maybe there was a moment of hope for Mr. Olinger. You know, 'They're going to let me out.'

And after all that time in the trunk, I'm sure he's freezing, he's cramped, he's been bounced around. Just for one moment maybe there was a little bit of hope for Mr. Olinger. But I'm sure when he got out and saw the .357 was still in the hands of Lee Moore, and he saw where he was, he knew – [Defense objection overruled]

He knew what was coming. And when he's marched back into that little cubbyhole behind the dumpster, that's the kidnapping. How much weight do you put on that? That's the aggravating factor. That's the second aggravating factor.

(Tr., pp. 1194-1196).

He's got a .357 on his lap. Mr. Olinger comes out of the car and is confronted by Lee Moore. As Mr. Piepmeier said, there's your kidnapping. Can you imagine the terror he's going through at this point?

These are the aggravating circumstances that you're balancing against mitigation. What did Mr. Olinger do to

32

deserve this?

They pull around the building.  He's ordered out, thrown in the trunk, six degrees maybe, in the trunk of a car; confined in an incredibly small place in freezing temperatures and driven quite some distance down to where Kinley stayed. Those are factors – those are facts to weight in considering the aggravating circumstance against this mitigation.

He drives him down, the car stops for a while, Kinley gets in, Holmes gets out, and then there is a conversation. While he's in the trunk, he, Lee Moore, is saying he's got a guy in the trunk he's going to kill.  Can you imagine the abject terror Melvin Olinger has at this point? [Defense objection overruled].

They drove him to the factory.  Again, he's ordered out at gunpoint.  Is the trunk open or shut?  It doesn't matter. Does it really matter?  He gets him out of the car.  Was he begging for his life?  You bet he was. [Defense objection overruled].

(Tr., pp. 1231-1232).

The Chief Magistrate correctly noted that the arguments were improper (Doc. 128 p. 82), purposeful because the prosecutor had been previously found to have improperly made identical arguments  (*Id.*), and that no curative instruction was offered.  *Id.* at p. 80. Petitioner objects to the Chief Magistrate's conclusion that Petitioner was not deprived of a fair trial or sentencing.  Doc. 128 p. 82.  Asking the jurors to identify themselves with this hope and then terror is highly improper.  *Boyle v. Million*, 201 F.3d 711, 715 (6th Cir. 2000).  The prosecutor's argument violated "the cardinal rule that a prosecutor cannot make statements 'calculated to incite the passions and prejudices of the jurors.'" *Gall v. Parker*, 231 F.3d 265, 315 (6th Cir. 2000) (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)).  Therefore there was a prejudicial effect at Petitioner's trial.  *Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005).

Petitioner objects to the Recommendation's conclusion that it is neither improper nor prejudicial to argue it's a duty to impose death. Doc. 128 p. 82. First, Petitioner did provide a cite to the closing where the prosecutor also improperly argued that it was the jury's responsibility or duty to impose death. Tr. 1191. Statements that exhort the jury to "do its job" are improper. *United States v. Young*, 470 U.S. 1, 18 (1985).

Petitioner objects to the Recommendation's conclusion that the improper non-statutory aggravating arguments are procedurally defaulted. Doc. 128 p. 82. As noted by the Chief Magistrate, the Ohio Supreme Court did note a lack of a contemporaneous objection – but did not in a plain statement assert that the court was going to enforce that bar. *See Harris v. Reed*, 489 U.S. 255 (1989). Rather, the Ohio Supreme Court went on to address the merits of the claim – finding the arguments improper but not harmful. *State v. Moore*, 81 Ohio St.3d 22, 35 (1998). When a court does not in a plain statement rely on a procedural default, then there is not a procedural default; there is merits review.

It was not prejudicial to argue death on the basis of non-statutory aggravators. Doc. 128 pp. 84-85. Under Ohio law, although prosecutors in the penalty phase of a capital case may properly refer to the nature and circumstances of the offense, it is improper to characterize that evidence as a nonstatutory aggravating circumstance. *See e.g. State v. Gumm*, 653 N.E.2d 253, 262-63 (Ohio 1995). Thus, in so arguing, the prosecutor misled the jury and injected an improper sentencing consideration. *See Combs*, 205 F.3d at 292-293 (Error for prosecutor to argue that the facts and circumstances, including the manner in which the victim died, are aggravating factors). Thus, Petitioner was prejudiced by the injection of an improper sentencing consideration and the Ohio Supreme Court's decision was contrary to and unreasonable.

Petitioner objects to the recommendation's conclusion that any error was cured by the Ohio Supreme Court's appellate reweighing under *Clemons v. Mississippi*, 494 U.S. 738 (1990).  Initially, the United States Supreme Court has overruled, or at the minimum restricted, *Clemons*, *Stringer v. Black*, 503 U.S. 222 (1992) and other such cases.  *See Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884 (2006).  Instead, *Brown* stands for the quite different proposition that where one or more improper aggravating factors are submitted to a penalty jury for weighing, "[T]he death sentence must be set aside if the jury's consideration of the invalidated eligibility factor allowed it to hear evidence that would not otherwise have been before it."  *Brown*, 126 S.Ct. at 891.  The most common example of this, in the Supreme Court's view is where, "[T][he aggravating factors *added* to the eligibility factors a category (such as an omnibus 'circumstances of the crime' factor which is quite common) that would allow the very facts and circumstances relevant to the invalidated eligibility factor to be weighed in aggravation under a different rubric." *Id*. at 890 (emphasis in original text).  There is, of course, no such "omnibus factor" in Ohio's death penalty statute.

As noted by Justice Scalia:

> We think it will clarify the analysis, and simplify the sentence-invalidating factors we have hitherto applied to non-weighing States, see *supra*, at ____ - ____, 163 L. Ed. 2d, at 733-734, if we are henceforth guided by the following rule: An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances…If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here.  See *supra*, at ____, 163 L. Ed. 2d, at 732; see also n 6, this page, 163 L. Ed. 2d, at 733.

*Brown*, 546 U.S. at \_\_\_\_, 126 S. Ct. at 893 (footnotes omitted).  Moreover, *Brown* sets

out the constitutional boundaries of what takes place where an invalid aggravating factor

or factors is submitted to a jury under a myriad of state court capital schemes.  *See*

*Rousan v. Roper*, 436 F.3d 951 (8th Cir. 2007) (applying *Brown* retroactively to habeas

proceeding).  In Petitioner's case pursuant to Ohio law, the non-statutory aggravating

evidence was not otherwise admissible, and thus would not have been considered under

*Brown* which constitutional excludes the reweighing remedy.

Further, there is a substantial difference between the consideration by the jury of

something that should not have been – and the state inviting the jury to consider

something prejudicial that the prosecutor knew should not be considered.  Petitioner

should not be penalized for the state's violation – depriving him of a valid jury

recommendation – otherwise, it encourages the prosecutors to continue in successive

cases to make the same improper comments – as the cases herein.  Indeed, Petitioner filed

a motion in limine prior to the closings in an attempt to prevent the very arguments made

by the prosecutor throughout the closing.  *See* (Tr., pp. 1067, 170-1071) (orally renewed

written motion to limit argument to the statutory aggravating circumstances and

requested limits on comments regarding the unsworn statement.)

Thus Petitioner objects to the basis of the recommendation regarding curing on

appeal.  First, *Brown* directs such a remedy no longer exists.  Second, it encourages

misconduct and would deprive Petitioner of his right to a jury.

Petitioner objects to the Recommendation's conclusion that the prosecutor did not

improperly comment on Petitioner's unsworn statement.  Doc. 128 p. 82.  The

prosecutorial comments above violated the principle described in *DePew v. Anderson,*

311 F.3d 742 (6th Cir. 2002). Factually, the prosecutor specifically argued: "If there is some pig [sic] mystery why he went to Butler County besides that, why didn't he tell you that today in his unsworn statement?" Tr. 1231. This goes beyond commenting on the unsworn and queries the jury as to why there was not more.

### EIGHTH GROUND FOR RELIEF – MOORE RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL IN HIS DIRECT APPEAL OF RIGHT TO THE OHIO SUPREME COURT IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

Moore possessed an appeal of right to the Ohio Supreme Court. Ohio Const. Art. IV, §2; O.R.C. §2929.05(A). Under *Evitts v. Lucey*, 469 U.S. 387 (1985), an appeal of right "trigger[s] the right to counsel" and the concomitant right to the effective assistance of appellate counsel. *Id*. at 402, 401 (citations omitted). Moore's appellate attorneys violated his right to the effective assistance of appellate counsel. First, no appellate counsel ever consulted with Moore prior to the filing of an appellate brief. Second, the attorneys failed to raise significant constitutional errors.

Elizabeth Agar ("Agar") and Julia Sears ("Sears") represented Moore in his appeal of right to the Ohio Supreme Court. The testimony of both Agar and Sears demonstrates that they failed to consult with Moore before filing his brief, regarding whether to file a reply brief or file for rehearing.

Sears testified that Agar handled all client contact. Sears Dep. p. 44 lines 15-16. As noted by Sears, Agar "would do all the communication back and forth, what communication there was, I don't know." *Id.* p. 45 lines 8-11. Sears provided that only Agar could provide insight as to any consultations with Moore regarding whether to file a reply brief or motion for rehearing. *Id.* p. 46 lines 16-19; *Id.* p. 54 lines 9-14. Sears indicated that she had absolutely no contact or correspondence with Moore. *Id.* p. 44 lines

17-21.

Agar indicated that she never visited Moore. Agar Depo p. 62 lines 22-23. Further, Agar's time sheets do not record any phone calls with Moore. Agar Depo Ex. 1. Agar's file only contained two letters to Moore. The first letter indicated the brief had been filed. Agar Depo Ex. 4. The second indicated that the Ohio Supreme Court denied Moore's appeal. *See* Agar Depo p. 76 lines 20-24 through p. 77 lines 1-6. Through questioning, Agar agreed that all correspondence in her file had a corresponding entry in her time voucher. *See Id.* pp. 76-77.

Agar indicated that she made the decision not to file a reply brief. *Id.* p. 41 lines 19-21. She further indicated that she doubted Moore would have been consulted in that regard. *Id.* p. 42 lines 15-21. Agar indicated her standard practice is not to file a motion for rehearing. *Id.* p. 45 lines 5-7. Agar could not recall if Moore was advised or consulted in this regard. *Id.* p. 45 lines 14-17. However, the only correspondence noted on her time sheets and in her file is the single letter saying here is the opinion. *Id.* p. 76 lines 20-24 through p. 77 lines 1-6.

Petitioner objects to the Recommendation's conclusion that aspects of this claim regarding appellate counsel's failure to consult this claim has never been raised in state court. Doc. 128 p. 85. Rather, these specific arguments were presented to the court of appeals and the Ohio Supreme Court. *See e.g.* Moore Supp. Apx. Vol. I pp. 11. Further, the facts regarding the lack of consultation, at a minimum, go to the deficiency prong. The Supreme Court recognized that an attorney has a constitutionally-imposed duty to consult with a defendant regarding an appeal. *See Roe v. Flores-Ortega*, 528 U.S. 470 (2000). Moore's Ohio Supreme Court attorneys violated this duty to consult. Because no

38

consultation occurred (as constitutionally required), Petitioner was prejudiced. *See Roe*, 528 U.S. 470 (2000); *Freels v. Hills*, 843 F.2d 958 (6th Cir. 1988).

Petitioner incorporates his objections herein as they relate to analysis of the recommendation regarding Petitioner's First, Fifth, Seventh, Ninth, Thirteenth, Fifteenth, Seventeenth, Eighteenth and Twenty-first Habeas Grounds.  *See*  Doc. 128 p. 90.

**NINTH GROUND FOR RELIEF – THE SELECTION OF THE GRAND JURY FOREPERSON AND THE UNDER REPRESENTATION OF MINORITIES AND WOMEN AS GRAND JURY FOREPERSONS IN HAMILTON COUNTY VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR CROSS-SECTION, AND A FAIR PROCEEDING.**

Petitioner objects to the Recommendation's conclusion that this claim is procedurally defaulted and that Petitioner cannot demonstrate cause.  Doc. 128 p. 91. First, the claim should have been presented on direct appeal.  Grand jury challenges are unique to the trial and direct appeal process, and not the post-conviction process.  *See Davis v. United States*, 411 U.S. 233 (1973).

There is a gross disparity of between the percentages of minorities in the Hamilton County population and the percentage of these minorities who have served as grand jury forepersons in Hamilton County.  For example, the percentage of African-Americans who have served as grand jury forepersons in Hamilton County has never approached the percentage of African-Americans who live in Hamilton County.  In fact, there was less than 25% as many African American forepersons than would be expected based on their representation in Hamilton County. Similarly, the percentage of women who have served as grand jury forepersons has never approached the percentage of women who live in Hamilton County.  (Affidavit of President of National Jury Project, Midwest, Exhibit E to Moore Supp. Apx., p. 431).

Petitioner objects to the recommendations alternative denial of the merits.  Doc. 128 pp. 91-93.  Because grand jury forepeople under Ohio are voting members (in the federal system they are not), Petitioner does state a claim upon which relief should be granted.  Under the applicable Supreme Court authority, Petitioner does not have to show prejudice – the government must now come forward with an explanation for this overwhelming discriminatory effect. *Jefferson v. Morgan*, 962 F.2d 1185 (6th Cir. 1992).

Further, in *Rideau v. Whitley*, 237 F.3d 472, 486 (5th Cir. 2000), the court held an absolute disparity of 13.5% created a presumption to discrimination.  Petitioner has demonstrated an absolute disparity of 13.9% with regard to race and 31% with regard to gender.  (Affidavit of President of National Jury Project, Midwest, Exhibit E to Moore Supp. Apx., pp. 433-34);  *See also Castenada*, 430 U.S. at 495-96, 97 (31% absolute disparity); *Whitus v. Georgia*, 385 U.S. 545, 550 (1967) (18% absolute disparity); *Sims v. Georgia*, 389 U.S. 404 (1967)(20% absolute disparity); *Jones v. Georgia*, 389 U.S. 24 (1967)(14.7% absolute disparity).

This disparities violates due process, fair cross-section, and equal protection guarantees.  *Rose v. Mitchell,* 443 U.S. 545, 565 (1979).  These errors and omissions violated Petitioner Moore's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.  Prejudice must be presumed from these errors.

