UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| LEE E. MOORE, ) | CASE NO. C-1-00-0023 |
| ) | |
| Petitioner, ) | JUDGE DLOTT |
| ) | |
| vs. ) | CHIEF MAGISTRATE MERZ |
| ) | |
| BETTY MITCHELL, Warden ) | |
| ) | *DEATH PENALTY CASE* |
| Respondent. ) | |

**PETITIONER'S SUPPLEMENTAL MEMORANDUM REGARDING A *BATSON*
VIOLATION PRESENTED AS HIS THIRTEENTH HABEAS GROUND,
SUBSECTION (D)**

*PROCEDURAL HISTORY*

In his amended habeas petition, Petitioner alleged that the state violated *Batson v. Kentucky*, 476 U.S. 79 (1986). Petitioner raised his *Batson* error as subsection (D) of his Thirteenth Habeas Ground. The Chief Magistrate addressed the claim on the merits, specifically noting that no procedural default had been raised. ECF Doc. 128 at 104.

The Chief Magistrate recommended granting in part and denying in part Petitioner's Writ of Habeas Corpus. ECF Doc. 128. While the Chief Magistrate granted Petitioner relief on errors similar to that which convinced the Sixth Circuit to grant relief in *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000) and *Powell v. Collins*, 328 F.3d 268 (6th Cir. 2003), the Chief Magistrate recommended denying relief on the *Batson* claim. ECF Doc. 128 at pp. 106-108. Petitioner and Respondent objected. ECF Doc. 130, 132.

Pursuant to a standing order of this Court, the Chief Magistrate recommitted the matter and issued a Supplemental Report and Recommendation ("Supplemental Report"). ECF Doc. 135. The Supplemental Report again recommended granting relief, overruling

1

Respondent's objections, and denied each of Petitioner's objections. *Id.* Respondent objected to a portion of the Supplemental Report. ECF Doc. 136. Petitioner responded to those objections and filed his objections to the Supplemental Report. ECF Doc. 137. Respondent filed a response to Petitioner's objections. ECF Doc. 138.

Regarding Subsection D of Petitioner's Thirteenth Ground for Relief, the parties stipulated to expand the record with four jury questionnaires. ECF Doc. 141. In that sub-claim, Petitioner challenges the prosecutor's exercise of a peremptory challenge to dismiss a black juror, Sandra Freeman. On December 13, 2007, this Court accepted the stipulation and granted the parties' request to file briefing regarding the effect of the questionnaires within fifteen (15) days. ECF Doc. 142. Petitioner now timely files his Supplemental Memorandum regarding the questionnaires.

## JURY QUESTIONNAIRES

The parties agreed to supplement the record with four questionnaires:

1. Jury Questionnaire 10 (Sitting Juror William Miller) (ECF Doc. 141-2)
2. Jury Questionnaire 11 (Sitting Juror Donna England) (ECF Doc. 141-3)
3. Jury Questionnaire 14 (Struck Juror Sandra Freeman) (ECF Doc. 141-4)
4. Jury Questionnaire 24 (Sitting Juror Guy Hopkins) (ECF Doc. 141-5)

The questionnaires of the sitting jurors contain information relevant to the questions of whether the race neutral explanations were a pre-textual basis for the exercise of the peremptory against Ms. Freeman. The state's proffered justification for excusing Ms. Freeman was its "concern" regarding her responses to Questions 28 and 73. Petitioner compares Ms. Freeman's responses to those questions with the responses of 3 white jurors for whom the state expressed no similar concern.

Sitting Juror William Miller filled out Jury Questionnaire 10. Mr. Miller's questionnaire identified his race as "Caucasian." ECF Doc. 141-2 p 1. In response to question 73, Mr. Miller notes that his college roommate was a lawyer. *Id.* p. 15. In response to the next question, Mr. Miller stated that his "close friend" (his college roommate) was a "public defender." *Id.* at pp. 15-16.

