IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Lee E. Moore, | : | |
| | : | Case No. 1:00-CV-023 |
| Petitioner, | : | |
| | : | District Judge Susan J. Dlott |
| v. | : | |
| | : | ORDER GRANTING IN PART AND |
| Betty Mitchell, Warden, | : | DENYING IN PART SUPPLEMENTAL |
| | : | PETITION FOR WRIT OF HABEAS |
| Respondent. | : | CORPUS |
| | : | |

In this case, Chief Judge Magistrate Michael R. Merz has recommended that the

Supplemental Petition for Writ of Habeas Corpus ("Supplemental Petition") (doc. 29) filed by

Petitioner Lee E. Moore be conditionally granted in part and denied in part.  Pending before the

Court are Chief Magistrate Judge Michael R. Merz's Report and Recommendations ("the R&R")

(doc. 128), the Warden's Objections to the R&R (doc. 130), and Petitioner's Objections to the

R&R (doc. 132); plus Chief Magistrate Judge Merz's Supplemental Report and Recommendations

("the Supp. R&R") (doc. 135), the Warden's Objections to the Supp. R&R

(doc. 136), and Petitioner's Objections to the Supp. R&R (doc. 137).  The Warden and Petitioner

have also filed briefs in opposition to each other's Objections.

For the reasons that follow, the Court will **CONDITIONALLY GRANT IN PART**

**AND DENY IN PART** the Supplemental Petition.  Accordingly, Petitioner's Objections are

**GRANTED IN PART AND DENIED IN PART** and the Warden's Objections are **DENIED**.

## I.      FACTUAL AND PROCEDURAL HISTORY

### A.      Factual Background of the Crime

The Ohio Supreme Court described the underlying facts of the crimes for which

Petitioner was convicted and sentenced to death as follows:

> On the evening of January 14, 1994, defendant-appellant, Lee Edward Moore, Jr.,
> and Jason Holmes abducted Melvin Olinger at gunpoint and forced him into the
> trunk of his blue Ford Taurus.  Moore drove Olinger's car to Mt. Healthy,
> dropped Holmes off, and picked up Larry Kinley.  The two drove Olinger's car to
> a factory area in Cincinnati, where Moore ordered Olinger out of the trunk,
> robbed him of his wallet, and shot him in the head, killing him.  Moore later
> admitted committing the crimes but claimed that the shooting was accidental.
> Moore was subsequently convicted of aggravated murder, kidnapping [sic], and
> aggravated robbery, and sentenced to death.
>
> On January 14, at approximately 7:20 p.m., Melvin Olinger, a suburban Chicago
> businessman, visited his parents in Fairfield.  Olinger went to a funeral home
> during calling hours for a friend who had passed away.  Later, he went to Gina's,
> a bar, around 9:00 to 9:30 p.m., where he talked with Charlotte James.  He told
> her that he was going to visit his mother that evening before returning to Chicago
> the next day.  Olinger stayed in the bar for about fifteen minutes.
>
> That same evening, Moore and Jason Holmes drove to Fairfield, intending to steal
> a car.  Moore waited outside Gina's and saw Olinger get out of his blue Ford
> Taurus and enter the bar.  When Olinger returned to his car, Moore confronted
> him with a gun and told Olinger to get in.  Moore drove the Taurus to the rear of
> the bar and forced Olinger to climb into the trunk.  Moore drove the Taurus to
> Larry Kinley's house in Mt. Healthy while Holmes followed in Moore's Ford
> Fairmont.
>
> Moore and Kinley drove to a store in the Taurus, leaving Holmes behind to
> babysit.  Moore told Kinley how he had stolen the car and that he was going to
> get it painted and modified.  Moore told Kinley that he was driving to the
> Cumminsville area of Cincinnati to show the car to a friend.  Instead, Moore
> drove to a factory area at 3366 Llewellyn Street.  On the way, Moore told Kinley
> that he was going to kill the man in the trunk.  When Kinley asked Moore why he
> was going to kill the man, Moore responded, "This ain't nothing. * * * We're not
> going to get caught for it."
>
> Upon driving into the factory area, Moore headed toward a dumpster.  He stopped
> the car and let Olinger out of the trunk while Kinley remained in the car.  Kinley

testified that he didn't see what happened because the trunk lid was up, but that he heard Moore tell Olinger to empty his pockets.  Kinley testified that Moore directed Olinger to the corner by the dumpster and that he heard Olinger beg and plead to Moore about Olinger's sick mother.

Kinley heard a gunshot, then Moore jumped into the car.  According to Kinley, Moore laughed and asked him, "Did you see his dome get shot off?"  After leaving the scene, Moore directed Kinley to take the credit cards out of Olinger's wallet.  Kinley said that Moore sounded upset because he had forgotten to ask Olinger for the personal identification number to his Jeanie card.

In a taped statement to police, Moore claimed that he asked Olinger for his wallet after directing him to the dumpster.  When Olinger dropped the wallet and stepped forward, Moore said that he panicked and "accidently pulled the trigger.  But it was an accident. * * * I had a large amount of drinks an' * * * some marijuana.  An' it truly truly was an accident."

Moore and Kinley returned to Kinley's house, where Moore told Holmes what had happened.  Moore told Holmes that he planned to keep the Taurus and that Holmes could use his Fairmont any time he wanted.  At Moore's request Kinley took the Michigan plates off Olinger's Taurus.  Kinley then took one of the plates off Moore's Fairmont and put it on the Taurus.

The next day, Moore and Kinley went out to get "some stuff."  Moore used Olinger's credit card to purchase over $1,000 worth of clothing and jewelry at two J.C. Penney stores in the Cincinnati area.  A sales clerk became suspicious and contacted Penney's loss prevention officer.  The officer observed two black males place their purchases in the trunk of a blue Ford Taurus with Ohio tags and drive away.

At approximately 5:30 p.m. on January 20, police apprehended Moore and Kinley as they waited for an order in the drive-through  lane of a McDonald's restaurant.  Moore was placed in a holding cell at the Mt. Healthy police station.  Officers confiscated several items of clothing from Moore which were believed to have been purchased with Olinger's credit card.  Shortly after midnight, Moore was advised of his *Miranda* rights and signed a waiver of rights form.

Moore was then taken to the downtown Cincinnati police station for questioning.  Although the weather was cold and snowy, Moore was required to walk a short distance to and from the police car in his stocking feet, since his shoes had been confiscated as evidence.  At approximately 6:30 a.m., while "crying a little bit" and sniffling, Moore admitted to police that he had robbed and kidnapped [sic] Olinger and that he had shot and killed Olinger.  He claimed that the shooting was accidental.

3

Based on information supplied by Kinley, police located Olinger's body. The chief deputy coroner determined that Olinger had died of a single gunshot wound to the head fired from a distance of between six and twenty-four inches away.

State v. Moore, 81 Ohio St. 3d 22, 22-24, 689 N.E.2d 1 (1998).

## B.    Procedural History–State Court Proceedings[1]

The Ohio Supreme Court summarized the procedural history of Petitioner's conviction

and sentencing as follows:

> The grand jury indicted Moore on three counts of aggravated murder, one count of aggravated robbery, and one count of kidnapping. All counts carried a firearm specification. All three aggravated murder counts carried three death-penalty specifications: (1) aggravated murder to escape detection for kidnapping and/or aggravated robbery (R.C. 2929.04[A][3]); (2) aggravated murder committed in connection with kidnapping where Moore either was the principal offender or committed the aggravated murder with prior calculation and design (R.C. 2929.04[A][7]); and (3) aggravated murder committed in connection with aggravated robbery where Moore either was the principal offender or committed the aggravated murder with prior calculation and design (R.C. 2929.04[A][7]).

> The defense essentially admitted Moore's involvement in the crimes. It argued that Moore had not formed the specific intent to kill Olinger. After deliberation, the jury found Moore guilty as charged.

> Prior to the mitigation hearing, the trial court merged the three death specifications of Count I (aggravated murder committed with prior calculation and design) into one specification: murder to escape detection for kidnapping and/or aggravated robbery. The court also merged the two felony murder counts into one count and merged the three specifications attached to these counts into two: murder during kidnapping and murder during aggravated robbery.

> During the mitigation hearing, several witnesses testified on Moore's behalf, and Moore gave a remorseful unsworn statement admitting the wrongfulness of his actions.

> The jury recommended death, and the court imposed the death penalty. The court also imposed consecutive prison sentences for Moore's other convictions.

Id. at 24.

---

[1] Large portions of the procedural history are taken almost verbatim from the R&R.

Moore appealed his conviction and sentence to the Court of Appeals, First Appellate District, Hamilton County, Ohio. After reviewing the merits of Moore's assignment of errors, re-weighing the aggravating circumstances against the mitigating factors, and independently assessing the appropriateness of the penalty of death, the court of appeals affirmed Moore's conviction and the sentence of death. State v. Moore, No. C-9500009, 1996 WL 348193 (Ohio App. June 26, 1996).

Moore then filed an appeal with the Ohio Supreme Court. On February 4, 1998, the Ohio Supreme Court, likewise, affirmed the judgment of the appeals court and upheld the death sentence after independently weighing the appropriateness and proportionality of the sentence of death. Moore, 81 Ohio St. 3d at 42-44.

On September 20, 1996, Moore filed his petition for Post-Conviction Relief under Ohio Revised Code ("O.R.C.") § 2953.21 in the Hamilton County Court of Common Pleas. (Doc. 31, Ex. M.) The Common Pleas Court found that Moore was not entitled to relief on any of his claims and denied the petition for post-conviction relief. (Id., Ex. Q.) Moore appealed to the court of appeals. (Id., Ex. R.) He alleged his counsel did not receive notice of the trial court's November 20, 1996, order. (Id., Ex. S.) The court granted Rule 60(B) relief from the judgment and a new order was entered dismissing the petition. (Id.) Petitioner filed a timely appeal from that second order. (Id.) In the court of appeals, Petitioner made the argument that throughout the post-conviction relief proceedings, his entire record had been before the court of appeals or Ohio Supreme Court on direct appeal. (Id.) The Clerk of the Ohio Supreme Court refused to relinquish the records to the lower courts for review while the case was pending argument in the Ohio Supreme Court, thus denying the trial court the ability to review the entire record in

evaluating the post-conviction petition. (Id.) Additionally, Petitioner Moore raised five

assignments of error in his merit brief (Id., Ex. T.)

The court of appeals granted the motion for a remand to allow for the trial court to certify

which portions of the record had been reviewed for the purpose of post-conviction relief. (Id.,

Ex. V.) On March 18, 1998, the Hamilton County Common Pleas Court issued an Entry on

Remand stating that it had no present recollection as to what materials were reviewed. (Id., Ex.

X.) The Court of Appeals then affirmed the judgment of the trial court on September 18, 1998.

(Id., Ex. Y.) Moore then appealed to the Ohio Supreme Court which declined to review the

judgment of the lower courts. State v. Moore, 84 Ohio St. 3d 1472, 704 N.E.2d 579 (1999).

On September 7, 2000, Moore filed an Application for Reopening of Direct Appeal

Under Ohio R. App. P. 26(B) ("Rule 26(B) Application"), alleging that his direct appeal counsel

had been constitutionally ineffective for their failure to raise fourteen assignments of error.

(Doc. 79, Vol. I at 2-10.)

The Hamilton County Court of Appeals declined to hear the Rule 26(B) Application on

the merits because it found Petitioner had not shown good cause for failing to file within the

ninety days allowed for such motions by Ohio R. App. P. 26(B); the Application was filed more

than four years after the Court of Appeals had journalized its decision that was sought to be

reopened. (Doc. 60, Ex. A at 1.) The Court of Appeals also held that all of the claims were

barred by *res judicata* because they could have been raised on direct appeal to the Ohio Supreme

Court and were not. (Id. at 3.)

On appeal, Moore presented six propositions of law to the Ohio Supreme Court. In his

first three propositions of law, he presented the merits of all of the proposed assignments of error

which he had raised in the Court of Appeals. (Doc. 79, Vol. III at 20-85.) The Court denied those propositions on the grounds that "Moore has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the application to reopen can be granted, as required under App.R. 26(B)(5)." State v. Moore, 93 Ohio St. 3d 649, 651, 758 N.E.2d 1130 (2001). As to another proposition of law, the Ohio Supreme Court decided that Mr. Moore had not shown good cause for filing his Rule 26(B) Application late because he had not raised a genuine issue as to whether he was deprived of the effective assistance of counsel on appeal. Id. at 650-51. In her concurring opinion, Justice Deborah Cook[2] noted that it was illogical to find a failure to demonstrate good cause for late filing on the basis that Moore failed to raise genuine issues because these are entirely separate questions. Id. at 651 (Cook, J., concurring). She also noted that the majority had unnecessarily reached the merits because the Court of Appeals had correctly held the claims were barred by *res judicata*. Id. at 652.

## C.   Procedural History–Proceedings in Federal Court

Petitioner filed his Supplemental Petition on June 1, 2000. He asserted twenty-five Grounds for Relief therein. Petitioner was granted the right to conduct limited discovery. (Docs. 93, 100.) Subsequently, the parties briefed the merits. (Docs. 115, 116, 117.) After briefing, Petitioner expanded the record by filing numerous depositions and documents. (Notice, July 15, 2005; Docs. 120, 124.)

On February 15, 2007, Chief Magistrate Judge Merz issued the first R&R. He recommended granting a conditional writ of habeas corpus as to part of Petitioner's Second

---

[2] Justice Cook has since become a Judge of the United States Court of Appeals for the Sixth Circuit.

Ground for Relief, but denying it as to all other Grounds for Relief.  (Doc. 128 at 138.)

Thereafter, the Warden filed Objections to the R&R as to the recommendation that the Court

issue a conditional writ as to part of the Second Ground for Relief and Petitioner filed Objections

as to the recommendation that the Court deny the remaining Grounds for Relief.  On August 13,

2007, Chief Magistrate Judge Merz issued the Supp. R&R and again recommended conditionally

granting a portion of the Second Ground for Relief, but denying all other Grounds for Relief.

The Warden and the Petitioner again filed Objections.  The R&Rs and the Objections are now

ripe for review.

## II.  STANDARD FOR HABEAS CORPUS PETITIONS

Moore's petition was filed after April 24, 1996 so it is subject to the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA").  See Hamilton v. Morgan, 474 F.3d 854, 857

(6th Cir. 2007).  A habeas petitioner must exhaust all remedies available to him in state court

before filing a habeas petition.  28 U.S.C. § 2254(b)(1)(A).  The AEDPA requires federal courts

to respect any determination on the merits made by a state court unless it: (1) "was contrary to,

or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," or (2) "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceedings."  28 U.S.C. §§ 2254(d)(1)-

(2); see also Williams v. Taylor, 529 U.S. 362, 402-03 (2000).  In Williams, the Supreme Court

further explained the meaning of § 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the
> state court arrives at a conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case differently than this Court has
> on a set of materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the writ if the state court
> identifies the correct governing principle from this Court's decisions but

unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-13.  An unreasonable application is more than simply incorrect; it must be objectively unreasonable.  Id. at 409, 411; see also Rompilla v. Beard, 545 U.S. 374, 380 (2005).  "Clearly established Federal law" under § 2254(d)(1) means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003).  "Under [the] AEDPA, if there is no clearly established Federal law, as determined by the Supreme Court, that supports a habeas petitioner's legal argument, the argument must fail."  Miskel v. Karnes, 397 F.3d 446, 453 (6th Cir. 2005) (internal citation omitted).

Pursuant to 28 U.S.C. § 2254(e)(1), a determination of a factual issue by a state court shall be presumed correct and the applicant shall have the burden of rebutting the presumption by clear and convincing evidence.  McAdoo v. Elo, 365 F.3d 487, 493-94 (6th Cir. 2004).  This presumption does not apply to mixed questions of law and fact.  Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003).  Instead, the "unreasonable application" prong of § 2254(d)(1) applies to mixed questions of law and fact.  Id.

A federal court will not review a question of federal law decided by an Ohio court if the decision rests "on a state law ground that is independent of the federal question and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  This is true whether the state law ground is substantive or procedural.  Id.  If a state prisoner "has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

9

failure to consider the claims will result in a fundamental miscarriage of justice."  Id. at 750.

That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default.  Engle v. Isaac, 456 U.S. 107, 128-29 (1982); Wainwright v. Sykes, 433 U.S. 72, 87 (1977).  Absent cause and prejudice, a federal habeas petitioner who fails to comply with a State's rules of procedure waives his right to federal habeas corpus review if the State court relied on that procedural bar.  Murray v. Carrier, 477 U.S. 478, 485 (1986); Engle, 456 U.S. at 128-29; Boyle v. Million, 201 F.3d 711, 716 (6th Cir. 2000).

The failure to raise a constitutional issue on direct appeal is subject to the cause and prejudice standard of Wainwright v. Sykes.  Murray, 477 U.S. at 485; Mapes v. Coyle, 171 F.3d 408, 413 (6th Cir. 1999); Rust v. Zent, 17 F.3d 155, 160-61 (6th Cir. 1994).  The failure to present an issue to the state supreme court on discretionary review constitutes procedural default.  O'Sullivan v. Boerckel, 526 U.S. 838, 845-48 (1999).

> As is well-established (although sometimes muddled by courts), two types of procedural barriers might preclude federal review of claims in a habeas petition. The first type, procedural default, is a judicially created rule, grounded in fealty to comity values and requiring federal courts to respect state court judgments that are based on an "independent and adequate" state procedural ground.  Coleman v. Thompson, 501 U.S. 722, 732, 115 L. Ed. 2d 640, 111 S. Ct. 2546 (1991); Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986) (establishing a four-part test for determining whether a procedural rule is an independent and adequate state ground).  In procedural default cases, the state court or courts reject a direct or post-conviction appeal because the defendant failed to comply with some state law or rule concerning timeliness, pleading requirements, sufficient evidence, or the like.
>
> The second type of bar, exhaustion, is similarly grounded in respect for state court procedures, but it is federally mandated by AEDPA, see 28 U.S.C. § 2254(b)(1)(A),(c), and requires petitioners to give state courts a "fair opportunity" to assess petitioners' claims.  O'Sullivan, 526 U.S. at 844.  Often, federal courts will rule that a petitioner's claim is "defaulted" because the petitioner failed to exhaust his remedies and the time for refiling an appeal in the state court has passed.  The unexhausted claim is then classified as "procedurally defaulted" and

deemed forfeited absent a showing of cause and prejudice.  See In re Cook, 215
F.3d 606, 607-08 (6th Cir. 2000). . . .

But exhaustion and procedural default are distinguishable in an important sense.
A defendant could fail to exhaust a claim without procedurally defaulting if he
could return to the state courts to exhaust.  Alternatively, as in this case, the
defendant could fail to exhaust without defaulting if a clarification in procedural
law indicates that he has already taken the necessary action to exhaust.  That is,
forfeiture by failure to exhaust entails a legal fiction, of sorts.  The state court has
not rejected an appeal based on a state rule violation; there is no declaration by
the state court of an independent and adequate state ground to which the federal
court must defer.  Instead, the federal court makes a presumption that the state
court would reject the appeal on independent and adequate state grounds if the
petitioner tried to file it.  But, by declaring the claim forfeited, the federal court
saves the petitioner and the state court from respectively preparing and rejecting a
futile filing.  The federal court then views the claim through the lens of
procedural default to determine whether  there is cause and prejudice to excuse
the default.  In short, the crux of forfeiture by failure to exhaust is that the federal
court's default decision rests upon a presumption about what the state court would
do, rather than respect for what a state court actually did.

Abdur'Rahman v. Bell (In re Abdur'Rahman), 392 F.3d 174, 186-187 (6th Cir. 2004), vacated

on other grounds, 545 U.S. 1151 (2005).

The Sixth Circuit Court of Appeals requires a four-part analysis when the State alleges a

habeas claim is precluded by procedural default.  Reynolds v. Berry, 146 F.3d 345, 347-48 (6th

Cir. 1998) (citing Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986)); accord Lott v. Coyle,

261 F.3d 594, 601-02 (6th Cir. 2001).

First, the court must determine that there is a state procedural rule that is
applicable to the petitioner's claim and that the petitioner failed to comply with
the rule.

* * * *

Second, the court must decide whether the state courts actually enforced the state
procedural sanction.

* * * *

11

> Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.
>
> * * * *
>
> Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under Sykes that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

Maupin, 785 F.2d at 138.

## III.   ANALYSIS

### A.   General Objections

In his first general objection, Petitioner Moore contends that Chief Magistrate Judge Merz erred when he refused to consider the merits of underlying claims that Petitioner raised in his Rule 26(B) Application and that he contends the Ohio Supreme Court addressed on the merits.  Petitioner in his Rule 26(B) Application raised issues that he contends his former appellate attorneys should have raised in the initial state court appeal of his conviction.  That is, he asserted that his appellate attorneys provided ineffective assistance of counsel because they did not raise certain underlying issues during his direct appeal.  The Ohio Supreme Court addressed the merits of three of Petitioner's six propositions (grounds for the Rule 26(B) Application) and held that Moore "failed to raise a genuine issue as to whether he was deprived of the effective assistance of counsel on appeal."  Moore, 93 Ohio St. 3d at 651.  The Ohio Supreme Court thus ruled on the merits of whether Moore had received ineffective assistance of appellate counsel; it did not directly address the merits of the underlying claims that Petitioner asserted his appellate counsel should have raised on the direct appeal.  The Sixth Circuit has

12

found that an ineffective assistance of appellate counsel claim is "analytically distinct" from the underlying claim about which it is asserted the appellate counsel should have raised.  White v. Mitchell, 431 F.3d 517, 526 (6th Cir. 2005).  Because the Ohio Supreme Court did not address the merits of the underlying claims, Chief Magistrate Judge Merz did not err in refusing to consider the merits of the underlying claims absent a showing of cause and prejudice.

In his second general objection, Petitioner Moore contends that Chief Magistrate Judge Merz erred in rejecting certain arguments that Petitioner had made regarding the legal standard for the prejudice aspect of an ineffective assistance of counsel claim.  Chief Magistrate Judge Merz cited McFarland v. Yukins, 356 F.3d 688 (6th Cir. 2004), for the proposition that appellate counsels' "failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." Id. at 699.  The quoted passage from McFarland case remains good law in this Circuit.  See Valentine v. United States, 488 F.3d 325, 338 (6th Cir. 2007) (quoting McFarland with approval).[3]  Petitioner's objection to the use of McFarland in examining issues of the effectiveness of appellate counsel is overruled.

## B.    Specific Objections as to Grounds for Relief

## First Ground for Relief

> **Petitioner Moore's mitigation specialist, Chuck Stidham, had an undisclosed, actual conflict of interest when he simultaneously represented Petitioner Moore and one of Petitioner Moore's co-defendant [sic] on his appeal of convictions and sentences for the same crime.  This conflict violated Petitioner Moore's rights, including his right to counsel, due process, equal protection, a fair proceeding, and a reliable sentence.** (Doc. 29 at 4.)

_____

[3] A more complete examination of the standard for analyzing ineffective assistance of appellate counsel claims is set forth in the discussion of Petitioner's First Ground for Relief.

Petitioner Moore alleges in this Ground for Relief that his mitigation specialist, Chuck Stidham, an attorney, had an actual conflict of interest when he simultaneously represented both Moore and his co-defendant, Jason Holmes, who was tried in a separate trial.  Stidham was Holmes's appointed counsel for Holmes's appeal.  Stidham did not reveal to Moore that he represented Holmes until after Moore's trial.  Moore was never given the opportunity to waive any potential conflict and the trial court was never given the opportunity to inquire about the potential conflict.  The potential for conflict in this situation is obvious.  Holmes could have benefitted from having as much culpability for the murder of Olinger placed on Moore as possible.

Petitioner failed to present this Ground for Relief as a claim to the Ohio state courts in his direct appeal or post-conviction proceedings.  Petitioner did raise his appellate counsel's failure to raise the issue on appeal as a claim for relief in his Rule 26(B) Application.  (Doc. 79, Vol. I at 3.)  Petitioner contends that the Ohio Supreme Court addressed the merits of the underlying claim (regarding Stidham's alleged conflict of interest) in its Order denying the Rule 26(B) Application, but as explained above in the discussion of Petitioner's General Objections, Petitioner is mistaken.  The Ohio Supreme Court summarily addressed the merits of the analytically distinct ineffective assistance of appellate counsel claim, not the merits of the underlying claim.  Moore, 93 Ohio St. 3d at 651.  Accordingly, Chief Magistrate Judge Merz correctly held that the underlying claim was procedurally defaulted.

