# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| LEE EDWARD MOORE, | ) | CASE NO: C-1-00-023 |
| | ) | |
| Petitioner, | ) | JUDGE SUSAN J. DLOTT |
| | ) | |
| vs. | ) | CHIEF MAGISTRATE MERZ |
| | ) | |
| BETTY MITCHELL, Warden | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

## PETITIONER'S MOTION FOR ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Now comes Petitioner Lee Edward Moore, by and through Counsel, and respectfully requests a certificate of appealability pursuant to 28 U.S.C. § 2253(c) and Fed. R. App. P. 22(b)(1) for his First Ground, Second Ground (Subsections A and C), Third Ground (Subsection B), Seventh Ground (Subsections A, C, and D), Thirteenth Ground (Subsection D), Fifteenth, Sixteenth Ground (Paragraphs 269-271), Eighteenth Ground (Subsections A, C and D), Nineteenth Ground, and his Twenty-first Ground (Subsection A), of his Petition for Writ of Habeas Corpus. The reasons in support are more fully explained in the attached memorandum in support.

Respectfully Submitted,

/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
Phone (636) 207 – 7330
Fax (636) 207 – 7351

-and-

MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan &
  Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
(859) 578-3365

COUNSEL FOR PETITIONER

# TABLE OF CONTENTS

**S.D. LOC. R. 7.2(a)(3) SUMMARY**...............................................................................iii

A.     **Procedural History**.................................................................................1

B.     **COA Standards**......................................................................................1

C.     **Introductory Statement**...........................................................................4

D.     **Grounds for Relief Regarding Which Petitioner Seeks COA** ......................6

**First Ground For Relief – Former Attorney Chuck Stidham Suffered From An Undisclosed, Actual Conflict By Simultaneously Representing Petitioner And His Co-Defendant, Jason Holmes, While Preparing And Investigating Petitioner's Mitigation Defense In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments.** ....................................................................6

**Second Ground For Relief – Moore's Attorneys Rendered The Ineffective Assistance Of Counsel At The Mitigation Phase.** ....................................10

    **(A) Employing A Mitigation Specialist Who Never Discussed Substantive Mitigation Issues With Petitioner Moore And Failed To Adequately Assist In The Preparation Of The Mitigation Phase** ...........10

    **(C)Counsel Presented A Hopelessly Ineffective Mitigation Argument Which Actually Damaged Petitioner Moore's Mitigation Case And Failed To Emphasize Petitioner Moore's Youth, Remorse, And Psycho Social Background**...................................................12

**Third Ground For Relief – Subsection B – Moore's Attorneys Rendered Ineffective Assistance Of Counsel In Failing To Request An Intoxication Instruction.** ......................................................................................16

**Seventh Ground For Relief (Subsections A, C And D) – Prosecutorial Misconduct At The Mitigation Phase Closing Argument Was In Violation Of The Sixth, Eighth And Fourteenth Amendments.** ......................................18

**Thirteenth Ground For Relief (Subsection D) – D.        The Prosecutors Used – And The Trial Judge Condoned – A Peremptory Challenge Against Prospective Juror Freeman, An African-American Woman, On The Basis Of Her Race.** ....................................................................................20

**Fifteenth Ground For Relief – The Sentencer Failed To Give Any Weight To The Uncontradicted Mitigating Evidence Presented By Moore In Violation Of The Sixth, Eighth And Fourteenth Amendments.** ...................................25

**Sixteenth Ground For Relief (Paragraphs 269-271) – Improper Instructions Deprived Moore Of His Constitutional Rights As Guaranteed By The Sixth, Eighth And Fourteenth Amendments.** ……………………………………28

**Eighteenth Ground For Relief – Improper Instructions Deprived Moore Of His Constitutional Rights As Guaranteed By The Sixth, Eighth And Fourteenth Amendments.** ……………………………………30

      **A.**     **During the Pretrial, the Prosecutors Had An Ex Parte Meeting with the Defense Expert.** …………………………………30

      **C.**     **During the Liability Phase, the Prosecutors Presented Testimony from the Victim's Father in Order to Elicit Sympathy from the Jury, Denigrated Petitioner's Counsel, Encouraged the Jury to Perform its Own Experiment, and Commented on Trial Counsel's Failure to Present Expert Witnesses.** …………………...31

      **D.**     **During The Mitigation Phase, The Prosecutors Urged The Sentencers To Identify With The Victim And Made Other Improper Arguments.** ……………………………………31

**Nineteenth Habeas Ground – Petitioner's Statement Was Taken From Petitioner In Violation Of His Rights Under Fifth And Fourteenth Amendment.** ………………………………………………………..33

**Twenty-First Ground For Relief – The Trial Court's Instructions At The Culpability Phase Violated Moore's Rights, Including His Rights To Due Process, Equal Protection, And A Fair Proceeding.** ……………………………36

      **A. The "Principal Offender" And "Prior Calculation And Design" Elements Of Capital Aggravated Murder/Felony Murder Are Alternatives That Are Not To Be Charged And Proven In The Same Case.** ……………………………………………………36

**E.**     **Habeas Question Upon Which Petitioner Seeks COA** ……………………………37

**F.**     **Conclusion**……………………………………………………………37

## S.D. LOC. R. 7.2(a)(3) SUMMARY

Petitioner seeks a certificate of appealability on portions of ten (10) habeas grounds he presented to this Court. Petitioner asserts that the claims satisfy the United States Supreme Court standard enunciated in *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000), in that each of the below grounds are debatable among reasonable jurists or the issues presented are adequate enough to deserve encouragement to proceed further.

As to the First Ground, Attorney Chuck Stidham had an actual conflict of interest from his joint representation of Petitioner during Petitioner's trial and Petitioner's co-defendant, Jason Holmes, during Holmes' appeal. Petitioner alleges that there is an adequate basis for the an appeal to proceed on this issue pursuant to Supreme Court authority *Mickens v. Taylor*, 535 U.S. 162, 175 (2002), *Wood v. Georgia*, 450 U.S. 261, 271 (1981), *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980), and *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978). Further, the Sixth Circuit has noted the error in Petitioner's case, concurrent representation, in cases where there was no concurrent representation. *See Fautenberry v. Mitchell*, 515 F.3d 614, 627-628 (6th Cir. 2008); *Gillard v. Mitchell*, 445 F.3d 883, 891 (6th Cir. 2006).

In his Second Ground for Relief, Petitioners alleges ineffective assistance of counsel at mitigation. As to Subsection A, Petitioner alleges that the trial counsel's reliance on Stidham for the mitigation investigation violates *Wiggins v. Smith*, 539 U.S. 510 (2003), and numerous Sixth Circuit cases. Stidham was neither conscientious nor timely in delivering the information to trial counsel and the court appointed expert. Given the factual record, and defense counsel's inability to use Stidham due to Stidham's short-comings, which were tolerated by trial counsel, there is an adequate basis for this issue to proceed on appeal.

As to Subsection B, Petitioner alleges that his counsel presented a woefully and

constitutionally ineffective closing argument that actually damaged Plaintiff's mitigation. The arguments of his counsel present an issue upon which an appeal should proceed on the basis of *Rickman v. Bell,* 131 F.3d 1150, 1156-1157 (6th Cir. 1997), and *Spisak v. Mitchell*, 465 F.3d 684 (6th Cir. 2006), *vacated and remanded Hudson v. Spisak*, 128 S. Ct. 373 (2007); *reinstated Spisak v. Hudson*, 512 F.3d 852 (6th Cir.) *amended by Spisak v. Hudson*, 2008 U.S. App. LEXIS 7760 (6th Cir. 2008).

As to his Third Ground (Subsection B), Petitioner alleges trial counsel's error in failing to request a voluntary intoxication instruction during the guilt phase when there was adequate evidence regarding the drugs and alcohol Petitioner had consumed (two "blunts" of marijuana, beer and gin on the day of the shooting).  Defense counsel presented a strategy of Petitioner's lack of "purpose" on he basis of his intoxication during opening statement, yet requested no instruction on that issue.  Petitioner asserts that the such failure of his counsel present an issue upon which an appeal should proceed on the basis of *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000) and *Hicks v. Collins*, 384 F.3d 204 (6th Cir. 2004).

As to his Seventh Ground (Subsections A, C, and D), Petitioner alleges that prosecutorial misconduct during the mitigation closing argument prejudiced Petitioner.  Each of these incidents of prosecutorial misconduct during closing presented by Petitioner was found to be improper argument by the Ohio Supreme Court.  *See State v. Moore*, 81 Ohio St. 3d 22, 33-34 (Ohio 1998).  Further, each of the bases complained of also is improper under applicable Sixth Circuit authority.  *Girts v. Yanai*, 501 F.3d 743 (6th Cir. 2007); *DePew v. Anderson,* 311 F.3d 742, 750 (6th Cir. 2002); *Combs v. Coyle*, 205 F.3d 269, 292-293 (6th Cir. 2000); *Boyle v. Million*, 201 F.3d 711, 715 (6th Cir. 2000); and *Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005).  Given the numerous improper arguments, Petitioner contends this

habeas ground has merit to proceed on the basis of the above authority.

As to Thirteenth Ground (Subsection D), Petitioner alleges that the prosecutor violated *Batson v. Kentucky*, 476 U.S. 79 (1986). The state struck an African-American juror for reasons that were not explored with that juror, and did not move to preempt white jurors that provided substantially identical responses. The racial disparity in treatment of prospective jurors is also evidenced by the record showing that the state prosecutors queried potential white jurors regarding "problems" the government had with them, while not affording a similar opportunity to the stricken black juror. *Snyder v. Louisiana*, -- U.S. --, 128 S.Ct. 1203 (2008); *Miller-El v. Dretke*, 545 U.S. 231, 247 n. 6 (2005). Because the state refused to strike or challenge white jurors suffering the same alleged shortcomings, Petitioner contends this habeas ground has merit to proceed on appeal especially in light of *Snyder*.

In his Fifteenth Ground, Petitioner alleges that the trial court failed to consider relevant mitigation presented by Petitioner and thereby denied Petitioner the individualized sentencing guaranteed by the Eight and Fourteenth Amendments. *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007). The trial Court expressly stated that other than age and family upbringing, none of the other evidence presented by Petitioner would be considered as mitigating. Due to the trial court's express statement, Petitioner contends this habeas ground has merit to proceed on appeal in light of *Eddings*, *Lockett*, and *Davis*.