> **TENTH GROUND FOR RELIEF.  THE UNDER REPRESENTATION OF MINORITIES IN THE GRAND JURY AND PETIT JURY VENIRE IN HAMILTON COUNTY – INCLUDING PETITIONER MOORE'S PETIT JURY VENIRE  – VIOLATED PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A JURY DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY, AND A FAIR PROCEEDING.**

The selection of a petit jury from a representative cross section of the community is an essential component of a defendant's Sixth Amendment right to a jury trial. *Taylor v. Louisiana,* 419 U.S 522, 528 (1975); *Smith v. Texas*, 311 U.S. 128, 130 (1940). However, a gross disparity exists between the percentages of minorities and women in the Hamilton County population and the percentage of these minorities and women who have served on the grand and petit juries in Hamilton County.  For example, the percentage of African-Americans who have served on the grand and petit juries in Hamilton County has never approached the percentage of African-Americans who live in Hamilton County. (Affidavit of President of National Jury Project, Midwest, Exhibit E to Moore Supp. Apx., p. 431, and supporting documentation, pp. 431-466).

Specifically, in Petitioner Moore's case, the petit jury venire failed to represent a fair cross section of the community.  Of the petit jury venire of fifty (50) prospective jurors, only five (5) were African-American.  (Tr. V.  pp. 212; 220-227).  Of these five (5) African-Americans, only one was male.  (*Id. at* 212-213; 215-216).

This petit jury venire failed to reflect a representative cross-section of the community, including a cross-section of Petitioner Moore's race (African-American), gender (male), and age (19).  (Tr. 212-215; 217).  According to the 1990 United States Census, in Hamilton County 20% of Hamilton County residents were African American during the relevant time period. A similar percentage of African Americans (19%) were 18 years of age and older.  Yet only 10% of Petitioner's of the venire was African American.

Petitioner objects to the Recommendation's conclusion that the petite jury is without merit.  Doc. 128 p. 95.  Petitioner demonstrates above that the state court's

decision rejecting this claim did not include a proper analysis under the federal standard enunciated in *Duren v. Missouri*, 439 U.S. 357, 364 (1979), and in any event constitutes and unreasonable application of *Duren*.

> **TWELFTH GROUND FOR RELIEF - PETITIONER MOORE WAS DENIED HIS RIGHTS TO COUNSEL, DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AN IMPARTIAL TRIBUNAL, A RELIABLE SENTENCE, AND AN ADEQUATE CORRECTIVE PROCESS DURING HIS POST-CONVICTION PROCEEDINGS.**

Petitioner does not object to the Recommendation's treatment of this Habeas Ground.

> **THIRTEENTH GROUND FOR RELIEF – THE CHIEF MAGISTRATE JUDGE ERRED IN RECOMMENDING THAT ERRORS DURING <u>VOIR DIRE</u> DID NOT RESULT IN A BIASED JURY THAT WAS ORGANIZED TO RETURN A DEATH VERDICT IN VIOLATION OF PETITIONER MOORE'S RIGHTS, INCLUDING HIS RIGHT TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, AN IMPARTIAL JURY, AND A RELIABLE SENTENCE.**

Consistent with constitutional constraints, a court may not entrust the determination of whether a man should live or die to a tribunal that is organized to return a death verdict. *Witherspoon v. Illinois*, 391 U.S. 510, 543 (1968).

> "It is, of course, settled that a State may not entrust the determination of whether a man is innocent or guilty to a tribunal 'organized to convict.' *Fay v. New York*, 332 U.S. 261, 294 1947]. See *Tumey v. Ohio*, 273 U.S. 510 [1927]. It requires but a short step from that principle to hold, as we do today, that a State may not entrust the determination of whether a man should live or die to a tribunal ***organized to return a verdict of death***." 391 U.S., at 520-521 (footnotes omitted). (Emphasis added).

*Lockhart v. McCree,* 476 U.S. 162, 179 (1986).

In the context of *voir dire*, the Supreme Court has held that a State may not constitutionally execute a death sentence imposed by a jury culled of all those who revealed during *voir dire* examination that they had conscientious scruples against or

were otherwise opposed to capital punishment.  *Id.* 179-180.  The State has "no valid

interest in such a broad-based rule of exclusion, since '[a] man who opposes the death

penalty, no less than one who favors it, can make the discretionary judgment entrusted to

him ... and can thus obey the oath he takes as a juror.' *Id., quoting Witherspoon v. Illinois,*

391 U.S. at 519."

       *Adams v. Texas,* 448 U.S. 38 (1980) involved what the Court has described as a

fairly straightforward application of the *Witherspoon* rule to the Texas capital punishment

scheme. The Court held that the Texas exclusion statute "focuses the inquiry directly on

the prospective juror's beliefs about the death penalty, and hence clearly falls within the

scope of the *Witherspoon* doctrine".  *Adams* 448 U.S. *at 48.*  The *Adams* Court explained,

> As an initial matter, it is clear beyond peradventure that
> *Witherspoon* is not a ground for challenging any prospective juror.
> It is rather a limitation on the State's power to exclude: if
> prospective jurors are barred from jury service because of their
> views about capital punishment on "any broader basis" than
> inability to follow the law or abide by their oaths, the death
> sentence cannot be carried out. [citation omitted].

*Adams,* 448 U.S. at 47-48.  The actions of the prosecutor and jury in this case

accomplished precisely that which is proscribed by *Adams* and *Lockhart*.  As

demonstrated below, the Chief Magistrate erred in recommending against granting the

writ as to this claim.

**Denial of Change of Venue**

       The erroneous denial of trial counsel's request for a change of venue resulted in

Petitioner's trial being held in Hamilton County, where the media's coverage of both the

crime itself and the co-defendants' court proceedings were pervasive.  In fact, during

closing argument at co-defendant Jason Holmes' trial – which was held before

Petitioner's trial – Mr. Holmes' lawyer argued that <u>Lee Moore should be "smoked," i.e.,</u> <u>electrocuted without having his appeals.  At that time, Petitioner had not even been found</u> <u>guilty</u>.[12]  Given the publicity and the trial of a co-defendant shortly before Petitioner's, it is reasonable to conclude that the pre-trial publicity so tainted the jury pool in Hamilton County as to require a change of venue as a matter of constitutional law.  *Irwin v. Dowd,* 366 U.S. 717 (1961); *and see Ritchie v. Rogers,* 313 F.3d 948, 952 (6th Cir. 2002).  The state court must be keenly aware of the risk of picking a jury organized to return a death verdict.  The publicity in this case added to this risk.  *Id.*

A.    **The Trial Court Erroneously Denied Trial Counsel's Unopposed Request for Individual *Voir Dire* on Death Penalty Issues**

Petitioner was constitutionally entitled to a panel of "impartial, indifferent jurors." *Irwin v. Dowd,* 366 U.S. 717, 722 (196).  It follows that counsel must be given a full and fair opportunity to conduct *voir dire* to assist a defendant in assuring this constitutional protection is realized.  The trial judge denied trial counsel's <u>unopposed</u> request for individual *voir dire* on death penalty issues.  (Tr. V. 1, p. 199, Ham. Co. Doc. Nos. 34, 77).  This denial was unreasonable and forced trial counsel to question the jurors as a group regarding death penalty issues.  This group questioning method did not constitute adequate *voir dire*.  Lack of adequate *voir dire* impairs trial counsel's effective use of cause and peremptory challenges and, thus, a defendant's right to exercise such challenges.  *Irwin*, 366 at 722.

During *voir dire*, the trial court informed Petitioner that as long as the prospective jurors agreed to follow the law and the instructions then that is all that is required.  (Tr. V. 2 pp. 347-348; 350).  He even ruled that the questions being asked by trial counsel

_____

[12] *State v. Holmes*, No. B-940661 (Hamilton C.P.), Tr. 367 (attached to Petition as Exhibit 16).

were improper because they had nothing to do with the prospective jurors' ability to be fair and impartial. (Tr. V. 3, p. 350). At one point, he denied trial counsel the opportunity to discuss mitigating factors. (Tr. V. p. 273-274).

This ignored the proper legal standard in a capital case – jurors in a capital case must be asked if they would impose the death penalty automatically without regard to mitigating factors. See *Morgan v. Illinois,* 504 U.S. 719, 735-736 (1992) (reversed death sentence because inadequacy of *voir dire* made Court doubt that petitioner was sentenced to death by fair and impartial jury). General questions about whether a prospective juror can be fair and follow the law are not sufficient. *Id.* 504 U.S. at 736.

Later during *voir dire*, the trial judge told counsel that "you can object all you want on this *voir dire* stuff when it comes up for cause on – when somebody says they can't follow the law, there's a point where, if they answer my question a certain way I'm going to excuse them." (Tr. V. 3, p. 320). Thus, the judge was not going to permit trial counsel to conduct a comprehensive *voir dire* despite a previous order granting trial counsel's motion for comprehensive *voir dire*. (Tr. V. 2, p. 199). The judge's limitation in this regard, contravenes the mandate of the Supreme Court as set out in *Irwin and Morgan.*

As stated by the Sixth Circuit, "individual *voir dire* might well avoid some of the problems that develop in a group *voir dire* setting, in particular when the trial involves a charge of capital murder." *Ritchie* at 962. The Chief Magistrate erred in failing to properly apply this principle.

### B. The Prosecutors Committed Misconduct in Organizing a Jury to Return a Death Verdict.

Not only did the death qualification process in Petitioner's case unfairly tilt a jury

towards sentencing the defendant to death, but the following errors at *voir dire* tilted Petitioner's jury even closer toward the ultimate penalty.

During *voir dire*, the prosecutors asked the prospective jurors how they would rate their beliefs about the death penalty on a scale of one (1) to ten (10), with one being a belief of adamant opposition to the death penalty, and ten being a belief that everyone who commits murder should be sentenced to death.  (See, Tr. V. 2, p. 280) The prosecutors used this misleading scale in order to empanel a tribunal organized to return a death verdict.

The tribunal was, in fact, biased and organized to return a death verdict.  Juror Wellington rated himself a 6-7. Juror Mason rated herself a 6 (saying that she was for the death penalty). Juror Miller rated himself a 7 (and later said that he favored the death penalty). ***Juror England rated herself a 10 – thus indicating that she thought that everyone who committed murder should get the death penalty.*** Juror Borgerding rated herself a 6.  Juror Games rated herself a 5-6. Juror Phillips rated herself a 6-7 (saying that she was for the death penalty). Juror Hopkins rated himself a 7 and Alternate Juror Jackson (who was ultimately on the jury) rated herself a 5-6.  (Tr. V. pp. 282; 285; 295-296; 344-347; 373; 400-401; 429; 439; 452, 482).

Also, obtaining personal commitments from the prospective jurors that they could sign a death verdict against a specific capital defendant is entrusting the determination of whether a man should live or die to a tribunal that is organized to return a death verdict. In this case, the prosecutors sought to obtain personal commitments from the prospective jurors that they could sign a death verdict specifically against Petitioner Moore.  (Tr. V. 3 pp. 261, 264, 373, 383, 436, 463).  This was consistent with the prosecutors' efforts to

attempt to organize a jury that was pre-ordained to return a death verdict.

One of the prosecutors first told the jury that although he was Catholic, he was not opposed to the death penalty and did not believe that it was a sin to believe in the death penalty, improperly interjecting his personal beliefs into this case.  (Tr. V. 3 p.  261). "Implicit in [a prosecutor's] assertion of personal belief that a defendant is guilty, is an implied statement that the prosecutor, by virtue of his experience, knowledge and intellect, has concluded that the jury must convict. The devastating impact of such 'testimony' should be apparent".  *United States v. Bess,* 593 F.2d 749, 755 (6th Cir. 1979), *quoted favorably* in *U.S. v. Young,* 470 U.S. 1, 30 (1985).  The prosecutor violated this proscription by clearly expressing his personal belief in the death penalty in general, and implicitly, his personal belief in its imposition in Mr. Moore's case in particular.

Additionally, the prosecutor told the venire members:

> So it may come down to the point, though, where everyone on this panel will sign that death penalty recommendation and they slide it across to you, and *even though you're one of twelve, at that point, even though you're the only thing standing between Mr. Moore and possibly the electric chair, do you feel at that point – again, following the law – you could do it*?

(Tr. V. 2 pp. 264 emphasis added; *and see Id.* at  253; 258-259; 381-383).

Given the totality of the conduct of the prosecutor during *voir dire*, which effectively molded the jury panel in a way that would tilt it to favor imposition of death, Petitioner was denied his right to am "impartial and indifferent jury" in contravention of the constitutional dictate of *Lockhart v. McCree,* 476 U.S. at 179.  The Chief Magistrate erred in recommending otherwise.

**C.    Trial Counsel Was Ineffective at *Voir Dire* Because They Failed to Fully Explore the Potential Biases of the Prospective Jurors and Because They Permitted Prospective Juror England to Sit on the Jury.**

All of the above errors reveal trial counsel's ineffectiveness at the *voir dire* phase as counsel failed to fully explore the biases of the prospective jurors.  Moreover, trial counsel was ineffective for failing to use a cause or peremptory challenge against Juror England, who had specifically stated she favors the death penalty that she rated herself a "10" on the prosecutor's scale of 1 to 10.  (Tr. V. 3 , p. 296). The prosecutor defined "10" as automatic, i.e.,  "*[e]verybody* who commits murder ought to get it [the death penalty]" (Emphasis added) (Tr. V. 2, p. 280).

"In the absence of an affirmative and believable statement that these jurors could set aside their opinions and decide the case on the evidence and in accordance with the law, the failure to dismiss them was unreasonable."  *Wolfe v. Brigano,* 232 F.3d 499, 503 (6th Cir. 2000).  Although the prosecutor elicited from her that she would be fair, [a] court's refusal to excuse a juror will not be upheld "simply because the court ultimately elicits from the prospective juror a promise that he will be fair and impartial...."  *Id.* at 502.