Sitting Juror Donna England filled out Jury Questionnaire 11. Ms. England's questionnaire identified her race as "white." ECF Doc. 141-3 p 1. In response to question 28, she offered a response similar to the response given by Ms. Freeman that so concerned the prosecutor and became the key basis of the state's alleged predisposition of Ms. Freeman. In answering what may negatively impact a child's development, Ms. England listed as number 1 "alcohol" and as number 2 "drugs." *Id.* p. 7. Of course, these are the same factors listed by Ms. Freeman that caused the prosecutor so much concern.

Struck Juror Sandra Freeman filled out Jury Questionnaire 14. Ms. Freeman's questionnaire identified her race as "black." ECF Doc. 141-4 p. 3. Ms. Freeman listed as her second negative impact factor "alcoholism or drugs." *Id.* at p. 9. She indicated that her uncle was a lawyer, and she marked both "District Attorney or United States Attorney" and "public defender." *Id.* at pp. 17-18. These are the two responses upon which the state relied in striking Ms. Freeman.

Sitting Juror Guy Hopkins filled out Jury Questionnaire 24. Mr. Hopkins' questionnaire identified his race as "white." ECF Doc. 141-5 p. 2. He noted that he had two friends who are lawyers. *Id.* at p. 17.

*BATSON STANDARD*

Due Process and Equal Protection principles prohibit a prosecutor's use of peremptory challenges in a racially discriminatory manner. *Batson v. Kentucky*, 476 U.S. 79 (1986).[1] In assessing *Batson* claims, a three-step analysis **must** be employed: "Under *Batson*, a defendant must first establish a prima facie case showing that the prosecution exercised peremptory strikes on the basis of race. If the defendant satisfies this requirement, the prosecution must articulate a race-neutral explanation for the challenges. The trial court must then decide if the defendant has carried the burden of proving purposeful discrimination." *United States v. Tucker*, 90 F.3d 1135, 1142 (6th Cir. 1996) (*citing Batson*, 476 U.S. at 96-98); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003)("*Miller-El I*").

The third step presents the critical question as to the persuasiveness of the prosecutor's justification for the peremptory strike balanced against the *voir dire* as a whole. *Purkett v. Elem*, 514 U.S. 765 (1995); *see also Miller-El I*, 537 U.S. 322. That is because the simple denial of racial animus is insufficient to turn back a *Batson* challenge. *See Purkett*, 514 U.S. 768-769. Thus, "this determination turns largely on the evaluation of credibility." *United States v. Harris*, 192 F.3d 580, 586 (6th 1999) *citing to Batson*, 476 U.S. at 98 n.21.

The Sixth Circuit has ruled: "Because the primary defense to pretext based violations of *Batson* is the district court's ability to assess the credibility of an attorney's representations, it is critical that the district court independently assess the proffered

---

[1] This type of error involves a "structural error," which is not subject to harmless error analysis. *United States v. Harris*, 192 F.3d 580, 588 (6th Cir. 1999); *see Arizona v. Fulminante*, 499 U.S. 279 (1991). In *Fulminante*, the Supreme Court distinguished between "trial errors" and "structural errors." Structural errors affect the "entire conduct of the trial from beginning to end." *Id.* at 309.

4

justifications." *McCurdy v. Montgomery County*, 240 F.3d 512 (6th Cir. 2001) *citing to See Hernandez v. New York*, 500 U.S. 352, 364-66 (1991) *overruled on other basis Barnes v. Wright*, 449 F.3d 709 (6th Cir. 2006). *Batson* makes it clear that, one way or another, a trial court must consider all relevant circumstances before it issues a final ruling on a defendant's motion:

> In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances. For example, a "pattern" of strikes against black jurors included in the particular venire might give rise to an inference of discrimination. Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose. These examples are merely illustrative.

*Batson*, 476 U.S. at 96-97.