Nonetheless, the Ohio Supreme Court's decision on the Rule 26(B) Application did preserve the merits of Petitioner's ineffective assistance of appellate counsel claims for review in this Court, either insofar as such claims, if meritorious, might constitute excusing cause for a

14

procedural default in presenting the underlying claims (e.g., the Stidham conflict of interest claim) or in themselves as justifying the writ conditioned on Petitioner's being granted a reopened appeal.  See Edwards v. Carpenter, 529 U.S. 446, 451, 453 (2000); Haliym v. Mitchell, 492 F.3d 680, 691-94 (6th Cir. 2007); Landrum v. Anderson, 185 F. Supp. 2d 868 (S.D. Ohio 2002).

Because the Ohio Supreme Court decided Petitioner's ineffective assistance of appellate counsel claim on the merits, this Court must consider if that decision was contrary to or an unreasonable application of law clearly established by the United States Supreme Court.  28 U.S.C. § 2254(d); Williams, 529 U.S. at 402-03.  However, in this case, the Ohio Supreme Court's conclusion is so summary that it is not possible to determine whether it is in any way an application of clearly established federal law.  All the Ohio Supreme Court said in disposing of these claims was "Moore has failed to raise 'a genuine issue as to whether [he] was deprived of the effective assistance of counsel on appeal' before the application to reopen can be granted, as required under App.R. 26(B)(5)."  Moore, 93 Ohio St. 3d at 651.

The test of Strickland v. Washington, 466 U.S. 668 (1984)[4] – constitutionally deficient

---

[4] The general governing standard for effective assistance of counsel is found in Strickland:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

performance plus prejudice resulting therefrom – applies to appellate counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000).  An appellate attorney need not advance every argument, regardless of merit, urged by the appellant.  Jones v. Barnes, 463 U.S. 745, 751-52 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made.  Williams v. Bagley, 380 F.3d 932, 971 (6th Cir. 2004).  However, failure to raise an issue can amount to ineffective assistance.  McFarland, 356 F.3d at 710; Mapes, 171 F.3d at 427-29.

"In order to succeed on a claim of ineffective assistance of appellate counsel, a petitioner must show errors so serious that counsel was scarcely functioning as counsel at all and that those errors undermine the reliability of the defendant's convictions."  McMeans v. Brigano, 228 F.3d 674, 682 (6th Cir. 2000).  Courts "strongly presume[]" that an attorney's performance was constitutionally sufficient.  Strickland, 466 U.S. at 690; McFarland, 356 F.3d at 710  To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that appellate counsel ignored issues that are clearly stronger than those presented.  Smith, 528 U.S. at 288.

Under the prejudice prong of the Strickland test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  466 U.S. at 694.  A reasonable probability is one that "is sufficient to undermine confidence in the outcome."  Id.  The Supreme Court further explained:

---

466 U.S. at 687.

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.  When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Id. at 695.  Counsels' failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal.  McFarland, 356 F.3d at 699.  A petitioner has not established prejudice if a court is left with only speculation on whether the outcome would have been different.  See Baze v. Parker, 371 F.3d 310, 322 (6th Cir. 2004).[5]

Turning to the facts of the underlying claim, to prevail on a conflict of interest claim, Petitioner Moore must demonstrate an actual conflict of interest that adversely affected counsel's performance.  Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980).  Chief Magistrate Judge Merz

---

[5] The Sixth Circuit has recognized the following list of factors a court can examine to determine whether appellate counsel were effective:

> (1) Were the omitted issues significant and obvious?
> (2) Was there arguably contrary authority on the omitted issues?
> (3) Were the omitted issues clearly stronger than those presented?
> (4) Were the omitted issues objected to at trial?
> (5) Were the trial court's rulings subject to deference on appeal?
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> (7) What was appellate counsel's level of experience and expertise?
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
> (9) Is there evidence that counsel reviewed all the facts?
> (10) Were the omitted issues dealt with in other assignments of error?
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Mapes v. Tate, 388 F.3d 187, 191 (6th Cir. 2004).

found that Moore could not establish that Stidham actively represented conflicting interests or that the Stidham's presumptive conflict of interest affected his performance.  Id.  Prejudice is presumed "only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance."  Burger v. Kemp, 483 U.S. 776, 783 (1987) (internal quotations and citations omitted).  Petitioner Moore "must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting evidence helpful to one client but harmful to the other."  Thomas v. Foltz, 818 F.2d 476, 481 (6th Cir. 1987) (internal quotations and citations omitted).

Petitioner's claim fails because he has not established that Stidham made choices which were helpful to Holmes, but prejudicial to Moore.  Stidham did not testify as a mitigation witness himself.  Petitioner asserts that Stidham recommended the use of Dr. David Chiappone as a mitigation expert.  As will be explained infra in regards to the Second Ground for Relief, Dr. Chiappone's testimony at mitigation was damaging and clearly prejudicial to Moore.  However, the Stidham deposition testimony Petitioner relies upon does not provide support for the assertion that Stidham suggested Dr. Chiappone's involvement.  (Doc. 132 at 7; Stidham Dep. at 111 lines 11-13.)  Stidham testified as to the reason "probably why Dr. Chiappone was requested to become involved," but he does not state or imply that he requested that Dr. Chiappone become involved.  (Stidham Dep. at 111 lines 11-13.)  Stidham had testified earlier in his deposition that he did not recall how Dr. Chiappone had become involved in the case.  (Stidham Dep. at 86.)  Moore's trial counsel and Dr. Chiappone himself, likewise, were unable to recall how Dr. Chiappone had become involved in the case, but no one suggested that Stidham was responsible

18

for Dr. Chiappone's involvement.  (James Dep. 10/16/2003 at 33-34; James Dep. 12/3/2003 at 9; Deardorff Dep. at 40; Chiappone Dep. at 31.)

Petitioner also relies on the fact that Stidham provided "some background information" to Dr. Chiappone for Dr. Chiappone's testimony.  (T.p. at 1110.)  However, Petitioner does not cite to any portion of the record specifying what particular background material Stidham provided to Dr. Chiappone or how that particular material influenced his mitigation testimony, if at all.  Accordingly, Petitioner has not provided any evidence that Stidham's presumptive conflict of interest influenced his performance.  Petitioner has not established that his appellate attorneys provided ineffective assistance of counsel when they failed to assert the Stidham claim during his state appeals process and Petitioner has not established cause for his procedural default of the underlying Stidham claim.  The First Ground for Relief is **DENIED**.

**Second Ground for Relief**

> **Petitioner Moore's trial counsel rendered ineffective assistance at the mitigation phase by (A) employing a mitigation specialist who never discussed substantive mitigation issues with Petitioner Moore and failed to adequately assist in the preparation of the mitigation phase; (B) failing to adequately prepare for the mitigation phase, during which Dr. Chiappone, the expert offered by trial counsel, impeached Petitioner Moore's entire liability and mitigation case; (C) presenting a hopelessly ineffective mitigation argument which actually damaged Petitioner Moore's mitigation case and failed to emphasize Petitioner Moore's youth, remorse, and psychosocial background; and (D) failing to seek or offer an expert to testify as to the effects of extensive alcohol and drug abuse on Petitioner Moore.  This ineffective assistance violated Petitioner Moore's rights, including his rights to counsel, not to incriminate himself, due process, equal protection, a fair proceeding, and a reliable sentence.**  (Doc. 29 at 7.)

> **1.**      **Subclaim (A):  Trial Counsel employed a mitigation specialist who never discussed substantive mitigation issues with Petitioner Moore and failed to adequately assist in the preparation of the mitigation phase**.

Chief Magistrate Judge Merz summarized Petitioner Moore's evidentiary support for this

subclaim in the R&R as follows:

> Petitioner argues that defense counsel were ineffective due to the performance of members of the defense team, specifically mitigation specialist Chuck Stidham.  Petitioner argues that Stidham's efforts were half-hearted and inadequate.  He argues that this inadequate preparation carried over to an ineffective and incomplete presentation of mitigation evidence.  Id.

> In support of this claim he details the communication between Stidham and other members of the defense: Stidham met with Moore on only one occasion, for approximately twenty-five minutes, and did not discuss any substantive mitigation issues; it was difficult for defense counsel to obtain the materials prepared by Stidham, finally obtaining them approximately two weeks prior to the start of trial; Stidham had no communication or direct contact with Dr. Chiappone; and failed to recommend that defense counsel hire an expert in substance abuse.

(Doc. 128 at 40 (citations omitted).)  Petitioner's trial counsel made a strategic decision to shy away from Mr. Stidham during the sentencing phase.  (Deardorff Dep. at 50-51.)

Chief Magistrate Judge Merz, however, also found that the neither the Constitution nor the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003) ("ABA Death Penalty Guidelines") guarantee or mandate the right to an "effective mitigation specialist."  In regards to this latter finding, Petitioner Moore cites to provisions in the ABA Death Penalty Guidelines which call for the use of a mitigation specialist: Guideline 4.1(A)(1) ("The defense team should consist of no fewer than two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist."); and Guideline 10.4(C)(2) (requiring lead attorneys to retain a mitigation specialist as soon a possible after being designated as counsel).

While the Court might be persuaded that trial counsel were deficient in failing to obtain the services of an effective mitigation specialist, the subclaim would nonetheless fail because Petitioner Moore has not established prejudice therefrom under the Strickland standard.  "In the

context of a death sentence, the question of prejudice turns on 'whether there is a reasonable probability that, absent the errors, the sentencer – including an appellate court, to the extent it independently reweighs the evidence – would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Hill v. Mitchell, 400 F.3d 308, 314 (6th Cir. 2005) (quoting Strickland, 466 U.S. at 695).

With the exception of helping prepare for the testimony of Dr. Chiappone, which is discussed in reference to a separate subclaim below, Petitioner Moore has not established what mitigation evidence could have been presented to the jury which might have tipped the scales away from a death sentence.  "[I]n order to establish prejudice, the new evidence that a habeas petitioner presents [in post-conviction proceedings] must differ in a substantial way – in strength and subject matter – from the evidence actually presented at sentencing."  Hill, 400 F.3d at 319. Petitioner cannot and does not argue that his trial counsel failed to complete *any* mitigation investigation or present *any* mitigation evidence.  Prejudice must be proven, and will not be presumed, in these circumstances.  Johnson v. Bagley, No. 1:02cv220, Dkt. No. 74 slip op. at 109 (S.D. Ohio Apr. 24, 2006) (citing Martin v. Mitchell, 280 F.3d 594, 613 (6th Cir. 2002)). This subclaim is **DENIED**.

2. **Subclaim (B)**:  **Trial counsel failed to adequately prepare for the mitigation phase, during which Dr. Chiappone, the expert offered by trial counsel, impeached Petitioner Moore's entire liability and mitigation case.**

Chief Magistrate Judge Merz recommended conditionally granting the writ in regards to one portion of this subclaim which concerns the testimony of Dr. Chiappone.  Petitioner has not presented objections in regards to the other portions of this subclaim on which Chief Magistrate Judge Merz recommended denying the writ and the Court considers those portions of the

subclaim to be abandoned.[6]  The Warden, however, has objected to the Chief Magistrate's recommendation to grant the writ as it concerns Dr. Chiappone's testimony.

Petitioner had raised the Dr. Chiappone portion of this subclaim to the Ohio Supreme Court on direct appeal.  Dr. Chiappone, a psychologist, was retained by Moore's trial counsel to present expert testimony in favor of Moore during mitigation.  Unfortunately for Moore, Dr. Chiappone offered devastating testimony that Moore intentionally killed Olinger, testimony which undercut trial counsel's theory of defense and mitigation.  The Ohio Supreme Court held that Dr. Chiappone's testimony did not demonstrate that trial counsel had been ineffective in failing to prepare with witnesses for the sentencing phase.  Moore, 81 Ohio St. 3d at 35-37. Chief Magistrate Judge Merz reached the opposite conclusion in his R&R and Supp. R&R and it is to this conclusion that the Warden objects.

 The relevant portion of the R&R to which Respondent objected is as follows:

When put on the stand, Dr. Chiappone undercut the defense mitigation theory by testifying that Moore admitted lying to the police when giving his statements concerning the "accidental shooting" of Olinger.  Dr. Chiappone further testified that Moore admitted to having shot the victim to avoid being identified.  The exchange between Dr. Chiappone and the prosecutor during the mitigation phase was as follows:

Q:     Dr. Chiappone, you reviewed all these tests, all these records.  And again, you're still trying to find out why Lee Moore did what he did. Did you ever ask him why he killed Melvin Olinger?
A:     Yes, I did.
Q:     What did he tell you?
A:     Well what struck me is he had a difficult time explaining it, if you will.  I asked him several times.  It's almost like he didn't know

---

[6] However, Petitioner did object to Chief Magistrate Judge Merz's discussion of *ex parte* conversations between the trial judge and Dr. Chiappone, and the defense expert and Dr. Chiappone, in his objections to the recommended disposition of the Fifth and Eighteenth Grounds for Relief, infra.

what to do.  He said he wasn't sure what to do.  He said that he was afraid the man would identify him.

Q:     So he shot him so he would not be identified?

A:     That's the implication . . . .[7]

Q:     Doctor, you are familiar with the previous statement that Lee Moore gave to the police, wherein he claimed this was all an accident?

A:     Yes, I am aware of that.

Q:     Did you specifically confront Lee Moore with that and ask him whether or not this was an accident when he shot Melvin Olinger?

A:     I am not sure if he used the word accident, but I did confront him about the information regarding his report to the police officers.

Q:     About the way he characterized it to the police?

A:     Correct.

Q:     What is your memory of how he characterized it at the time?

A:     Well, he told me that he made that up when he talked to the police, because he wanted to make it look like an accident.

Q:     So when he gave that statement to the police about dropping the wallet and the gun just went off and it was an accident, he told you that he made that up?

A:     That is correct.

(T.p. 1115-17.)  In Combs v. Coyle, 205 F.3d 269, 288 (6th Cir. 2000), the only expert witness put on by defense counsel undercut their entire defense theory that the defendant was too drunk and high on drugs to form intent.  The court held that:

> Although Comb's counsel's decision may be considered a strategic one, it was a decision made without undertaking a full investigation . . . . However, Stidham testified that defense counsel put Fisher on the stand in an effort "to establish that Combs could not act purposely and intentionally because of his diminished capacity," and Stidham admitted that he was "surprised" when Fisher testified to the opposite.  Fisher's opinion regarding whether Combs lacked the requisite intent to commit the crimes was crucial to the defense theory; defense counsel's failure to have questioned Fisher in this regard prior to trial is inexcusable.  Defense counsel should have known Fisher's opinion on this ultimate issue and should have prepared accordingly.  Regardless of whether Comb's counsel should have known or instead actually knew Fisher's opinion regarding Comb's intent, however, counsel's decision to put him on the stand was objectively unreasonable.

---

[7] The Court noted that Moore's trial counsel made an objection at this point which was denied by the trial court.

23

Combs, 205 F.3d at 288.

       The Court finds that this case is similar to the Combs case.  While the testimony in Combs occurred during the culpability phase and here it occurred in the penalty phase, it was no less detrimental.  Counsel should have interviewed their expert witness before putting him on the stand where his testimony would contradict the defense mitigation theory.  They should have been aware of the information he was going to testify to regarding Moore's statements to him about the shooting and confession.  The State relied on this testimony in closing arguments in an attempt to show that Petitioner killed Olinger for the purpose of avoiding identification and to counter Petitioner's mitigation argument of remorse.  The trial judge also relied on this testimony in sentencing as evidenced from his opinion, "[t]he defendant did not do this accidently, but, rather, as he told Dr. Chiappone, the victim was executed because the defendant was worried about being identified." (T.p. 1265.)  Petitioner has shown prejudice: trial counsels' lack of preparation and Dr. Chiappone's testimony severely damaged the defense's mitigation case.

(Doc. 128 at 46-48.)

The Warden objected to the R&R in part on the basis that Combs was a pre-AEDPA case and that Chief Magistrate Judge Merz applied the wrong legal standard in evaluating the case under Combs.  The Warden asserted that the Sixth Circuit had reviewed Combs' claims of ineffective assistance of counsel de novo, but that after the adoption of the AEDPA this Court had to apply the more deferential standard of 28 U.S.C. § 2254(d).  The Warden contends that the Ohio Supreme Court's conclusion that trial counsel could not be considered ineffective based solely on Dr. Chiappone's damaging testimony was not an unreasonable application of Strickland.

Chief Magistrate Judge Merz clarified in the Supp. R&R that it was his recommendation that the Court find that the Ohio Supreme Court's decision on this issue was objectively unreasonable under Strickland, as well as under Wiggins v. Smith, 539 U.S. 510 (2003) (finding that trial counsel's inadequate investigation for mitigation was ineffective assistance of counsel

24

which prejudiced the petitioner), and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005) (finding trial counsel ineffective for not reviewing the petitioner's prior conviction file despite being forewarned that the prosecution would use it to establish the petitioner's prior violent history and undercut the petitioner's residual doubt theory).  The Chief Magistrate reiterated that trial counsel rendered ineffective assistance when they did not know that their own expert witness would testify that Moore committed to the crime in order to avoid identification by the victim.

Upon consideration of the merits de novo, this Court agrees with the analysis and conclusion of Chief Magistrate Judge Merz.  Respondent's objection is overruled.  The Court conditionally **GRANTS** the writ as to subclaim (B) of the Second Ground for Relief.

**3.      Subclaim (C): Trial counsel presented a hopelessly ineffective mitigation argument which actually damaged Petitioner Moore's mitigation case and failed to emphasize Petitioner Moore's youth, remorse, and psychosocial background.**

In this subclaim, Petitioner Moore asserts that his trial counsel were ineffective in how they presented the opening and closing statements during the sentencing phase.  Chief Magistrate Judge Merz disagreed and recommended denying the subclaim on the merits.

The Court has carefully reviewed the opening and closing statements.  (T.p. 1080-88, 1200-22).  Petitioner points to the following sample of isolated comments made by his trial counsel which he purports damaged his mitigation case:

> Comments that suggested his guilt and diminished an argument for residual doubt:
> * "[C]ut out all the garbage – he shot Mr. Olinger and stole his car and used his credit cards.  That's the bottom line."  (T.p. 1202.)
> * "Larry [Kinley, a co-defendant who testified against Moore] was not believeable, but that doesn't matter, because that's – as Mr. Deters said, we showed you other things to find him guilty."  (T.p. 1204.)
> * "And I think the bottom line is Lee [Moore] just doesn't want to believe that he did this. . . . And I think that's what he's trying to say to you

25

today."  (T.p. 1208.)

Comments that emphasized the brutal nature of the crime:

- "You can put as much weight on remorse as you want on him pulling that
  trigger.  You can put as much weight on him admitting that he did this as
  you can have throwing Mr. Olinger in the trunk."  (T.p. 1213-14.)

Comments that suggested the jury should vote for the death penalty:

- "Maybe a long-term imprisonment, a very long term in prison would be
  fair.  Or, if not, if I cannot convince you, and you feel he deserves the
  death penalty, then maybe, for his family, I can tell you why this
  happened."  (T.p. 1082.)
- "So what does [sending Lee to prison] mean?  Oh, that's great.  We're
  going to send Lee off to a place where he's going to get along great.  That
  doesn't sound fair to the Olinger family, that he's going to go to jail where
  he can do well.  I think what that means is, if Lee went to jail for the next
  fifty-three years, he could be beneficial to other people in our prison
  system.  I don't know how.  I don't know how."  (T.p. 1214.)

A comment that suggested that a death sentence was preferable to a lengthy
prison term:

- "I know I wouldn't want to go to jail for seventy-three years.  I'd rather
  you put me to death."  (T.p. 1221.)

On the other hand, trial counsel repeatedly pointed in his arguments to several mitigating

factors for the jury to consider in favor of a life sentence:

- Moore's remorse and acceptance of responsibility for the crime (T.p. 1213, 1219,
  1220, 1222);
- Moore's young age (19) when he committed the crime (T.p. 1084, 1200, 1209);
- Moore's history of alcohol and drug use (T.p. 1200, 1217, 1218); and
- Moore's childhood during which his parents divorced and he was bullied (T.p.
  1216-18).

The theme of the closing argument was that Moore accepted responsibility for his crime and

expressed sincere remorse for it.  Petitioner's trial attorney also expressed his personal

opposition to the death penalty, his opinion that the death penalty was not an effective means of

26

deterrence, and his opposition to the concept that the death penalty could be justified as retribution or revenge.  (T.p. 1212-13.)  The trial attorney described for the jury a young man who made a horrible decision, but did not deserve to die.

Petitioner seeks to analogize his case to that of <u>Rickman v. Bell</u>, 131 F.3d 1150 (6th Cir. 1997), where the Sixth Circuit held that defendant's attorney, Robert I. Livingston, was constitutionally ineffective when he painted a picture of his client worse than that painted by the prosecutor in that case.  The Sixth Circuit summarized:

> But our thorough review of the record and consideration of the circumstances of the overwhelming evidence of Rickman's guilt leave us, like the district court below, appalled by Livingston's performance.  As we shall describe, Livingston combined a total failure to actively advocate his client's cause with repeated expressions of contempt for his client for his alleged actions.  The effect of all this was to provide Rickman not with a defense counsel, but with a second prosecutor.  And while the State makes a claim that Livingston was pursuing a strategy of painting a picture of his client that would make the jury find him too pitiable to convict or sentence to death, this simply stretches imagination past the point of credulity.  Livingston succeeded in creating a loathsome image for Rickman – one that would make a juror feel compelled to rid the world of him.

<u>Id.</u> at 1157.  Trial counsel's advocacy for Petitioner Moore is clearly distinguishable.  Though he made a series of unfortunate remarks which might have been misinterpreted by the jury when taken in isolation, on the whole Moore's trial attorney showed empathy for Moore and pleaded for his life.

The Court holds that Petitioner has not demonstrated ineffective assistance of counsel in this regard.  The Court **DENIES** subclaim (C) of the Second Ground for Relief.

### 4. Subclaim (D):  Trial Counsel failed to seek or offer an expert to testify as to the effects of extensive alcohol and drug abuse on Petitioner Moore.

Petitioner Moore did not object to Chief Magistrate Judge Merz's conclusion that he failed to demonstrate prejudice as a result of trial counsel's failure to call on expert witness

regarding Moore's alcohol and drug use.  This subclaim is abandoned.  The Court **DENIES**

subclaim (D) of the Second Ground for Relief.

**Third Ground for Relief**

> **Petitioner Moore's trial counsel rendered ineffective assistance at the liability phase by (A) inadequately preparing the sole defense, lack of a purposeful state of mind; (B) failing to present or seek a jury instruction on the voluntary intoxication defense; and (C) failing to seek or offer a forensic expert, thus violating Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.**  (Doc. 29 at 14.)

Petitioner has abandoned subclaim (A) of the Third Ground for Relief.  (Doc. 115 at 43.)

Chief Magistrate Judge Merz recommended denying subclaims (B) and (C) on the merits.

> **1.      Subclaim (B):  Trial counsel failed to present or request a jury instruction on the voluntary intoxication defense.**

Petitioner asserts that his trial counsel should have requested a jury instruction on

voluntary intoxication because (1) trial counsel argued in his opening argument that Petitioner's

intoxication the night of the murder affected him, (2) the State introduced evidence regarding

Petitioner's use of alcohol and marijuana (T.p. 712-13), (3) the trial court instructed the jury on a

lesser offense of involuntary manslaughter, and (4) voluntary intoxication may be considered in

determining whether an act was done intentionally under Ohio law.

Indeed, at the time of the crime the law in Ohio stated that "evidence of voluntary

intoxication 'may be considered in determining whether an act was done intentionally or with

deliberation and premeditation.'"  Hicks v. Collins, 384 F.3d 204, 214 (6th Cir. 2004) (quoting

Combs, 205 F.3d at 288); see also Ohio v. Wolons, 44 Ohio St. 3d 64, 68 (1989).  Voluntary

intoxication is a defense to a crime where specific intent is a necessary element of the crime and

"the intoxication was such as to preclude the formation of such intent . . . ."  Ohio v. Fox, 68

Ohio St. 2d 53, 55 (1981).  "[E]vidence of voluntary intoxication may be taken in order to show

defendant was thereby precluded from forming the necessary 'purpose' to commit murder."  Id.