As to the Sixteenth Ground (Paragraphs 269-271), Petitioner alleges that the trial court improperly instructed Petitioner's jury on alternative basis for the death penalty without requiring unanimous verdict as to such alternatives and thus subjected Petitioner to the possibility of a non-unanimous finding. Consequently, the death sentence in this case did not

comport with the dictates of *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson v. United States*, 526 U.S. 813 (1999). The Ohio Supreme Court, *Moore*, 81 Ohio St. 3d at 39-40, and the District Court, *Moore*, 531 F.Supp.2d at 907, found the instructions to constitute error, but a harmless error. The finding of constitutional harmlessness is reasonably debatable.

As to the Eighteenth Ground (Subsections A, C and D), Petitioner alleges that various acts or arguments by the prosecutor amounted to misconduct. Under subsection A, Petitioner demonstrates that there was an extended *ex parte* and undisclosed contact between the expert retained by defendant and the prosecuting attorney shortly before the mitigation hearing. The Court relied on *Workman v. Bell*, 178 F.3d 759, 771-772 (6th Cir. 1998) in rejecting the claim. Because *Workman* did not involve contact with a defendant's retained expert, it is distinguishable. Thus, Petitioner has demonstrated a reasonable basis to proceed on appeal.

As to subsection C of the Eighteenth Ground, the prosecutor violated *Payne v. Tennessee,* 501 U.S. 808, 825 (1991), by presenting at the **culpability stage** victim impact evidence. As to subsection D, the prosecutor improperly asked the jury to experiment, in violation of *Turner v. State of Louisiana,* 379 U.S. 466, 472-473 (1965); *Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982), and bolstered its case by pointing to the absence of defense expert testimony. Given the numerous improper arguments, Petitioner demonstrates that Subsections C and D of this habeas ground has merit to proceed on appeal.

As to the Nineteenth Ground, Petitioner alleges that his statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The Ohio Supreme Court found "troubling" that Petitioner was not provided food or drink while he was in the holding cell, that Petitioner was forced to walk in the snow and slush in subfreezing temperatures in his

stocking feet, and Petitioner's hands cuffed behind his back for over three hours while he sat in the interview room. *State v. Moore*, 81 Ohio St.3d 22, 32 (Ohio 1998). In addition, Petitioner had not eaten for more than 15 hours at the time he signed his *Miranda* waiver, and for nearly 20 hours at the point he was asked to give his statement. Petitioner had also gone 20 hours without sleep. Petitioner was not given his *Miranda* waiver form until "when he was standing almost naked without shoes and after being held for six hours without having anything to eat. . . ." (Tr. p. 104, Officer Tiernan Testimony). He was not asked if he wanted a lawyer. (*Id.*) He was not questioned until more than 4 hours later at 4:45 a.m. (Tr. pp. 73-75), and nearly five hours elapsed between Petitioner's signing of the waiver form and his "confession" to Officer Feldhaus and Officer Tiernan. They did not ask him to sign a *Miranda* waiver at the time of the second interview. Because of these compelling facts and because every court to consider this issue has found those facts troubling, Petitioner demonstrates that this habeas ground has merit to proceed on appeal.

As to the Twenty-first Ground (Subsection A), Petitioner alleges that the jury was improperly charged and returned a verdict without being required to make a unanimous finding as to either prior calculation and design, or the principal offender elements in violation of *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson*, 526 U.S. 813. The Ohio Supreme Court agreed and held that this instruction in Petitioner's case was improper in not requiring unanimity on one or the other specification, but found it harmless. *Moore*, 81 Ohio St. 3d at 40. However, it is contrary to and/or an unreasonable application of Supreme Court authority to substitute an appellate court's finding as to an death eligibility and narrowing function, which must be made under the statute by the jury. *Richardson*, 526 U.S. 813. Petitioner contends this issue has merit to proceed further on appeal.

## MEMORANDUM IN SUPPORT

**A.    Procedural History -**

On January 18, 2008, the District Court entered its opinion and judgment conditionally granting Petitioner's writ for habeas corpus.  ECF Doc. 145 and 146.  This Court granted relief on a portion of Petitioner's Second Habeas Ground, Sixth Habeas Ground, and a portion of Petitioner's Sixteenth Habeas Ground.  This Court also denied relief as to Petitioner's other Habeas Grounds.  *Id.*

On February 11, 2008, Respondent filed a Notice of Appeal. ECF Doc. 147.  On February 25, 2008, Petitioner filed a notice of cross-appeal regarding those portions of the opinion that denied relief, and earlier rulings of the Court regarding the denial of discovery and an evidentiary hearing.  ECF Doc. 149.

On February 29, 2008, Petitioner moved, with the agreement of Respondent, for a date certain in which to file a request for certificate of appealability ("COA").  ECF Doc. 150.  This Court granted this motion (*see* ECF Doc. 151), and Petitioner now timely files his COA request.

**B.    COA Standards -**

District courts have the power to issue COAs under AEDPA in §2254 cases. *Lyons v. Ohio Adult Parole Authority*, 105 F.3d 1063 (6th Cir. 1997); *Hunter v. United States*, 101 F.3d 1565 (11th Cir. 1996)(en banc). Likewise, district courts are to be the initial decision makers on COAs under §2255. *Kincade v. Sparkman*, 117 F.3d 949 (6th Cir. 1997)(adopting analysis in *Lozada v. United States*, 107 F.3d 1011, 1017 (2nd Cir. 1997).

The COA provisions are governed by 28 U.S.C. § 2253(c)[1] and Fed. R. App. P.

---

[1] 28 U.S.C. § 2253(c) provides:
(1)  Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court

1

22(b)(1).[2]  They require a losing applicant, or petitioner, to request with specificity a COA on any merits claim.  *Id.*  The Supreme Court noted that the COA requirements also mandate a COA on any procedural impediment, as well as the merits, of a claim. *Slack v. McDaniel*, 529 U.S. 473, 483-484 (2000).

The government, in this case Respondent Warden, does not have to obtain a COA to pursue an appeal.  The rules do not specifically address whether a COA is required when a winning applicant/petitioner files a cross-appeal, and Fed. R. App. P. 22(b)(3) can be read as relieving a winning applicant from having to obtain a COA.  *See Id.* ("A certificate of appealability is not required when a state or its representative or the United States or its representative appeals.")  Indeed, Fed. R. App. P. 22(b)(3)'s express language indicates a COA "is not required when" the government appeals, which the government has in this case. No language limits this exclusion to just a government's appeal rather than a winning applicant's cross-appeal.  The Sixth Circuit has yet to determine this issue under AEDPA. As a result, and to preserve his rights, Petitioner is filing the current COA request.

The Supreme Court announced that in order to obtain a COA, a "habeas prisoner must make a substantial showing of the denial of a constitutional right, a demonstration that,

---

of appeals from --
       (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of a process issued by a State court; or
       (B) the final order in a proceeding under section 2255.
(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).
[2] Fed. R. App. P. 22(b)(1) provides:
(b) Certificate of Appealability.
(1) In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court, or in a 28 U.S.C. § 2255 proceeding, the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). If an applicant files a notice of appeal, the district judge who rendered the judgment must either issue a certificate of appealability or state why a certificate should not issue. The district clerk must send the certificate or statement to the court of appeals with the notice of appeal and the file of the district court proceedings. If the district judge has denied the certificate, the applicant may request a circuit judge to issue the certificate.

under *Barefoot[ v. Estelle*, 463 U.S. 880 (1983)], includes a showing that reasonable jurists could debate whether (or, for that matter agree that) the petition should have been resolved in a different manner or that issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack*, 529 U.S. at 484. Therefore, the Supreme Court has enunciated that the same standard for the issuance of a certificate of probable cause still applies under AEDPA and Petitioner need only "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484.

The COA standard is quite minimal in that Petitioner does not have to demonstrate that he will win his cross-appeal. As noted by the Supreme Court: "We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

Further where ambiguity exists as to the whether to issue a COA, any ambiguity must be resolved in Appellant's favor. The Fifth Circuit noted that "[a]ny doubt whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination." *Miller v. Johnson*, 200 F.3d 274, 280 (5th Cir. 2000) *citing Fuller v. Johnson*, 114 F.3d 491, 495 (5th Cir. 1997); *see also Petrocelli v. Angelone*, 248 F.3d 877, 884 (9th Cir. 2001) ("'[i]n a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA,]'" and that "'[w]e will resolve any doubt about whether the petitioner has met the requisite standard[for issuance of a COA] in his favor.'" (quoting *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000) (additional citation omitted));

Because Petitioner case involves the death penalty, his request for a COA on the issues presented herein should be granted. The Supreme Court has long recognized that capital cases demand heightened standards of reliability because of the unique severity and finality of the death penalty. *Beck v. Alabama*, 447 U.S. 625, 637-638 (1980); *see also Andres v. United States*, 333 U.S. 740, 753 (1948) ("[i]n death cases, doubts … should be resolved in favor of the accused.").

In light of the Supreme Court's persistent admonitions stressing the need for caution in death penalty cases, and the significant issues of constitutional concern arising from the trial and sentences of death, this Court should grant his COA request.

## C.    Introductory Statement

Both the Chief Magistrate and the District Court found that Petitioner received the ineffective assistance of counsel during his penalty hearing and on his direct appeal. *See* ECF Doc. 128, (Report and Recommendation), pp. 90, 138; ECF Doc. 135 (Supplemental Report and Recommendation), p. 20; *Moore v. Mitchell*, 531 F. Supp. 2d 845, 921-922 (S.D. Ohio 2008). Petitioner's ineffective counsel failed to interview their expert witness before putting him on the stand where his testimony would contradict the defense mitigation theory. *Id.* at 867-870. Petitioner's counsel actions in this regard robbed Petitioner of the constitutionally required Sixth Amendment right to counsel and irretrievably skewed the death penalty sentencing calculus. Thus, the Petitioner was prejudiced by this deficient representation. *Id.* at 870.

The District Court expanded the grounds upon which relief was granted, finding that the mitigation instructions constituted an improper acquittal first of the death penalty instruction. *Id.* at 881-885 *citing to Hartman v. Bagley*, 492 F.3d 347, 363-64 (6th Cir.

2007); *Davis v. Mitchell*, 318 F.3d 682, 689 (6th Cir. 2003). As a result of this erroneous instruction and appellate counsel's ineffectiveness in failing to challenge this aspect as error, the District Court conditioned the writ on the State of Ohio "permit[ing] an appeal in the Ohio courts with effective assistance of counsel." *Moore*, at 885.