The prosecutor recognized Ms. England's bias in favor of the death penalty by remarking "you feel very strongly, obviously, about the death penalty . . ." (Tr. V. 3, p. 296).  The Chief Magistrate rejected this sub-claim, finding that defense counsel elicited the juror's response that she would follow the law. (Doc. 128, p. 103)  In fact, defense counsel failed to ask Ms. England a single question about her belief in the death penalty. Indeed, in defense counsel's questioning of Ms. England, counsel inexplicably fails even to mention the term "death penalty."  When he asks Ms. England if she is able to follow the judge's instructions, he fails to tie the question in any way to sentencing instructions. No questions regarding her ability to consider mitigation are ever asked, despite the fact

that she had previously rated her commitment to the death penalty a "10." (Tr. V. 2, pp.

313-314). This failure is not addressed by the Chief Magistrate.

Under *Strickland,* defense counsel's failure amounts to constitutionally deficient

performance.

> Because the trial court failed to respond to Juror Bell's statement of bias
> on *voir dire,* we find that, as in *Hughes,* counsel's failure to respond in turn
> was objectively unreasonable pursuant to *Strickland.* "When a venire
> person expressly admits bias on *voir dire,* without a court response or
> follow-up, for counsel not to respond [to the statement of partiality] in turn
> is simply a failure 'to exercise the customary skill and diligence that a
> reasonably competent attorney would provide.' " *Hughes,* 258 F.3d at 462
> (quoting *Johnson v. Armontrout,* 961 F.2d 748, 754 (8th Cir.1992)).

*Miller v. Webb,* 385 F.3d 666, 675 (6th Cir. 2004); *See Morgan v. Illinois,* 504 U.S. 719

(1992) (reversed death sentence because inadequacy of *voir dire* made Court doubt that

petitioner was sentenced to death by fair and impartial jury). There can be "no sound

trial strategy that could support what is essentially a waiver of a defendant's basic Sixth

Amendment right to trial by an impartial jury." *Id.* at 676.

Thus, counsel's failure to pursue England's bias during *voir dire* is

constitutionally ineffective. Moreover,

> The "'presence of a biased juror cannot be harmless; the error requires a
> new trial without a showing of actual prejudice.'" *Hughes,* 258 F.3d at 453
> (quoting *United States v. Gonzalez,* 214 F.3d 1109, 1111 (9th Cir.2000)
> (citations omitted)). Therefore, because Miller's trial counsel impaneled a
> biased juror, "prejudice under *Strickland* is presumed, and a new trial is
> required."

*Id.* at 676. The Court of Appeals held, therefore, that the state court's finding to the

contrary is an unreasonable application of Strickland and granted the writ. *Id.* at 678.

The same result should obtain here and the Chief Magistrate erred in recommending

otherwise.

**D.    The Prosecutors Used – and The Trial Judge Condoned – a Peremptory Challenge Against Prospective Juror Freeman, an African-American Woman, on the Basis of Her Race.**

The prosecutors exercised a peremptory challenge against Prospective Juror Freeman, an African-American woman who had stated that she could follow the law and sign a death verdict in this case and that sometimes the death penalty is warranted. (Tr. V. 3 pp. 258-260; 405). Trial counsel objected on the basis of *Batson v. Kentucky*, 476 U.S. 79 (1986). It is undisputed that Petitioner made out a *prima facie* showing of a race based exclusion under *Batson*. The burden, therefore, shifted to the state to show that it was more likely than not that its peremptory challenge was race-neutral. *Purkett v. Elem,* 514 U.S. 745, 768 (1995).

The prosecutor responded to Petitioner's *Batson* challenge by stating vaguely that things about Ms. Freeman's answer to a question on the questionnaire bothered him. (Tr. V. 3 pp. 405; 408-410). Specifically, it was her response to Question 28 on the jury questionnaire that bothered the prosecutor. (Tr. p. 409). Question 28 reads: "What factors do you feel most likely have a negative influence on a criminal's development?" (Tr. p. 409-410). According to the prosecutor, Ms. Freeman's reference to "alcoholism" indicated a "predisposition" to something that the prosecutor was unable to explain:

> but the main [objection to Ms. Freeman], Judge, would be the alcoholism, and her predisposition to that before it was even brought out by the defense concerns us.

(Tr. p. 412). This "explanation" is both inarticulate and strains credulity. First, Question 28 had no relationship to an individual's alleged predispositions to anything. It merely asks for negative factors in a criminal's development. Does the state really contend that there is something inherently biased about a person who believes "alcoholism" has a

"negative" effect on a person's development?  Nothing offered by the prosecution showed that Ms. Freeman's answer to this innocuous question set her apart from any of the white members of the venire accepted by the prosecution.  (*Id.*)

The answer to this questionnaire item was the main reason that the prosecutors removed Ms. Freeman.  They had two other reasons for the removal: (a) an uncle of Ms. Freeman's was a lawyer in Columbus and had once been a public defender; and (b) Ms. Freeman's arms had been crossed.  (Tr. V. 3 pp. 410-414).  This last reason was the least important of the three.  (Tr. V. 3 pp. 412).[13]

Contrary to the Chief Magistrate's conclusion, this implausible "explanation" cannot rebut Petitioner's admitted *prima facie* showing of a *Batson* violation.   As trial counsel pointed out, there were white prospective jurors who had answered the question on the questionnaire the same way and were not removed by the prosecutors.  (Tr. V. 3 p. 413).  Also, as far as her uncle being a former defense lawyer, Ms. Freeman's questionnaire showed that her uncle had once been a prosecutor as well.  The irrelevance of the prosecutor's "explanation" is further confirmed by his utter failure to ask her any questions regarding these matters during *voir dire.*  (See Tr. 296).  Clearly, the State failed to meet its burden and the Chief Magistrate Judge erred in recommending that it did.  *Purkett,* 514 U.S. at 768.

These errors and omissions violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by permitting the State to focus largely on the personal beliefs of the venire regarding the death penalty and ultimately organizing the

---

[13]Judge Ruehlman upheld the removal of Ms. Freeman because (b) from his reading of a Columbus magazine, that in Columbus "they" are "very hostile" towards prosecutors and police.  (Tr. V. 3 p. 414).  This explanation is equally implausible as it was not even explored in voir dire by the prosecution nor was it offered as their main objection. Tr. p. 412

jury to return a sentence of death.  Such a record renders the sentence of death

constitutionally infirm.  *Adams,* 448 U.S. at 51.  The state court's determination to the

contrary constitutes an unreasonable application of the controlling federal standard.

*Adams,* 448 U.S. at 51; and see *Wolfe v. Brigano* 232 F.3d at 503.

**FOURTEENTH GROUND FOR RELIEF – THE CHIEF MAGISTRATE ERRED IN RECOMMENDING THAT THE SENTENCERS DID NOT BASE THEIR DECISIONS TO SENTENCE MOORE TO DEATH ON IMPROPER AND NON-STATUTORY AGGRAVATING FACTORS IN VIOLATION OF MOORE'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS.**

The trial court permitted improper and irrelevant evidence in the form of non-

statutory aggravating factors to be considered by Petitioner's jury.  This violated his

rights under the Eighth and Fourteenth Amendments.  Petitioner may only be sentenced

to death where the sentencing authority's direction has been guided so as to avoid

arbitrary and capricious imposition of the death penalty.  *Gregg v. Georgia*, 428 U.S. 153

(1976); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Furman v. Georgia*, 408 U.S. 238

(1972).

O.R.C. §2929.04(A) guides and limits the sentencing discretion in Ohio.

Consideration of irrelevant evidence and non-statutory aggravating factors destroys

Ohio's statutory guidance and impermissibly risks imposition of an arbitrary death

sentence.  *Sochor v. Florida*, 504 U.S. 527, 532 (1992); *see Espinosa*, 505 U.S. at 1082.

Therefore, the Supreme Court has held that it is a violation of the Eighth Amendment for

a sentencer to weigh invalid aggravating factors when deciding to impose a death

sentence.  *Sochor*, 504 U.S. at 532.  *See*, *Espinosa*, 505 U.S. at 1082; *Clemons v.*

*Mississippi*, 494 U.S. 738, 752 (1990).  "Employing an invalid aggravating factor in the

weighing process creates the possibility of randomness, by placing a thumb on death's

side of the scale, thus creating the risk of treating the defendant as more deserving of the death penalty." *Sochor*, 504 U.S. at 532 (citing *Stringer v. Black*, 503 U.S. 222, 232, 235-36 (1992)). Therefore, the jury's consideration of improper non-statutory aggravating circumstances when recommending Petitioner's death sentence violated Moore's right to have his sentence individually determined as guaranteed by the Eighth and Fourteenth Amendments.

### A.    Improper prosecutorial argument.

Petitioner previously argued in detail the substance of the improper and prejudicial prosecutorial comments. He will not repeat or belabor those arguments now. Rather, Petitioner incorporates them by reference. (Petitioner respectfully refers the Court to argument as to Ground __ above, p. ___.) Petitioner notes, however, the four-part prosecutorial flagrancy test is not applicable to this claim. Instead, this Court must simply determine if the arguments had a substantial injurious effect.

The improper arguments that incorporated non-statutory aggravating circumstances undermined the jury's ability to make a fair determination as to whether Petitioner's proffered mitigation was outweighed by the aggravating factors proved against him. The improper arguments, particularly when taken together, were designed to keep, and successfully kept, the jury from properly considering and weighing the mitigating evidence offered by Petitioner against ***proper*** aggravators. Thus, there is a substantial injurious effect that inured at the penalty phase.

Consequently, this Court should reject the Chief Magistrate's recommendation regarding this sub-claim and reverse Petitioner's death sentence and remand to the State court's for imposition of a remedy envisioned by *Brown v. Sanders*, 546 U.S. 212, 126

S.Ct. 884 (2006); *Lockett v. Ohio,* 438 U.S. at 752.

> **C.     A Reasonable Juror Would Understand Instruction to consider "any other factors relevant to the issue of whether Petitioner Moore should be sentenced to death" as a basis to consider non-statutory aggravating circumstances.**

The Supreme Court has held that the Eighth Amendment requires that the class of death eligible offenders must be narrowly and rationally guided by state law. *McCleskey*, 481 U.S. at 305. In Ohio, the only factors that make a defendant death-eligible are detailed in O.R.C. §2929.04(A). The language in O.R.C. §2929.04(B)(7), however, creates a reasonable likelihood that the average juror will apply the defendant's (B)(7) mitigation in an unconstitutional manner. *See Stringer*, 503 U.S. at 231-235; *Boyde*, 494 U.S. at 380-81.

The statutory definition permits the capital sentencer to consider "[**a**]**ny other factors** relevant to the issue of whether the offender **should be sentenced to death**." O.R.C. §2929.04(B)(7) (emphasis added). This definition eviscerates the narrowing achieved by O.R.C. §2929.04(A) because it requires the sentencer to consider **any** factor relevant to imposing the **death sentence**. Accordingly, there is a substantial risk that the sentencer will view the defendant's proffered (B)(7) mitigation as a non-statutory aggravator, rather than evidence that weighs against a death sentence.

Moreover, the O.R.C. §2929.04(B)(7) definition precludes the jury from giving the defendant's "catch-all" mitigating evidence its full consideration and effect. The intent of the legislature in drafting O.R.C. §2929.04(B)(7) was to allow the jury to consider **all** relevant evidence that supported a **life** sentence. *See Lockett*, 438 U.S. 586. The legislature's intent is frustrated by the ill-worded provision in O.R.C.

§2929.04(B)(7).  That statutory definition shifts the focus of the defendant's (B)(7) or

"catch-all" mitigating evidence from reasons to impose a **life** sentence to reasons to

impose a **death** sentence.

The Chief Magistrate incorrectly concludes that the court's instruction vitiates this

claim because the reference to consideration of all evidence in the instructions applied

only to consideration of mitigating factors, not aggravating factors.  But the language

itself is not so limiting.

> In reaching a verdict in this proceeding, you must ***consider all the evidence admitted*** at both trials and ***the arguments of counsel.*** You must then determine whether the State of Ohio has proven beyond a reasonable doubt that ***the aggravating circumstances in each count of aggravated murder which Lee Moore was found guilty of committing are sufficient to outweigh the mitigating factors present***. (Emphasis added)

(Tr. 1243). Clearly, even with this instruction, Moore's §2929.04(B)(7) mitigating

evidence can be construed as an aggravating factor.  It is, thus, stripped of its full

mitigating effect.  To satisfy the Eighth Amendment, each actor in the capital sentencing

scheme must be able to give consideration and full mitigating effect to all relevant

mitigating evidence offered by the defendant.  *Penry*, 492 U.S. 302; *Eddings*, 455 U.S.

104; *Lockett*, 438 U.S. 586; *Smith*, 125 S. Ct. 400.  Moore's jury was instructed to

consider, as per the statute: "any other factors that are relevant to the issue of whether the

Defendant should be ***sentenced to death***." (Emphasis added) (Tr., p. 1243).

Moore's jury would reasonably understand the plain language of this instruction:

that Moore's (B)(7) mitigating evidence could be used as a reason to impose the death

penalty, not as a reason to impose a life sentence.  The court's charge and the statutory

definition of (B)(7) mitigation eviscerated the constitutional principle of guided

discretion in capital sentencing and prevented the jury from giving full mitigating effect

to Moore's (B)(7) or "catch-all" mitigating evidence.[14]  If indeed these are to be factors in

mitigation, then the factors should be framed accordingly – those that are relevant to the

issue of whether the offender should receive a sentence **less than** death.

> The trial court should have instructed the jury to consider:
>
> (G)    any other factors that weigh in favor of a sentence <u>other
>        than death</u>.  This means you are not limited to the specific
>        mitigating factors that have been described to you.  You
>        should consider any other mitigating factors that weigh in
>        favor of a sentence other than death. (Emphasis added.)

4 OJI 503.011 §10(G).  Moore suffered substantial and injurious prejudice as to this

instruction.  It permitted the jury to consider non-statutory aggravating circumstances.

In a weighing state (i.e., a state where the sentencer weighs aggravating and

mitigating circumstances) like Ohio, "the weighing of an invalid aggravating

circumstance violates the Eighth Amendment."  *Espinosa*, 505 U.S. at 1081, *citing*

*Sochor*, 504 U.S. at 532; *Parker*, 498 U.S. at 319-321; *Clemons*, 494 U.S. at 752.  When

a sentencer considers as an aggravating circumstance "[which] actually should mitigate in

favor of a lesser penalty" the death sentence must be struck.  *Zant*, 462 U.S. at 885.