As described by the Sixth Circuit, this third step in the process gives the trial court "the responsibility to assess the prosecutor's credibility under all the pertinent circumstances, and then to weigh the asserted justification against the strength of the defendant's prima facie case under the totality of the circumstances." *United States v. Hill*, 146 F.3d 337, 342 (6th Cir. 1998). The reason for this inquiry is that a given race-neutral reason may appear to be rational and yet be a pretext for discrimination. *See Hernandez*, 500 U.S. at 363. A *Batson* claim, after all, depends on "*all* relevant circumstances [that] raise an inference of purposeful discrimination." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005)("*Miller-El II"*), quoting *Batson*, 476 U.S. at 96-97 (emphasis added).

It must also be noted that jurors are not "cookie-cutters," and will never be identical. This Court should guard against any such comparisons. As the Supreme Court recently held in the context of a claim of race-based peremptory strikes of jurors, "a rule

that no comparison [among prospective jurors] is probative unless the situation of the individuals compared is identical in all respects" would make claims of discrimination "inoperable," because "potential jurors are not products of a set of cookie cutters." *Miller-El II*, 545 U.S. at 247 n.6.

*FACTS REGARDING THE STRIKE*

The prosecutors exercised a peremptory challenge against Prospective Juror Freeman, an African-American woman who had stated that she could follow the law and sign a death verdict in this case, and that sometimes the death penalty is warranted. Tr. 258-260, 405. Trial counsel objected on the basis of *Batson*. The trial court then asked the prosecutor for a race neutral explanation. Tr. 407, 408. This offering of a neutral reason is not without legal significance. The offering of a race neutral reason moots, or stated another way, satisfies the first two *Batson* prongs. *Franklin v. Anderson*, 267 F. Supp. 2d 768 (S.D. Ohio 2003) *citing to Hernandez v. New York*, 500 U.S. 352, 359 (1991) and *Lancaster v. Adams,* 324 F.3d 423 (6th Cir. 2003); *see also Hill*, 146 F.3d 337, 341.

It should be noted this is not the first time race had been raised as an issue in Petitioner's trial. Trial counsel noted that there existed an under-representation of minorities in the jury venire; only 5 minorities were on the 50-person panel. Tr. 212. All total, only one black male made the venire; and he was seated so far back it was next to impossible that he would sit as a juror. Tr. 212-213. He did not sit; and was not even voir dired. The jury commissioner indicated that he excused 7or 8 individuals before court proceedings; of which 2or 3 were minorities. Tr. 223-24.

1.  Prosecutor's First Race Neutral Explanation – Not Consistently Enforced Against Whites.

The prosecutor responded to Petitioner's *Batson* challenge by stating vaguely that things about Ms. Freeman's answer to a question on the questionnaire bothered him. Tr. 405, 408-410. Specifically, it was her response to a Question 28 regarding what negatively impacts a child's development. Tr. 409-410. As noted by the prosecution, "from the questions asked by the defense, she points out that alcoholism or drugs, she feels, negatively impacts a child's development." Tr. 410. Thus, the prosecution then pointed out the apparent defense relates to alcohol "and since she on her own, without even knowing that, pointed out this is a factor that concerns her – and that really bothers us, the fact that she is predisposed, apparently, to consider those type of things." Tr. 410. The "main reason," as described by the prosecutor, was Ms. Freeman's reference to "alcoholism" indicated a "predisposition" to "that before it was even brought out by the defense concerns us." Tr. 412. Of course, this statement standing alone evidences no bias for or against the state.

Defense counsel immediately pointed out that white jurors answered similarly – but were not struck. Tr. 413. Defense counsel expressed disbelief stating:

> I don't know where we're coming from that she's predisposed. She was questioned by Mr. Piepmeier. She said she could hear the testimony. She testified that she has – is not predisposed to the death penalty one way or the other, that she could apply the death penalty. She testified that she could follow the your instructions….