The Ohio Supreme Court in Fox held that a jury instruction on intoxication might be appropriate

where evidence supported the instruction, but it left it to a trial court's discretion whether to

issue the instruction.  Id. at 56.  Following Fox, the Sixth Circuit noted that the United States

Supreme Court has not held that "the Constitution requires trial courts to give jury instructions

on intoxication as a defense to a murder charge."  Hill, 400 F.3d at 322.  "[E]ven severe

intoxication can co-exist with purpose to kill."  Id. at 324 (quoting Ohio v. Dennis, 79 Ohio St.

3d 421, 683 N.E.2d 1096, 1109 (1997)).

Chief Magistrate Judge Merz set forth the reasons why the trial court in this case might

have properly concluded that the evidence was overwhelming that Moore's conduct had been

intentional and an intoxication instruction was not warranted:

> He drove to another county with the intentions of stealing a car with out of state
> plates.  He kidnaped Olinger at gunpoint, put him in the trunk, and drove to
> multiple locations before going to the desolate area in which Olinger was shot.
> Once there Moore had Olinger empty his pockets and then walk over to the
> dumpster.  Following the murder, Moore used Olinger's credit cards at local JC
> Penny department stores.

(Doc. 128 at 57-58.)  In these circumstances, trial counsel either did not err in not requesting the

instruction and/or Petitioner cannot establish prejudice as a result of the trial counsel's decision

not to request the instruction.  The Court **DENIES** subclaim (B) of the Third Ground for Relief.

**2.      Subclaim (C):  Trial counsel failed to seek or offer a forensic expert**.

Petitioner asserts in this subclaim that his trial counsel provided ineffective assistance of

counsel when they failed to offer forensic evidence in an effort to corroborate Petitioner's theory

of the shooting – that the gun held by Moore accidently discharged as he bent down – despite

promising in their opening statement to present such evidence.  Petitioner's trial counsel had stated during opening statements as follows:

> I think the evidence that you will hear will indicate that when [Moore] talked to the police, he told them that he didn't mean to kill anybody.  He had no intention to do that; . . . he had been smoking marijuana that night; he had been drinking beer and alcohol; and that when the unfortunate shooting occurred it was an accident; that the gun went off; that he didn't mean to hurt anybody; he didn't hope to hurt anybody.

(T.p. 553-54.)

As Chief Magistrate Judge Merz found, Petitioner's subclaim fails because he cannot establish that he was prejudiced by his trial counsel's failure to present forensic expert testimony.  The deputy chief coroner testified at trial that the gun was at a distance of six inches to twenty-four inches away from the head of Melvin Olinger when it was fired.  (T.p. 841.)  He also testified that the exit wound from the bullet that killed Melvin Olinger was higher on the skull than the entrance wound.  (T.p. 839.)  Finally, the coroner testified that it was difficult based on the physical evidence to estimate what position Melvin Olinger was in when Moore fired the fatal bullet.  (T.p. 849-50.)  The jury also heard Petitioner Moore's statement to the police that he accidently pulled the trigger on the gun when Melvin Olinger dropped his wallet and both men bent over to pick it up.  (Doc. 120-16 at CC0293, CC0305-0306; T.p. 698 (tape played), 716-17).

Petitioner's trial counsel argued in his closing that Moore shot the gun accidently and in an upwards direction towards Melvin Olinger when Moore bent over to pick up Olinger's wallet.  (T.p. 913-14.)  Petitioner's theory of how the shooting occurred contradicted the State's theory that Petitioner shot Olinger execution-style when Olinger was on his knees.  The deputy coroner's testimony did not directly refute or contradict the defense theory because the coroner

30

admitted that he could not be sure what position Olinger was in when he was shot.

To the extent that Petitioner implicitly is arguing in this subclaim that trial counsel failed to provide any support for their assertion in opening statements that the shooting was accidental, the Court rejects the argument based on the discussion of the trial testimony above.  To the extent Petitioner suggests that trial counsel rendered ineffective assistance by not presenting their own forensic evidence, the subclaim also fails.  Petitioner has not offered any evidence regarding what a defense-retained forensic expert would have found and testified to concerning the gun or the shooting.  As such, Petitioner has failed to establish a reasonable probability that the outcome of the trial would have been different if trial counsel had presented expert forensic evidence.  The Court **DENIES** subclaim (C) of the Third Ground for Relief.

**Fourth Ground for Relief**

> **One of Petitioner Moore's trial counsel continued to represent him on his intermediate direct appeal and rendered ineffective assistance at this stage because he had an actual conflict of interest and because he failed to raise meritorious issues. This violated Petitioner Moore's rights, including his rights to counsel, due process, equal protection, and a fair proceeding.**  (Doc. 29 at. 17.)

Petitioner Moore argued in this claim that one of his trial counsel, Timothy Deardorff, rendered ineffective assistance of counsel when he continued to represent him on appeal.  Chief Magistrate Judge Merz held that Attorney Deardorff did not have an actual conflict of interest insofar as he was not required on direct appeal to present issues of his own ineffectiveness at the trial.  Petitioner Moore has not filed any objections to that conclusion.

Petitioner Moore also asserts in this Ground for Relief that his appellate counsel were ineffective for failing to raise certain issues on appeal.  The specific claims and issues each are addressed separately throughout this Order.

31

**Fifth Ground for Relief**

> **Judge Ruehlman, the trial judge, was not an impartial judge at trial or on post-conviction, as evidenced by his desire to have Petitioner Moore executed immediately after sentencing him to death, thus violating Petitioner Moore's rights, including his right to an impartial tribunal, due process, equal protection, a fair proceeding, and a reliable sentence.** (Doc. 29 at 19.)

In his Fifth Ground for Relief, Petitioner argues that the trial judge was not impartial and as a result his rights were violated. Petitioner withdrew subclaim (A), (doc. 115 at 48), and has not objected to the Chief Magistrate Judge Merz's recommendation regarding subclaims (D)-(G), (doc. 132 at 27). Thus, the Court need only address the remaining subclaims.

> 1. **Subclaim (B): The trial judge's desire to have Petitioner Moore executed immediately without providing him with his state and federal appeals showed his actual or apparent bias against Petitioner Moore and his hostility to Petitioner Moore's federal constitutional rights.**

Petitioner argues that the trial judge was biased as demonstrated by comments made at trial.

During the sentencing phase after pronouncing sentence, Judge Ruehlman made the following comments:

> One last comment, Mr. Moore. You know, I'm required by law to set this execution date of – I put down May 16th, 1995, but you won't be executed then. In fact, I'll probably be retired – seriously– by the time you're ever executed, and you'll be a middle-aged person, because you're going to the safest place in the United States. And the safest place in the United States right now is Ohio's Death Row.

> You'll be completely protected. If there's a riot, you'll be protected. You won't be killed by the other prisoners, because they protect you there. If there is a fire, you're the first one they're going to get out.

> The only person I know of that – when I was a prosecutor, we prosecuted Mr. Mize, John Mize. He's the only person I know to have died on Death Row in the last over thirty years, and he died from natural causes. And the only irony in that case is that, if he hadn't have died of cancer, he'd still be alive today on Death

Row.

The delays brought on by the Ohio Post-conviction Relief Statute and the Federal Habeas Corpus procedure that we now have caused the citizens of the State of Ohio to really distrust our justice system, and, hopefully, our newly elected state legislators will repeal the Ohio Post-conviction Relief Statute and our newly elected federal legislators will pass laws that restrict the Federal Habeas Corpus procedure as a method to unjustly delay these convictions.

If we're going to volunteer the death penalty, we should use it. I believe in it. I believe it should be used and not delayed. And yours shouldn't be delayed. But now it probably will.

We took a big step in November when we passed the law that gets rid of intermediate appeals, but, still, we need to get rid of Ohio's Post-conviction Relief Statute and the federal habeas corpus delays which are part of that statute. It's wrong. It's [sic] causes people to really think this system is not a fair just system, when sentences are not carried out.

Okay. You can take him away. That's the sentence of the Court.

(T.p. 1269-71.)

Petitioner Moore procedurally defaulted this claim by not raising it on appeal. He did assert in his Rule 26(B) Application, however, that his appellate counsel had been ineffective for not raising the issue on appeal. (Doc. 79, Vol. I at 5.) The Ohio Supreme Court denied the claim on the merits to the extent it found that appellate counsel had not been ineffective. Therefore, the merits must be examined to determine if the ineffectiveness of appellate counsel excuses the procedural default and if the writ should be granted so that Moore can reopen his appeal with effective counsel.

Petitioner Moore supports this claim, in part, by citing to an Ohio Supreme Court decision disqualifying Judge Ruehlman in another case on the basis of comments he made regarding the propriety of the defendant's sentence. In that other case, Judge Ruehlman made the following unsolicited remark at a hearing: "[I]f the parole board calls me I am going to tell

33

them that you should serve the full three and one-half years." In re Disqualification of Ruehlman, 74 Ohio St. 3d 1229, 1229, 657 N.E.2d 1339 (1991). The Chief Justice of the Ohio Supreme Court found that Judge Ruehlman's remark had suggested "the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind such that a reasonable person could question whether the decision on the pending motion will be governed by the law and the facts." Id. 74 Ohio St. 3d at 1229-30 (internal quotation and citation omitted). The Chief Justice removed Judge Ruehlman from further participation in the case to avoid "even the appearance of any bias or prejudice." Id., 74 Ohio St. 3d at 1230.

It is fundamental that due process requires the absence of both actual judicial bias and the appearance of judicial bias. Anderson v. Sheppard, 856 F.2d 741, 746 (6th Cir. 1988). The trial judge must appear as an impartial arbiter and not assume the posture of an advocate. Id. at 747. However, disqualification of a judge for bias or prejudice is "constitutionally required" only in the "most extreme of cases." Aetna Life Ins. v. Lavoie, 475 U.S. 813, 821 (1986). "The floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Bracy v. Gramley, 520 U.S. 899, 904-05 (1997) (internal quotation and citation omitted). "Opinions held by judges as a result of what they learned in earlier proceedings" do not constitute objectionable bias or prejudice. Liteky v. United States, 510 U.S. 540, 551 (1994). The only exception is a bias or prejudice based on facts learned at trial where the bias is "so extreme as to display clear inability to render fair judgment." Id. Therefore, ordinarily, "[t]he alleged bias must 'stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" Youn v. Track, Inc., 324

34

F.3d 409, 423 (6th Cir. 2003) (quoting United States v. Grinnell Corp., 384 U.S. 563, 583

(1966)).  The fact that during the course of criminal proceedings a judge may become

"exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly

reprehensible person" is not recusable bias or prejudice.  Liteky, 510 U.S. at 550-51.

A habeas petitioner in a different case raised a similar charge of bias against Judge

Ruehlman for similar comments he made "during sentencing concerning the delay in executions

due to the manner in which federal courts handle death penalty cases."  Johnson v. Bagley, Case

No. 1:02-cv-220, Dkt. No. 74, slip. op. at 39 (S.D. Ohio Apr. 24, 2006).  The decision does not

identify the exact comments made by Judge Ruehlman in that case.  The district court judge held

that the comments did not demonstrate bias under the controlling Supreme Court precedent, but

instead "were directed at the federal court system."  Id., slip op. at 40.

A similar issue also arose in DePew v. Anderson, 311 F.3d 742 (6th Cir. 2002).  In that

case, a petitioner sought habeas relief on the grounds of judicial bias where his trial judge had

written a letter to a newspaper criticizing the Ohio Legislature for putting too many impediments

in the way of prosecuting death penalty cases.  Id. at 752.  The letter was the judge's response to

public criticism of a life sentence he had imposed in an earlier case where the defendant

apparently had been eligible for the death penalty.  Id.  The Sixth Circuit found that Depew's

trial judge had not demonstrated judicial bias in the newspaper letter, but rather had reacted only

to political pressures:

> We recognize the political realities that Judge Moser faced in the form of a
> contested race for reelection when he wrote the letter blaming the legislature for
> any perceived deficiencies in death penalty sentencing. Such shifting of blame for
> unpopular decisions is common during contested elections. The statement was
> merely a political response by a judge facing an election, and we do not believe it
> indicates that Judge Moser could not or would not render decision based on the

law and the evidence before him in a specific case.

Id.  Likewise, Judge Ruehlman's comments here similarly criticized the Ohio Legislature for the post-conviction relief procedures the legislature had enacted, (T.p. 1269-71), and in that way demonstrate hostility towards the state and federal procedures, not towards Moore personally.

Finally, the Sixth Circuit refused to find actionable judicial bias when a trial judge had made undisclosed *ex parte* comments to two students observing a capital trial, after the verdict had been handed down, to the effect of "[t]he son of a bitch will die of old age before he ever goes to the chair."  Alley v. Bell, 307 F.3d 380, 387 (6th Cir. 2002).  The Sixth Circuit found the comment to be permissible under Liteky as having arisen from the events of the trial and as not being so extreme as to demonstrate a hostility that would impair fair judgments.  Id. at 388.  This comment was similar to Judge Ruehlman's comment in the instant case that Moore was going to the "safest place in the United States" and would not be executed until he was at least "middle-age."  (T.p. 1269-71.)

Turning back to the facts in this case, it is understandable that Judge Ruehlman felt ill-disposed towards Moore, whom the jury found guilty of a brutal act of murder.  This Court is concerned, however, that the tone of some of Judge Ruehlman's sentencing comments – particularly those speculating about death row inmates being killed by other prisoners or burned in a fire – might be perceived as demonstrating a lack of impartiality towards Petitioner Moore.  Nonetheless, given the Sixth Circuit precedent quoted above from Alley and DePew, the Court must hold that Judge Ruehlman's comments taken as a whole do not evidence a judicial bias which denied Petitioner Moore his due process rights.  Subclaim (B) is **DENIED**.

**2.**      **Subclaim (C):  Judge Ruehlman's conduct throughout Petitioner Moore's trial showed his actual or apparent bias against Petitioner Moore and the**

**defense as well as his hostility to Petitioner Moore's federal constitutional rights.**

**a. During the pre-trial phase, Judge Ruehlman refused to permit Petitioner Moore's counsel to present evidence regarding the racial imbalance of the petit jury venire.**

In this subclaim, Petitioner contends that he was denied a fair opportunity to present evidence regarding an alleged imbalance in the petit jury venire such that African-Americans in general, and African-American men in particular, were underrepresented. Relatedly, Petitioner contends that the trial court should have selected a new petit jury venire because of the racial imbalance on his venire.

Chief Magistrate Judge Merz analyzed this subclaim from the perspective of whether Petitioner was able to establish that the venire had been properly selected pursuant to Duren v. Missouri, 439 U.S. 357 (1979). Defendants have a constitutional right to a jury selected from a fairly representative cross section of the community. Taylor v. Louisiana, 419 U.S. 522, 528 (1975). "[T]he selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." Id. In Duren, the Supreme Court explained how to establish a prima facie violation of the fair cross-section requirement:

> [T]he defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

439 U.S. at 364. The fair-representation requirement does not require the composition of the petit jury to "mirror" the community. Taylor, 419 U.S. at 538.

In this case, trial counsel for Petitioner received completed juror questionnaires from the fifty members of the prospective venire on Monday, November 7, 1994. (T.p. 211.) Jury

37

selection began on Wednesday, November 9, 1994.  (T.p. 205.)  On November 9, trial counsel

moved the trial court to order that a new venire be impaneled because of the fifty venire

members, only five were black and only one was a black male.  (T.p. 211-14.)  Trial counsel then

attempted to establish the <u>Duren</u> factors in oral argument made immediately after he moved for

the new venire.  (T.p. 217.)  The trial judge asked Petitioner's trial counsel if they had evidence

to support their argument.  (T.p. 218.)  Trial counsel requested more time to prepare and gather

evidence, but the judge reminded counsel that they had been aware of Hamilton County's system

for selecting petit jury venires from registered voter lists "from day one."  (T.p. 219.)  The trial

court was not sympathetic to counsel's argument that they had known of results of that selection

for less than forty-eight hours.  (<u>Id.</u>)

       In response to the arguments made by Petitioner's trial counsel, the prosecutor called the

jury commissioner, whom he had asked to attend the court session, to testify as to the venire

selection procedures.  The jury commissioner testified that the jury pool was selected from the

voter registration lists, (T.p. 222), and that the venire of fifty people for Petitioner's trial was

randomly selected from the jury pool, (T.p. 221).  The commissioner denied systematically

excluding "people of African-American descent."  (T.p. 222.)  After the commissioner testified,

Petitioner's trial counsel requested an extension of time so they could "testify as to the

percentage of male blacks in the population of Hamilton County and, as well, the percentage

who vote that should be appropriately represented on a jury panel."  (T.p. 227.)  The trial court

denied that request and denied the motion for the selection of a new venire.  (T.p. 227.)

       Petitioner asserts that the trial judge demonstrated bias when it did not permit his trial

counsel an extension of time to present evidence of racial imbalance.  Petitioner specifically

requested an extension of time to gather evidence as to the second <u>Duren</u> factor – whether the distinctive group is underrepresented. (T.p. 227.) When asked earlier in the discussion how Petitioner would prove the third <u>Duren</u> factor, systematic exclusion, Petitioner's trial counsel implied he would need evidence from the jury commissioner. (T.p. 214.) The jury commissioner, however, did testify, but against Petitioner's argument. The Commissioner denied that African-Americans were systematically excluded. Petitioner's trial counsel suggested no additional way they would have sought to establish the third <u>Duren</u> factor. Additionally, the Ohio Supreme Court repeatedly has held that a jury selection system based on the voter registration rolls does not systematically or intentionally discriminate against any distinctive group. <u>Ohio v. Nields</u>, 93 Ohio St. 3d 6, 19, 752 N.E.2d 859 (2001); <u>Moore</u>, 81 Ohio St. 3d at 28; <u>Ohio v. Johnson</u>, 31 Ohio St. 2d 106, 114, 285 N.E.2d 751 (1972). Petitioner does not cite to any state or federal case to the contrary. Accordingly, the trial judge did not demonstrate bias by refusing to permit Petitioner an extension of time to gather evidence to support his motion.

       **b. During *voir dire*, Judge Ruehlman refused to permit Petitioner Moore's counsel to fully explore the potential biases of prospective jurors and denied Petitioner Moore's challenge to the prosecution's removal of an African-American woman from the jury.** In the first part of this subclaim, Petitioner contends that the trial judge, Judge Ruehlman, improperly limited his trial counsel's scope of voir dire examination. Specifically, he objects to Judge Ruehlman's decision to prevent trial counsel from exploring whether prospective jury members consider sorrow or remorse as mitigating factors if required to do so by the trial court. The prosecutor objected, and the trial court sustained the objection to, the following questions

posed by Moore's trial counsel to a prospective juror:

> MR. JAMES: [W]ould you be able to consider an individual's sorrow or remorse as a factor in whether – in deciding whether or not to give the death penalty?

> [JUROR]: No. . . . I wouldn't think of whether this person felt sorry for doing it or not.

> \* \* \* \*

> MR. JAMES: Let me ask you this, . . . . If your Honor, Judge Ruehlman, instructs you that you can consider sorrow and remorse [as mitigating factors], how much weight would you give that?

(T.p. 347-49.) The trial court stated that the hypothetical question was unfair because jurors did not know what his instructions were going to be. He explained, "I can see the jurors are very uncomfortable, and they don't know what the law is, and I've already told them numerous times, no matter what anybody says, they have to follow what [law] I tell them to follow." (T.p. 350-51.)

A capital defendant's remorse can be considered as a mitigating factor under Ohio law. Ohio v. Ketterer, 111 Ohio St. 3d 70, 100, 855 N.E.2d 48 (2006); Ohio v. Green, 66 Ohio St. 3d 141, 153, 609 N.E.2d 1253 (1993). As discussed in greater detail, infra, in regards to the Thirteenth Ground for Relief, the Supreme Court has stated that defense counsel must be permitted to ask the venire whether they would impose the death penalty automatically upon convicting the defendant of murder without considering the mitigating evidence. Morgan v. Illinois, 504 U.S. 719, 735-36 (1992). The fact that the trial court did not allow defense counsel to question prospective jurors about a specific mitigating factor about which no evidence had been offered does not equate to the trial court prohibiting defense counsel from asking jurors about their willingness to consider mitigating factors generally. In actuality, defense counsel

40

here were permitted to ask the venire whether they would consider mitigating evidence generally and not impose a death sentence automatically upon a finding of guilty.  (See e.g., T.p. 331, 343, 346-47, 364-65, 387, 424-25, 477-78, 495, 511.)  Because the defense counsel were permitted to weed out death-inclined jurors, Judge Ruehlman did not show bias by not permitting the specific questions about remorse.  "It would be a game of semantics, not law, to conclude that the failure to phrase a question in a specific way is fatal where other questions are equally illuminating." McQueen v. Scroggy  99 F.3d 1302, 1330 (6th Cir. 1996), overruled on other grounds by, In re Abdur'Rahman, 392 F.3d 174 (6th Cir. 2004).  Petitioner Moore cannot establish judicial bias on this basis.

In the second part of this subclaim, Petitioner asserts that Judge Ruehlman demonstrated bias by permitting the State to preemptorily challenge Prospective Juror Freeman, an African-American woman.  The merits of the propriety of the challenge are analyzed in regards to subclaim (D) of the Thirteenth Ground for Relief, infra.  Based on the Court's analysis infra, the Court finds here that Judge Ruehlman did not demonstrate bias in permitting the preemptory strike.

**c.  During the liability phase, the trial court failed to promptly excuse a sleeping juror, improperly denied Petitioner's objections, assumed Petitioner would be convicted, and improperly permitted the jury to conduct an experiment.**   In this subclaim, Petitioner asserts that the trial judge showed bias by not promptly removing a juror whom the trial attorneys had seen sleeping.  (T.p. 526-27.)  The trial judge did not excuse the juror after first hearing the complaints because he stated that he had not personally witnessed the juror sleeping.  (T.p. 527.)  He later excused the juror after his bailiff confirmed that the juror had

41

been asleep. (T.p. 685-94.) Petitioner concedes that the presence of the sleeping juror itself caused no prejudicial harm. The Court finds that this incident, standing alone, is not indicative of the trial judge's bias against Petitioner Moore.

Next, Petitioner asserts that the trial judge demonstrated hostility and bias by his decision to allow Melvin Olinger's father to testify and by the manner in which he handled defense counsel's objection. The trial judge denied the objection to the father's testimony without initially permitting defense counsel to explain his reason for the objection on the record. (T.p. 559-60.) This subclaim fails. The trial judge permitted defense counsel to fully explain the basis for his objection during the next trial break. (T.p. 629.) Moreover, the Sixth Circuit allows limited victim impact statements at both the liability and sentencing phases of trial. Hicks v. Collins, 384 F.3d 204, 222 (6th Cir. 2004); Cooey v. Coyle, 289 F.3d 882, 921 (6th Cir. 2002). The testimony offered by Melvin Olinger's father was brief and not inflammatory. The trial judge did not demonstrate bias in allowing his testimony.

Petitioner also asserts that the trial judge demonstrated bias when he permitted the prosecutor to encourage the jury to conduct its own experiment in the jury room and thus to consider evidence not admitted at trial. This subclaim is discussed in more detail in regards to subclaim (C) of the Eighteenth Ground for Relief. It suffices here to state that the Court disagrees with Petitioner's characterization of the record and finds that this incident does not demonstrate judicial bias.

**d. The trial judge had improper *ex parte* contacts with the defense expert and improperly permitted the prosecutors to urge the jurors to identify with the victim.**

Petitioner in this subclaim asserts that the trial judge showed bias in the fact that he had an *ex*

*parte* communication with the defense expert, Dr. Chiappone. The communication occurred as part of the trial judge's attempts to clarify initial confusion concerning whether Dr. Chiappone was serving as a defense expert or as an expert appointed by the Court. The trial judge explained on the record:

> Now, what about the mitigation? One thing on mitigation. There was a kind of mistake. Judge Morrissey did put an order on which was really – well, I straightened it out the other day. Nancy Schmidtgoessling called me the other day concerning – she was going to make a full report. And, as you know, especially under that Cook case, there shouldn't be any reports unless they ask for one.
>
> They were going to make a whole pre-sentence investigation type report. Dave Chippone [sic] and Nancy Schmidtgoessling called me, and I said no. They even asked for that. They've been contacted, as they are in every case, to do mitigation . . . to do mitigation for the defendant, you know, and normally, because they don't want you to get the report, they don't make a report. So they're not going to make a report. But I think Dave Chippone [sic] and/or Nancy Schmidtgoessling are going to be your witnesses?