A majority of the errors addressed below relates to a jury assessing culpability and/or the appropriate sentence; and sets forth a separate and independent basis entitling Petitioner to relief. Because Respondent appealed the District Court's grant of habeas relief (*see Moore v. Mitchell*, Case Nos. 08-3167/08-3230 (6th Cir.)), Petitioner asks this Court to review and consider the alternative bases upon which relief could have been granted. These additional bases, however, should not be considered in a vacuum from the constitutional errors already recognized by the Chief Magistrate and the District Court.

Petitioner was denied the benefit of counsel as guaranteed by the Sixth Amendment. Each of the below requests for a COA must be considered in conjunction with the ineffective assistance of counsel Petitioner received. Trial counsel's short-comings aggravate other attorney failures, and prosecutorial misconduct, as well as other errors which prevented a fair jury consideration of guilt and penalty, and thus, such claims are debatable amongst jurists of reason.

D.     **Grounds for Relief Regarding Which Petitioner Seeks COA**

**First Ground For Relief – Former Attorney Chuck Stidham Suffered From An Undisclosed, Actual Conflict By Simultaneously Representing Petitioner And His Co-Defendant, Jason Holmes, While Preparing And Investigating Petitioner's Mitigation Defense In Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments.[3]**

The Sixth Amendment right to counsel includes the right to representation that is free from conflicts of interest. *Wood v. Georgia*, 450 U.S. 261, 271 (1981). The United States Supreme Court has repeatedly cautioned against the high probability of prejudice from multiple concurrent representation. *See e.g., Mickens v. Taylor*, 535 U.S. 162, 175 (2002). "In a case of joint representation of conflicting interests the evil, it bears repeating, is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." *Holloway v. Arkansas*, 435 U.S. 475, 490 (1978).

In Petitioner's case, Attorney Chuck Stidham[4] had an actual conflict of interest from his joint representation of Petitioner during his trial phase and Petitioner's co-defendant, Jason Holmes, during Mr. Holmes appeal. The Hamilton County Court of Appeals appointed Stidham to represent Jason Holmes on May 10, 1994. *See* Doc. 29 at Exhibit 6 to Habeas Petition. By accepting Holmes representation on appeal, it became his ethical obligation to advance Holmes interest. Holmes' interests would necessarily include reducing his degree of

---

[3] The Court considered the claim through the lens of appellate ineffectiveness. *See Moore*, 531 F. Supp. 2d. at 863-865. This Court considered the claim *de novo* due to shortcomings in the Ohio Supreme Court's opinion. *Id.* at 864 (noting "Ohio Supreme Court's conclusion is so summary that it is not possible to determine whether it is in any way an application of clearly established federal law.") Petitioner presents the underlying merits claim as it relates to the appellate ineffectiveness because as recently noted by the Sixth Circuit such claims are "analytically linked." *Mahdi v. Bagley*, ___ F.3d ___, 2008 U.S. App. LEXIS 7766 at *11 (6th Cir. 2008). This applies equally to the COA arguments related to the Fifteenth Habeas Ground, and the Eighteenth Ground subsections A.

[4] Mr. Stidham no longer possesses an active law license. *Cincinnati Bar Association v. Stidham*, 721 N.E.2d 977 (Ohio 2000) (two–year suspension); *see* (Cook, J., Dissenting) (penalty to light, should be indefinite suspension). **During** his representation of Petitioner, Mr. Stidham was suffering from serious emotional impairments which played a part in his eventual suspension from the practice of law. (Stidham Depo., pp. 32-43).

culpability consistent with the developed record. Of course, that could happen only at the expense of Petitioner. Subsequently on June 20, 1994, Petitioner hired Stidham to investigate and prepare the mitigation phase of Petitioner's trial. *See* Moore Supp. Apx. Vol. I at p. 344. Stidham accepted the representation knowing of the inherent conflict.

Stidham argued for co-defendant Holmes that Petitioner was a purposeful and remorseless killer from whom co-defendant Holmes disassociated himself. Specifically, in co-defendant Holmes' appellate brief, Stidham wrote "[t]he plan was to take the driver, put him into the trunk of the car, find someplace and then shoot him in the head." *See* Doc. 29 at Exhibit 7 to Habeas Petition at p. 3 (*State v. Holmes*, No. C9400385, Brief of Defendant-Appellant). In defending co-defendant Holmes, Stidham further argued against Petitioner's defense, stating that "the proof offered clearly establishes that the plan to commit the Aggravated Murder was abandoned by [Holmes]." *Id.* at 9. The Ohio Court of Appeals recognized that the sole issue raised by Stidham was the lack of evidence to support the aggravated murder because Holmes "abandoned" the conspiracy to kill and shifted the blame clearly to Petitioner. *State v. Holmes*, 1995 Ohio App. LEXIS 1594 (Ohio Ct. App., Hamilton County Apr. 19, 1995)("We hold that the evidence does not support appellant's argument that he abandoned the conspiracy to commit aggravated murder.")

Mr. Stidham and the other defense counsel retained only one expert to testify at mitigation, Dr. Chiappone. This Court has granted relief on the basis of the devastating effect Dr. Chiappone's testimony had on Petitioner's defense at mitigation. *Moore*, 531 F. Supp. 2d. at 867-870. The record shows that Stidham contributed to Dr. Chiappone's testimony. Chiappone noted in response to a state question that Stidham gathered information that assisted and contributed to Chiappone's assessment of Petitioner. Tr. 1110. Dr. Chiappone

possessed a copy of Jason Holmes' statement in his Court Clinic file.  (Court Clinic file,

Bates pp. CC 0162-CC 0193). Further, Stidham testified in his deposition that Chiappone

was selected, "became involved," because another expert was deemed "not very helpful."

Stidham Depo p. 68 lines 3-5. Stidham later admitted that he never spoke with the other

expert, Dr. Schwartz.  Stidham Depo p. 78 lines 4-5.  Stidham added that he had worked with

Chiappone in the past and that he had "a very good rapport" with him. *Id.* at 86 lines  3-6, 6-

8.  Stidham admitted that no other experts were recommended based on the record. *Id.* at 110

lines 21-23.  Stidham affirmed however that he requested Chiappone be brought in to address

Petitioner's mental status or any mental disorder that may have played a role.  *Id.* at 111 lines

11-13.

The facts indisputably demonstrate an actual conflict based upon concurrent

representation.  The Sixth Circuit has considered allegations regarding an actual conflict

where the habeas petitioners could not establish the existence of concurrent representation.

*See Fautenberry v. Mitchell*, 515 F.3d 614, 627-628 (6th Cir. 2008) (finding no evidence of

concurrent representation when attorney represented city where killing occurred); *Gillard v.

Mitchell*, 445 F.3d 883, 891 (6th Cir. 2006) (denying claim because there was successive not

concurrent representation).  In concurrent representation cases, the prejudice is presumed

once Petitioner demonstrates that the conflict "adversely affects counsel's performance."

*Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002).  Pursuant to *Cuyler v. Sullivan*, 446 U.S.

335, 348 (1980), if Stidham's divided loyalties affected his representation, then prejudice is

presumed and Petitioner need not demonstrate actual prejudice.

There is no dispute that Petitioner presents a case of concurrent representation.  The

sole remaining issue is whether there was an adverse affect on the performance of Stidham

and the other counsel.  The evidence in the record of the adverse effect on Stidham's performance as well as the performance of the other counsel is substantial.  Stidham was directly involved in selecting Chiappone.  Stidham made no effort to confer with any other expert.  Chiappone obtained a copy of the statement of Stidham's other client, Jason Holmes, a statement that clearly shifted blame to Petitioner and was entirely inconsistent with Petitioner's theory of mitigation.  Stidham was lax in meeting his obligations to gather and produce mitigating evidence as demonstrated by his late delivery of mitigation materials to Chiappone and Petitioner's trial counsel.  Stidham's failure to attend or otherwise participate in the mitigation hearing.  Indeed on this point, trial counsel were so disappointed in Stidham's performance that they chose in essence to proceed to mitigation without his help. (Deardorff Dep.  pp. 50-51).  Finally,  the testimony of Chiappone, the only expert with whom Stidham was to have been working, completely  undercut Petitioner's mitigation and, in effect, supported the co-defendant Holmes' case.  He did this with a confession that Moore purportedly gave to Chiappone that contradicted every statement Moore had previously given to police, counsel and family members.  That purported statement, as critical as it was, shows up nowhere in Chiappone's file or notes, nor does it appear in the notes of Chiappone's assistant. (See generally Court Clinic Records; and see, for example, Chiappone Dep. pp. 58-59, 67-68 conceding that he did not have the notes of two of his face to face interviews  with Mr. Moore, and could not explain why those were missing.)[5]  Such a record, at the very least, renders it debatable among reasonable jurists as to whether Petitioner has satisfied *Mickens* and *Cuyler*.  Further, while the Sixth Circuit ultimately denied relief in *Fautenberry* and

---

[5] Chiappone's second meeting with Moore involved only the administration of various tests and Chiappone took no notes of that meeting. (Chiappone Dep. pp. 59-61).  Chiappone's Clinic File confirms that he did not meet with defense counsel until October 25, 1994.  Again those notes are missing as well. (*Id.* pp. 71-72).  Surprisingly, Chiappone had an ex parte meeting with the prosecutor.  The notes of that meeting are also missing.  (*Id.* pp. 88-89).

*Gillard*, the analysis of the Court in those cases establishes that in Petitioner's circumstance where there is a conflict of interest due to concurrent representation that that claim deserves encouragement to proceed further.

### Second Ground For Relief – Moore's Attorneys Rendered The Ineffective Assistance Of Counsel At The Mitigation Phase.

#### (A) Employing A Mitigation Specialist Who Never Discussed Substantive Mitigation Issues With Petitioner Moore And Failed To Adequately Assist In The Preparation Of The Mitigation Phase

Petitioner alleges an ineffective preparation for the mitigation phase. Stidham, retained by Mr. Deardorff and Mr. James for the sole purpose of preparing the mitigation portion of the defense, did not effectively perform that function. On August 11, 1994, Mr. James requested Mr. Stidham to deliver his mitigation evidence and material "within the next few days." James informed Stidham that he would need his information "so that we can get Chiappone started." (James Letter to Stidham, August 11, 1994, Petitioner's Exhibit 11 to Stidham Deposition). Those materials were not forthcoming. There is no effort by Defense counsel to follow up until the eve of trial.