Further, in a weighing state that allocates sentencing authority to the jury and the trial

court, <u>both</u> the jury and the trial court must weigh aggravating and mitigating

circumstances properly.  *Espinosa*, 505 U.S. at 1082.

Instructing the jury that it could consider "any other factors that are relevant to the

issue of whether the defendant should be sentenced to <u>death</u>" constituted a violation of

Moore's federal due process rights in the death penalty statutes established by Ohio.

---

[14] The Ohio Supreme Court has repeatedly held that the facts of the case are not aggravating circumstances.  *State v. Wogenstahl*, 75 Ohio St. 3d 349, 356 (1996); *State v. Combs*, 62 Ohio St. 3d 278, 283 (1991).  Likewise, the aggravated murder itself is not an aggravating circumstance. *See also Combs v. Coyle*, 205 F.3d 269, 292 (6th Cir. 2000).

These statutes specifically provide for statutory aggravating circumstances. O.R.C. §2929.04(A). This provision of a limited number of proper aggravating circumstances guides the capital sentencer's discretion in accordance with *Gregg*, 428 U.S. at 192-195 (when sentencer's discretion is guided "the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary" will be reduced). However, permitting the jury to consider other non-statutory factors as aggravating fails to guide the sentencer's discretion and increases the likelihood that it will impose a capricious and arbitrary sentence. *Id.*; *Gregg*, 428 U.S. at 192-195; *see Espinosa*, 505 U.S. at 1081, *citing Sochor*, 504 U.S. at 532; *Stringer*, 503 U.S. at 232; *Parker*, 498 U.S. at 319-321; *Clemons*, 494 U.S. at 752 (all holding that "the weighing of an invalid aggravating circumstance violates the Eighth Amendment.").[15] Accordingly, the Chief Magistrate's recommendation to deny this sub-claim should be rejected

### FIFTEENTH GROUND FOR RELIEF – THE CHIEF MAGISTRATE ERRED IN RECOMMENDING THAT THE SENTENCER DID NOT FAIL TO GIVE ANY WEIGHT TO THE UNCONTRADICTED MITIGATING EVIDENCE PRESENTED BY MOORE IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

The trial court failed to consider relevant mitigation presented by Moore, denying Moore the individualized sentencing guaranteed by the Eighth and Fourteenth Amendments. *Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North*

---

[15] The Ohio Supreme Court did not provide any analysis for denying the claim. Rather it summarily disposed of this allegation of constitutional error along with other allegations in a single sentence. Therefore, this Court's review is not constrained by the decision of the Ohio Supreme Court because it did not adjudicate the claims on the merits. 28 U.S.C. 2254(d); Wiggins, 503 U.S. at 534; Davis, 290 F.3d at 951 (AEDPA does not apply where the state court has failed to address an issue). Further, to the extent a string cite to state authority is an adjudication, this is not an identification and application of the correct United States Supreme Court test to be applied in considering this error. Boyde, 494 U.S. 370. Thus, even if an adjudication, this Court still is not constrained by the decision of the Ohio Supreme Court. Williams, 529 U.S. at 405, 409; Magana, 263 F.3d 542 (state court's use of incorrect standard erects no AEDPA barrier to the federal court's review of claim).

*Carolina*, 428 U.S. 280, 303-04 (1976). Furthermore, the independent sentencing review of the Ohio Supreme Court did not correct this error as alleged by Respondent, due to Moore's liberty interest, established by Ohio law, in having the trial court independently determine that the aggravating circumstance outweighs any mitigating factor once the jury has recommended a death sentence.

Both the Eighth and the Fourteenth Amendments require that the defendant's character and record, as well as the circumstances of the offense, be considered as mitigating factors when inflicting a penalty of death. *Eddings*, 455 U.S. at 110, *Lockett*, 438 U.S. at 604; *Woodson*, 428 U.S. at 304. Furthermore, Ohio's statute mandates that the sentencer consider the defendant's history, character, and background as mitigating evidence. O.R.C. §2929.04(B). Despite this clear direction, the sentencing order specifically held that other than age and a good family upbringing, nothing else was mitigating. (Return Ex. A at p. 12 ("the Court cannot find any [other mitigating factors]"); *see also* Tr., p. 1266).

The Chief Magistrate recommends rejecting this claim because, "[a]s long as the factors presented are considered the sentencer may determine the amount of weight to be given to the mitigating factors." (Doc. 128, p. 113). This overlooks the trial judge's unequivocal statement that he did not consider anything other than age and family upbringing as a mitigator. Thus, as in *Eddings*, the sentencer did not properly consider all mitigating evidence.

The trial court should have considered (a) the effect of his parents' divorce on him; (b) the bullying, teasing and beating of him by his peers throughout his childhood and adolescence; (c) his feelings that he did not fit in with his peers; (d) his substance

abuse and dependency beginning at age fifteen (15); (d) how he was very capable of being productive in a structured environment, i.e., prison; and (e) his unrealized potential as mitigating aspects of Petitioner's history, character, and background. Both Supreme Court precedent and Ohio's statute obligated the trial court to consider this evidence, but there is no evidence in the sentencing order that the court did so. This failure is a violation of the Eighth and Fourteenth Amendments.

In *Eddings*, the Court reversed the defendant's death sentence and remanded the matter for a new sentencing hearing where it appeared that the Oklahoma trial and appellate courts refused to consider the defendant's mitigating evidence of his abused and traumatic youth. *Id.* at 113-17. In dissent, Chief Burger pointed out that the record was "at best ambiguous" as to whether the Oklahoma trial and appellate courts refused to consider that evidence. *Id.* at 124-25 (Burger, CJ, dissenting). Nevertheless, the majority reversed the defendant's death sentence because, as Justice O'Connor explained,

> [W]e may not speculate as to whether [the state courts]
> actually considered all of the mitigating factors and found
> them insufficient to offset the aggravating circumstances.
> … *Woodson* and *Lockett* require us to remove any
> legitimate basis for finding ambiguity concerning the
> factors usually considered by the trial court.

*Eddings*, 455 U.S. at 119 (O'Connor, J., concurring). Moore's case is stronger in that the trial court specifically indicated it could find no other mitigation to weigh.

The Seventh Circuit recognized the continued validity of *Eddings* in another habeas proceeding, *Wright v. Walls*, 288 F.3d 937 (7th Cir 2002). There, the Seventh Circuit affirmed the district court's grant of the writ with respect to Wright's death sentence, holding that "the trial judge's failure to consider as mitigation Wright's traumatic childhood…violated *Eddings v. Oklahoma*." *Id.* at 941. The parallels between

Wright's and Moore's case are unavoidable.

The Chief Magistrate suggests that the Ohio Supreme Court's independent sentencing review cured any error committed by the trial court. (Doc. 128, p. 113). To the contrary, the errors in the sentencing order were not corrected by the independent sentencing review of the Ohio Supreme Court and were, in fact, a violation of Petitioner's liberty interest in having a trial court independently determine that the aggravating circumstance outweighs any mitigating factor.

Ohio's trial courts have an essential role in the imposition of sentences on capital defendants. After a jury recommends death, the trial court is mandated to reweigh all the evidence presented before imposing a sentence of death. O.R.C. §2929.03(D)(3). Furthermore, O.R.C. §2929.03 places very specific obligations upon the trial court sentencing a capital defendant to death. In its sentencing opinion, the trial court must state its "specific findings as to the existence of any of the mitigating factors set forth in O.R.C. 2929.04(B), the existence of any other mitigating factors, the aggravating circumstances of which the offender was found guilty of committing, and the reasons why the aggravating circumstances of the offender was found guilty of committing were sufficient to outweigh the mitigating factors." O.R.C. §2929.03(F). Thus, "state law creates for a defendant a liberty interest" in having the trial court make that determination. *See*, *Clemens*, 494 U.S. at 746; *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Therefore, Moore had a liberty interest in the trial court's sentencing determination.

Thus, it was improper for the Ohio Supreme Court to cure the trial court's error through reweighing. In Ohio, a defendant cannot be sentenced to death without the trial

court finding that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.  O.R.C. §2929.03(D)(3).  The trial court's finding was essential.  Its failure to appropriately perform its statutory duty, failing to consider statutorily and constitutionally mandated mitigating factors, infringed upon Moore's liberty interest and thus violated his rights.  The error could not be cured by appellate speculation due to Moore's liberty interest and, thus, reweighing without the trial court's determination violated Moore's rights under the Fifth and Fourteenth Amendments.  *See Clemons*, 494 U.S. at 746, 754; *See e.g. Paxton v. Ward*, 199 F.3d 1197, 1220 (10th Cir. 1999) (appellate court cannot reweigh when mitigation not considered).

In every capital case, an "individualized decision" must be made regarding imposition of the death penalty.  *Lockett*, 438 U.S. at 605.  In sentencing Moore to death, the trial court did not treat Moore as a unique individual.  The trial court failed to consider all mitigation.  As a result, the trial court violated Moore's right to individualized sentencing as guaranteed by the Eighth and Fourteenth Amendments, and his due process rights guaranteed by the Fifth and Fourteenth Amendments.

Moore's case is materially indistinguishable from *Eddings*, in that both involved the failure of state courts to consider mitigation. Therefore, the AEDPA does not bar relief of Moore's claim.  *Williams*, 529 U.S. at 406 ("A state court decision will…be contrary to…clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."); *Vincent*, 226 F.3d at 689 (state court decision unreasonable when it reached a different result from the United States Supreme Court but considered materially indistinguishable facts).

Neither the Ohio Supreme Court nor the Chief Magistrate can cite to a United States Supreme Court case that allowed reweighing *when mitigating evidence was not considered by the original sentencer.* That is because all cases out of the United States Supreme Court regarding the failure to consider mitigation require an immediate vacation of the death sentence. Therefore, the Ohio Supreme Court's weighing of mitigation (for the first time by any sentencer) is contrary to and an unreasonable application of *Gregg*, *Woodson*, *Lockett*, *Eddings*, and *Penry I. See also Paxton*, 199 F.3d at 1220 (cannot reweigh when mitigation not considered); *Wright*, 288 F.3d 937 (remanded for resentencing for *Eddings* error). The Sixth Circuit agrees with Petitioner's legal argument.

In *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007), the Sixth Circuit granted relief in a death penalty habeas case when the state courts refused to consider and give effect to mitigation. The Sixth Circuit specifically rejected the position taken by this Court that an appellate court could reweigh for an *Eddings* error. The Sixth Circuit determined the proper remedy to be a resentencing:

> There remains for our resolution the question of a remedy for the rejection of the new evidence that the petitioner sought to introduce before the three-judge panel. The respondent cites precedent to support the proposition that if a sentencer considers improper aggravating circumstances, the state appellate court may reweigh the remaining aggravating circumstances against the mitigating circumstances or may determine that the error was harmless. *See Parker v. Dugger*, 498 U.S. 308, 319, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 745-50, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). Presumably, the warden, by citing these cases, contends that any constitutional error committed in this matter may be rectified simply by a state court reconsideration of Davis's suitability for execution or for lifetime incarceration. But, reweighing in this case is not possible because the improperly-excluded evidence was never put into the record. Defense counsel's proffer concerning the proposed witnesses' testimony merely summarized his interviews with these witnesses; the actual substance of

> the witnesses' testimony was not put before any court and, therefore, no factual basis for reweighing exists. For this reason, the Supreme Court has decided that, when a trial court improperly excludes mitigating evidence or limits the fact-finder's consideration of such evidence, the case must be remanded for a new sentencing hearing. *See Skipper*[ *v. South Carolina*], 476 U.S. [1,] at 8, [106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986)].

*Davis*, 475 F.3d at 774-775. *Davis* is directly on point regarding Petitioner's objection

Indeed, the remedy under *Eddings* and *Lockett* is an immediate reversal of the sentence.[16] Thus, the Ohio Supreme Court's treatment of Moore's *Eddings* error is contrary to Supreme Court precedent. *Williams*, 529 U.S. at 406 ("A state court decision will…be contrary to…clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent."); *Vincent*, 226 F.3d at 689 (same).

Consistent with *Eddings* and *Lockett* this Court should remand to the Hamilton County Common Pleas for a resentencing.

### SIXTEENTH GROUND FOR RELIEF B THE CHIEF MAGISTRATE ERRED IN RECOMMENDING THAT JURY INSTRUCTIONS DID NOT DEPRIVE PETITIONER OF HIS CONSTITUTIONAL RIGHTS AS GUARANTEED BY THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.[17]

Error occurred at Petitioner's mitigation hearing when the trial court refused to provide certain instructions that would properly guide jury deliberations and when the trial judge affirmatively provided erroneous instructions. Individually and collectively, these instructions and the instructions the court failed to give prejudiced the weighing process and led to a death sentence.

---

[16]It is a matter of common sense that one cannot reweigh something that was never weighed in the first place. However, removing something previously weighed from the scales, i.e. an improper aggravator, does logically permit a reweighing.

[17]Petitioner previously withdrawn the allegations contained in paragraphs 261, 265, 266, 267, 268, 272 and 273 of this habeas petition.

At par. 262 and 263, Petitioner alleges that the trial court erroneously denied his request to restrict certain irrelevant and improper considerations he presumed the state would argue at the mitigation phase: non-statutory aggravating factors and excessive comments on Petitioner's unsworn statement. The trial court denied such requests, effectively giving the prosecutor the green light to argue such matters. Seizing upon this, the state's closing argument focused upon improper non-statutory aggravators. The prosecutor also improperly commented on Petitioner's unsworn statement.

The Ohio Supreme Court found the arguments to be improper. For example the court criticized numerous statements made by the prosecutor regarding imagining the terror the victim felt, exceeding permitted comments on unsworn and arguing non-statutory aggravators. *Moore*, 81 Ohio St.3d at 34-35. Without any analysis the Ohio Supreme Court found these "clearly improper" remarks to be non-prejudicial. Yet, it is quite clear from the record that the failure of the trial court to rule in Petitioner's favor and provide the jury with limiting instructions regarding these matters allowed the prosecutor to knowingly inject improper penalty considerations for the jury and skew the weighing process. *Stringer v. Black,* 503 U.S. 222, 230-32, (1992) (and see Ground for Relief Eighteen, below).