Tr. 413.[2]

---

[2] Its important to note that a Judge of this Court previously recognized a substantial *Batson* violation involving Prosecutor Piepmeier. In *Jamison v. Collins*, 100 F. Supp. 2d 647, 696-697 (S.D. Ohio 2000), the Court reviewed a circumstance where peremptories were exercised and that Hamilton County prosecutors could not offer a race neutral explanation. However, the claim had been waived because it had never been presented to state court. Regardless, as noted by the Supreme Court in *Miller-El I,* 537 U.S. at

7

Sitting juror Donna England, a white female, offered a response similar to Ms. Freeman's on the main basis of the state's alleged "predisposition" of Ms. Freeman. In answering what may negatively impact a child's development, Ms. England listed as number 1 "alcohol" and as number 2 "drugs." ECF Doc. 141-3 p. 7. Not only did the state not strike Ms. England, they waived available peremptories[3] thus keeping her on the panel. This demonstrates that, on this point the prosecutor unquestionably treated the white Ms. England different than the black Ms. Freeman.

Reliance on a problem with the questionnaire is alarming for another reason. The trial prosecutor never queried Ms. Freeman on the alleged troubling nature of the questionnaire. The trial prosecutor noted that he had received and had read the jury questionnaires. Tr. 262. On at least one occasion, the trial prosecutor queried potential jurors on "troubling" issues raised by a response to the questionnaire. Tr. 278 (Bottenhorn). On numerous other occasions, the trial prosecutor queried those who became sitting jurors on "troubling" issues raised by a response to the questionnaire. Tr. 398 (Juror Borgerding); 433 (Juror Phillips); 450 (Juror Hopkins).

The state's voir dire of Juror Phillips illustrates the disparate treatment as to the alleged race neutral explanation offered by the state. Ms. Phillips indicated on her questionnaire that a friend of hers was on death row – placed there by Hamilton County. Tr. 433-34. She indicated that it would not affect her – but would not agree with the prosecutor's attempts to have her endorse the appropriateness of the death penalty. Tr.

---

347, pattern and practice evidence "is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case."

[3] Each party had six (6) peremptories. The State only exercised four of its peremptories. *See* Tr. 368 (Perempt 1 struck Mr. Petticrev, white); Tr. 389 (Perempt 2 struck Mr. Ashton, white); Tr. 405 (Perempt 3 struck Ms. Freeman, black); Tr. 432 (Perempt 4 struck Ms. Baldauf, white); Tr. 448 (waived Perempt 5); Tr. 457 (waived Perempt 6).

434-435. She refused to endorse such even though she noted her friend asked for the death penalty. Tr. 435. Ms. Phillips was white, and was not struck by the state.

The state attempted a voir dire of Ms. Phillips, white, and could not get her to agree to a death sentence, despite her friend asking for it. Thus, she clearly had a pre-disposition reflected in her opinion of a previously imposed death sentence. Meanwhile, Ms. Freeman was struck although no voir dire was conducted of her alleged predispositions on potential mitigation. In contrast, Ms. England, white, was not struck after the state conducted no voir dire of her alleged predispositions on potential mitigation. Asserted reasons applicable to similarly situated white prospective jurors whom it did not strike, are pretexts for purposeful discrimination. *Miller-El II, supra,* 545 U.S. at 246, 252, 258 n. 17; *Purkett, supra,* 514 U.S. at 768.

    2.    Prosecutor's Second Race Neutral Explanation – Also Not Consistently Enforced Against Whites.

The prosecution then offered a purported race neutral justification, i.e., that Ms. Freeman's uncle was a lawyer in Columbus and had once been a public defender. Tr. 410-411. The prosecution propounded "So I don't know what type of leanings that would give her, but, again, that's something that concerned us." Tr. 411. Again defense counsel responded that there were white prospective jurors who had answered the question on the questionnaire the same way and were not removed by the prosecutors. Tr. 413.