(T.p. 321-322; see also T.p. 1119.) Petitioner is concerned that the trial judge's communication with the defense expert might have influenced the trial judge's decision. Petitioner has not explained in what way, if any, the communication did or could have influenced the trial judge. In the absence of any evidence to the contrary, this Court agrees with Chief Magistrate Judge Merz that the trial judge's clarification of the role of the defense expert was more likely beneficial to Moore than prejudicial. This incident is insufficient to demonstrate judicial bias.

**e. During the post-conviction proceedings, [the] trial court ruled upon Petitioner's petition despite his earlier comments in this case calling for the elimination of the post-conviction process.** The Chief Magistrate Judge found that this claim was procedurally defaulted because Moore did not move the Ohio Chief Justice to disqualify Judge Ruehlman from adjudicating the post-conviction relief proceedings. See O.R.C. § 2701.03

(petitions for disqualification). The failure to move for disqualification until after the judge has

participated in the proceedings results in a waiver if the basis for the disqualification was known.

In re Disqualification of Pepple, 47 Ohio St. 3d 606, 606, 546 N.E.2d 1298 (1989). Petitioner

Moore objects to this finding, but states no basis for his objection. The Court holds that the

subclaim is procedurally defaulted. For all these reasons, subclaim (C) is **DENIED** in toto.

**Sixth Ground for Relief**

> **At the mitigation phase, the trial court erroneously instructed that the jury's verdict had to be unanimous; this instruction was contrary to Ohio law and violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.** (Doc. 29 at 37.)

In this Ground for Relief, Petitioner asserts that the trial court improperly instructed the

jurors regarding unanimity and acquittal first during the sentencing phase. The Sixth Circuit has

precluded as unconstitutional "[a]ny instruction requiring that a jury must first unanimously

reject the death penalty before it can consider a life sentence." Davis v. Mitchell, 318 F.3d 682,

689 (6th Cir. 2003). Further, Petitioner asserts that the trial court erroneously denied defense

counsel's motion to instruct the jury that it need not unanimously agree on the existence of a

mitigating factor. "A state may not require unanimity in finding mitigating factors." Id. at 688.

"The Eighth Amendment requires that jurors not be precluded from giving effect to the

mitigating evidence by an instruction requiring unanimity as to the presence of [particular]

mitigating circumstances." Id. at 689.

This claim was procedurally defaulted as it was based on the record and could have been

brought on direct appeal. Petitioner does not in his Objections to the R&R or to the Supp. R&R

challenge the finding that the claim is procedurally defaulted. He simply argues the merits of the

underlying claim. As Chief Magistrate Judge Merz recognized, however, Petitioner Moore

44

asserted this claim as a basis for relief in the Rule 26(B) Application, (doc. 79, Vol. I at 6), and

this Court therefore considers the merits in determining whether it was ineffective assistance of

counsel to fail to raise the issue on direct appeal.

The Sixth Circuit recently addressed the type of instructions that are improper under

Ohio law.  The court explained:

> An acquittal-first jury instruction is "[a]ny instruction requiring that a jury must
> first *unanimously* reject the death penalty before it can consider a life sentence."
> Davis v. Mitchell, 318 F.3d 682, 689 (6th Cir. 2003) (emphasis added).  This
> court has held that such instructions are unconstitutional and provide grounds for
> habeas relief.  Id.  Under Ohio law, however, the jury must unanimously agree on
> the final sentence imposed, whether it be death or a term of life imprisonment.
> See id.  Thus, even though the jury may not be required to unanimously "acquit" a
> defendant of death before considering life sentences, Ohio law requires that the
> jury be instructed that their ultimate sentencing decision must be unanimous.
>
> Hartman [the petitioner] urges that the instructions given in this case, although
> not explicitly erroneous, were ambiguous and subject to an unconstitutional
> interpretation. The Supreme Court has held that, in evaluating such an argument,
> the appropriate inquiry centers on "whether there is a reasonable likelihood that
> the jury has applied the challenged instruction" in an unconstitutional manner.
> Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)
> (applying the "reasonable likelihood" examination to determine that an allegedly
> ambiguous jury instruction was not unconstitutional).

Hartman v. Bagley, 492 F.3d 347, 363-64 (6th Cir. 2007).

The following instructions from Hartman were held not to amount to an improper

acquittal-first instruction:

> If all 12 members of the jury find by proof beyond a reasonable doubt that the
> aggravating circumstances ... are sufficient to outweigh the mitigating factors,
> then you must return such finding to the court....
>
> I instruct you, as a matter of law, that if you make such a finding, then you have
> no choice and must make a recommendation to the court that the sentence of
> death be imposed on the Defendant, Brett X. Hartman.
>
> * * *

On the other hand, if after considering all of the evidence raised at trial which is relevant to the issues before you, the testimony, other evidence, and the arguments of counsel, *you cannot unanimously agree that the State of Ohio proved beyond a reasonable doubt that the aggravating circumstances, as I have defined them, outweigh the mitigating factors*, then you'll return your recommendation reflecting your decision.

In this event, you will then proceed to determine which of the three possible life imprisonment sentences to impose.

Id. at 362 (emphasis added). The court stated that these <u>Hartman</u> instructions "correctly and explicitly state that anything short of unanimous agreement regarding whether the aggravating circumstances outweigh the mitigating factors required the jury to determine which possible life sentence to impose." <u>Id.</u> at 364. Thus, if there is not unanimous agreement on death, then a life sentence can be considered. Stated differently, if even one juror opposes the recommendation of death, the jury can impose a life sentence.

The <u>Hartman</u> instructions are in contrast to the improper <u>Davis</u> instructions, which suggested that there must be a unanimous rejection of death before a life sentence can be considered. The relevant discussion of the <u>Davis</u> instruction from that Sixth Circuit case follows:

Instead of instructing the jury that it need not be unanimous in rejecting the death penalty, the trial judge in this case told the jury that in order to return a verdict for life imprisonment, "*you must find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors*." Immediately thereafter, the Court instructed that "since this is a criminal case the law requires that in order for you to reach a decision all 12 of you must be in agreement." *The verdict form likewise reflected a unanimity requirement in finding that the aggravating circumstances do not outweigh the mitigating circumstances, setting out twelve signature lines under the statement, "We, the jury ... do find that the Aggravating Circumstances which the defendant, Wiley Davis, Jr., was found guilty of committing are not sufficient to outweigh the Mitigating factors present in this case beyond a reasonable doubt."* This instruction, combined with the jury verdict form, not only "could" but by its plain language "would" lead a reasonable juror to conclude that the only way to get a life verdict is if the jury

46

unanimously finds that the aggravating circumstances do not outweigh the
mitigating circumstances, an entirely different instruction from one that clearly
informs the jurors that a life verdict can be rendered by a jury that has not first
unanimously rejected the death penalty.  Further adding to the confusion, the jury
was never told, either expressly or impliedly, that individual jurors may consider
mitigating circumstances in the weighing process regardless of the lack of
agreement with other jurors as to the presence of that factor.  In sum, the silence
in these instructions on the lack of unanimity required for mitigating
circumstances, the improper "acquittal-first" instruction, and the unqualified
instruction, "Now, as you know ... the law requires that in order for you to reach a
decision all 12 of you must be in agreement"-would have led a reasonable jury to
apply an unconstitutional standard of unanimity at all stages in the deliberative
process.

Davis, 318 F.3d at 689-90 (emphasis added); see also Williams v. Anderson, 460 F.3d 789, 811-

13 (6th Cir. 2006) (finding instruction to be an improper acquittal first instruction).

     With the preceding case law in mind, the Court turns back to the jury charge and verdict

form in Moore's trial.  Chief Magistrate Judge Merz found that the instruction and verdict form

were not unconstitutional and did not give improper acquittal-first or unanimity instructions.  In

charging the jurors during the sentencing phase, the trial judge instructed:

> All twelve jurors must agree on a verdict.  If all twelve members of the jury find
> by proof beyond a reasonable doubt that the aggravating circumstances in a
> particular count of aggravated murder which the defendant was found guilty of
> committing outweigh the mitigating factors, then you must recommend to the
> Court a sentence of death as to that particular count.
>
> On the other hand, *if, after considering all the relevant evidence admitted at the
> two trials and the arguments of counsel, you find that the State of Ohio failed to
> prove by proof beyond a reasonable doubt that the aggravating circumstances in
> a particular count of aggravated murder which the defendant was found guilty of
> committing outweigh the mitigating factors, then you will not recommend to the
> Court a sentence of death as to that particular count of aggravated murder.*
>
> In that event, you will determine which of two possible life imprisonment
> sentences to recommend to the Court as to that particular count of aggravated
> murder.
>
> Your recommendation to the Court shall be one of the following: (1) that Lee

Moore be sentenced to life imprisonment with parole eligibility after twenty full years of imprisonment; or, (2) that Lee Moore be sentenced to life imprisonment with parole eligibility after thirty full years imprisonment.

You must understand that you make one of these recommendations – if you make one of these recommendations, it will be binding upon the Court and the Court must impose the specific life sentence you recommend.  So if you make one of these recommendations of either twenty years to life or thirty years to life, it will be binding upon me, and I must impose the specific life sentence that you recommend.

In making your recommendation as to each count of aggravated murder, keep in mind that the fact there are some mitigating factors present does not preclude or prevent the death penalty if you find beyond a reasonable doubt that the aggravating circumstances still do outweigh the mitigating factors.

(T.p. 1243-45 (emphasis added).)

Immediately thereafter, the trial judge read the verdict forms.  The verdict forms in part

stated as follows:

Now, the three possible sentencing recommendations as to each count will be in verdict forms which I'm about to read to you.  You should not draw any inferences from the order in which these verdict forms are read to you.  These are how my secretary gave them to me this morning.

* * *

"We, the jury, unanimously find by proof beyond a reasonable doubt that the aggravating circumstance the defendant was found guilty of committing in Count 1 outweighs the mitigating factors, and, therefore, we do further hereby recommend to the Court that the sentence of death be imposed on the defendant," and there's twelve blank lines there at the bottom.

* * *

"We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving thirty full years of imprisonment," and there's twelve full blank lines there at the bottom of that form.

* * *

48

"We, the jury, unanimously find that the aggravating circumstance the defendant was found guilty of committing in Count 1 does not outweigh the mitigating factors, and recommend that the defendant be sentenced to life imprisonment with parole eligibility after serving twenty full years of imprisonment."  Again, there's twelve blank lines.

(T.p. 1245-47.)

The Court finds that these instructions when considered as a whole amounted to an improper "acquittal-first" instruction.  The Court focuses on the following critical language in the instructions:  "[I]f, after considering all the relevant evidence . . . , *you find* that the State of Ohio failed to prove by proof beyond a reasonable doubt that the aggravating circumstances in a particular count of aggravated murder which the defendant was found guilty of committing outweigh the mitigating factors, then *you will* not recommend to the Court a sentence of death." (T.p. 1244.)  Similarly, on the verdict form, the jury was told that they had to unanimously find that the aggravating circumstances did not outweigh the mitigating factors in order to impose one of the two life sentences.  (T.p. 1245-47.)  Like in Davis, the jury instructions here could have permitted the unconstitutional interpretation that a life verdict could only be rendered if the jury *unanimously* found that the aggravating circumstances did not outweigh the mitigating factors, or in other words, only if the jury unanimously rejected death.  Throughout the instructions, the trial court used the term "you" to refer to the twelve jury members as one collective jury unit where the jury acted collectively or unanimously.  (T.p. 1234 ("you decided the issues of guilt or innocence"); T.p. 1236 ("your verdict"); T.p. 1250 ("your verdict")).  There is a reasonable probability in these circumstances, like in Davis, that the jury improperly understood that they had to unanimously reject the death sentence before considering the life sentence.

Respondent does not directly refute that the jury instructions were improper under the

49

<u>Davis</u> standard.  Rather, Respondent contends that it was not improper assistance of appellate counsel to have failed to raised the issue because <u>Davis</u> was issued many years after Moore's appeal and because the law in this area has been murky at best.  He points out that in <u>Scott v. Mitchell</u>, 209 F.3d 854, 873-74 (6th Cir. 2000), the Sixth Circuit did not grant habeas relief despite the fact a set of jury instructions very similar to those in <u>Davis</u> had been used.  <u>See Hartman</u>, 492 F.3d at 362-63 (noting the similarity between <u>Davis</u> and <u>Scott</u> instructions).  This Court disagrees that the supposed confusion in the law excused counsel's failure to appeal the issue.  The decision in Moore's intermediate appeal was issued in June 1996.  <u>Ohio v. Moore</u>, No. C-950009, 1996 WL 348193 (Ohio Ct. App. June 26, 1996).  Earlier that year, the Ohio Supreme Court had held that acquittal-first instructions were improper and that a jury did not have to "rule out the death penalty unanimously before considering a life sentence."  <u>Ohio v. Brooks</u>, 75 Ohio St. 3d 148, 160, 661 N.E.2d 1030 (1996).  The Ohio Supreme Court also mandated that juries be instructed that "a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors."  <u>Id.</u> at 162.  Accordingly, Petitioner's appellate counsel should have been aware of the potential issue of acquittal-first instructions and had no reasonable basis for not asserting the life-or-death issue on appeal.

It is now necessary to review the procedural posture of this claim.  The underlying claim of whether Moore's rights were violated at the sentencing phase by the use of the unconstitutional jury instructions is procedurally defaulted.  The Court has examined the merits of this underlying issue only insofar as it bore relevance to whether Moore received ineffective assistance of appellate counsel because appellate counsel did not raise the underlying issue on

50

appeal.  See Mapes v. Tate, 388 F.3d at 194-95 (setting forth procedural roadmap in similar situation).  The appropriate remedy wherein effective assistance of appellate counsel is found is to grant a  writ conditioned upon Moore being permitted an appeal in the Ohio courts with effective assistance of counsel.  Id.

The Court concludes in this case that the omitted issue was significant and that there could have been no strategic value in failing to raise it on appeal.  Petitioner's trial counsel had highlighted the importance of the issue at trial when it requested a jury instruction that the jury did not need to unanimously agree on the existence of a particular mitigating factor.  (T.p. 1063-64.)  Appellate counsel's failure to raise the issue undermines this Court's confidence in the outcome of Moore's state court appeal.  Accordingly, the Court will conditionally **GRANT** the writ as to the Sixth Ground for Relief conditioned upon Moore being permitted an appeal in the Ohio courts with effective assistance of counsel.

**Seventh Ground for Relief**

> **The prosecutor's misconduct at the mitigation phase closing argument when, among other things, he urged the sentencers to identify with the victim, violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair hearing, and a reliable sentence.**  (Doc. 29 at 39.)

In this Ground for Relief, Petitioner argues that the prosecutor committed misconduct in closing argument in the sentencing phase when the prosecutor (A) argued the personal feelings of the victim and speculated as to what the victim was feeling; (B) argued that the jury had a duty to impose death; (C) referenced non-statutory aggravating factors as a basis to return a death sentence; and (D) improperly commented on Moore's unsworn statement.  (Doc. 29 at 39-42.)  The Warden argues that the majority of this claim is procedurally defaulted as it was not raised on direct appeal, specifically to the Ohio Supreme Court.  (Doc. 31 at 73.)  Alternatively,

51

if not defaulted, the Warden argues that this claim is without merit and the Ohio Supreme

Court's rejection of the claim was not contrary to nor an unreasonable application of United

States Supreme Court precedent.  (Id.)  Subclaims (A), (C), and (D) were all raised on direct

appeal to the Ohio Supreme Court as the eleventh proposition of law.  Moore, 81 Ohio St. 3d at

33-35.

"A claim of prosecutorial misconduct . . . will not justify habeas corpus relief unless the

prosecutor's conduct was so egregious as to render the trial fundamentally unfair."  Roundtree v.

Adams, No. 02-1968, 65 F. App'x 26, 2003 WL 1795720, *2 (6th Cir. Mar. 28, 2003); see also

Angel v. Overberg, 682 F.2d 605, 608 (6th Cir. 1982) (same).  This determination is made by

examining the totality of the circumstances.  See Angel, 682 F.2d at 608.  The Sixth Circuit

stated:

> In every case, we consider the degree to which the remarks complained of have a
> tendency to mislead the jury and to prejudice the accused; whether they are
> isolated or extensive; whether they were deliberately or accidentally placed before
> the jury, and the strength of the competent proof to establish the guilt of the
> accused.

Id.; see also Pritchett v. Pitcher, 117 F.3d 959, 964 (6th Cir. 1997) (same).  Relief is not to be

granted unless the misconduct "likely had a bearing on the outcome at trial in light of the

strength of the competent proof of guilt."  Byrd v. Collins, 209 F.3d 486, 529 (6th Cir. 2000)

(citation omitted).  The Sixth Circuit has characterized as "demanding" its standard that "the

misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the

trial."  See id. at 529-30 (internal quotation and citation omitted).

**1.      Subclaim (A):  Prosecutor committed misconduct when he discussed the
personal feelings of the victim and speculated as to what the victim was
feeling.**

Petitioner Moore contends that the prosecutor improperly speculated on the victim's feelings and discussed facts not in evidence during his sentencing phase arguments. Petitioner contends that Ohio law does not permit consideration of victim impact evidence or argument at mitigation.

The prosecutor stated in relevant part:

. . . . And think a minute what Melvin Olinger went through during that kidnapping. That's really what you have to do in order to decide how much weight do I attach to that?

You know, when he is first scooted over in his car, that's when the kidnapping began, and when they took him behind that building and said "Get out of the car," I'm sure he was thinking, "Thank God, I'm going to be let out here, I'm alive, take my car, take everything I have," and then he's put into that trunk.

If you look at the weather report for that day, it started out, I think, at twenty-nine degrees at midnight the night before. By 10 o'clock that night, it was down in single digits, somewhere around four or two or six degrees. Just setting aside a moment the physical discomfort of not having a heavy coat on and being placed in that trunk, what went through his mind as he was driven from Fairfield back to Mount Healthy?

And when they made that initial stop in Mount Healthy, I'm sure at that point – because it's in this little complex where there's a lot of apartments and cars and activity – Mr. Olinger maybe there felt a little bit of relief that, you know, "I'm not anywhere out in the sticks, out in the boondocks. I'm not going to be abandoned. Maybe they're going to let me out here. Maybe they're going to put me someplace."

And I'm not sure exactly how much time he spent at that location, but a short time later the car started up again, and, again he's in the trunk, and, again, he's on a journey. But when the car stopped that last time, I'm sure the sounds were a little bit different.

And you can tell from the photograph of that old Gilbert Machine Company, I believe it is, down in Cumminsville. It's a very, very desolate area. It's basically the perfect place to take someone if you want to get rid of them. And when the trunk lid opened, maybe there was a moment of hope for Mr. Olinger. You know, "They're going to let me out."

53

After all that time in the trunk, I'm sure he's freezing, he's cramped, he's been bounced around.  Just for one moment maybe there was a little bit of hope for Mr. Olinger.  But I'm sure when he got out and saw the .357 was still in the hands of Lee Moore, and he saw where he was, he knew – [Defense objection overruled]

He knew what was coming.  And when he's marched back into that little cubbyhole behind the dumpster, that's the kidnapping.  How much weight do you put in that?  That's the aggravating factor.  That's the second aggravating factor.

(T.p. 1194-96.)  Later on, the prosecutor stated:

He's got a .357 on his lap.  Mr. Olinger comes out of the bar and is confronted by Lee Moore.  As Mr. Piepmeier said, there's your kidnapping.  Can you imagine the terror he's going through at this point?

These are aggravating circumstances that you're balancing against mitigating.  What did Mr. Olinger do to deserve this?

They pull around the building.  He's ordered out, thrown in the trunk, six degrees maybe, in the trunk of a car; confined in an incredibly small place in freezing temperatures and driven quite some distance down to where Kinley stayed.  Those are factors – those are facts to weight[sic] in considering the aggravating circumstance against this mitigation.

He drives him down, the car stops for a while, [Larry] Kinley gets in, Holmes gets out, and then there is a conversation.  While he's in the trunk, he, Lee Moore, is saying he's got a guy in the trunk he's going to kill.  Can you imagine the abject terror Melvin Olinger has at this point? [Defense objection overruled].

They drove to the factory.  Again, he's ordered out at gunpoint.  Is the trunk open or shut?  It doesn't matter.  Does it really matter?  He gets him out of the car.  Was he begging for his life?  You bet he was. [Defense objection overruled].

(T.p. 1231-32.)

Petitioner's trial counsel stated a contemporaneous objection citing to Ohio v. Combs, 62 Ohio St. 3d 278, 282-83, 581 N.E.2d 1071 (1991), wherein the Ohio Supreme Court had found that a prosecutor erred by "improperly suggest[ing] that how the victims were killed and the suffering and mental anguish the victims endured was an aggravating circumstance" in the previous case.  (T.p. 1251-52.)  The trial court refused to give a curative instruction.  (T.p. 1253-

54.)

Both the Ohio Supreme Court and Chief Magistrate Judge Merz found that the prosecutor's remarks were improper, and in the words of Chief Magistrate Judge Merz "disturbing."  This Court agrees.  However, Petitioner Moore must prove not only that the remarks were improper, but also that were "so egregious as to render the trial fundamentally unfair."  Roundtree, 2003 WL 1795720 at *2.  The prosecutor's remarks appear to be neither isolated nor accidental.  Pritchett, 117 F.3d at 964 (setting forth analysis factors).  Whether the trial was tainted by the misconduct also requires considering the misconduct in light of the evidence of guilt admitted at trial.  Id.  In this case, the evidence of guilt was overwhelming.  Petitioner admitted to stealing Olinger's car, kidnapping Olinger, and shooting him.  His sole defense was that the shooting was accidental.  Evidence that the shooting was not accidental included the fact that Petitioner drove Olinger to a remote location, that Petitioner approached Olinger with a loaded handgun at the remote location, that his accomplice testified that Petitioner reacted with excitement after he fired the shot, and that Petitioner used Olinger's car and credit cards for his personal benefit after the killing.  Additionally, at the mitigation stage, Petitioner put on a weak case for mitigation, including calling an expert witness who stated that Petitioner had killed Olinger on purpose to avoid prosecution for kidnapping.  For these reasons, the Court finds that the prosecutor's misconduct in regards to this subclaim does not warrant relief.  Subclaim (A) is **DENIED**.

### 2. Subclaim (B):  The prosecutor committed misconduct when he argued that the jury had a duty to impose death.

Petitioner objects to the prosecutor's statement in the opening argument at sentencing phase regarding the "duty" the jury had to perform.  The Court disagrees with Petitioner's

55

characterization of the prosecutor's statement on this point.  The Court simply does not read the

prosecutor's opening on the pages cited, (T.p. 1191-92), or elsewhere in the argument, to have

stated explicitly or implicitly that the jury had the duty to impose death.  The prosecutor does

suggest that the jury must perform its duty to "decide the case on the law," (T.p. 1191-92), but

that is not improper or objectionable.  The Court finds that this subclaim does not warrant relief

and is **DENIED**.

   3.     **Subclaim (C):  The prosecutor committed misconduct when he referenced
          non-statutory aggravating factors as a basis to return a death sentence.**

      In this subclaim, Moore contends that the prosecutor improperly argued that the jury

should consider non-statutory aggravating circumstances, including suggesting that Moore

placed more value on the items he purchased with Melvin Olinger's credit card than he placed on

Olinger's life, and requesting that the jury focus on the terror Olinger felt when he was

kidnapped.  (T.p. 1193-94, 1231-32.)  Chief Magistrate Judge Merz recommended that this claim

be found procedurally barred, or alternatively, denied on the merits.  This Court agrees that the

claim should be denied on the merits and does not address the procedural bar.

      On direct appeal after the death sentence was opposed, the Ohio court of appeals

completed its duty mandated by O.R.C. § 2929.05(A)[8] to independently re-weigh the aggravating

---

[8] O.R.C. § 2929.05(A) at that time read in relevant part as follows:

   The court of appeals and the supreme court shall review the judgment in the case
   and the sentence of death imposed by the court or panel of three judges in the
   same manner that they review other criminal cases, except that they shall review
   and independently weigh all of the facts and other evidence disclosed in the
   record in the case and consider the offense and the offender to determine whether
   the aggravating circumstances the offender was found guilty of committing
   outweigh the mitigating factors in the case, and whether the sentence of death is
   appropriate.

circumstances and mitigating factors.  <u>Moore</u>, 1996 WL 348193, at *19.  The court of appeals

considered only those aggravating circumstances "found by the jury during the guilt phase of the

proceedings," <u>id.</u>, therefore eliminating the chance that they relied on any improper aggravators

suggested by the prosecutor during the sentencing phase.  The appeals court concluded that the

"aggravating circumstances . . . outweigh, overwhelmingly and beyond any reasonable doubt, the

factors offered in mitigation."  <u>Id.</u> at *20.  The Ohio Supreme Court also completed an

independent review and also upheld the death sentence.  <u>Moore</u>, 81 Ohio St. 3d at 42.  The Ohio

Supreme Court specifically found the presence of two statutory aggravating factors and relied on

only those factors in its re-weighing process.  <u>Id.</u> at 42-43.