The time sheets of Mr. Stidham and his assistant reveal that their interviews with "family and friends" were not completed until October 28, 1994. (See Assistant's Time Sheet, Petitioner's Exhibit 2 to Stidham Deposition). While Mr. Stidham's time sheet reflects "preparation of documentation to be sent to Dr. Chiappone" on September 20, no entry reflects delivery and James letter confirms that the documentation had not been delivered as late as September 23. (See Stidham Time Sheet, Petitioner's Exhibit 3 to Stidham Deposition, and see James Letter to Stidham September 23, 1994, Petitioner's Exhibit 12 to Stidham Deposition). Dr. Chiappone confirms Stidham's dilatory action:

> Forgive me now, I can't remember the specifics, but he [Stidham] was supposed to help with this case, and if I remember correctly he was dragging his feet, didn't get some stuff, and so I think that's what that's referring to.

(Chiappone Dep. p. 99). When asked about the inability to get information from Stidham, Dr. Chiappone recollected, "but I remember in general. You look back at the case and say, oh, yeah, we had -- we couldn't get some stuff. . . . I didn't mean we didn't get it, but it wasn't coming the way we thought it would." (*Id.* p. 100). In any event, no materials were received from Stidham by Chiappone until approximately 2 weeks before the trial was to start.

As late as November 2, 1994 (a week before Petitioner's trial), Mr. Stidham had not shared his "mitigation materials" with trial counsel. (James Letter to Stidham, November 2, 1994, Petitioner's Exhibit 6 to Stidham deposition; and see James Letter to Deardorff, November 2, 1994, Petitioner's Exhibit 2 to Deardorff Deposition). Mr. James requested receipt of those materials by November 7, just 2 days before the beginning of trial.

Mr. Deardorff recognized that "during the mitigation phase, I didn't use a lot of Mr. Stidham's stuff . . . I kind of shied away from Mr. Stidham in the mitigation phase. . . . . I felt like Chiappone was going to be more effective than Stidham. I wanted not to use Stidham.." (Deardorff Dep. pp. 50-51). Although Stidham was assigned the responsibility of putting together a mitigation case, he was not requested by either James or Deardorff to attend or participate in any way in the mitigation hearing. (Stidham Dep. p. 121).

It is because Mr. Stidham was inattentive and not working with trial counsel that such a decision was thrust upon them. Rather than being a reasoned tactical decision, the decision was based upon an ineffective investigation that did not satisfy the Sixth Amendment. *See e.g. Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007)*; Haliym v. Mitchell,* 492 F.3d 680

(6th Cir. 2007); *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006); *Poindexter v. Mitchell,* 454 F.3d 564 (6th Cir. 2006); *Dickerson v. Bagley,* 453 F.3d 690 (6th Cir. 2006); *Harries v. Bell*, 417 F.3d 631 (6th Cir. 2005); *Hamblin v. Mitchell*, 354 F.3d 482 (6th Cir. 2003); *Powell v. Collins*, 328 F.3d 268 (6th Cir. 2003); *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000).

The above facts present, at minimum, a debatable claim regarding the effective assistance of counsel at the mitigation phase. As noted above the Sixth Circuit has found similar claims to merit relief. Further, to the best of Petitioner's knowledge, the Sixth Circuit currently has pending effective assistance of counsel at the mitigation phase claims in other §2254 capital cases. *Eley v. Bagley*, Case No. 06-4503 (6th Cir.); *Mason v. Mitchell*, Case No. 05-4511 (6th Cir.). Finally, because the Supreme Court in *Wiggins v. Smith*, 539 U.S. 510, 524 (2003),[6] has stated that defense counsel must make "efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor…" it is debatable that the state court's treatment of the claim was contrary to or an unreasonable application of the *Strickland* requirements.

### (C) Counsel Presented A Hopelessly Ineffective Mitigation Argument Which Actually Damaged Petitioner Moore's Mitigation Case And Failed To Emphasize Petitioner Moore's Youth, Remorse, And Psycho Social Background

In his mitigation opening, Mr. Deardorff gives the jury the false impression that it was Petitioner's burden to overcome the overwhelming evidence already presented by the prosecution, despite the fact that no evidence regarding mitigation had yet been presented

---

[6] In *Wiggins, ,* the Court determined that the petitioner, Wiggins, was deprived of competent representation when his counsel abandoned their investigation of his background "after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id. at 524.* Petitioner's counsel similarly received less than rudimentary knowledge of Petitioner's background, an investigation that was so lacking defense counsel proceeded without relying of the attorney responsible for preparing that evidence.

and although due process places the burden on the state.

> ***We have to convince you*** that right now all you've heard are aggravating circumstances, we're up here.   You know, if you're playing basketball right now, ***its ninety-eight for the prosecutor, its zero for Mr. Deardorff.   I have to do something in the second half to make it a hundred and one for Mr. Deardorff, ninety-nine for the prosecutors.***  We have to outweigh what the prosecutors have shown you.

(Tr. Vol. 7, p. 1083).  This improperly shifts the burden from the prosecutor to Petitioner and erroneously characterizes Petitioner as having an enormous deficit to overcome.

Exacerbating the damage done by the above, trial counsel erroneously argued, "[m]aybe . . . a very long term in prison would be fair.  ***Or, if not, if I can't convince you, and you feel he deserves the death penalty,*** then maybe, for his family, I can tell why this happened. . ."  (Tr., V. 7, p. 1082).  Inexplicably, trial counsel concedes that death may be the appropriate sentence and then offers no cogent theory or argument regarding what they intended to present as mitigation.  (Tr., V. 7, p. 1080 - 1087).

The closing was equally inappropriate, as well as unfocused, as Deardorff admitted he was rattled by the irreparable damaged done by Dr. Chiappone. (*See* Deardorff Dep. pp. 78-81).  The closing impugned Petitioner, and seemingly emphasized a ***lack of mitigation --*** an absence of remorse and the brutality of the shooting.   (Tr. V. 7 1200-1222).  The closing argument was contradictory, directionless, incriminating and never effectively argued the existence and weight of mitigating factors.

First, trial counsel torpedoes his client by informing the jury that he has no faith in his client or his client's case, and eliminates one of their main theories of mitigation, residual doubt as to whether the shooting was the consequence of an accident.[7]

---

[7]  Deardorff confirmed in his deposition that "accident" would be a focus at both the guilt phase and mitigation. (Deardorff Dep. p. 23).  Deardorff remains convinced that the shooting itself was accidental. *Id.* There can be

> …as Mr. Deters says, is :  Did he accidentally shoot him?
> That's what he said he did.  **I don't know if it's true, but it
> doesn't matter anymore**…but the bottom line - - **cut out all the
> garbage - - he shot Mr. Olinger and stole his card and used
> his credit cards.**  That's the bottom line, that's what he did.

*Id*. at 1202 (emphasis added).  Trial counsel next emphasizes the guilt of his client and the

gruesomeness of the offense.

> [Co-Defendant] Larry [Kinley] was not believable, but that doesn't
> matter because that's - - as Mr. Deter's said **we showed you other
> things to find him guilty**… (*Id*. at 1204) (Emphasis added).

> So maybe when he gave his statements, Lee didn't remember.  **I mean,
> if you shoot somebody in the head,** and your in a little area **and his
> brains fly out all over the wall, that is going to have an effect.** (*Id*. at
> 1205) (Emphasis added).

> But the point is that, whatever statement he [Lee Moore] gave  - - **I
> don't know if he was lying,** if he wasn't lying . . .  (*Id.*)(Emphasis
> added).

> . . . Lee didn't say he put [the victim] on his knees. **I don't know if he
> did or he didn't** . . . But I don't think it's proven, if that's one of the
> factors beyond a reasonable doubt to you that he put him on his knees
> and shot him.  That's the bottom line.  He shot him.  So what do I say?
> (*Id*. at 1206) (Emphasis added).

Deardorff then concedes everything that the prosecutor has told the jury to counter

mitigation.

> Everything they tell you, everything they're going to tell you,
> **everything Mr. Peipmeier told you - - we didn't contest that** .

> **Mr. Piepmeier was right.**  I wish I could tell you I've got a---he was
> sexually abused when he was three, that he was left on streets when he
> was six.  I don't have that.  But what I do have is to show that he was
> raised in a good family.  (*Id*. at 12014).

Finally, after reviewing the relevant portions of his closing argument, Deardorff admits that,

at one point in his closing argument, he is clearly telling the jury that Petitioner does not want

---

no logical justification, therefore, for telling the jury that he questioned the truthfulness of this contention, i.e.,
did not really believe his client and that, in any event, "it didn't matter."  (Tr. 1202).

to accept responsibility for his actions. (Deardorff Dep. p. 79).  This point is reinforced by

Deardorff's following closing comments:

> I don't know how many defendants I've seen as a prosecutor all of a sudden they fine God, ***we all find . . . as soon as we're caught***, we all find God.  But you can look at their family backgrounds ***and see it's a sham when they sit here and tell you they find God.***

(Tr. V. 7 p. 1214).

Deardorff does further damage to his client in closing argument when addressing the

issue concerning Petitioner's ability to work well in the structured setting of a prison.

> His future in the jail–as I said, he would get along in a structured setting.  So what does that mean?  ***Oh, that's great. We're going to send Lee off to a place where he is going to get along great.  That doesn't sound fair to the Olinger family, that he is going to go to jail where he can do well.***
>
> I think what that means is, if Lee went to jail for the next fifty-three years, he could be beneficial to other people in our prison system.  ***I don't know how.  I don't know how.***   (Emphasis added).

(Tr. V. 7 p. 1214).

Deardorff invites the jury to return a death penalty when he says, "I know I wouldn't

want to go to jail for seventy-three years, I'd rather you put me to death."  (Tr. V. 7, p. 1221).

All of this must be considered in light of counsel's responsibility for the presentation of

Chiappone's devastating testimony.

Where counsel creates a more damaging image of his client than the prosecution,

constitutional ineffectiveness is present and prejudice should be presumed.  *Rickman v. Bell,*

131 F.3d 1150, 1156-1157 (6th Cir. 1997); *see also Spisak v. Mitchell*, 465 F.3d 684 (6th Cir.

2006), *vacated and remanded Hudson v. Spisak*, 128 S. Ct. 373 (2007); *reinstated Spisak v.*

*Hudson*, 512 F.3d 852 (6th Cir. 2008) *amended by Spisak v. Hudson*, 2008 U.S. App. LEXIS

7760 (6th Cir. 2008) (finding counsel ineffective for a mitigation closing that focused on nature of crime and flaws of defendant, and did not focus on reasons for sparing defendant's life).  Petitioner presents a claim that is debatable, in that the District Court did recognize that trial counsel "…made a series of unfortunate remarks which might have been misinterpreted by the jury when taken in isolation."  *Moore*, 531 F.Supp.2d  at 872.