The injury to Petitioner is enhanced by the trial court's refusal to instruct the jury that they need not be unanimous as to the existence of a mitigating factor. (Tr., pp. 1063-1064). Defense counsel's request was entirely consistent with the mandate of *Mills v. Maryland*, 486 U.S. at 370. As explained more fully in his objections as to the Sixth Ground and incorporated herein, the instructions as given would lead a reasonable juror to believe that he or she could not consider a mitigating factor unless and until every juror

member first agreed as to its existence. Therefore, the failure of the trial court to affirmatively instruct on non-unanimity as to all mitigating evidence, in the context of the erroneous instructions provided the jury, violated Petitioner's rights as articulated in *Mills*.

> We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence.

*Id. a*t 384.

The court's refusal to give a proper instruction that would inform the jury that they were not obligated to be unanimous with regard to any finding of the existence of a mitigating factor effectively prevented the jury from giving proper consideration to all mitigating evidence. *See, Eddings v. Oklahoma,* 455 U.S. 104 (1982) (failure to give due consideration to all mitigating evidence requires vacation of the death sentence); *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884 (2006).

As pled at Petition paragraphs 269-271, the harm to Petitioner is further enhanced by the trial court's improperly instructing the jury on various non-unanimous bases upon which to base a death sentence. Specifically, the trial court instructed the jury that the first specification for Count 1 was that Petitioner Moore had committed the aggravated murder for the purpose of escaping detection for an aggravated robbery **OR** kidnapping, two very distinct criminal acts. Yet, the jury was not required to make a unanimous finding as to either of those alternatives. (Tr. p. 973). Similarly, the trial court instructed the jury that specification 1 to Count 2 was that Petitioner Moore had committed the killing in the course of a kidnapping and that he was either the principal offender **OR**

used prior calculation and design. Again, the jury is not required to make a unanimous

finding as to either of those alternatives. (Tr. 980; and see Instructions as to specification

3 as to Count 1 at Tr. p. 982). Similarly, Judge Ruehlman instructed the jury that, under

specification 2 as to Count 2, they were to determine whether Petitioner had committed

the killing in the course of a kidnapping and that he was either the principal offender **OR**

had prior calculation and design. (Tr. pp. 991-992). Thus, the jury is never instructed they

had to be unanimous in their collective decision regarding which alternative they selected

to make Petitioner death eligible. This risked the very real possibility of a non-

unanimous finding as to the jury's basis for imposing the death penalty. It is possible that

some jurors found the death sentence applicable because Moore had prior calculation and

design while other jurors based it upon Moore as the principal offender. Thus, the death

sentence in this case did not comport with the dictates of *Richardson v. United States*,

526 U.S. 813 (1999). Consistent with *Richardson*, a writ should issue with respect to this

Ground.

### SEVENTEENTH GROUND FOR RELIEF – TRIAL COURT ORDERED THE COURTROOM DOORS TO BE LOCKED IN VIOLATION OF PETITIONER'S RIGHTS TO A PUBLIC TRIAL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS.

Petitioner does not object to the Chief Magistrate's finding as to this Ground for

Relief.

### EIGHTEENTH GROUND FOR RELIEF - THE CHIEF MAGISTRATE ERRED IN REJECTING PETITIONER'S CLAIM THAT THE PROSECUTORS COMMITTED MISCONDUCT AT THE PRE-TRIAL, VOIR DIRE, AND LIABILITY PHASES OF PETITIONER'S TRIAL IN VIOLATION OF HIS RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR TRIAL, AN IMPARTIAL JURY AND JUDGE, AND EFFECTIVE ASSISTANCE OF COUNSEL.

There are four factors that are relevant in analyzing a claim of forensic

prosecutorial misconduct: (1) the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks are isolated or extensive; (3) whether they were accidentally or deliberately placed before the jury; and (4) the strength of the competent proof to establish the guilt of the accused. *Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999). To constitute a due process violation, the prosecutorial misconduct must be " 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *United States v. Bagley,* 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs,* 427 U.S. 97, 108 (1976)); and see *Greer v. Miller* 483 U.S. 756, *765 (U.S. Ill., 1987). The scope and recurring nature of the misconduct in this case meets that standard.

### A. During the Pretrial, the Prosecutors Had ex Parte Discussions with Judge Ruehlman and Met with the Defense Expert.

When trial counsel's motion to reassign the trial judge was argued, Prosecutor Joe Deters admitted that he had *ex parte* discussions with Judge Ruehlman:

> ***from discussions with this Court*** ... judges were petitioned by Judge Cartolano, and this Court [Judge Ruehlman] was available for this trial, and that is why we're here today. (Emphasis added).

(Tr. 210). These *ex parte* discussions between Prosecutor Deters and the trial judge were improper.

The Chief Magistrate recommends rejecting this claim, and simply incorporates his discussion relative to the Second Ground for Relief. (Doc. 128, p. 119). The Chief Magistrate agrees that, *"[e]x parte* communications are strongly discouraged so as to ensure that defendants are afforded the right to be present at all critical stages of his trial and to guarantee an opportunity to be heard. Doc. 128, p. 44, *citing, Rogers v. United States*, 422 U.S. 35, 39 (1975). In that discussion, the Chief Magistrate emphasizes the

fact that, as to the contact with Defendant's expert, the trial judge disclosed his contact to counsel. (*Id.* at 44). Of course, that does not address the *ex parte* contact between prosecutor and judge. Moreover, the trial judge's mere disclosure that an *ex parte* contact occurred does not obviate the problem. The Chief Magistrate applied the incorrect legal standard. "The correct inquiry is whether matters were discussed that did ***or could have influenced the judge*** in his . . . decision." (Emphasis added). *McKenzie v. Risley,* 915 F.2d 1396, 1398 (9th Cir. 1990). A "serious question" regarding this *ex parte* contact between prosecutor and judge, should be sufficient for Petitioner to meet his burden. *Cf., U.S. v. Reese,* 775 F.2d 1066, 1077-78 (9th Cir. 1985) (remanding for resentencing because there was a "serious question" concerning the possibility of reliance by the sentencing judge on *ex parte* materials submitted by the prosecutor.)

Likewise, the prosecutor's meetings with the defense expert psychologist, Dr. Chiappone, to discuss his findings were improper. The Chief Magistrate incorrectly concludes that such *ex parte* contacts are required to be permitted because the expert was listed as a witness and counsel are not permitted to prohibit a witness from conferring with other counsel. (Doc. 128, p. 45). The Chief Magistrate's reliance on *Workman v. Bell*, 178 F.3d 759, 771-772 (6th Cir. 1998) is misguided. That decision addresses only a counsel's right to have access to employee witnesses, i.e., lay witnesses, ***not access to a party's expert witness.*** *Id.* The prosecutor's *ex parte* contacts with the Defendant's expert *clearly go beyond ethical boundaries.* (Tr. 1119).

> [The expert's] understanding that this conduct is "just not done" is in perfect congruity with the rules that [the prosecutor] so wantonly broke. As Professor Charles Wolfram, Chief Reporter of the *Restatement of the Law Governing Lawyers* testified, it is a "no-brainer" that a prosecutor simply does not make an *ex parte* communication with a defense expert without the explicit consent of defense counsel.

*Lambert v. Blackwell,* 962 F.Supp. 1521, 1546 (E.D.Pa. 1997), rev=d on other grounds,

134 F.3d 506 (3rd Cir. 1997).  *Accord, Erickson v. Newmar Corp.,* 87 F.3d 298, 301-302

(9th Cir. 1996) ("Since existing rules of civil procedure carefully provide for limited and

controlled discovery of an opposing party's expert witnesses, ***all other forms of contact***

***are impliedly prohibited***.  Therefore, an attorney who engages in prohibited

communications violates the attorney's ethical duty to obey the obligations of the

tribunal.") (Emphasis added). The Chief Magistrate applied the wrong rule to this issue.

Thus, his resulting recommendation should be rejected. [18]

**B.     During *Voir Dire,* the Prosecutors Organized a Jury to Return a Death Verdict.**

As noted in the Thirteenth Ground for Relief, a state may not entrust the

determination of whether a man should live or die to a tribunal that is organized to return

a death verdict.[19]  *Witherspoon v. State of Illinois,* 391 U.S. 510, 522-523 (1968).  The

prosecutors committed misconduct in Petitioner's case by organizing a jury to return a

death verdict; by asking the jurors how they would rate on a death penalty scale that set

forth false standards; by obtaining personal commitments from the prospective jurors that

they could sign a death verdict against Petitioner; and by removing a juror on the basis of

her race.  It is readily apparent that the prosecutor's focus during *voir dire* was on

exposing the personal beliefs of each member of the venire rather than their ability too

follow the law.  (See e.g., Tr. pp. 282; 285; 295-296; 344-347; 373; 400-401; 429; 439;

---

[18] Further, the Ohio Supreme Court  failed to provide any reasoning for its decision, *Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000).  Clearly, by not citing to or analyzing Moore's claim under the applicable standard, the Ohio Supreme Court failed to address all of the pertinent parts of the constitutionally required by that analysis.  Thus, the AEDPA does not constrain this Court's review of Moore's claim.  *Frazier*, 343 F. 3d 780; *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

[19] *Witherspoon v. Illinois*, 391 U.S. 510, 543 (1968).

452, 482).   Indeed at one point, the prosecutor obtains specific commitments for the

venire members that they would be able to sentence Petitioner to death:

> So it may come down to the point, though, where everyone on this
> panel will sign that death penalty recommendation and they slide it
> across to you, and ***even though you're one of twelve, at that point,
> even though you're the only thing standing between Mr. Moore
> and possibly the electric chair, do you feel at that point - again,
> following the law B you could do it?***

(Tr. p. 264; <u>see</u> Tr. pp. 253; 258-259; 381-383).   Rather than repeat all of the relevant

facts here, Petitioner respectfully refers the Court to the discussion in support of his

objections to the Thirteenth Ground for Relief.

The Chief Magistrate incorrectly recommends rejecting this claim by

noting that the members were also asked if they could follow and apply the law

given to them by the trial court.  (Doc. 128, p. 120).  But a review of the transcript

references mentioned above confirms that the effect of the prosecutor's conduct

here is to focus the inquiry on the personal beliefs of the jurors regarding the

death penalty, rather than on whether the venire member would be able to fairly

apply the law as given by the court.

Constitutional principles of due process forbid this conduct.  As

previously discussed the Supreme Court has held that a *voir dire* process that

"focuses the inquiry directly on the prospective juror's beliefs about the death

penalty, . . . clearly falls within the scope of the *Witherspoon* doctrine." *Adams,*

448 U.S. at 48.  The *Adams* Court explained,

> [I]t is clear beyond peradventure that *Witherspoon* is . . . a
> limitation on the State's power to exclude: if prospective jurors are
> barred from jury service because of their views about capital
> punishment on "any broader basis" than inability to follow the law
> or abide by their oaths, the death sentence cannot be carried out.

[citation omitted]

*Adams,* 448 U.S. 47-48. *See* Thirteenth Ground for Relief.[20]   The prosecutor's overriding focus on the jurors' personal beliefs and his obtaining death sentence specific commitments from each juror as to Petitioner in particular, renders the verdict and sentence unconstitutional.   Thus, Petitioner objects to the Chief Magistrate's recommended disposition of this claim.

### C. During the Liability Phase, the Prosecutors Presented Testimony from the Victim's Father in Order to Elicit Sympathy from the Jury, Denigrated Petitioner's Counsel, Encouraged the Jury to Perform its Own Experiment, and Commented on Trial Counsel's Failure to Present Expert Witnesses.

### And

### D. During the mitigation phase, the prosecutors urged the sentencers to identify with the victim and made other improper arguments.

The Chief Magistrate incorrectly rejects both of these sub-claims out of hand. The Chief Magistrate does not reject Petitioner's characterization of the record.  Rather, he concludes that "the 8[th] Amendment is not a *per se* bar to the submissions of victim impact statements."  (Doc. 128, p. 121).  No other explanation is offered by the Chief Magistrate Judge.  The recommendation is in error.

The prosecutors presented testimony of the victim's father only for the purpose of being able to elicit sympathy from the jury and to identify for the jury that Mr. Olinger

---

[20]As discussed in the First Ground for Relief, AEDPA does not constrain this Court's review of Moore's claim.  Petitioner's *Murnahan* application, in which this allegation was raised, received merits review.  *State v. Moore*, 93 Ohio St.3d 649 (2001)(per curiam).  The Court's one sentence merits analysis does not identify or apply the appropriate United States Supreme Court standard for this claim *(Adams* and *Witherspoon).*  Consequently, the AEDPA is not applicable. *Williams*, 529 U.S. at 406.  *See also, Magana v. Hofbauer*, 263 F.3d 542 (6th Cir. 2001).  Further, the Ohio Supreme Court failed to provide any reasoning for its decision or analysis under *Adams. Hameen v. Delaware*, 212 F.3d 226, 248 (3rd Cir. 2000).  Thus, the AEDPA does not constrain this Court's review of Moore's claim.  *Frazier*, 343 F.3d 780; *Miller v. Staub*, 299 F.3d 570, 581-582 (6th Cir. 2002).

would be sitting in the courtroom audience.  Mr. Olinger testified that (a) the victim had a

sister; (b) he worked out of town; (c) he hugged and kissed his mother before he left the

house the night that he was killed; (d) a friend of his had died; and (e) his family did not

know what to do when they discovered that he was missing.  (Tr. 556-565).  This

testimony showed that the victim had been a dutiful son.  None of his testimony was

remotely relevant to any of the elements of the offenses at issue.  (*See* Tr. V. p. 629).

Judge Ruehlman, however, stated that it was relevant.  Id.

Additionally, at the liability phase closing argument, the prosecutor improperly

encouraged the jury to perform its own experiment regarding the victim's position when

he was shot.  This was clearly part of an improper effort to undercut the defense's

contention that the gun discharged accidentally.

> [G]o back in the jury room B nothing prevents you from doing
> this.  Go back and see how did he get in that position, what you
> have to do.  You're like this (indicating).  He's like this on his
> knees. .... After you're down like this, have somebody take that
> State's Exhibit 16 [the gun] and see what your reaction is.  Do you
> think you might maybe turn away from that gun and tilt your head
> back a little bit?