Sitting white juror William Miller notes that Mr. Miller's college roommate was a lawyer. ECF Doc. 141-2 p. 15. In response to the next questions, Mr. Miller stated that his college roommate was his "close friend" and was a "public defender." *Id.* at pp. 15-16. Mr. Miller's questionnaire identified his race as "Caucasian." *Id.* at p. 1. This again

9

demonstrates that the prosecutor treated the white Mr. Miller different than the black Ms. Freeman.

Ms. Freeman's questionnaire actually reflects a pro-prosecution bent. She specifically identified that her uncle was a lawyer, and she marked both "District Attorney or United States Attorney" and "public defender." ECF Doc. 141-4 pp. 17-18. The trial court seized on only half of this noting:

> And on the things about her relative, her uncle being a public defender, I mean – hey, I remember, when I was a prosecutor, every defense attorney in the world knocked every one of my relatives off because they were related to me. It's a common thing. That would be – people have talked to their uncle. It's something you think about when you're a lawyer: Do I want somebody that might be a little predisposed to the defense? Because they talked to their uncle, their uncle is defense attorney, and they'd be more predisposed to the defense case and maybe a little more anti-prosecutor…. .

Tr. 414. However, Ms. Freeman indicated her uncle was also a prosecutor! Thus, the prosecutor should have wanted a pro-prosecution bent on their jury, as opposed to a juror who had only been exposed to a public defender.

The state conducted voir dire of white Juror Hopkins regarding his questionnaire and its identification of friends that were lawyers. Tr. 450-451. However, the state did not delve into the type of practice in which these individuals engaged, even though they were not familiar with at least one of them. Tr. 451.

The failure to delve demonstrates the significance the state attached to this alleged reason – none. The state conducted no voir dire of either white Juror Mr. Miller and of black struck juror Ms. Freeman; the voir dire conducted of white Juror Mr. Hopkins did not query into the nature of the legal practice. This disparity of treatment and revelation that this basis really had no significance demonstrates the pre-textual nature of the strike.

10

      3.      Prosecutor's Third Race Neutral Explanation – Not Supported By the Record.

The final, and least important basis according to the state, offered for Ms. Freeman's removal was that her arms had been crossed. Tr. 411-412. In support thereof, the prosecutor indicated 'I've seen it before in people. It's almost a sign that they're not – they're not with you, they're not accepting your question, they're not following your theory of the case, whatever." Tr. 412. Immediately thereafter, the prosecutor identified this as "the least of the objections." *Id.* During Ms. Freeman's voir dire, the prosecutor failed to note for the record the alleged arm crossing; nor did the trial prosecutor query as to any perceived "sign" or negative "signal" from her. Nothing in the record verifies this "concern."

Defense counsel indicated that the arms crossed excuse "is looking for a place to hang their hat." Tr. 413. The trial court responded that a good attorney looks to body language. The trial court then inappropriately expanded the basis offered by the state and noted that "I did think that she was a little defensive with the prosecution, and I sensed a little hostility." Tr. 413-14.

Later defense counsel noted that defense struck juror John Grievenkamp, a white male, had horrible body language but the state did not strike him. Tr. 461. Specifically, defense counsel described:

> I would indicate that Juror No. 1, Mr. Grievencamp, I believe from the time he was put in that panel, sat with his hand in disgust over his forehead and his hand on his hip. The prosecutor's chose not to excuse him for obviously dissatisfactory body language.

*Id.* The trial court noted "I know he was mad." Tr. 462. Thus, the trial court (even though it expanded the basis offered by the state) demonstrated its disparate comparative

11

treatment – noting that an actually angered white juror was not struck as opposed to a little bit hostile struck black juror.

In reality, and setting aside the trial court's expanded basis, the voir dire transcript of Ms. Freeman reflects no such hesitancy, defensiveness or hostility. Rather, it indicates a juror that was receptive to the questions and affirmatively answered them. *See* Tr. 259-261 ("I think at times it does warrant it. It would be a very difficult decision to make, but I could go along with it if I thought it was appropriate."; "Yes, I do."; "Not that I am aware, I am Catholic. I'm Catholic, but I don't attend regularly."; "No, I do not."; "I can't see a reason."). Ms. Freeman far exceeded the typical "yes" or "no" responses. This also rebuts the prosecutor's third and least important explanation.