 In <u>Clemons v. Mississippi</u>, 494 U.S. 738, 745-46 (1990), the U.S. Supreme Court upheld

a death sentence where the state appeals court had invalidated one or more of the aggravating

circumstances found by the jury, but then itself concluded that the remaining aggravating

circumstances outweighed the mitigating factors.  Following <u>Clemons</u>, the Sixth Circuit has held

that the Ohio Supreme Court is permitted to correct weighing errors made below and

independently re-weigh the aggravating circumstances and mitigating factors.  <u>See</u> <u>Cooey</u>, 289 at

891-92.  The state courts' independent re-weighing in this case, therefore, cured any error and

rendered non-prejudicial any misconduct by the prosecutor during the sentencing phase.  As

such, Moore's appellate counsel could not have been constitutionally ineffective for failing to

raise the issue on appeal.

 In attempting to refute this analysis, Petitioner relies on <u>Brown v. Sanders</u>, 546 U.S. 212

(2006).  In <u>Sanders</u>, the Supreme Court stated that in non-weighing states, "the death sentence

---

<u>Id.</u>

must be set aside if the jury's consideration of the invalidated eligibility factor allowed it to hear evidence that would not otherwise have been before it."  546 U.S. at 218.  This language does not affect the outcome here, however, because the language Petitioner cites from <u>Sanders</u> applies only in a non-weighing state.  Ohio is a weighing state.  <u>Wilson v. Mitchell</u>, 498 F.3d 491, 505 (6th Cir. 2007) (examining <u>Sanders</u> and the way it treated weighing and non-weighing states differently).  "In a weighing State . . .  the sentencer's consideration of an invalid eligibility factor necessarily skews its balancing of aggravators with mitigators."  <u>Id.</u>  Also, in a weighing state, the consideration of an invalid aggravating factor requires reversal "unless a state appellate court determined that the error was harmless or reweighed the mitigating evidence against the valid aggravating factors."  <u>Sanders</u>, 546 U.S. at 217; <u>Wilson</u>, 498 F.3d at 507.  This case fits into that exception because the Ohio appellate courts independently reweighed the aggravating circumstances against the mitigating factors.  <u>Sanders</u> has not restricted <u>Clemons</u> or <u>Cooey</u> as they apply to this case.

Accordingly, subclaim (C) is **DENIED**.

### 4.    Subclaim (D):  The prosecutor committed misconduct when he improperly commented on Moore's unsworn statement.

Petitioner objects to the following two statements made by the prosecutor in his mitigation closing argument that questioned Moore's decision to offer an unsworn statement during the sentencing phase:

> Their last piece is the defendant's statement, unsworn statement, so he does not have to face any cross-examination or face any tough questions from the prosecutors.  And you can consider that when you consider his credibility as a witness.

> * * * *

58

> If there is some pig [sic?] mystery why he went to Butler County besides that [ – to choose a victim who wouldn't be missed for quite some time – ], why didn't he tell you that today in his unsworn statement?

(T.p. 1227, 1231.)  The Ohio Revised Code permitted Moore, a capital defendant, to make an unsworn statement at the sentencing phase which is not subject to cross-examination.  O.R.C. § 2929.03(D)(1) ("If the offender chooses to make a statement, the offender is subject to cross-examination only if the offender consents to make the statement under oath or affirmation.").  The Sixth Circuit has instructed that "to permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affects Fifth Amendment rights." DePew, 311 F.3d at 750 (citation omitted).  Petitioner asserts that the prosecutor's statements here ran afoul of the DePew admonition.

The DePew court distinguished between permissible comments that a defendant's statement was unsworn and impermissible extensive comments:

> "[T]he prosecution may comment that the defendant's statement has not been made under oath or affirmation, but such comment must be limited to reminding the jury that the defendant's statement was not made under oath, in contrast to the testimony of all other witnesses." DePew, 311 F.3d 742, 745 (6th Cir. 2002) (quoting DePew, 38 Ohio St. 3d 275, 528 N.E.2d 542, 553- 54 (1998)).

Durr v. Mitchell, 487 F.3d 423, 443 (6th Cir. 2007).  The prosecutor's latter statement – about why Moore did not explain his reason for going to Butler County – went beyond reminding the jury defendant's statement was not made under oath, and thus impinged on Moore's Fifth Amendment rights.  The Ohio Supreme Court in addressing this claim held that the former comment – reminding the jury that Moore's statement was not sworn or cross-examined – is proper, but the Ohio Supreme Court did not address the whether latter comment was improper or not.  This Court finds that the latter statement, although improper, did not "render the trial

59

fundamentally unfair." <u>Roundtree</u>, 2003 WL 1795720 at *2; <u>Angel</u>, 682 F.2d at 608.  The

comment was isolated in the context of the mitigation arguments and did not directly impact any

of the aggravating circumstances or mitigating factors put forth by the parties for the jury's

consideration.  <u>See</u> <u>Angel</u>, 682 F.2d at 608 (setting for factors for evaluating misconduct).

Accordingly, subclaim (D) is **DENIED**.

**Eighth Ground for Relief**

> **Petitioner Moore's appellate counsel on his appeal to the Ohio Supreme Court
> rendered ineffective assistance because they never met with Petitioner Moore to
> discuss this appeal, never showed him a copy of the appellate brief before it was
> filed, and failed to raise meritorious issues.  This violated Petitioner Moore's rights,
> including his rights to counsel, due process, equal protection, and a fair proceeding.**
> (Doc. 29 at 43.)

This Ground for Relief is composed of two subclaims.  In the first subclaim, Petitioner

Moore contends that his appellate counsel on appeal to the Ohio Supreme Court rendered

ineffective assistance of counsel because they failed to meet with Petitioner or to consult with

him prior to filing the Supreme Court brief.  The Chief Magistrate Judge concluded that this

subclaim was procedurally defaulted.  Petitioner was precluded from bringing this subclaim on

direct appeal to the Supreme Court because he had been represented by the same attorney at trial

and on his initial direct appeal.  However, Petitioner was not precluded from asserting ineffective

assistance of appellate counsel in his Rule 26(B) Application for Reopening in the state courts.

Petitioner objects to Chief Magistrate Judge Merz's conclusion that the subclaim is procedurally

defaulted because he asserts that he raised the subclaim in his Rule 26(B) Application to the

Ohio court of appeals and the Ohio Supreme Court.  He cites to Document 79, Vol. I at 11, in

support.  The Court has reviewed the Rule 26(B) Application at the pages cited, and the Ohio

Supreme Court decision denying the Rule 26(B) Application, <u>Moore</u>, 93 Ohio St. 3d at 650-51,

and finds that Petitioner did not assert the first subclaim – concerning appellate counsel's failure to consult with him – during the Rule 26(B) Application stage.  This subclaim is procedurally barred.

Petitioner's second subclaim involves a set of nineteen arguments which he contends that his appellate counsel on appeal to the Ohio Supreme Court either failed to raise (fourteen arguments) or failed to adequately brief (five arguments).  Chief Magistrate Judge Merz set forth each of the arguments in the R&R and they will not be repeated here.  (Doc. 128 at 87-89.)  He then observed that each argument was raised elsewhere by Petitioner in his Petition.  Petitioner does not challenge this observation.  Because the Court concludes elsewhere in this Order that each of the Grounds for Relief, except for a portion of the Second Ground for Relief, the Sixth Ground for Relief, and a portion of the Sixteenth Ground for Relief, are without merit, appellate counsel cannot be deemed ineffective failing to assert or adequately brief those claims. Regarding the portion of this subclaim that asserts ineffective assistance of appellate counsel for failing to raise the issues that underlie the relevant portions of the Second, Sixth, and Sixteenth Grounds for Relief, it is moot because the Court has recommended that the Writ for Habeas Corpus be granted in part as to those claims.

Accordingly, the Court **DENIES** the Eighth Claim for Relief.

**Ninth Ground for Relief**

> **The selection of the grand jury foreperson and the underrepresentation of minorities and women as grand jury forepersons in Hamilton County violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair cross-section, and a fair proceeding.** (Doc. 29 at 45.)

Petitioner alleges in this Ground for Relief that he was denied a fair trial as a result of the allegedly discriminatory manner in which grand jury forepersons are selected in Hamilton

County, Ohio.  Chief Magistrate Judge Merz found that this claim was procedurally barred, or alternatively, should be denied on the merits.

The Petitioner did not assert this claim on direct appeal.  He did raise it indirectly in his sixth claim in his Rule 26(B) Application, first to the court of appeals, (doc. 79, Vol. I at 6-7), and then again to the Ohio Supreme Court as part of the second proposition of law, (id., Vol. III at 58-60), when he asserted that his appellate counsel erred in not raising the underlying claim during the state court direct appeal.  The Ohio Supreme Court denied the second proposition of law on the merits, and thus held that appellate counsel was not ineffective for failing to raise the grand jury foreperson argument on appeal, but without any analysis or discussion.  Moore, 93 Ohio St. 3d at 650-51.  The Court already determined in its discussion of Petitioner's general objections, supra, that the Ohio Supreme Court did not address the merits of the underlying claims which Petitioner faulted appellate counsel for not raising.  Accordingly, Petitioner did not raise this claim to the state courts and he is procedurally barred absent a showing of cause and prejudice.

In his Objections to the R&R, Petitioner asserted as cause for the failure to preserve the issue the ineffectiveness of his appellate counsel on direct appeal.  Chief Magistrate Judge Merz correctly held that the ineffectiveness of appellate counsel could not serve as cause for the failure because the underlying issue regarding grand jury selection required as proof substantial *de hors* evidence.  The claim, therefore, could not have been asserted on direct appeal.  The claim should have been raised as part of the petition for post-conviction relief, but it was not.  (Doc. 31, Ex. M.)  Accordingly, the claim is procedurally barred and the Ninth Ground for Relief is **DENIED.**

**Tenth Ground for Relief**

**The underrepresentation of minorities in the grand jury and petit jury venires in Hamilton County – including Petitioner Moore's petit jury venire – violated Petitioner Moore's rights, including his rights to due process, equal protection, a jury drawn from a fair cross-section of the community, and a fair proceeding.**  (Doc. 29 at 47.)

Petitioner in this Ground for Relief objects to the composition of grand jury and petit jury venires in Hamilton County, Ohio.  Chief Magistrate Judge Merz concluded that the subclaim related to grand jury composition was procedurally defaulted on the same basis the grand jury foreperson claim was procedurally defaulted.  This Court agrees.

Regarding the petit jury claim, Chief Magistrate Judge Merz concluded that the subclaim was without merit on the same basis that he recommended denying the analogous subclaim (C)(1) of the Fifth Ground for Relief.  In that subclaim, the Court held that the trial judge did not demonstrate prejudice by denying Petitioner additional time to gather evidence to establish a violation of the fair cross-section requirement pursuant to the Duren standard.  The Court also cited to Ohio case law which has held that the selection of jurors from voter registration rolls does not result in intentional or systematic discrimination of any distinctive group.  See e.g., Nields, 93 Ohio St. 3d at 19; Johnson, 31 Ohio St. 2d at 114.  Again, Petitioner has not cited any federal or state law to the contrary.  Petitioner's petit jury claim fails on the merits.

For these reasons, the Tenth Ground for Relief is **DENIED.**

**Eleventh Ground for Relief**

**Hamilton County's overprosecution of people charged with homicide violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, and a reliable sentence.**  (Doc. 29 at 50.)

Petitioner has withdrawn this Ground for Relief.  (Doc. 115 at 100.)

**Twelfth Ground for Relief**

63

> **Petitioner Moore was denied his rights to counsel, due process, equal protection, a fair proceeding, an impartial tribunal, a reliable sentence, and an adequate corrective process during his post-conviction proceedings.** (Doc. 29 at 52.)

Petitioner Moore has withdrawn subclaim (A) of this Ground for Relief. (Doc. 115 at 100.) Chief Magistrate Judge Merz recommended denying subclaims (B) and (C) on the merits. Petitioner did not object to these recommendations. (Doc. 132 at 42.) The Twelfth Ground for Relief is **DENIED**.

## Thirteenth Ground for Relief

> **Errors during voir dire, including the prosecutors' racially biased peremptory challenge of an African-American woman, resulted in a biased jury that was organized to return a death verdict in violation of Petitioner Moore's rights, including his right to due process, equal protection, a fair proceeding, and impartial jury, and a reliable sentence.** (Doc. 29 at 56.)

Petitioner asserts numerous subclaims in this Ground for Relief alleging that his rights were violated during voir dire. Each claim is addressed individually and on the merits below.

### 1. Denial of Change of Venue[9]

First, Petitioner asserts his rights were violated when the trial court denied his motion for a change of venue out of Hamilton County, Ohio. Petitioner asserts that the media's coverage of the crime itself and of the separate trials of Moore and his co-defendants was pervasive. However, he provides in his Brief on the Merits, and in the Objections to the R&R and Supp. R&R, only one example of an inflammatory comment about Moore being made before the trial in the media – a comment made against Moore by an attorney for one of his co-defendants. (Doc. 115 at 106; doc. 132 at 43-44; doc. 137 at 6.) Thus, Petitioner has not identified sufficient

---

[9] Petitioner did not identify this subclaim by a separate letter as he did the other subclaims.

evidence to establish that the pretrial publicity was pervasive.  Additionally, the trial judge and the attorneys questioned the jurors about pretrial publicity about which they may have heard and exhorted them to remain impartial and unbiased until hearing the evidence. (See e.g., T.p. 230-31, 236, 355-57.)  Petitioner has not established that his rights were violated and this subclaim is **DENIED**.

> **2.      Subclaim (A):  Judge Ruehlman erroneously denied trial counsel's unopposed request for individual voir dire on death penalty issues.**

Petitioner Moore contends that Judge Ruehlman should have granted his request for invidual voir dire.  Petitioner cites dicta language from the Sixth Circuit recommending the use of individual voir dire in a capital murder case to avoid potential problems.  Ritchie v. Rodgers, 313 F.3d 948, 962 n.13 (6th Cir. 2002).  However, the Sixth Circuit and the Ohio Supreme Court have both held that an individual voir dire is not constitutionally mandated.  Robinson v. Gundy, 174 F. App'x 886, 891-92 (6th Cir. 2006); Ritchie, 313 F.3d at 962 n.14; Ohio v. Landrum, 53 Ohio St. 3d 107, 117, 559 N.E.2d 710 (1990).

As part of this subclaim, Petitioner objects to the fact that the trial judge intimated that the prospective jurors needed only to agree to follow the law and the court's instructions.  (T.p. 347-48, 350.)  As Petitioner points out, the Supreme Court has stated that defense counsel must be permitted to ask the venire whether they would impose the death penalty automatically upon convicting the defendant of murder without considering the mitigating evidence:

> As to general questions of fairness and impartiality, such jurors could in all truth and candor respond affirmatively, personally confident that such dogmatic views are fair and impartial, while leaving the specific concern unprobed.  More importantly, however, the belief that death should be imposed ipso facto upon conviction of a capital offense reflects directly on that individual's inability to follow the law.  Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law.  It may be that a

> juror could, in good conscience, swear to uphold the law and yet be unaware that maintaining such dogmatic beliefs about the death penalty would prevent him or her from doing so. A defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception. The risk that such jurors may have been empaneled in this case and infected petitioner's capital sentencing is unacceptable in light of the ease with which that risk could have been minimized. Petitioner was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty.

Morgan, 504 U.S. at 735-36 (internal quotations and citations omitted). This requirement stems from the fact that "[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Id. at 729.

Again, the Court has carefully reviewed the trial transcript. Petitioner's counsel were permitted to ask venire members individually, but in the presence of other prospective jurors, whether they could consider mitigating circumstances and not impose a death sentence automatically upon a finding of guilty. (See e.g. T.p. 331, 343, 364-65, 387, 424-25, 477-78, 495, 511.) As such, Petitioner's concern in this part of the subclaim appears to be more hypothetical than actual.

The Court finds that this subclaim is without merit and it will be **DENIED**.

**3.      Subclaim (B):  The prosecutors committed misconduct in organizing a jury to return a death verdict.**

The Court has nothing to add to the substance of Chief Magistrate Judge Merz's analysis from the R&R which is set forth verbatim immediately below:

> In the next sub-claim Petitioner argues that the death qualification process in this case tilted the jury to return a verdict of death. Specifically, in that the State asked prospective jurors on a scale of one to ten, with one being the lowest, how they felt about the death penalty. (Id.) Petitioner argues that many of his jurors

rated themselves at a six or above, thus creating a biased jury organized to return a death verdict.  Respondent does not argue procedural default on this particular sub-claim.

As the United States Supreme Court held in Witherspoon v. Illinois, the proper inquiry on voir dire is not whether the prospective juror is opposed to the death penalty, but rather whether their religious, moral, or conscientious objections would preclude him or her from following the instructions of the court.  391 U.S. 510, 521-522 (1968).  Thus, it is proper to exclude for cause a prospective juror who indicates that either they could not vote for capital punishment under any circumstances or that they would be hesitant to do so.  Morgan v. Illinois, 504 U.S. 719, 728 (1992).

Here the prosecution asked on a scale of one to ten, how the individual prospective juror would rate their beliefs about the death penalty.  Juror Wellington rated himself a 6-7, Juror Mason rated herself a 6, Juror Miller rated himself a 7, Juror England rated herself a 10, Juror Borgerding rated herself a 6, Juror Games rated herself a 5-6, Juror Phillips rated herself a 6-7, Juror Hopkins rated himself a 7 and Alternate Juror Jackson (later seated on the jury) rated herself a 5-6.  The jurors were asked if they could follow the law and apply it as given to which they answered affirmatively.  When questioned if they could give consideration to the life imprisonment options, the jurors being questioned stated they could do so.  Additionally, after a thorough reading of the voir dire transcript by this Court, it seems Petitioner has over simplified the jurors' positions based solely on their response to the "scale."  For example, Juror England, who rated herself a 10, also stated that she didn't understand the number system being used on this scale and that she would "definitely go by the law."  Juror Hopkins, who rated himself a seven, also stated "I guess my response would be, sir, if I gave you a ten in any case, I would say, yes, that's reasonable, that should be done, and a five, six or seven, it depends on what the incident is, what the mitigating circumstances are, and what the evidence proved."

Petitioner next argues that the Prosecutor told the jury that he was Catholic yet was not opposed to the death penalty. (T.p. 261.)  Petitioner argues that this was improper as it inserted the Prosecutor's personal opinion into voir dire.  "It is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of the defendant," or for them to express their opinion as to the existence of aggravating circumstances or mitigating factors or the appropriateness of the death penalty.  Byrd v. Collins, 209 F.3d 486 (6th Cir. 2000).  This, however, does not appear to be the case before us.  Mr. Piepmeier was questioning a potential juror as to her opinion on the death penalty and if she had any moral opposition to its use.  The prospective juror had already answered in the negative to the question, "Do you belong to any type of organization, or have you been - - does your religion take a stance

teaching that the death penalty is wrong or immoral or anything like that?" when Mr. Piepmeier made a comment about his own beliefs. (T.p. 260-261.)  The statement was not made in view of Moore's actual case, but rather in regard to a question posed during voir dire.  Furthermore, the Court notes that there was no objection from defense counsel to this statement.  This portion of the claim is without merit.

(Doc. 128 at 101-03 (citations to the record omitted).)  This subclaim is **DENIED**.

> **4.     Subclaim (C):  Trial counsel was ineffective at *voir dire* because they failed to fully explore the potential biases of the prospective jurors and because they permitted prospective juror England to sit on the jury.**

Petitioner next argues ineffective assistance of trial counsel for their failure to object to the above set of alleged errors.  Because the Court has concluded that Petitioner's subclaims above are without merit, he cannot establish ineffective assistance of counsel on this basis.  Petitioner also asserts that his trial counsel were ineffective for failing to explore the potential biases of Prospective Juror England or failing to use a preemptory challenge against her.

Prospective Juror England, as discussed above, had stated that she would rate herself a "10" regarding her beliefs on the death penalty.  (T.p. 296.)  However, she stated immediately prior to that rating that she was "for" the death penalty, but that she did not "understand your numbering system."  (Id.)  Petitioner is dismissive of Prospective Juror England's statements that follow upon further questioning that she could follow the law despite her strongly stated beliefs.  The Court, however, believes that Prospective Juror England's subsequent statements are significant:

> MR. PIEPMEIER:  Okay.  If in a particular case – you feel very strongly, obviously, about the death penalty, and if Judge Ruehlman reads you the law and says if you find A, B, and C, you should recommend a life sentence, and you have found A, B, and C, could you follow the law?
>
> PROSPECTIVE JUROR ENGLAND:  I would definitely go by the law, definitely go by the law.

(Id.)  Prospective Juror England implicitly agreed in this exchange that she could recommend a life sentence if that is what the law dictated.  She later reiterated pursuant to questioning by defense counsel that she would base her decisions on the evidence and the instructions of the trial judge, not on the basis of the attorneys' arguments.  (T.p. 315.)  Still later, she stated that she would not hold Moore's decision not to testify against him, (T.p. 334), and that she believed a person's upbringing and family life could influence their actions, (T.p. 360-61).

Prospective Juror England's repeated and unequivocal statements that she would follow the law distinguish this case from the case cited by Petitioner, Miller v. Webb, 385 F.3d 666 (6th Cir. 2004).  In Miller, no follow-up questions were asked of a juror who qualified a statement that she thought she could be fair with a statement that she had feelings of partiality towards a key witness.  Id. at 674, 675.  Here, Prospective Juror England initially expressed a strong belief in the death penalty, but later unequivocally stated that she would follow the law as instructed and that she would consider mitigating factors if appropriate.  The Court finds that Petitioner's trial counsel were not ineffective for failing to explore Prospective Juror England's biases or for not excusing her with a preemptory challenge.  Subclaim (C) is **DENIED**.

5. **Subclaim (D):  The prosecutors used – and Judge Ruehlman condoned – a peremptory challenge against Prospective Juror Freeman, an African-American woman, on the basis of her race**.

**a. Background.**  Petitioner contends that the prosecutor's preemptory challenge of Prospective Juror Freeman was based on the fact that she was an African-American woman and that the prosecutor's proffer in response to a Batson challenge was not credible.  During voir dire, the prosecutor had a short exchange with Prospective Juror Freeman.  He asked if she had a particular interest in the outcome of the case, and she responded "no."  (T.p. 258.)  He asked if

69

she could sign a death verdict if the law warranted, and she responded "yes." (T.p. 259.) He asked about her position on the death penalty generally, and she stated that she "never really thought about it," but could decide to recommend it if appropriate. (Id.) He asked if she could set aside her personal feelings and follow the law if the two were different, and she stated "yes." (T.p. 260.) He asked if she was a member of any organization or religion that opposed the death penalty. (Id.) She responded that she was Catholic, but that she was not aware that the Catholic Church opposed the death penalty and that she did not attend church regularly. (T.p. 261.) Finally, she stated in response to a question that she was not aware of any reason she could not be a fair juror. (Id.) The prosecutor did not ask Prospective Juror Freeman any questions regarding her responses to the juror questionnaire.

The prosecutor later excused Prospective Juror Freeman with a preemptory challenge. (T.p. 405.) Defense counsel raised an immediate challenge pursuant to Batson v. Kentucky, 476 U.S. 79 (1985). (T.p. 407.) The prosecutor began his response by noting that he had opposed a number of white venire members for cause and that Freeman was the first African-American he had challenged. (T.p. 408-09.) The prosecutor then gave three reasons for challenging Freeman. First, his "main" reason was that she stated on her juror questionnaire that she believed alcoholism and drugs could negatively impact a child's development or influence a criminal's development. (T.p. 410, 412.) The prosecutor stated that the defense had made it clear through their questions on voir dire, after he had questioned Freeman, that the use of alcohol and drugs would be a factor in their defense. (T.p. 410.) He was concerned about "her predisposition to [the alcoholism issue] before it was even brought out by the defense." (T.p. 412.) Second, the prosecutor was concerned that Freeman stated on the questionnaire that her uncle was an

attorney and had been a public defender.  (T.p. 410-11.)  Third, the prosecutor believed that she

was not receptive to the voir dire questions she had asked because she "had her arms folded

[across her chest] when I questioned her."  (T.p. 411.)