Given the damaging impact of Dr. Chiappone's testimony, the admitted impact it had on counsel as they presented their closing, and this Court's recognition that counsel made inappropriate/unfortunate arguments, this Claim deserves encouragement to proceed further, especially in light of the Sixth Circuit's reinstatement of the *Spisak* decision.

### Third Ground For Relief – Subsection B – Moore's Attorneys Rendered Ineffective Assistance Of Counsel In Failing To Request An Intoxication Instruction.

Petitioner's trial counsel ineffectively presented their only culpability phase defense. As noted in their opening statement, trial counsel argued to the jury that Petitioner's influence under drugs and alcohol affected his state of mind. Tr. 554.  In introducing his statement, the state established the amount of alcohol and drugs Petitioner ingested the day and evening of the killing, including two "blunts" of marijuana, beer and gin on the day of the shooting. Thus, defense counsel had a basis to request an intoxication instruction at the culpability phase and failed to do so, even though a stated strategy was that Petitioner lacked the "purpose" to commit murder, based in part on his intoxication at the time of the shooting. *See* Tr. 554.

Under Ohio law and as noted by the Sixth Circuit, voluntary intoxication may be considered in determining whether an act was done intentionally.  *See Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000)("In Ohio, evidence of voluntary intoxication 'may be

considered in determining whether an act was done intentionally or with deliberation or premeditation.' *Ohio v. Fox*, 68 Ohio St. 2d 53, 428 N.E.2d 410, 412 (Ohio 1981).").  When such evidence is presented, an attorney must request the proper instruction to allow the jury to give effect to the evidence.  Petitioner's trial counsel unreasonably failed to make such a request.  Petitioner was prejudiced in that the jury was unable to consider and give effect to evidence that lessened Petitioner's intent – further supporting trial counsel's closing argument to convict Petitioner of a lesser offense. *See* Tr. 933, 935 (involuntary manslaughter).

The state presented evidence as to amount that Petitioner drank in combination with the marijuana smoked– it was a jury function to determine whether Petitioner's actions while voluntarily drunk could provide a defense. Nevertheless trial counsel did not request such an instruction even though enough evidence was present to allow instruction on a lesser offense. Because the state presented the evidence and the evidence provided sufficient value to merit an instruction on a lesser offense, the request for an instruction on involuntary intoxication would have been granted.

While not AEDPA cases, the Sixth Circuit considered voluntary intoxication issues in *Hicks v. Collins*, 384 F.3d 204 (6th Cir. 2004), and tangentially in *Combs*.  Thus, the Sixth Circuit recognizes the efficacy and importance under Ohio law of voluntary intoxication instructions where, as here, such evidence is present.  Under the unique facts of Petitioner's case, Petitioner presents an issue that deserves encouragement to proceed further.  Certainly, the point is reasonably debatable among reasonable jurists.

**Seventh Ground For Relief (Subsections A, C And D) – Prosecutorial Misconduct At The Mitigation Phase Closing Argument Was In Violation Of The Sixth, Eighth And Fourteenth Amendments.**

In Petitioner's case, the prosecutor's improper closing argument at the penalty phase denied Petitioner a fundamentally fair penalty hearing. During his argument, the prosecutor improperly 1) sympathized with the victim and speculate as to what the victim was feeling (subsection A); 2) referenced non-statutory aggravating factors as a basis to return a death sentence (subsection C); and 3) improperly commented on Petitioner's unsworn statement. (subsection D)[8]

The Ohio Supreme Court addressed the merits of each of the above, finding the majority to be improper arguments. *State v. Moore*, 81 Ohio St. 3d 22, 33-34 (Ohio 1998) (speculating what victim was feeling improper but did not impact any substantial right); *id.* at 35 (comments on unsworn statements did not impact a substantial right); arguments regarding non-statutory aggravators improper but not prejudicial). The Sixth Circuit has also found error regarding similar arguments.

The Prosecutor painted a vivid and emotional portrait of an individual who was feeling "hope" only to have that replaced with "abject terror."[9] Asking the jurors to identify

---

[8] Petitioner filed a motion in limine prior to the closings in an attempt to prevent the very arguments made by the prosecutor throughout the closing. *See* (Tr., pp. 1067, 170-1071) (orally renewed written motion to limit argument to the statutory aggravating circumstances and requested limits on comments regarding the unsworn statement.)

[9] The closing in this regard is quite lengthy and is contained at Tr. 1194-1196, 1231-1232. The prosecutor continuously noted that "I'm sure he was thinking, 'Thank God, I'm going to be let out here, I'm alive, take my car, take everything I have,'… what went through his mind as he was driven from Fairfield back to Mount Healthy?... Mr. Olinger maybe there felt a little bit of relief that, you know, 'I'm not anywhere out in the sticks, out in the boondocks. I'm not going to be abandoned. Maybe they're going to let me out here. Maybe they're going to put me someplace.'… And when the trunk lid opened, maybe there was a moment of hope for Mr. Olinger. You know, 'They're going to let me out.'… Just for one moment maybe there was a little bit of hope for Mr. Olinger. But I'm sure when he got out and saw the .357 was still in the hands of Lee Moore, and saw where he was, he knew – [Defense objection overruled] He knew what was coming…. Can you imagine the terror he's going through at this point?... Can you imagine the abject terror Melvin Olinger has at this point? [Defense objection overruled]… Was he begging for his life? You bet he was. [Defense objection overruled]." *Id.*

themselves with this hope and then terror is highly improper. *Boyle v. Million*, 201 F.3d 711, 715 (6th Cir. 2000). The Sixth Circuit noted that prosecutorial arguments asking the jury to speculate as to the terror or anguish of a victim has no place in a death penalty sentencing hearing. *See Combs v. Coyle*, 205 F.3d 269, 292-293 (6th Cir. 2000). This is significant in that the misconduct described in *Combs* formed the actual basis of Petitioner's objection and request for a curative instruction. This Court can take notice of the fact that *Combs* is a Hamilton County case predating Petitioner's trial by five years – thus Hamilton County knowingly ignored the *Combs* admonition from the Ohio Supreme Court. Further, the law concerning what is a proper penalty consideration was longstanding.

Regarding the arguments concerning improper non-statutory aggravators, the prosecutor misled the jury and injected an improper sentencing consideration.[10] *See Combs*, 205 F.3d at 292-293 (Error for prosecutor to argue that the facts and circumstances, including the manner in which the victim died, are aggravating factors).

As to the improper comments on the unsworn statement, (the prosecutor made two such statements: "he does not have to… face any tough questions from the prosecutors;" (Tr. 1227); "If there is some pig (sic) mystery why he went to Butler County besides that, why didn't he tell you that today in his unsworn statement?" (Tr. 1231)). In *DePew v. Anderson*,

---

[10] Specifically, the prosecutor argued that the aggravating factors to which the jury could give weight were:

> But if you really want to look at it and you really want to assign some weight to that, the real strength of that factor from the State's point of view is that Lee Moore put that type of value on someone's life; that to get a hat and to get a sweatshirt and to drive around in a nice car and to get some chains to wear and a gold nugget ring, he robbed for all those; that means more to him than someone's life; and back on January 14th, the ability to get those items meant more to him than Melvin Olinger. And that's what you consider when you weigh that aggravating factor.

Tr. 1193-1194. Thereafter the prosecutor argued the previously excerpted portions of the closing argument as the weight to be assigned the kidnapping aggravator. *See* Tr. 1194-1196 (fear and dashed hope of Mr. Olinger); Tr. 1231-1232 ("imagine the terror"). But that was not all – the prosecutor also argued that to place on the death side "the coldness and premeditation in which Melvin Olinger was stalked." Tr. 1230; Tr. 1231 ("coldly and premeditatedly went to a county and sought a victim who wouldn't be missed for a while.")

311 F.3d 742, 750 (6th Cir. 2002), the Sixth Circuit held such arguments to be constitutionally improper. *See also Girts v. Yanai*, 501 F.3d 743 (6th Cir. 2007) (granting habeas relief in non-capital context for improper prosecutorial comment on failure to testify).

The Sixth Circuit has granted relief (*see Bates v. Bell*, 402 F.3d 635 (6th Cir. 2005)), *DePew*), in death penalty cases based upon prosecutorial argument. Because the arguments in Petitioner's case are similar to those found inappropriate in other cases, Petitioner's claim deserves encouragement to proceed further. As *Bates* and *DePew* demonstrate, it is debatable among jurists of reason whether there is a substantial and injurious effect from the improper arguments.[11] Further, Further, to the best of Petitioner's knowledge, the Sixth Circuit currently has pending prosecutorial misconduct in argument claim in another 2254 capital case, *Davie v. Mitchell*, Case No. 03-4293 (6th Cir.), reflecting the belief that the Sixth Circuit considers such issues worthy of review.

**Thirteenth Ground for Relief –**

**D.    The Prosecutors Used – And The Trial Judge Condoned – A Peremptory Challenge Against Prospective Juror Freeman, An African-American Woman, On The Basis Of Her Race.**

The prosecutors exercised a peremptory challenge against Prospective Juror Freeman, an African-American woman who had stated that she could follow the law and sign a death verdict in this case and that sometimes the death penalty is warranted. (Tr. V. 3 pp. 258-260; 405). Trial counsel objected on the basis of *Batson v. Kentucky*, 476 U.S. 79 (1986). It is undisputed that Petitioner made out a *prima facie* showing of a race based exclusion under

---

[11] Petitioner does not dispute the universal finding that the arguments complained of were improper. Petitioner does contest the Ohio Supreme Court's finding and this Court's conclusion that Petitioner cannot demonstrate prejudice. Due to the harmfulness review by the Ohio Supreme Court, the COA standard relates to the substantial injurious impact standard because it is stricter than (d)(2) review of a state court's harmfulness determination. *Fry v. Pliler*, 127 S.Ct. 2321, 2327 (2007) (a reviewing federal court must weigh the prejudice of constitutional error in a state-court criminal trial under the standard established in *Brecht* rather than the "more liberal" §2254(d)(1) review of the state court's harmlessness review because *Brecht* "subsumed" the former.

*Batson.*  The burden, therefore, shifted to the state to show that it was more likely than not that its peremptory challenge was race-neutral.  *Purkett v. Elem,* 514 U.S. 745, 768 (1995).