(Tr. V. p. 957).   This experiment permitted the jury to improperly base its verdict on

additional evidence supplementing the evidence admitted at the mitigation phase.  The

Constitution requires that evidence used against a defendant and considered by the jury

be first presented at trial "where there is full judicial protection of defendant's right of

confrontation, of cross-examination, and of counsel." *Turner v. State of Louisiana,* 379

U.S. 466, 472-473 (1965); *and see, Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir.

1982).  The Chief Magistrate Judge does not address this argument.  (Doc. 128, p. 121).

A writ should issue on this claim alone.  It goes without saying that, as a fundamental

matter of due process, a jury must be limited in its deliberations to the evidence offered at trial and may not consider evidence the jury itself generates after it is charged and begins deliberations. *Turner*, 379 U.S. at 473.

This error is exacerbated by additional improper conduct by the state. At the liability phase closing argument, when he was arguing about whether the victim was on his knees when he was shot, the prosecutor improperly commented on trial counsel's failure to present an expert witness: "The defense has every ability to subpoena in any expert they want to prove otherwise. Where were they? Where were they?" (Tr. V. 6 p. 956). This improperly shifted the burden of proof to Petitioner.

Contrary to the Chief Magistrate's recommendation, the state court's decision to the contrary constitutes an unreasonable application of *Payne v. Tennessee,* 501 U.S. 808, 825 (1991), as the Court has never permitted such testimony in the culpability stage or to otherwise bias a jury and undercut the fairness of the proceedings.

The most egregious example of prosecutorial misconduct occurred at the mitigation phase closing arguments, when, among other things, the prosecutor repeatedly urged the sentencers to put themselves in the victim's place and speculate on what the victim was feeling. (Tr. V. 7 pp. 1194-1196; and *see, Id.* 1231-1232; 1250-1254). See, Seventh Ground for Relief (regarding prosecutorial misconduct at mitigation phase closing argument).

In addition to these arguments, the prosecutors also improperly argued that it was the jury's duty to, in essence, impose the death penalty in this case (Tr. V. 7, pp. 1191); that the sentencers should consider the nature and circumstances of the offense and of the aggravating circumstances as non-statutory (and thus improper) aggravating factors; that

the strength of the aggravating circumstance of the killing being in the course of an aggravated robbery was that Petitioner placed a certain value on someone's life, (Tr. 1193-1194); and commented on the fact that Petitioner was not subject to cross-examination when he made his unsworn statement and argued that the jury could consider this when it considered Petitioner's credibility, (Tr. 1070-1071; 1227-1228; 1231; 1254).  See Seventh Ground for Relief.

In combination, the impropriety of all of these arguments warrant reversal because they mislead the jury, prejudiced Petitioner Moore, and were deliberately placed before the jury. *See United States v. Francis,* 170 F.3d 546, 550-551, 553 (6th Cir. 1999) (cumulative prosecutorial misconduct found despite overwhelming evidence of guilt); *United States v. Carroll,* 26 F.3d 1380, 1388 (6th Cir. 1994); *Sizemore v. Fletcher,* 921 F.2d 667, 670 (6th Cir. 1990); *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986); *United States v. Leon,* 534 F.2d 667 (6th Cir. 1976).

These errors and omissions violated Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  Prejudice may be presumed from these errors and omissions.  In the alternative, the record reviewed above demonstrates that these errors and omissions caused Petitioner actual prejudice, resulting in an unreliable verdict and the unconstitutional imposition of death sentence.

Prejudice to Petitioner

Because AEDPA does not constrain this Court's review of Petitioner's claim, this Court must determine whether the misconduct "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  The Sixth Circuit described the complexity of this inquiry: "In the context of a death penalty sentencing hearing, however, the question of error or effect is more

complex than in traditional trials.  Rather than determining whether a constitutional error would have pushed a jury from a 'not guilty' verdict to a 'guilty' verdict, we must attempt to discover whether the constitutional error influenced the jury's decision between life and death."  *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).  The record here confirms pervasive misconduct by prosecutor at multiple stages of the proceedings highly prejudicial to Petitioner.  "If a habeas court is in 'grave doubt' as to the harmlessness of an error, the habeas petitioner must prevail."  *Id.* at 649.  Consistent with *Bates,* the writ should issue with respect to this claim.

**NINETEENTH HABEAS GROUND** - **THE CHIEF MAGISTRATE ERRED IN RECOMMENDING THAT THE ADMISSION OF PETITIONER'S STATEMENT DID NOT VIOLATE HIS RIGHTS UNDER FIFTH AND FOURTEENTH AMENDMENT.**

The Ohio Supreme Court concluded that "[s]everal aspects of the events leading to Moore's confession [were] troubling."  *State v. Moore*, 81 Ohio St.3d 22, 32 (Ohio 1998).  The Chief Magistrate agreed and was equally "troubled@" by the circumstances leading up to Petitioner's confession.  Nevertheless, he recommends against granting relief as to this Ground.  (Doc. 128, p. 124).  Petitioner objects to the Chief Magistrate's recommended disposition.

The Ohio Supreme Court was disturbed by the following sequence of events leading to Petitioner's purported confession:

> The police officer did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in subfreezing temperatures in his stocking feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room.

*Id.*  In addition, the record in this case shows the following facts, not considered by the

Ohio Supreme Court.  Mr. Moore was arrested at 5:23 p.m., on January 20, 1994, while waiting for food at a fast food restaurant.  (Tr. 19).  Mr. Moore had not eaten for more than 15 hours at the time he signed his *Miranda* waiver form at 12:10 a.m., on January 21, and for nearly 20 hours at the point he was asked to give his statement at 4:45 a.m.  (Tr. pp. 49, 64-65, 73-74, 104, 179).  At the time of his statement, Moore had gone 20 hours without sleep.[21]  Around 8:00 p.m., a detective takes Moore's hat, shirt and sweatshirt. (Tr. p. 28).  Mr. Moore was not given his *Miranda* waiver form until 12:10 a.m., on the 21st "when he was standing almost naked without shoes and after being held for six hours without having anything to eat. . . ." (Tr. p. 104, Officer Tiernan Testimony).  He was not asked if he wanted a lawyer.  (*Id.*)  He was not questioned until more than 4 hours later at 4:45 a.m. (Tr. pp. 73-75), and nearly five hours elapsed between Mr. Moore's signing of the waiver form and his "confession" to Officer Feldhaus and Officer Tiernan. *State v. Moore*, 81 Ohio St.3d at 31.  When the interview was conducted at 4:45 a.m., Officer Tiernan testified that they did not ask him to sign a *Miranda* waiver at that time.  (Tr. p. 75).  The officers took a taped statement from Petitioner at 6:35 a.m.  (Tr. p. 88)

Again, there is no evidence that any *Miranda* waiver was requested at either of these interviews.  Officer Feldhaus admits that, at the time of the 4:45 a.m. interview, he simply showed Mr. Moore the *Miranda* rights form that had been given to Moore nearly five hours earlier, but did not read Mr. Moore his *Miranda* rights at the time he actually

---

[21]The Chief Magistrate notes that there was a cot in the room and no evidence that the police prevented him from using it. (Doc. 128, pp. 124-125).  The Chief Magistrate overlooks the undisputed fact that he remained cuffed behind his back much of the time he was being held, had little in the way of clothing and had to remain in the cold, wet socks in which the police made him walk on two occasions through the snow. (Tr. p. 138).  Those were conditions imposed by the police and it is little wonder he could not sleep.

took his statement.  He did not ask him if he agreed to waive his *Miranda* rights at the time he took his oral statement around 4:45 a.m., nor did he ask Petitioner if he was waiving his *Miranda* rights at the time the taped statement was obtained at 6:35 a.m. Indeed, on neither of these occasions did Officer Feldhaus even inform Petitioner that he had the right not to speak and had the right to have counsel present. (Officer Feldhaus testimony, Tr. pp. 114).   All of these facts considered together establish state coercion to obtain a statement.

The Chief Magistrate erred in concluding that the Ohio Supreme Court's decision was not contrary to U.S. Supreme Court authority under 2254 (d)(1).  The Ohio Supreme Court's error occurred when it found this conduct troubling, yet held Moore's *Miranda* violation was cured by an earlier valid waiver.  *Miranda* and its progeny refute this contention.  *Miranda* specifically recognized that a one time waiver is not the end of the inquiry - that subsequent (mis)conduct can invalidate the waiver.  It stands to reason that if a one-time warning given at the beginning of an interrogation may not satisfy the continuing obligation under *Miranda*, then a previous *Miranda* waiver given in a preceding interrogation would not satisfy *Miranda,* particularly in light of the harsh conditions and deprivations to which the police subjected Petitioner prior to obtaining his "confession."  Neither the Ohio Supreme Court nor the Chief Magistrate Judge adequately address this basic principle of *Miranda*.

A *Miranda* violation occurring at the point the police officers obtained Petitioner's statement sometime after 4:45 a.m. cannot be cured by earlier conduct.  *See*, *Miranda*, 384 U.S. at 469 ("[o]ur aim is to assure that the individual's right to choose between silence and speech remains unfettered ***throughout the interrogation process***.")

(Emphasis added).  The *Miranda* decision imposes more than a mere requirement that warnings be provided at the beginning of an interrogation.  The police officers did not properly re-advise Moore of his *Miranda* rights prior to the final interrogation session after the troubling aspects occurred.  As Chief Justice Rehnquist noted for the Court in *Dickerson v. United States*, 530 U.S. 428, 440 (2000):

> "After discussing the 'compelling pressures' inherent in custodial police interrogation, the *Miranda* court concluded that, 'in order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively appraised of his rights and the exercise of those rights must be fully honored.'"

As mentioned, this constitutional protection attaches at all stages of the interrogation process.  Because the Ohio Supreme Court did not identify and apply the correct Supreme Court case law, Moore satisfies his burden of showing the Ohio Supreme Court's ruling was clearly contrary to established federal law.  *Williams*, 529 U.S. at 406.

Determining the validity of a *Miranda* waiver usually entails two separate inquiries.  The waiver must be both voluntary and knowing and intelligent. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  A waiver is voluntary when "it [is] the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.*  A waiver is knowing and intelligent when "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*  Both inquiries are judged based on the "totality of the circumstances surrounding the interrogation." *Id.*  (internal quotation omitted).

Moore's case is similar to *Hart v. AG*, 323 F.3d 884 (11th Cir. 2003), in which the habeas court found that a confession offered after police told the defendant that "honesty wouldn't hurt him" was involuntary.  *Id.* 894.  Even though the defendant had received

*Miranda* warnings earlier that day, the court found that the subsequent comment by an interrogating officer contradicted the *Miranda* warning, thus rendering his confession a product of the officer's deception.

In this case, Petitioner stated that during the interrogation he was told that if it was an accident he should give his statement otherwise it would be assumed that he did it on purpose. (Tr. p. 144).[22]  The interrogating officer concedes discussion about an "accident" scenario and a lack of recollection about advising Petitioner about the charge against him. (Officer Tiernan testimony, Tr. pp. 90-91).  The *Miranda* rule enunciated in *Hart* would apply here and require exclusion of the statement. "Any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive" constitutional rights.  *Miranda* at 476. *See, Smith v. Illinois*, 469 U.S. 91, 98 (1984) (police statement not constitutional because it was "seriously misleading" since it "imparted" to the suspect that "he had to talk to the interrogator.")  See *also, U.S. v. Malloy,* Fed. Appx. 520 (9th Cir. 2002), *cert. denied,* 536 U.S. 915 ("Where successive custodial interrogations after an initial *Miranda* warning occur, we must consider the totality of the circumstances to determine whether the defendant should have been re-advised of his or her *Miranda* rights to ensure that the subsequent interrogations are not coerced." *Id*. at *522, *citing*, *Wyrick v. Fields,* 459 U.S. 42, 49 (1982)).

The totality of the circumstances here (lack of food and sleep, the lack of clothing, being cuffed behind his back for several hours awaiting interrogation, being required to walk through snow in socks, not being advised of the charges, being encouraged to give

---

[22]  Petitioner confirms in his statement that the gun discharged by accident. (Tr. 153, 155)

his statement about it being an "accident", coupled with Petitioner's belief that the document he signed was merely advice of rights and not a waiver), are all sufficient to constitutionally require that Petitioner be properly re-advised of his *Miranda* rights before the successive interrogations occurred. "Our aim is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." *Miranda*, 384 U.S. at 469. That clearly did not happen here, even under the Police Officer's description of the successive interrogations.

The Ohio Supreme Court failed to consider the totality of these circumstances as it is obligated to do under *Miranda* and its progeny. As noted by the Supreme Court in *Wiggins*, 539 U.S. at 527, a state court unreasonably applied United States Supreme Court authority when it failed to consider relevant facts. Therefore, AEDPA does not constrain this Court's review of Moore's claim that his *Miranda* rights were violated.

The Chief Magistrate erred in concluding otherwise. Statements admitted in violation of *Miranda* must be excluded. *Miranda* 384 U.S. at 479. Such error is not harmless. *Jackson v. Giurbino,* 364 F.3d 1002, 1008 (9th Cir. 2004). Therefore, Petitioner objects to the recommended disposition.

### TWENTIETH HABEAS GROUND B THE CHIEF MAGISTRATE ERRED IN RECOMMENDING THAT MOORE'S REASONABLE DOUBT INSTRUCTION COMPORTED WITH THE REQUIREMENTS OF THE FOURTEENTH AMENDMENT.

In its charge to the jury, the trial court improperly defined "reasonable doubt" in a way that lessened the state's burden of proof. The trial court at the culpability phase gave the following, constitutionally deficient definition of reasonable doubt:

> Reasonable doubt is present when after you have carefully considered and compared all the evidence, you cannot say you are ***firmly convinced*** of the truth of the charge.

> Reasonable doubt is a doubt that's based on reason and
> common sense. Reasonable doubt is not mere possible
> doubt because everything relating to human affairs
> depending on moral evidence is open to some possible or
> imaginary doubt.  So proof beyond a reasonable doubt is
> proof of such character that an ordinary person would be
> **willing to rely and act upon it** in the most important of his
> or her own affairs.  (Emphasis acted).