    4.    Prosecutor's amended response.

Without prompting, the prosecutor later returned to the *Batson* challenge. The prosecutor stated that he had the opportunity to strike the single minority that actually made the jury, Juror Mason, but did not. Tr. 461. The trial court noted agreement and stated he intended to point that out as well. *Id.*

Rather than demonstrate a lack of racial motivation, it exhibits a profound misunderstanding by both the trial prosecutor and the trial court of *Batson*. Indeed, the presence of a minority on a panel does not ameliorate other race misconduct.[4] *See Lancaster v. Adams*, 324 F.3d 423, 433 (finding trial court's ruling unreasonable under AEDPA when it relied solely on the presence of another minority on the panel to reject *Batson* claim). Indeed, the presence of one or more African-American venire members on the jury, standing alone, does nothing to preclude a valid claim under *Batson*. *Harris*, 192 F.3d 580, 587. Further, the trial prosecutor omits that two out of the next six

---

[4] This should especially be true if its done in an attempt to cover past misconduct.

potential jurors were minorities. Thus, the state's failure to exercise peremptories actually inhibited the potential that an even higher percentage of minorities could make the jury.

     5.     Trial Court Unreasonably Sustained Pre-textual Basis – At times on the basis not offered by the state.

The trial court upheld the Freeman peremptory challenge. The trial court first noted a basis not offered by the state, i.e., that Ms. Freeman was "defensive with the prosecution and I sensed a little hostility." Tr. 413-414. As previously noted, this was not offered by the state and was not a consistently applied basis given Mr. Grievencamp's actual anger displayed in court and recognized by the trial court.

As to her uncle being a lawyer in Columbus and a former public defender, the trial court stated that when he was a prosecutor every defense attorney struck his relatives. *Id.* Again the state did not offer this nonsequitor as a race neutral justification. The trial court also stated that from reading a Columbus magazine, that in Columbus "they" are "very hostile" towards prosecutors and police." *Id.* The state also did not raise Columbus' alleged hostility toward law enforcement as a race neutral explanation.

In making this determination, the state courts[5] only assessed the face of the state's response and never addressed trial counsel's argument that jury questionnaires reflect similar responses by white, non-struck jurors. The failure to consider the state's race neutral explanation in the context of the white juror questionnaires was unreasonable. A state court's ruling is "based on" on unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2) when, among other things, it fails to consider relevant evidence of record. *See Miller-El I*, 537 U.S. at 346 (Supreme Court's "concerns" "amplified" by the

---

[5] The trial court made the initial ruling which the Ohio Supreme Court neither disturbed nor added additional analysis.

13

fact state court "apparently ignored" evidence in assessing *Batson* claim); *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004). Indeed, disparate treatment of *similarly* situated jurors is indispensably relevant to the ultimate issue of discrimination, *Miller-El II*, 545 U.S. at 247 n.6. The state courts, therefore, unreasonably ignored relevant evidence in reaching its finding as to the proffered bases, when the questionnaires reflect actual racially disparate treatment of venire members. Further, the voir dire of a subsequent white juror regarding attorneys discloses this was not even a relevant factor.