The trial judge rejected the <u>Batson</u> challenge and seemed to expand upon the prosecutor's

stated reasons for the preemptory challenge:

> A good attorney looks to body language.  I found her to be a nice lady, but I did
> think she was a little defensive with the prosecution, and I sensed a little hostility.
>
> And the thing about her relative, her uncle being a public defender . . .
>
> It's a common thing.  That would be – people have talked to their uncle.  He's a
> defense attorney.  It's something you think about when you're a lawyer:  Do I
> want somebody that might be a little bit predisposed to the defense?  Because
> they talked to their uncle, their uncle is a defense attorney, and they'd be more
> predisposed to the defense case and maybe a little more anti-prosecutor, because I
> know, in Ohio, especially in Columbus, from reading that vindicating magazine
> that they send down here all the time – that's a Columbus magazine.  I mean,
> they're very hostile towards prosecutors and police.
>
> But, you know, she could be a little anti-prosecutor.  I think that's just being a
> good lawyer.  I don't think it was race-based at all, this challenge.  I don't have a
> problem at all with them knocking her off for those reasons.  So I'll note your
> objections.

(T.p. 413-15.)

Petitioner raised this claim on direct appeal and it was denied on the merits.  <u>Moore</u>, 81

Ohio St. 3d at 29.  The Ohio Supreme Court determined that the trial judge had not been "clearly

erroneous" in determining that the prosecutor did not evidence "discriminatory intent" in striking

Prospective Juror Freeman.  <u>Id.</u>  Chief Magistrate Judge Merz, likewise, found that the

prosecutor's belief that a person whose uncle had been a public defender might be predisposed

towards the defense was a race-neutral basis for striking the prospective juror.

71

**b. Clearly Established Law.**  It is clearly established United States Supreme Court law that a State may not exercise a peremptory challenges in violation of the Equal Protection Clause.  Batson, 476 U.S. at 91.  A State may not use its challenges to exclude racial minorities from the jury "for reasons wholly unrelated to the outcome of the particular case on trial" or to deny "the same right and opportunity to participate in the administration of justice enjoyed by the white population."  Id. (quoting Swain v. Alabama, 380 U.S. 202, 224 (1965)).  As with any equal protection claim, the defendant who alleges the discrimination has the burden of establishing "the existence of purposeful discrimination."  Id. at 93.

A trial court must use a three-step process to evaluate a Batson claim.  First, a state criminal defendant can establish a prima facie case of purposeful racial discrimination in the selection of jurors by showing that he is a member of a cognizable racial group, that a challenge has been exercised to remove a venireperson of the same race, and any additional facts and circumstances from which an inference could be drawn that the prosecutor had used the peremptory challenge in a race-based manner.  Batson, 476 U.S. at 96.[10]  The defendant is entitled to rely on the fact that the peremptory challenge process is one in which those who are of a mind to discriminate on the basis of race are able to do so.  Id.  The burden then shifts to the proponent to articulate a race-neutral reason for the challenge.  Purkett v. Elem, 514 U.S. 765, 767 (1995); Hernandez v. New York, 500 U.S. 352, 358-59 (1991).  Finally, the trial court must

---

[10] After Batson, the Supreme Court clarified that "a criminal defendant may assert jurors' equal protection rights by objecting to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race."  U.S. v. Tucker, 90 F.3d 1135, 1142 (6th Cir. 1996) (quoting Powers v. Ohio, 499 U.S. 400, 402 (1991)).

determine if the opponent has carried his burden of proving purposeful discrimination.  Purkett, 514 U.S. at 767; Hernandez, 500 U.S. at 359.

The trial court should consider all relevant circumstances including, if applicable, whether the prosecutor has demonstrated a pattern of striking minority venire members and whether the prosecutor's statements and questions during voir dire support an inference of discrimination.  Batson, 476 U.S. at 96-97.  Other relevant  circumstances can include "1) the racial composition of the initial group seated and the final jury panel sworn; 2) the number of peremptory strikes allowed each side; and 3) the race of those who were struck or excused from the jury panel throughout the *voir dire* (whether for cause or by a peremptory challenge), the order of strikes, and by whom they were exercised; [plus] . . .  the percentage of the 'cognizable racial group' in the jury pool, or the racial composition of the district wherein the jury pool is selected."  U.S. v. Sangineto-Miranda, 859 F.2d 1501, 1520 (6th Cir. 1988).

A trial judge's conclusion that the challenge was race-neutral is accorded a "deferential standard of review."  Hernandez; 500 U.S. at 366: see also Purkett, 514 U.S. at 769 ("[T]he factual findings of state courts are presumed to be correct . . ."); United States v. Tucker, 90 F.3d 1135, 1142 (6th Cir. 1996) (district court decision reviewed for clear error); United States v. Peete, 919 F.2d 1168, 1179 (6th Cir. 1990) (same).  Evidence that would support a challenge for cause is sufficient to demonstrate a race-neutral basis.  Batson, 479 U.S. at 97.  A Batson is a structural error, not subject to harmless error review.  United States v. McFerron, 163 F.3d 952, 956 (6th Cir. 1998) (citing Arizona v. Fulminante, 499 U.S. 279 (1991)).

**c.  Analysis of Subclaim.**  Turning now to the race-neutral bases put forth by the prosecutor and accepted by the trial judge, a potential juror's negative or apathetic demeanor,

attitude, and body language are valid race-neutral justifications for exercising a preemptory

challenge.  See e.g., U.S. v. Forrest, 402 F.3d 678, 687 (6th Cir. 2005); McCurdy v. Montgomery

County, Ohio, 240 F.3d 512, 521 (6th Cir. 2001).  The use of such subjective criteria, however,

emphasizes the need for an "explicit, on-the-record analysis of each of the elements of a Batson

challenge" at the trial court.  McCurdy, 240 F.3d at 521.  The trial judge did make an explicit

finding, though it was conclusory and without any significant explanation, that he sensed

hostility from Potential Juror Freeman.  (T.p. 413.)  There is no factual evidence in the record

from which this Court can conclude that Judge Ruehlman's conclusion regarding Potential Juror

Freeman's demeanor was an unreasonable determination of the facts.  Finally, the prosecution's

decision not to strike a white potential juror who also may have demonstrated hostile body

language is not indicative of racial discrimination in light of the juror's stated strong support of

the death penalty.  (T.p. 461-62.)

Regarding alcohol and drug use, after the prosecutor had questioned Potential Juror

Freeman and passed on her for cause, Petitioner's trial attorney did ask two other potential jurors

about alcohol and drugs.  He asked one potential juror several questions about whether the juror

would consider the influence alcohol or drugs might have on a person's ability to act

purposefully and with intent.  (T.p. 352-54.)  Petitioner's trial attorney then asked another

prospective juror, a teacher, about drug and alcohol use by his students. (T.p. 393-94.)  These

limited questions gave notice to the prosecutor that Petitioner Moore's defense might include his

drug and alcohol use on the night of the offense.  Potential Juror Freeman's answer on her juror

questionnaire that "alcoholism or drugs" were "likely to have a negative influence on a child's

development" might have triggered concern from the prosecutor's perspective.  Although

74

another potential juror also listed alcohol and drugs as being likely to have a negative influence on a child's development, that same juror strongly supported the death penalty, rating her support as a ten on a scale of one to ten.  (Doc. 141-3; T.p. 296.)  Thus, while this second juror's answer on drugs and alcohol might have been a concern to the prosecutors, the juror's support of the death penalty was likely seen as a positive characteristic.  Potential Juror Freeman's answer regarding alcohol and drug use was a valid non-racial justification for the prosecutor's decision.

Finally, regarding the fact that Prospective Juror Freeman's uncle used to be a defense attorney, this ordinarily would be a non-racial justification for exercising a preemptory challenge.  Petitioner Moore contends that the prosecutor's reliance on this basis is not reasonable here because Freeman's uncle also served as a prosecutor, and moreover, the prosecutor did not strike a white juror whose close friend was a public defender.  (Docs. 141-2, 141-4.)  However, the white juror did not identify any concerns about childhood alcohol or drug use in his questionnaire, the justification that the prosecutor stated was most significant to him.  On balance, the state court's decision that the prosecutor had not demonstrated purposeful discrimination in striking Potential Juror Freeman was not unreasonable or clearly erroneous.[11]  Subclaim (D) is **DENIED**.

**Fourteenth Ground for Relief**

---

[11] The most puzzling aspect of the Batson challenge process was Judge Ruehlman's tangent regarding an imagined anti-prosecutor bias in an unidentified Columbus, Ohio magazine and possibly in people from Columbus.  His observations in that regard, simply put, are not rationally supported by the record.  However, Judge's Ruehlman's conclusion regarding Freeman's demeanor appears to have been independent of his Columbus tangent.  Moreover, the prosecutor stated that Freeman's answers about childhood alcohol and drug use were more significant to his decision to strike Freeman than either her demeanor or her familial relationship to a former defense attorney.

**The sentencers based their decisions to sentence Petitioner Moore to death on improper and non-statutory aggravating factors – including the prosecutor's argument urging them to identify with the victim – in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.** (Doc. 29 at 61.)

Petitioner submits several subclaims in this Ground for Relief, but has withdrawn subclaim (B).  (Doc. 115 at 114.)

### 1.     Subclaim (A):  Improper Prosecutorial Argument

This subclaim raises the same concerns that the prosecutor asserted improper aggravating factors during the sentencing phase of the trial that were addressed in the Seventh Ground for Relief, supra.  This subclaim fails for the same reasons the Seventh Ground for Relief failed.  This subclaim is **DENIED**.

### 2.     Subclaim (C):  A reasonable juror would understand instruction to consider "any other factors relevant to the issue of whether Petitioner Moore should be sentenced to death" as a basis to consider non-statutory aggravating circumstances.

Petitioner again contends, this time on a new basis, that the trial judge authorized or instructed the jury to consider an improper aggravating circumstance.  This subclaim regards the statutory catch-all mitigating factor stated in O.R.C. § 2929.04(B)(7).  The statute instructs that a jury should weigh against the aggravating circumstances, the mitigating factors as follows:

the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:

\* \* \* \*

(4) The youth of the offender;

\* \* \*

(7) Any other factors that are relevant to the issue of whether the offender should be *sentenced to death*.

O.R.C. § 2929.04(B) (emphasis added).  Petitioner asserts that the poor wording of the statute made it likely that the jury would consider any evidence offered by Petitioner as (B)(7) mitigation evidence to be  non-statutory aggravating circumstance evidence instead.

Petitioner asserts further that the jury instructions arising from this statute compounded the error.  The trial judge instructed the jury as follows:

In deciding what penalty to recommend for Counts 1 and 2, you must consider each count and specification to each count separately.

The mitigating factors – what are mitigating factors?  Well, the statutory law has established certain mitigating factors.  These mitigating factors include the history, character, and background of the offender.  That's No. 1.  Number 2, the youth of the offender.  Number 3, any other factors that are relevant to the issue of whether the offender should be sentenced to death.

In reaching a verdict in this proceeding, you must consider all the evidence admitted at both trials and the arguments of counsel.  You must then determine whether the State of Ohio has proven beyond a reasonable doubt that the aggravating circumstances in each count of aggravated murder which Lee Moore was found guilty of committing are sufficient to outweigh the mitigating factors present.

(T.p. 1243.)

Chief Magistrate Judge Merz recommended denying this subclaim on the merits.  He concluded that the jury instructions made clear that the "other factors that are relevant to the issue of whether the offender should be sentenced to death" were to be considered as mitigation, not as aggravating factors.  The Sixth Circuit also has rejected an argument substantially similar to the one Petitioner Moore asserts here.  Cooey, 289 F.3d at 926.  The Court explained:

We find this argument meritless.  Mr. Cooey makes no showing that any Ohio court has ever used evidence presented for mitigation under § 2929.04(B)(7) as evidence of an aggravating factor instead.  He certainly cannot show that such a thing happened in his

case, because it did not.  Moreover, even if Section 2929.04(B)(7) really has the potential claimed for it by Mr. Cooey, there is no reason to think that is a constitutional violation.

Id.; see also Hawkins v. Coyle, No. C-1-97-296, 2005 WL 1684022, *61 (S.D. Ohio July 19, 2005) (rejecting similar argument).  Petitioner's argument here fails for the same reasons.  This subclaim is **DENIED**.

**Fifteenth Ground for Relief**

> **The sentencers failed to give any weight to the uncontradicted mitigating evidence presented by Petitioner Moore in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.**  (Doc. 29 at 65.)

In his Fifteenth Ground for Relief, Petitioner argues that the trial court failed to consider relevant mitigation evidence presented by Moore during the sentencing phase of his trial in determining his sentence.  The following analysis of this Ground for Relief is adopted, almost verbatim, from the R&R.  The Warden contends that this claim is procedurally defaulted as a result of Petitioner's failure to present the claim in state court.  Alternatively, the Warden argues that the claim lacks merit.  This claim was presented in its entirety however, as an underlying claim in Moore's Rule 26(B) Application.  (Doc. 79, Vol. I at 8.)

The Court turns to the merits to the extent they support Petitioner's ineffective assistance of appellate counsel claim.  Petitioner argues specifically that the trial court failed to take the following factors into consideration: the effect of his parents' divorce on him; the bullying, teasing and beating of him by his peers throughout his childhood and adolescence; his feelings that he did not fit in with his peers; his substance abuse and dependency beginning at age 15; that he was capable of being productive in a structured environment; and his unrealized potential.  In the sentencing opinion of the trial court, Judge Ruehlman summarized the findings as follows:

On November 21, 1994, the Court reconvened for the sentencing hearing.  The defendant presented four witnesses who testified under oath and then the defendant himself made an unsworn statement.

The mitigating factors that the defendant tried to establish were the history, character and background of the defendant, the youth of the defendant and any other factors that are relevant to the issue of whether the defendant should be sentenced to death.

The testimony as to the history, character and background of the offender consisted of evidence that the defendant's parents were divorced but that he was raised by a very loving mother.  The defendant's witnesses testified that the defendant was basically given anything he wanted during his childhood.  His mother had a good job and so could afford to provide him with nice clothing.  However, according to these witnesses, because the defendant was provided with such nice clothing, his peers became jealous and often would steal these clothes from the defendant.  As a consequence, the defendant became a target for abuse by his peers.

As to evidence of the youth of the defendant, the defendant was born on October 19, 1974 and so therefore, he was nineteen (19) years old at the time of the Aggravated Murder.

The evidence concerning any other factors that are relevant to the issue of whether the defendant should be sentenced to death, consisted of testimony that the defendant was remorseful and that the shooting was an accident.  However, one of the defendant's own witnesses during the mitigation hearing, Dr. David Chiappone, a clinical psychologist from the Community Diagnostic and Treatment Center, testified that the defendant admitted to him that he had killed the victim, Melvin Olinger, because the defendant did not want to be identified.  Furthermore, the defendant told Dr. Chiappone that he lied to the police when he told them that the shooting was accidental.  Moreover, he told Dr. Chiappone that he even tried to make the shooting look like an accident.

At the close [of] the evidence in the mitigation hearing, the Court instructed the jury that the mitigating factors were the history, character and background of the offender; the youth of the offender; and any other factors that are relevant to the issue of whether the offender should be sentenced to death.

(Doc. 31, Ex. A at 89-91.)

The trial judge then articulated factors that were considered and the amount of weight

afforded the mitigating factors:

The evidence is overwhelming that the aggravating circumstance in Count I and the aggravating circumstances in Count II outweigh the mitigating factors in each count.  The defendant was nineteen at the time of these offenses but his history, character and background indicate that he was raised in a loving middle class home where he was not deprived of any material or emotional needs.  Basically, the defendant was given every opportunity to lead a productive law abiding life.

As to any other factors that are relevant to the issue of whether the defendant should be sentenced to death, the Court cannot find any.

(Id. at 93; see also T.p. 1266).

Petitioner relies on Eddings v. Oklahoma, 455 U.S. 104 (1982), in support.  In Eddings, the trial court permitted the defendant to present evidence regarding his abusive childhood and his apparent mental and emotional disturbances.  455 U.S. at 107.  However, the trial judge stated that, when considering the evidence, "[n]or can the Court in following the law, in my opinion, consider the fact of this young man's violent background." 455 U.S. at 109.  The trial judge determined that the only mitigating evidence he could consider was the defendant's youth. Id.  The Supreme Court explained that "the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact; rather he found that *as a matter of law* he was unable even to consider the evidence."  Id. at 113 (emphasis in the original).

The Supreme Court reversed the state court decision.  The Supreme Court held as follows:

Just as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence.  In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf.  The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

Id. at 113 (emphasis in the original).  The Supreme Court concluded that the trial court had erred

80

in refusing to consider the mitigating evidence as a matter of law.  Id.

In contrast to Eddings, Moore's trial court did not limit as a matter of law the consideration and weighing of the mitigation evidence.  As explained in the trial court's written decision, the trial court did in fact consider mitigating factors as prescribed in O.R.C. § 2929.04(B).  The trial court specifically stated in the written opinion that Moore had presented evidence of his history, character, and background, including his parents' divorce, his youth, the bullying he experienced while growing up, and other factors relevant to the issue of whether the offender should be sentenced to death.  However, it was the opinion of the trial court that Petitioner was nonetheless "raised in a loving middle class home where he was not deprived of any material or emotional needs."  (T.p. 1266.)

Additionally, the trial judge considered O.R.C. § 2929.04(B)(7) which provides as a mitigating factor "any other factors that are relevant to the issue of whether the offender should be sentenced to death."  Judge Ruehlman, in fact, considered the mitigating evidence presented and found that the mitigating factors did not outweigh the aggravating circumstances, as opposed to the judge in Eddings, who thought that, *as a matter of law*, he was *not permitted* to even consider such evidence.  As long as the factors presented are considered the sentencer may determine the amount of weight to be given to mitigating factors.  Eddings, 455 U.S. at 115.  Furthermore, errors by the sentencing court in weighing aggravating circumstances and mitigating factors can be cured by re-weighing in the state appellate courts. See Clemons, 494 U.S. at 745-46 (permitting re-weighing generally); Baston v. Bagley, 420 F.3d 632 (6th Cir. 2005) (re-weighing of mitigating factors); Cooey, 289 F.3d at 888-90 (re-weighing generally).

The recent Davis v. Coyle, 475 F.3d 761 (6th Cir. 2007), decision does not dictate a

different result.  The Sixth Circuit stated in <u>Davis</u> that "when a trial court improperly excludes *mitigating* evidence or limits the fact-finder's consideration of such evidence, the case must be remanded for a new sentencing hearing."  475 F.3d at 774-75 (emphasis in the original).  Important factual and procedural aspects limit the precedential value of <u>Davis</u>.  <u>Davis</u> concerned a prisoner who had been sentenced to death, and then re-sentenced to death after the Ohio Supreme Court had vacated his original sentence.  <u>Id.</u> at 763-64.  The trial court at re-sentencing refused to allow the prisoner to introduce new mitigation evidence concerning his good behavior in prison from the date he had first been sentenced.  <u>Id.</u> at 770-71.  Significantly, the prosecutor had not objected to the presentation of the new evidence by the prisoner.  <u>Id.</u> at 772.  The new mitigation evidence would have been relevant to rebut the prosecutor's argument at re-sentencing that the prisoner was a repeat offender who was too dangerous to permit to serve a life sentence.  <u>Id.</u>  The Sixth Circuit noted that "the record in this case establishes without a doubt that [the new mitigation evidence] was highly relevant to the single aggravating factor relied upon by the state – that future dangerousness should keep Davis on death row."  <u>Id.</u> at 773.  The Sixth Circuit then ordered a second re-sentencing by the trial court as a remedy, as opposed to permitting the state appellate courts to cure the error by re-weighing, because "the improperly-excluded evidence was never put into the record . . . and therefore, no factual basis for re-weighing exists."  <u>Id.</u> at 774.

This case is clearly distinguishable.  Procedurally, there has been no re-sentencing in this case.  Also, Petitioner Moore does not object that the trial court denied him the right to present mitigating evidence.  Rather, his concern is that the trial judge refused to accord the evidence presented any consideration.  The Court explained above that it finds on the record that the trial

judge did consider the evidence offered in mitigation, but simply determined it had no mitigating weight.  Moreover, if the trial judge had erred, this error was corrected by the appellate courts' independent re-weighing, consistent with Clemons and Baston, because the relevant mitigating evidence was in the record.

Appellate counsel was not ineffective in their failure to raise this claim as it is without merit.  This Ground for Relief is **DENIED**.

**Sixteenth Ground for Relief**

> **Judge Ruehlman (a) erroneously denied trial counsel's requests for proper mitigation instructions and (b) gave erroneous mitigation instructions, in violation of Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.**  (Doc. 29 at 67.)

In his Sixteenth Ground for Relief, Petitioner Moore alleges that his rights were violated during the sentencing phase when the trial court refused to provide the jury guidance in its instructions.  Petitioner and the R&R identify the various claims by their paragraph number in the Supplemental Petition for Relief and this Court will do the same.  Petitioner has withdrawn the subclaims stated in Supplemental Petition paragraphs 261, 265, 266, 267, 268, 272, and 273.  (Doc. 115 at 123.)  Chief Magistrate Judge Merz found that the other portions were raised in Petitioner's Rule 26(B) Application and are to be considered for the support they might give to the claim of ineffective assistance of appellate counsel.

**1.      Subclaim:  Paragraphs 262 and 263 of Supplemental Petition**

In his paragraphs 262 and 263, Petitioner contends that Judge Ruehlman erred by denying, prior to sentencing phase arguments, Petitioner's motions in limine to restrict the prosecution from discussing both (a) any aggravating circumstances not proven in the liability

phase of the trial and (b) Petitioner Moore's unsworn statement to the jury.  (T.p. 1067-73.)

Regarding the aggravating circumstances motion, it is not clear to this Court that the trial judge

denied the motion.  The following exchange took place outside the presence of the jury:

> MR. JAMES: * * * * Anything that's not included in the indictment that hasn't
> been proven or under which a verdict has not been returned shouldn't be argued.
>
> THE COURT: That goes without saying.  I'm sure they're not going to raise
> something that was not proven.  But, again, if they tried to do that, under <u>Brown</u>,
> I'd urge you to make your objection, because you have to do that to preserve the
> record.  Okay.

(T.p. 1067.)  Appellate counsel were not ineffective for not raising the issue on appeal because

the procedure called for by the trial judge was proper.  This subclaim is **DENIED**.

Regarding the unsworn statement motion in limine, the trial judge denied the motion

insofar as he held that the prosecutor would be permitted to comment on the fact that the

prosecution was not permitted to cross-examine the defendant on his unsworn statement.  (T.p.

1068-73.)  As the Court discussed in regards to subclaim (D) of the Seventh Ground for Relief,

<u>supra</u>, the prosecution is allowed to comment on a capital defendant's unsworn statement in

limited fashion to highlight that it was unsworn and not cross-examined, and therefore, not like

the testimony of other witnesses.  <u>Durr</u>, 487 F.3d at 443.  The trial judge's decision to deny the

motion in limine was not improper facially.

Subsequently, the prosecutor did commit misconduct by wrongfully commenting on the

fact that Petitioner did not explain during his unsworn statement why he traveled to Butler

County.  The trial court denied a motion for a limiting instruction, which should have been

granted.  (T.p. 1254.)  However, the Court has found that the prosecutor's isolated improper

comment did not render the sentencing proceedings fundamentally unfair.  Applying that same

84

analysis, appellate counsel cannot be held constitutionally ineffective for failing to raise issue of the trial court's erroneous ruling on appeal.  This subclaim is **DENIED**.

### 2.      Subclaim:  Paragraph 264 of the Supplemental Petition

In paragraph 264, Petitioner asserts that the trial court erred in denying his motion to instruct the jury that it need not unanimously agree on the existence of a mitigating factor.  This subclaim is cross-referenced to the Sixth Ground for Relief, <u>supra</u>.  The Court found therein that the trial court's jury instructions and verdict form constituted improper "acquittal-first" instructions in that they could have been misinterpreted as requiring the jury to unanimously reject a death sentence before imposing a life sentence.  However, a jury need not unanimously reject death before reaching a unanimous life sentence recommendation.  The jury instruction requested by Petitioner would have helped alleviate the confusion in the jury instructions by explaining that the jury need not unanimously agree on the existence of a mitigating factor. <u>Henley v. Bell</u>, 487 F.3d 379, 390 (6th Cir. 2007) (citing <u>Mills v. Maryland</u>, 486 U.S. 367, 373-75 (1988)).  Thus, the trial court erred in denying Petitioner's jury instruction motion.