This was not the first time race had been raised as an issue in Petitioner's trial.  Trial counsel noted that there existed an under-representation of minorities in the 50 person venire; only 5 minorities out of 50.  Tr. 212.  In total, only one black male made the venire; and he was seated so far back it was next to impossible that he would sit as a juror.  Tr. 212-213.  He did not sit; and was not even voir dired.  The jury commissioner indicated that he excused 7or 8 before court proceedings; of which 2 or 3 were minorities.  Tr. 223-24.

The prosecutor responded to Petitioner's *Batson* challenge by stating vaguely that things about Ms. Freeman's answer to a question on the questionnaire bothered him.  (Tr. V. 3 pp. 405; 408-410).  Specifically, it was her response to Question 28 on the jury questionnaire that bothered the prosecutor. (*Id.* at 409).  Question 28 reads: "What factors do you feel most likely have a negative influence on a criminal's development?" (*Id.* at 409-410).  According to the prosecutor, Ms. Freeman's reference to "alcoholism" indicated a "predisposition" to something that the prosecutor was unable to explain:

> but the main [objection to Ms. Freeman], Judge, would be the alcoholism, and her predisposition to that before it was even brought out by the defense concerns us.

(*Id.* at 412).  This "explanation" is both inarticulate and strains credulity.  First, Question 28 had no relationship to an individual's alleged predispositions to anything.  It merely factors that may have negatively influenced a defendant's development.  Nothing offered by the prosecution showed that Ms. Freeman's answer to this innocuous question set her apart from any of the white members of the venire accepted by the prosecution.  (*Id.)* [12]

---

[12]  Its important to note that a Judge of this Court previously recognized a substantial *Batson* violation involving Prosecutor Piepmeier.  In *Jamison v. Collins*, 100 F. Supp. 2d 647, 696-697 (S.D. Ohio 2000), the Court

The answer to this questionnaire item was the main reason that the prosecutors removed Ms. Freeman.  They had two other reasons for the removal: (a) an uncle of Ms. Freeman's was a lawyer in Columbus and had once been a public defender; and (b) Ms. Freeman's arms had been crossed.  (Tr. V. 3 pp. 410-414).  This last reason was the least important of the three.  (*Id.* at 412).[13]

As trial counsel pointed out, there were white prospective jurors who had answered the question on the questionnaire the same way and were not removed by the prosecutors. (Tr. V. 3 p. 413).  Also, as far as her uncle being a former defense lawyer, Ms. Freeman's questionnaire showed that her uncle had once been a prosecutor as well.  The irrelevance of the prosecutor's "explanation" is further confirmed by his utter failure to ask her any questions regarding these matters during *voir dire.*  (See Tr. 296).  Further, the record before this Court was expanded to include the questionnaires (*see* ECF Doc. 141-2, 141-3, 141-4, 141-5), which demonstrate numerous responses similar to Ms. Freeman's from white jurors who were not removed by the State.

The jury questionnaires bear out defense counsel's suggestion that similarly situated white, non-challenged jurors were not removed.  Sitting juror Donna England, a white female, offered a similar response to Ms. Freeman's regarding "predispositions" towards "alcoholism" as mitigation, the main basis of the state's alleged reason for excusing the African-American.  In answering what may negatively impact a child's development, Ms.

---

reviewed a circumstance where peremptories were exercised and that Hamilton County prosecutors could not offer a race neutral explanation.  However, the claim had been waived because it had never been presented to state court.  Regardless, as noted by the Supreme Court in *Miller-El I,* 537 U.S. at 347, pattern and practice evidence "is relevant to the extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case."

[13]The trial court upheld the removal of Ms. Freeman because from his reading of a Columbus magazine, that in Columbus "they" are "very hostile" towards prosecutors and police.  (Tr. V. 3 p. 414).  This explanation is equally implausible as it was not even explored in voir dire by the prosecution nor was it offered as their main objection.  *Id.* at 412

England listed as number 1 "alcohol" and as number 2 "drugs."  ECF Doc. 141-3 (England Questionnaire) p. 7.  Not only did the state not strike Ms. England, they waived available peremptories, thus keeping her on the panel.  This demonstrates the prosecutor treated the white Ms. England different than the black Ms. Freeman.

Sitting white juror William Miller notes that his college roommate was a lawyer. ECF Doc. 141-2 (Miller Questionnaire) p. 15.  In response to the next questions, Mr. Miller noted in his questionnaire that his "close friend" was a "public defender;" (his college roommate).  *Id.* at pp. 15-16.  Mr. Miller's questionnaire identified his race as "Caucasian." *Id.* at p. 1.  Thus demonstrating, the prosecutor treated the white Mr. Miller different than the black Ms. Freeman.

Reliance on a problem with the questionnaire is alarming for another reason.  The prosecutor never queried Ms. Freeman on the alleged troubling nature of the questionnaire. The prosecutor noted that he had received and had read the jury questionnaires.  Tr. 262.  On at least one occasion, the prosecutor queried potential jurors on "troubling" issues raised by a response to the questionnaire.  Tr. 278 (Bottenhorn).  On numerous other occasions, the prosecutor queried those who became sitting jurors on "troubling" issues raised by a response to the questionnaire.  Tr. 398 (Juror Borgerding);  433 (Juror Phillips); 450 (Juror Hopkins).

The state's voir dire of Juror Phillips illustrates the disparate treatment as to the alleged race neutral explanation offered by the state.  Ms. Phillips indicated on her questionnaire that a friend of hers was on death row – placed there by Hamilton County.  Tr. 433-34.  She indicated that it would not affect her – but would not agree with the prosecutor's attempts to have her endorse the appropriateness of the death penalty.  Tr. 434-435.  She refused to endorse such even though she noted her friend asked for the death

penalty. Tr. 435. Ms. Phillips was white, and was not struck by the state.

The state attempted a voir dire of Ms. Phillips, white, and could not get her to agree to a death sentence, when her friend asked for it. Phillips exhibited a much stronger potential for bias in that she would not agree with an already imposed and asked for death sentence. Meanwhile, Ms. Freeman was struck when the state conducted no voir dire of her alleged predispositions on potential mitigation. In further contrast, Ms. England, white, was not struck when the state conducted no voir dire of her alleged predispositions on potential mitigation. Asserted reasons applicable to similarly situated white prospective jurors whom it did not strike, are pretexts for purposeful discrimination. *Miller-El II, supra,* 545 U.S. at 246, 252, 258 n. 17; *Purkett, supra,* 514 U.S. at 768.

The District Court noted that while there were some similarities each of the non-struck jurors did not possess each of the short-comings described by the state. *See Moore,* 531 F.Supp.2d at 899-900 (analysis of Freeman with Miller). The Supreme Court held in the context of a claim of race-based peremptory strikes of jurors, "a rule that no comparison [among prospective jurors] is probative unless the situation of the individuals compared is identical in all respects" would make claims of discrimination "inoperable," because "potential jurors are not products of a set of cookie cutters." *Miller-El v. Dretke,* 545 U.S. 231, 247 n. 6 (2005).

Most recently, the Supreme Court again endorsed the *Batson* protections in *Snyder v. Louisiana,* -- U.S. --, 128 S.Ct. 1203 (2008), where Court granted relief on a *Batson* claim by the vote of 7-2. Of particular pertinence to Petitioner's *Batson* allegation, *Snyder* reaffirmed the importance of comparing the non-challenged white jurors to those of the struck minority juror. *Id.* at 1211-1212. Such comparisons were ignored by the state courts in Petitioner's

case.  *See Kesser v. Cambra*, 465 F.3d 351, 358 (9th Cir. 2006) (en banc) (AEDPA case ,

court granted habeas relief on the petitioner's *Batson* claim when the state court had failed to

consider comparative juror evidence, and thereby unreasonably determined the facts in

accepting the prosecutor's stated motivations for striking a Native American woman.)

The above demonstrates that Petitioner's *Batson* claim and the state court's treatment

of the same deserves encouragement to proceed further.  The facts, as found by the state

courts, are rebutted by the record and the questionnaires of white jurors.  Further, the *Snyder*

and *Miller-El* decisions closely resemble both the factual circumstances of Petitioner's case

and the errors committed by the state courts in addressing Petitioner's allegation of error.

Finally, Petitioner's case was decided prior to the *Snyder* decision.  Since *Snyder* at least one

Federal Circuit Court of Appeals has granted a COA on an issue similar to the one presented

by Petitioner herein.  *See Haynes v. Quarterman*, 2008 U.S. App. LEXIS 8735 (5th Cir. Apr.

23, 2008).  Thus, the issues raised by this claim are fairly subject to debate among reasonable

jurists.

### Fifteenth Ground For Relief – The Sentencer Failed To Give Any Weight To The Uncontradicted Mitigating Evidence Presented By Moore In Violation Of The Sixth, Eighth And Fourteenth Amendments.[14]

The trial court failed to consider relevant mitigation presented by Petitioner denying

him the individualized sentencing guaranteed by the Eight and Fourteenth Amendments.

*Zant v. Stephens*, 462 U.S. 862, 879 (1983); *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982);

*Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303-

04 (1976).  Both the Eighth and the Fourteenth Amendments require that the defendant's

character and record, as well as the circumstances of the offense be considered as mitigating

---

[14]  *See* footnote 3.

factors when inflicting a penalty of death.  *Eddings*, 455 U.S. at 110, *Lockett*, 438 U.S. at

604; *Woodson*, 428 U.S. at 304.  Furthermore, Ohio's statute mandates that the sentencer

consider the defendant's history, character, and background as mitigating evidence.  O.R.C. §

2929.04(B).  Despite this clear direction, the sentencing order specifically held that other

than age and a good family upbringing, nothing else was mitigating.  Return Ex. A at p. 12

("the Court cannot find any [other mitigating factors]"); *see also* Tr. 1266.

However, the trial court should have considered (a) the effect of his parents' divorce

on him; (b) the bullying, teasing and beating of him by his peers throughout his childhood

and adolescence; (c) his feelings that he did not fit in with his peers; (d) his substance abuse

and dependency beginning at age fifteen (15); (d) how he was very capable of being

productive in a structured environment, i.e., prison; and (e) his unrealized potential as

mitigating aspects of Petitioner's history, character, and background.

In *Eddings*, the Court reversed the defendant's death sentence and remanded the

matter for a new sentencing hearing where it appeared that the Oklahoma trial and appellate

courts refused to consider the defendant's mitigating evidence of his abused and traumatic

youth.  *Id.* at 113-17.  In dissent, Chief Burger pointed out that the record was "at best

ambiguous" as to whether the Oklahoma trial and appellate courts refused to consider that

evidence.  *Id.* at 124-25 (Burger, CJ, dissenting).  Nevertheless, the majority reversed the

defendant's death sentence because, as Justice O'Connor explained,

> [W]e may not speculate as to whether [the state courts] actually
> considered all of the mitigating factors and found them insufficient to
> offset the aggravating circumstances. … *Woodson* and *Lockett* require
> us to remove any legitimate basis for finding ambiguity concerning the
> factors usually considered by the trial court.