(Tr., pp. 962-63).  At the penalty phase, the trial court gave the identical constitutionally

infirm instruction.  (Tr., p. 1237).

The trial court's charge, taken as a whole, did not adequately convey to jurors the

stringent "beyond a reasonable doubt" standard that is mandated by the Fourteenth

Amendment.   The "willing to rely and act" language provided the jury with no guidance

because it is clearly too lenient.  Finally, reference to "moral evidence" carries the same

constitutional deficiency by lessening the states burden of proof.  *Cf., Gaines v. Kelly,*

202 F.3d 598, 606-607 (2d Cir. 2000) (use of "morally and reasonably certain" is

unconstitutional).

As a result of the instruction regarding burden, the jurors convicted and sentenced

Moore on a standard below that required by the Fourteenth Amendment.  This

fundamental, structural error requires reversal of convictions and sentences.  "Where

there is a reasonable likelihood that a jury does not believe that it must find proof beyond

a reasonable doubt to find the defendant guilty, the erroneous instruction is a 'structural

error' that may not be cured through a harmless error analysis."  *Bartlett v. Battaglia,* 453

F.3d 796, 801 (7th Cir. 2006).

The Supreme Court has always been vigilant in enforcing the beyond a reasonable

doubt standard.  In *Cage v. Louisiana,* 498 U.S. 39, 41 (1990), *modified on other*

*grounds, Estelle v. McGuire,* 502 U.S. 62, 72 (1991), the Court overturned a Louisiana

81

defendant's capital conviction and death sentence because the instruction on reasonable doubt could have led jurors to find guilt "based on a degree of proof below that required by the Due Process Clause." The Supreme Court held that a jury instruction providing a constitutionally inadequate definition of reasonable doubt can never be subjected to harmless error review under the test of *Chapman*. *Sullivan v. Louisiana,* 508 U.S. 275 (1993).

The Supreme Court and the majority of federal circuit courts have condemned the "willing to act" language with which the trial court defines reasonable doubt. In *Holland v. United States,* 348 U.S. 121, 140 (1954), the Court indicated its disapproval of the "willing to act" language when defining proof beyond a reasonable doubt. "There is a substantial difference between a juror's verdict of guilt beyond a reasonable doubt and a person making a judgment in a matter of personal importance to him." *Scurry v. United States,* 347 F.2d 468, 470 (D.C. Cir. 1965). Indeed, the majority of the federal circuit courts have disapproved of the "willing to act" phrase and adopted a preference in favor of defining proof beyond a reasonable doubt in terms of a prudent person who would hesitate to act when confronted with such evidence. *United States v. Pinkney,* 551 F.2d 1241 (D.C. Cir. 1976); *United States v. Noone*, 913 F.2d 20 (1st Cir. 1990); *United States v. Colon,* 835 F.2d 27 (2nd Cir. 1987); *United States v. Conley,* 523 F.2d 650 (8th Cir. 1975); *Monk v. Zelez,* 901 F.2d 885 (10th Cir. 1990).

The definition of reasonable doubt given to Moore's jury was further flawed because it informed the jury that "[r]easonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt." (Tr., pp. 963, 1237). The phrase "moral evidence"

improperly shifted the focus of this jury to the subjective morality of Moore rather than

the required legal quantum of proof. *Cage,* 498 U.S. at 41. This is substantially the same

as directing them to find guilt by some undefined quantum of moral conviction and

confuses the jury regarding the standard of proof is to apply. There is little difference

between this instruction and the constitutionally defective instruction in *Cage* that

allowed the jury to be guided by a "moral certainty."

> The charge did at one point instruct that to convict, guilt
> must be found beyond a reasonable doubt; but it then
> equated a reasonable doubt with a "grave uncertainty" and
> an "actual substantial doubt," and stated that what was
> required was a "moral certainty" that the defendant was
> guilty. It is plain to us that the words "substantial" and
> "grave," as they are commonly understood, suggest a
> higher degree of doubt than is required for acquittal under
> the reasonable-doubt standard**.** When those statements are
> then considered with the reference to ***"moral certainty,"***
> rather than ***evidentiary certainty,*** it becomes clear that a
> reasonable juror could have interpreted the instruction to
> allow a finding of guilt based on a degree of proof below
> that required by the Due Process Clause.

*Cage,* 498 U.S. at 41.

Although in *Victor v. Nebraska*, 511 U.S. 1(1994) the Court rejected a due

process challenge to a jury instruction that included the phrase "moral evidence." *Id.* at

13. *But see Id.* at 21 (Kennedy J., concurring). The Court found no error because the

phrase "moral evidence" was proper when placed in the context of the jury instruction on

reasonable doubt that was given:

> [T]he instruction itself gives a definition of the phrase. The
> jury was told that "everything relating to human affairs, and
> depending on moral evidence, is open to some possible or
> imaginary doubt" - in other words, that absolute certainty is
> unattainable in matters relating to human affairs. Moral
> evidence, in this sentence, can only mean empirical
> evidence offered to prove such matters - the proof

introduced at trial.

*Id.* at 13 (emphasis added).

Unlike *Victor*, the instruction in this case did not guide the jury by placing the phrase "moral evidence" within any proper context.  In *Victor*, the jury was properly guided on the phrase "moral evidence" because it was conjunctively paired with the phrase "matters relating to human affairs."  *Id.*  Here, "moral evidence" appears to be a reference to the type of evidence offered in this action and is associated with the degree of doubt that the Court instructs the jury is "reasonable" and is undefined.  Accordingly, Moore's jury would likely be misled into believing it was allowed to convict him based on considerations of subjective morality, rather than evidentiary proof required by the Due Process Clause.  *Victor*, 511 U.S. at 21 (Kennedy J., concurring) ("[the] use of 'moral evidence' ... seems quite indefensible ... the words will do nothing but baffle").

The trial court also improperly equated reasonable doubt with whether the jurors were firmly convinced.  (Tr., pp. 963, 1237).  The "firmly convinced" language is not reasonable doubt language; rather, it represents a clear and convincing standard as illustrated by *Cross v. Ledford*, 161 Ohio St. 469 (1954), syllabus.  In *Cross*, clear and convincing evidence was defined as that "which will provide in the mind of the trier of facts a firm belief or conviction to the facts sought to be established." *Id.* at 477 (emphasis added).  The "firmly convinced" language is not reasonable doubt language; rather, it represents a clear and convincing standard of proof that fails to meet a constitutional threshold in the criminal context. (*Cf.,* Vol. 1 *Ohio Jury Instructions*, 3.75, (2006) (ACLEAR AND CONVINCING.  "To be 'clear and convincing' the evidence . . . must produce in your minds a ***firm belief or conviction*** about . . . the truth of the

matter"). Neither the Respondent nor the Chief Magistrate explain how "firmly convinced" can provide a definition for both a standard of "beyond a reasonable doubt" and the lesser standard of "clear and convincing."

The similarity of this definition to O.R.C. 2901.05(D) is quite notable, where reasonable doubt is present if jurors "cannot say they are <u>firmly convinced</u> of the truth of the charge." O.R.C. 2901.05(D) (emphasis added). As a result, the jurors convicted and sentenced Petitioner on a standard below that required by the Due Process Clause. *See Cage,* 498 U.S. 39; *In re Winship,* 397 U.S. at 364.

Moore recognizes that the Sixth Circuit has accepted this definition of reasonable doubt. However, Moore respectfully argues that, applying United States Supreme Court authority - a Court that has never passed on the Ohio definition of reasonable doubt - those decisions are unreasonable and contrary to *Cage,* 498 U.S. at 41. This is so because the instructions in Moore's trial allowed his jury to find him guilty "based on a degree of proof below that required by the Due Process Clause." Thus, Petitioner objects to recommended disposition of this claim.

**<u>TWENTY-FIRST GROUND FOR RELIEF</u> B THE CHIEF MAGISTRATE ERRED IN RECOMMENDING THAT THE TRIAL COURT'S INSTRUCTIONS AT THE CULPABILITY PHASE DID NOT VIOLATE MOORE'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND A FAIR PROCEEDING.**

**A. The "principal offender" and "prior calculation and design" elements of capital aggravated murder/felony murder are alternatives that are not to be charged and proven in the same case.**

The language of Ohio's death penalty scheme provides that the "principal offender" and "prior calculation and design" are not to be charged and proven in the same case. These two elements were intended to be alternatives. In spite of this, the trial court

in Moore's case instructed the jury on three separate occasions on both alternatives. *(See*

Tr., pp. 971-982 (Count 1), pp. 984-993 (Count 2), pp. 994-1002 (Count 3)).  At its

essence, the Ohio Supreme Court agrees with this position:

> With regard to the court's instructing the jury on both principal offender and prior calculation and design, such an instruction is proper if the alternatives are given to the jury disjunctively in the same specification. *Cook , supra*, 65 Ohio St.3d at 527, 605 N.E.2dat 82-83. ***The court erred in not instructing the jury to be unanimous in agreeing on which alternative Moore was guilty of.*** (Emphasis added).

*State v. Moore*, 81 Ohio St. 3d 22, 40 (1998).  Despite this admitted error, the Chief

Magistrate recommended to accept the Ohio Supreme Court's incorrect ruling that the

error was harmless. (Doc. 128, pp. 128-129).

    The reason that aggravating factors must be found unanimously is that they are

the elements of the murder offense that make the defendant death eligible. *See Ring v.*

*Arizona*, 536 U.S. 584 (2002) (holding that because Arizona's enumerated aggravating

factors operate as the functional equivalent of elements of the offense, the Sixth

Amendment requires that they be found by a jury).  All of the elements of a criminal

offense must be found by a jury unanimously as a matter of constitutional criminal

procedure, *see Richardson v. United States*, 526 U.S. 813 (1999).  This is particularly true

as to all elements that make a defendant death eligible, *see Ring*, 122 S. Ct. at 2431.

    The language of Ohio's death penalty scheme provides that the "principal

offender" and "prior calculation and design" are not to be charged and proven in the same

cause.  These two elements were intended to be alternatives.  In spite of this, the trial

court instructed the jury on three separate occasions on both alternatives. *(See* Tr., pp.

971-982 (Count 1), pp. 984-993 (Count 2), pp. 994-1002 (Count 3)).

    Instructing the jury with the alternative elements risked the possibility of a non-

unanimous finding on this aggravating specification.  It is possible that some jurors found that Moore had prior calculation and design while other jurors found that Moore was the principal offender, thus rendering that verdict non-unanimous.  Such a verdict does not comport with the dictates of *Richardson v. U.S.*, 526 U.S. 813 (1999).  Indeed, as noted above, on Moore's direct appeal, the Ohio Supreme Court held that this instruction was improper.[23]

The Chief Magistrate implicitly agrees with the Ohio Supreme Court's conclusion that the error was rendered harmless as the jury unanimously agreed on the aggravated murder charge in Count I which included a "prior calculation and design" element.  First, the instruction on Count 1 itself contains the offending alternative elements language.  (See Instruction as to Count 1, Specification 2, Tr. p. 980).  More important, it is contrary to and/or an unreasonable application of United States Supreme Court authority to substitute an appellate court's finding as to an eligibility and narrowing function that is to be made under the statute ***by the jury.***  Thus, it is the jury that must determine unanimously which, if any, of the alternative limiting elements in a death penalty case are supported by the evidence beyond a reasonable doubt. *Richardson v. U.S.*, 526 U.S. 813 (1999).  "[T]his Court has indicated that the Constitution itself limits a State's power to define crimes in ways that would permit juries to convict while disagreeing about means." *Id.* at 820.  This determinative rule of law is not addressed in the Chief Magistrate's Report.  (Doc. 128, pp. 128-129).  Consistent with *Ring* and *Richardson,* Petitioner is entitled to relief as to this Ground, and objects to the recommended disposition of this claim.

---

[23]*State v. Moore,* 689 N.E.2d 1, 17 (Ohio 1998).

**B & C.** **The definition of "cause" and purpose diluted the "specific intent to kill" element that is required in a capital aggravated murder case.**

In its instructions to the jury, the trial court improperly allowed the jury to presume the necessary degree of intent when it informed the jury that, "If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, *the purpose to cause the death may be inferred from the use of the weapon."* (Emphasis added). (Tr., p. 968). It is an elementary principle of due process that the prosecution must prove every element of the crime beyond a reasonable doubt. *Sandstrom v. Montana*, 442 U.S. 510, 520 (1979). An instruction that tells a jury to presume any element of a crime without evidence is unconstitutional, for "the Fourteenth Amendment's guarantees prohibit a State from shifting to the defendant the burden of disproving an element of the crime charged." *Id.* at 527 (Rehnquist, J., concurring). The Supreme Court has made clear that an instruction that a jury should presume malice from use of a deadly weapon falls under this constitutional prohibition. See, Y*ates v. Evatt*, 500 U.S. 391, 401-02 (1991); *Francis v. Franklin*, 471 U.S. 307, 317 (1985); *see also Houston v. Dutton*, 50 F.3d 381, 385 (6th Cir. 1995); *Caldwell v. Bell*, 288 F.3d 838 (6th Cir. 2002).

*Carella v. California*, 491 U.S. 263 (1989), summarizes Moore's underlying contention: "The Due Process Clause . . . denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense. Jury instructions relieving States of this burden violate a defendant's due process rights." *Id*. at 265 (citations omitted). The Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact

necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at

364. This "bedrock, 'axiomatic and elementary' [constitutional] principle," (*Id.* at 363)

prohibits the State from using evidentiary presumptions in a jury charge that have the

effect of relieving the State of its burden of persuasion beyond a reasonable doubt of

every essential element of a crime. *Sandstrom*, at 520-524; *Patterson v. New York*, 432

U.S. 197, 210, 215 (1977); *Mullaney v. Wilbur*, 421 U.S. 684, 698-701 (1975); *see also*

*Morissette v. United States*, 342 U.S. 246, 274-275 (1952).

In Ohio, "the existence of an accused's purpose to kill must be found by the jury

under proper instructions from the trial court and can never be determined by the court as

a matter of law." *State v. Jenkins*, 473 N.E.2d 264, 305 n.41 (Ohio 1984); *Ohio v. Scott*,

400 N.E.2d 375 syl. 4 (1980)(same). Further, 2929.03(D)(1) requires a specific intent to

kill. The trial court violated these principles by instructing the jury that it could infer the

purpose or a specific intent to kill via a much lesser standard.