In crediting the prosecutor's claim that he struck Ms. Freeman primarily because of her predisposition on alcohol and drugs, the state courts ignored evidence that the prosecutor never asked Ms. Freeman about these "concerns", and whether this would influence her in considering the evidence during Petitioner's trial. *See Miller-El II*, 545 U.S. at 250 n.8 ("[T]he failure to ask undermines the persuasiveness of the claimed concern."). Further compounding this error, the state courts failed to recognize (in spite of trial counsel's argument to the same effect) that a white juror, Ms. England listed as number 1 "alcohol" and as number 2 "drugs," that which negatively impacts the development of children. ECF Doc. 141-3 p. 7. There is no explanation for the indifference showed Ms. England's response versus the alleged critical nature of Ms. Freeman's response although both responses listed identical factors. However *reasonable* the state's purported reason may seem on its face; the question is whether it was sincerely held. The state's own conduct establishes the lack of sincerity due to the disparity in concern the state displayed between the responses of the white jurors as compared with the responses of Ms. Freeman.. The disparity of treatment is further

confirmed by the state's absolute failure to voir dire Freeman regarding these purported important "concerns."[6]

In *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (en banc), the Ninth Circuit granted habeas relief on the petitioner's *Batson* claim. Among other things, the court held that the state court had failed to consider comparative juror evidence, and thereby unreasonably determined the facts in accepting the prosecutor's stated motivations for striking a Native American woman. *Id.* at 358. The Ninth Circuit analyzed this evidence in detail and held that the prosecutor failed to strike other prospective jurors who had similar characteristics. *Id.* at 364-368. Similarly, here, the state courts simply failed to undertake the comparative analysis – even in the face of defense counsel providing notice that white juror questionnaires contained the same shortcomings. Thus, in Petitioner's case, as in *Kesser*, the jury questionnaires "clearly and convincingly refute... the prosecutor's nonracial grounds." *Id.* at 360; *accord Brown v. Del Papa*, No. 06-15215, 2006 WL 3267778, at *2 (9th Cir. Nov. 13, 2006) (unpublished) (state court decision unreasonable because "it failed to consider crucial evidence in the voir dire transcript that undermined the prosecution's proffered justifications for exercising it peremptory strikes").

The Sixth Circuit granted habeas relief on a *Batson* claim under AEDPA in *Lancaster*. In *Lancaster*, 324 F.3d at 344, the Sixth Circuit found the trial court's reliance on the presence of a minority on the panel to be unreasonable under AEDPA.

---

[6] Ms. Freeman listed "alcoholism and drugs" as the second most important factor (ECF Doc. 141-4 p. 9), while Ms. England listed "alcohol" as number one and "drugs" as number two. ECF Doc. 141-3 p. 7. Ms. Freeman imposed a more demanding use of alcohol – that it arose to the degree of a disease; while Ms. England did not require a disease. Thus, applying the basis of the state's reason Ms. England was more predisposed than Ms. Freeman.

15

The trial prosecutor's reliance upon, and the trial court's mentioning of the same in Petitioner's case (*see* Tr. 461) is equally unreasonable.

In conclusion, the state courts' treatment of Petitioner's *Batson* challenge is unreasonable.  The state courts' failure to conduct a comparative juror analysis in order to evaluate pretext is "contrary to" Supreme Court precedent, *Batson* and its progeny, and involves "an unreasonable determination of the facts" under §§2254(d)(1) and (2).  As stated by the United States Supreme Court in *Miller-EL II*, at 248, in finding *Batson* was unreasonably applied where, "the plausibility [of the State's explanation] is severely undercut by the prosecution's failure to object to other panel members who expressed [similar] views… ."  *See also id.*  262 ("State's rationale flatly fails to explain why most white panel members who expressed similar opposition or ambivalence were not subject to [similar questioning.]")  Therefore, this Court should not accept the Chief Magistrate's recommendation as to Petitioner's Thirteenth Habeas Ground Subsection (D), and instead should grant habeas relief.

Respectfully Submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
Phone (636) 207 – 7330
Fax (636) 207 – 7351

-and-

MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan &
   Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
Fax: (859) 578-3365

COUNSEL FOR PETITIONER

CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the foregoing was filed with and will be made available to Respondent via this Court's electronic filing system and pursuant to Loc. R. 5.2 this constitutes service.

/s/ Laurence E. Komp
LAURENCE E. KOMP – 0060142