Petitioner did not assert the error concerning this mitigating factor instruction on direct appeal, but raised it instead for the first time in his Rule 26(B) Application.  As with the related Sixth Ground for Relief, the Court finds that the omitted issue was significant and that there could have been no strategic value in failing to raise it on appeal.  Petitioner's appellate counsel was on notice about the issue because trial counsel had made the motion at trial.  Appellate counsel's failure to assert the issue on direct appeal undermines this Court's confidence in outcome of Moore's state court appeal.  Accordingly, the Court will conditionally **GRANT** the writ as to paragraph 264 of the Supplemental Petition conditioned upon Moore being permitted

an appeal in the Ohio courts with effective assistance of counsel.

### 3.      Subclaim:  Paragraphs 269-271 of the Supplemental Petition

Turning to the next subclaim, Petitioner asserts in paragraphs 269-271 that the trial judge improperly instructed the jury regarding the specifications of aggravating circumstances for each count of aggravated murder such that the jury could have rendered non-unanimous verdicts as to each count.  During the first part of the trial, the jury held that Moore was guilty of three separate counts of aggravated murder for the act of killing one person, Melvin Olinger.  The jury convicted Moore of aggravated murder with prior calculation and design and with three specifications of aggravating circumstances in Count I, felony murder in connection with an armed robbery with three specifications of aggravating circumstances in Count II, and of felony murder in connection with a kidnapping with three specifications of aggravating circumstances in Count III.  (T.p. 966-67, 1041-48, 1241.)  The jury also convicted Moore of aggravated robbery in Count IV and kidnapping in Count V.  (T.p. 1047-48.)

At the sentencing phase, the trial court merged the three specifications of aggravating circumstances for Count I as follows:

> Lee Moore committed the aggravated murder of Melvin Olinger in Count No. 1
> for the purpose of escaping detection or apprehension or trial or punishment for
> another crime committed by him, to-wit: Kidnapping and/or aggravated robbery.

(T.p. 1059, 1241.)  Petitioner asserts that this instruction was improper because it permitted the jury to be non-unanimous in that some jurors could have found that Moore committed murder to escape detection for kidnapping, while others could have determined that he committed murder to escape detection for aggravated robbery.  Of course, as stated above, the jury separately had concluded that Moore had committed both kidnapping and aggravated robbery.  The Court also

merged the two felony murder counts each with three specifications into one count with two specifications.  (T.p. 1242.)  The first specification for the merged Count II (felony murder) involved aggravated murder/kidnapping with Moore as the principal offender or with Moore committing the offense with prior calculation and design.  The second specification for the merged Count II (felony murder) involved aggravated murder/aggravated robbery with Moore as the principal offender or with Moore committing the offense with prior calculation and design. (Id.)  Petitioner asserts that this instruction was also in error because it permitted a non-unanimous finding where some jurors found Moore guilty of prior calculation and design and other juror found him guilty of being the principal offender.  Petitioner asserts that there was the risk that at sentencing the jurors found the aggravating circumstances to outweigh the mitigating factors without having agreed on any specific aggravating circumstance unanimously.

In Schad v. Arizona, 501 U.S. 624 (1991), Justice Souter held, with the Chief Justice and two justices concurring, and one justice concurring in the result, that "the requisite specificity of the charge may not be compromised by the joining of separate offenses." 501 U.S. at 633.  The Supreme Court, per Justice Souter and the concurrences, also stated, however, that it may be alleged in a single count that a defendant committed a single offense by one or more specified means.  See id. at 631.  State law determines whether statutory alternatives like principal offender and prior calculation are mere means of committing a single offense, or rather, if they are independent elements of a crime.  See id. at 636.

Turning to state law, Petitioner contends that prior calculation and design is a distinct conceptual grouping from principal offender, and that the "alternatives [ ] are not to be charged and proven in the same cause."  Ohio v. Penix, 32 Ohio St. 3d 369, 371, 513 N.E.2d 744 (1987).

87

In Penix, the trial court had erred by instructing the jury before sentencing that it was to weigh both that the defendant was a principal offender and that he acted with prior calculation and design as aggravating circumstances against the mitigating factors.  Id. at 370.  The alternatives – that the defendant was the principal offender, or that the defendant was not the principal offender but did act with prior calculation and design – are not to be charged in the same cause.  Id.

In subsequent cases, the Ohio Supreme Court found no error where "the prior calculation and design and principal offender elements of R.C. 2929.04(A)(7) were charged disjunctively to the jury in a single specification; the jury could not have found both elements to have been proven, as it could have in Penix."  Ohio v. Cook, 65 Ohio St. 3d 516, 527, 605 N.E.2d 70 (1992); see also Nields, 93 Ohio St. 3d at 30 (no error if alternatives in the sentencing phase instruction were listed disjunctively).  Nonetheless, a court errs if it does not instruct the jury that they must be unanimous in agreeing on which of the alternatives the defendant is guilty.  Ohio v. Burke, 73 Ohio St. 3d 399, 405, 653 N.E.2d 242 (1995). That error is harmless if the jury elsewhere indicates its unanimous verdict on either the prior calculation and design aspect or on the principal offender aspect.  Id.; see also Hawkins, 2005 WL 1684022 at *46.

The trial court erred as it related to Count II because it did not require a unanimous finding as to either prior calculation and design aspect or the principal defender aspect. However, as the Supreme Court of Ohio also found, Moore, 81 Ohio St. 3d at 39-40, the error was harmless because the jury had unanimously concluded in reference to Count I that Moore had killed Melvin Olinger with prior calculation and design.  (T.p. 971, 1007, 1041.)  Also, the trial court's error in sentencing Moore on two aggravated murder counts was a procedural error, but harmless, because the trial court imposed only one death penalty.  Cook, 65 Ohio St. 3d at

88

527.  This subclaim is without merit and the is **DENIED**.

**Seventeenth Ground for Relief**

> **Judge Ruehlman ordered the courtroom to be locked in violation of Petitioner Moore's rights, including his right to a public trial, due process, and equal protection.**  (Doc. 29 at 71.)

Chief Magistrate Judge Merz recommended denying this claim in the R&R.  Petitioner Moore did not object to the recommendation.  (Doc. 132 at 66.)  Accordingly, the Seventeenth Ground for Relief is **DENIED**.

**Eighteenth Ground for Relief**

> **The prosecutors committed misconduct at the pre-trial, voir dire, and liability phases of Petitioner Moore's trial in violation of his rights, including his rights to due process, equal protection, a fair trial, an impartial jury and judge, and effective assistance of counsel.**  (Doc. 29 at 72.)

> **1.** **Subclaim (A):  During the pre-trial, the prosecutors had *ex parte* discussions with Judge Ruehlman and met with the defense expert.**

Petitioner objects to *ex parte* conversations that the prosecutor had with the trial judge and with his mitigation expert witness, Dr. Chiappone.  Petitioner did not raise this issue on appeal, but instead, first asserted this subclaim in his Rule 26(B) application.  (Doc. 79, Vol. I at 9.)  Accordingly, the Court must determine if appellate counsel were ineffective for failing to assert the subclaim on direct appeal.

Before the trial started, during a discussion of defense counsel's motion to have the trial judge reassigned, one of the prosecutors, Joseph Deters, revealed that he had an *ex parte* discussion with Judge Ruehlman about his assignment to the case:

> MR DETERS: * * * And its my understanding from discussions with this Court that judges were petitioned by Judge Cartolano, and this Court was available for this trial, and that is why we're here today.

(T.p. 210.)  The Court notes that it is not clear from that limited statement whether defense counsel were aware of or participated in the discussions with the Court.  In any event, Petitioner's defense counsel did not state a contemporaneous objection to the apparent *ex parte* communication.  The Court will assume the discussion was *ex parte* for purposes of the following analysis.

This apparent *ex parte* communication implicated Petitioner Moore's right to be present at all trial  proceedings.  "[T]he orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict." Rogers v. United States., 422 U.S. 35, 38 (1975) (citation omitted). The "right to be present during all critical stages of the proceedings" generally is subject to "harmless error analysis." Rushen v. Spain, 464 U.S. 114, 119 n.2 (1983).  Additionally, "ex parte contact does not, in itself, evidence any kind of bias."  Getsy v. Mitchell, 495 F.3d 295, 311 (6th Cir.  2007) (quoting Alley v. Bell, 307 F.3d 380, 388 (6th Cir. 2002)).

Nonetheless, the Sixth Circuit "has not concealed its strong disapproval" of *ex parte* communication in criminal cases, "reasoning that giving the government private access to the ear of the court is not only 'a gross breach of the appearance of justice,' but also a 'dangerous procedure.'" U.S. v. Carmichael, 232 F.3d 510, 517 (6th Cir. 2000) (quoting United States v. Minsky, 963 F.2d 870, 874 (6th Cir.1992)).  Judge Ruehlman should have disclosed any *ex parte* communication to Petitioner Moore and his attorneys. Rushen, 464 U.S. at 119.  Ordinarily, the State would bear the burden of establishing a compelling justification for the *ex parte* contact. Carmichael, 232 F.3d at 518.  It becomes unfair to put that burden on the State, however, in

90

situations like here where the Petitioner acquiesced in the *ex parte* communication by not raising an objection or seeking to make a factual record regarding the nature of the communication at the time he learned about the communication.  See id.  ("To now allow the ex parte communications to be objected to after-the-fact is a form of 'sandbagging' that we will not permit in the absence of proof that the content of what was in fact communicated adversely affected Carmichael's substantial rights.")

Petitioner Moore frames this issue as one of prosecutorial misconduct, not as a Sixth Amendment right to counsel violation or judicial bias.  Petitioner would only be entitled to relief if "the prosecutor's conduct was so egregious as to render the trial fundamentally unfair." Roundtree, 2003 WL 1795720 at *2; Angel,  682 F.2d at 608.  The Court therefore examines (1) the degree of prejudice to Moore; (2) whether the misconduct was isolated or extensive; (3) whether the misconduct was deliberate or accidental; and (4) the strength of the competent proof to establish guilt.  Angel, 682 F.2d at 608; Pritchett, 117 F.3d at 964.  This subclaim fails under these factors.  Moore has offered no factual basis to conclude that he was prejudiced by the apparent *ex parte* communication nor has he offered any legal basis to presume prejudice.[12] The transcript suggests the communication regarded a limited, procedural matter of how Judge Ruehlman was assigned to the case.  The transcript does not suggest whether the communication

---

[12] The Ninth Circuit cases cited by Petitioner are clearly distinguishable.  In McKenzie v. Risley, 915 F.2d 1396, 1398 (9th Cir. 1990), the prosecutor and judge had an *ex parte* discussion prior to sentencing proceedings during which the merits of the underlying case against the defendant, including the brutality of his crime, were discussed.  The court found that the discussion "might well have had an impact" on the judge's thinking at the sentencing.  Id. Likewise, the court in United States v. Reese, 775 F.2d 1066, 1077-78 (9th Cir. 1985), received *ex parte* documentation pertaining to sentencing matters from the prosecutor.  The cases are not persuasive on the issue of prosecutorial misconduct before the court.

was incidental or purposeful. Finally, as discussed in reference to previous Grounds for Relief, the proof of Moore's guilt was overwhelming. The Court cannot conclude that Moore was denied a fair trial as a result of this apparent *ex parte* communication between the prosecutor and the trial judge. The claim is without merit and appellate counsel were not ineffective for failing to assert the issue on appeal.

The Court turns now to the prosecutor's communications with the defense mitigation expert, Dr. Chiappone. Dr. Chiappone met with Mark Piepmeier, one of the prosecutors, to share his records and discuss his opinions between the guilt and sentencing phases of the trial. (T.p. 1119.) Dr. Chiappone, as it is discussed in reference to the Second Ground for Relief, supra, subsequently testified at the sentencing hearing in a way that contradicted the defense theory of accidental shooting. This part of the subclaim also was asserted for the first time in the Rule 26(B) Application and must be examined to determine if appellate counsel were ineffective for not raising the claim on appeal. (Doc. 79, Vol. I at 9.) Chief Magistrate Judge Merz recommended denying the subclaim on the basis that the Sixth Circuit has stated "instructions to a witness not to cooperate with the other side or to talk to lawyers for the other side would not be proper," but "a witness is free to talk or not unless compelled by order of the court." Workman v. Bell, 178 F.3d 759, 771-72 (6th Cir. 1998) (citing United States v. Matlock, 491 F.2d 504, 506 (6th Cir. 1974)).

Petitioner objects to the recommendation and contends that Workman applies to lay witnesses, but not to expert witnesses. He cites to Lambert v. Blackwell, 962 F. Supp. 1521, 1546 (E.D. Pa. 1997), rev'd on other grounds, 134 F.3d 506 (3rd Cir. 1997), for the proposition that prosecutors cannot contact the expert witnesses of a defendant without consent. The

92

Lambert district court reached its determination because it found the contact was a breach of ethical standards and contrary to the Pennsylvania Rules of Criminal Procedure.  Id.  On a later appeal, however, the Third Circuit Court of Appeals examined the issue from the perspective of whether the government had threatened or intimidated the defendant's expert witness in a way that might have dissuaded the expert from testifying and thus violated the defendant's rights. Lambert v. Blackwell, 387 F.3d 210, 260-64 (3rd Cir. 2004).  The Third Circuit examined the nature of the pre-trial communication and the subsequent expert testimony given and held that the "[state court's] conclusion that there was not substantial interference was, given the evidence before it, well within the bounds of reason."  Id. at 264.  Petitioner also cites Erickson v. Newmar Corp., 87 F.3d 298 at 301-02 (9th Cir. 1996), for the proposition that the only proper way for an attorney to communicate with an opposing party's expert is through proper discovery requests.

Turning to the relevant law from Ohio and this Circuit, Petitioner does not identify any Ohio Rule of Criminal Procedure or Ohio ethical rule violated by the prosecutor's conduct. Federal and state cases from Ohio agree that witnesses generally are neither the property of the prosecution nor the defense.  Matlock, 491 F.2d at 506; Penix, 1986 WL 9094 at *24.  A defendant has the right to present his own witnesses free from actions by the government designed to discourage those witnesses from testifying.  U.S. v. Emuegbunam, 268 F.3d 377, 400 (6th Cir. 2001). "[G]overnmental conduct must amount to a substantial interference with a witness's free and unhampered determination to testify before we will find a violation of due process or the Sixth Amendment."  Id.  Petitioner has not established that the prosecutor attempted to intimidate Dr. Chiappone from testifying or to improperly influence the substance

93

of Dr. Chiappone's testimony.  Petitioner has not established that his rights were violated thereby.  The underlying claim is without merit and appellate counsel were not ineffective for not raising the issue on appeal.  Subclaim (A) is **DENIED**.

   **2.      Subclaim (B):  During voir dire, the prosecutors organized a jury to return a death verdict.**

This claim of prosecutorial misconduct involves the same issues raised in the Thirteenth Ground for Relief, supra: asking the jurors to rate their feelings on the death penalty, obtaining commitments from potential jurors that they could sign a death verdict, and challenging a juror allegedly on the basis of her race.  The Court reiterates its analysis from the Thirteenth Ground, supra, in denying these subclaims here as well.  The Court also notes that the potential jurors gave their commitment not so much that they could sign a death verdict, but rather that they could follow the law as the trial court instructed and consider all the sentencing options presented.  (T.p. 294, 314-15, 346-47, 376-77, 400, 425, 429, 439, 452, 482-83, 491, 495.)

   **3.      Subclaim (C):  During the liability phase, the prosecutors presented testimony from the victim's father in order to elicit sympathy from the jury, denigrated Petitioner Moore's counsel, encouraged the jury to perform its own experiment, and commented on the trial [defense] counsel's failure to present witnesses.**

Chief Magistrate Judge Merz treated subclaims (C) and (D) together and recommended denying both subclaims without a substantive analysis of the merits of subclaim (C).  This Court will address the two subclaims separately.  Regarding the testimony of Melvin Olinger's father, the Court agrees that the testimony was not strictly necessary to prove any of the elements of crimes charged.  Olinger's father testified regarding the timeline of events the night Olinger was killed, that he had reported Olinger missing to the police, and that he identified the body for the police when it had been found.  Additionally, the Sixth Circuit allows limited victim impact

statements at both the liability and sentencing phases of trial.  <u>Hicks</u>, 384 F.3d at 222; <u>Cooey</u>,

289 F.3d at 921.  Moreover, Petitioner has not established that the father's testimony was

inflammatory or prejudicial to the fairness of the trial as a whole.

Next, Petitioner contends that the prosecutor improperly encouraged the jury to consider

matters not in evidence by urging them during his closing argument at the liability phase of trial

to conduct the following "experiment" during their deliberations:

> Mr. Olinger, who is in this position – and go back to the jury room –
> nothing prevents you from doing this.  Go back and see how did he get in that
> position, what you have to do.  You're like this (indicating).  He's like this on his
> knees.

> We know from expert testimony this shot was fired from between six
> inches and thirty inches.  After you're down like this, have somebody take that
> State's exhibit 16 [the gun] and see what your reaction is.  Do you think you
> might maybe turn away from that gun and tilt your head back a little bit?  That's
> exactly what happened in this case.

(T.p. 957.)  Following the closing arguments, the Court instructed the jury in relevant part as

follows:

> The evidence on which you will make your decisions is what you heard
> from the mouths of the witnesses sitting up here on the witness stand, plus the
> exhibits that were admitted by the court, plus any agreed or stipulated facts.

> * * *

> In determining what parts of a witness' testimony you wish to believe . . .
> you use all those tests which you use in your ordinary life in order to determine
> what testimony is worthy of belief and what testimony is not worthy of belief.

(T.p. 959-60, 961-62.)  Petitioner's subclaim is predicated on an assumption that the prosecutors

urged the jurors to consider extraneous evidence.  The Court disagrees.  The prosecutor did not

urge the jurors to conduct their own scientific experiments.  Rather, he urged them to draw

inferences from the evidence submitted at trial regarding the position of the victim when he was

shot.  This part of the subclaim is without merit.  In sum, the Court **DENIES** subclaim (C).

> **4.** **Subclaim (D):  During the mitigation phase, the prosecutors urged the sentencers to identify with the victim and made other improper arguments.**

In subclaim (D), Petitioner reiterates arguments he made in the Seventh Claim for Relief,

supra, regarding his speculation as to what Melvin Olinger was feeling the night he was killed

and regarding improper non-statutory aggravating circumstances.  The Court found the

prosecutor's victim-impact type statements were improper, but that they did not so taint the

process to render the whole trial or the sentencing phase unconstitutional, particularly in light of

the weak case for mitigation presented by Petitioner.  The Court also found that any misconduct

by the prosecutor in urging consideration of non-statutory aggravating circumstances was cured

by the Ohio Supreme Court's independent re-weighing.

This subclaim is **DENIED**.

Additionally, the Court notes that cumulative effect of any instances of actual

prosecutorial misconduct were not sufficiently prejudicial to justify the issuance of a habeas writ.

Lundy v. Campbell, 888 F.2d 467, 472 (6th Cir. 1989).

**Nineteenth Ground for Relief**

> **Petitioner Moore's statements to the police were admitted in violation of his rights, including his Miranda rights and rights to counsel, due process, and equal protection.**  (Doc. 29 at 76.)

Petitioner asserted this claim on direct appeal and the Ohio Supreme Court addressed the

claim on the merits.  The Ohio Supreme Court stated in relevant part as follows:

> The issues of whether a statement was made voluntarily and whether an accused voluntarily, knowingly, and intelligently waived his right to counsel and right against self-incrimination are distinct.  However, both standards are determined by the totality of the circumstances.  Ohio v. Clark (1988), 38 Ohio St. 3d 252, 261, 527 N.E.2d 844, 854.

The evidence supports the trial court's findings that Moore was properly advised of his <u>Miranda</u> rights and that he understood those rights when he signed the waiver. An accused's signed waiver form is strong proof that the waiver was valid. <u>Id.</u> at 261, 527 N.E.2d at 854; <u>North Carolina v. Butler</u> (1979), 441 U.S. 369, 374-375, 99 S. Ct. 1755, 1758-1759, 60 L. Ed.2d 286, 293.

Several aspects of the events leading to Moore's confession are troubling. The police officers did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in subfreezing temperatures in his stocking feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room. Nevertheless, based on the totality of the circumstances, these troubling aspects do not lead us to conclude that Moore's "will was overborne" or that "his capacity for self-determination was critically impaired because of coercive police conduct." <u>Ohio v. Otte</u> (1996), 74 Ohio St. 3d 555, 562, 660 N.E.2d 711, 719; <u>Colorado v. Connelly</u> (1986), 479 U.S. 157, 167, 107 S. Ct. 515, 522, 93 L. Ed.2d 473, 484. <u>See</u> <u>also</u>, <u>Ohio v. Edwards</u> (1976), 49 Ohio St. 2d 31, 3 O.O.3d 18, 358 N.E.2d 1051, paragraph two of the syllabus. Accordingly, we conclude that Moore made a knowing, voluntary, and intelligent waiver of his constitutional rights. The sixth and seventh propositions of law are rejected.

The credible evidence submitted at the suppression hearing indicates that Moore was properly advised of his constitutional right to counsel and that he validly waived that right. In deference to the trial court's ruling, we find that there is no credible evidence that Moore ever requested an attorney either before or during his custodial interrogation. <u>See</u> <u>Minnick v. Mississippi</u> (1990), 498 U.S. 146, 147, 111 S. Ct. 486, 488, 112 L. Ed. 2d 489, 494; <u>Edwards v. Arizona</u> (1981), 451 U.S. 477, 484-485, 101 S. Ct. 1880, 1885, 68 L. Ed. 2d 378, 386; and <u>Ohio v. Knuckles</u> (1992), 65 Ohio St. 3d 494, 605 N.E. 2d 54, paragraph one of the syllabus. We reject the eighth proposition of law.

<u>Moore</u>, 81 Ohio St. 3d at 31-32. The Court must uphold this merits determination unless it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. §§ 2254(d)(1)- (2); <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 402-03.

Chief Magistrate Judge Merz recommended upholding the Ohio Supreme Court's analysis as not an unreasonable application of federal law. The relevant facts were provided by Petitioner and reviewed by Chief Magistrate Judge Merz. Moore stated that the last meal he ate

prior to his arrest on January 20, 1994 was at 9 a.m. and that he had smoked a marijuana cigar around 2 p.m.  (T.p. 128.)  He was arrested around 5:30 p.m. while in a  McDonald's drive-thru line and was taken to the Mount Healthy Police station around 6:00 p.m.  (T.p. at 129-30.)  Moore was not offered anything to eat or drink while being held at the Mount Healthy Police Station, but had water from the drinking fountain prior to his transport to Cincinnati. (T.p. 33, 49, 135-136.)[13]  Moore was cuffed in his holding cell at the Mount Healthy Police station for about fifteen minutes.  (T.p. 131.)  The police at the Mount Healthy Police Station confiscated Petitioner's hat, t-shirt, sweatshirt, jewelry, and shoes as possible evidence around 8:00 p.m. (T.p. 21, 28 132.)  A police officer read Moore his Miranda rights and had him sign a waiver around 12:00 a.m. on January 21, 1994.  (T.p. 64-65, 133-52.)  Moore testified that he told the officer at that time that he wanted an attorney.  (T.p. 133.)  The officer did not respond to his request but simply continued reading the Miranda rights.  (T.p. 134.)  Incidentally, Moore testified that he had been advised by the police of his Miranda rights on three separate, prior occasions.  (T.p. 152.)  The police officers did not attempt to communicate with Moore any further at the Mount Healthy Police Station.  (T.p. 134.)

During the transport to Cincinnati, Petitioner had to walk about thirty feet from the station to the squad car, through slush, while wearing jeans, a jacket provided by the police department, and socks.  (T.p. at 48-49, 135.)  There was snow on the ground and the temperature was at or below freezing.  (T.p. 49.)  Once in Cincinnati, Petitioner again had to walk through

_____

[13]  Petitioner asserts that immediately after his arrest he was placed in a Mount Healthy holding cell while still in handcuffs. (Brief, Doc. No. 115 at 136.)  The evidence simply does not support this proposition.  During the motion to suppress hearing officers testified that the handcuffs were in fact removed. (T.p. 19, 28, 40, 64.)  Petitioner himself testified to this fact. (T.p. at 131.)

the slush/snow for approximately thirty-five feet to get from the car to the building. (T.p. at 52, 137.)  Petitioner further testified that once inside, no one offered him a towel to dry off, or gave him an opportunity to take off his wet socks. (T.p. at 138.)