*Eddings*, 455 U.S. at 119 (O'Connor, J., concurring).  Petitioner's case is stronger in that the

trial court specifically indicated it could find no other mitigation to weigh.

The Seventh Circuit recognized the continued validity of *Eddings* in *Wright v. Walls*, 288 F.3d 937 (7th Cir 2002). There, the Seventh Circuit affirmed the district court's grant of the writ with respect to Wright's death sentence, holding that "the trial judge's failure to consider as mitigation Wright's traumatic childhood …violated *Eddings v. Oklahoma*." *Id.* at 941. The parallels between Wright's and Petitioner's case are unavoidable.

In *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007), the Sixth Circuit granted relief in a death penalty habeas case when the state courts refused to consider and give effect to mitigation. The Sixth Circuit specifically rejected the position taken by this Court that an appellate court could reweigh for an *Eddings* error. The Sixth Circuit determined the proper remedy to be a re-sentencing:

> There remains for our resolution the question of a remedy for the rejection of the new evidence that the petitioner sought to introduce before the three-judge panel. The respondent cites precedent to support the proposition that if a sentencer considers improper aggravating circumstances, the state appellate court may reweigh the remaining aggravating circumstances against the mitigating circumstances or may determine that the error was harmless. *See Parker v. Dugger*, 498 U.S. 308, 319, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991); *Clemons v. Mississippi*, 494 U.S. 738, 745-50, 110 S. Ct. 1441, 108 L. Ed. 2d 725 (1990). Presumably, the warden, by citing these cases, contends that any constitutional error committed in this matter may be rectified simply by a state court reconsideration of Davis's suitability for execution or for lifetime incarceration. But, reweighing in this case is not possible because the improperly-excluded evidence was never put into the record. Defense counsel's proffer concerning the proposed witnesses' testimony merely summarized his interviews with these witnesses; the actual substance of the witnesses' testimony was not put before any court and, therefore, no factual basis for reweighing exists. For this reason, the Supreme Court has decided that, when a trial court improperly excludes mitigating evidence or limits the fact-finder's consideration of such evidence, the case must be remanded for a new sentencing hearing. *See Skipper*[ *v. South Carolina*], 476 U.S. [1,] at 8, [106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986)].

*Davis*, 475 F.3d at 774-775. *Davis* is directly on point with Petitioner's allegation of

constitutional error.

Indeed, the remedy under *Eddings* and *Lockett* is an immediate reversal of the sentence. Thus, the Ohio Supreme Court's treatment of Petitioner's *Eddings* error is contrary to Supreme Court precedent. *See e.g. Nelson v. Qaurterman*, 472 F.3d 287, 310 (5th Cir. 2006)(appellate court cannot reweigh under *Tennard v. Dretke*, 542 U.S. 274 (2004); *Paxton v. Ward*, 199 F.3d 1197, 1220 (10th Cir. 1999) (appellate court cannot reweigh when mitigation not considered).

Given the express statement by the trial court, it is debatable among reasonable jurists as to whether Petitioner has established an *Eddings* violation. Further, and due to the *Davis* decision, as well as the reasonable decisions of the Fifth Circuit in *Nelson* and the Tenth Circuit in *Paxton*, a reasonable jurist could find that this Claim deserves encouragement to proceed further because appellate court's cannot reweigh when the mitigation was not considered in the first circumstance.

### Sixteenth Ground For Relief (Paragraphs 269-271) – Improper Instructions Deprived Moore Of His Constitutional Rights As Guaranteed By The Sixth, Eighth And Fourteenth Amendments.

The trial court improperly instructed Petitioner's jury on various non-unanimous factors upon which to base a death sentence. Instructing the jury with the alternative elements risked the possibility of a non-unanimous finding as to the basis for the death penalty. It is possible that some, but not all, jurors found the death sentence applicable because Moore had prior calculation and design, while other jurors based it upon Petitioner as the principal offender. Thus, the death sentence in this case did not comport with the dictates of *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson v. United States*, 526 U.S. 813 (1999).

As pled at Petition paragraphs 269-271, the harm to Petitioner is further enhanced by the trial court's improperly instructing the jury on various non-unanimous factors upon which to base a death sentence.  Specifically, the trial court instructed the jury that the first specification for Count 1 was that Petitioner had committed the aggravated murder for the purpose of escaping detection for an aggravated robbery **OR** kidnapping, two very distinct criminal acts. Yet, the jury was not required to make a unanimous finding as to either of those alternatives.  (Tr. p. 973).  Similarly, the trial court instructed the jury that specification 1 to Count 2 was that Petitioner had committed the killing in the course of a kidnapping and that he was either the principal offender **OR** used prior calculation and design.  Again, the jury is not required to make a unanimous finding as to either of those alternatives. (Tr. 980; and see Instructions as to specification 3 as to Count 1 at Tr. p. 982).

Similarly, Judge Ruehlman instructed the jury that, under specification 2 as to Count 2, they were to determine whether Petitioner had committed the killing in the course of a kidnapping and that he was either the principal offender **OR** had prior calculation and design. (Tr. pp. 991-992). Thus, the jury is never instructed they had to be unanimous in their collective decision regarding which alternative they selected to make Petitioner death eligible.  This risked the very real possibility of a non-unanimous finding as to the jury's basis for imposing the death penalty.  It is possible that some jurors, but not all, found the death sentence applicable because Petitioner had prior calculation and design, while other jurors based it upon Moore as the principal offender. Thus, the death sentence in this case did not comport with the dictates of *Richardson v. United States*, 526 U.S. 813 (1999).

The Ohio Supreme Court, *Moore*, 81 Ohio St. 3d at 39-40, and the District Court, *Moore*, 531 F.Supp.2d at 907, found the instructions to constitute error but a harmless error.

The finding of harmlessness is debatable among jurists of reason.

### Eighteenth Ground For Relief – Improper Instructions Deprived Moore Of His Constitutional Rights As Guaranteed By The Sixth, Eighth And Fourteenth Amendments.

#### A.    During The Pretrial, The Prosecutors Had An Ex Parte Meeting With The Defense Expert.

Petitioner alleges the prosecutor's meetings with the defense expert psychologist, Dr. Chiappone, to discuss his findings were improper.  This Court relied on *Workman v. Bell*, 178 F.3d 759, 771-772 (6th Cir. 1998) in rejecting this claim.  *Workman* did not address *access to a party's expert witness*.  The prosecutor's *ex parte* contacts with the Defendant's expert *clearly go beyond ethical boundaries*.  (Tr. 1119).

> [The expert's] understanding that this conduct is "just not done" is in perfect congruity with the rules that [the prosecutor] so wantonly broke.  As Professor Charles Wolfram, Chief Reporter of the *Restatement of the Law Governing Lawyers* testified, it is a "no-brainer" that a prosecutor simply does not make an *ex parte* communication with a defense expert without the explicit consent of defense counsel.

*Lambert v. Blackwell,* 962 F.Supp. 1521, 1546 (E.D.Pa. 1997), rev'd on other grounds, 134 F.3d 506 (3rd Cir. 1997).  *Accord, Erickson v. Newmar Corp.,* 87 F.3d 298, 301-302 (9th Cir. 1996) ("Since existing rules of civil procedure carefully provide for limited and controlled discovery of an opposing party's expert witnesses, *all other forms of contact are impliedly prohibited*.  Therefore, an attorney who engages in prohibited communications violates the attorney's ethical duty to obey the obligations of the tribunal.") (Emphasis added).

While *Workman* dealt with the constitutional doctrine at issue, it did not cover the precise factual underpinnings now presented by Petitioner.  This is a matter of first impression for the Sixth Circuit that is debatable among jurists of reason.

30

    **C. During The Liability Phase, The Prosecutors Presented Testimony From The Victim's Father In Order To Elicit Sympathy From The Jury, Denigrated Petitioner's Counsel, Encouraged The Jury To Perform Its Own Experiment, And Commented On Trial Counsel's Failure To Present Expert Witnesses.**

      **And**

    **D. During The Mitigation Phase, The Prosecutors Urged The Sentencers To Identify With The Victim And Made Other Improper Arguments.**

The prosecutors presented testimony of the victim's father only for the purpose of being able to elicit sympathy from the jury and to identify for the jury that Mr. Olinger would be sitting in the courtroom audience. Mr. Olinger testified that (a) the victim had a sister; (b) he worked out of town; (c) he hugged and kissed his mother before he left the house the night that he was killed; (d) a friend of his had died; and (e) his family did not know what to do when they discovered that he was missing. (Tr. 556-565). This testimony showed that the victim had been a dutiful son. None of his testimony was remotely relevant to any of the elements of the offenses at issue **at the culpability phase**. (*See* Tr. V. p. 629). Judge Ruehlman, however, stated that it was relevant. *Id.* In *Payne v. Tennessee,* 501 U.S. 808, 825 (1991), the Supreme Court did not permit such testimony in the **culpability stage** or to otherwise bias a jury and undercut the fairness of the proceedings.

Additionally, at the culpability phase closing argument, the prosecutor improperly encouraged the jury to perform its own experiment regarding the victim's position when he was shot. This was clearly part of an improper effort to undercut the defense's contention that the gun discharged accidentally.

> [G]o back in the jury room B nothing prevents you from doing this. Go back and see how did he get in that position, what you have to do. You're like this (indicating). He's like this on his knees. .... After you're down like this, have somebody take that State's Exhibit 16 [the

> gun] and see what your reaction is.  Do you think you might maybe
> turn away from that gun and tilt your head back a little bit?

(Tr. V. p. 957).   This experiment permitted the jury to improperly base its verdict on

additional evidence supplementing the evidence admitted at the mitigation phase.  The

Constitution requires that evidence used against a defendant and considered by the jury be

first presented at trial "where there is full judicial protection of defendant's right of

confrontation, of cross-examination, and of counsel."  *Turner v. State of Louisiana,* 379 U.S.

466, 472-473 (1965); *and see, Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982).

As a fundamental matter of due process, a jury must be limited in its deliberations to the

evidence offered at trial and may not consider evidence the jury itself generates after it is

charged and begins deliberations.  *Turner*, 379 U.S. at 473.