The trial court violated the *Sandstrom* and *Winship* principles in giving the

following instructions. First, the trial court instructed "cause" is when the death is the

natural and foreseeable result of the act; that a death is the result of the act when it is

produced directly by the act and would not have occurred without it; and that a result

occurs when the death is naturally and foreseeably caused by an act. (Tr. pp. 968-969).

Second, the trial court also instructed that a person acts purposely when it is his specific

intention to cause a certain result; that purpose is a decision to do an act with the

conscious objective of producing a specific result or engaging in specific conduct; that to

do something purposely is to do it intentionally and not accidentally; and that purpose is

determined from the manner in which the act is done, the means or the weapon used and

all other facts and circumstances in evidence. The trial court then delivers the following constitutionally fatal instruction: ***"the purpose to cause the death may be inferred from the use of the weapon. . . ."*** (Emphasis added) (Tr., pp. 967-968).

The totality of the instructions would likely cause a reasonable juror to equate specific intent with purpose and general intent. Since the trial court instructed the jurors that specific intent is present so long as there was no accident ***or from the use of a weapon***, the jury had no choice but to return a guilty verdict to all charges - especially when Mr. Ollinger was killed by a handgun. Thus, the trial court's instructions lessened the *mens rea* to a nullity, thereby prejudicing Moore. *See Reagan v. Norris*, 365 F.3d 616 (8th Cir. 2004) (prejudice because "jury could have believed every aspect of the defense's case and still convicted Reagan of first-degree murder because the jury was instructed that simply 'causing' Sarah's death would constitute cruel and malicious indifference.")

The effect of the trial court's instruction was to create a conclusive presumption that, since a deadly weapon was involved, or that it was reasonably foreseeable, or that it was not an accident, Moore's purpose and specific intent had been established. By also failing to instruct that this inference was not conclusive, the trial court left the jury with a conclusive presumption on the element of purpose and specific intent. This relieved the State of its burden to prove the elements in violation of the Fourteenth Amendment. *Cabana v. Bullock*, 474 U.S. 376, 384 (1986) ("A defendant charged with a serious crime has the right to a jury to determine his guilt or innocence.")

In rejecting this portion of Petitioner's Twenty-First Ground, the Chief Magistrate sets out the entire instruction and concludes, "It is clear in the instruction that the State had to prove the element of intent." (Doc. 128, p. 130). In considering jury instruction

90

issues, however, it is not simply as easy as determining what a court or party interprets the instruction to mean. This Court is required to examine what a reasonable juror could have understood the totality of the instructions to mean. *See Francis v. Franklin*, 471 U.S. 307, 315-316 (1985) ("The question is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror could have understood the charge as meaning."). The trial court's addition of language in the instruction that "the purpose to cause the death ***may be inferred from the use of the weapon*"** creates an improper presumption and lessens the State's burden to prove all elements of the offense beyond a reasonable doubt.

In this regard the Chief Magistrate commits the same error as the Ohio Supreme Court, which failed to correctly identify and articulate the legal principle governing Petitioner's allegation of error. Instead of assessing how a jury may have reasonably interpreted the instruction, the Ohio Supreme Court rejected the claim in a single sentence, along with numerous other claims of error. At no point did the Ohio Supreme Court indicate that no reasonable jury would interpret this instruction to create a conclusive presumption. *See Francis*, 471 U.S. at 315-316; *Mills v. Maryland*, 486 U.S. 367, 370 (1988) (relief granted even though state appellate court's interpretation of the instructions was described as plausible).[24]

When this Court applies the correct legal test *de novo*, this Court should find constitutional error under *Sandstrom*, 442 U.S. 510. Thus, Petitioner objects to the

---

[24] Because the Ohio Supreme Court did not identify and apply the applicable standard of the United States Supreme Court, the AEDPA does not erect a bar to this Court's review of Petitioner's claim. *See Williams*, 529 U.S. at 405 (AEDPA not applicable "if the state court applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases."); *McCambridge v. Hall*, 266 F.3d 12 (1st Cir. 2001) (AEDPA not applicable when state court did not identify Supreme Court standard); *Magana*, 263 F.3d at 549-550 (AEDPA not applicable when state court applies wrong standard); *Wade v. Terhune*, 202 F.3d 1190, 1197 (9th Cir. 2000) (same).

recommended disposition of this claim.

**TWENTY-SECOND GROUND FOR RELIEF B THE CHIEF MAGISTRATE ERRS IN RECOMMENDING THAT THE USE OF DUPLICATIVE SPECIFICATIONS TO THE AGGRAVATED MURDER COUNTS AND THE USE OF THE SAME OPERATIVE FACTS TO ELEVATE MURDER TO AGGRAVATED MURDER AND TO CAPITAL AGGRAVATED MURDER AS WELL AS THE SUBMISSION TO THE JURY OF ALL OF THESE COUNTS DID NOT VIOLATE PETITIONER'S RIGHTS, INCLUDING HIS RIGHTS TO DUE PROCESS, EQUAL PROTECTION, A FAIR PROCEEDING, A RELIABLE SENTENCE, AND TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT.**

Petitioner was charged with three counts of capital aggravated murder growing out of a single shooting incident and a single victim. A single death can form the basis for only one homicide conviction. The multiple counts and specifications which were included in the instructions to the jury constituted the use of duplicative aggravating factors and operated to unconstitutionally skew the weighing process at sentencing to favor imposition of the death penalty. This violated Petitioner's rights as protected by the Eighth and Fourteenth Amendments. *U.S. v. McCullah,* 76 F.3d 1087, 1111 -1112 (10th Cir. 1996).

The Chief Magistrate recommends against granting relief with respect to this claim. He notes that "[d]uring the jury instructions the trial judge merged the specifications under each count and merged the felony-murder counts." He then cites *Scott v. Mitchell,* 209 F. 3d 854, 884 (6th Cir. 2000) as rejecting Petitioner's substantive contention on the merits. The Chief Magistrate is in error.

The first count charged him with purposely causing the death of the victim with prior calculation and design. Id. It contained the following capital specifications:

(a) committing the killing to escape detection for a kidnapping and/or an aggravated robbery; (b) committing the killing in the course of a

kidnapping and either being the principal offender in the killing or committing the killing with prior calculation and design; and (c) committing the killing in the course of an aggravated robbery and either being the principal offender in the killing or committing the killing with prior calculation and design. *Id*.

The second count charged him with purposely causing the death of the victim in the course of a kidnapping. *Id*. It contained the following capital specifications:

(a) committing the killing to escape detection for a kidnapping; (b) committing the killing in the course of a kidnapping and with being either the principal offender in the killing or committing the killing with prior calculation and design; and (c) committing the killing in the course of an aggravated robbery and with being either the principal offender in the killing or committing the killing with prior calculation and design. *Id.*

The third count charged him with purposely causing the death of the victim in the course of an aggravated robbery. *Id*. It contained the following capital specifications:

(a) committing the killing to escape detection for an aggravated robbery; (b) committing the killing in the course of an aggravated robbery and either being the principal offender in the killing or committing the killing with prior calculation and design; and (c) committing the killing in the course of a kidnapping and either being the principal offender in the killing or committing the killing with prior calculation and design. *Id.*

Each of these three counts also contained a firearm specification, which is a non-capital specification. *Id*.

Despite the "merger" at the penalty phase to which the Chief Magistrate refers in denying this claim, the jury was still instructed as to two counts of aggravated murder (each containing the element of purposeful killing) for killing of a single victim. The mitigation phase instructions also included overlapping specifications. For example, each count included a specification that involved a finding that Petitioner committed aggravated murder in the process of committing kidnapping. The specification in the first count includes the language that Mr. Moore committed aggravated murder for the

purpose of "escaping detection . . . or punishment . . . *for another crime committed by him, to wit: Kidnapping and/or aggravated robbery.*" (Tr. 1241). (Emphasis added). The instruction on the second count includes the language that defendant committed aggravated murder

> Awhile committing or attempting to commit, or fleeing immediately after committing or attempting to commit *the offense of aggravated robbery*, and the Defendant Lee Moore and the defendant . . . was the principal offender, or . . . committed the offense with prior calculation and design.

(Tr. 1241-1242). Both the commission of a single act of killing and the commission of single act of aggravated robbery are double counted, thus, unconstitutionally skewing the weighing process in favor of a sentence of death. As demonstrated below, this violates the Supreme Court's holding in *Stringer v. Black,* 503 U.S. 222, 230-32 (1992), which proscribes infecting the weighing process with imprecise or otherwise an invalid factors. The new remedy for such a violation is a remand for a new resentencing. *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884 (2006).

Charging Petitioner with the same specifications for each count of aggravated murder constituted duplicative specifications. Moreover, the same operative facts served to elevate a murder charge to an aggravated murder charge and then to a capital aggravated murder charge.

The use of duplicative specifications and the use of the same operative facts to elevate the murder charge to a capital aggravated murder charge fail to narrow the class of offenders eligible for the death penalty; and does not properly guide the sentencer's discretion in imposing the death penalty. The "double counting" of aggravators has a tendency to skew the process so as to give rise to the risk of an arbitrary, and thus unconstitutional, death sentence. *United States v. McCullah,* 76 F.3d 1087, 1111 (10th

Cir. 1996).  Applying the Supreme Court's decision in *Stringer*, the court explained,

> Such double counting of aggravating factors, especially under a weighing
> scheme, has a tendency to skew the weighing process and ***creates the risk
> that the death sentence will be imposed arbitrarily and thus,
> unconstitutionally.*** *Cf. Stringer v. Black,* 503 U.S. 222, 230-32, 1(1992).
> As the Supreme Court of Utah pointed out, when the same aggravating
> factor is counted twice, the "defendant is essentially condemned 'twice for
> the same culpable act,' " which is inherently unfair. *Parsons v. Barnes,*
> 871 P.2d 516, 529 (Utah) (quoting *Cook v. State,* 369 So.2d 1251, 1256
> (Ala.1979)), *cert. denied, *1112 --- U.S. ----, 115 S.Ct. 431, 130 L.Ed.2d
> 344 (1994).  (Emphasis added).

*Id.* at 1111-1112.  The Tenth Circuit explained its concern that the weighing process is

tainted where the state is permitted to stack duplicative factors to obtain a sentence of

death.

> While the federal statute at issue is a weighing statute which allows the
> jury to accord as much or as little weight to any particular aggravating
> factor, the mere finding of an aggravating factor cannot but imply a
> qualitative value to that factor. *Cf. Engberg v. Meyer,* 820 P.2d 70, 89
> (Wyo.1991). When the sentencing body is asked to weigh a factor twice in
> its decision, a reviewing court cannot "assume it would have made no
> difference if the thumb had been removed from death's side of the scale."
> *Stringer,* 503 U.S. at 232.

*Id.* at 1112.  Even where the factors are not identical, where one necessarily subsumes the

other unconstitutional overlapping occurs. *Id.* at 1111.

The Fourth and Fifth Circuits are in agreement. "[A] submission [of multiple

overlapping aggravating factors] ... that permits and results in cumulative findings of

more than one of the ... circumstances as an aggravating factor is constitutional error."

*United States v. Tipton,* 90 F.3d 861, 899 (4th Cir.1996) (citing *McCullah,* 76 F.3d at

1111). Likewise, the Fifth Circuit has held that

> double counting of aggravating factors creates the risk of an arbitrary
> death sentence. If the jury has been asked to weigh the same aggravating
> factor twice, the appellate court cannot assume that "it would have made
> no difference if the thumb had been removed from death's side of the

scale." *Stringer v. Black,* 503 U.S. 222, 232, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992). Consequently, the district court erred by submitting the duplicative aggravating factors to the jury.

*United States v. Jones,* 132 F.3d 232, 251 (5th Cir.1998), *aff'd* on other grounds, 527 U.S. 373.[25]

The Chief Magistrate's reliance on *Scott* is clearly misplaced as that case did not involve the giving of duplicative instructions at sentencing nor did it involved such redundant guilt phase instructions.  Rather *Scott* concerned itself only with the issue of whether the same act that forms the basis of the conviction can also provide an aggravating circumstance. *Id.* 209 F.3d at 884-885.  It did not address the overlapping specifications and counts that were submitted to the jury in this case.

The Tenth Circuit properly held that the use of duplicative aggravating factors creates an unconstitutional skewing of the weighing process, which necessitates a reweighing of the aggravating and mitigating factors. *Id.* at 1112.  The same result is constitutionally mandated hereby a jury. *Brown v. Sanders*, 546 U.S. 212, 126 S.Ct. 884 (2006).  Thus, Petitioner objects to the recommended disposition of this claim.

**TWENTY-FIFTH GROUND FOR RELIEF.  OHIO'S DEATH PENALTY SCHEME IS UNCONSTITUTIONAL AND VIOLATED PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Moore stands on the legal arguments and authority submitted with the habeas petition.

---

[25] The Fifth Circuit found the constitutional error to be harmless when it conducted it's own independent re-weighing in a federal death penalty case by reviewing each of the mitigating factors against the non-duplicative aggravating factors.  That was not done by the Ohio appellate courts in Mr. Moore's case. Rather the Ohio Supreme Court held rather perfunctorily that "merger of the death sentences as part of this court's independent assessment can cure any errors that taint the jury's sentencing verdict." *State v. Moore*, 81 Ohio St. 3d at 39.  There is no indication in the Ohio Supreme Court's opinion that the offending duplicative aggravating factors were removed from its consideration. *Id.*

## CONCLUSION

WHEREFORE, for the above stated reasons, this Court should exercise its de

novo review pursuant to Fed. Civ. R. P. 72(b) and 28 U.S.C. § 636(b) et seq. and sustain

Petitioner's objections as to the merits and/or the procedural defaults, and grant

appropriate relief.

Respectfully Submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
Phone (636) 207 – 7330
Fax (636) 207 – 7351

-and-

/s/ Michael J. O'Hara
MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan &
Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
Fax: (859) 578-3365

COUNSEL FOR PETITIONER

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed with and will be
made available to Respondent via this Court's electronic filing system and
pursuant to Loc. R. 5.2 this constitutes service.

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142