Officers testified that once Petitioner arrived at the Cincinnati station he was offered snack food and pop or coffee, but that he requested only water which was then provided to him. (T.p. 112, 115-117, 140.)  Petitioner testified, however, that he was not offered food nor did he see snacks in the police department, and that he was not offered water until 4:45 a.m.  (T.p. 141, 136, 147.)

Petitioner was placed in an interview room in Cincinnati and was then left for hours with his hands cuffed behind his back.  (T.p. 138)  The police removed Moore's handcuffs at 4:45 a.m. at which time the police began to interview him.  (T.p. 49, 64-65, 73-74, 104, 138, 179.) The police officers did not ask Petitioner to sign another <u>Miranda</u> waiver form nor explicitly to waive his rights at the 4:45 a.m. interview.  (T.p. 75, 113.)  The officers did show Moore the waiver he had signed five hours earlier and asked Moore to verify that he understood his rights, which Moore did verify.  (T.p. 75, 113, 141-42.)  Moore testified that he asked for an attorney before the 4:45 interview began.  (T.p. 142.)  The police officer denied that Moore requested an attorney.  (T.p. 114.)  Moore testified further that the police officers did not permit him to talk to an attorney in any event, but rather one of the police officers told Moore a story during which it was implied that Moore should tell the police if the shooting had been an accident or else the police would assume that Moore had shot Olinger on purpose.  (T.p. 144.)  The police officers took a taped statement from Moore at 6:35 a.m.  (T.p. 115.)

Regarding the factual dispute as to whether Moore asked for an attorney at any time, the

99

Supreme Court of Ohio found in deference to the trial court holding that "there is no credible evidence that Moore requested an attorney either before or during his custodial interrogation." Moore, 81 Ohio St. 3d at 32.  The state court's resolution of this conflicting testimony has not been shown to be incorrect by clear and convincing evidence.  28 U.S.C. §2254(e)(1).

Petitioner argues that at the time of his interrogation he had been awake for approximately twenty hours and was tired. (T.p. 143.)  A cot was provided in the holding cell and multiple officers observed him lying down. (T.p. 34, 99.)  Petitioner asserts that his sleep was impeded by the fact that his hands were handcuffed behind his back for hours and that he was wearing little clothing and wet socks. (T.p. 138.)

Chief Magistrate Judge Merz was troubled by several circumstances of Moore's arrest, confinement, and subsequent confession, including the facts that he was handcuffed behind his back for several hours, not provided food and drink, and forced to walk through the snow in stocking feet.  However, he concluded that in the totality of the circumstances, Moore's waiver of his Miranda rights and confession were made knowingly, voluntarily, and without coercion.

A waiver of Miranda rights must be made voluntarily, knowingly, and intelligently. Miranda v. Arizona, 384 U.S. 436, 444 (1966).  The inquiry has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (internal quotation and citation omitted).

Petitioner compares his case to that in Hart v. Attorney General, 323 F.3d 884 (11th Cir.

2003), wherein the defendant's waiver was not voluntary or knowing.  The police in <u>Hart</u> had

read the defendant his <u>Miranda</u> rights, but then the police gave the defendant two pieces of

advice which contradicted <u>Miranda:</u> (1) the officer told the defendant that having an attorney

assert the privilege against self-incrimination was a disadvantage of seeking attorney

representation and (2) the officer told the defendant that "honesty wouldn't hurt [him.]."  <u>Id.</u> at

894.  Regarding the second inaccuracy, the <u>Hart</u> court explained:

> The phrase "honesty will not hurt you" is simply not compatible with the phrase
> "anything you say can be used against you in court."  The former suggested to
> Hart that an incriminating statement would not have detrimental consequences
> while the latter suggested (correctly) that an incriminating statement would be
> presented at his trial as evidence of his guilt.

<u>Id.</u>

Petitioner Moore contends that the officer's statement to him that he should tell

the police if the shooting was an accident so it did not "look like I . . . killed the man"

was similarly misleading.  (T.p. 144.)  Moore had agreed with his attorney's

characterization that the police officer told Moore that "it would be better to say that it

was accidental and . . . it would go easier on you."  (T.p. 144.)  The Court cannot agree

that the two sets of circumstances are substantially similar.  What the officers told the

defendant in <u>Hart</u> directly contradicted his <u>Miranda</u> rights.  The officers questioning

Moore did not contradict Moore's rights.  Moore's description of what the officer told

him is vague.  The officer's statement that the police would assume that Moore intended

to kill Olinger if he did not tell the police that he shot Oligner by accident is not

misleading as to any of Moore's <u>Miranda</u> rights.  Moore's  attorney characterized the

officer's statement as implying to Moore that confessing to an accidental shooting would

make it "easier" on Moore.  Even if this characterization is accurate, an officer telling

Moore that confessing will make it "easier"on him is not analogous to telling Moore that

such a confession would not be used against him.

Looking at the totality of the circumstances, the Court is troubled by the unnecessarily

harsh manner in which the police treated Moore.  However, the police properly advised Moore

of his Miranda rights and obtained a signed waiver at midnight, and then re-affirmed with Moore

that he had understood those rights before interrogating him five hours later.  The Court finds

that the Ohio Supreme Court's determination that Moore's waiver was voluntary and knowing is

not an unreasonable application of Supreme Court precedent.  This claim fails on the merits and

is **DENIED**.

**Twentieth Ground for Relief**

> **The reasonable doubt instruction given at the liability and mitigation phases is unconstitutional and violated Petitioner Moore's rights, including his rights to due process, equal protection, and fair proceedings.**  (Doc. 29 at 80.)

Petitioner contends in this Ground for Relief that the reasonable doubt instruction

given by the trial court was unconstitutional.  The trial court instructed on reasonable

doubt as follow:

> Now, reasonable doubt – let me define this for you, and I'm going to read this right out of the State Legislature.  Reasonable doubt is present when the jurors, after they've carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.  It is doubt based on reason and common sense.

> Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.

> Proof beyond reasonable doubt is proof of such character that an ordinary person would be willing to rely and at upon it in the most important of his own

affairs.

(T.p. 962-63; see also T.p. 1237.)

Petitioner now concedes that "the Sixth Circuit has accepted" the definition of

reasonable doubt given by the trial court in his case.  (Doc. 132 at 85); see also Scott v.

Mitchell, 209 F.3d 854, 883 (6th Cir. 2000); Byrd, 209 F.3d at 527.  He nonetheless asks

this Court to find that the Sixth Circuit precedent is in error and constitutes an

unreasonable application of Supreme Court precedent.  This Court must follow binding

Sixth Circuit precedent.  The claim fails on the merits and is **DENIED**.

**Twenty-First Ground for Relief**

> **The trial court's instructions at the liability phase violated Petitioner
> Moore's rights, including his rights to due process, equal protection, and a
> fair proceeding.**  (Doc. 29 at 81.)

> **1.      Subclaim (A):  The "principal offender" and "prior calculation and
>          design" elements of capital aggravated murder/felony murder are
>          alternatives that are not to be charged and proven in the same case.**

Petitioner's first subclaim in this Ground for Relief is substantially similar to

subclaim (C) of the Sixteenth Ground for Relief.  This Court has agreed with the Ohio

Supreme Court and the recommendation of the Chief Magistrate Judge that the trial court

erred in not instructing the jury that it had to be unanimous in agreeing on which

alternative–principal offender or prior calculation and design–Moore was guilty.

However, the Court also had concluded that the error was harmless because the jury

agreed unanimously in reference to Count I that Moore had killed Melvin Olinger with

prior calculation and design.  (T.p. 971, 1007, 1041.)  This subclaim fails and is

**DENIED**.

**2.       Subclaims (B) and (C):  The definitions of "cause" and "purpose" diluted the "specific intent to kill" element that is required in a capital aggravated murder case.**

In these subclaims, Petitioner objects that the trial court improperly defined

"cause" and "purpose" in a manner that negated the definition of "specific intent."

Petitioner has not objected to Chief Magistrate Judge Merz's recommended finding that

these subclaims were procedurally defaulted.  Petitioner has objected to Chief Magistrate

Judge Merz's alternative finding that the claims fail on the merits.

The trial court instructed the jury in the following manner about the meaning of

"purpose" and "cause":

> Before you can find the defendant guilty, you must find beyond a reasonable
> doubt that on or about the fourteenth day of January 1994 -- and the State doesn't
> have to prove the exact date or minute or hour; they just have to prove that it
> happened on or about a certain date.  They have to prove it happened on or about
> January 14th, 1994.  They also must prove that this happened in Hamilton
> County, Ohio, and that the defendant purposely caused the death of Melvin
> Olinger with prior calculation and design.
>
> Now let's go over the different elements.
>
> Purposely – purpose to cause death is an essential element of the crime of
> aggravated murder.  A person acts purposely when it is his or her specific
> intention to cause a certain result.
>
> Now, it must be established in this case that at the time in question there was
> present in the mind of the defendant a specific intention to cause the death of
> Melvin Olinger.
>
> Now, purpose is a decision of the mind to do an act with a conscious objective of
> producing a specific result or engaging in specific conduct.  To do an act
> purposely is to do it intentionally, and not accidentally.
>
> Purpose and intent mean the same thing.  The purpose with which a person does
> an act, of course, is known only to himself, unless he expresses it to others or
> indicates it by his conduct.

104

The purpose with which a person does an act or brings about a result is determined from the manner in which it is done, the means or weapon used, and all the other facts and circumstances in evidence.

Now, no person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another. If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, the purpose to cause the death may be inferred from the use of the weapon.

Proof of motive is not required. The presence or absence of motive is one of the circumstances bearing upon purpose. And where an act is a crime, a good motive or purpose is not a defense.

Cause – what does that mean? That's another element they have to prove. And cause is an essential element of this offense. The State charges that the act by the defendant caused the death of Melvin Olinger. Cause is an act which, in the natural and continuous sequence, directly produces the death and without which it would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act.

A death is the result of an act when it is produced directly by the act, in a natural and continuous sequence, and would not have occurred without the act. Result occurs when the death is naturally and foreseeably caused by the act.

(T.p. 966-69.)

Petitioner asserts that "the trial court improperly allowed the jury to presume the necessary degree of intent when it informed the jury that, 'If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life, *the purpose to cause the death may be inferred from the use of the weapon*.'"  (Doc. 132 at 88 (quoting T.p. 968) (emphasis in the original).)  The same argument based on almost identical instructions was rejected by a different judge in this District Court in Franklin v. Anderson, 267 F. Supp. 2d 768, 791-92 (S.D. Ohio 2003), aff'd, 434 F.3d 412 (6th Cir. 2006).  The court rejected the petitioner's interpretation of the instructions stating "the only fair interpretation of [the] jury instruction is that purpose may be inferred from the

use of the weapon, rather than being determined from same." Id. at 792.

The Franklin court further found that Sandstrom v. Montana, 442 U.S. 510, 99 (1979), a case relied upon by Petitioner Moore, was distinguishable. The Supreme Court found that the jury instruction in Sandstrom – "the law presumes that a person intends the ordinary consequences of his voluntary acts" – violated due process because it created a conclusive presumption on *mens rea*. Franklin, 267 F. Supp. 2d at 792. The instruction in Franklin, on the other hand, did not inform the jury "that it must apply a presumption or that the petitioner had a burden of proof." Id. Likewise, the Sixth Circuit rejected a similar challenge in a separate case to an instruction that "purpose to kill may be inferred from the use of the weapon." Campbell v. Coyle, 260 F.3d 531, 557 (6th Cir. 2001) ("[T]he instructions as a whole correctly described the elements of purposefulness, specific intent, and causation."). These subclaims fail on the merits. Appellate counsel were not ineffective for failing to assert the issues on appeal. The subclaims are

**DENIED**.

**Twenty-Second Ground for Relief**

> **The use of duplicative specifications to the aggravated murder counts and the use of the same operative facts to elevate murder to aggravated murder and to capital aggravated murder as well as the submission to the jury of all of these counts violated Petitioner Moore's rights, including his rights to due process, equal protection, a fair proceeding, a reliable sentence, and to be free from cruel and unusual punishment.** (Doc. 29 at 85.)

Petitioner argues in this Ground for Relief that his rights were violated because he was charged with duplicative specifications and that the same operative facts served to elevate a murder charge to an aggravated murder charge, then to a capital aggravated murder charge. Respondent does not argue procedural default. Chief Magistrate Judge

106

Merz recommended denying the claim on the merits.

The Court discussed in subclaim (C) of the Sixteenth Ground for Relief, <u>supra</u>, the trial court's decision to merge counts and specifications at the sentencing phase of which Moore had been found guilty at the liability phase.  At the sentencing phase, the trial court merged the three specifications of aggravating circumstances for Count I as follows:

> Lee Moore committed the aggravated murder of Melvin Olinger in Count No. 1 for the purpose of escaping detection or apprehension or trial or punishment for another crime committed by him, to-wit: Kidnapping and/or aggravated robbery.

(T.p. 1241; <u>see also</u> T.p. 1059.)  The Court also merged the two felony murder counts each with three specifications into one count with two specifications.  (T.p. 1241-42.) The first specification for the merged Count II (felony murder) involved aggravated murder/kidnapping with Moore as the principal offender or with Moore committing the offense with prior calculation and design.  The second specification for the merged Count II (felony murder) involved aggravated murder/aggravated robbery with Moore as the principal offender or with Moore committing the offense with prior calculation and design.  (<u>Id.</u>)

Chief Magistrate Judge Merz recommended denying this claim citing Sixth Circuit precedent.  The fact that a "same act was the basis of [both a] conviction and [an] aggravating circumstance" does not "alone . . . justify habeas relief."  <u>Scott</u>, 209 F.3d at 884.  Petitioner contends that <u>Scott</u> is inapplicable or does not resolve the issue raised in his Ground for Relief that the double counting of aggravators has a tendency to skew the weighing process in favor of the imposition of the death penalty, and is thus

107

unconstitutional.  This Court finds that <u>Scott</u> is applicable and does resolve at least some issues raised in the Ground for Relief.

Additionally, the Ohio Supreme Court completed an independent re-weighing of the aggravated circumstances against the mitigating factors.  The Ohio Supreme Court identified the aggravating circumstances to be "that Moore murdered Melvin Olinger while committing aggravated robbery and kidnapping" and "that Moore killed Olinger to escape detection or apprehension for kidnapping and robbery."  <u>Moore</u>, 81 Ohio St. 3d at 42.  This independent re-weighing cured any potential error by the trial court jury in counting a single aggravated factor twice.  This Ground for Relief is **DENIED**.

**Twenty-Third Ground for Relief**

> **The Ohio courts that heard Petitioner Moore's direct appeal and post-conviction proceedings lacked jurisdiction over those proceedings, violating Moore's rights including his rights to due process and equal protection**  (Doc. 29 at 87.)

Petitioner has withdrawn this Ground for Relief.  (Doc. 115 at 151.)

**Twenty-Fourth Ground for Relief**

> **Execution by electrocution or lethal injection is unconstitutional.  Forcing Petitioner Moore to choose the method of his execution is unconstitutional.  Execution by either of these means, as well as forcing Petitioner Moore to choose the means, would violate Petitioner Moore's rights, including his rights to due process, equal protection, and to be free from cruel and unusual punishment.**   (Doc. 29 at 88.)

Petitioner has withdrawn this Ground for Relief as a habeas claim.  (Doc. 115 at 152.

**Twenty-Fifth Ground for Relief**

> **Ohio's death penalty scheme is unconstitutional and violated Petitioner Moore's rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth**

**Amendments to the United States Constitution.**   (Doc. 29 at 90.)

Petitioner asserts that Ohio's death penalty scheme is unconstitutional for a

variety of reasons.  Chief Magistrate Judge Merz determined that the following subclaims

were procedurally barred:  there is a lack of individualized sentencing; the right to a jury

trial is burdened; the mandatory submission of reports and evaluations violates rights; the

definition of mitigating factors in O.R.C. § 2929.04(B)(7) violates the reliability

component of the Eighth Amendment; O.R.C. § 2929.04(A)(7) is constitutionally invalid

when used to aggravate O.R.C. § 2903.01(B) aggravated murder; O.R.C. §§

2929.03(D)(1) and 2929.04 are unconstitutionally vague; electrocution is cruel and

unusual punishment; and Ohio's death penalty scheme violates international law.

Petitioner does not object to this portion of the R&R and the Court adopts the Chief

Magistrate Judge's finding.[14]  Alternatively, Chief Magistrate Judge Merz found that

each subclaim in this Ground for Relief was without merit.  The Court reiterates the

findings of the R&R almost verbatim in the text that follows.

In his first subclaim, Moore makes the argument that the death penalty is

unconstitutional because it constitutes cruel and unusual punishment. That claim has been

rejected by the Sixth Circuit Court of Appeals in a previous case.  Buell v. Mitchell, 274

F.3d 337, 367 (6th Cir. 2001).

Petitioner Moore next argues that Ohio's capital sentencing scheme results in

unreliable sentencing procedures.  Specifically, he argues that Ohio does not satisfy the

---

[14]  In his Objections, Petitioner merely incorporates the arguments he made in the
Supplemental  Petition.  (Doc. 132 at 96.)  Petitioner only argued the merits in his Supplemental
Petition and did not address issues of procedural default.  (Doc. 29 at 90-111.)

Due Process and Equal Protection Clauses in that it does not require the State to prove the absence of any mitigating factors or that death is the only appropriate penalty. Additionally, he argues that Ohio's death penalty statute fails to provide sufficient guidance on how to determine the existence of mitigating factors and fails to establish a standard by which to balance the mitigating factors against the aggravating circumstances. The United States Supreme Court has never held that "the state must affirmatively structure in a particular way the manner in which juries must consider mitigating evidence." Buchanan v. Angelone, 522 U.S. 269, 276 (1998). The Court notes, too, that the Ohio statutes clearly place the burden of proving the existence of any mitigating factors on the defendant in a capital case, O.R.C. § 2929.03(D)(1), and a requirement that the defendant do so by a preponderance of the evidence does not offend the federal constitution. See Walton v. Arizona, 497 U.S. 639, 649-51 (1990) overruled in part on other grounds Ring v. Arizona, 536 U.S. 584 (2002).

Next, Moore asserts that Ohio's capital sentencing scheme is unconstitutional because of a lack of individualized sentencing. He makes the argument that it is unconstitutional because it requires proof of aggravating circumstances in the trial phase of the bifurcated proceeding. That argument has been rejected by a different judge in this Disrict Court in Zuern v. Tate, 101 F. Supp. 2d 948, 1003-04 (S.D. Ohio 2000), rev'd in part on other grounds 336 F.3d 478 (6th Cir. 2003), on the authority of Tuilaepa v. California, 512 U.S. 967, 971-72 (1994).

Petitioner argues that his right to a jury is burdened in that Ohio's death penalty statutory scheme unconstitutionally encourages capital defendants to plead guilty. He

110

argues that the scheme imposes an impermissible risk of death on capital defendants who choose to exercise their rights to a trial as opposed to those who plead.  The same claim was rejected in Zuern, 101 F. Supp. 2d at 1004-05, on the authority of Corbitt v. New Jersey, 439 U.S. 212 (1978); accord Scott v. Anderson, 58 F. Supp. 2d 767, 796 (N.D. Ohio 1998), rev'd in part on other grounds, Scott v. Mitchell, 209 F.3d 854 (6th Cir. 2000).

Next, Petitioner Moore argues that Ohio's statute is unconstitutional due to the requirement that if a capital defendant requests investigation reports and mental evaluations, they must be submitted to the jury or judge once requested pursuant to O.R.C. § 2929.03(D)(1).  This claim has been previously rejected.  Williams, 380 F.3d at 963-64; Cooey, 289 F.3d at 925-26; Dennis v. Mitchell, 68 F. Supp. 2d 863, 904 (N.D. Ohio 1999).

In his next subclaim, Petitioner Moore argues that the definition of mitigating factors in O.R.C. § 2929.04(B)(7) violates the reliability component of the Eighth Amendment.  His argument concerns the fact that the State does not have the burden of proving an absence of mitigating factors in the sentencing phase, nor is the State required to make a showing that death is the only appropriate sentence.  Again, the United States Supreme Court does not require a State to "affirmatively structure in a particular way the manner in which juries must consider mitigating evidence."  Buchanan, 522 U.S. at 276. The Court notes as well Ohio's requirement that a defendant has the burden of proving the existence of any mitigating factors by a preponderance of the evidence, O.R.C. 2929.03(D)(1), does not offend the federal constitution.  See Walton, 497 U.S. at 649-51.

111

Petitioner Moore argues in his next claim that O.R.C. § 2929.04(A)(7) is constitutionally invalid when used to aggravate O.R.C. § 2903.01(B) aggravated murder. Specifically, he states that this fails under constitutional standards because it fails to genuinely narrow a class of individuals eligible for the death penalty and because it allows an element of aggravated murder to be considered as an aggravating circumstance in the sentencing phase of trial.  To be constitutional, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."  Lowenfield v. Phelps, 484 U.S. 231 (1988) (quoting Zant v. Stephens, 462 U.S. 862, 877 (1983)).  Under the Ohio capital sentencing scheme, the jury is required to find at least one aggravating circumstance before imposing a death sentence, creating a narrowing of the class of persons that may be eligible for the sentence.  Furthermore, an aggravating circumstance may duplicate an element of the capital offense if the class of death-eligible defendants is sufficiently narrowed by the definition of the offense itself.  Williams, 529 U.S. at 392-93 n.16.

Moore challenges the constitutionality of O.R.C. §§ 2929.03(D)(1) and 2929.04 as being vague.  In his first portion of this claim he asserts that the reference to "the nature and circumstances of the aggravating circumstance" incorporates the nature and circumstances of the offense as factors to be weighed in favor of death.  Id. at 102.  They are, however, statutory mitigating factors.  O.R.C. § 2929.04(B).  This argument has been previously rejected.  Cooey, 289 F.3d at 927-28.  Moore additionally argues that the sentencers are not provided proper guidance in weighing the aggravating circumstances

112

and mitigating factors, thus giving them unfettered discretion.  This portion of the claim has already been discussed and found to be without merit in an above sub-claim.

Next, Petitioner Moore asserts that Ohio law provides inadequate appellate review of the proportionality of death sentences.  This contention fails, however, as no proportionality review is constitutionally "required in every case in which the death penalty is imposed and the defendant requests it."  Pulley v. Harris, 465 U.S. 37, 50-51 (1984); Buell, 274 F.3d at 368-69.  Petitioner also argues that the electric chair is cruel and unusual.  This subclaim is moot as the state of Ohio no longer uses the electric chair as a means of execution.  House Bill 362, signed by Governor Bob Taft on November 15, 2001, eliminated the choice of execution by the electric chair.  See O.R.C. § 2949.22

In his final subclaim, Moore argues that sentencing an individual to death in violation of treaties to which the United States of America is a signatory violates the Supremacy Clause of the United States Constitution.  Moore advances this subclaim by stating that pursuant to the Supremacy Clause of Article VI of the United States Constitution, the judges of every State are bound by the terms of international treaties to which the United States is a party.  He further asserts that Ohio's statutory death penalty scheme violates international law.  This claim has been rejected by the Sixth Circuit in Buell, 274 F.3d at 370-72, and Coleman v. Mitchell, 268 F.3d 417, 443 (6th Cir. 2001).

In sum, the Twenty-Fifth Ground for Relief is **DENIED**.

## IV.    CONCLUSION

For the foregoing reasons, the Supplemental Petition (doc. 29) is **GRANTED IN PART AND DENIED IN PART**.  The Supplemental Petition is **CONDITIONALLY**

113

**GRANTED** as to subclaim (B) of the Second Ground for Relief with instructions to the State of Ohio to reduce Petitioner Moore's sentence to life imprisonment or to retry the penalty phase of the case within 180 days.  The Supplemental Petition also is **CONDITIONALLY GRANTED** as to the Sixth Ground for Relief, and the subclaim addressing Paragraph 264 of the Supplemental Petition in the Sixteenth Ground for Relief, conditioned upon Moore being permitted an appeal in the Ohio courts with effective assistance of counsel.  The Supplemental Petition is **DENIED** as to all other subclaims and Grounds for Relief.  Accordingly, Petitioner's Objections (doc. 136) are **GRANTED IN PART AND DENIED IN PART** and the Warden's Objections (doc. 137) are **DENIED.**

IT IS SO ORDERED.

\_\_\_\_s/Susan J. Dlott_____
Susan J. Dlott
United States District Judge