This error is exacerbated by additional improper conduct by the state.  At the liability

phase closing argument, when he was arguing about whether the victim was on his knees

when he was shot, the prosecutor improperly commented on trial counsel's failure to present

an expert witness: "The defense has every ability to subpoena in any expert they want to

prove otherwise.  Where were they? Where were they?"  (Tr. V. 6 p. 956).  This improperly

shifted the burden of proof to Petitioner.

In combination, the impropriety of all of these arguments warrant reversal because

they mislead the jury, prejudiced Petitioner, and were deliberately placed before the jury. *See

United States v. Francis,* 170 F.3d 546, 550-551, 553 (6th Cir. 1999) (cumulative

prosecutorial misconduct found despite overwhelming evidence of guilt); *United States v.

Carroll,* 26 F.3d 1380, 1388 (6th Cir. 1994); *Sizemore v. Fletcher,* 921 F.2d 667, 670 (6th

Cir. 1990); *United States v. Krebs*, 788 F.2d 1166, 1177 (6th Cir. 1986); *United States v.

Leon,* 534 F.2d 667 (6th Cir. 1976).

The above facts present, at minimum, a debatable claim regarding the improper prosecutorial argument.  As noted previously the Sixth Circuit has found similar claims to merit relief.  Further, to the best of Petitioner's knowledge, the Sixth Circuit currently has pending prosecutorial misconduct in argument claim in another 2254 capital case,  *Davie v. Mitchell*, Case No. 03-4293 (6th Cir.), reflecting the belief that the Sixth Circuit considers such issues worthy of review.

### Nineteenth Habeas Ground – Petitioner's Statement Was Taken From Petitioner In Violation Of His Rights Under Fifth And Fourteenth Amendment.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statements made during custodial interrogation may be admitted in evidence.  *Miranda* established a baseline rule as to warnings that must be given before a suspect's custodial statements may be admitted into evidence.  The Court in *Dickerson v. United States*, 530 U.S. 428, 440 (2000): "After discussing the 'compelling pressures' inherent in custodial police interrogation, the Miranda court concluded that, 'in order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively appraised of his rights and the exercise of those rights must be fully honored.'" "*Miranda* announced a constitutional rule." *Dickerson*, 530 U.S. at 444.

In Petitioner's case, the Ohio Supreme Court found that "[s]everal aspects of the events leading to Moore's confession [were] troubling."  *State v. Moore*, 81 Ohio St.3d 22, 32 (Ohio 1998).  Specifically, the Court found the following facts troubling.

> The police officer did not provide Moore with food or drink while he was in the holding cell, they required Moore to walk in the snow and slush in subfreezing temperatures in his stocking feet, and they kept Moore's hands cuffed behind his back for over three hours while he sat in the interview room.

*Id.* However, the Ohio Supreme Court failed to consider all of the circumstances.

The *Miranda* decision imposes more than a mere requirement that warnings be provided at the beginning of an interrogation. Further, as in *Jackson v. Giurbino*, 364 F.3d 1002 (9th Cir. 2004)(finding AEDPA not applicable to a *Miranda* claim), the police officers did not improperly re-advise Petitioner of his Miranda rights prior to the final interrogation session after the troubling aspects occurred. The record in this case shows the following facts were not considered by the Ohio Supreme Court. Petitioner was arrested at 5:23 p.m., on January 20, 1994, while waiting for food at a fast food restaurant. (Tr. 19). Petitioner had not eaten for more than 15 hours at the time he signed his *Miranda* waiver form at 12:10 a.m., on January 21, and for nearly 20 hours at the point he was asked to give his statement at 4:45 a.m. (Tr. pp. 49, 64-65, 73-74, 104, 179). At the time of his statement, Petitioner had gone 20 hours without sleep. Around 8:00 p.m., a detective takes Petitioner's hat, shirt and sweatshirt. (Tr. p. 28). Petitioner was not given his *Miranda* waiver form until 12:10 a.m., on the 21st "when he was standing almost naked without shoes and after being held for six hours without having anything to eat. . . ." (Tr. p. 104, Officer Tiernan Testimony). He was not asked if he wanted a lawyer. (*Id.*) He was not questioned until more than 4 hours later at 4:45 a.m. (Tr. pp. 73-75), and nearly five hours elapsed between Petitioner's signing of the waiver form and his "confession" to Officer Feldhaus and Officer Tiernan. *Moore*, 81 Ohio St.3d at 31. When the interview was conducted at 4:45 a.m., Officer Tiernan testified that they did not ask him to sign a *Miranda* waiver at that time. (Tr. p. 75). The officers took a taped statement from Petitioner at 6:35 a.m. (Tr. p. 88)

Again, there is no evidence that any *Miranda* waiver was requested at either of these interviews. Officer Feldhaus admits that, at the time of the 4:45 a.m. interview, he simply

showed Petitioner the *Miranda* rights form that had been given to Petitioner nearly five hours earlier, but did not read Petitioner his *Miranda* rights at the time he actually took his statement.  He did not ask Petitioner if he agreed to waive his *Miranda* rights at the time he took his oral statement around 4:45 a.m., nor did he ask Petitioner if he was waiving his *Miranda* rights at the time the taped statement was obtained at 6:35 a.m.  Indeed, on neither of these occasions did Officer Feldhaus even inform Petitioner that he had the right not to speak and had the right to have counsel present. (Officer Feldhaus testimony, Tr. pp. 114).  All of these facts considered together establish state coercion to obtain a statement.

It is debatable among jurists of reason as to whether the Ohio Supreme Court's decision was contrary to or unreasonable application of Supreme Court authority under §2254 (d)(1) and (2).  The Ohio Supreme Court's error occurred when it found the conduct troubling; yet also held, Petitioner's *Miranda* violation cured by an earlier valid waiver. *Miranda* and its progeny refute this illogic.  *Miranda* specifically recognized that a one time waiver is not the end of the inquiry – that subsequent (mis)conduct can invalidate the waiver. It stands to reason that if a one-time warning given at the beginning of an interrogation may not satisfy the continuing obligation under *Miranda*, then a previous *Miranda* waiver given in a preceding interrogation would not satisfy *Miranda*.  The Ohio Supreme Court ignored this basic principle of *Miranda*.  It is not logical under *Miranda* to recognize that a harmful *Miranda* violation took place at a subsequent point in the case, but have it cured by earlier conduct and an earlier waiver.  *Miranda*, 384 U.S. at 469 ("Our aim is to assure that the individual's right to choose between silence and speech remains unfettered ***throughout the interrogation process***."  Emphasis Added).

The Ohio Supreme Court, the Chief Magistrate, as well as, the District Court found

some of the circumstances in this case "troubling."  *See Moore*, 531 F.Supp. 2d at 915; ECF

Doc. 128 (Report and Recommendation) p. 124,  *Moore*, 81 Ohio St. 3d at 31-32.  Because

the actions are "troubling," the ultimate resolution of the merits is debatable among jurists of

reason.  Further, to the best of Petitioner's knowledge, there is a pending *Miranda* claim in

*Davie v. Mitchell*, Case No. 03-4293 (6th Cir.), which also demonstrates Petitioner's claim

deserves encouragement to proceed further.

> **<u>Twenty-First Ground For Relief</u> – The Trial Court's Instructions At
> The Culpability Phase Violated Moore's Rights, Including His Rights
> To Due Process, Equal Protection, And A Fair Proceeding.**

> **B.  The "Principal Offender" And "Prior Calculation And
> Design" Elements Of Capital Aggravated Murder/Felony
> Murder Are Alternatives That Are Not To Be Charged
> And Proven In The Same Case.**

All of the elements of a criminal offense must be found by a jury unanimously as a

matter of constitutional criminal procedure, *see Richardson v. United States*, 526 U.S. 813

(1999), particularly all elements that make a defendant death eligible. *See Ring v. Arizona*,

536 U.S. 584 (2002).  Instructing the jury with the alternative elements risked the possibility

of a non-unanimous finding on this aggravating specification.  It is possible that some jurors,

but not all, found that Petitioner had prior calculation and design while other jurors found

that Petitioner was the principal offender in violation of the verdict in this case did not

comport with the dictates of *Schad v. Arizona*, 501 U.S. 624 (1991), and *Richardson*, 526

U.S. 813.  The Ohio Supreme Court agreed and held that this instruction in Petitioner's case

was improper.  *Moore*, 81 Ohio St. 3d at 40. However, it is contrary to and/or unreasonable

pursuant to Supreme Court authority to substitute an appellate court's finding as to an

eligibility and narrowing function to be made under the statute by the jury. *Richardson*, 526

U.S. 813.

### E.    Habeas Question Upon Which Petitioner Seeks COA

The government, in this case Respondent Warden, does not have to obtain a COA to pursue an appeal.  The rules do not specifically address whether a COA is required when a winning applicant/petitioner files a cross-appeal, and Fed. R. App. P. 22(b)(3) can be read as relieving a winning applicant from having to obtain a COA.  *See Id.* ("A certificate of appealability is not required when a state or its representative or the United States or its representative appeals.")  Indeed, 22(b)(3)'s express language indicates a COA "is not required when" the government appeals, which the government has in this case.  No language limits this exclusion to just a government's appeal rather than a winning applicant's cross-appeal.  The Sixth Circuit has yet to determine this issue under AEDPA and this presents a colorable issue of first impression for the Sixth Circuit.  Given the express language of the federal rules, this question is debatable among jurists of reason.

### F.    Conclusion

For the above stated reasons, Petitioner respectfully requests a COA as to the following Habeas Grounds for Relief: his First Ground, Second Ground (Subsections A and C), Third Ground (Subsection B), Seventh Ground (Subsections A, C, and D), Thirteenth Ground (Subsection D), Fifteenth, Sixteenth Ground (Paragraphs 269-271), Eighteenth Ground (Subsections A, C and D), Nineteenth Ground, and his Twenty-first Ground (Subsection A).

Respectfully Submitted,


/s/ Laurence E. Komp
LAURENCE E. KOMP - 0060142
Attorney at Law
P.O. Box 1785
Manchester, MO 63011
Phone (636) 207 – 7330
Fax (636) 207 – 7351

-and-

MICHAEL J. O'HARA – 0014966
O'Hara, Ruberg, Taylor, Sloan &
    Sergent
25 Crestview Hills Mall Rd, Ste 201
P.O. Box 17411
Covington, KY 41017
Phone: (859) 331-2000
Fax: (859) 578-3365

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing was filed with and will be made available to Respondent via this Court's electronic filing system and pursuant to Loc. R. 5.2 this constitutes service.


/s/ Laurence E. Komp
LAURENCE E. KOMP – 0060142